UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff ) | |
| ) | No. 1:04-CR-160 |
| v. ) | |
| ) | Chief Judge Curtis L. Collier |
| REJON TAYLOR, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM & ORDER**

Defendant Rejon Taylor seeks a mistrial in the penalty phase of his capital prosecution (Court File Nos. 688 & 706). The United States opposes the request (Court File Nos. 693 & 722). For the following reasons, the Court **DENIES** Defendant's motions (Court File Nos. 688 & 706).

**I.    RELEVANT FACTS AND PROCEDURAL HISTORY**

Defendant was charged with four capital crimes in connection with the murder of Guy Luck (Court File No. 447). The United States sought a sentence of death. Trial commenced on August 25, 2008 and concluded on September 8 with the jury finding Defendant guilty on all four counts. At the request of counsel, the Court set the penalty phase to begin on September 16, 2008, at which point the jury would hear arguments and evidence to determine whether Defendant should be sentenced to life imprisonment without possibility of release or death.[1]

The day prior to the sentencing phase, the government gave the defense ten hours of recorded

---

[1] Because one of Defendant's convictions was for kidnapping resulting in death, the only possible sentences were life imprisonment without possibility of release or death. 18 U.S.C. § 1201(a).

phone conversations of Defendant which it had just obtained. As a result of the late disclosure, the defense requested exclusion of the evidence or a continuance. The Court granted a continuance and reset the penalty phase for September 23. During argument as to the proper remedy, outside the presence of the jury, the Court questioned the government about the nature of the phone conversations. In response, an Assistant United States Attorney stated that among the statements the government sought to introduce was that Defendant had referred to the jury as "racist rednecks."[2]

The media reports about those comments are the basis for the instant motions. The statements were the top story in the next day's Chattanooga Times Free Press, the main local newspaper, and on Chattanoogan.com, a popular Internet news site, and were also covered on local television and on a local radio program. The government subsequently decided that it would not seek to admit this particular statement for fear it may be too prejudicial.

Because the Court earlier rejected Defendant's sequestration motion, Defendant contends jurors may have heard the statement and may be reluctant to admit having heard the statement for fear they did something wrong. These are the same jurors who will now be required to decide whether Defendant lives or dies.

In his first motion, Defendant urged the Court to give each juror a brief individual voir dire, in private with only the court reporter present, and with Defendant waiving his right to be present. The Court would then report its findings back to counsel. The government agreed with Defendant's suggestion. Thus, when jurors returned on September 23, the Court interviewed them each about whether they had been exposed to any publicity regarding the trial. Six of the twelve regular jurors

---

[2]This term is not an entirely accurate description of what Defendant said, but the term is what was used in court and reported in the press (*see* Court File No. 688, attachment 2).

2

Case 1:04-cr-00160-CLC-CHS   Document 727   Filed 10/03/08   Page 2 of 8   PageID #: 2048

and five of the six alternates had heard something connected to the remarks, mostly from coworkers. The Court reported back to the parties on what the jurors said, and the parties obtained transcripts of the interviews. Subsequently, both parties filed briefs, and the Court heard oral argument on October 2. The penalty phase is set to resume October 6.

**II.    DISCUSSION**

Defendant's requests, in order of preference as established at the hearing, are for the Court to discharge the jury, conduct a hearing on juror influence from extraneous sources, discharge individual jurors, and give a curative instruction.

**A.    Request for Mistrial**

As a result of the jurors' awareness of the remarks, Defendant requests a mistrial as to the penalty phase. Before considering the merits of this request, the Court notes that it has the ability to discharge some or all jurors if necessary. Alternates who sat through the guilt phase can be seated at the sentencing phase to replace jurors who are excused. *Battle v. United States*, 419 F.3d 1292, 1302 (11th Cir. 2005); *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000). If there are not enough jurors to hear the case, the Court could discharge the whole jury. Under the Federal Death Penalty Act, a new jury is empaneled to hear the sentencing phase if the jury that determined guilt is "discharged for good cause." 18 U.S.C. § 3593(b)(2)(C). Indeed, the Sixth Circuit has contemplated discharging a jury under these circumstances:

> For example, if the jury found the defendant guilty, and then, before the sentencing phase, certain members were disqualified because of their exposure to outside influences, a district court could entertain a motion to discharge the jury and could find "good cause" to grant such a motion.

*United States v. Young*, 424 F.3d 499, 506 (6th Cir. 2005) (quoting *United States v. Williams*, 400

3

F.3d 277, 282 (5th Cir. 2005)). *See also Jones v. United States*, 527 U.S. 373, 381 (1999) (section 3593(b)(2)(C) "plainly encompasses events such as juror disqualification").

Defendant asks for a mistrial as to the penalty phase, which the Court will interpret as a request to discharge the jury. He points to *Marshall v. United States*, wherein the Supreme Court considered the exposure of jurors to defendants' criminal histories, "information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence." *Marshall*, 360 U.S. 310, 312 (1959). Therefore, the Supreme Court exercised its supervisory power to grant a new trial. *Id.* at 313.

Defendant argues this situation is analogous to or worse than the situation in *Marshall* because the jurors have been exposed to information that Defendant insulted them. But each case must turn on its "special facts." *Id.* at 312. In this case, the Court had the benefit of personally interviewing the jurors. From these interviews, it was evident that those who were aware of the comment were not nearly as impacted by the comment as one might imagine. Most of the jurors who were aware of the comments heard them from co-workers who joked that they were rednecks. Most of those jurors did not know what the jokes referred to and many did not attribute the comments to Defendant at all. From their responses to the questioning, it was evident that they had brushed off the comments and diligently followed the Court's admonishments to avoid outside publicity and not consider anything they heard outside the courtroom. To extent there might be some prejudice, the Court is convinced it can be cured by an instruction.

### B. Evidentiary Hearing

If no mistrial is granted, Defendant requests further questioning in line with the Supreme Court's decision in *Remmer v. United States*, 347 U.S. 227 (1956). During Remmer's trial, a person

4

approached a juror who sought to influence him in Remmer's favor. The juror reported the contact to the judge, who referred the matter to the FBI, which interviewed the juror. The Supreme Court ordered the district court to determine whether the incident was harmful to Remmer, and if it was, to grant a new trial:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Id.* at 229-30.

Defendant requests the Court hold a *Remmer* hearing to give Defendant an opportunity to prove actual bias. Although *Remmer* involved a purposeful attempt to influence a juror, the case is applicable where the external influence is a media report. *United States v. Rugiero*, 20 F.3d 1387, 1390 (6th Cir. 1994); *see United States v. Rigsby*, 45 F.3d 120, 123 (6th Cir. 1995) ("This court has not limited the *Remmer* requirements to cases in which there is a deliberate attempt to subvert the jury process in some way. . . . Rather, we require a *Remmer* hearing in all cases involving an unauthorized communication with a juror or the jury from an outside source that presents a likelihood of affecting the verdict."). The Sixth Circuit has articulated four points for dealing with concerns of improper juror contact:

> (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the "*Remmer* hearing" is not inherently suspect.

*Id.* (quoting *United States v. Zelinka*, 862 F.2d 92, 95-96 (6th Cir. 1988)) (footnote omitted).[3]

---

[3]Although *Remmer* placed the burden of proof on the government, the Sixth Circuit interpreted *Smith v. Phillips*, 455 U.S. 209 (1982) to shift the burden to the defendant. *United States*

5

Thus, Defendant requests that a hearing be held. This request has already been satisfied. Although not framed as a *Remmer* hearing at the time, the Court's interviews of jurors on September 23 satisfy *Remmer*. District judges are afforded discretion in determining the scope of a *Remmer* hearing because they are "in the best position to determine the nature and extent of alleged jury misconduct." *United States v. Sturman*, 951 F.2d 1466, 1477 (6th Cir. 1991) (quoting *United States v. Shackleford*, 777 F.2d 1141, 1145 (6th Cir. 1985)); *accord United States v. Herndon*, 156 F.3d 629, 637 (6th Cir. 1998).

In *Sturman*, the district judge asked jurors questions requested by defense counsel but denied defense requests for additional questioning and did not allow defense attorneys to directly question the jury. 951 F.2d at 1478. Similarly, in this case the defense proposed that the Court ask jurors questions, which the Court did, but the Court is not allowing further questioning, at least at this time.[4] As in *Sturman*, the questioning of jurors by the Court instead of by counsel was proper, especially given that defense counsel proposed the arrangement. *See also Carroll v. Renico*, 475 F.3d 708, 711 (6th Cir. 2007) ("It is not unusual for judges to take an active role in investigating."); *United States v. Boscia*, 573 F.2d 827, 832 (3d Cir. 1978) (holding district court conducted adequate *Remmer* hearing by interviewing jurors in camera outside presence of counsel, providing transcripts to counsel, and making factual findings); *Hasan v. Ishee*, 2006 U.S. Dist. LEXIS 83926 (S.D. Ohio Aug. 14, 2006) (counsel acquiesced to judge questioning jurors).

---

*v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984); *see also United States v. Walker*, 1 F.3d 423, 431 (6th Cir. 1993) (noting a circuit split on the issue).

[4]The *Sturman* court also considered the possibility that *Remmer* requires the direct questioning of jurors by counsel, but found the absence of such questioning in that case would be harmless error because each juror was asked separately what had occurred and its impact on them. *Id.*

6

The Court recognizes the heightened due process requirements of a capital case and the need to avoid a verdict based on emotion. *See Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion."). Based on its interviews with jurors, the Court is confident that the verdict in this case will not be based on emotion.

Nevertheless, the defense seeks an opportunity to further question jurors about their exposure to the prejudicial comments.[5] During oral argument, the Court expressed concern that questioning jurors could bring the comments to the forefront of jurors' minds and cause jurors to connect the statements to Defendant. This effect would obviously be detrimental to Defendant, and the Court noted it could spur a claim of ineffective assistance of counsel. Defense counsel rebutted that they could face a claim of ineffective assistance if they did not undertake such an important measure. Although the Court is hesitant to second-guess defense strategy, the Court concludes the better solution is to not further interview jurors at this time. At the time the penalty phase begins October 6, it will have been nineteen or twenty days since the media coverage of the remarks.[6] One week after the coverage, the Court interviewed the jurors, and those who heard the remarks did not seem bothered by them.[7] They certainly were not inflamed by the remarks. Two additional weeks will

---

[5]The government declined to introduce the statements out of fear they were too prejudicial. Because the government did not seek to admit the statements, the Court has not ruled on whether they were prejudicial, but based on the government's decision to not introduce the statements, the Court will assume they are prejudicial to Defendant.

[6]Although the remarks have come up in some additional coverage since then, it has been far less prominent and less frequent. Given that the Court's interviews with jurors showed they were diligently avoiding media coverage, it is unlikely they were exposed to any media coverage about the remarks since then.

[7]Defendant points out that one juror inquired about purchasing a weapon as a result of the trial. That juror's comments, however, were not linked to the remarks but to the general nature of

7

have passed since the Court conducted those interviews, and there is every reason to believe that any remarks jurors heard will be out of their minds. Allowing the defense to interview jurors at this point would only serve to remind jurors of the remarks and connect them to Defendant. That is why the Court originally accepted the defense's proposal for it to question the jurors. *See Sturman*, 951 F.2d at 1478 ("[W]hen the questioning of the jurors occurs during the trial it is preferable it be done by the judge. Jurors may resent being questioned directly by counsel.").

When the penalty phase begins on October 6, the Court will give a curative instruction to remind jurors not to let themselves be influenced by anything they have heard outside the courtroom. When they begin their deliberations, they will consider all the evidence from the first phase of the trial and all the new arguments and evidence from the second phase of the trial. Considering the jurors' reactions to the remarks and the passage of time, the Court concludes the remarks will not influence the jury's deliberation.

Accordingly, Defendant's motions for a mistrial or a Remmer hearing are **DENIED** (Court File Nos. 688 & 706).

**SO ORDERED.**

**ENTER:**

                                        **/s/**
                                        **CURTIS L. COLLIER**
                                        **CHIEF UNITED STATES DISTRICT JUDGE**

---

the trial.