# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 1:04-CR-160 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| REJON TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

The Court is currently presiding over the trial of Defendant Rejon Taylor on charges of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3); murder by use of a firearm during and in relation to carjacking, in violation of 18 U.S.C. § 924(j)(1); kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1); and murder by use of a firearm during and in relation to the kidnapping, in violation of 18 U.S.C. § 924(j)(1). The indictment related to the murder of Guy Luck ("Luck"), a French national who was carjacked and kidnapped from Atlanta, Georgia, and driven to Collegedale, Tennessee (a suburb of Chattanooga, Tennessee), where he was fatally shot by Defendant. All four charges are capital offenses and expose Defendant to a possible sentence of death. At the conclusion of the guilt phase of the trial, the jury found Defendant guilty on all charges.

The trial is now in the sentencing phase. Pursuant to the Federal Death Penalty Act, 18 U.S.C. §§ 3591-3598 ("FDPA"), at the conclusion of this phase of the trial the jury will decide

Defendant's sentence: death or life imprisonment without possibility of release.[1]

This Memorandum concerns several outstanding motions and evidentiary and procedural issues related to the sentencing phase. For some of these issues, the Court has already ruled but did not provide its rationale. Because of the rarity of capital cases in federal court, some of the issues addressed by the Memorandum are without much case precedent.

The issues addressed by the Memorandum are:

1.      Constitutional challenge to death penalty based upon race disparity and comparative proportionality, and discovery and admissibility of such information;

2.      Admission of expert testimony regarding prison facilities;

3.      Applicability of French law regarding the death penalty;

4.      Admissibility of defense witnesses' pleas for mercy;

5.      Admissibility of exhibits read during Defendant's unsworn statement to jury; and

6.      Defendant's motion for a judgment as a matter of law.


# I.      RELEVANT FACTS

The evidence presented in the trial demonstrates Defendant had been responsible for various thefts and burglaries from Luck's house and other nearby residences in Atlanta between 2001 and 2003. On August 6, 2003, Defendant, along with codefendants Sir Jack Matthews and Joey Marshall, went to Luck's house with the intention of robbing him. After confronting Luck at gunpoint, Marshall guarded Luck while Defendant began looking through Luck's house. Inside the

---

[1]Those are the only two sentencing options because one of Defendant's convictions was for kidnapping resulting in death. 18 U.S.C. § 1201(a). To help the parties prepare for the sentencing phase, the Court previously issued an Order addressing the admissibility of defense experts Kevin McNally and James E. Aikens (Court File No. 726).

house, Defendant took around $600 or $800. Marshall testified Defendant later told him there was a warrant or other document connected with Defendant's arrest on theft charges in another case, which suggested Luck could be a witness against Defendant.

At gunpoint, Luck was forced outside his house and into his van. Defendant got in the driver's seat, while Matthews guarded Luck in the back. Defendant and Matthews each had a gun. Defendant drove the van onto Interstate 75 and traveled north from Atlanta. They made a brief stop at a gas station in north Georgia before eventually crossing into southeast Tennessee, where Defendant exited the expressway and drove into the Chattanooga suburb of Collegedale. During the trip, Marshall followed behind in a car registered to Defendant's mother.

As Defendant drove the van around relatively isolated roads in Collegedale, there was a confrontation in the back of the van, in which Matthews fired a shot, which hit Luck in the arm. Defendant turned around from the driver's seat and fired three shots at Luck. The third bullet hit Luck in the mouth and caused his death later that day at Erlanger Hospital. Defendant and Matthews left their guns in the van and walked briskly from the van to the car driven by Marshall. They then drove back to Atlanta.

Defendant was subsequently arrested and incarcerated pre-trial at the Hamilton County Jail in Chattanooga. While incarcerated there, Defendant was part of a group of inmates that attempted to escape.

## II.     RACE, DISCOVERY, AND COMPARATIVE PROPORTIONALITY

Defendant seeks to bar the death penalty due to alleged racial discrimination and disproportionality (Court File No. 702) and seeks discovery and an evidentiary hearing on the issue

(Court File No. 704). The United States moves to prevent the testimony of Kevin McNally[2] regarding the dispositions of other potential capital cases and how they compare to the instant case (Court File No. 674). In response, Defendant seeks to admit McNally's testimony as to disproportionality and racial discrimination in the administration of the federal death penalty (Court File No. 701).

The three motions are of different natures–one is a constitutional challenge, one seeks discovery, and one is an evidentiary motion–but all have a common basis, and Defendant's briefs regarding the motions overlap significantly. Thus, the Court will consider all three motions together. The essence of Defendant's argument is that defendants who kill white victims are more likely to face capital prosecutions than defendants who kill non-white victims. Defendant notes that he is African-American, while the victim, Luck, was white. He alleges the United States Attorney did not request permission to seek the death penalty against Defendant but was ordered to do so by then-Attorney General Alberto Gonzales.[3] Defendant alleges such situations occur disproportionately when defendants are African-American. Defendant also contends attorneys general of the United States have sought the death penalty in a disproportionate number of cases with black defendants and white victims and did not seek the death penalty when the victim was a

---

[2]Kevin McNally in an attorney at law and partner in the Frankfort, Kentucky firm of McNally and O'Donnell, P.S.C. (Court File No. 653). According to his resume he is a Federal Death Penalty Resource Counsel (FDPRC). In this position he is involved in the monitoring of federal death penalty cases, making recommendations as to counsel in federal capital cases, and assisting Criminal Justice Act attorneys in death penalty cases with research, pleadings, and other assistance. There is nothing in his resume indicating he is a statistician or has formal training in statistical research or the academic discipline of statistics.

[3]At oral argument, the United States declined to discuss its internal deliberative processes other than to confirm that the Attorney General makes all capital prosecution decisions.

member of a minority group. Furthermore, Defendant alleges federal juries have disproportionately sentenced defendants to death when the victim is white.

The government's theory in this case is that Defendant killed Luck because he was involved in Defendant's prosecution for property crimes in Georgia. In support of his motion, Defendant submitted a lengthy "declaration" by McNally (Court File No. 701 attach. 1). McNally lists nine recent cases in which the government has not sought the death penalty for the murder of a witness when the victim was a member of a minority group. There are three such cases listed in which the government withdrew its intent to seek death sentence without the defendants offering or agreeing to plead guilty. Similarly, McNally lists four cases in which the government did not seek the death penalty against white people who killed witnesses. He also lists two dozen cases in which juries sentenced defendants who had killed witnesses to life imprisonment. McNally also recites a number of statistics, such as that 70% of the most recent 33 federal death sentences have involved white victims. During the tenure of Attorney General John Ashcroft, the government sought death sentences against 32% of defendants accused of killing a white victim, compared to 18% of defendants accused of killing non-white victims. (However, because the number of non-white victims was almost three times as high as the number of white victims, there were 52 capital prosecutions involving white victims and 86 involving non-white victims.) The disparity was somewhat similar under Attorney General Gonzalez, who approved capital prosecution in 35% of cases (31 cases) with white victims and 16% of cases (50 cases) involving non-white victims. During Attorney General Mukasey's term, capital prosecutions were approved in 16% of cases (5

5

cases) with white victims and 11% of cases (10 cases) with non-white victims.[4]

From the materials submitted in connection with McNally's declaration, it does not appear he had any direct involvement in or first hand knowledge of the decision making process of the various attorneys general or that he was a participant in any of the federal death penalty cases described in the declaration. His knowledge appears to be obtained from reviewing documents or talking to individuals who may have been directly involved in the attorneys general decisions or the trials. For purposes of this Memorandum, the Court assumes this lack of direct or first hand knowledge would not serve as an impediment to the admissibility of his testimony if it was otherwise relevant or useful to the jury.

## A.    Constitutional Challenge

Because of the alleged disparities in capital prosecutions based on victims' race, Defendant requests the Court declare the FDPA unconstitutional and bar the death penalty against Defendant, or order discovery and an evidentiary hearing on the issue of race discrimination in this case. A previous decision in this case rejected Defendant's constitutional challenge:

> Defendant does not argue the FDPA has unfair or inconsistent procedures, and he cites no cases supporting his contention the FDPA lacks a "principled basis for distinguishing cases" in which the death penalty will be sought from those in which it is not. Rather, Defendant emphasizes the effect of the FDPA, which is an unavailing argument. Inconsistent results are not unconstitutional. *McCleskey v. Kemp*, 481 U.S. 279, 307 n.28 (1987). "Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be

---

[4]Defendant compares his case with ones in which a witness was murdered. But there is another element Defendant overlooks, namely that he attempted to escape from custody after being arrested. A February 2006 status report from the government indicated the acting United States Attorney intended to request the Attorney General *not* seek a sentence of death (Court File No. 118). Subsequently, Defendant attempted to escape in April 2006. On June 1, 2006, the government filed its first notice of intent to seek the death penalty against Defendant (Court File No. 123). The escape attempt appeared prominently throughout the non-statutory aggravating factors.

6

irrelevant to his actual guilt." *Id.*

(Court File No. 493, p. 7).

In his current brief, Defendant acknowledges the Supreme Court's decision in *McCleskey*, but argues it would be valuable to revisit the issue of racial discrimination in applying the death penalty. That may be a worthy suggestion for the Supreme Court or Congress, but this Court does not have, nor desire to have, authority to ignore or revisit binding Supreme Court precedent.

*McCleskey* involved a complex statistical study, referred to as the Baldus study, of 2,000 murder cases in Georgia. 481 U.S. at 286. After accounting for nonracial variables, the Baldus study concluded defendants who killed white victims were 4.3 times as likely to receive a death sentence as defendants who killed black victims. *Id.* at 287. Thus, black defendants who killed whites had the greatest likelihood of receiving the death penalty. As in *McCleskey*, the defendant in this case is black and the victim was white.

The Supreme Court rejected McCleskey's equal protection challenge because there was no evidence the decision makers in his case acted with discriminatory purpose. *Id.* at 292. McCleskey argued the Baldus study gave rise to an inference of discrimination, but the Supreme Court emphasized the discretion inherent in criminal prosecution and noted the unique composition of each jury and the various innumerable factors relevant to each case. *Id.* at 294-97. Those considerations counseled against adopting an inference of purposeful discrimination from the Baldus study. *Id.* at 297. Nor did the Baldus study give rise to an inference that the State of Georgia acted in a discriminatory fashion, given that "legislatures necessarily have wide discretion in the choice of criminal laws and penalties." *Id.* at 298-99.

Defendant's argument, that the government is more likely to seek a death sentence when a

murder victim is white, is the same argument made in the *McCleskey* case and supported by the Baldus study and rejected by the Supreme Court. The argument is essentially that sentencing bodies should compare the crimes and sentences of various defendants to ensure defendants are not sentenced disproportionately to other defendants. Such comparative proportionality review is not required by the Constitution. *Beuke v. Houk*, 537 F.3d 618, 652 (6th Cir. 2008) (rejecting habeas corpus claim that death sentence was disproportionate to ten similar cases in the same county); *Getsy v. Mitchell*, 495 F.3d 295, 304-09 (6th Cir. 2007) (en banc) (explaining difference between comparative proportionality review and Eighth Amendment proportionality review). The Supreme Court has "expressly held that a defendant could not prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *Beuke*, 537 F.3d at 652 (quoting *Getsy*, 495 F.3d at 305).

The Supreme Court requires fair and consistent sentencing proceedings. *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *Furman v. Georgia*, 408 U.S. 238, 309-10 (1972). To pass constitutional muster, a capital sentencing scheme must "perform a narrowing function with respect to the class of persons eligible for the death penalty and must also ensure that capital sentencing decisions rest upon an individualized inquiry." *Jones v. United States*, 527 U.S. 373, 381 (1999). There is no constitutional requirement that the government's decision be free from any arbitrariness. Rather, the government has "broad discretion" in enforcing federal law. *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

The discretion as to whom to seek death sentences against is best left with the government. It is not a task this Court could handle. *See id.* at 465. This is the first and only death penalty case prosecuted in this district. With a sample size of one, the Court cannot compare this prosecution to

8

others. The same is true at the appellate level, where the rarity of federal capital prosecutions leading to death sentences in the Sixth Circuit means the sample size would be too small to make any meaningful comparisons. And the Supreme Court, where review is discretionary, has already indicated it does not require comparative proportionality review. Only the Department of Justice, which authorizes each federal capital case, has the broad perspective necessary to ensure cases are not racially or otherwise disproportionate.

**B.      Discovery Request**

Defendant essentially contends that the Justice Department is abusing its prosecutorial discretion by allowing or making racially disproportionate capital prosecution decisions. Therefore, Defendant requests discovery and does so mid-trial.[5] He seeks all correspondence from the government regarding its decision to seek the death penalty against Defendant; information regarding all cases submitted to the Department of Justice's Capital Case Review Committee; all standards, policies, practices, or criteria used by the government to guard against racial or other arbitrary factors in selecting capital cases; any correspondence from the government regarding capital case policies; all policies regarding whether to charge defendants under federal law; information on death-eligible indictments in this district; and information on non-negligent homicide cases in this district in which anyone was charged by state or federal law enforcement.

In seeking this discovery, Defendant raises a selective prosecution claim, contending the government sought the death penalty against him for a constitutionally impermissible reason, that

---

[5]Discovery is a pre-trial tool to equip the parties to prepare for what will be presented at trial. Fed. R. Crim. P. 16. The type of information sought here is not covered by Rule 16.

9

he is black and his victim was white.[6]  The Supreme Court reviewed the "demanding" standards of a selective prosecution claim in *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  As noted earlier, the government enjoys "broad discretion" in enforcing the law.  *Id.* at 464.  Courts are hesitant to review prosecutorial decisions because the government is in a better position to assess its cases.  "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."  *Id.* at 865 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).

An exception to this discretion occurs when the prosecutorial decision is based on race or another constitutionally prohibited arbitrary classification.  *Id.* (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).  Proving a selective prosecution claim requires showing federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose."  *Id.* at 465.  "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."  *Id.*

Prosecutorial decisions enjoy a "presumption of regularity," which is dispelled only by "clear evidence to the contrary."  *Id.* at 464-65 (citing *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).  To obtain discovery for a selective prosecution claim, courts "require some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent."  *Id.* at 468 (quotation marks omitted).  To do this, a defendant must provide evidence that the government has treated differently people who are similarly situated to the

_____

[6]The Supreme Court has held that a defendant has standing to raise a claim of discrimination based on the race of the victim. *McCleskey*, 481 U.S. at 291 n.8.

defendant. *Id.* at 469-70. The Court recognized that this showing to obtain discovery would "itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 463.

The Supreme Court applied *Armstrong* to a federal death penalty prosecution in *United States v. Bass*, 536 U.S. 862 (2002). The government sought the death penalty against Bass, who is black. Bass sought discovery as to the government's capital charging practices, which the district court and the Sixth Circuit allowed. *Id.* at 862-63. The Sixth Circuit had concluded Bass satisfied the *Armstrong* showing with statistics demonstrating that the government charges blacks with a death-eligible offense more than twice as often as it charges whites and that the government enters into plea bargains more frequently with whites than it does with blacks. *Id.* at 863. But *Armstrong* required a comparison with similarly-situated defendants, the Supreme Court noted in summarily reversing the Sixth Circuit. Bass was not entitled to discovery because his "raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants." *Id.* at 864.

In considering Defendant's statistics, the most significant problem is finding similarly-situated defendants. As previously noted, Defendant did not merely murder a witness. He also attempted to escape from prison where there were injuries to jail guards, an allegation featured prominently in the government's notice of intent to seek the death penalty.[7] Yet, Defendant does not list any comparison cases involving attempting to escape from custody.

*Armstrong* requires that Defendant prove the government has treated differently people who are similarly situated to him. Ignoring momentarily Defendant's escape attempt, *Armstrong* would

---

[7]Defendant has been indicted for the escape attempt (case no. 1:07-cr-138), but not yet tried. At trial in this case, both the government and the defense introduced evidence of the escape attempt. However, the Court's references to the escape attempt in this Memorandum should not be interpreted as suggesting he is guilty in the escape case.

11

seemingly require Defendant prove the government disproportionately seeks death sentences against people like Defendant, a black person who murdered a white witness, while not seeking death sentences against white people who murdered a witness or black people who murdered a non-white witness. But Defendant's listings of cases and statistics do not support this claim.

• Defendant lists nine recent cases in which the government has not sought the death penalty for the murder of a non-white witness, but the Court has no idea how typical this situation is. Defendant does not indicate of how many times the government has sought the death penalty for the murder of a minority witness, nor is there any comparison with the frequency the death penalty is sought when a white witness is murdered.

• Defendant lists three cases with minority murder victims in which the government has withdrawn its intent to seek death sentence. But the Court has no idea how often such cases are prosecuted as capital offenses, nor how often the government withdraws its intent to seek death when murder victims are white.

• Defendant lists four cases in which the government did not seek the death penalty against white people who killed witnesses, but does not state anything about how often the government does seek the death penalty against white people who kill witnesses, nor how often the government seeks the death penalty against black people who kill witnesses.

• Defendant also lists two dozen cases in which juries sentenced defendants who had killed witnesses to life imprisonment, but does not state how often such defendants were sentenced to death. Furthermore, inconsistent results by juries would not be cause for discovery from the government.

• Defendant also notes 70% of the most recent 33 federal death sentences involved white

victims.[8]  This statistic does not refer to similarly-situated defendants, and it indicates nothing about whether such a statistic is disproportionate to the number of white victims. It is the exact type of "raw statistics" rejected in *Bass*.  536 U.S. at 864.

• Defendants lists statistics from the three most recent attorneys general showing they authorized capital prosecutions at higher rates when victims were white than non-white. These statistics also do not refer to similarly-situated defendants.  *See Bass*, 536 U.S. at 864. Furthermore, there is some ambiguity in the meaning of the statistics because they show that the government prosecuted defendants for killing non-white victims much more frequently than defendants accused of killing white victims.

Having reviewed Defendant's evidence, he fails to make the showing required by *Armstrong* and *Bass*, and therefore the Court will not permit discovery.[9]

Discovery is also not appropriate because a selective prosecution challenge should have been made prior to trial.  Fed. R. Crim. P. 12(b)(3)(A); *United States v. Brimite*, 102 F. App'x 952, 955 (6th Cir. 2004) (citing *United States v. Mann*, 884 F.2d 532, 539 (10th Cir. 1989)).  This case is now in the middle of the trial.  Additionally, the materials sought and the arguments advanced are for the

---

[8]These two numbers are from McNally's declaration as found in attachment 1 to Court File No. 701.  The numbers in Defendant's brief are slightly different.

[9]In addition, it is worth noting that these statistics do not account for or shed light on the nature of federal murder prosecutions, which differ from state prosecutions in that they are tied to specific federal statutes or the commission of crimes on federal land.  Most murder cases are prosecuted in state court.  This case could not have been prosecuted in federal court except that it involved a carjacking and kidnapping that crossed state lines.  Many federal cases arise out of Indian reservations or other federal territories.  It is not evident how these peculiarities of federal prosecution affect the statistics.

Court and not the jury. The Court could address the motion post-trial or in a collateral proceeding. There is no necessity that this claim be addressed during trial.

### C. McNally's Testimony and the Scope of Mitigating Factors in the FDPA

The Court now turns to whether evidence about other capital prosecutions and statistics like those discussed above can be admitted into evidence for the jury's consideration in determining a sentence. Defendant seeks to admit the testimony of Kevin McNally on (1) similar or worse federal capital cases where the death penalty was neither sought nor imposed and (2) the race of other federal capital defendants and their victims and the outcomes of these cases. The Court concludes such testimony is inadmissible and is not proper for presenting to a jury.

During opening statements in the sentencing phase, defense counsel argued Defendant should not be sentenced to death because he is not one of the "worst of the worst." In his brief, Defendant argues, "*It is insane* to sentence a young man to death for a homicide precipitated by a struggle for a gun when terrorists, vicious gang members, career criminals and multiple murderers are not sentenced to death." Defendant contends this information sought to be introduced through Kevin McNally is relevant to a mitigating factor. The government disagrees.

### 1. Scope of Mitigating Factors in the FDPA

The Court will begin by determining whether comparative proportionality evidence (i.e., information on other federal capital prosecutions, defendants, and victims) is a proper mitigating factor. This is an inquiry based both on the Constitution as currently interpreted by the Supreme Court and the specific language of the FDPA. The Eighth Amendment to the Constitution mandates that capital sentencing bodies be permitted to consider "any relevant mitigating factor." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 S. Ct. 1654, 1665 (2007); *United States v. McVeigh*,

14

153 F.3d 1166, 1211 (10th Cir. 1998) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982));

*accord Abdul-Kabir*, 127 S. Ct. at 1665 ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."); *Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("[O]ur precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence."); *Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987) (holding that defendants have a constitutional right to the consideration of nonstatutory mitigating factors). A relevant mitigating factor is one concerning "any aspect of a defendant's character or record and any of the circumstances of the offense." *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988) (citing *Eddings*, 455 U.S. at 110).

The Court will now review the precise language of the FDPA. The FDPA states: "In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following." 18 U.S.C. § 3592(a). The FDPA then lists eight mitigating factors: Impaired capacity, Duress, Minor participation, Equally culpable defendants, No prior criminal record, Disturbance, Victim's consent, Other factors. Each factor is followed by a brief description. The description for "Other factors" is "Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." *Id.* § 3592(a)(8).

Determining the precise meaning of this language requires the Court to engage in statutory construction. The Court has been unable to locate a decision by a circuit court applying traditional

statutory construction tenets to this section of the FDPA. Defendant argues the FDPA is broader than the Constitution in its consideration of mitigating factors. However, the Seventh Circuit construed the statute more narrowly than the reading advanced by Defendant. *United States v. Johnson*, 223 F.3d 665, 675 (7th Cir. 2000). Two district courts in circuits outside of the Seventh Circuit have reached the same result as the Seventh Circuit. *United States v. Eye*, 2008 WL 2121011, 2008 U.S. Dist. LEXIS 40215 (W.D. Mo. May 19, 2008); *United States v. Caro*, 483 F. Supp. 2d 513, 520 (W.D. Va. 2007).

Some district courts agree with Defendant's argument that the FDPA's consideration of mitigating factors is broader than the Constitution. However these courts also fail to utilize the traditional tools of statutory construction. Typical is *United States v. Sampson*:

> The most notable aspect of [18 U.S.C. § 3592(a)] is the introductory statement. The finder of fact (1) "shall" consider (2) "any mitigating factor, (3) including the following." First, the jury "shall" or must consider the mitigating factors; it is obligatory, not discretionary. Second, the fact finder must consider "any" mitigating factor. There is no qualification or limitation other than the factor "mitigate" against a sentence of death. Third, "Including the following" means the subsequent list is not exclusive, but is instead illustrative. The eight identified factors are examples of specific factors that, if supported by the evidence, mitigate against the death penalty. Most significantly for the issue here, subhead (8) which refers to other factors "in the defendant's background, record, or character or any other circumstance of the offense" is a sub category of "any mitigating factor" rather than being the outer boundaries of what may be considered as mitigating. What 18 U.S.C.A. § 3592 allows is substantially broader than what the Supreme Court has declared to be the minimal requirements under the Constitution. According to the Supreme Court, the Eighth Amendment demands consideration only for those mitigating factors that concern the defendant's "character or record and any of the circumstances of the offense …" *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Under the statute, on the other hand, the Supreme Court's constitutional minimum is simply subhead (8) of a non-exclusive list. The statute demands the fact finder consider "any mitigating" factor … period.

*Sampson*, 335 F. Supp. 2d 166, 194-95 (D. Mass. 2004) (quoting *United States v. Davis*, 132 F. Supp. 2d 455, 463-64 (E.D. La. 2001)); *accord United States v. Bodkins*, No. 4:04CR70083, 2005

16

WL 1118158, 2005 U.S. Dist. LEXIS 8747 (W.D. Va. May 11, 2005).

Applying the traditional tools of statutory construction, the Court concludes the Seventh Circuit's interpretation is more persuasive. The Court begins by considering the language of the statute as a whole. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 255 (2004); *Broad. Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 769 (6th Cir. 2005); *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 377 F.3d 592, 596 (6th Cir. 2004), *aff'd*, 545 U.S. 308 (2005). One provision of a statute is not considered in isolation or in a vacuum. "Rather, courts must consider a statutory provision's phraseology in light of the overall structure and purpose of the legislation." *Slaven v. BP America, Inc.*, 973 F.2d 1468, 1472 (9th Cir. 1992) (citing *Dole v. United Steelworkers*, 494 U.S. 26, 35 (1990)). Thus, the Court must "make every effort to interpret provisions so that other provisions in the statute are not rendered inconsistent, superfluous, or meaningless." *Broad. Music*, 396 F.3d at 769 (quoting *Cafarelli v. Yancy*, 226 F.3d 492, 499 (6th Cir. 2000)).

*First*, the statutory construction canon *ejusdem generis* applies here:

> Where a statute lists specific things followed by a more general one, the canon of *ejusdem generis* provides guidance. Under *ejusdem generis*, we attribute "the same characteristic of discreteness shared by all the preceding items" to the term in question.

*United States v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008). Applying this canon shows that the first seven factors are similar to the eighth factor. Although the list of seven specific factors is illustrative, not exhaustive, the description of "Other factors" does not allow for factors of an entirely different nature from the illustrated factors. All the illustrated factors concern the defendant or the circumstances of the offense, including the culpability, participation, and punishment of other defendants. *See Eye*, 2008 WL 2121011, 2008 U.S. Dist. LEXIS 40215. Applying *ejusdem generis*, it is evident that the characteristics of the enumerated mitigating factors are similar to the description

17

of "Other factors" as those concerning a "defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence."

*Second*, Defendant's reading of the statute would render the inclusion of "Other factors" superfluous. "Other factors" is a catch-all provision. If the statute permitted other factors beyond what is contained in "Other factors," the statute would contain a broader description than what is contained in "Other factors." Under Defendant's reading, the statute contains an implied "other factors" in addition to the "Other factors" actually listed, thus rendering "Other factors" superfluous.

*Third*, the Court finds misplaced the emphasis on the word "any" in "any mitigating factors." Contrary to Defendant's assertion, the FDPA's use of the word "any" does not indicate Congress intended to greatly expand the definition of mitigating factors over that required by the Constitution. The statutory language of "any mitigating factor," 18 U.S.C. § 3592(a), is the same as the Constitutional requirement of "any relevant mitigating factor," *Abdul-Kabir*, 127 S. Ct. at 1655 (quoting *Eddings*, 455 U.S. at 112). The FDPA's exclusion of the word "relevant" has no bearing because elsewhere the statute makes clear non-relevant information is inadmissible. 18 U.S.C. § 3593(c).

Based on these considerations, the Court concludes the mitigating factors required by the FDPA are not as broad as Defendant contends, but are rather in line with the seven enumerated factors and the description of "Other factors" contained in the statute.

### 2. *McNally's Testimony*

The outcomes of other cases and the races of victims and defendants in other cases have nothing to do with the defendant in this case or the circumstances of his offense or any of the mitigating factors in § 3592(a). Therefore, the Court concludes comparative proportionality review

18

with defendants unconnected to this case is not a proper task for the jury. *Accord United States v. Caro*, 461 F. Supp. 2d 459, 464 (W.D. Va. 2006); *cf. United States v. Johnson*, 2008 WL 2095344, *2, 2008 U.S. Dist. LEXIS 39791, *6-7 (E.D. Mich. May 16, 2008). Within its collective knowledge, the jury will be aware of some circumstances and outcomes of other cases, but its decision on life or death must turns on its understanding of this case, the offenses involved, and this defendant, not on the specifics of other cases and other defendants. To hold otherwise would necessitate turning the trial into a series of mini-trials over the facts and circumstances of other prosecutions, in a situation where the specific facts and circumstances and the exact reason the juries reached their decisions in those other prosecutions are not available to the parties. Such information has no probative value and would confuse and mislead the jury with irrelevant information. *See* 18 U.S.C. § 3593(c); *United States v. Sampson*, 335 F. Supp. 2d 166, 193-98 (D. Mass. 2004), *aff'd*, 486 F.3d 13, 44-45 (1st Cir. 2007); *United States v. Regan*, 221 F. Supp. 2d 659, 660-61 (E.D. Va. 2002) (proportionality evidence relating to the harm done in other espionage cases could not be used as a mitigating factor because it lacked probative value and there was a significant danger of confusing the issues and misleading the jury).

In *Sampson*, the defense also sought for McNally to testify. Although the district court concluded proportionality evidence was admissible, it rejected McNally's testimony because it would turn the trial into numerous mini-trials over other cases. 335 F. Supp. 2d at 193-98. The district court suggested a narrower proffer might be admissible, but rejected McNally's proffer regarding 47 cases similar to Sampson's as not being narrow enough.[10] In this case, Defendant

---

[10] On appeal, the First Circuit concluded the district court had "ample reason" to exclude the evidence, and it did not reach the issue of whether the evidence qualified as mitigating evidence. 486 F.3d 13, 45 & n.15 (1st Cir. 2007).

19

offers to limit McNally's testimony to 10 or 15 cases, but this would decrease the reliability of the information, while still needlessly occupying time, and in any event the Court concludes comparative proportionality evidence is not admissible.

## II.     CORRECTIONS EXPERT

The government moves to exclude testimony by James E. Aiken, a so-called corrections expert, concerning security at federal prison facilities (Court File No. 681). The government contends the testimony is not relevant to a mitigating factor and will not rebut government evidence. Defendant emphasizes the FDPA's inclusion of relevant information and argues this is a proper mitigating factor. At Defendant's request, the Court took a live proffer of Aiken's testimony.[11]

General prison security is not a proper mitigating factor because it unrelated to the defendant's background, record, or character, or any other circumstance of the offense, 18 U.S.C. § 3592(a)(8), or any other mitigating factor required by the Constitution and the FDPA.[12] In *United States v. Johnson*, the Seventh Circuit concluded a defendant "should not have been permitted to present to the jury, as he was, evidence of the existence of maximum-security federal prisons decked out with control units, in order to establish a mitigating factor." 223 F.3d 665, 674-75 (7th Cir. 2000). "The argument that life in prison without parole, especially if it is spent in the prison's

---

[11]The Court notes from the witness's testimony the bulk of his experience is with state and non-federal prison facilities, but he possesses sufficient experience and personal knowledge of the federal Bureau of Prisons and federal prison facilities to offer reliable fact testimony as to general federal prison practices and procedures. He also demonstrated he has sufficient direct and first hand knowledge of present Bureau of Prisons regulations and policies to base an opinion upon them.

[12]The Court discussed its interpretation of the Constitution and the FDPA as they relate to mitigating factors in the previous section.

20

control unit and thus in an approximation to solitary confinement, sufficiently achieves the objectives aimed at by the death penalty to make the latter otiose is an argument addressed to legislatures, not to a jury." *Id.* at 675. In addition, the government cites *Johnson* for the argument that Defendant's argument is inherently illogical, "as it amounts to saying that because this defendant is so dangerous, he does not deserve to be sentenced to death, since his dangerousness will assure his secure confinement. And its illogic shows that it is really an argument against the death penalty, period, since if this defendant should be spared because he is unusually dangerous, surely less dangerous murderers should not be executed either, even though, because they are less dangerous, they are less likely to be confined securely." *Id.* While *Johnson* disapproved of this evidence as a mitigating factor, it approved of it in a proper case as rebuttal evidence to counter future dangerousness, which the government has alleged as a non-statutory aggravating factor in this case,[13] although not of the nature involved in *Johnson*. *Id.* at 674-75. *Cf. United States v. Edelin*, 180 F. Supp. 2d 73, 76-78 (D.D.C. 2001) (prison evidence not relevant in rebuttal where future dangerousness not at issue).

Defendant points to *United States v. Battle*, 264 F. Supp. 2d 1088, 1181 (N.D. Ga. 2003), where the warden of a federal prison testified at trial the prison is the most secure Bureau of Prisons ("BOP") facility and houses the most violent inmates; the warden described the control unit and

---

[13]Had the Government presented evidence that Defendant was likely to personally injure other inmates or prison staff members while incarcerated, as is often the allegation and evidence in federal death penalty prosecutions, then obviously the Court's decision would be different. However, as discussed more fully below, there is no evidence in this case that would allow a rational juror to conclude Defendant is likely to personally injure other inmates or prison staff members. Accordingly, Mr. Aikens' testimony regarding Bureau of Prisons security capabilities and practices does not serve to rebut anything present in this case and thus is not relevant. Moreover, it would confuse and mislead the jury because it invites the jury to consider factors not present in this case.

21

restrictions on inmates. Similarly, in *United States v. Sampson*, the court allowed testimony by a corrections expert because it was valuable in considering "whether a defendant is likely to present a danger in a prison setting if incarcerated for life. The danger any individual presents is a function not only of that individual, but also of his environment." 335 F. Supp. 2d 166, 227 (D. Mass. 2004). Thus, the *Sampson* court "permitted only general testimony about the ability of the BOP to control inmates, including gross statistics regarding assaults and other misconduct, but did not permit testimony regarding specific other prisoners." *Id.*

Defendant quotes from the Supreme Court's decision in *Skipper v. South Carolina*, which held "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." 476 U.S. 1, 5 (1986). But the evidence in *Skipper* concerned the defendant's good behavior in prison, not security information about the prison. The Supreme Court has not addressed the right of a capital defendant to present evidence of prison security considerations. *Schmitt v. Kelly*, 189 F. App'x 257, 265 (4th Cir. 2006) (concluding state court's refusal to allow such evidence was not an unreasonable application of federal law). However, a federal district court has joined the Seventh Circuit in holding such testimony is admissible in rebuttal:

> Because it will be obvious to the jury that the Government's proof of this factor is intended to show that Wilson, rather than criminals in general, is a future danger, it will be equally obvious to the jury that [the expert's] testimony, though based on statistical evidence, is intended to shed light on Wilson's future dangerousness, not on that of anyone else. And because the Government will argue for the death penalty based in part on Wilson's alleged future dangerousness, this court must give Wilson "fair opportunity to present argument as to the adequacy of the information to establish the existence" of that aggravating factor. 18 U.S.C. § 3593(c).

*United States v. Wilson*, 493 F. Supp. 2d 491, 508 (E.D.N.Y. 2007). The *Wilson* court, however, prohibited testimony about any specific institutions as unduly speculative. *Id.* The evidence would

be especially important in rebuttal because the FDPA and Constitution both require Defendant have a fair opportunity to rebut the government's evidence. 18 U.S.C. § 3593(c); *Gardner v. Florida*, 430 U.S. 349, 362 (1977); *Davis v. Coyle*, 475 F.3d 761, 771 (6th Cir. 2007) (holding state court improperly refused to admit evidence of defendant's adaptation to prison because it was clearly relevant to future dangerousness); *see also Johnson*, *supra*, 223 F.3d at 674-75.

In this case, however, the proffered testimony clearly was not rebuttal evidence. The FDPA allows Defendant to "rebut any information received at the hearing." 18 U.S.C. § 3593(c). Although "the hearing" appears to refer to the sentencing phase, it can only logically be read as referring to the entire trial since the government's evidence at the guilt/innocence phase is part of the basis for the jury's sentencing decision. Thus, Defendant has the right to rebut information and evidence received through the entire trial. This right to rebut relates to information or evidence, not allegations. If the government alleges something but has no evidence to support it, the jury will ignore it and there is nothing to rebut.

Accordingly, it is important to examine exactly what evidence or information the government presented and not be confused by its allegations or claims. At trial, the government's evidence regarding future dangerousness, in the light most favorable to the government, showed that Defendant was involved in an attempt to escape from custody; wrote a letter which contained a statement that could constitute a threat against codefendant and witness Joey Marshall; could have been involved in vandalism and damage to Marshall's grandmother's home; and was able to send letters to third parties from the Hamilton County Jail in someone else's name. The government rested in the sentencing phase of the case so there is no possibility of other evidence in its case in chief. The above was the extent of the government's evidence of future dangerousness, which

23

Defendant is entitled to rebut.[14]  This evidence, if believed by a rational juror, could support a conclusion that Defendant might be involved in or might influence others to commit harm to others, including prison staff and other inmates.  Based on the evidence, no rational fact finder could conclude Defendant is likely to personally injure someone while in custody, whether a fellow inmate or a prison staff member.  This is especially true given the jurors' observation of Defendant's slight build and physique.

Prison security conditions do not have any relevance to the government's evidence. The defense has set up a chimera, which they seek to destroy by introducing rebuttal testimony.  Had this been a case where there was evidence the defendant was, to use Mr. Aiken's terminology, a "predator" with a propensity to personally harm others, then the defense would have a better argument.  With a proper witness, such evidence might be admissible.  However, this is not that case.

Appropriate rebuttal to the government's evidence in this case would be information that it would be impossible for Defendant to ever communicate with anyone outside of prison for the rest of his life or that he would not be able to influence any other inmates while in prison.  And, of course, with the proper witness, such as a psychologist, testimony would be proper either as mitigating evidence or rebuttal that Defendant did not possess the personal qualities to harm others either directly or indirectly and would be unlikely to ever develop those personal qualities.

At the conclusion of the live proffer of Aiken's testimony, considering the proper scope of

---

[14]The Court anticipates including in the jury instructions guidance on the precise evidence or information in the case upon which the jury can make a decision on future dangerousness. This instruction will cabin the jury's decision and properly limit the jury to just a consideration of the evidence and information the Court has listed.  The Court's instruction would not allow for the broad, free-standing concept of future dangerousness feared by the defense.

24

rebuttal evidence, the Court indicated Aiken could testify that after the trial Defendant will be transferred from the county jail where he is currently detained, and from which he allegedly tried to escape, to a Bureau of Prisons facility, where security would be different and greater. But the Court prohibited Aiken from testifying about any specific institution Defendant may be sent to or about general conditions of federal prisons. Until the Bureau of Prisons selects a facility for Defendant, it would be speculative to testify about where Defendant may be sent and what security measures may be in place at such facilities during the future times in which Defendant will be incarcerated. Although there are commonalities among the security conditions at all federal prisons, these are unrelated to any mitigating factor. Because the conditions in federal prisons are unrelated to the circumstances of this offense or to Defendant, and because they do not rebut evidence or information introduced at trial, the Court prohibited most testimony about them.

Even though the Court had limited Mr. Aiken's testimony as described, after the government had completed its cross-examination, the defense on redirect examination of Mr. Aiken brought out a great deal of information regarding Bureau of Prisons policies, procedures, general prison conditions and typical life in prison. The government did not object to this testimony even though it exceeded the permissible scope of the witness's testimony, so it was presented to the jury.

After the testimony of Mr. Aiken, the defense called Dr. Mark Cunningham as a witness.[15]

---

[15]Neither the government nor the defense filed a motion in limine regarding Dr. Cunningham's testimony prior to trial. For this reason no *Daubert* hearing was held, and the Court never had an opportunity to examine Dr. Cunningham's qualifications as a witness, provide the parties with any guidance or instructions regarding the permissible scope of Dr. Cunningham's testimony, nor place any limitations on his testimony.

Dr. Cunningham is a clinical and forensic psychologist and was tendered to the Court as an expert.[16] He gave lengthy and extensive testimony regarding Defendant's family, family history, development, and other matters regarding Defendant. This testimony included his expert opinion regarding the effect of various influences in Defendant's life on Defendant's development and life choices.

Subsequently, however, Dr. Cunningham began testifying as a fact witness regarding the federal Bureau of Prisons, particular federal prison facilities, and Bureau of Prisons policies, regulations and procedures,[17] prison classification, prison security, and crime conditions in prisons.[18] Upon objection by the Government the Court sustained the objection. Thereafter, the Court sent the jury out of the courtroom and provided the defense the opportunity to have Dr. Cunningham present his entire testimony to the Court. During this session out of the presence of the jury, Dr.

---

[16]In the Sixth Circuit, trial judges are not permitted to accept witnesses as experts before the jury. *United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007). Because of this prohibition, the Court did not declare Dr. Cunningham an expert in any particular field. Perhaps because the Court did not state it accepted Dr. Cunningham as an expert, the defense did not identify the other areas of expertise for which it sought to have him give expert opinions.

[17]Some of this testimony clearly impinged on the role of the court. According to the witness, he was referring to and explaining Bureau of Prisons formal policies, regulations, and other matters of law. "To the extent that these policies are prescribed or codified in statutes or regulations, as distinct from being informal policies, this testimony was improper . . . . Witnesses testify about fact, not law. When a legal proposition is relevant to the jury's consideration, the proper procedure is for the judge to instruct the jury on the proposition." *United States v. Johnson*, 223 F.3d 665, 671 (7th Cir. 2000).

[18]That the witness would be asked questions in these areas is somewhat surprising considering the Court had already rendered its decision in prohibiting Mr. Aiken from testifying about these same matters. The scope of Mr. Aiken's testimony was the subject of considerable discussion with counsel and that discussion should have alerted counsel that it was the subject matter of the testimony that was problematic and not the particular witness. If the substance of the testimony was admissible, Mr. Aiken was a much more qualified witness through which to present it than Dr. Cunningham.

Cunningham testified at considerable length and utilized a slide show pertaining to the rate of violence among various segments of the prison population, risk analysis[19] among federal prisoners in capital cases, rates and correlations of prison violence, and the capability of the federal Bureau of Prisons to prevent inmate violence. With the benefit of Dr. Cunningham's entire testimony, the Court reiterated its decision to sustain the objection. The Court explained that the objection was sustained for two reasons: in large measure the testimony was not relevant to any issues involved in this case and Dr. Cunningham was not qualified to give some of the testimony. For these reasons Dr. Cunningham's testimony was unreliable, would mislead the jury about the true issues of future dangerousness involved in this case, and would impermissibly confuse the jury.

The major problem with Dr. Cunningham's disallowed testimony is its irrelevance to the issues in this case. The essence of his testimony is that individuals imprisoned in federal prisons are not likely to commit crimes. This is indisputably true but it has nothing to do with this case.[20] As explained above, the government has introduced no evidence that Defendant is likely to pose a danger of personally injuring another inmate in prison or personally attacking a prison staff member. So even if Dr. Cunningham had offered his opinion, which he did not, that Defendant was not likely

---

[19]The Court did not hear Dr. Cunningham testify he had conducted a risk assessment on Defendant nor offer an opinion as to whether Defendant was or was not a risk to commit crimes in the future. Nor did the Court understand Dr. Cunningham to offer an opinion as to whether Defendant fell within the large segment of the prison population that does not commit acts of violence or that smaller segment that does commit acts of violence. Nor does the Court understand Dr. Cunningham to offer an opinion on a different but more individual issue of whether Defendant has a propensity to commit acts of violence in prison, regardless of whether such acts could or could not be prevented by the Bureau of Prisons.

[20]It is such an indisputable fact that the Court would be happy to instruct the jury that most inmates in federal prisons do not commit violent crimes against other inmates or prison staff members. To the extent the defense has some fears the jury will act irrationally and be concerned about this, it should inform the Court whether it desires such an instruction.

27

to personally injure another inmate or a staff member, such opinion testimony would not rebut anything involved in this case.  Permitting his generalized testimony about prison crime would simply confuse and mislead the jury and invite a decision on an impermissible basis.  For the same reason the Court disallowed testimony from Mr. Aiken regarding prison security, Dr. Cunningham's testimony about the capability of the Bureau of Prisons to secure inmates is not relevant to any issues in this case.

In this respect this case is much like *United States v. Edelin*, 180 F. Supp. 2d. 73, 76-78 (D.D.C. 2001), where testimony of a psychologist was sought to show the Bureau of Prisons' capability to prevent inmates from committing crimes.  The defense in that case argued the evidence was mitigation and was necessary as rebuttal of future dangerousness. The district court held the evidence was not mitigation evidence.  "The proffered testimony of Mr. Cunningham and Mr. Aiken has no relation to the specific charges against Tommy Edelin, his character, or any other proper mitigation factor, would provide no basis for the jury to impose a sentence less than death, and is therefore inadmissible as mitigation evidence."  *Id.* at 76.  In that case the government had withdrawn its allegation of future dangerousness.  Despite the withdrawal the defense argued it had a right to present rebuttal evidence on the basis that it was possible some juror might conclude the defendant was a future danger.  The district judge rejected this argument by saying, "If the Court were to hold that defendant Edelin had the right to rebut any *possible* conclusion that might be drawn from the evidence, the penalty phase of any capital case would be an endless and discombobulated evidentiary morass." *Id.* at 78 (emphasis in original).  With the withdrawal of the allegation of future dangerousness, the evidence sought to be introduced by the psychologist expert became irrelevant.  Here, although the allegation has not been withdrawn, the proffered testimony

of Dr. Cunningham does not rebut any of the evidence or information that is actually before the jury and that must form the basis of any jury decision.

The second problem with Dr. Cunningham's disallowed testimony was that much of it is not expert testimony but rather is fact testimony, so he is testifying not as an expert but as just another fact witness. As a fact witness he must have direct or first hand knowledge of the facts about which he testifies. It is permissible for a witness to testify both as a fact witness and as an expert. But the case law indicates the Court must make it clear to the jury the distinction between the two roles. Even though the rules of evidence are relaxed in the sentencing phase of the trial, the Court is still obligated to ensure that the information being presented is minimally reliable, can be tested, and is not confusing or misleading. From Dr. Cunningham's testimony, the facts he related often came from second, third, or fourth hand sources. Those sources are not available for questioning in this trial.

The third problem with Dr. Cunningham's disallowed testimony was that some of it amounted to instructing the jury on the law. His mention of Bureau of Prisons policies, regulations, and procedures were matters of law that are properly within the province of the Court and that witnesses are not allowed to discuss in trials. To the extent such information would be relevant in a case, it should be provided to the jury by the Court and not by witnesses.

Moreover, Dr. Cunningham's testimony had nothing to do with the personal characteristics or record of Defendant but rather was about an extraneous body, i.e., the federal Bureau of Prisons. The capability or lack of capability of the Bureau of Prisons says nothing about the individual background, record, or character of Defendant or the circumstances of this case. Dr. Cunningham's testimony may concern the background, record, and character of the Bureau of Prisons and the

employees of that institution, but not Defendant. And of course it can be expected that the capability of the Bureau of Prisons will vary over time and will even vary within particular constituent parts of the organization. This focus on the Bureau of Prisons ignores that we are concerned with a living, breathing human being with thoughts, passions, instincts, goals, ambitions, motivations, and all the other intangibles that make us human beings. Regardless of how capable the Bureau of Prisons is, a highly motivated individual who desires to harm others poses a threat. Perhaps it is a preventable threat but it is still a threat.

Lastly, because Dr. Cunningham's disallowed testimony could be given verbatim in any capital case in the country without changing a single word, it runs afoul of what the Supreme Court said should be the foundation of capital sentencing: an individualized inquiry. *Jones v. United States*, 527 U.S. 373, 381 (1999). Testimony regarding hundreds or thousands of prisoners in groups, in many unidentified prisons, in circumstances that the jury could never know precisely, would run the risk of the jury losing sight of its obligation to focus on the individual before it, the defendant, his character or record, and the circumstances of the offenses. Individualized sentencing of a capital defendant is one of the most important decisions the jurors will ever make in their own lives and testimony regarding generalities of prison invites the jury to make decisions based upon group characteristics and assumptions.[21] This presentation, as the Seventh Circuit said in *Johnson*,

---

[21]Late on Friday, October 10, 2008, Defendant filed a well written and thorough motion with the Court asking it to reconsider its decision to sustain the government's objection to Dr. Cunningham's testimony (Court File No. 728). Attached to the motion were a number of exhibits and affidavits. The Court has carefully considered the motion and the cases cited in the memorandum in support of the motion. After considering the motion for reconsideration the Court sees that it suffers from the same misunderstanding of the law that led to the attempted improper use of Dr. Cunningham. The defense erroneously assumes it must and is entitled to offer rebuttal evidence to a mere pleading, i.e., allegations, of the government, the Amended Superseding Death Notice (*id.* at 7). Based upon this misunderstanding of the law, the defense then makes arguments

30

could be directed to Congress to convince it there is no need for the death penalty, rather than to a jury.

## III.   THE RELEVANCE OF FRENCH LAW

Defendant moves the Court to take judicial notice of the fact that France has abolished the death penalty (Court File No. 677).   Defendant represents that the government opposes this mitigating factor.   The Court will deny Defendant's motion.

France's abolishment of the death penalty is not a mitigating factor.  It is not an "aspect of a defendant's character or record and any of the circumstances of the offense." *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988).  France's policy on capital punishment does not make Defendant more

---

regarding this obligation.  However, as the Court has stated, what the law provides is that the Defendant has a right and must be given the opportunity to rebut evidence.  The allegation of the government drops out of the case unless supported by evidence, or in this phase of the case, information.  Once the government puts on evidence, then that evidence defines the scope of and extent of the defense's right and obligation to rebut.  Dr. Cunningham's proffered testimony does not rebut any evidence in the case.  The Court therefore adheres to its earlier ruling.

The Court has explained what is mitigating evidence under the FDPA.  Dr. Cunningham's testimony does not meet the requirements of mitigating evidence under the construction of the FDPA the Court has provided.

Defendant also suggested he would like Dr. Cunningham to testify as to what Defendant's life would be like for the remainder of his life if he is sentenced to life in prison and what the conditions in the Bureau of Prisons would be for the remainder of Defendant's life.  Given Defendant's present age, he has a life expectancy of somewhere around 50 years.  As the defense rightfully acknowledges in its memorandum, conditions and capabilities of all human institutions change.  *See id.* at 6 ("The government is surely not arguing that Rejon Taylor, had he been incarcerated in the federal prison system of thirty years ago . . .").  If we compared the federal prison system of 50 years ago to the one that exist today, there would be tremendous differences.  Much of the changes could not have been predicted 50 years ago.  The federal prison system of today is much larger, both in terms of inmates and employees; the types of inmates in the system are much different; the system is more professional; it is more expensive to incarcerate inmates; and the governing philosophy regarding inmate management is different.  It is not possible for anyone to know what the federal prison system will be like in 50 years.  Any opinion as to this is merely speculation.  The Court adheres to its prior ruling.

31

or less deserving of a death sentencing.

Presumably, Defendant offers this mitigating factor because Luck was a French national. But the FDPA expressly prohibits jurors from considering the national origin of the victim. 18 U.S.C. § 3593(f). Furthermore, Luck lived and was murdered in the United States, so French law has no bearing on Defendant's prosecution. The United States has made a different judgment regarding the appropriateness of the death penalty.

A different but instructive situation occurred in *United States v. Higgs*, 353 F.3d 281, 328 (4th Cir. 2003), where Higgs committed murders on federal property in Maryland. Higgs sought to submit as a mitigating factor that his killings would not have been death-eligible under Maryland law. The district court rejected that mitigating factor. Reviewing the decision de novo, the Fourth Circuit agreed. "An assertion that the death penalty is improper in one jurisdiction because it is not allowed in another is, at bottom, a reflection of the debate surrounding the propriety of the death penalty, which is a matter of policy for the legislative branch." *Id.*

A court is not required to take judicial notice of non-relevant facts. *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006); *United States v. Cofield*, 272 F.3d 1303, 1307 n.4 (11th Cir. 2001); *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 n.1 (5th Cir. 1996); *Cox v. Tenn. Valley Auth.*, 1993 U.S. App. LEXIS 5875 (6th Cir. Mar. 15, 1993). Because France's decision to not have a death penalty is a policy matter for that country, unconnected and irrelevant to a murder in this country, the Court will not take judicial notice of the fact and the jury will not be able to consider it.

IV.    **DEFENSE WITNESSES' PLEAS FOR MERCY**

During the sentencing proceeding, defense counsel asked a defense witness how her life would be impacted if Defendant were sentenced to death or executed. The government objected, and the Court sustained the objection. From the arguments of defense counsel, the Court understood the defense expected to ask the same question to every member of defendant's family and friend that testified.

The defense referred to this proposed testimony as execution impact testimony, apparently to suggest a correlation with victim impact testimony, which the Court admitted during the government's case. But while the FDPA specifically provides for victim impact evidence, 18 U.S.C. § 3593(a), there is no parallel provision allowing for execution impact evidence. Asking the jury to sentence a defendant to life is not mitigating evidence. *United States v. Mitchell*, 502 F.3d 931, 991 (9th Cir. 2007) (approving of district court not allowing witnesses to offer opinions on what jury's verdict should be); *United States v. Caro*, 461 F. Supp. 2d 459, 465 (W.D. Va. 2006) ("[A]n express plea for mercy to the jury from a defendant's witness is not mitigating evidence that could aid the jury in their decision making"); *see also Stenson v. Lambert*, 504 F.3d 873, 892 (9th Cir. 2007) (noting there are no federal cases requiring the admission of execution impact testimony); *Jackson v. Dretke*, 450 F.3d 614, 617-18 (5th Cir. 2006); *but see Jackson*, 450 F.3d. at 620 (Dennis, J., dissenting).

There are other problems with such testimony. First, the testimony would be speculative. While testimony about the victim's death is based on past events that witnesses can clearly and accurately testify about, the execution of a person in the future is a speculative event. Testimony about a future event would require a witness to imagine the effects of a prospective occurrence, not relate facts that have occurred. Given the vagaries of human life and the plethora of internal and

33

external events that impact our lives, both positively and negatively, to ask a person to testify with any degree of certainty about the impact on one's life of an event that may happen many years in the future is simply to ask for conjecture.

Second, there is a matter of fairness. Victim impact witnesses are prohibited from opining on the proper sentence. *Booth v. Maryland*, 482 U.S. 496, 509 (1987), *overruled on other grounds*, *Payne v. Tennessee*, 501 U.S. 808, 827 (1991); *Fautenberry v. Mitchell*, 515 F.3d 614, 638 (6th Cir. 2008). The reason for prohibiting such opinion testimony is that "any decision to impose the death sentence must be, and appear to be, based on reason rather than caprice or emotion. The admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases." *Booth*, 482 U.S. at 509. Emotionally charged opinions should not form the basis for a verdict in a capital case regardless of whether the opinions favor death or life.

In *Payne*, where the Supreme Court held that victim impact evidence was not constitutionally prohibited, the Court emphasized the fairness in considering both the life of the defendant and the life of the victim. 501 U.S. at 827 ("Justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."). The parallel between defendant and victim supports prohibiting witnesses from opining on their desired sentence, regardless of their preference.

In a very general sense, since the victim of a murder in a capital case is not alive to testify at the trial, victim impact testimony serves the purpose of allowing the jury to get a feel and sense of the victim's life. The defendant in a capital case will always be available to offer the jury relevant information regarding the defendant's life and the impact of any sentence through mitigation

34

evidence, relevant testimony from witnesses, or the defendant's own testimony or statement. Permitting testimony as to the impact on third parties at Defendant's execution would have upset this symmetry.

## V.     LETTERS READ DURING DEFENDANT'S UNSWORN STATEMENT

The Court granted Defendant's request he be allowed to make an unsworn statement to the jury (Court File No. 610). The Court required the statement be given from the defense table and not from the witness stand. Prior to the statement the Court instructed the jury this statement was not evidence or testimony. For that reason Defendant would not be placed under oath, would not be examined by his counsel, and would not be subject to cross-examination. During his statement Defendant mentioned letters he had received from other people, including others serving prison sentences. He read two of the letters during his statement. At the end of his statement defense counsel offered the two letters into evidence. The Court disallowed them.

In allowing Defendant to speak to the jury it was clear what he was to say would not be evidence. He was not a witness. However, if the Court had allowed the letters to be introduced, it would have elevated that portion of his statement to the level of evidence and would have converted him to a witness with respect to this aspect of his statement. Since there was no right to cross-examine Defendant, the government would never have a chance to question Defendant about the authenticity of the letters, their authors, or the circumstances under which they had been received.

Second, Defendant read the letters in their entirety during his statement. The jury therefore had the benefit of the entire contents and could weigh those contents with its knowledge Defendant was not a witness and was not giving testimony. Since Defendant read the letters, he suffered no

35

prejudice, and so the introduction of the letters, even if proper, would have been cumulative.

## VI.    RULE 29 MOTION

At the conclusion of the government's case during the sentencing phase, Defendant moved for the Court to dismiss or strike various aggravating factors.  Having considered the parties' arguments and the evidence, the Court will not permit the jury to consider the statutory aggravating factor of pecuniary gain.

During trials, Fed. R. Crim. P. 29 requires the Court to enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction.  By its terms, Rule 29 does not apply at sentencing phases, but the district court in *United States v. Sampson* concluded it was nevertheless proper for district courts to exercise such power during a capital sentencing phase.  335 F. Supp. 2d 166, 198-202 (D. Mass. 2004).  *See also United States v. Brown*, 441 F.3d 1330, 1368 (11th Cir. 2006); *United States v. Johnson*, 403 F. Supp. 2d 721, 842 (N.D. Iowa 2005).

When reviewing Rule 29 motions, the Court considers "all of the evidence in a light most favorable to the government" and gives the government "the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial." *United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004).  Although the wording sometimes varies, this is the same standard used by courts of appeal to review the sufficiency of the evidence of aggravating factors. *E.g.*, *United States v. Fields*, 516 F.3d 923, 943 (10th Cir. 2008); *United States v. Sampson*, 486 F.3d 13, 47 (1st Cir. 2007).

In this case, the superseding indictment and notice of intent to seek the death penalty alleged four statutory aggravating factors.  At the beginning of the sentencing phase, the government

36

announced it had withdrawn one of those statutory aggravating factors, "Grave Risk of Death to Additional Persons." Of the remaining three statutory aggravating factors, Defendant does not challenge the evidentiary support for "Death During the Commission of Another Crime." Defendant does challenge whether there is sufficient evidence of "Pecuniary Gain" and "Substantial Planning and Premeditation."

      *1.    Pecuniary Gain*

Defendant challenges the sufficiency of the evidence as to pecuniary gain on the grounds that the murder was not motivated by pecuniary gain. The Court agrees and will not allow this aggravating factor to be considered by the jury.

The FDPA defines the pecuniary gain aggravating factor as existing when the "defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." 18 U.S.C. § 3592(c)(8). This aggravating factor can apply in situations involving murder-for-hire ("consideration for the receipt") or robbery ("expectation of the receipt"). *United States v. Mitchell*, 502 F.3d 931, 975 (9th Cir. 2007); *Brown*, 441 F.3d at 1370; *United States v. Cooper*, 91 F. Supp. 2d 90, 105-06 (D.D.C. 2000). Here, robbery is at issue because the evidence showed that Defendant took $600 or $800 from the victim prior to forcing the victim into his van and driving him to Tennessee. Taking the van at gunpoint also amounts to robbery.

Courts agree the FDPA requires the pecuniary gain to follow from murder, not merely from an underlying offense such as robbery. *Brown*, 441 F.3d at 1370; *United States v. Barnette*, 390 F.3d 775, 807-08 (4th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005); *United States v. Bernard*, 299 F.3d 467, 483 (5th Cir. 2002); *United States v Chanthadara*, 230 F3d 1237 (10th Cir. 2000); *United States v. Roman*, 371 F. Supp. 2d 36, 45 (D.P.R. 2005); *Cooper*, 91 F. Supp. 2d at

106. The aggravating factor applies when the "defendant is motivated to kill for pecuniary reasons," *Mitchell*, 502 F.3d at 975, or "pecuniary gain is expected to follow as a direct result of the murder," *Bernard*, 299 F.3d at 483 (quoting *Chanthadara*, 230 F.3d at 1263) (brackets and quotation marks omitted).

It is simple to apply the pecuniary gain aggravating factor in situations where a defendant kills someone to obtain money or goods. *See Brown*, 441 F.3d at 1371 (jury could have found the defendant killed the victim to obtain control of money orders); *Barnette*, 390 F.3d at 808 (the defendant killed the victim because he wanted the victim's car and money).

Here, Defendant had taken around $600 or $800 from Luck and taken Luck's van two hours before the killing. The killing was not necessary to obtain the money or the van. Rather, the government argues Defendant committed the killing to complete the robbery. That was the same argument advanced by the government and rejected in *Bernard*, 299 F.3d at 467. In *Bernard*, the defendants carjacked a married couple, robbed them of their belongings, and forced the couple into the trunk of the car. *Id.* at 472. After driving around with the couple in the trunk, during which time the defendants withdrew money from an ATM, pawned a piece of jewelry, and bought goods with the couple's money, the defendants opened the trunk. They shot the couple and set the car on fire, killing both victims. *Id.* at 472-73. On these facts, the Fifth Circuit held there was insufficient evidence for the pecuniary gain aggravating factor, rejecting the government's contention that the murders were a "necessary step in finishing the car-jacking plan." *Id.* at 483. Rather, the evidence showed the defendants murdered the couple to prevent the victims from reporting their crimes to the police. *Id.* "Since no pecuniary gain was expected to flow directly from the homicide, this aggravating factor should not have been considered by the jury in weighing whether to impose the

38

death penalty." *Id.* at 483-84.

*Bernard* was distinguished by the Ninth Circuit in *Mitchell*, 502 F.3d at 975. Like the defendants in *Bernard*, Mitchell carjacked and later killed his victims. But the difference between the two cases was that Mitchell killed his victims to prevent their car from being traced to him in connection with a robbery. *Id.* Thus, pecuniary gain was expected to flow directly from the homicide. *Id.* In other cases, courts have found sufficient evidence for the pecuniary gain aggravating factor when a killing was necessary to complete a robbery. *See Brown*, 441 F.3d at 1371 (jury could have found the defendant killed the victim to complete robbery because the victim was struggling); *Roman*, 371 F. Supp. 2d at 45 (after the victim was shot, the defendant shot him again as he lay on ground in pain). The court in *Roman* concluded: "It may be that the pecuniary gain was already had at the time of the murder, but because the murder was practically simultaneous with the gain, and the murder clearly facilitated that gain, it can be said that the murder is part of the same transaction." 371 F. Supp. 2d at 45.

This is not a case where the murder was proximate in time to the pecuniary gain or facilitated the pecuniary gain. Instead, the facts of this case resemble *Bernard*. The government's theory at trial is Defendant killed Luck was because Luck was a witness in another case. Presumably, Luck would also be a witness in connection with the carjacking and kidnapping. Although pecuniary gain need not be the sole motive for a murder, *Roman*, 371 F. Supp. 2d at 45 n.6, in this case there is no evidence Defendant killed Luck to complete the robbery or to keep the money or van he had already taken. There is no evidence Defendant wanted to keep Luck's van or feared Luck would reclaim the money taken from him. Rather, it is reasonable to conclude from the evidence that Luck was trying to escape from his van where he was being held captive, not reclaim the van. Presumably,

he would then report the robbery and kidnapping to the police, which does not support the pecuniary gain aggravating factor. *See Bernard*, 299 F.3d at 483. Accordingly, the Court concludes there is insufficient evidence for the pecuniary gain aggravating factor.

### 2. *Substantial Planning and Premeditation*

Defendant argues there is insufficient evidence he committed the murder after substantial planning and premeditation. The Court disagrees. The evidence showed Defendant had been watching Luck and knew when Luck took money from his restaurant to the bank. Defendant picked that time to confront Luck. Luck was then forced into his van, and driven by Defendant from Atlanta, Georgia, to Collegedale, Tennessee, where Defendant fatally shot Luck. Defendant correctly points out that the substantial planning and premeditation must occur as to the murder, not the kidnapping. *United States v. Webster*, 162 F.3d 308, 325 (5th Cir. 1998) (citing 18 U.S.C. § 3592(c)(9)). "'Substantial planning and premeditation,' as included in the statutory aggravating factor of § 3592(c)(9), means a higher degree of planning than would have the words 'planning and premeditation' alone - i.e., more than the minimum amount sufficient to commit the offense." *Barnette*, 390 F.3d at 786 (quotation marks omitted). The jury could conclude Defendant killed Luck after substantial planning and premeditation based on the fact that he learned Luck's routine and killed Luck after taking him on a two-hour drive, during which time Defendant would have had substantial time to plan and think about the murder. Viewing the evidence in the light most favorable to the government, a rational jury could conclude Defendant had decided to kill Luck sometime before the murder and that the events on the day of the murder were just the culmination of a well thought-out plan.

### 3. *Non-Statutory Aggravating Factors*

40

In its notice of intent to seek the death penalty, the government alleged three non-statutory aggravating factors, two of which Defendant challenges. The Court rejects both challenges.

The first factor is "Participation in Additional Uncharged Murders, Attempted Murders, or Other Serious Acts of Violence," in relation to Defendant's alleged escape attempt. Defendant disputes some of the allegations in the notice of intent, but there is no question there is sufficient evidence Defendant attempted to escape from custody. The government introduced significant probative evidence of the escape attempt.

The second non-statutory aggravating factor is future dangerousness. As noted earlier in this Memorandum, the government's evidence regarding future dangerousness, in the light most favorable to the government, shows Defendant attempted to escape from custody; wrote a letter which contained a statement that could constitute a threat against codefendant and witness Joey Marshall; could have been responsible for vandalism to Marshall's grandmother's home; and was able to send letters from prison in someone else's name. Additional information presented during the sentencing phase indicates Defendant is in communication with a number of other people both in and out of the Hamilton County Jail, some of them other prisoners, by mail and telephone. From this evidence, a jury could conclude that while Defendant would not personally injure a guard or other inmate, he might involve himself in future escape efforts, which could injure guards or other inmates, and he might involve himself through others in efforts to pose a risk of danger to Marshall. This evidence is sufficient for the jury to find future dangerousness.

An Order shall enter.


**/s/** _____
**CURTIS L. COLLIER**

**CHIEF UNITED STATES DISTRICT JUDGE**