UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:04-CR-160 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| REJON TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

After convicting Defendant Rejon Taylor of four capital offenses, his jury determined Defendant should received the death sentence. In accordance with that verdict the Court sentenced Defendant Rejon Taylor to death pursuant to the Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-3598.

Defendant filed three post-trial motions that are now before the Court: 1) motion for a new trial (Court File No. 778), 2) motion for a new trial based on newly discovered evidence (Court File No. 793), and 3) motion to allow the defense to interview jurors (Court File No. 802). The United States opposes all three motions. The Court has considered the parties' briefs, the proceedings, and the applicable law. For the following reasons, the Court will **DENY** Defendant's motion for a new trial (Court File No. 778); **DENY IN PART** the motion for a new trial based on newly discovered evidence (Court File No. 793), **RESERVE RULING** on the remaining portion of that motion, and **ORDER** an evidentiary hearing; and **DENY** Defendant's motion to interview jurors ahead of the hearing (Court File No. 802).

# I.    RELEVANT FACTS & PROCEDURAL HISTORY

After a lengthy and contested trial Defendant was convicted of four capital offenses in connection with the carjacking, kidnapping, and murder of an Atlanta, Georgia businessman, Guy Luck.  The Court discussed the facts of this case previously (Court File No. 744, pp. 2-3) and does not deem it necessary to repeat them here.  The sentencing phase of the trial concluded on October 21, 2008 with the jury deciding upon a sentence of death.  The Court imposed sentence on December 3, 2008.

The next day, December 4, 2008, the local newspaper, the Chattanooga Times-Free Press. published a front-page article describing an interview with an alternate juror, Everage Holloway, who also posed for a photograph which appeared at the top of the front page.  According to the article, Holloway stated he and other jurors frequently talked during the trial about whether they believed witness testimony because they did not realize the Court's instructions against discussing the case with anyone applied to their fellow jurors.  Two regular jurors, only one of whom is listed by name, also confirmed such talks, the article said.  The article also reported that Holloway said all 12 jurors and six alternates knew about and discussed media reports about "racist" and "redneck" comments by Defendant.  Holloway was quoted saying all the jurors believed Defendant was guilty. "But after that I heard (jurors) talking about how we needed to make an example of him.  It was like, here's this little black boy.  Let's send him to the chair, and all I ever thought was that he made the unluckiest (gun)shot of his life."  (parentheses in original).  Another regular juror is quoted saying, "We all thought (Mr. Taylor) had no remorse.  We tried to have sympathy for him, but we just couldn't find it." (parentheses in original).

The version of the article on the Times-Free Press website also contained an email Holloway

sent to the newspaper:

> Do you know what fear is? Well I know, after I was the only black alternate juror on the Taylor death trial. You and the other whites listened to that fear and are going to make an example of a young man that made a terrible mistake. Think I'm just ranting? I dare you to take the time to listen to what this human being heard. In that courtroom, the slogan when I was a kid, 'Justice means just-us' help me change this!"

Two days later, a December 6 Times-Free Press article reported Holloway said he contacted the newspaper because he was concerned that jurors decided to sentence Defendant to death out of "fear" and the desire to "make an example of him." Holloway said he would not have voted for death because he did not believe Defendant acted with premeditation when he killed Luck. The article also repeated some information from the previous article.

In addition to submitting the articles and a copy of the web page into the record, Defendant submitted an affidavit from one of his attorneys, who testified he spoke with the reporter who wrote the Times-Free Press articles. During the conversation, the reporter told the attorney that a black female juror, Juror #256, had been the last holdout during the penalty phase. Juror #256 was the only black juror on the jury. Holloway was the only black alternate juror. Defendant is also black. Earlier in the proceedings, during the sentencing phase but prior to deliberations, Juror #256 had difficulty being paid by her employer because she was not a full time employee. Because the failure to be paid had become of concern to her, the Court requested the local chapter of the Federal Bar Association enlist an attorney to contact the employer to resolve the situation. The Court was informed the juror had received the back pay to which she was entitled and would be paid for the remainder of her jury service.

## II. ALLEGATIONS OF JUROR MISCONDUCT AND BIAS

Pursuant to Fed. R. Crim. P. 33, Defendant moves for a new trial based on newly discovered evidence, relying on information appearing in the newspaper article and related to defense counsel by the newspaper reporter.

### A.    Standard of Review

To prevail on a motion for a new trial based on newly discovered evidence, a defendant must establish: (1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal. *United States v. Blackwell*, 459 F.3d 739, 768 (6th Cir. 2006); *United States v. Turns*, 198 F.3d 584, 587 (6th Cir. 2000). However, this standard is not entirely applicable where the new evidence alleges juror misconduct because a juror's conduct is not relevant evidence of whether a defendant should be acquitted, or, in this case, sentenced to life or death. *Blackwell*, 459 F.3d at 769. But the Court will construe the motion as one for a new trial in the interests of justice based on new evidence. *See id.*

### B.    Analysis

Defendant seeks a new trial or an evidentiary hearing based on allegations that alternative jurors engaged in premature deliberations, jurors considered an improper factor in making their decision, one juror was worried about her employment situation, racism affected the verdict, and jurors were exposed to prejudicial publicity. The government opposes the request, contending any inquiry into the jury's verdict is improper. The Court agrees with Defendant that the first two elements of a motion for new trial based on newly discovered evidence are satisfied in that the evidence was discovered after trial and could not have been discovered earlier with due diligence because counsel is prohibited from interviewing jurors. At issue is whether the third and fourth

4

elements are satisfied. The Court finds possible merit in one aspect of Defendant's motion and deems it appropriate to have an evidentiary hearing to more fully develop the facts as to this one aspect. However, the evidentiary hearing will be limited to respect the sanctity of jury deliberations.

The limited nature of this hearing results from constraints on juror testimony. For at least a century, "the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." *Tanner v. United States*, 483 U.S. 107, 117 (1987) (citing 8 J. Wigmore, Evidence § 2352, pp. 696-97). An exception to this rule exists "only in situations in which an 'extraneous influence,' *Mattox v. United States*, 146 U.S. 140, 149 (1892), was alleged to have affected the jury." *Id.* Aside from this exception for external influences, juror testimony is inadmissible to impeach a verdict. *Tanner*, 483 U.S. at 117 (citing *McDonald v. Pless*, 238 U.S. 264 (1915); *Hyde v. United States*, 225 U.S. 347, 384 (1912)). Substantial policy considerations support shielding jury deliberations from public scrutiny:

> Let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation -- to the destruction of all frankness and freedom of discussion and conference.

*Tanner*, 483 U.S. at 119-20 (quoting *McDonald*, 238 U.S. at 267-268).

Federal Rule of Evidence 606(b) is grounded in the common-law rule against impeaching a verdict except in cases of extraneous influence. *Tanner*, 483 U.S. at 121. The Rule states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or

5

concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

Fed. R. Evid. 606(b).[1]

Thus, the Court is prohibited from inquiring into internal influences on jurors but is permitted to inquire into external influences. The distinction between internal and external influences is based on the nature of the allegation, not whether the juror was inside or outside the jury room when the alleged irregularity took place. *Tanner*, 483 U.S. at 117. In *Tanner*, after the defendant's conviction, jurors reported that during the trial some jurors had consumed large amounts of alcohol, sold and used drugs, and slept. Applying Rule 606(b), the Court noted that evidence of a juror's inattentiveness during trial or deliberation is inadmissible. *Tanner*, 483 U.S. at 121 (citing 3 D. Louisell & C. Mueller, Federal Evidence § 287, pp. 121-25 (1979)). The Court also rejected the argument that voluntary substance abuse is an extraneous influence, concluding it is no more an outside influence than a virus, poorly prepared food, or a lack of sleep. *Tanner*, 483 U.S. at 122.

Other examples of internal influences "include the behavior of jurors during deliberations, the jurors' ability to hear or comprehend trial testimony, and 'physical or mental incompetence of a juror.'" *United States v. Herndon*, 156 F.3d 629, 634-35 (6th Cir. 1998) (citing *Tanner*, 483 U.S. at 118); *see also United States v. Logan*, 250 F.3d 350, 379 (6th Cir. 2001) (reviewing cases from other circuits holding internal influences include pressure of one juror on another, juror

---

[1]The version of Rule 606(b) in effect at the time of *Tanner* is substantially the same as the current version, except for the addition of a juror's ability to testify whether there was a mistake in entering the verdict onto the verdict form, a situation not alleged in this case.

6

misunderstanding of court instructions, a verdict achieved through compromise, juror misgivings about the verdict, and juror agreement on a time limit for a decision).  "In contrast, *Tanner* gave the following as examples of extraneous influences: a juror in a criminal trial who had previously applied for a job in the district attorney's office, a bribe attempt on a juror, and newspaper articles and media attention."  *Herndon*, 156 F.3d at 635 (citing *Tanner*, 483 U.S. at 117-18) (internal citations omitted).

Distilling prior cases, the Sixth Circuit defined an extraneous influence on a juror as "one derived from specific knowledge about or a relationship with either the parties or their witnesses." *Herndon*, 156 F.3d at 636 (concluding juror's prior business dealings with defendant constituted an external influence).  "This knowledge or relationship is such that it taints the deliberations with information not subject to a trial's procedural safeguards."  *Id.*

Based on Rule 606(b)'s distinction between internal and external influences, a post-verdict interrogation of jurors is permitted if the allegation involves an extraneous or external influence on the jury.  *Logan*, 250 F.3d at 380.  "Conversely, if the case involves an internal influence, [Rule 606(b)] does not permit the post-verdict interrogation of jurors."  *Id.*  "In the latter instance, the preservation of the integrity of the jury system outweighs any potential violation of the defendant's constitutional rights."  *Id.* (citing *Tanner*, 483 U.S. at 127).

When faced with a claim like Defendant's, a district court "must exercise judicial discretion to determine what steps, if any, are required to make certain that a jury has not been tainted." *United States v. Rigsby*, 45 F.3d 120, 124-25 (6th Cir. 1995).  A hearing is required only when there is a "credible allegation" of extraneous influence or information.  *United States v. Lloyd*, 462 F.3d 510, 518 (6th Cir. 2006); *United States v. Orris*, 86 F. App'x 82, 89 (6th Cir. 2004); *United States v.*

7

*Corrado*, 227 F.3d 528, 535 (6th Cir. 2000); *Rigsby*, 45 F.3d at 124-25. Furthermore, the external contact must have "had an obvious potential for improperly influencing the jury." *United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997) (citing *Rigsby*, 45 F.3d at 124).

With these precepts in mind, the Court will now consider Defendant's allegations:

### 1. Participation of Alternate Jurors in Premature Deliberations

Based on Holloway's comments in the newspaper, Defendant contends that regular and alternate jurors talked during the trial about witness credibility and possibility other matters. Apparently, the jurors [mis]understood the Court's instruction, which specifically directed against talking to family members and other outsiders, as not prohibiting discussions about the case among themselves. As a result, Defendant requests the Court order a new trial.

Defendant relies primarily on *United States v. Olano*, 507 U.S. 725 (1993), in which the defendant had acquiesced to the presence of an alternate during deliberations, and on appeal argued the alternate's presence was plain error. The Supreme Court disagreed because the alternate's presence did not prejudice the defendant. *Olano*, 507 U.S. at 737. However, *Olano* implied that prejudice arises when an alternate participates in deliberations (as opposed to merely being present). *Manning v. Huffman*, 269 F.3d 720, 722 (6th Cir. 2001); *United States v. Acevedo*, 141 F.3d 1421, 1424 (11th Cir. 1998) (citing *Olano*, 507 U.S. at 739). When an alternate participates in formal deliberations, that violates Fed. R. Crim. P. 24(c) (in *Manning*, a habeas case, it violated the equivalent Ohio rule).[2]

---

[2]At the time of *Olano*, Fed. R. Crim. P. 24(c) required alternate jurors to be discharged after the jury retires to consider its verdict. Under the current version of Rule 24, a court may retain alternate jurors after the jury retires to deliberate, but "must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged." Fed. R. Crim. P. 24(c)(3). Both versions of Rule 24(c) prohibit an alternate juror's participation in formal

8

In opposing Defendant's argument, the government relies primarily on *United States v. Logan*, 250 F.3d 350 (6th Cir. 2001). Following the defendants' convictions in *Logan*, a juror communicated to defense counsel that jurors had routinely discussed evidence among themselves during the entire trial, thereby effectively deliberating prior to the close of evidence and before being advised of the appropriate jury instructions. *Logan*, 250 F.3d at 378. The Sixth Circuit held premature deliberations are an internal influence and are thus inadmissible under Rule 606(b). *Id.* at 381; *accord United States v. Caldwell*, 83 F.3d 954, 956 (8th Cir. 1996); *United States v. Sabhnani*, 529 F. Supp. 2d 384, 394 (E.D.N.Y. 2008); *see also United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993) (noting doctrinal distinction between improper intra-jury communications and extra-jury influences, the latter of which pose a far more serious threat to a fair trial).[3]

Defendant attempts to distinguish this case from *Logan* and similar cases by emphasizing that alternates, not just regular jurors, allegedly participated in premature deliberations. But the alternates were not an external influence at the time they may have engaged in discussions with fellow jurors. Unlike Rule 24(c)'s prohibition on alternate jurors participating in formal deliberations, there is no rule specifically prohibiting alternate jurors from talking with regular jurors about the case prior to formal deliberations. Furthermore, the alternate jurors did not even know they were alternate jurors until just before deliberations started. The alternates were "indistinguishable from" the regular jurors, having taken the same oath, received the same

---

deliberations.

[3]In *Resko*, the Third Circuit concluded a district court abused its discretion by not properly questioning jurors about premature deliberations, which the court learned of during trial. *Resko*, 3 F.3d at 693. But the Third Circuit emphasized the outcome would be different if the district court had learned of the premature deliberations after the verdict because of Rule 606(b). *Id.* at 695 n.8 & n.10.

9

preliminary jury instructions, and heard the same evidence and argument. *Olano*, 507 U.S. at 740.

An alternate juror could have become a regular juror if a regular juror had been excused. Or, a

regular juror could have discussed the case with fellow jurors, which would be an internal influence,

and then that juror could have been excused for some reason.

A similar situation occurred in *United States v. Lawrence*, 477 F. Supp. 2d 864 (S.D. Ohio

2006).[4] After the defendant's sentencing, an alternate juror sent an email to the victim's wife, which

stated, among other things, that "we [the jury] were all on your side . . . ." *Lawrence*, 477 F. Supp.

2d at 872. The defendant contended the email implies that prior to deliberations, of which the

alternate juror was not a part, the alternate juror had discussed the case and formed an opinion with

fellow jurors. *Id.* at 872. The court, however, agreed with the government that any influence the

alternate juror had prior to deliberation would have been entirely internal. *Id.* at 874. "[I]t is

impossible for the alternate to have been an 'outsider' until the deliberations started; and, after

deliberations did start, the alternate was separated from the rest of the jury." *Id.* (quoting *United

States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990)); *accord Erikson v. Rowland*, 1993 U.S. App.

LEXIS 9999, *9 n.3 (9th Cir. Apr. 26, 1993). Therefore, the court concluded there was no evidence

of extraneous influence on the jurors who deliberated, and a hearing was unnecessary and prohibited

by Rule 606(b). *Lawrence*, 477 F. Supp. 2d at 872.

For the same reason, this Court concludes that the possible discussion among regular and

alternate jurors prior to deliberations is an internal influence. Because the alternate and regular

---

[4] *Lawrence* is one of the only two other recent federal capital prosecutions to conclude with a death verdict in the Sixth Circuit. In the same opinion, the *Lawrence* court granted a new sentencing hearing. The government appealed, and the case is currently before the Sixth Circuit, with oral argument having been heard in April 2008 (Case Nos. 06-4105/06-4626/07-3004).

10

jurors were indistinguishable from one another except during deliberations, the possible discussion of the case between alternates and regular jurors outside formal deliberations does not constitute an external influence, and therefore evidence of such discussions would be inadmissible under Rule 606(b).

### 2.    *Deterrence as a Factor in Jury's Sentence*

Holloway told the newspaper that jurors wanted to make an example of Defendant and implies this led to Defendant's death sentence. Defendant argues deterrence is not a proper factor for the jury to consider under the Federal Death Penalty Act and therefore a new trial is warranted. Even if we assume Defendant is correct that a juror may not consider deterrence, *but see United States v. Caro*, 461 F. Supp. 2d 459, 462 (W.D. Va. 2006), it is nevertheless apparent that a juror's mental decision to consider deterrence is an internal influence into which the Court cannot inquire.

The behavior of jurors during deliberations and juror misunderstandings of court instructions are both internal influences. *Logan*, 250 F.3d at 379 (citing *United States v. D'Angelo*, 598 F.2d 1002 (5th Cir. 1979)); *Herndon*, 156 F.3d at 634-35. A juror considering deterrence is not considering something "derived from specific knowledge about or a relationship with either the parties or their witnesses." *Herndon*, 156 F.3d at 636.

In addition, it is not clear when Holloway heard the comment about an example being made. Because the overwhelming majority of the time the jurors were together was prior to the sentencing phase jury instructions, there is a significant chance the comment was made prior to jurors hearing the Court's instructions. During the sentencing phase jury instructions, the Court explained to jurors what they need to consider in reaching a sentencing verdict. Jurors were obligated to follow those instructions, and we must assume the jury did. Thus, any comments Holloway heard prior to the

11

instruction may not have reflected the jurors' actual deliberations. In any event, an inquiry into this matter is prohibited by Rule 606(b).

### 3. Juror #256's Employment Situation

Defendant's counsel's affidavit states he learned from the newspaper reporter that Juror #256, the sole black juror among the regular jurors, was last holdout in favor of a death sentence. Based on the assumption that this is true, Defendant speculates Juror #256's eventual decision to vote for death resulted from fear of losing her job and racial prejudice by other jurors, and therefore contends a new trial is warranted. The Court will discuss the employment situation in this section and the racism allegation in the next section.

The government contends Defendant's allegation is pure speculation and is contradicted by the facts, and the Court agrees. Prior to the sentencing deliberations, the issue involving Juror #256's employer was resolved in the juror's favor. She received her back pay and the employer promised to pay her for the rest of the work days she missed as a result of jury service. Thus, there is no reason to believe Juror #256 was worried about her job and every reason to believe that at the time of sentencing deliberations her pay was not a source of concern at all. Defendant's allegation as to why Juror #256 changed her vote, if in fact she ever did, is pure speculation.

There are two other reasons this allegation fails. First, before the employment situation was resolved, the Court brought the juror's concerns to the attention of counsel, pointed our that the issue might be a distraction for the jury, and inquired of counsel whether they wished to excuse Juror #256. The Court noted that she was the only black regular juror and also noted that the juror's employment situation may affect her deliberations. Faced with a possible dilemma, the defense chose to keep Juror #256 on the panel despite knowing of her possible employment problems and

12

cannot now claim that her employment situation may have affected her deliberations. To the extent her employment situation may have affected her deliberations the Court offered the defense a perfect remedy which it rejected. Second, any influence on Juror #256 regarding her employment would be an internal influence. It has no connection to "either the parties or their witnesses." *Herndon*, 156 F.3d at 636. Any possible stress or fear related to her employment situation is no more an external influence than voluntary substance abuse, a virus, poorly prepared food, or a lack of sleep. *See Tanner*, 483 U.S. at 122.

Thus, the Court will not permit an evidentiary inquiry into this matter because there is no credible allegation that Juror #256 feared losing her job, Defendant knowingly opted for this juror to remain part of the jury, and any worries over the juror's job were an internal influence.

### 4. Allegation of Racism

Defendant seeks a new trial based on allegations of racial bias by jurors. Although a Sixth Circuit case lists a juror's use of racial slurs as an internal influence, that conclusion is unsupported by any discussion and the case goes on to discuss whether racial slurs affected the defendant's right to a fair trial. *Mason v. Mitchell*, 320 F.3d 604, 636-37 (6th Cir. 2003). Other circuit courts have held that evidence about jurors' racial bias is admissible under Rule 606(b) or to ensure a fair trial. *United States v. Henley*, 238 F.3d 1111, 1120 (9th Cir. 2001); *Shillcutt v. Gagnon*, 827 F.2d 1155, 1159 (7th Cir. 1987); *United States v. Heller*, 785 F.2d 1524, 1527-28 (11th Cir. 1986).

The newspaper article quotes Holloway saying he "heard (jurors) talking about how we needed to make an example of him. It was like, here's this little black boy. Let's send him to the chair, and all I ever thought was that he made the unluckiest (gun)shot of his life." In the email Holloway sent to the newspaper, published on its website, he asserts that when he was a kid, the

13

slogan in that courtroom was "Justice means just-us." That is the extent of the allegation of racism. While it is clear Holloway believes racism permeated the jury, there is no credible basis for his belief.

The government contends Holloway may have a personal agenda relating to feelings about race and the death penalty. At the very least, he disagrees with the verdict in this case, as is evident from the conclusion of his email to the newspaper: "help me change this!" His inference that the jury chose Defendant's punishment based on his race lacks any support. Jurors were entitled to select a death sentence based on Defendant's actions, regardless of his race. Holloway's suggestion that in the past, justice meant "just-us" again contains no allegation of any racial improprieties during this trial.

As for Defendant's contention that Juror #256 was influenced by racism, this is pure speculation. Also noteworthy is that because of her employment situation, Juror #256 spoke with court personnel on multiple occasions and never raised any concerns about racism. In addition, all the regular and alternate jurors spoke personally to the Court in a one-on-one setting while the Court investigated jurors' exposure to publicity, and none of them raised any issues of racial bias, including Holloway and Juror #256.

In *Tanner*, the Supreme Court noted defendants' rights to a fair trial are protected by several aspects of the trial process: the determination of jurors' suitability at voir dire; the observations of the jury by the court, counsel, and court personnel; the observations of jurors by each other, who can report inappropriate behavior to the court "*before* they render a verdict" (emphasis in the original); and the ability to impeach a verdict with nonjuror evidence of misconduct. *Tanner*, 483 U.S. at 127. Here, neither Juror #256, Holloway, nor any other juror or nonjuror reported any incident of racial

14

bias to the Court or court personnel. Jurors at times communicated with court personnel over scheduling issues and comfort issues, and no one reported any of the issues now raised by Holloway. At the start of trial, counsel had an opportunity to conduct suitable voir dire, which consisted of a lengthy written questionnaire and then oral questioning of jurors, first in large groups, then in small groups. In addition, the Court, counsel, and court personnel observed jurors throughout the trial without learning of any racist behavior. Finally, in its verdict form determining Defendant should receive the death penalty each juror affirmed their decision was not influenced by race. The Court concludes there is no credible allegation of racial bias infecting the proceedings.

5. *Media Reports*

After the guilty verdict, Defendant made a phone call in which he made comments referring to jurors using the words "racist" and "rednecks." These comments were recorded and the government listened to them before the sentencing phase began. Based on a prosecutor's statement in court outside the presence of the jury, media reports said Defendant had called jurors "racist rednecks."

At Defendant's request, the Court interviewed jurors individually and learned that some jurors had been exposed to the information based on the media reports. But after evaluating the interviews, the Court concluded jurors did not necessarily link the remarks to Defendant, there was a significant break in time between when jurors heard about the remarks and the sentencing phase, and jurors were not inflamed by the remarks. The Court declined to discharge the jury or permit further questioning at that time, which the Court worried would remind jurors of the remarks and connect them to Defendant (Court File No. 727). The Court's opinion stated it would not allow further question "at least at this time" (*id.* at 6); *see also id. at 7* ("[T]he Court concludes the better

15

solution is to not further interview jurors at this time."). After the death verdict, the Court inquired of defense counsel whether they desired to interview the jurors regarding their exposure to the "racist redneck" publicity. Defendant declined the request. He filed a notice stating earlier questioning would have provided for the only meaningful opportunity to question jurors, and that opportunity cannot be restored after the verdict because jurors will be unlikely to admit any bias influencing their decision (Court File No. 780).

Subsequently, the articles about Holloway were published, and Defendant now seeks a new trial or evidentiary hearing based on Holloway's assertion that all 12 jurors and six alternates knew about and discussed media reports about the comments. Information derived from media reports is an external influence and evidence of jurors' exposure to media reports is admissible under Rule 606(b). *Herndon*, 156 F.3d at 635 (citing *Tanner*, 483 U.S. at 117-18). From its interview of jurors, the Court was already aware of some jurors' exposure to the media reports, but Holloway's comment suggests jurors' exposure was broader than known. Based on Holloway's statement, the Court concludes it should further inquire into jurors' exposure.

Accordingly, the Court will conduct an evidentiary hearing on this one issue. At least initially, the only juror who may testify at this hearing will be Holloway. If a party desires Holloway's testimony, it may contact the Court concerning his appearance. After that initial hearing, the Court will be able to determine how to proceed. *See Logan*, 250 F.3d at 378 ("It is a well-established principle of law that trial judges are afforded considerable discretion in determining the amount of inquiry necessary, if any, in response to allegations of jury misconduct.").

By local rule, counsel are prohibited from interviewing jurors after the verdict. E.D.TN. LR 48.1. Defendant suggests interviewing jurors ahead of any hearing would be reasonable and

16

beneficial in terms of judicial economy. The government opposes the request. Defendant will have the opportunity to question Holloway if he is called for the hearing and to question any other jurors who may be called for a subsequent hearing. The Court will not permit out-of-court interrogation of jurors.

## III.    EVIDENCE OF AGGRAVATING FACTORS

Defendant challenges the sufficiency of the evidence of the aggravating factors "Substantial Planning and Premeditation" and "Future Dangerousness."[5] He requests a new trial. The Court is not persuaded there was insufficient evidence of these aggravating factors or that a new trial is warranted.

During both the guilt and sentencing phases of the trial, the Court ruled on Defendant's motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. This post-verdict motion for judgment of acquittal is reviewed under the same standard as the motions during trial. The Court considers "all of the evidence in a light most favorable to the government" and gives the government "the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial." *United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004). Although the wording sometimes varies, this is the same standard used by courts of appeals to review the sufficiency of the evidence of aggravating factors. *E.g.*, *United States v. Fields*, 516 F.3d 923, 943 (10th Cir. 2008); *United States v. Sampson*, 486 F.3d 13, 47 (1st Cir. 2007). Defendant also moves for a new sentencing phase. In deciding whether a new trial is

_____

[5]In response to an earlier defense motion, the Court addressed the sufficiency of the evidence of these aggravating factors (Court File 744 at 40-41). *United States v. Taylor*, 583 F. Supp. 2d 923, 945-48 (E.D. Tenn. 2008).

warranted, a court should primarily concern itself with whether the prior proceedings were fair for the accused. *See United States v. Davis*, 15 F.3d 526, 531-32 (6th Cir. 1994). A district judge may assess witness credibility and weigh the evidence to determine if the verdict is "against the manifest weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 592-3 (6th Cir. 2007).

### A. Substantial Planning and Premeditation

"Substantial Planning and Premeditation" is a statutory aggravating factor applicable if the "defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism." 18 U.S.C. § 3592(c)(9). Defendant contends the jury's finding of "Substantial Planning and Premeditation" must have been to offenses other than murder because there was insufficient evidence Defendant planned the murder. But the Court instructed the jury "that 'substantial planning and premeditation' refer to the crime of murder, not to any other offenses that accompanied or preceded the murder." *See United States v. Webster*, 162 F.3d 308, 325 (5th Cir. 1998) (citing 18 U.S.C. § 3592(c)(9)). As the Court noted in its previous Memorandum on this issue, a rational jury could conclude, based upon the evidence before the jury and the reasonable inferences from that evidence, Defendant had decided to kill Luck sometime before the murder, possibly prior to the day of the kidnapping, and the events on the day of the murder were just the culmination of a well thought-out plan. The evidence did show, as Defendant points out, that the actual killing may have occurred earlier than intended and not as planned, but the aggravating factor does not require the murder to occur as planned, just that it occur after substantial planning and premeditation. The Fourth Circuit reached the same conclusion under similar circumstances in *United States v. Tipton*, 90 F.3d 861, 896 (4th Cir. 1996), where the victim was shot in an unplanned, spontaneous effort to prevent him from escaping from his captors. The

court held the aggravating factor was appropriate because "the issue was whether the murder, not its exact means, was the result of substantial planning and premeditation." *Id.* at 897.[6]

This conclusion is not contradicted by the jury's verdict at the guilt-innocence phase. In that phase, Defendant faced two counts of murder in the first degree by use of a firearm during and in relation to a crime of violence. One of the elements of those counts contained two ways the jury could find Defendant guilty: the killing was committed either (1) "during the perpetration of a kidnapping" or (2) was "wilful, deliberate, malicious, and premeditated."[7] On the verdict form, the jury checked "during the perpetration of a kidnapping," and left blank the option for "wilful, deliberate, malicious, and premeditated." Once the jury found the killing was committed in perpetration of a kidnapping, they were not obligated to also determine if the killing was wilful, deliberate, malicious, and premeditated, so their failure to check that option does not mean they concluded the killing was not premeditated. *Cf. Schiro v. Farley*, 510 U.S. 222, 233-36 (1994) ("The failure to return a verdict does not have collateral estoppel effect, however, unless the record establishes that the issue was actually and necessarily decided in the defendant's favor.").

## B.    Future Dangerousness

Future dangerousness is a non-statutory aggravating factor. The Supreme Court "has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made

---

[6]*Tipton* was a prosecution under 21 U.S.C. § 848(n)(8), but the aggravating factor uses the same words and is construed the same as in the Federal Death Penalty Act. *United States v. Jackson*, 327 F.3d 273, 301 (4th Cir. 2003).

[7]During deliberations the jury submitted a question asking to confirm that they need only find one or the other, and in response the Court did confirm that after reviewing the matter with counsel.

in our criminal justice system." *Simmons v. South Carolina*, 512 U.S. 154, 162 (U.S. 1994); *see also Jurek v. Texas*, 428 U.S. 262, 275 (1976) (plurality opinion) ("[A]ny sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose."). Thus, Defendant's arguments that a jury cannot predict future dangerousness beyond a reasonable doubt do not invalidate the aggravating factor. Defendant also contends the evidence was insufficient to apply the aggravating factor. As the Court noted in its previous Memorandum on the subject, there was sufficient evidence for the jury to find future dangerousness. The evidence on this aggravating factor does not warrant a new trial.

## IV.     GOVERNMENT'S OPENING STATEMENT AND CLOSING ARGUMENTS

Defendant argues a new trial is warranted because of improprieties in the government's opening statement and closing argument. Defendant makes three arguments: (1) the government's Powerpoint slide show, during both opening and closing, referred to "additional uncharged murders"; (2) the government, in both its opening and closing, linked substantial planning and premeditation to the carjacking and kidnapping, not the murder; and (3) the government, in its closing rebuttal argument, sought to arouse jurors' passions and persuade them to act outside the law.

### A.     "Additional Uncharged Murders"

Defendant argues the government improperly and prejudicially implied Defendant had committed other uncharged murders or attempted murders. This contention arises from a Powerpoint slideshow the government displayed during its opening statement and closing argument. While the government discussed Defendant's attempt to escape from jail, a slide appeared with the

20

heading "Participation in Additional Uncharged Murders, Attempted Murders, or Other Serious Acts of Violence," language which tracked the government's amended superseding notice of intent to seek the death penalty (Court File No. 547).[8] Below the heading were four allegations relating to Defendant's alleged escape attempt. There was nothing else other than these four allegations on the particular slide. During closing arguments, the defense objected to the slide because there was no allegation or evidence Defendant participated in uncharged murders or attempted murders. The defense argued showing the slide to the jury was prejudicial. In response to the objection during closing argument, the prosecutor stated he was talking about "Other Serious Acts of Violence," not additional uncharged murders. The Court instructed the jury to disregard the language on the slide talking about additional uncharged murders or attempted murders and stated that there is no evidence of such.

Defendant argues the Court's instruction left intact the implication he committed other murders. He contends the government essentially argued a fact not in evidence and the prejudicial effect of this argument warrants a new trial. The government responds that it never made such an argument and the Court properly instructed the jury on how to make its determination.

The prosecutor stated he was not referring to uncharged murders, only to the escape attempt. That statement was consistent with the allegations in the slide, which solely concerned the escape attempt, and the government's verbal argument that Defendant had attempted to escape from prison.

---

[8]Prior to trial, Defendant moved to strike that language from the notice of intent to seek the death penalty (Court File No. 523), but the Court denied the motion because it was "unnecessary to worry about the wording of the notice of intent" since the "Court determines what the jury is told about the charges, including the aggravating factors." (Court File No. 563). The language in the notice of intent appears to come from the United States Attorneys' Manual form for death penalty-eligible homicides, http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/crm00074.htm.

Thus, although the government carelessly placed the heading on the slide, the inclusion of the heading did not constitute argument. In the face of evidence and argument about the escape attempt, and a denial that there was any implication of uncharged murders, a reasonable juror would not assume the government was accusing Defendant of committing other uncharged murders or attempted murders. *See United States v. Stuckey*, 253 F. App'x 468, 485 (6th Cir. 2007).

### B.        Substantial Planning and Premeditation of Carjacking and Kidnapping

Defendant contends the government improperly argued to the jury that Defendant had engaged in substantial planning and premeditation of the carjacking and kidnapping, as opposed to the murder. Like the previous allegation of improper argument, this one is also based on the heading of a Powerpoint slide.

But aside from the incorrect or ambiguous heading on the slide, it was clear to the jury that the substantial planning and premeditation had to occur as to the murder. The Court instructed the jury on that specific point.[9] And the government emphasized that point during closing arguments. When he introduced the aggravating factor, the prosecutor accurately characterized it by saying, "Rejon Taylor committed the offense, the murder, after substantial planning and premeditation to cause the death of a person." The defense objected, stating the proof must relate "to the murder itself, rather than the kidnapping or carjacking." The prosecutor responded, "I think that's what I said." He then stated twice, "I said to the murder, Judge." Resuming his argument to the jury, the prosecutor said, "Substantial planning and premeditation with regard to the murder of Guy Luck by

_____

[9]The jury instructions on this issue began: "The second statutory aggravating factor alleged by the government is that Defendant committed the murder after substantial planning and premeditation to cause the death of Guy Luck. Please keep in mind that 'substantial planning and premeditation' refer to the crime of murder, not to any other offenses that accompanied or preceded the murder."

22

the defendant Rejon Taylor." He later stated, "And this wasn't just a premeditated murder or a planned murder. This was substantially planned and premeditated."

During the rebuttal argument, the prosecutor did not expressly link substantial planning and premeditation to the murder, but the connection was evident from the government's argument. For example, he argued that when Defendant showed up at Luck's house, "Mr. Luck didn't know it, but he was already dead." This statement is consistent with the government's statements throughout the closing arguments implying that Defendant had put substantial planning and premeditation into killing Luck, not merely carjacking or kidnaping him. Furthermore, a large part of the government's argument about this aggravating factor concerned events that occurred during the trip from Georgia to Tennessee, after the carjacking and kidnapping had occurred, events which could only be substantial planning and premeditation for the murder. Finally, the verdict form asked jurors whether the government proved Defendant "committed the murder after substantial planning and premeditation to cause the death of Guy Luck," again reinforcing that substantial planning and premeditation must have occurred as to the murder. Therefore, the Court concludes the jury could not have confused which offense must be substantially planned and premeditated.

### C. Statements During Rebuttal Closing Argument

Defendant argues the government's closing argument diverted the jury's attention from its oath to follow the law and sought to improperly arouse jurors' passions. He quotes the following four parts of the government's rebuttal closing argument:

- "Ladies and gentlemen, society has a right to self-defense, just like the victim Mr. Luck had a right to defend himself. . . . He couldn't finish what he had the right to start. You not only have the right but you have the obligation to finish it." [10/14/08 tr, p. 39.]

- "A lot of time you'll hear people talking about the horrible things that happen in the community—'When are they going to do something about that?' Well, ladies and gentlemen, you are now they. When it comes to Rejon Taylor, you are the ones that have to do something about it." [10/14/08 tr, pp. 39-40.]

- "Hear sometimes people talk about an-eye-for-an-eye philosophy. Ladies and gentlemen, that's a limitation on punishment. We're not—We're asking for your punishment to be more merciful and less than the defendant's crime. We're not asking you to surprise him, drag him out of his cell, drive him around for a couple of hours, shoot him in the mouth, and leave him on the side of the road to die. That would be eye for eye." [10/14/08 tr, p. 40.]

- We're asking you to exercise the legitimate authority given to the people by Providence, the people of this government. You are the people of the government." [10/14/08 tr, p. 41.]

Defendant did not object to any of these statements at trial. The reference to "eye for eye" is especially troubling, Defendant contends, because during voir dire many prospective jurors expressed religious convictions in favor of the death penalty and often referenced an eye for an eye. Thus, Defendant contends, the government's argument appealed to jurors' personal desires rather than the law. The government's suggestion that the jury had an obligation beyond the law on which the Court would instruct them was prejudicial, Defendant argues. Because of the prejudice, the calculated nature of the argument, and the weak proof of some aggravating factors, Defendant contends he is entitled to a new trial. The government responds that its argument was effective and forceful and not inappropriate. Each argument was tethered to an appropriate sentencing consideration, the government argues. Furthermore, it argues any improprieties were isolated and not flagrant.

24

Prosecutorial misconduct based on improper statements is reviewed under a two-part test. *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994). First, a court determines whether the statements were improper. Second, if the statements were improper, a court looks to see if they were flagrant. *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003); *United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir. 1999). There are four factors used to determine if an improper statement was flagrant: "1) whether the statements tended to mislead the jury and prejudice the defendant; 2) whether the statements were isolated or pervasive; 3) whether the statements were deliberately placed before the jury; and 4) whether the evidence against the accused is otherwise strong." *Galloway*, 316 F.3d at 632.[10]

Of the four statements Defendant criticizes, only the second one is somewhat inflammatory. In contrast, the first statement's description of jurors having an obligation to fulfil Luck's right to self-defense is not logically clear; the third statement notes the difference between an eye-for-an-eye and the implementation of a death sentence (while Defendant is correct that some of the potential jurors during voir dire did reference the eye-for-an-eye sentiment, Defendant challenged most if not all potential jurors expressing that sentiment); and the fourth statement, although referencing Providence, does so to indicate the authority of the government. Because Defendant did not object to the second statement, or to any of the other statements, the Court did not instruct the jury to disregard any statement. Nor were the statements flagrant. They did not tend to mislead the jury because the jury was fully instructed on how to make its decision, and the special verdict form led

---

[10]Even if an improper statement is not flagrant, the Court of Appeals will reverse a conviction if "1) the proof of the defendant's guilt is not overwhelming; 2) the defense objected to the statements; and 3) the trial judge did not cure the impropriety through an admonishment to the jury." *Id.* This standard is inapplicable because the defense did not object to the statements.

jurors through the decision-making process.  And the statements were isolated; although they were bunched together at the end of the government's closing argument, Defendant has not alleged there were inflammatory statements throughout the government's closing.  Also noteworthy is that the jury spent almost two full days deliberating Defendant's sentence, during which time they answered all the questions on the verdict form, which include 33 defense mitigators.  The time spent on deliberations strongly suggests the jury was not impacted by an inflammatory statement.  Based on these conclusions, a new trial is not warranted.

## V.      CONCLUSION

For the foregoing reasons, the Court will **DENY** Defendant's motion for a new trial (Court File No. 778); **DENY IN PART** the motion for a new trial based on newly discovered evidence (Court File No. 793), **RESERVE RULING** on the remaining portion of that motion, and **ORDER** an evidentiary hearing; and **DENY** Defendant's motion to interview jurors ahead of the hearing (Court File No. 802).

**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

26