UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff ) | |
| ) | No. 1:04-CR-160 |
| v. ) | |
| ) | Chief Judge Curtis L. Collier |
| REJON TAYLOR, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

Following Defendant Rejon Taylor's conviction and sentence of death, he filed three post-trial motions: 1) Motion for new trial (Court File No. 778); 2) Motion for new trial due to newly discovered evidence (Court File No 793); and 3) Motion to interview jurors (Court File No. 802). The Court has ruled on the motions with the exception of one issue (Court File Nos. 810 & 811).

By a fortuitous convergence of an allegation Defendant made a racially tinged remark regarding the jury that convicted him, media reports of that remark, and the jury determining Defendant should receive the death penalty, this sole remaining issue is thorny. The one remaining issue concerns potential juror exposure to media reports that Defendant referred to the jurors as racist rednecks.

Because of the Court's sensitivity, for obvious reasons, to the possibility that extraneous information may have played a role in Defendant's sentence, the Court granted Defendant an evidentiary hearing (Court File No. 810 at 15-17). The Court held the hearing on February 25, 2009 (Court File No. 822), at which Defendant presented testimony from alternate juror Everage Holloway and a newspaper reporter who had interviewed Holloway and introduced exhibits. The

government did not call any witnesses or cross-examine either witness. Following the hearing Defendant filed a brief in support of a new trial (Court File No. 827), the government filed a response brief (Court File No. 828), and Defendant filed a reply brief (Court File No. 831). Having now had the benefit of the alternate juror's testimony and the arguments of counsel, the Court will **DENY** Defendant's motion for a new trial based on newly-discovered evidence (Court File No. 793).

### A. Defendant's Motion

Defendant sought a new trial based upon his argument "the jury's verdict was the result of unfair bias against Mr. Taylor, generated in the jury by outside influences and extraneous information, and exacerbated by the jury's disregard for and disobedience of the Court's instructions throughout the trial." (Court File No. 794 at 1). As explained in the previous decision (Court File No. 810 at 15-17), the purpose of the hearing was to determine whether jurors had been exposed to media reports—whether directly or indirectly—about a "racist redneck" comment attributed to Defendant.

### B. The Hearing

Defendant called Holloway to the stand first. The Court and the parties were aware some jurors had been exposed to the comment (Court File No. 727). However, Holloway testified all jurors were probably aware of the comment. Earlier, on September 23, 2008, the Court had conducted individual in camera interviews of the jurors at the request of the parties to determine whether any jurors had been exposed to media coverage that reported the comment. As jurors returned to the jury room after being interviewed by the Court, some of them shared with other

2

jurors that they had been asked about the comment, Holloway testified.[1] As a result, Holloway believes every juror heard about the "racist redneck" comment in the jury room.

Assuming Holloway's testimony is accurate, it appears all jurors heard something about the "racist redneck" comment, although it is not evident they all attributed the comment to Defendant.[2] Regardless, Holloway's testimony shows the comment did not affect jurors. The comment sparked jokes and laughter among jurors; there was no indication jurors took the comment personally. No juror seemed to take offense at the comment. The comment was not a big deal, Holloway testified. Holloway did not say the comment created fear in any juror.

Jurors frequently ate lunch together and talked with each, Holloway testified. During the sentencing phase, the tone of conversations was more serious than in the guilt-innocence phase,

---

[1] When interviewing the jurors, the Court did not mention the comment unless a juror said he or she had heard it.

[2] Defendant contends all the jurors attributed the comment to him. But the testimony Defendant cites for this assertion is ambiguous:

> Defense Counsel: "So on that day that the Judge interviewed you, at some point did every juror hear that there had been an accusation that Mr. Taylor had called the jury redneck racists?"
>
> Holloway: "Yeah. Yeah. It was talked about. I mean..."
>
> Defense Counsel: "With all 18 jurors present. Is that right?"
>
> Holloway: "As far as I know. Everybody had to be in the room with me."

Although defense counsel's question attributes the comment to Defendant, the thrust of the question is whether all the jurors had heard about the racist redneck comment. Holloway's answer is that all the jurors were present when the comment was talked about. It is not clear he is saying all jurors attributed the comment to Defendant. *See also* Court File No. 727 at 4 ("Most of those jurors did not know what the jokes referred to and many did not attribute the comments to Defendant at all.").

3

which Holloway attributed to nervousness about the life-or-death choice jurors would have to make. Holloway was not aware of any discussions during that period of the trial about media reports. In fact, Holloway testified, jurors did their best to avoid media coverage. Nor was Holloway aware of any juror expressing fears or concerns related to media coverage or the "racist redneck" remark. The "racist redneck" comment was not the subject of continuing conversation among jurors. "It was one of those things that got brought up every blue moon, you know, joke -- in joke or jest or something," Holloway testified. "It wasn't serious if it was brought up."

The other witness presented by Defendant was a newspaper reporter. She had written articles that were published and she was contacted after the trial by Holloway. After she was contacted by Holloway she contacted some of the other jurors. Other than what was reported in her articles, she had little memory of what she had been told by Holloway or the other jurors.

### C. Extraneous Prejudicial Influences on Jury

Juror exposure to extraneous information does not create a presumption of juror bias. *United States v. Rugiero*, 20 F.3d 1387, 1390 (6th Cir. 1994) (citing *United States v. Zelinka*, 862 F.2d 92, 95-96 (6th Cir. 1988)). As Fed. R. Evid. 606(b) is interpreted in the Sixth Circuit, jurors may be asked about extraneous influences upon them and whether those influences caused bias. *United States v. Walls*, 1998 U.S. App. LEXIS 20597 (6th Cir. Aug. 11, 1998) (citing *Zelinka*, 862 F.2d at 94).[3] Holloway's testimony shows jurors were not affected by hearing about the "racist redneck" remark. There is no evidence jurors were affected by the remark or that the remark caused prejudice. The lack of impact is consistent with jurors' statements and expressions during the

---

[3]Even if testimony about the impact of extraneous influences is not admissible, it was the defense that elicited the testimony.

4

Court's in camera interviews; jurors who were aware of the comment at the time of the Court's interview were not angered or otherwise affected by the comment, and jurors who were asked said they could put the comment out of mind and decide the case solely on the evidence presented at trial. Moreover, there is nothing in the remark itself that logically that should lead a rational juror to put aside his or her oath and decide the case on improper grounds. The remark is not a threat, is not threatening, is not personal to any particular juror, and as far as insults go, is not a major insult. We must assume the jury followed the Court's instructions. The Court instructed the jury to not make its decision based upon prejudice, bias, or sympathy. At the end of the verdict sheet, each juror certified that race did not enter into his or her decision. In short, despite the seemingly inflammatory nature of the comment, the jurors were not affected by the comment and showed no inflammation or impact as a result of the comments. Thus, a new sentencing hearing is not necessary.

### D.   Future Dangerousness

Defendant contends the comment affected jurors' decision on one of the nonstatutory aggravating factors, future dangerousness: "Evidence that after the defendant, angered by having been convicted, called the jurors 'racist rednecks' is the very sort of evidence the Court had instructed the jury to consider in deciding whether Mr. Taylor was a 'future danger.' That is, the Court specifically said the jury was to consider as evidence of future dangerousness that Mr. Taylor had used others to communicate with people outside of the detention facility." (Court File No. 827 at 5).

Part of the jury's consideration on future dangerousness was that Defendant communicated information to people outside the jail. However, there is no evidence jurors were aware of any of the circumstances of Defendant making the remark. There is no evidence the jury was aware

5

Defendant make the remark in a telephone conversation. There is no evidence the media reported Defendant was angry. And there is no evidence the jury thought Defendant made the remarks with any seriousness. There is no support for Defendant's supposition that the jurors were secretly fearful and angry but all concealed that fear and anger from other jurors and the Court. The comment could just as easily have been made and more logically would have been made in open court while the jury was not present. Furthermore, jurors knew Defendant communicated with people outside the jail because there was plenty of information showing this at the trial, including some from Defendant himself. That specific issue was not in dispute. Defendant's argument the comment caused the jury to be unfair and biased against him is belied by the fact the jury took two full days to reach a decision on the death penalty, the fact that it found in his favor on some points, and their post verdict certification. One would think a jury motivated by anger, fear, and bias would reach a decision quickly and uniformly against Defendant.

### E. Use of Juror Numbers

Defendant argues that the jurors' secret fear and anger over their exposure to media reports of the racist redneck comment was reinforced by the Court suddenly deciding to not refer to the jurors by their names but rather by number. "[W]hen the trial resumed for the penalty phase, the Court suggested to the parties that the jurors would be more comfortable during the remainder of the trial if they were escorted from the jury room by security personnel. This measure suggests more than a concern over avoiding the press." (Court File No. 827 at 9). "Other jurors' awareness that the Court itself had decided they needed to become anonymous would have sent a message to them that they did indeed have something to fear from Mr. Taylor or his friends or family. This message from the Court to the jurors would itself have been highly prejudicial." (*Id.*)

6

The problem with this argument is that it is not supported. Juror names were used during voir dire and when jurors were polled after the guilty verdict. The Court used the name of a juror as late as the first day of sentencing deliberations, on October 15, 2008. When jurors were polled after the sentencing verdict, their numbers were used instead of their names. But the use of juror numbers could not have affected jurors because it occurred after the sentencing verdict. The Court is not aware of any other instance when juror numbers were used while the jury was present. Outside the presence of jurors, on occasion either names or numbers were used, but these could not have affected the jury because the jury was not present.

Defendant also references the jury foreperson's in camera interview with the Court. Since the Court was conducting the interview, it has a better understanding of what was communicated. The foreperson's question went to the nature of the case, that is, a murder case, and was not connected to any specific threat or concern involving Defendant. Such a question about safety is imminently reasonable in a murder case.

Defendant also mentions the jury being escorted by security personnel. Because of the age of the courthouse where the trial was conducted, there are no separate areas for jurors outside the jury room itself. At breaks and when leaving the building, jurors, witnesses, attorneys, spectators, the media, and family members by necessity intermix in the hallways, stairway, and elevator. Obviously, such contact is undesirable and is fraught with the potential for problems.[4]

### F. Juror Discussions Prior to Deliberations

Based on allegations jurors discussed the case prior to deliberations, Defendant suggests

---

[4]In a prior case, family members of a criminal defendant confronted the Court in a stairwell and followed jurors to their parked cars and confronted some of them.

7

jurors made up their minds about a death sentence before the defense had the opportunity to present its case. The Court already determined evidence of juror discussions outside of deliberations is inadmissible (Court File No. 810 at 8-11). Furthermore, there is no indication jurors had made up their minds prior to deliberations. Holloway testified jurors were nervous about making the choice in this capital case; there was no evidence they had already made a decision. Nor would jurors have had any significant time to make up their minds after the government's sentencing case, which started and ended in a single day, and which was followed the same day by the start of the multi-day defense case (Court File No. 747). Holloway testified that as sentencing deliberations were about to start one juror said "Let's get this over with," but it is not reasonable to draw a nefarious inference from that comment. It is easy to understand how a juror was looking forward to finishing the trial, which had been going on intermittently for almost two months. The two full days of sentencing deliberations also suggest jurors had not made up their minds before deliberations.

### G.     Conclusion

As noted, juror exposure to extraneous information does not create a presumption of juror bias. *Rugiero*, 20 F.3d at 1390. The evidence in this case does not show bias or prejudice; it shows jurors did their best to avoid media coverage and took seriously their duties as jurors. The Court instructed jurors to decide the case based on the evidence they heard in court. Jurors followed the Court's instructions to avoid media coverage of the case and presumably also to decide the case based on what they heard in court. Although they became aware of extraneous information, there is no reason to conclude the information affected their decision.

Accordingly, the Court will **DENY** Defendant's motion for a new trial based on newly-discovered evidence (Court File No. 739).

8

Case 1:04-cr-00160-CLC-CHS   Document 836   Filed 04/17/09   Page 8 of 9   PageID #: 2870

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

9