1    IN THE UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF TENNESSEE

3    AT CHATTANOOGA
---------------------------------------------------------
4                              :
UNITED STATES OF AMERICA,    :
5                              :
         Plaintiff,          :
6                              :
v.                           :          1:04-CR-160
7                              :
REJON TAYLOR,                :
8                              :
         Defendant.          :
9    ---------------------------------------------------------
                              Chattanooga, Tennessee
10                             September 8, 2008

11        BEFORE:  THE HONORABLE CURTIS L. COLLIER,
                  CHIEF UNITED STATES DISTRICT JUDGE
12
APPEARANCES:
13
             FOR THE PLAINTIFF:
14
             STEVEN S. NEFF
15           CHRISTOPHER D. POOLE
             Assistant United States Attorney
16           1110 Market Street, Suite 301
             Chattanooga, Tennessee  37402
17
             FOR THE DEFENDANT:
18
             WILLIAM H. ORTWEIN
19           Post Office Box 38
             Hixson, Tennessee  37343
20
             HOWELL G. CLEMENTS
21           1010 Market Street, Suite 401
             Chattanooga, Tennessee  37402
22

23
                      JURY TRIAL
24                    NINTH DAY OF TRIAL

25

UNITED STATES DISTRICT COURT

1   APPEARANCES:  (Continuing)

2

3           FOR THE DEFENDANT:

4           LESLIE A. CORY
            FREDERICK L. ORTWEIN
5           1010 Market Street, Suite 306
            Chattanooga, Tennessee  37402

6

7

8                               – – –

9

10                      INDEX OF PROCEEDINGS

11

12  Charge Conference. . . . . . . . . . . . . . . . . . . 1650

13
    Closing Argument by Mr. Neff . . . . . . . . . . . . . 1678
14

15  Closing Argument by Mr. Clements . . . . . . . . . . . 1694

16
    Rebuttal Argument by Mr. Poole . . . . . . . . . . . . 1710
17

18  Jury Charge. . . . . . . . . . . . . . . . . . . . . . 1722

19
    Verdict. . . . . . . . . . . . . . . . . . . . . . . . 1762
20

21                              – – –

22

23

24

25

1     (The proceedings were held outside the presence of

2     the jury, as follows:)

3     THE COURT:  On Friday the Court had copies of the

4  draft charge provided to the parties.  So let's take up the

5  draft charge.  We'll start with the government.  We'll give the

6  government a chance to object to any portions of the draft and

7  to make requests for additional instructions.  We'll give the

8  defense a chance to respond to the government's comments.  And

9  when the government is finished, we'll provide the same

10  opportunity to the defense.

11     Mr. Poole, I see you're standing?

12     MR. POOLE:  Yes, sir.  No objections to the charge.

13  We do have some requests, Your Honor.

14     Number 1, on Page 14, it's the proof of other

15  certain crimes or acts, the 404(b) instruction.  And it does

16  lay out that "If you find the defendant did these acts, you

17  can consider the evidence only as it relates to the

18  government's claim on the defendant's motive or lack of

19  mistake."  We would ask to add the other factors of intent and

20  consciousness of guilt in there as well.  Those factors, the

21  404(b) evidence could demonstrate the defendant's intent and

22  consciousness of guilt as well as motive or lack of mistake.

23     THE COURT:  Any objection?

24     MS. CORY:  Well, Your Honor, we certainly prefer the

25  instructions as they are now; but if the government's asserting

1  that's what it introduced the evidence for, then I don't think

2  we have an objection.

3       THE COURT:  Okay.  Very well.  On Page 14, then, we

4  will add those other two purposes as stated by the government.

5       MR. POOLE:  Thank you, sir.  Next is Page 38, which

6  is where the instruction talks about aiding and abetting.

7  Certainly we don't have any objection to that.  Mr. Neff had

8  submitted a request for an instruction which we think would fit

9  in either right before or right after this, which is the

10 *Pinkerton* instruction on conspiracy theory.  I know he laid out

11 the law with respect to that in the submission, but

12 basically -- I know the conspiracy is not charged in this case,

13 but I think that there is proof of a conspiracy, and I think

14 that's the test.  If the facts demonstrate that a conspiracy

15 was there, then a *Pinkerton* conspiracy charge is appropriate.

16      As I said, I believe Mr. Neff submitted that a few

17 weeks ago with the appropriate law.  But we would ask for

18 that.  I think there is certainly proof that these three men

19 charged in this conspired together in this case to commit

20 these criminal acts.  So I think the *Pinkerton* instruction

21 with regard to coconspirator liability is appropriate, Judge.

22      THE COURT:  What was the conspiracy?  Conspiracy to

23 do what?

24      MR. POOLE:  I think there is a conspiracy to, if

25 nothing else, rob Mr. Luck.

1    THE COURT:  But he's not -- this defendant is not

2    charged with robbery, though.

3    MR. POOLE:  Well, carjacking, Your Honor, I would

4    relate to the robbery, robbery of not just the items, but they

5    also ended up robbing him of the van.  I think it also became a

6    conspiracy to kidnap him, Judge.  I think Mr. Matthews and

7    Mr. Taylor, the proof is, took him together.  I don't think

8    there's any doubt that they agreed to do this, that they were

9    in this together.  I would argue to you, Judge, based on

10   testimony last week of Mr. Matthews, this conspiracy is ongoing

11   in order to cover up the kidnapping and the carjacking.  I

12   don't think the conspiracy has ever stopped, Judge; I think it

13   kept going until Mr. Matthews got on that stand and testified.

14   THE COURT:  What is the evidence to support the idea

15   that there was a conspiracy to take the van?

16   MR. POOLE:  Well, Judge, they went in together, they

17   came out at -- with guns on him, and took the van.  So I think

18   that's pretty strong evidence that they agreed to do it.

19   Mr. Matthews rode in it, with Mr. Taylor driving it, from

20   Atlanta to Chattanooga; I think that's pretty clear.  As I

21   said, I think that the conspiracy is ongoing to cover this up.

22   I think the proof is--  There is proof before the Court that--

23   THE COURT:  Who is part of that conspiracy, the

24   ongoing conspiracy?

25   MR. POOLE:  Sir Jack Matthews and Rejon Taylor.

1        THE COURT:  So Mr. Marshall is not a part of that

2  conspiracy, then.

3        MR. POOLE:  I believe he's withdrawn from that

4  conspiracy, that's correct, Your Honor.

5        THE COURT:  Was he ever a part of that conspiracy?

6        MR. POOLE:  Was he ever a party to?

7        THE COURT:  The ongoing conspiracy.

8        MR. POOLE:  To cover it up afterwards.

9        THE COURT:  So we have two different conspiracies,

10 then.

11       MR. POOLE:  Probably more than that, Judge.  I think

12 he withdrew.  There is proof before the Court that Mr. Matthews

13 and Mr. Taylor were in the cell together for Mr. Taylor -- that

14 Mr. Matthews had Mr. Taylor's possessions, Mr. Matthews lied

15 about being in the cell with Mr. Taylor.  I think the Court can

16 easily conclude that there is a -- that they were together,

17 that they were conspiring for Mr. Matthews to come up and tell

18 that story.  I think that's part of the original conspiracy

19 which Mr. Marshall withdrew from.  So I don't think it's

20 actually multiple conspiracies; it's where one -- you had one

21 of the people withdraw, and two people stayed in it.

22       THE COURT:  The essence of the conspiracy is the

23 agreement.

24       MR. POOLE:  Sure.

25       THE COURT:  Under your theory what happened was, at

1  the onset of the conspiracy the three conspirators, and perhaps

2  others, decided they would also cover up any crimes committed

3  during the course of the conspiracy.

4         MR. POOLE:  Mr. Matthews testified he and Marshall

5  came up with that story, Judge.  If that's not a conspiracy--

6  They sat there and they drank Hennessee and they smoked

7  marijuana and they came up with the story, and "This is the

8  plan, and this is what we'll tell anybody if we get caught."

9  That's exactly what he testified so.  So I think there's proof

10 out there that's exactly what they do.  Now, I obviously don't

11 believe that proof, but there is proof out there, and I think

12 Mr. Matthews has backed it up with what he's done with

13 Mr. Taylor.  I don't think there is any doubt there is an --

14        THE COURT:  Ms. Cory?

15        MS. CORY:  Your Honor, there is absolutely no

16 evidence in the record of a conspiracy.  And the *Pinkerton*

17 theory is just a huge stretch that would do nothing but confuse

18 the jury.  The aiding and abetting instruction does everything

19 that the law requires to hold one codefendant responsible for

20 the acts of other codefendants in these activities.  There is

21 no evidence of a conspiracy to kidnap, there is no evidence of

22 a conspiracy to carjack, and there is no evidence of a

23 continuing conspiracy.  They were arrested.  The crimes ceased

24 at the point of their arrest, if you want to include what

25 Marshall and Matthews did in conspiring or agreeing to try to

1    cover things up prior to their arrest.  There is no evidence of

2    any continuing activity after the arrest.  But what Mr. Poole

3    is trying to address as the conspiracy, isn't that just good

4    old aiding and abetting?  And Your Honor has already given an

5    instruction for that.

6         THE COURT:  Thank you.

7         The *Pinkerton* theory allows one conspirator to be

8    held responsible for the acts of other conspirators so long as

9    those acts were committed during the course of the conspiracy

10   and would have been reasonably foreseeable to the

11   conspirators.  The essence of a conspiracy is the agreement

12   itself.  And in this case the evidence of a conspiracy, as

13   articulated by Mr. Poole, are the acts themselves, not the

14   agreement, that is, that we don't have an agreement and then

15   we have certain acts that take place pursuant to that

16   agreement, that some of the conspirators may not even have

17   known of but would have been within the scope; the acts

18   themselves constitute the existence of the conspiracy.  And

19   because we're dealing with the acts themselves, the

20   participants in those acts are personally responsible for

21   whatever they did.

22        So I don't think that the *Pinkerton* liability theory

23   is applicable in this case.  There is no evidence of a

24   separate agreement between the parties, although there is

25   agreement of a conspiracy.  But, as I said, the conspiracy

1  consists of the acts that constitute the conspiracy itself.

2  So the Court will deny the government's motion for a *Pinkerton*

3  liability instruction.

4        MR. POOLE: I understand that, Judge. I would point

5  out that Mr. Marshall testified that he had been following

6  Mr. Luck for some time and they did plan to rob him and they

7  talked about it a day before. Carjacking is just a robbery of

8  a car. So while I disagree, I understand the Court's ruling.

9        Next, on Page 40, flight and escape. I pointed this

10  out to your clerk, Judge. Number 1, October 6 should be

11  August 6——I'm sure that's been changed——at the top, August 6,

12  2003.

13        We would ask to add here, with regard to the flight

14  and escape, destruction of evidence. There is proof in the

15  record, Judge, that, Number 1, clothes were burned. We've got

16  the trash can actually put in as an exhibit where clothes were

17  burned because they had blood on them. The car——that was the

18  Impala——had blood in it, and it was stripped and seats torn

19  out of it. That was the condition it was found in. There was

20  proof from Mr. Marshall that he was told to cover the car, by

21  Mr. Taylor, and that he would come take care of it later. And

22  it was found in a condition where, you know, the seats had

23  been removed and there had been some destruction to the car.

24        Once again, if you believe Mr. Matthews, they

25  actually threw away a firearm which was involved in this,

1  which belonged to Mr. Luck, which is also, I guess,

2  destruction of evidence, evidence that, I guess, supports

3  their theory of self-defense, as well as the pictures they say

4  he destroyed.

5          But I think there is adequate proof for destruction

6  of evidence, certainly with regard to burning Sir Jack's

7  clothes and destroying the Impala.  That could be added as

8  well.  The jury could consider that—they certainly don't have

9  to—as proof of consciousness of guilt.

10          THE COURT:  Any objection to that?

11          MS. CORY:  Your Honor, we do object to that.  The

12  flight/escape instruction pretty well encompasses activities

13  after the crime itself occurred.  Everything that Mr. Poole

14  mentioned is in the record.  I don't think we need anything

15  above and beyond what the flight/escape instruction

16  encompasses.

17          THE COURT:  The Court does recall that there was

18  evidence of the concealment of evidence.  So the Court will

19  give the instruction as requested by the government.

20          Do you have any particular language in mind?

21          MR. POOLE:  Judge, Your Honor has given it,

22  destruction of evidence, before, in the Michael Johnson case.

23  We can get that language.  But I think it says—  You have—

24  It says, "If the defendant took evasive action to avoid being

25  arrested, and was involved in attempting to escape from jail."

1    I think we can add "was involved in the destruction or

2    concealment of evidence" to that.  That would cover it.

3             THE COURT:  Very well.  We'll add that, then.

4    Anything else?

5             MR. POOLE:  No, thank you, sir.

6             THE COURT:  Okay.  Ms. Cory?

7             MS. CORY:  Your Honor, although by and large we found

8    the jury instructions very acceptable to us, there were

9    numerous comments that we had and a couple of additions to the

10   instructions.  In order to avoid confusion, I have made copies

11   of the pages in which our changes are made, and I'd like to

12   give a copy to the government and the Court, just to follow as

13   I'm going --

14            THE COURT:  Very well.

15            MR. POOLE:  Thank you.

16            (Brief pause.)

17            MS. CORY:  Your Honor, on Page 5 of your

18   instructions, the very first line we would like amended to

19   read, "A defendant is not obligated to produce any evidence,

20   either by cross-examining the witnesses who are called to

21   testify by the prosecution or by testifying on his own behalf."

22   And we ask that simply because saying "A defendant is not even

23   obliged to testify," I think, lends itself to the jury's

24   inferring that the defendant should have testified.  And our

25   amended change does the same thing without -- it serves the

1     same purpose without having that implication.

2            THE COURT:  Any objection?

3            MR. POOLE:  No, sir.

4            THE COURT:  Okay.  We will make that change.

5            MS. CORY:  Thank you, Your Honor.  There are also

6     several places where I made changes to what I thought were

7     grammatical or typographical errors.  I'm not going to go

8     through those.

9            THE COURT:  I see on Page 5 you have or crossed out

10    and the word are, A-R-E, put in.

11           MS. CORY:  Yes, Your Honor.  That's the kind of

12    thing, "Possible doubts are doubts based purely --"

13           THE COURT:  No, I think that's --

14           MS. CORY:  Oh, okay.  You're right.  Sorry about

15    that.

16           On Page 11, second paragraph, "The fact that Joey

17    Marshall and Sir Jack Matthews have confessed," the evidence

18    at trial really was that they had pleaded guilty to a crime.

19    In the end, neither of them confessed to it.  So we would ask

20    that be changed to pleaded guilty.

21           MR. POOLE:  I object to that, Your Honor.

22           THE COURT:  And why is it that you think they have

23    not confessed?

24           MS. CORY:  Well, Mr. Marshall's testimony was, he

25    didn't know what was going on, he didn't even know that there

1  was anybody in the van that he was following.  So he obviously

2  was not confessing to participating in either a carjacking or a

3  kidnapping because he didn't know Guy Luck was in the van.  At

4  the most, he was agreeing that he was following a van that

5  Rejon Taylor may have stolen.

6        As far as Sir Jack Matthews goes, his whole

7  explanation was that he was participating in the distribution

8  of marijuana with Guy Luck and Mr. Marshall and Mr. Taylor.

9  So he didn't confess to any crime other than the distribution

10  of marijuana.

11        THE COURT:  Well, they stood up before me, under

12  oath, and in answer to the question "Are you pleading guilty

13  because you are in fact guilty?" they both swore under oath

14  that they were in fact guilty.  Why is that not a confession?

15        MS. CORY:  It was a confession during those

16  proceedings, but what the jury heard was not a confession.  And

17  the evidence that entered in of their prior pleas of guilty

18  does not enter in as substantive evidence.  So what the jury

19  has before them is people who pleaded guilty, not people who

20  confessed under oath during this trial.

21        THE COURT:  Mr. Poole?

22        MR. POOLE:  Number 1, I don't know why their pleas of

23  guilty don't come in as substantive evidence.  I don't think

24  there is any support for that.

25        Number 2, there is plenty of proof from Mr. Matthews

1  and Mr. Marshall.  They gave plenty of evidence.

2  Mr. Matthews, Special Agent Melia talked to him at least ten

3  times, and he confessed to these crimes.  Granted, he no

4  longer claims that's the story.  But he's confessed at least

5  ten times.  And Mr. Marshall also said from the stand he's

6  confessed numerous times.  He confessed.  He confessed on the

7  stand, I would argue because he's part of the conspiracy, but

8  certainly because he's part of these actions, and he explained

9  why he was guilty as being part of these.  I don't think there

10  is any doubt that both these defendants confessed on numerous

11  occasions, Judge.

12           THE COURT:  The Court will deny that request, then.

13           MS. CORY:  Your Honor, following Page 12, I did find

14  that the defense had requested an instruction on inconsistent

15  statements.  Unfortunately in my requests I had termed it

16  "inconsistent testimony," and submitted two instructions on

17  that.  However, we did ask for an instruction on witness

18  credibility and inconsistent statements.  A great deal of the

19  proof in this case involved inconsistent statements, and

20  therefore I would ask the Court to instruct the jury as I've

21  provided here on this additional page, with this term,

22  Requested Instruction Number 11 in my original requests, to

23  provide an instruction regarding inconsistent statements.

24           Then also we would ask for the addition of an

25  instruction in the same vein, and right after that one,

1  "Evidence Admitted for a Purpose Other Than to Establish the

2  Truth of the Matter Asserted."  And it would read similarly,

3  "During the trial you heard testimony from Lieutenant

4  Coppinger regarding an envelope and its contents.  The

5  contents of the envelope are not to be considered by you as

6  affirmative evidence bearing on the defendant's guilt or

7  innocence, because this envelope was placed before you for the

8  limited purpose of helping you decide what significance the

9  envelope had on your determination of Sir Matthews'

10 testimony" -- or, rather, that should be "Sir Matthews'

11 credibility."

12          THE COURT:  Mr. Poole, is there any objection to the

13 first request, that is, inconsistent -- prior inconsistent

14 statements?

15          MR. POOLE:  No.  No, I don't think so, Judge.

16          THE COURT:  Okay.  The Court, then, will give that.

17          Now, the second one, I think this addresses the

18 matter that we brought up on Friday, that we had a chance to

19 discuss some, and the parties have submitted briefs on it.

20          MS. CORY:  As I said, Your Honor, that's --

21          THE COURT:  Mr. Poole?

22          MR. POOLE:  Judge, we actually filed a very brief

23 response.  I don't think there is any basis in the law for

24 doing what they're asking.  That being said, just to protect

25 the record, we don't object to a charge stating that the

1    contents of the envelope in question are not to be considered

2    for the truth of the matter asserted.  If the Court is willing

3    to give that, we don't object to it.  We don't intend to argue

4    those facts, Judge, out of those 302s.

5            THE COURT:  I don't have a problem with giving that,

6    but if I give that I think I need to reconsider the Defendant's

7    Rule 29 motion, then.  The Court's Rule 29 decision was based

8    in part upon there being some substantive evidence as to what

9    took place in the van.  And without those statements I don't

10   know that there is any substantive evidence at all in the

11   record as to what took place in the van.

12           MR. POOLE:  I believe there is, Judge.  I believe the

13   plea agreements are still in, with the facts that they both --

14   Mr. Marshall and Mr. Matthews swore to, and they're substantive

15   evidence as to what took place in the van.

16           MS. CORY:  Your Honor, I agree with you.  I would

17   simply say, if you add this instruction, that while the jury is

18   considering their decision, Your Honor can reconsider the

19   Rule 29 motion.

20           MR. POOLE:  Certainly, Your Honor, if Your Honor does

21   not want to consider the plea agreements, I think the plea

22   agreements are in, the factual bases are in, and the same facts

23   are in through those as the 302s.  But even if Your Honor wants

24   to reconsider the Rule 29, we would not agree to the limiting

25   instruction.  We believe that testimony and that proof is

1    already in, Your Honor, through both Sir Jack Matthews' and

2    Joey Marshall's pleas.

3         MS. CORY:  Your Honor, we did object vigorously to

4    Lieutenant Coppinger's being admitted to testify as to either

5    the envelope or the contents.  I think we preserved that

6    objection.

7         MR. POOLE:  They didn't object to the contents, Your

8    Honor.  They put them in.

9         MS. CORY:  Well, the only reason we put the contents

10   in, Your Honor, was because we felt that there was an unfair

11   representation or inference being made by the envelope's being

12   submitted.  We had to rebut that.  That's why we submitted the

13   contents, to show the jury that there was no evidence of a

14   conspiracy or collusion between Mr. Taylor and Mr. Matthews.

15        THE COURT:  Well, I think that was a sound tactical

16   decision based upon what was before the defense at the time,

17   and I think that any number of attorneys faced with the same

18   facts would have made the same decision.  And I agree with the

19   defense that the evidence is offered to rebut an inference.

20   But just as most of the defense evidence and cross-examination

21   was intended to rebut either other evidence or inferences,

22   rebuttal evidence is not impeachment evidence.  Impeachment

23   evidence is a very special type of evidence.  And if the

24   parties decide to admit inadmissible evidence, then that is

25   fine, the parties can do that, they have the right and the

1   power to do that.  And once the evidence comes in, it can be

2   used for any purpose, even if it was presented for some other

3   purpose, unless the law has some limitations on it.

4           The Court recalls that during the testimony of

5   Mr. Matthews he talked about certain statements that Mr. Luck

6   made.  Those were hearsay statements that were being offered.

7   There was no objection to those statements.  Those statements

8   came in, and the jury is free to consider them for any purpose

9   at all.  And the Court sees the contents of the envelope as

10  the same thing.

11          It was very logical and reasonable for the defense

12  to want to show to the jury that what was in the envelope was

13  not a direction by the defendant for the witness to testify on

14  the stand the way he testified on the stand.  That was

15  appropriate, logical, and reasonable under the circumstances.

16  But once the evidence came in without objection, the evidence

17  was in.  So the Court will not give the second request, then,

18  "Evidence Admitted for a Purpose Other Than to Establish the

19  Truth of the Matter Asserted."

20          MS. CORY:  Your Honor, on Page 14, second line, we

21  would ask, in addition, "If you find beyond a reasonable doubt

22  the defendant did those acts," in regard to the 404(b)

23  evidence.

24          MR. POOLE:  Judge, we don't think that's an accurate

25  statement of the law, though, looking at it right now.

1    Obviously we're not trying to prove him guilty beyond a

2    reasonable doubt on those charges.  Mr. Neff is frantically

3    looking for the 404(b), but we have -- I don't think that's

4    accurate.  I think "If you find the defendant did those acts"

5    is sufficient.

6         MS. CORY:  Your Honor, I would agree that for the

7    Court to have admitted the 404(b) evidence the Court need not

8    have decided it beyond a reasonable doubt.  But for the jury to

9    consider it, it's like any element of the offense, it has to

10   go -- it has to measure up to the proof beyond a reasonable

11   doubt standard.

12        MR. POOLE:  Judge, it's not an element of the

13   offense.  So I guess it is --

14        THE COURT:  Let me take a look at that.  I don't know

15   that I've ever faced this before.  I know that the law is that

16   the jury must determine that the acts took place.

17        MR. POOLE:  Yes, sir.

18        (Brief pause.)

19        THE COURT:  Well, I do have some law on it.  It is

20   the United States Supreme Court, the *Huddleston* case,

21   *Huddleston v. United States*:  "Thus, the judge need only find

22   that the jury could reasonably conclude by a preponderance of

23   the evidence that the defendant committed or is responsible for

24   the other crimes, wrongs, or acts."

25        And there is another Supreme Court case, *Dowling v.*

1  *United States*, that indicates that you can submit to the jury

2  evidence upon which a defendant had previously been acquitted,

3  which means that a prior jury had determined that the evidence

4  did not meet the proof beyond a reasonable doubt standard.  So

5  that would have to mean, then, that the second jury would be

6  making its decision upon a lesser standard.

7            I'll still take a look at this, though, and see.

8  And if there is support for the issue, the Court will give the

9  instruction.

10           MS. CORY:  Thank you, Your Honor.

11           On Page 21, which is the "Carjacking Resulting in

12  Death," the first element, we would ask that it be -- that the

13  phrase be added "defendant took and caused to be taken a motor

14  vehicle from the person or presence of another."

15           The way it's worded here, that would apply to a car

16  theft as well as a carjacking.  And this is-- A carjacking

17  is, in essence, a robbery; it has to be from the person and

18  presence of another.

19           MR. POOLE:  I think the second element differentiates

20  between a carjacking and car theft, Your Honor.

21           MS. CORY:  Your Honor, I think it's critical that

22  they understand that this is from the person or presence of

23  another.  That is an element.  I think that's the way the

24  element reads in many jury instructions.

25           THE COURT:  Okay.  We will add that, then.

1    MS. CORY:  Thank you.  And that same addition, then,

2  on what's my Page 22 of your instructions, the top sentence,

3  "from the person or presence of another."

4    Then the third element, Your Honor——and this is just

5  to avoid confusion——we ask that the very last sentence be

6  changed to state, "The parties have stipulated or agreed that

7  the van was made in the state of Ohio."  Leaving it "They've

8  agreed that this has occurred" is just vague enough so

9  somebody on the jury could think that we were admitting to the

10  carjacking and not just to the previous sentence that the car

11  was made in the state of Ohio.

12    THE COURT:  Is that what the stipulation says?  What

13  does the stipulation say?

14    MR. POOLE:  I'll have to find it, Judge.

15    (Brief pause.)

16    MR. POOLE:  The stipulation was that the van was

17  previously transported, shipped, and received in interstate

18  commerce.

19    (Brief pause.)

20    MR. POOLE:  Actually doesn't mention Ohio.

21    MS. CORY:  Your Honor, he's correct.

22    THE COURT:  I'd like the instruction to conform to

23  what's in the stipulation, then.

24    MR. POOLE:  Would Your Honor like a copy --

25    THE COURT:  Ms. Cory, I can change it to conform to

1    what's in the stipulation, or we can keep it as it is.

2              MS. CORY:  Your Honor, I would prefer that it conform

3    to the stipulation, because I think even that avoids any

4    inference that we're agreeing to more than the fact that this

5    particular van had crossed state lines at some point.

6              THE COURT:  Very well.

7              MS. CORY:  On Page 23--  And this goes to both of

8    the--  I think I used this same matter in a couple of the other

9    counts.  But we'll get there.  We would ask for the addition--

10   Your Honor goes through a little description of each of the

11   elements of the offense, but then there is no recapitulation of

12   the fifth element.  And we would ask, in order not to leave the

13   jury with the thought that there is less than all five elements

14   that must be proved, that the Court simply add, "The

15   fifth element requires that in committing the carjacking the

16   defendant did in fact cause the death of Guy Luck."  And, here

17   again, that's simply to avoid any confusion on the jury's part

18   about the necessity of finding each element.

19             THE COURT:  Mr. Poole?

20             MR. POOLE:  I don't object to that, Judge.

21             THE COURT:  Okay.  We will do that, then.

22             MS. CORY:  On Page 24, Charge 2, I think that in

23   trying to make the initial description of the murder with a

24   firearm explanatory toward all of the also lesser-includeds,

25   the Court has diluted the fact that what's charged is murder

 1    with a firearm.  We would ask, on that first paragraph, that

 2    the second sentence, "Count 2 of the indictment charges the

 3    defendant with violating federal law by using, carrying, and

 4    discharging a firearm during and in relation to a crime of

 5    violence," that that sentence be omitted——the sentence before

 6    it is a more accurate and precise explanation——and also that

 7    each place here where it says "causes the death of," it say

 8    "murder" or "committed first-degree murder," because the other

 9    two lesser-includeds deal with something other than murder.

10    The first decision the jury is making is murder, whether there

11    was a murder.

12              THE COURT:  Mr. Poole?

13              MR. POOLE:  I think as it's written it's an accurate

14    statement of the law, Your Honor, or the charge.  I think the

15    charge does mention using, carrying, and discharging a firearm.

16    So I don't think there is any problem with it as written.

17              MS. CORY:  If Your Honor is going to leave that

18    sentence in, then we would ask at least that it be moved to be

19    the first sentence, because it is the least descriptive of what

20    this count charges, and make the second sentence "Count 2 of

21    the indictment charges the defendant with murder by use of a

22    firearm during and in relation to a carjacking."

23              And definitely the fourth element has to be he

24    committed first-degree murder; it is not that he simply caused

25    the death of Guy Luck.

 1          THE COURT:  Well, these first two sentences are not

 2   written correctly.  Let's see if we can straighten this out.

 3   "Count 2 of the indictment charges defendant with murder by use

 4   of a firearm during and in relation to carjacking.  Federal law

 5   prohibits the use, carry, and discharge of a firearm during and

 6   in relation to a crime of violence."

 7          MS. CORY:  That's fine, Your Honor.

 8          THE COURT:  Mr. Poole?

 9          MR. POOLE:  Yes, sir.

10          THE COURT:  Okay.  "Federal law prohibits the use,

11   carry, and discharge of a firearm.  A person is guilty of this

12   offense if he, in the course of committing a crime of

13   violence --" and, Mr. Poole, do you object to taking out the

14   words "causes the death of" and substituting the word murders?

15          MR. POOLE:  Judge, I believe that the indictment says

16   "caused the death of," which is why I think it's appropriate.

17          THE COURT:  And did the indictment track the statute?

18          MR. POOLE:  Yes, sir.

19          MS. CORY:  Your Honor, I believe if you look at all--

20   I don't have the indictment right in front of me.  I need to go

21   get it.  But I think if you track everything that that count

22   says, it establishes murder, because it deals with he did it

23   knowingly and with premeditation or in the course of kidnapping

24   and he did it with malice aforethought.  All of those, which

25   Your Honor explains later in this charge, go to murder, and not

1   to the lesser-includeds of voluntary manslaughter or

2   second-degree murder.

3           MR. POOLE:  I think the Court explains it under the

4   fourth element, which is appropriate.

5           MS. CORY:  And, Your Honor, we think the

6   fourth element should be "committed first-degree murder,"

7   because that's what's charged in the indictment, then the

8   lesser-includeds would be the second-degree murder, which Your

9   Honor deals with later, or voluntary manslaughter.

10          THE COURT:  In fact, other than in the titles, I

11  don't see the word <u>murder</u> in the first two counts at all.

12          MS. CORY:  Well, Your Honor --

13          THE COURT:  I do see "murder" in Count 4.

14          MR. POOLE:  It is Count 3, Judge.

15          THE COURT:  And it is in Count 2.  So it's not in

16  Counts 1 and 3.

17          MR. POOLE:  That's correct.

18          MS. CORY:  That's correct.  And we're not asking for

19  it in 1 and 3.  But Count 2 specifically says "caused the death

20  of Guy Luck through the use of a firearm, which killing is a

21  murder as defined in 18, United States Code, Section 1111, in

22  that the defendants, with malice aforethought and in the

23  perpetration of kidnapping, did unlawfully kill Guy Luck by

24  shooting him multiple times with a firearm, willfully,

25  deliberately, maliciously, and with premeditation."

1    What they've charged is murder.  Your Honor explains

2  all of those elements in detail later.  But to say that

3  premeditation and malice aforethought are encompassed by

4  "caused the death of Guy Luck," it doesn't give the jury

5  anything appropriate to go by.

6    THE COURT:  Mr. Poole?

7    MR. POOLE:  Judge, I think Your Honor does lay out

8  what caused the death of means.  If Ms. Cory would like "which

9  caused the death of Guy Luck," comma, "which killing is a

10  murder," I don't object to that.  I mean --

11    MS. CORY:  Your Honor, "caused the death of Guy Luck"

12  is an element in the murder, in the second-degree murder, and

13  in the voluntary manslaughter charges.  That covers all three

14  of those.  The thing that makes this distinct is that he's

15  charged with first-degree murder.

16    THE COURT:  The Court will grant the request with

17  regard to changing "caused the death of" in this first

18  paragraph to murder.  So the Court will make that change.

19    Now, in the elements you'd like the word knowingly

20  put before the --

21    MS. CORY:  Your Honor, that's just an element of the

22  offense.

23    THE COURT:  Any objection?

24    MR. POOLE:  Where are we, Judge?  I'm sorry.

25    MS. CORY:  Second count.  Excuse me.  Second element.

Case 1:04-cr-00160-CLC-CHS  Document 868  Filed 10/05/10  Page 26 of 120  PageID #: 5071

1    MR. POOLE:  That's fine, Judge.

2    THE COURT:  Okay.  We will do that.  And then in the

3  fourth count, something similar, you'd like the words "caused

4  the death of" taken out and "committed first-degree murder" --

5    MS. CORY:  Yes, Your Honor.

6    THE COURT:  Mr. Poole?

7    MR. POOLE:  "Defendant murdered Guy Luck through the

8  use of a firearm."  That's fine, Judge.

9    THE COURT:  What, now, Mr. Poole?

10    MR. POOLE:  If she wants--  I thought that kind of

11  tracked what we were just talking about.  "Murdered Guy Luck

12  through the use of a firearm" is fine.

13    THE COURT:  "Fourth, in committing the offense,

14  defendant murdered Guy Luck through the use of a firearm"?

15    MR. POOLE:  Yes, sir.

16    MS. CORY:  Your Honor, we prefer the murder.  We

17  prefer, above all, murder in the first degree, since that's

18  what the first count -- or the second count charges.

19    THE COURT:  The Court will change the language, then,

20  to "fourth, in committing the offense, defendant murdered Guy

21  Luck through the use of a firearm."

22    MR. POOLE:  Thank you.

23    THE COURT:  What's next?

24    MS. CORY:  Your Honor, on Page 32, you give the

25  "Kidnapping Resulting in Death" instructions.  We would ask

 1    that you insert definitions of <u>knowingly</u> and <u>willfully</u> for the

 2    jury.  And I have just submitted as an additional page where

 3    we, in our requested jury instructions, gave definitions of

 4    those terms.

 5              THE COURT:  Any objection?

 6              MR. POOLE:  No, sir.

 7              THE COURT:  Okay.  We will do that, then.

 8              MS. CORY:  And on Page 33, the same thing we did in

 9    the earlier definition -- or explanation of the elements, to

10    add, after the third element, that the fourth element requires

11    that in committing the kidnapping the defendant did cause the

12    death of Guy Luck.

13              MR. POOLE:  No objection.

14              MS. CORY:  Then on the next page, Page 34, "Murder

15    With a Firearm," the same changes we just discussed, where Your

16    Honor revised the second sentence and changed to <u>murder</u> and

17    <u>knowingly</u>.

18              MR. POOLE:  I think you should track Count 2.  So I

19    have no objection, Judge.

20              MS. CORY:  And that's what we're requesting.

21              THE COURT:  Okay.  Any other suggestions or

22    objections?

23              MS. CORY:  I'm getting there, Your Honor.  No, Your

24    Honor.  Those are all our comments.

25              THE COURT:  Thank you.

1  I think, then, I've also addressed the issue that we

2  discussed on Friday regarding the contents of the envelope.

3  And, let's see, there was another-- Let's see. There was a

4  motion or brief filed regarding statements made by Mr. Luck?

5        MS. CORY:  Your Honor, that's right.

6        THE COURT:  Is that right?

7        MS. CORY:  Your Honor, there was a motion filed

8  regarding whether Mr. Luck's statement was admissible as a

9  dying declaration.  And the government made a lengthy rebuttal

10  of that argument.

11        THE COURT:  Is that something the Court needs to take

12  up now?

13        MR. POOLE:  Yes, sir.

14        MS. CORY:  I think so.

15        THE COURT:  Who wants to argue it, then?

16        MS. CORY:  Your Honor, I think the issue was very

17  well briefed by both parties.  It was simply that in the light

18  of the evidence we received from Dr. Maxwell and Dr. King, it

19  appeared that death was not imminent, and we thought there was

20  a good argument that it was not a dying declaration.

21        THE COURT:  Mr. Poole?

22        MR. POOLE:  Actually Mr. Neff will have this, Judge.

23        MR. NEFF:  Your Honor, as I said in my response, this

24  was a classic dying declaration.  The victim stumbled out of

25  the van, spurting blood as a result of a shot to his mouth.  He

1  indicated that he had been -- they had robbed him and shot him,

2  and he repeated over and over that he thought he was going to

3  die.  He in fact did die.  He lost consciousness shortly after

4  that.  The fact that heroic measures by the emergency room were

5  taken to keep him alive is immaterial.  The doctor testified

6  that the victim was essentially brain-dead when he got to the

7  hospital, and never regained consciousness.  So it's clearly a

8  dying declaration, Judge.  He believed he was going to die.

9  His death was imminent.  And he did in fact die.  Even if it's

10 not a dying declaration, it's certainly an excited utterance,

11 Judge, and I outlined that as well.  And I would point out that

12 our view is that the defense is attempting to turn back the

13 hands of time on the trial again and unadmit previously

14 admitted testimony, and our view is that they have forfeited

15 that or defaulted on that opportunity by not objecting in the

16 first place.

17             (Brief pause.)

18             THE COURT:  The rule on this motion is rule 804(b)(2)

19 of the Federal Rules of Evidence, which permits the

20 introduction of statements made by a victim in a homicide case

21 where the victim believes that death is imminent.  From the

22 evidence available in this case, introduced, the Court

23 concludes that the requirements of this rule have been

24 satisfied.  Therefore the Court denies the defendant's motion

25 to strike the testimony of the witnesses Charlie Pac and Jason

1    Reeves.

2            Is there anything further that the Court must do?

3    Okay.  We asked the jury to come back at 9:30.  We still have

4    a few minutes.

5            Mr. Poole?

6            MR. POOLE:  I was going to say no, sir.

7            THE COURT:  Okay.  We'll be in recess, then, until

8    the jury arrives.

9            (Brief recess.)

10           (The jury entered the courtroom, and the proceedings

11           continued as follows:)

12           THE COURT:  Please be seated.

13           Mr. Neff, is the government ready to proceed?

14           MR. NEFF:  We are, Your Honor.

15           THE COURT:  You may.

16           MR. NEFF:  Ladies and gentlemen, about two weeks ago

17   I talked to you about the fact that we were getting ready to

18   travel down the road of this case together and, while there

19   might be a couple of detours, that we would inevitably end up

20   in the same place, and that is, arriving at the defendant's

21   guilt.  And there is no need to ask if we're there yet, ladies

22   and gentlemen, because we are.

23           Notwithstanding the fairy tale world testimony --

24   fairy tale world of Sir Jack Land which we made a brief detour

25   to, the bizarre science-fiction world in which there's

1  magically appearing and disappearing guns and marijuana and

2  photos of naked Asian boys and homosexual sex -- in fact, the

3  story is so ridiculous, if you were to believe Mr. Matthews,

4  the only thing he and the defendant are guilty of is

5  littering.  But that's not really what we have here, ladies

6  and gentlemen.  The proof of the defendant's guilt, from all

7  the credible evidence in this case, I would submit to you, is

8  overwhelming.  And the fictional testimony of Mr. Matthews

9  does not match either the evidence in the case or common

10  sense, despite his best efforts to study, to collaborate with

11  the defendant in his cell——which, by the way, he had a very

12  difficult time admitting that he'd been in the same cell with

13  the defendant for a period of time——and try to make it so.

14        Mr. Matthews, Mr. Marshall, and the defendant

15  conspired to carjack and kidnap the victim, Mr. Luck, five

16  years ago, on August 6th of 2003.  And Mr. Matthews and the

17  defendant continued to conspire to attack the victim even as

18  late as September 3rd, 2008, when Mr. Matthews came in and

19  gave his outlandish testimony.  But lies can't be reconciled

20  with the truth, ladies and gentlemen.  And what I want to do

21  with you is cover the credible proof from the trial and show

22  that we've proven the elements of the defendant's crimes

23  beyond any reasonable doubt.

24        Now, you're going to get some instruction from the

25  Court.  I think probably the two most important words in any

1    trial for a criminal jury to hear are the words right here,

2    "common sense."  Ladies and gentlemen, we ask you to apply

3    your common sense to your consideration of the evidence in

4    this case.  And really, even though this case is obviously of

5    great magnitude and very important, it's also quite simple.  I

6    mean, we know certain things without any contest.  We know

7    that the victim lived in Georgia and he ended up in Tennessee.

8    We know that he owned the van that ended up crossing from

9    Georgia to Tennessee.  We know who was in the van.  We know

10   the three people that were in the van, because we've got one

11   man's body, we've got another man's blood along with the dead

12   victim's body, and we've got the defendant's palm print in the

13   victim's blood inside the van.  So we know who the players

14   were inside the van.

15          We also know what each of the players did inside the

16   van.  We know, for example, that Mr. Matthews had the 9mm

17   pistol.  We know that he shot the victim once with that pistol

18   in the arm.  We know that the defendant then came into the

19   picture and turned around and shot the victim, and the bullet

20   that went through the victim entered into Mr. Matthews, the

21   side of his back.  He didn't shoot himself with a .38 caliber

22   pistol, ladies and gentlemen.  Mr. Taylor ended up shooting

23   him.  We know that that same pistol in which a round ended up

24   in Mr. Matthews also was the pistol that was used to shoot the

25   victim in the mouth and kill him.  So, ladies and gentlemen,

1   that's really what this case is about.  We know the victim

2   ended up dead in the state of Tennessee.

3           Now, the Court's going to instruct you on what the

4   elements of each of the charges are going to be, and I'm going

5   to cover that here with you just for a minute and talk about

6   the proof in light of these.  "Carjacking resulting in death"

7   is the first one, and you can see the elements right here:

8   "The defendant took and caused to be taken a motor vehicle"

9   from another person.

10          Now, Ms. Belcher, the defendant's fiancée, testified

11  that van belonged to him.  The registration came back to

12  Mr. Luck.  There is no question that that van belonged to

13  Mr. Luck.  We know that the defendant ended up driving that

14  van and drove it for two hours, not the victim.  We know the

15  victim ended up in the back of that van, being held at

16  gunpoint.  We've obviously got the fact that the van ended up

17  here in the state of Tennessee ultimately.

18          The defendant--  The second element is, the

19  defendant took the van by force, violence, or intimidation.

20  Now, what happened at the house, ladies and gentlemen?  What

21  does the credible proof tell us happened at the house?  Well,

22  these three individuals, the defendant and -- accompanied by

23  Mr. Matthews and Mr. Marshall, go to the victim's house on

24  August 6, 2003, with the intent of robbing him, taking money,

25  taking -- getting PIN numbers or whatever; and when they get

1    there, they confront -- Mr. Matthews confronts the victim,

2    ultimately, at gunpoint, takes him into the house; the

3    defendant joins him in the house; they come back; they put the

4    victim, at gunpoint, in the back of his van at his residence

5    in Georgia; they then drive for two and a half hours, or two

6    hours, with the victim being held at gunpoint.  Mr. Marshall

7    saw it.  We know it ended up being that way.  We know from

8    Ms. Belcher's testimony that --

9           MR. CLEMENTS:  Excuse me.  When he says "we," seems

10   to give the impression of improper vouching.  He can say the

11   jury knows, you know, but "we" indicates the U. S. Attorney's

12   Office, all their witnesses, and everything else, and I think

13   that's an insinuation of improper vouching.  Thank you.

14          THE COURT:  Mr. Neff?

15          MR. NEFF:  Your Honor, it's not improper vouching.

16   I'm just talking about the uncontroverted facts in the case.

17          THE COURT:  I think he's objecting to the use of the

18   word "we."

19          MR. NEFF:  I can adjust that, Your Honor.

20          Ms. Belcher testified that the victim had no

21   business in Tennessee, had not been in Tennessee, and in fact

22   had other plans for the day.  So there can be no question that

23   the victim was taken by force, violence, and intimidation.

24   Ultimately, of course, we know that the firearms were

25   discharged inside the van and the victim was shot and killed.

1    We know from the third element -- or in the third

2  element, there is no question that the vehicle had previously

3  crossed state lines.  There is a stipulation to that fact, and

4  that's one of the elements of the case.

5    The fourth element, the defendant intended to cause

6  death or serious bodily harm to that person.  Well, the

7  victim's dead.  He shot him.  He shot him in the mouth.  There

8  is no question about what the intent was.

9    And obviously, fifth, in committing the offense, the

10  defendant caused the death of Guy Luck.

11    So those are the elements of that particular

12  offense.

13    The emergency room doctor said something

14  interesting; he said that they had to empty the blood bank,

15  empty the blood bank, in order to try to save Mr. Luck from

16  the defendant's actions.

17    Now, the next charge is kidnapping.  Go over to

18  those elements for you.  And some of the same proof is going

19  to cover these various issues.  "Defendant knowingly and

20  willfully seized, confined, kidnapped, abducted, or carried

21  away the person named in the indictment."

22    Again, Mr. Marshall saw Mr. Matthews take the victim

23  at gunpoint in Georgia.  The defendant joined them in the

24  house, brought him out, put him in the van at gunpoint, and

25  drove him away.  Again, Ms. Belcher testified that the victim

1    had no business in Tennessee, and actually had plans for that

2    day.  We know -- or Ms. Gallant testified that she saw the

3    defendant's vehicle driving around the neighborhood that day

4    at the time of the -- at the time of the kidnapping.  There

5    was a two-hour drive across state lines with the defendant

6    driving the van.  And, once again, the victim ended up dead in

7    Tennessee from multiple gunshot wounds.  His blood was found

8    inside the van.  The defendant's guns were both found inside

9    the van, guns which the defendant had shown up with originally

10   fully loaded, also with gloves.  He was transported across

11   state lines.  There is no question about that, that this case

12   started in Georgia and ended up in Tennessee.

13          The defendant held the victim for ransom, reward, or

14   otherwise.  Well, they took money from the victim and split it

15   later on, ultimately using -- the defendant using, and

16   Mr. Marshall using, that money that evening to pay for a trip

17   to a restaurant.  So there is no question there was some cash

18   stolen from the victim in the case.

19          But also we know something very important about --

20   I'm going to get into this in a minute, but we know something

21   very important, another reason why he was kidnapped and held

22   for a while before ultimately the defendant killed him, and

23   that's because there was a prior history there of burglaries,

24   there was a prior -- there were warrants out for the

25   defendant's arrest, and he became aware of that when he went

1    inside the house, he became aware of that when he saw the

2    paper work sitting on Mr. Luck's desk.

3           The last-- I would also mention that the victim,

4    when he stumbled out of the car, said several things that are

5    very important. One of them was, he said that "They robbed

6    me," which would satisfy this element, "They shot me," and he

7    kept indicating that he felt he was going to die.

8           Now, the other count in the case-- There's actually

9    two counts of firearms murder. We would have to prove that --

10   with each of those, that the defendant committed either the

11   kidnapping or the carjacking in the first place.

12          The second element is that the defendant used,

13   carried, or discharged a gun during the offense. Obviously we

14   have the guns that were recovered from the van; this one, the

15   one the defendant used to shoot the victim in the mouth with

16   and shoot him two more times; and we have this one,

17   Mr. Matthews' gun, which is the one that took the first shot.

18   (Indicating.) So we know they had guns. Those guns were

19   recovered. The guns were loaded when officers recovered the

20   firearms at the scene, by the way, in the same exact location

21   inside the van, right there, right next to the driver's seat,

22   on top of each other, sitting on top of a glove, the other

23   glove caught in the seat belt -- seat belt strap.

24   (Indicating.)

25          Bullets were fired. Obviously several of them ended

1    up in the victim.  When you look at the photograph of the gun

2    after it was recovered, it shows the rounds that were fired

3    from the .38.  Obviously the 9mm -- there's proof about the

4    fact that the first shot was fired, the second shot

5    stove-piped.  So the victim ended up being shot.  He ended up

6    dying.  And Mr. Matthews ended up with the same caliber .38 --

7    or the same kind of round, .38 caliber round from Mr. Taylor's

8    gun, is what ended up in the stomach contents of the victim.

9         The defendant caused the death of the victim.  There

10   is no question about that.  The victim's dead.  There is a

11   gunshot wound to his mouth.  There is his blood all within the

12   van.

13        Then the other elements to this particular crime

14   involve malice aforethought during the kidnapping and having

15   the murder occurring during the kidnapping and/or the jury

16   could also find that the defendant committed the crime with a

17   willful, deliberate, malicious, and premeditated intent.  So

18   what I want to talk to you right now about is that intent and

19   some of the indicia of the defendant's intent during this

20   case.

21        Now, obviously nobody's psychic.  And we discussed

22   this in the beginning.  It is hard for-- It's hard to look

23   into somebody's mind and find out what they're thinking.  We

24   can know what they're thinking by looking at their surrounding

25   actions.  I want to break this down into three parts.  I want

1   to talk about the things that the defendant did prior to the

2   murder, I want to talk about the things that happened around

3   the time of the murder, and I want to talk about the things

4   that happened after the murder.  These are all excellent

5   indicia of the defendant's intent.

6          We know he was engaging in a large-scale scheme to

7   burglarize residences in the neighborhood belonging to the

8   defendant.  The purpose of the scheme was evident from his

9   arrest when he was trying to buy stuff in De Kalb County using

10  somebody else's credit card, the discovery of multiple

11  victims' -- burglary victims' items in an apartment that's

12  tied to him in Rockdale County, and the discovery of other

13  victims' items in the Impala, as well as Joey Marshall's

14  testimony, which is corroborated by all of those particular

15  facts, that this scheme had been going on for quite some time

16  and the defendant was basically engaged in trying to steal

17  identities and credit cards.

18         Now, we know our victim was an easy mark because he

19  was rarely at home, the house was often empty, and there was

20  mail sometimes left on the ground.  He didn't -- he didn't

21  stay at that place every night.  So it was easy to pick him

22  out as a victim in the case, and that's ultimately what the

23  defendant did.

24         The defendant, when confronted with these, was an

25  unrepentant liar.  He tried to manipulate Detective Clowden.

1    He tried to manipulate Detective Wolfe with different lines

2    about where he had gotten the credit cards and what he was

3    doing.  All of these things that I'm talking about, the

4    defendant's schemes, his lies, his manipulations, and the fact

5    that he uses people, and kills if necessary, is indicative of

6    his intent in this case.

7            Ultimately the defendant moved from simply

8    burglarizing this particular victim to stalking him.  He went

9    to the restaurant and ate.  He committed multiple burglaries

10   at the victim's house.  He was casing the victim's other

11   house.  He found out about the other house by following the

12   victim from the restaurant.  And also one of the items

13   recovered from inside the victim's residence later on -- or

14   photographed inside the victim's residence later on was a

15   piece of mail with the other address, the Abbey Lane address,

16   on it.

17           The stalking then changed to something more

18   sinister.  The stalking became what we saw the end result of

19   here.  This time when the defendant went to the victim's

20   house, he didn't go to the victim's house with gloves and wire

21   cutters.  This time he went with gloves, guns, and no masks.

22   This time he went with loaded guns, loaded the same way, by

23   the way, as the gun -- one of the guns that was found in the

24   defendant's house later on, with that unique wad cutter bullet

25   that we talked about during the trial.  So obviously we're

1   moving along, we're progressing, his intent is becoming more

2   and more obvious.

3           Discussing what happened right around the time of

4   the murder, at the point that they confronted the victim at

5   his house and took him inside the house. You saw the

6   photographs of what was inside the house. You saw the

7   photograph of the paper work that was sitting on top of the

8   victim's desk. Defendant saw that paper work, and his plan

9   became even more sinister. He saw that paper work and knew

10  that he had been identified as one of the thieves. And notice

11  that he left credit cards, he left a checkbook, and he left

12  money and cash at the victim's residence, which also indicates

13  that his intent has now changed and become what his plan is

14  going to be.

15          Now, somebody might argue that the manner in which

16  the murder took place was more indicative of somebody who's

17  reacting to events rather than a plan. And, you know,

18  obviously the van ended up being driven off the road, the

19  defendant left the victim there while he was still alive, and

20  there's still unfired bullets in the revolver. But the answer

21  to this question about why it happened that way and whether

22  this was a reaction by the defendant really is fairly simple.

23  The defendant planned to kill Mr. Luck, but it didn't happen

24  the way he planned, because the victim saw what was about to

25  happen and forced the issue by trying to fight for his life.

1    Obviously the defendant had to react to that, and he reacted

2    in the way that he did, still accomplishing the mission he set

3    out to accomplish.

4            When they drove to Tennessee, they passed by

5    numerous banks, ATMs, and other businesses, places where they

6    could have gotten money.  It was a two-hour drive.  Now, why

7    didn't they kill him in the house?  They could have killed him

8    in the house, but that would obviously mark him as a suspect

9    and risk leaving too much physical evidence at the scene.

10   Instead they drove far away, into another state and a far away

11   place, to dump the body and dump the van.  They drove him for

12   two hours without wearing masks.  And what does that tell us?

13   Are you just going to drop him off on the side of the road and

14   tell him to find his way home so he can identify them when he

15   gets back?  No way.  That doesn't make any sense.  So there is

16   no question what the end of the road was going to be.

17           Now, Mr. Marshall testified that they stopped at the

18   side of the road and the defendant came back and asked him if

19   he needed gas and also mentioned that the guy whose van they

20   were driving was the one he thought that took the warrants out

21   on him in Rockdale County.  Joey testified he wasn't inside

22   the house.  He wouldn't have known about that paper work.  So

23   it's interesting that the comments by the defendant match the

24   evidence found inside the house.

25           They passed by multiple populated and rural areas in

1  Georgia, but they kept driving.  They crossed state lines.

2  They traveled into a more and more obscure area.  You saw the

3  video of the drive; you saw what it was like; you saw that it

4  became less and less populated and more and more rural.  Then

5  they turn around and drive back and forth, up and down rural

6  roads in Collegedale, Tennessee.  What was the victim's

7  natural reaction to this?  Now, we don't know what was said

8  specifically inside the van, obviously, but the victim knew

9  what he was -- what was about to happen to him.  He sees that

10 they're traveling down this rural road and they're going back

11 and forth.  He sees this road that's bounded by a creek on one

12 side and a heavy wooded hillside area on the other.  It

13 doesn't take a rocket scientist to figure this out.

14         THE CLERK:  You have two minutes.

15         MR. NEFF:  He knew.  And his decision was evident

16 from the fact that he tried to attack two younger and stronger

17 men, knowing they both had guns.  The defendant then fired

18 multiple shots.  He shot the victim in the mouth at a downward

19 angle.  There is no question what your intent is when you cause

20 injuries like that.  Then they left him there and didn't report

21 it immediately to eyewitnesses.  If he were innocent, he

22 wouldn't do that.  The victim then stumbled out and said, "They

23 robbed me," but he didn't identify them.  He didn't know who

24 they were.  That's not what he would have said if this were

25 about something else.

 1      After the murder the defendant has the wherewithal

 2  to flip down the license tag.  Innocent people don't do that.

 3  The defendant later, when he was arrested, was found hiding

 4  naked in a fridge.  Innocent people don't do that.  Later on

 5  there was evidence that was attempted to be destroyed——the

 6  trash can with the clothing, the car being trashed on the

 7  inside.  People don't try to destroy evidence if they're

 8  innocent.  Later on the defendant attempted to escape.

 9  Innocent people don't do that, either.  And then there's

10  finally the defendant's ongoing conspiracy and manipulations

11  with Mr. Matthews.  Innocent people don't do that.

12      The defendant thinks that you're not very bright,

13  and he's trying to manipulate you the way he manipulates

14  everybody else.  He thinks that if he can manipulate

15  Mr. Matthews into maybe withdrawing from his guilty plea and

16  coming up here and testifying in contradiction to what he had

17  earlier said -- and there is a version of Mr. Matthews' story

18  in his sworn statement to the Court that he made under oath in

19  his plea, but he's trying to manipulate you like he

20  manipulated Mr. Matthews in --

21          MR. CLEMENTS:  I object.

22          MR. NEFF:  -- getting him to change his --

23          MR. CLEMENTS:  I object to that.  He can't know what

24  the defendant thinks.  And he is speculating.  There is no

25  evidence in the record as to that.  It's improper for him to

1  speculate as to what the defendant is thinking, particularly

2  when it relates to Mr. Matthews.  Thank you.

3          THE COURT:  Mr. Neff?

4          MR. NEFF:  Your Honor, that's a very fair and

5  reasonable, and certainly probably the most reasonable,

6  inference that can be drawn from the evidence in this case, the

7  evidence of the defendant and Mr. Matthews being in the same

8  cell for a year, the evidence of items found in Mr. Matthews'

9  possession.  That's the best inference that can be made.  And

10 in argument I'm allowed to draw those reasonable inferences.

11 And I'm asking the jury to do the same thing.

12         THE COURT:  If you put it in those terms, the Court

13 will overrule the objection.  But if you state it as facts that

14 were established by the evidence, then the Court will grant the

15 motion.

16         MR. NEFF:  Well, I'm almost done here, Judge.  So

17 I'll put it together.

18         Obviously, ladies and gentlemen, Mr. Matthews and

19 the defendant have been in the same cell for a year.  Again,

20 it doesn't -- it's not difficult to figure out what's gone on

21 during that year.  They're trying to make the testimony match

22 the evidence the best they can.  But unfortunately the

23 story -- unfortunately for the defendant, the story is

24 ridiculous.  It's a matter of common sense.  We talked about

25 earlier that Mr. Matthews is lying.  The attempt to do this is

1  insulting to the Court, it's insulting to you, and it's

2  egregiously insulting to the victim and his loved ones.  They

3  laid in wait for the victim on August 6, 2003, and attacked a

4  defenseless man; and they did it again on September 3rd, 2008,

5  to attack the victim after they've already killed him.

6          In conclusion, ladies and gentlemen, we've come to

7  the end of the road.  Unfortunately this road was Guy Luck's

8  road to death.  Fortunately, though, you will provide him and

9  the people of the United States with justice.  At the end of

10  this road for the defendant is his guilt.  Thank you.

11          THE COURT:  Mr. Clements?

12          MR. CLEMENTS:  Thank you, Your Honor.

13          Ladies and gentlemen of the jury, Rejon Taylor and

14  our defense team thank you for doing your duty; that's serving

15  on this jury and standing between the government and another

16  American citizen.

17          If my recollection of the facts differs from your

18  recollection collectively or individually, ignore what I say.

19  I don't have a photographic memory, and I may have lost a step

20  or two.  But you are the most important people in the system.

21  You're 12 to 16 judges without robes.  You would not have been

22  selected if we hadn't believed you when you said that you

23  would vote not guilty if the government had not proven Rejon

24  Taylor guilty beyond a reasonable doubt, even if you thought

25  he might be guilty, even if you thought possibly he was

1    guilty, or almost probably guilty.  You would not have been

2    selected if we hadn't believed you when you said that you

3    would presume him innocent because that was the law.

4            So you are selected people.  The system of justice

5    would not work without you.  There's no experienced lawyers or

6    judges that would do away with the jury system.  That's the

7    first thing that tyrannists do when they take over, or

8    Communists do——do away with the jury system.  That's the

9    reason I say that you're the most important people in the

10   system.

11           Now, let's discuss reasonable doubt.  If I give you

12   no reasonable doubt, ignore what I say.  But hold them to the

13   same standard.  (Indicating.)  And I'm not going to say "we,"

14   but I'm going to tell you Mr. Neff wasn't there for anything,

15   he doesn't know any more than I do.  He may be smarter, but he

16   doesn't know any more about the facts than I do.

17           Now, let's go down the reasonable doubts.  Here is

18   Mr. Chris Chambers.  I believe he's an honest man.  I believe

19   he's a good detective.  And they're trying to show that this

20   is a premeditated, willful, malicious murder beyond a

21   reasonable doubt.  What does Detective Chambers say?  The

22   ignition was running.  The guns were in the car.  There's

23   blood on the front -- both the front seats.  There's blood on

24   the windshield.  There is no conclusion, I suggest, that you

25   can come to other than that there was a struggle and no intent

1  to kill.  Do you think that I'm going to plan a premeditated,

2  malicious murder and leave the keys in the ignition in the

3  car, leave the guns in the car, and have it running?  I

4  suggest to you that that is unreasonable.  Now, I've still got

5  enough sense to know that it's not what I say, it's what you

6  say, it's not what we say.

7       Now, let's take Number 2, Stephanie Belcher.  She

8  seemed like a nice woman to me, but there's some curious

9  things.  And I want you to tie these in -- or suggest to you

10  that you tie these in to Sir Jack Matthews' testimony.

11  Exhibit Number 507.  (Indicating.)  This is a modest

12  restaurant in Atlanta.  Now, Mr. Neff is talking about

13  robberies and burglaries and so on and so forth.  But when

14  they left on this day--  I want you to look, please, if you

15  will, at Exhibit Number 520.  This is the door.  Look right

16  down here.  (Indicating.)  It looks to me--  You make your

17  decision.  It looks to me like it's bolted from the inside.

18  Is that consistent with an abduction, a kidnapping, and a

19  carjacking?  It can't be.

20       Plus, there's something kind of funny going on.

21  There's nothing wrong with somebody moving from France that's

22  a lawyer, I mean, to Georgia, there's nothing wrong with

23  making a lot of money in a brief period of time, and nothing

24  wrong with having cash in your house that Detective Dunn

25  found.  I don't have stacks of cash in my house, and I don't

1 think that many people do.  But this is what he found.

2 (Indicating.)  And let's think about how he got in the house.

3 Let's think about how he got in the house.  It was a little

4 bit hard for me to hear Detective Dunn because he was turned

5 towards you.  That's all right.  I'm not complaining about it.

6 But, you know, Ms. Belcher said he had three houses.  She

7 would not let him go in the Beechwood house, wouldn't let him

8 go.  I don't think she stated the reason, really.  I really

9 don't remember.  But if she stated a reason, I didn't hear

10 her, didn't make a note of it.  She wouldn't let him go in.

11 Something funny is going on.  Plus, how does Detective Dunn

12 get in the house?  He has to go through the window.  And he's

13 got a search warrant.  He is a police officer.  Mr. Neff

14 suggests to you, well, they had some kind of paper there.  We

15 don't know if it was a credit card company or what it is.  Two

16 credit card companies are laying on it.  Well, if it was

17 important to the police, why didn't they keep it?  They didn't

18 keep it.

19         I'll tell you one thing, this man right here is a

20 good officer.  (Indicating.)  He's served his country, just

21 like all these other people have over here, been in the

22 Airborne like some of these other people have been over here,

23 been in combat like some of these other people have been over

24 here.  They know what they're doing.  If that had been an

25 important piece of information to them, they'd have kept it;

1   they're too smart not to.

2          Now, let's talk about Sir Jack.  And I hate to read

3   things to you.  I'm going to read something to you, because

4   I've got a big obligation on me and I'm afraid I'll drop the

5   ball and then I won't remember something.  And I don't like to

6   criticize anybody's mental acumen or their IQ or how smart

7   they are, because there's a lot of things I can't compete in.

8   I barely passed freshman physics, and that's with study.  But

9   the truth of the matter is, Sir Jack Matthews isn't the

10  brightest bulb in the field house.  Do you think for a minute

11  that he could come up with these Asiatic nudes, delivering

12  marijuana, and a struggle, and that he shot first, if it

13  hadn't been true?  I suggest to you no.  Has he told some

14  lies?  Yeah, he's told some lies.  But he didn't lie like Joey

15  Marshall.  Joey Marshall lied to save himself.  Now, I'll tell

16  you one time that I don't believe anybody will lie except for

17  rare exceptions, and that's to lie when you're exposing

18  yourself to death, to the death penalty.  And he said he did

19  it to have peace.  And we know as human beings--  Most of this

20  jury is older.  I'm probably the oldest person in the

21  courtroom.  But every time in our life, whether we're a good

22  athlete, an average athlete, or an average person -- and I

23  don't think there is any such thing as an average person or

24  ordinary person, because I think it's the ordinary people, the

25  people that's their blood that's on the battlefield, it's them

1   that pay the taxes, it's them that set the moral standards of

2   the country, and it's them that find the facts.  How many

3   people-- You can read philosophy, and you can read history.

4   How many people would lie so they could go to the death

5   penalty?

6           There is nothing Rejon Taylor can give Joey

7   Matthews, not a thing.  He can't help him.  He can't help him.

8   There's no motive for him to lie.  Joey Marshall will come up

9   here before this Judge, who is the law, and swear to a set of

10  facts, and then take this stand, when they've been interviewed

11  by these people, who are all smart, who all have plenty of

12  experience, and tell a story——"I didn't even know he was in

13  the van."  If he didn't know he was in the van, it's like

14  Mr. Ortwein brought out, he's innocent.  And he pled guilty.

15  If they had a race--  I don't know how many people run the

16  Boston Marathon.  I don't know how many there's in -- even how

17  far it is.  But if you had a race full of liars, I would

18  put -- if I was a betting man, I'd put my money on Joey

19  Marshall every time, because he'd at least place, and probably

20  bring in the blue ribbon most of the time.

21          Now, let's think about Mr. Westlake.  If you're

22  going to kill--  Mr. Neff has suggested, not very subtly——in

23  fact, I think he's done it point-blank——that this is a

24  killing, you know, "because I could possibly be prosecuted."

25  Mr. Westlake took the stand.  Preliminary hearing.  Detective

1   Clouden testified to it.  Rejon Taylor's there.  They know the

2   address.  There's five warrants out for him.  As far as I

3   know, there's never been any proof that there's a warrant out

4   for Mr. Taylor, or Rejon, by Mr. Luck.  If there is, I missed

5   it.  Mr. Westlake testified he was never threatened.

6   Certainly nothing ever happened to him.

7          Now, let me go through a couple of things.  And I

8   have the transcript here.  And I know it's boring, or it may

9   be boring.  And, you know, you talk too long and people simply

10  won't listen to you.  And maybe I'm just getting antsy in old

11  age, but when I go to church and the preacher talks over 30

12  minutes, I'm about exhausted.  But this is some of Joey

13  Matthews' testimony.  "Had to stop at an apartment, making

14  light conversation."  He's talking about, basically, like, how

15  he'd do females and so forth.  And then he says, "You got me

16  blanked up."  And then he talks about the naked kids.  That's

17  Sir Jack and Luck's conversation.  And that's when the ruckus

18  starts.  Sir Jack admits that he shot him because Mr. Luck was

19  going to shoot him.  And he shoots him in the arm, hits him

20  over the head with a 9mm.

21          You heard Dr. King.  Autopsy man.  Honest.  You

22  know, honest as you could be.  Doesn't pretend to know

23  everything; "This is the best I can do.  This is what I

24  think."  And no question that he's hit over the head.  Sir

25  Jack admits that he hit him over the head and the gun jammed.

1 | This was a spontaneous ruckus or fight. After that, Rejon

2 | shoots wildly, not intentionally, because he doesn't know

3 | what's happened. In fact, one shot hits Joey Matthews and

4 | goes through him.

5 | Now, listen, if you intend to kill somebody and

6 | you've got a .38 -- and Detective Chambers said there's two

7 | rounds left. If I've gone that far, I'm going to make sure

8 | they're dead, particularly if I've got two rounds. I'm not

9 | going to let them get in the front seat where they may shoot

10 | me.

11 | And you'll remember Dr. or Ms. Bash—I'm not sure of

12 | the total pedigree—testifies that there's Sir Jack's blood

13 | and there's the victim's blood in the front seat, front

14 | passenger seat, front driver's seat, and on the windshield,

15 | both, indicative of a struggle, indicative of a struggle, not

16 | a premeditated, not a malicious, not a killing. And that's

17 | what they testified to. That's their proof. That's what they

18 | put on.

19 | And by the way, who put Sir Jack Matthews on? Was

20 | it Rejon Taylor's defense team? No. It was Mr. Neff and

21 | Mr. Poole and Mr. Melia. And he says that they talked to him

22 | a week before. That's what he says. They're the ones who

23 | have put him on, not Mr. Ortwein or anybody else on the

24 | defense team.

25 | Now, Joey Marshall is, frankly, just slicker than

1    Sir Jack.  You know, his own testimony, he doesn't really care

2    about anything.  That's just the truth.  You saw the

3    cross-examination Mr. Ortwein brought out of him:  "I sell

4    cocaine.  I really don't care.  Yeah, I do, but it's for the

5    money.  I sell marijuana."  That's what he does.  He is a

6    manipulator.  He is the one who's trying to cover his tracks.

7    He's the one that has the girlfriend write the alibis; he

8    corrects it, he edits it, he bumps it up.  And then, according

9    to Sir Jack, he's the one that comes up with, "Let's just lay

10   it on Rejon."

11        Now, let me tell you, I don't know what people will

12   admit to now, and I know times have changed.  I'm 72 years

13   old.  I'm from a coal mining town.  Stayed in the military off

14   and on, counting the Reserve, for 20 years.  And maybe I live

15   a sheltered life, maybe I do; I don't know.  But the last

16   thing you would admit or talk about, people my age -- I don't

17   know about now.  Talk about anything.  That may be all right,

18   too.  This is a free country.  But most people aren't going to

19   admit, in public, most people-- And I'm not criticizing

20   anybody's appetites or habits or any of that, and please don't

21   think I am obliquely.  But most people aren't going to admit,

22   where I'm from, that they have these certain types of

23   proclivities and appetites.  And he does, and he says.  Well,

24   that blows me away.  But they make up this deal to lay it on

25   Rejon.

1    Now, there is another thing that I want you to think

2    about.  And this is what he says.  And Sir Jack can't express

3    himself adroitly.  He doesn't even feel the pressure of a

4    courtroom, a distinguished judge, and the aura of this

5    building.  He gets up there and talks, in front of you, in

6    front of the Judge, in front of everybody else, just like he'd

7    talk on the street.  The Judge has to suggest to him, you

8    know, "We don't use profanity in the courtroom."  And he says

9    at the end, "All I want, all I want, is peace."  What's more

10   believable?

11   Now, the fight and the struggle was after Mr. Luck

12   says, "You're the ones that burglarized me after I found the

13   nude pictures."  My notes say "Asiatic girl."  I'm not really,

14   really sure that that's what he said.  But it was nude

15   pictures of little girls.  And he says, "Because when the dude

16   got up with the gun, know what I'm saying, later on when we

17   were leaving in the car, he said he thought the dude had shot

18   me."  And now he's talking about Rejon.  "He didn't even know

19   that I had Joey's gun."

20   Now let me tell you about some of the things that

21   Joey says.  He admits writing his girlfriend——this is on

22   direct examination with Mr. Neff——asking her to lie.  He'll

23   ask anybody to lie.  Says, "So you lied several times, 2003 to

24   2004."  Well, he starts changing his lies when he knows he's

25   not going to face the death penalty and the chair.  He didn't

1  plead-- He did plead guilty to life without parole, with the

2  possibility of getting a downward departure at the

3  recommendation of these people. (Indicating.) And they had

4  the sole right to make the recommendation, the sole right to

5  make the recommendation. And then it was up to the Judge to

6  see whether or not he would -- he would take the

7  recommendation.

8          Now, something else. And forgive me for jumping

9  around, because this has been a little bit hard for me to

10  organize, and I'm disorganized by nature, anyway. Joey talks

11  about getting the mailboxes. Now, no question Joey's a thief.

12  No question that Rejon Taylor's a thief. I'm not trying to

13  paint him as one of the 12 apostles or George Washington or

14  Abraham Lincoln. But he's not a murderer.

15          He doesn't even-- Now, he's running a business, got

16  these houses. He won't let his girlfriend in there. They go

17  by and look at these houses, or this house. And I believe

18  this one's on Beechwood, he says. I guess an upscale

19  neighborhood of Atlanta. Well, he's finding credit cards -- I

20  mean, excuse me, not credit cards, but mail just falling out

21  of the mailbox. He apparently never even picks up the mail,

22  or doesn't care. Is that the kind of person that's a

23  legitimate businessman? I don't know if any of you have ever

24  worked in a restaurant or not, but if it's a small, home-owned

25  restaurant, you got to hump it out to make a living, and you

1   watch what you spend, you watch what you pay.  That's just

2   logic.

3          And this is Joey's statement:  "We were just riding

4   by one night.  He had mail coming out of it.  It was

5   overpacked with mail.  Also on the ground.  The mail had piled

6   up pretty high.  So we stopped and put it -- put his mail in

7   the mailbox."

8          Now, another example of how clever Joey is, or how

9   clever he thinks he is, he comes up and testifies here in this

10  court, and he's still trying to put it up on Rejon, but he's

11  shrewd enough to know that if he says he knew about Mr. Luck

12  being in the van, he's going to get what he's agreeing to,

13  life without parole.  Well, then he says he didn't even know

14  about it.  Well, if he didn't know about it, he can't be

15  guilty, he can't be.

16         MR. NEFF:  Your Honor, I would object to that

17  statement because that's not an accurate statement of the law.

18         THE COURT:  Ladies and gentlemen, it's permissible

19  for the attorneys to tell you what they think the law is during

20  their closing statements, but the Court is going to give you

21  the law.  If what I say about the law conflicts with what the

22  attorneys say, you must follow what I say and not what the

23  attorneys say.

24         MR. CLEMENTS:  Thank you, Your Honor.

25         Joey -- I mean, Joey Marshall says--  "And I take

1   it--"  And this is on cross-examination.  "I take it by your

2   testimony today you did not know Mr. Luck was in the van.  Is

3   that right?

4           "No, I didn't.  No, I didn't."

5           Let me go over a few things.  And I hope I don't

6   have this messed up, because Judge Collier's exactly right; he

7   is the law, not me.  And I have his jury charge here, which

8   I -- there have been a few changes made, but I -- he is going

9   to charge you what the law is, and you're to take what he says

10  as the law, and not what I say.

11          Now, Count 1, or Charge 1, is the carjacking

12  resulting in death.  The charge goes through all the elements,

13  and one of them is, while taking or attempting to take the

14  motor vehicle, the defendant, in this case Rejon Taylor,

15  intended to cause the death, and that you're to judge that,

16  whether or not he intended to cause harm, by an objective

17  standard, not by a subjective standard, not what you feel or

18  guess or speculate at, but an objective standard, and that the

19  defendant intended to cause death or serious bodily harm if

20  the victim had refused to turn the car over.

21          Charge 2, murder with a firearm during and in

22  relation to carjacking.  If, of course, there is no

23  carjacking, of course he can't be guilty of that count.  And

24  then the second and third -- excuse me, the third and fourth

25  -- excuse me, fourth element on Count 2 is, the killing was

1 committed during the perpetration of kidnapping, or willful,

2 deliberate, malicious, and premeditated. And then it goes

3 on-- I'm just going to read the highlights of the count.

4 "Kidnapping Resulting in Death," some of the elements in it

5 are knowingly, willfully. And then 4, "Murder with a

6 Firearm," it has to prove beyond a reasonable doubt that the

7 kidnapping was committed. And then the Judge will give you

8 the rest of these about the required mental state and so on

9 and so forth.

10        The things that I want to emphasize is that it's up

11 to the government to prove beyond a reasonable doubt that he

12 committed these offenses, that he intended to kill him,

13 premeditation, malice aforethought. We simply suggest to you

14 that the government has failed in its burden.

15        Now, I realize that there's a psychological

16 tendency, when the indictment's read that says "United States

17 of America versus Rejon Taylor"-- You know, I want my

18 government to be right every time. But the government can be

19 wrong in a criminal case and we've won, we, the United States.

20 And I know deep down inside that we always want to think the

21 executive branch of the government is right. I do. It

22 doesn't make any difference who I voted for for President, if

23 he loses, or U.S. Senate, I want them to be right, every time,

24 because I want myself, my children, my grandchildren, to be

25 the beneficiary of their right decisions, even if I think

 1    they're wrong at the time.  That's human nature.

 2            But we know from history, from reading history, and

 3    you're old enough to know now, that our executive branch of

 4    the government has made many, many mistakes.  I'm not saying

 5    they were willful mistakes.  I'm not saying they were

 6    malicious mistakes.  I'm not saying they were knowing

 7    mistakes.  But they have made mistakes, and we have seen it.

 8    And they're not always right.

 9            So don't just think-- Follow the Judge's charge,

10    follow the law, which it's your duty to do, that the

11    indictment is simply a charge, it's simply a piece of paper,

12    it's not evidence of guilt, because at that point Rejon Taylor

13    has not had a chance.  And we know through our life

14    experiences that there's at least two sides to every story.

15            Those of you that have had children know that who

16    gets to go first makes the biggest impression on you.  As my

17    children grew older, I would bring them all in together, if

18    they were all there, because the first one -- I couldn't help

19    it; I knew that I tended to believe the first one that got to

20    me.  I just could not help it.  So I had to get them all in

21    there together.  And they would kind of fizzle down, if I had

22    enough patience to finally listen to it all, and try to work

23    it out.

24            But one of the reasons lawyers can't talk to a judge

25    without bringing the other lawyer there and with the judge's

1    permission is because the judge does not want to be influenced

2    by an ex parte communication.  If I went to Judge Collier, or

3    Mr. Neff, or any other lawyer, and tried to see him about a

4    case without the other lawyer there, he would hold me in

5    contempt, and he should hold me in contempt, because that

6    would be unfair, that would be a chance to influence him.  So

7    please listen to both sides, because that's your duty and

8    that's what makes the system go.

9            Now, as another thing, I generally like practicing

10   law.  There's two things, at least two things, I haven't

11   liked; one, when I sit down after giving a jury argument,

12   thinking about all the mistakes I've made, the things I should

13   have said.  And not trying to be humble pie, I can't believe

14   some of the things I forget and how stupid I am.  But I don't

15   have to come up with all the reasonable doubts.  You can use

16   your own judgment.  And what I've overlooked, you can come up

17   with the reasonable doubt.

18           Now, the government gets to go last, and the reason

19   they get to go last is because they have the burden of proof

20   on every element of the offense beyond a reasonable doubt or

21   it's your duty under the law, under the law, just as much as

22   it's your duty to pay your tax and obey the law, it's your

23   duty under the law to vote not guilty if they haven't proven

24   every element of the offense beyond a reasonable doubt.  And I

25   suggest to you that they won't argue to the contrary.

1       Now, lawyering is not who you like best; it's

2  whether or not you can follow the law.  I suggest to you under

3  the facts of this case and under the arguments given by the

4  government, the executive branch, that you should return a

5  verdict of not guilty on every count, and that will be a

6  verdict sanctioned by your logic and ratified by the law that

7  Judge Collier has given you.  Thank you for serving your

8  country.  And we all thank you.

9       THE COURT:  Mr. Poole?

10       MR. POOLE:  Mr. Clements is right about a couple of

11  things, and one is that it's not about which lawyer is more

12  likeable; and I'm glad, because there is not anyone more

13  likeable than Mr. Clements.

14       He's also right when he says the United States makes

15  mistakes.  We called Sir Jack Matthews to the stand.  There is

16  no doubt about that.  That was a mistake.  But think about

17  that.  Mr. Clements says Sir Jack Matthews is not the

18  brightest bulb in the house, he couldn't have come up with

19  these lies, he's not as smooth as Joey Marshall.  He also says

20  Mr. Melia and we are smart.  I'm not sure that's true.  But

21  Mr. Melia told you we talked to Sir Jack Matthews over ten

22  times in the last five years about what happened that day.  If

23  he wasn't able to fool us, if he wasn't smooth enough to fool

24  us about what his story was that day, do you think we would

25  have called him to that witness stand?  If Joey's the smooth

1   one, not Sir Jack, why would we have called Sir Jack?  It's

2   because for ten meetings over five years he told a totally

3   different story, and the story that he told then matched the

4   physical proof.

5          This is not Sir Jack Matthews versus Joey Marshall

6   and who you have to believe; it's Sir Jack Matthews' story

7   versus common sense, all the evidence you heard; Joey

8   Marshall, who is backed up by the evidence; and the law that

9   the Judge gives you.  Sir Jack Matthews probably couldn't have

10  come up with that story on his own; and lucky for him and

11  lucky for Mr. Taylor he didn't have to, because he's been in

12  the cell with Mr. Taylor since September of last year,

13  together.  We know they were plotting and planning this and

14  that Mr. Taylor was affecting this.  Use your common sense.

15         Mr. Neff asked Sir Jack Matthews, "Who are your

16  cellmates?"  What did he say?  "Chris."  Tony.  He starts

17  looking for names.  Mr. Taylor was his cellmate from September

18  of 2007 until he testified last week.  He didn't remember

19  that?  Why wouldn't he tell you that Rejon Taylor was his

20  cellmate, unless there was something about that relationship

21  he didn't want you to know?  Why did he have Rejon Taylor's

22  legal mail in his possessions?  And look at what that mail

23  was.  Look what the contents were.  It was all Sir Jack

24  Matthews' statements, stuff he already had, stuff Mr. Marshall

25  pointed out to you that was provided in discovery, stuff

1  Mr. Melia pointed out to you we told the defense every time

2  Sir Jack Matthews changed his story.  Was it to go over his

3  story and make sure he could try and back up the physical

4  evidence with the story he and Mr. Taylor created?  Think

5  about that.  Use your common sense.

6         Why would Sir Jack Matthews and Joey Marshall sit in

7  jail for five years if they didn't do anything wrong and it

8  was all self-defense?  Why just come up with that story for

9  the first time now?  Is Joey Marshall so afraid that somebody

10  might think he's gay that he is going to spend the rest of his

11  life in jail?  Does that make sense?  He's been sitting in

12  jail for five years.  He pled guilty to life without parole.

13  He got up here and he testified to being involved in stalking

14  and robbing and killing a man.  But none of that's true?

15  Really he didn't do anything wrong?  Nobody really did

16  anything wrong?  This man tried to pull a gun on them, so it

17  was self-defense, Joey just doesn't want you to know he's gay?

18  Why didn't Sir tell that story in the last five years?  Sir

19  doesn't say he's gay.  Why doesn't he come up and say, "Hey,

20  no, no, no, I'm not pleading guilty to life without parole.

21  I'm not sticking with that story, because I didn't do anything

22  wrong.  This guy pulled a gun on me."  Is Sir Jack so worried

23  that somebody might think Joey Marshall is gay that he's going

24  to spend the rest of his life in jail?  That's what he came in

25  here and pled guilty to.  Does that make sense?

1    Mr. Clements says, "Oh, Mr. Taylor can't do anything

2  for Sir Jack Matthews." Can't he? Can't Mr. Taylor get up --

3  after he's acquitted on this story, get up and do the same

4  thing for Sir Jack Matthews, and say, "Oh, no, it was

5  self-defense"?

6    MR. CLEMENTS: Your Honor, I --

7    THE COURT: Sustained.

8    MR. POOLE: Use your common sense. Sir Jack Matthews

9  has never told this story before. He's with a cellmate. Comes

10  in, makes up a story, and what does he say? We'll go through

11  the little things that just defy common sense, defy reason.

12  But what does he do? He attacks the victim.

13    Rejon Taylor, Sir Jack Matthews, and Joey Marshall

14  went to Guy Luck's house on August 6, 2003, in the early

15  morning hours. Now, this is Rejon Taylor's day in court. And

16  Sir Jack Matthews tries to make it his day in court. But do

17  not forget it is also Guy Luck's day in court and it is

18  Stephanie Belcher's day in court.

19    Guy Luck did nothing wrong but wake up and try to go

20  to work, just like everyone does every day. He woke up in his

21  house in Atlanta, Georgia, and had a man hiding under the van

22  with a gun when he walked out into his driveway. And Rejon

23  Taylor and Sir Jack Matthews put that man in a van, and they

24  drove him for over two hours to a rural area in Chattanooga,

25  Collegedale. They shot him multiple times. And then Rejon

1    Taylor shot Guy Luck in the mouth at a downward angle.  One of

2    the bullets that Rejon Taylor used to shoot Guy Luck was

3    recovered in his stomach, along with his teeth.

4        Stephanie Belcher testified to you.  This is her

5    fiancé and co-business owner we're talking about.  And the

6    last time she talked to Mr. Luck, he was going to call her the

7    next day, and he had plans.  Does she see him again?  Not

8    until she gets to Erlanger Hospital and he has just died and

9    she has to identify the body.

10        And you would think that Rejon Taylor and Sir Jack

11    Matthews couldn't do anything more to Guy Luck, could not do

12    anything more to Stephanie Belcher.  But what did they do?

13    Now they're accusing him of being a gay, drug-dealing

14    pedophile.  It's ridiculous.  It's disgusting.  It's

15    outrageous.  And it's got to stop.  And you have to stop it.

16    You have to stop it by using your common sense and following

17    the law and following the evidence that's backed up by other

18    evidence.

19        Joey Marshall.  Joey Marshall told you they'd been

20    stalking this man.  Joey Marshall told you they'd been

21    stealing mail.  We know they had been stealing identities,

22    because Rejon Taylor gets stopped with Robert Westlake's

23    credit cards and --

24        MR. CLEMENTS:  Your Honor, there is no testimony in

25    the record that Rejon Taylor has ever accused Mr. Luck of

1    anything.

2         THE COURT:  I think he's referring to you.  I don't

3    think he was referring --

4         MR. CLEMENTS:  Referring to me?

5         THE COURT:  Yes, uh-huh.

6         MR. WILLIAM ORTWEIN:  He said Rejon.

7         MR. POOLE:  I don't know what they're referring to.

8         THE COURT:  Mr. Poole, who were you referring to when

9    you said the defendant is accusing Mr. Luck of being a gay,

10   drug-dealing pedophile?

11        MR. POOLE:  I'm referring to the defense team, Judge,

12   who are embracing Mr. Sir Jack Matthews.  And I'm also saying

13   the defendant and Mr. Matthews got this story together.  And

14   the jury can draw that inference.  And I think that's their

15   theory.  I absolutely am including the defendant as being part

16   of the story Sir Jack Matthews said.  And I think the jury can

17   draw that inference, Judge, based upon the proof.

18        THE COURT:  I think he is referring to your remarks,

19   Mr. Clements, but he's also trying to attribute that to the

20   defense team in general.

21        MR. CLEMENTS:  My understanding, Your Honor—I would

22   like a jury instruction—he made some remark about Rejon Taylor

23   testifying for Mr. Matthews.  And we think that remark is

24   entirely improper, the Court will sustain the objection.  It

25   never should have been argued.

1       THE COURT:  Ladies and gentlemen, what Mr. Poole is

2  doing is responding to the arguments made by the defense.  So

3  to the extent that he may have said something that -- he asked

4  you to believe that the defendant himself made certain

5  statements, you should reject that; and you should limit your

6  consideration of his remarks to what the other attorney said,

7  what Mr. Clements said.

8       Proceed, Mr. Poole.

9       MR. POOLE:  Thank you.

10       What more could they do to this man, five years

11  after he's dead, but now ruin his reputation, now tell

12  Stephanie Belcher that the fiancé that she knew, who had done

13  nothing but fail to pick up some mail and been shot in the

14  mouth for it, and start a business from the ground up and work

15  hard at it and try and live what he described as the American

16  dream, done nothing wrong, is now being accused of being a

17  drug dealer, pedophile, and homosexual?  There is no proof to

18  back that up, mind you.

19       Mr. Sir Jack Matthews says that they're over at Guy

20  Luck's house and there's a smell of weed and, you know, he and

21  Joey later are smoking weed.  There is no proof of that.

22  There is no marijuana found in that house of Guy Luck.  There

23  is no marijuana in Mr. Luck's system during the autopsy.

24  There is no marijuana in the van.  There's not a big amount of

25  money in the van.  There is no trace or residue of marijuana

1  in the Impala or anywhere else.

2          His story is that they all rode up in the van except

3  for Mr. Marshall, who drove behind in the Impala.  You've seen

4  that van.  Why wouldn't they ride in the Impala where it's

5  clean and the seats are there?  There's nowhere to sit in that

6  van.  His story is——if we can turn on the screen, we're going

7  to try and use the computer here——that Mr. Guy Luck is sitting

8  in the passenger seat of that van and that he is behind him.

9  This is a picture taken out of the crime scene video, which

10  you can watch.  This is the same scene of the van.  The story

11  is, that is where Mr. Luck is sitting on this two-hour-plus

12  ride from Atlanta.  Watch the video.  See if that makes any

13  sense.  Here is a picture of it.

14          Go back to Elmo.  Thank you.

15          Was he sitting on all that stuff for two hours by

16  choice?  Remember, they're going there by choice.  He doesn't

17  take some papers out of the van and sit down, when he's

18  driving up there for two and a half hours?

19          There is a shot in Mr. Luck's left back shoulder

20  area.  Couple of things that don't make sense about Mr. Luck

21  sitting in the passenger seat, as Sir Matthews claims.

22  Number 1, if Mr. Luck is sitting in the passenger seat, why

23  does Rejon Taylor have to turn around to shoot him?  Why

24  doesn't he just shoot him right next to him?  (Indicating.)

25  And if it's because Mr. Luck is running in the back to attack

1   Sir Jack Matthews for some reason, wouldn't that bullet be in

2   the back right shoulder, when he turns around and tries to go

3   to the back? (Indicating.) Does it make any sense at all

4   that he's sitting in the passenger seat when this happens?

5   There's blood there, sure. There's blood all over that van.

6   Looks like a blood bomb exploded in that van. But you

7   remember the testimony of Charlie Pack, of Jason Reeves, even

8   of Dr. Maxwell and Dr. King, about how much blood was coming

9   out of his mouth. Remember Charlie Pack said it was like

10  pouring a drink out of a pitcher, blood was coming out so

11  fast. He's choking on his blood. He's spitting his blood.

12  It's all over that van. Could he have sat in the passenger

13  seat? And if he did, why did he have to turn around to shoot

14  him?

15          According to Mr. Matthews-- And to believe the

16  defense theory and to believe Mr. Matthews -- or to find the

17  defendant not guilty is to believe Mr. Matthews' theory.

18  According to Mr. Matthews, there was another gun that he threw

19  away or he and Rejon threw away, there are all these pictures

20  of little naked Asian kids that were thrown away, and all the

21  proof that showed really the bad guy in all this is Guy Luck

22  has been destroyed. Does that make sense? Does that make

23  sense? Does it make sense that the one gun out of the three

24  that Rejon Taylor would take would be the victim's gun, the

25  one gun that makes him not guilty? Does that make sense? Oh,

1  Mr. Matthews says, "Oh, he thought it was -- Rejon must have

2  thought it was his gun, because it was the same caliber."

3  When they're driving down the road back to Atlanta for an hour

4  and a half or two hours, doesn't he know it's not his?  Why

5  throw out the piece of evidence that can acquit you?  Why

6  leave two guns, the two guns used to shoot Mr. Luck, in the

7  van, and leave them sitting there in the driver's side wheel

8  well there?

9         Remember, Sir Jack Matthews said, "I got shot.  I

10  didn't know what was going on.  I got out.  I dropped my gun

11  and got out," said he was in the back of the van.  So,

12  according to Mr. Matthews, Rejon Taylor got that gun out of

13  the back of the van as well as his gun out of the back of the

14  van, put them down there in the wheel well, picked up Guy

15  Luck's gun, and left.  Does that make sense?  The glove is

16  caught right there.  (Indicating.)  There is another glove

17  caught in the seat belt contraption there.  Does it make sense

18  that these guys are driving from Atlanta to Chattanooga and

19  they're not doing anything wrong but he's just wearing --

20  Mr. Taylor is just wearing gloves in August?  Does that make

21  sense, or does what Mr. Marshall said and what Sir Jack

22  Matthews said for the ten times before that make more sense?

23  And you can look and see what he said before that, compare it

24  with the proof.

25         Joey Marshall tells you that they went -- Sir Jack

1    -- he went up to the house with Sir Jack Matthews, he

2    chickened out, Sir Jack said, "I'll do it myself," and got

3    under the van, and that Joey and Rejon drove around the

4    house -- around the neighborhood, excuse me, until Sir Jack

5    took the victim into the house at gunpoint.  How do we know

6    that's true?  Melissa Gallant, who doesn't know any of these

7    people, who is just the Neighborhood Watch, and sees a strange

8    car coming down her very steep driveway, took the license

9    plate number and the car down, and said two black males were

10   circling around, driving around in her neighbor.  She lives

11   right down from the victim.  She supports Joey Marshall's

12   statement.

13          We know Rejon Taylor's in the van, because his

14   bloody print is in the van, in the victim's blood.  We know

15   Sir Jack Matthews is in the van, because he's got one of the

16   bullets in his back.  All support Joey Marshall.  Joey

17   Marshall told you Sir Jack Matthews said, "You bust him.  You

18   busted him.  You're a soldier," to Rejon Taylor.

19          Rejon doesn't deny it, doesn't say, "No, man, I

20   didn't do it.  That was self-defense."  None of that.

21          We know Rejon Taylor said, "That's the guy who took

22   warrants out on me in Rockdale County."  And we know there is

23   paper work from Rockdale County saying that thieves have been

24   identified.

25          They didn't go there to rob him.  There were credit

 1   cards there and money, and they didn't take it.  I submit

 2   that's because Rejon Taylor went there for a different reason.

 3   We do know that before Rejon Taylor went to that house, this

 4   was Guy Luck, a restaurant owner, engaged, a hard-working man

 5   who had two houses so sometimes his mail piled up at one of

 6   them.  (Indicating.)  That's what he looked like after he met

 7   Rejon Taylor --

 8           MR. CLEMENTS:  Your Honor, I object.

 9           MR. POOLE:  -- shot in the mouth, down through the

10   mouth.  (Indicating.)

11           MR. CLEMENTS:  This picture has no probative value

12   other than bias and prejudice.

13           MR. POOLE:  Your Honor, this picture is in evidence.

14           MR. CLEMENTS:  Appeals to sympathy.  Doesn't have any

15   probative value, particularly compared to prejudicial value,

16   period.

17           THE COURT:  Mr. Poole?

18           MR. POOLE:  Your Honor, this photograph has been

19   admitted into evidence, and for having probative value.  So I

20   believe I can argue it to the jury, Judge.

21           THE COURT:  Overruled.

22           MR. POOLE:  That's Mr. Guy Luck after he met

23   Mr. Taylor.  (Indicating.)  That's the last time Stephanie

24   Belcher saw her husband -- or fiancé, when she came up and

25   identified his dead body, while Rejon Taylor was sitting at Red

1    Lobster spending the victim's money.

2           Rejon Taylor is the one found hiding in the

3    refrigerator.  Rejon Taylor is the one who tried to escape

4    from jail.

5           THE CLERK:  That's your time.

6           MR. POOLE:  Stop it.

7           (Brief pause.)

8           THE COURT:  Members of the jury, now that the

9    evidence is in and you have heard the closing arguments of the

10   attorneys, it is time for me to instruct you about the law you

11   must follow in deciding this case.  I will start by explaining

12   your duties and the general rules that apply in every criminal

13   case.  Then I will explain the elements or parts of the crimes

14   the defendant is accused of committing.  Next I will explain

15   some rules you must use in evaluating particular testimony and

16   evidence.  And last I will explain the rules you must follow

17   during your deliberations in the jury room and the possible

18   verdicts you may return.  Please listen very carefully to

19   everything I say.

20          You have two main duties as jurors.  The first one

21   is to decide what the facts are from the evidence you saw and

22   heard here in court.  Deciding what the facts are is your job,

23   not mine, and nothing I have said or done during this trial

24   was meant to influence your decision about the facts in any

25   way.

1    Your second duty is to take the law I give you,

2    apply it to the facts, and decide if the government has proved

3    defendant guilty beyond a reasonable doubt.  It is my job to

4    instruct you about the law, and you are bound by the oath you

5    took at the beginning of the trial to follow the instructions

6    I give you, even if you personally disagree with them.  This

7    includes the instructions I gave you before and during the

8    trial and these instructions.  All the instructions are

9    important, and you should consider them together as a whole.

10   The lawyers have talked about the law during their arguments,

11   but if what they said is different from what I say, you must

12   follow what I say.  What I say about the law controls.

13   Perform these duties fairly.  Do not let any bias,

14   sympathy, or prejudice that you may feel toward one side or

15   the other influence your decision in any way.

16   As you know, defendant has pleaded not guilty to the

17   crimes charged in the indictment.  The indictment is not any

18   evidence at all of guilt.  It is just the formal way the

19   government tells a defendant what crime he is accused of

20   committing.  It does not raise any suspicion of guilt.

21   Instead, defendant starts the trial with a clean

22   slate, with no evidence at all against him, and the law

23   presumes he is innocent.  The presumption of innocence alone

24   is sufficient to find defendant not guilty.  This presumption

25   of innocence stays with defendant unless the government

1  presents evidence here in court that overcomes the presumption

2  and convinces you beyond a reasonable doubt defendant is

3  guilty.  This means defendant has no obligation to present any

4  evidence at all or to prove to you in any way that he is

5  innocent.  It is up to the government to prove defendant is

6  guilty, and this burden stays on the government from start to

7  finish.

8       You must find defendant not guilty unless the

9  defendant convinces you beyond a reasonable doubt that

10  defendant is guilty.  The burden never shifts to defendant,

11  for the law never imposes on a defendant in a criminal case

12  the burden or duty of calling any witnesses or producing any

13  evidence.  A defendant is not obligated to produce any

14  evidence, either by cross-examining the witnesses who were

15  called to testify or by--  A defendant is not obligated to

16  produce any evidence, either by cross-examining witnesses who

17  are called to testify by the prosecution or by testifying on

18  his own behalf.

19       The government must prove every element of the

20  crimes charged beyond a reasonable doubt.  Proof beyond a

21  reasonable doubt does not mean proof beyond all possible

22  doubt.  Possible doubts or doubts based purely on speculation

23  are not reasonable doubts.  A reasonable doubt is a doubt

24  based on reason and common sense.  It may arise from the

25  evidence, the lack of evidence, or the nature of the evidence.

1  Proof beyond a reasonable doubt means proof which is so

2  convincing that you would not hesitate to rely and act on it

3  in making the most important decisions in your own lives.  If

4  you are convinced the government has proved defendant guilty

5  beyond a reasonable doubt, say so by returning a guilty

6  verdict.  If you are not convinced, say so by returning a not

7  guilty verdict.

8         You must make your decision based only on the

9  evidence you saw and heard here in court.  Do not let rumors,

10 suspicions, or anything else you may have seen or heard

11 outside of court influence your decision in any way.  The

12 evidence in this case includes only what the witnesses said

13 while they were testifying under oath and the exhibits that I

14 allowed into evidence and the stipulations of the parties.

15 Nothing else is evidence.  The lawyers' statements and

16 arguments are not evidence.  Their questions and objections

17 are not evidence.  My legal rulings are not evidence.  And my

18 comments and questions are not evidence.  Make your decisions

19 based only on the evidence, as I have defined it here, and

20 nothing else.

21         You should use your common sense in weighing the

22 evidence.  Consider it in light of your everyday experience

23 with people and events, and give it whatever weight you

24 believe it deserves.  If your experience tells you certain

25 evidence reasonably leads to a conclusion, you are free to

1  reach that conclusion.

2        Now, some of you may have heard the terms <u>direct</u>

3  <u>evidence</u> and <u>circumstantial evidence</u>.  Direct evidence is

4  simply evidence like the testimony of an eyewitness which, if

5  you believe it, directly proves a fact.  If a witness

6  testified he saw it raining outside, and you believed him,

7  that would be direct evidence it was raining.

8        Circumstantial evidence is simply a chain of

9  circumstances that indirectly proves a fact.  If someone

10 walked into the courtroom wearing a raincoat covered with

11 drops of water and carrying a wet umbrella, that would be

12 circumstantial evidence from which you could conclude it was

13 raining.

14        It is your job to decide how much weight to give the

15 direct and circumstantial evidence.  The law makes no

16 distinction between the weight you should give to either one

17 nor does it say that one is any better evidence than the

18 other.  You should consider all the evidence, both direct and

19 circumstantial, and give it whatever weight you believe it

20 deserves.

21        As I told you at the beginning of the trial, an

22 important part of your job as jurors is to decide how credible

23 or believable each witness was.  This is your job, not mine.

24 It is up to you to decide if a witness's testimony was

25 believable and how much weight you think it deserves.  You are

 1  free to believe everything a witness said, or only part of it,

 2  or none of it at all, but you should act reasonably and

 3  carefully in making these decisions.

 4       Let me suggest some things for you to consider in

 5  evaluating each witness's testimony.  Ask yourself if the

 6  witness was able to clearly see or hear the events.  Sometimes

 7  even an honest witness may not have been able to see or hear

 8  what was happening and may make a mistake.

 9       Ask yourself how good the witness's memory seemed to

10  be.  Did the witness seem able to accurately remember what

11  happened?  Ask yourself if there was anything else that may

12  have interfered with the witness's ability to perceive or

13  remember the events.

14       Ask yourself how the witness acted while testifying.

15  Did the witness appear honest, or did the witness appear to be

16  lying?

17       Ask yourself if the witness had any relationship to

18  the government or to the defendant or anything to gain or lose

19  from the case which might influence the witness's testimony.

20  Ask yourself if the witness had any bias or prejudice or

21  reason for testifying that might cause the witness to lie or

22  to slant the testimony in favor of one side or the other.

23       And ask yourself how believable the witness's

24  testimony was in light of all the other evidence.  Was the

25  witness's testimony supported, or contradicted, by other

1    evidence that you found believable?  If you believe that a

2    witness's testimony was contradicted by other evidence,

3    remember that people sometimes forget things and that even two

4    honest people who witness the same event may not describe it

5    exactly the same way.

6          These are only some of the things you may consider

7    in deciding how believable each witness was.  You may also

8    consider other things that you think shed some light on the

9    witness's believability.  Use your common sense and your

10   everyday experience in dealing with other people, and then

11   decide what testimony you believe and how much weight you

12   think it deserves.

13         You have heard that certain witnesses made

14   statements on earlier occasions which counsel argue are

15   inconsistent with those witnesses' trial testimony.  Evidence

16   of a prior inconsistent statement is not to be considered by

17   you as affirmative evidence bearing on the defendant's guilt

18   or innocence, because this evidence was placed before you for

19   the limited purpose of helping you decide whether to believe

20   the trial testimony of the witness who contradicted himself.

21   If you find that a witness made an earlier statement that is

22   inconsistent with his or her trial testimony, you may consider

23   that fact in deciding how much of his trial testimony, if any,

24   to believe.  In making this determination, you may consider

25   whether the witness purposely made a false statement or

1   whether it was an innocent mistake, whether the inconsistency

2   concerns an important fact or whether it had to do with a

3   small detail, whether the witness had an explanation for the

4   inconsistency and whether that explanation appealed to your

5   common sense.  It is exclusively your duty, based upon all the

6   evidence and your own good judgment, to determine whether the

7   prior statement was inconsistent and, if so, how much, if any,

8   weight should be given to the inconsistent statement in

9   determining whether to believe all or part of a witness's

10  testimony.

11          You have also heard that Joey Marshall and Sir Jack

12  Matthews may have been involved in the same crime which

13  defendant is charged with committing.  You should consider the

14  testimony of these witnesses with more caution than the

15  testimony of other witnesses.  The fact that Joey Marshall and

16  Sir Jack Matthews have confessed to a crime is not evidence

17  that defendant is guilty, and you cannot consider this against

18  defendant in any way.

19          You have also heard that Joey Marshall, Sir Jack

20  Matthews, and Steven Szabo may hope for a reduction in their

21  sentences based on them giving substantial assistance to the

22  government in its investigation of federal crimes.  The law

23  provides that if a criminal defendant in federal court

24  provides substantial assistance in the investigation or

25  prosecution of other persons, the government may file a motion

1  with the Court asking the Court to sentence that defendant to

2  a reduced term of incarceration.  If such a motion is filed by

3  the government, it is up to the Judge to decide whether to

4  reduce the sentence at all and, if so, by how much to reduce

5  it.  Do not convict the defendant based on the unsupported

6  testimony of such a witness, standing alone, unless you

7  believe his testimony beyond a reasonable doubt.  You may give

8  the testimony of such witness as much weight as you think the

9  testimony deserves.  Whether or not the testimony of such

10  witness may have been influenced by the hope of receiving a

11  reduced sentence or by receiving such a benefit is for you to

12  decide.

13          One more point about the witnesses.  Sometimes

14  jurors wonder if the number of witnesses who testified makes

15  any difference.  Do not make any decision based only on the

16  number of witnesses who testified.  What is more important is

17  how believable the witnesses were and how much weight you

18  think their testimony deserves.  Concentrate on that, not the

19  numbers.

20          You have heard evidence of acts of the defendant

21  relating to alleged thefts, burglaries, and other acts other

22  than those charged in the indictment.  If you find the

23  defendant did those acts, you can consider the evidence only

24  as it relates to the government's claim on the defendant's

25  motive, lack of mistake, intent, or consciousness of guilt.

1  You must not consider it for any other purpose.  Remember that

2  defendant is on trial here only for the crimes alleged in the

3  indictment, not for the other acts.  Do not return a guilty

4  verdict unless the government proves the crimes charged in the

5  indictment beyond a reasonable doubt.

6        The defendant has been charged with four separate

7  offenses.  The number of crimes charged is not evidence of

8  guilt, and this should not influence your decision in any way.

9  It is your duty to separately consider the evidence that

10 relates to each charge and to return a separate verdict for

11 each one.  For each charge you must decide whether the

12 government has presented proof beyond a reasonable doubt that

13 the defendant is guilty of that particular charge.  Your

14 decision on one charge, whether it is guilty or not guilty,

15 should not influence your decision on the other charges.

16       The evidence also includes stipulations agreed to by

17 the parties.  When the attorneys on both sides stipulate or

18 agree to the existence of a fact, you should accept the

19 stipulation as evidence and regard the fact as proved.  You

20 are not required to do so, however, since you are the sole

21 judges of the facts.

22       A defendant has an absolute right not to testify.

23 The fact that defendant did not testify cannot be considered

24 by you in any way.  Do not even discuss it in your

25 deliberations.  Remember that it is up to the government to

1   prove defendant guilty beyond a reasonable doubt.  It is not

2   up to defendant to prove that he is innocent.

3          You have heard the opinion testimony of several

4   witnesses.  A witness may offer an opinion if they have

5   special knowledge or experience which may be helpful to the

6   jury.  You do not have to accept their opinions.  In deciding

7   how much weight to give them, you should consider the

8   witnesses' qualifications and how the witnesses reached their

9   conclusions as well as any other factors you think are

10  relevant to determining whether their opinions are credible.

11  Remember that you alone decide how much of a witness's

12  testimony to believe and how much weight it deserves.

13         There is one more general subject I want to talk to

14  you about before I begin explaining the elements of the crimes

15  charged.  The lawyers for both sides objected to some of the

16  things that were said or done during the trial.  Do not hold

17  this against either side.  The lawyers have a duty to object

18  whenever they think something is not permitted by the rules of

19  evidence.  Those rules are designed to make sure both sides

20  receive a fair trial.  And do not interpret my rulings on

21  their objections as any indication of how I think the case

22  should be decided.  My rulings were based on the rules of

23  evidence, not on how I feel about the case.  Remember, your

24  decision must be based only on the evidence you saw and heard

25  here in court.

1    That concludes the part of my instructions

2  explaining your duties and the general rules that apply in

3  every criminal case.  In a moment I will explain the elements

4  of the crimes defendant is accused of committing.  But before

5  I do that, I want to emphasize that defendant is only on trial

6  for the particular crimes charged in the indictment.  Your job

7  is limited to deciding whether the government has proved the

8  particular crimes charged.

9    Also keep in mind that whether anyone else was, or

10 should be, prosecuted and convicted for this crime is not a

11 matter for you to consider.  You should not be concerned with

12 the guilt of any other person or persons not on trial as

13 defendants in this case.

14    I'll explain the definition of several terms

15 frequently used in federal criminal law and then explain the

16 elements which the government must prove in this case.

17    Count 1 of the indictment charges defendant with

18 carjacking resulting in death.  A person is guilty of

19 carjacking if he, with intent to cause death or serious bodily

20 harm, takes a motor vehicle that has been transported,

21 shipped, or received in interstate commerce from the person of

22 another by force and violence or by intimidation.

23    For you to find defendant guilty of the offense

24 charged in Count 1, the government must prove each of the

25 following elements beyond a reasonable doubt:  First,

1    defendant took and caused to be taken a motor vehicle from the

2    person or presence of another; second, defendant did so by the

3    use of force, violence, or intimidation; third, the motor

4    vehicle had previously -- third, the motor vehicle had

5    previously crossed state lines; fourth, while taking or

6    attempting to take the motor vehicle, defendant intended to

7    cause the death of or cause serious bodily harm to that

8    person; and, fifth, in committing the offense, defendant

9    caused the death of Guy Luck.

10              I will now explain some of the terms I just used.

11    The first element requires a motor vehicle be taken from the

12    person or presence of another.  To take a motor vehicle means

13    to acquire possession or control of the vehicle for a period

14    of time.  The government does not have to prove that the

15    defendant intended to permanently deprive the owner of

16    possession of the vehicle.  Also, the government does not have

17    to prove that the victim was forced to leave the vehicle, as

18    long as it proves that the defendant had control over the

19    situation.

20              The second element requires the use of force,

21    violence, or intimidation.  The term by force and violence

22    means by use of actual physical strength or actual physical

23    violence.  The term by intimidation means the commission of

24    some act or the making of some statement that would put a

25    reasonable person of ordinary sensibilities in fear of bodily

1    harm.  It is not necessary for the government to prove that

2    the alleged victim was actually placed in fear.

3            The third element requires the motor vehicle to have

4    previously crossed state lines.  The parties have stipulated

5    or agreed that the vehicle was previously transported,

6    shipped, and received in interstate commerce.

7            The fourth element requires defendant to have

8    intended to cause death or serious bodily harm.  Whether

9    defendant intended to cause death or serious bodily harm is to

10   be judged objectively from the conduct of defendant as

11   disclosed by the evidence and from what one in the position of

12   the alleged victim might reasonably conclude.  In this case

13   the government contends that the defendant intended to cause

14   death or serious bodily harm if the alleged victim had refused

15   to turn over the car.  If you find beyond a reasonable doubt

16   that the defendant had such an intent, the government has

17   satisfied this element of the offense.

18           The fifth element requires that in committing the

19   carjacking defendant did cause the death of Guy Luck.

20           If you are convinced the government has proved all

21   of these elements, say so by returning a guilty verdict on

22   Count 1.  If you have a reasonable doubt about any one of

23   these elements, then you must find the defendant not guilty on

24   Count 1.

25           Count 2 of the indictment charges defendant with

1   murder by use of a firearm during and in relation to

2   carjacking.  Federal law prohibits the use, carry, and

3   discharge of a firearm during and in relation to a crime of

4   violence.  A person is guilty of this offense if he, in the

5   course of committing a crime of violence, murders a person

6   through the use of a firearm.

7           For you to find defendant guilty of the offense

8   charged in Count 2, the government must prove each of the

9   following elements beyond a reasonable doubt:  First,

10  defendant committed the carjacking charged in Count 1; second,

11  defendant knowingly used, carried, or discharged a firearm;

12  third, the use, carrying, or discharge of the firearm occurred

13  during and in relation to the carjacking charged in Count 1;

14  and, fourth, in committing the offense, defendant murdered Guy

15  Luck through the use of a firearm.

16          The first element of this offense requires defendant

17  have committed the carjacking charged in Count 1.  If you find

18  the defendant guilty on Count 1, you will then consider

19  whether the government has proved each of the remaining

20  elements of this Count 2 offense beyond a reasonable doubt.

21  If you find defendant not guilty on Count 1, then you must

22  also find defendant not guilty on Count 2.

23          The second and third elements involve the use,

24  carrying, or discharge of a firearm.  To establish use, the

25  government must prove active employment of the firearm during

1  and in relation to the crime charged in Count 1.  <u>Active</u>

2  <u>employment</u> means activities such as brandishing, displaying,

3  bartering, striking with, and, most obviously, firing or

4  attempting to fire-- <u>Active employment</u> means activities such

5  as brandishing, displaying, bartering, striking with, and,

6  most obviously, firing, or attempting to fire, a firearm.  Use

7  also includes a person's reference to a firearm in his

8  possession for the purpose of helping to commit the crime

9  charged in Count 1.  Use requires more than mere possession or

10 storage.

11        <u>Discharge</u> means firing a firearm, causing it to

12 expel a bullet.

13        The term <u>firearm</u> means any weapon which will, or is

14 designed to, or may readily be converted to, expel a

15 projectile by the action of an explosive.

16        The term <u>during and in relation to</u> means the firearm

17 must have some purpose or effect with respect to the crime

18 charged in Count 1; in other words, the firearm must

19 facilitate or further, or have the potential of facilitating

20 or furthering, the crime charged in Count 1, and its presence

21 or involvement cannot be the result of accident or

22 coincidence.

23        The fourth element requires the government to prove

24 the death of Guy Luck was a murder in the first degree.  This

25 requires the government to prove these additional elements

1  beyond a reasonable doubt:  First, the defendant unlawfully

2  killed Guy Luck; second, defendant committed the killing with

3  malice aforethought; third, the killing was committed either

4  during the perpetration of a kidnapping or was willful,

5  deliberate, malicious, and premeditated.

6          Thus, there are two ways the government can prove

7  defendant guilty of Count 2.  The government does not need to

8  prove both of these ways beyond a reasonable doubt.  However,

9  to return a guilty verdict, all 12 of you must unanimously

10  agree that the same way has been proven beyond a reasonable

11  doubt.

12          Regarding the second of the additional elements, to

13  kill with malice aforethought means an intent, at the time of

14  the killing, to take the life of another person either

15  deliberately and intentionally or to willfully act with

16  callous and wanton disregard for human life.

17          The government need not prove that defendant hated

18  the person killed or felt ill will toward the victim at the

19  time, but the evidence must establish beyond a reasonable

20  doubt that defendant acted either with the intent to kill or

21  to willfully do acts with callous and wanton disregard for the

22  consequences and which defendant knew would result in a

23  serious risk of death or serious bodily harm.

24          Regarding the third of the additional elements, in

25  perpetration of kidnapping, means that defendant killed Guy

1   Luck while the defendant was committing the kidnapping charged

2   in Count 3 of the indictment and in furtherance of that

3   kidnapping.

4          Premeditation is typically associated with killing

5   in cold blood, and requires a period of time in which the

6   accused deliberates or thinks the matter over before acting.

7   The law does not specify or require any exact period of time

8   that must pass between the formation of the intent to kill and

9   the killing itself.  It must be long enough for the killer,

10  after forming the intent to kill, to be fully conscious of

11  that intent.

12         If you are convinced that the government has proved

13  all of these elements, say so by returning a guilty verdict on

14  Count 2.  If you have a reasonable doubt about any one of

15  these elements, then you must find the defendant not guilty on

16  Count 2.

17         If you find defendant not guilty on Count 2, then

18  you should proceed to determine whether defendant is guilty of

19  the lesser included offense of second-degree murder by use of

20  a firearm during and in relation to carjacking.  This offense

21  requires the government to prove the same elements as

22  previously described for Count 2.  The only difference is that

23  you do not have to find that defendant is guilty beyond a

24  reasonable doubt of murdering Guy Luck deliberately,

25  maliciously, willfully, and with premeditation, nor do you

1  have to find that defendant is guilty beyond a reasonable

2  doubt of murdering Guy Luck during the perpetration of the

3  kidnapping charged in Count 3.  If you are convinced the

4  government has proved all of the elements of second-degree

5  murder by use of a firearm during and in relation to

6  carjacking, say so by returning a guilty verdict on that

7  charge.  If you have a reasonable doubt about any one of these

8  elements, then you must find the defendant not guilty on that

9  charge.

10         If you find the defendant not guilty on Count 2 of

11  both first- and second-degree murder, then you should proceed

12  to determine whether the defendant is guilty of the lesser

13  included offense of voluntary manslaughter by use of a firearm

14  during and in relation to carjacking.  Manslaughter is the

15  unlawful killing of a human being without malice.  This

16  offense requires the government to prove the same elements as

17  previously described for Count 2; specifically, defendant

18  committed the carjacking charged in Count 1; defendant used,

19  carried, or discharged a firearm; the use, carrying, or

20  discharge of the firearm occurred during and in relation to

21  the carjacking charged on Count 1; in committing the offense,

22  the defendant caused the death of Guy Luck through the use of

23  a firearm.

24         For voluntary manslaughter the description of the

25  elements are the same as I previously described, except for

the fourth element.  For the fourth element you do not have to

find that defendant is guilty beyond a reasonable doubt of

murdering Guy Luck deliberately, maliciously, willfully, and

with premeditation, and you do not have to find that defendant

is guilty beyond a reasonable doubt of murdering Guy Luck

during the perpetration of the kidnapping charged in Count 3,

and you do not have to find defendant is guilty beyond a

reasonable doubt of killing Guy Luck with malice aforethought.

Instead, the fourth element requires the additional elements

defendant unlawfully killed Guy Luck while in a sudden quarrel

or heat of passion caused by adequate provocation, either

defendant intentionally killed Guy Luck or defendant killed

Guy Luck recklessly with extreme disregard for human life.

Heat of passion may be provoked by fear, rage, or terror.

Provocation, in order to be adequate, must be such as might

naturally cause a reasonable person, in the passion of the

moment, to lose self-control and act on impulse and without

reflection.

        If you are convinced that the government has proved

the elements of this charge, say so by returning a guilty

verdict on the lesser offense of voluntary manslaughter by use

of a firearm during and in relation to carjacking.  If you

have a reasonable doubt about any one of these elements, then

you must find the defendant not guilty on this charge.

        Count 3 of the indictment accuses defendant of

```
 1   kidnapping causing death.  A person is guilty of kidnapping

 2   when he unlawfully seizes, confines, kidnaps, abducts, or

 3   carries away and holds for ransom or reward or otherwise any

 4   person when the person is willfully transported in interstate

 5   commerce.

 6           For you to find defendant guilty of the offense

 7   charged in Count 3, the government must prove each of the

 8   following elements beyond a reasonable doubt:  Defendant

 9   knowingly and willfully seized, confined, kidnapped, abducted,

10   or carried away the person named in the indictment, Guy Luck;

11   that person was thereafter transported in interstate commerce

12   while so seized, confined, kidnapped, or abducted; defendant

13   held that person for ransom, reward, or other reason; and, in

14   committing the offense, defendant caused the death of Guy

15   Luck.

16           With regard to the first element, to kidnap a person

17   means to forcibly and unlawfully hold, keep, detain, and

18   confine the person against his will.  So involuntariness or

19   coercion in connection with the victim's detention is an

20   essential part of the offense.  A person acts knowingly if he

21   acts intentionally, voluntarily, and with an awareness of his

22   actions, and not because of ignorance, accident, mistake, or

23   carelessness.  Whether defendant acted knowingly may be proven

24   by defendant's conduct and by all the facts and circumstances

25   surrounding the case.
```

1    Willfully means acting knowingly, purposefully, and

2  deliberately with an intent to do something the law forbids,

3  that is to say, with the bad purpose to disobey or to

4  disregard the law.  A defendant's conduct was not willful if

5  it was due to negligence, inadvertence, or mistake.

6       The second element requires the person be

7  transported in interstate commerce.  Interstate commerce means

8  commerce or travel between one state and another state.  A

9  person is transported in interstate commerce whenever that

10  person moves across state lines from one state into another

11  state.  The government does not have to prove that defendant

12  knew of the crossing of state lines or that defendant intended

13  to cross state lines but only that it was done while the

14  defendant was intentionally transporting the victim.

15       The third element requires the government to prove

16  defendant held the person for ransom, reward, or other reason.

17  It need not be proved that a kidnapping was carried out for

18  ransom or personal monetary gain so long as it is proved that

19  defendant acted willfully, intending to gain some benefit from

20  the kidnapping.

21       The fourth element requires that in committing the

22  kidnapping defendant did cause the death of Guy Luck.  If you

23  are convinced that the government has proved all of these

24  elements, say so by returning a guilty verdict on Count 3.

25       If you have a reasonable doubt about any one of

1  these elements, then you must find the defendant not guilty on

2  Count 3.

3         Count 4 of the indictment charges the defendant with

4  murder by use of a firearm during and in relation to

5  kidnapping.  Federal law prohibits the use, carry, and

6  discharge of a firearm during and in relation to a crime of

7  violence.  A person is guilty of this offense if he, in the

8  course of committing a crime of violence, murders a person

9  through the use of a firearm.

10        For you to find defendant guilty of the offense

11  charged in Count 4, the government must prove each of the

12  following elements beyond a reasonable doubt:  First,

13  defendant committed the kidnapping charged in Count 3; second,

14  defendant knowingly used, carried, or discharged a firearm;

15  third, the use, carrying, or discharge of the firearm occurred

16  during and in relation to the kidnapping charged in Count 3;

17  and, fourth, in committing the offense, defendant murdered Guy

18  Luck through the use of a firearm.

19        The descriptions of these elements that I have

20  provided with regard to Count 2 are the same for Count 4,

21  including the additional requirements of proving the killing

22  was a murder in the first degree.  If you are convinced that

23  the government has proved all of these elements, say so by

24  returning a guilty verdict on Count 4.  If you have a

25  reasonable doubt about any one of these elements, then you

1 must find the defendant not guilty on Count 4.

2         If you find defendant not guilty on Count 4, then

3 you should proceed to determine whether defendant is guilty of

4 the lesser included offense of voluntary manslaughter by use

5 of a firearm during and in relation to kidnapping.

6 Manslaughter is the unlawful killing of a human being without

7 malice.  This offense requires the government to prove the

8 same elements as previously described for Count 4;

9 specifically, defendant committed the kidnapping charged in

10 Count 3; defendant used, carried, or discharged a firearm; the

11 use, carrying, or discharge of the firearm occurred during and

12 in relation to the kidnapping charged in Count 3; and, in

13 committing the offense, defendant caused the death of Guy Luck

14 through the use of a firearm.

15         For voluntary manslaughter the descriptions of the

16 elements are the same as I have previously described, except

17 for the fourth element.  For the fourth element, you do not

18 have to find that defendant is guilty beyond a reasonable

19 doubt of murdering Guy Luck deliberately, maliciously,

20 willfully, and with premeditation, and you do not have to find

21 defendant is guilty beyond a reasonable doubt of killing Guy

22 Luck with malice aforethought.  Instead, the fourth element

23 requires these additional elements:  First, defendant

24 unlawfully killed Guy Luck; and, second, while in a sudden

25 quarrel or heat of passion caused by adequate provocation

1   either defendant intentionally killed Guy Luck or defendant

2   killed Guy Luck recklessly with extreme disregard for human

3   life.

4           If you are convinced that the government has proved

5   the elements of this charge, say so by returning a guilty

6   verdict on the lesser offense of voluntary manslaughter by use

7   of a firearm during and in relation to kidnapping.  If you

8   have a reasonable doubt about any one of these elements, then

9   you must find the defendant not guilty on this charge.

10          Next I want to explain something about proving a

11  defendant's state of mind.  Ordinarily there is no way that a

12  defendant's state of mind can be proved directly because no

13  one can read what is in another person's mind and tell what

14  that person is thinking.  But a defendant's state of mind can

15  be proved indirectly from the surrounding circumstances.  This

16  includes things like what the defendant said, what the

17  defendant did, how the defendant acted, and any other facts or

18  circumstances in evidence that show what was in the

19  defendant's mind.  You may also consider the natural and

20  probable results of any acts that defendant knowingly did, and

21  whether it is reasonable to conclude that defendant intended

22  those results.  This, of course, is all for you to decide.

23          For you to find the defendant guilty, it is not

24  necessary for you to find that he personally committed the

25  crime himself.  You may also find him guilty if he

1  intentionally helped or encouraged someone else to commit the

2  crime.  A person who does this is called an aider and abettor.

3  But for you to find the defendant guilty of any crimes as an

4  aider and abettor, you must be convinced the government has

5  proved each and every one of the following elements beyond a

6  reasonable doubt:  First, that the crime was committed;

7  second, that the defendant helped to commit the crime or

8  encouraged someone else to commit the crime; and, third, that

9  the defendant intended to help commit or encourage the crime.

10      Proof that the defendant may have known about the

11  crime, even if he was there when it was committed, is not

12  enough for you to find him guilty.  You can consider such

13  proof in deciding whether the government has proved that he

14  was an aider and abettor, but without more it is not enough.

15  What the government must prove is that the defendant did

16  something to help or encourage the crime with the intent that

17  the crime be committed.  If you are convinced that the

18  government has proved all of these elements, you can return a

19  guilty verdict based on an aiding and abetting theory.  If you

20  have a reasonable doubt about any one of these elements, then

21  you cannot find the defendant guilty of those crimes as an

22  aider and abettor.

23      You have heard evidence that after the August 6,

24  2003, crime was supposed to have been committed, defendant may

25  have been involved in the destruction or concealment of

1  evidence, taken evasive action to avoid being arrested, and

2  later may have been involved in an attempt to escape from

3  jail.  The burden is upon the government to prove intentional

4  flight.  Intentional flight after a defendant is accused of a

5  crime is not, alone, sufficient to conclude that he is guilty.

6  Flight does not create a presumption of guilt.  If you believe

7  that defendant destroyed or concealed evidence, took evasive

8  action to avoid being arrested, and was involved in an attempt

9  to escape from jail, you may consider this conduct, along with

10  all the other evidence, in deciding whether the government has

11  proved beyond a reasonable doubt that he committed the crimes

12  charged.  This conduct may indicate that he thought he was

13  guilty and was trying to avoid punishment.  On the other hand,

14  sometimes an innocent person may do these actions for some

15  other innocent reason.  It is up to you as members of the jury

16  to determine whether or not such evidence shows a

17  consciousness of guilt and the weight or significance to be

18  attached to any such evidence.

19       That concludes the part of my instructions

20  explaining the rules for considering the testimony and

21  evidence.  Now let me finish up by explaining some things

22  about your deliberations in the jury room and your possible

23  verdicts.

24       The first thing you should do in the jury room is

25  choose someone to be your foreperson.  This person will help

1    to guide your discussions and will speak for you here in

2    court.

3          Once you start deliberating, do not talk to

4    Ms. Palmer or to me or to anyone else except each other about

5    the case.  If you have any questions or messages, you must

6    write them down on a piece of paper, sign the paper, and then

7    give it to Ms. Palmer.  Ms. Palmer will give the questions to

8    me, and I will respond as soon as I can.  I may have to talk

9    to the lawyers about what you have asked, so it may take me

10   some time to get back to you.  Any questions or messages

11   normally should be sent to me through your foreperson.

12         One more thing about messages.  Do not ever write

13   down or tell anyone outside the jury room how you stand on

14   your votes.  For example, do not write down or tell anyone

15   except your fellow jurors what your vote happens to be.  That

16   must stay secret until you are finished.

17         Your verdict, whether it is guilty or not guilty,

18   must be unanimous.  To find defendant guilty, every one of you

19   must agree the government has overcome the presumption of

20   innocence with evidence that proves defendant's guilt beyond a

21   reasonable doubt.  To find defendant not guilty, every one of

22   you must agree the government has failed to convince you

23   beyond a reasonable doubt.  Either way, guilty or not guilty,

24   your verdict must be unanimous.

25         I have now concluded the instructions relevant to

1    the specific charges in this case.  Before closing, I must add

2    several final notes concerning your deliberations.  First, at

3    this stage in the proceedings the question of possible

4    punishment of the defendant must be of no concern to the jury

5    and should not in any sense enter into or influence your

6    deliberations.  As you know from jury selection, defendant

7    faces the possibility of the death penalty in this case.  But

8    at this stage in the case your only concern should be whether

9    the government has satisfied its burden of proving the

10   defendant's guilt in regard to the charged crimes.  The fact

11   that a guilty verdict could lead to a particular punishment

12   should not influence your decision at all during this stage of

13   the case.

14           Now that all the evidence is in and the arguments

15   are completed, you are free to talk about the case in the jury

16   room.  In fact, it is your duty to talk with each other about

17   the evidence and to make every reasonable effort you can to

18   reach unanimous agreement.  Talk with each other, listen

19   carefully and respectfully to each other's views, and keep an

20   open mind as you listen to what your fellow jurors have to

21   say.  Try your best to work out your differences.  Do not

22   hesitate to change your mind if you are convinced other jurors

23   are right and that your original position was wrong.  But do

24   not ever change your mind just because other jurors see things

25   differently or just to get the case over with.  In the end,

1   your vote must be exactly that——your own vote.  It is

2   important for you to reach unanimous agreement but only if you

3   can do so honestly and in good conscience.

4           No one will be allowed to hear your discussions in

5   the jury room, and no record will be made of what you say.  So

6   you should all feel free to speak your minds.  Listen

7   carefully to what the other jurors have to say, and then

8   decide for yourself if the government has proved defendant

9   guilty beyond a reasonable doubt.

10          I have prepared a verdict form for you to use to

11  record your verdict.  The form, I think, is self-explanatory,

12  and you will have no difficulty with it as you go through it.

13  There is one question that pertains to each of the charges.

14  So the first one, for example, which relates to Charge 1,

15  reads, "We, the jury, find defendant," then there is a blank,

16  and then by the blank, in parentheses, in bold print, is the

17  one word is, and then there is a slash and the two words is

18  not, "guilty of the offense charged in Count 1 of the

19  indictment, carjacking resulting in death."

20          Question Number 2 says the same thing, it just

21  applies to Count 2; Question 3, Count 3; Question 4, Count 4.

22          Now, because I instructed you that there are some

23  lesser included offenses with respect to Counts 2 and 4, there

24  are also some additional questions that you will have to

25  answer, 2.A, 2.B.1, 2.B.2, and under 4, 4.A and 4.B.  And

1  there are some instructions in bold print between questions 2

2  and 2.A and 4 and 4.B that tells you when and whether you need

3  to answer the questions.  As I said, I think you will find

4  this self-explanatory and you will not have any difficulty

5  with it once you see it.

6          Once the jury has concluded its deliberations and

7  has come to a unanimous decision, then the foreperson should

8  complete the instruction by putting in the appropriate words

9  in the questions, that is, is or is not, and then checking the

10  appropriate other questions.  And then the foreperson should

11  sign the verdict form at the place for the foreperson's

12  signature, and then put the date the decision was reached,

13  then let Ms. Palmer know that the jury has reached a decision.

14  And Ms. Palmer will inform me, and we'll have you brought

15  back.

16          That concludes the Court's instructions.  At this

17  time the Court will order the jury to return to the jury

18  deliberation room.  Do not begin deliberating, though, until

19  the Court tells you to do so.  The jury should step out of the

20  courtroom.

21          (The jury exited the courtroom, and the proceedings

22          continued as follows:)

23          THE COURT:  Please be seated.

24          The jury has departed the courtroom.  Does the

25  government have any objection to the charge the Court just

1  gave?

2          MR. NEFF:  No, Your Honor.

3          THE COURT:  Does the defense have any objection to

4  the charge the Court just gave?

5          MS. CORY:  Your Honor, we have none other than the

6  ones we had initially made during the charge conference.

7          THE COURT:  It's almost lunchtime.  I would suggest

8  that we let the jury take lunch and then begin deliberating

9  when they return.

10          We have six alternates in the case, and I would also

11  propose that either now or when they come back to begin

12  deliberating, that they be separated from the first 12, and

13  that Ms. Palmer place them someplace in the courtroom --

14  courthouse where they're not exposed to outsiders.  I don't

15  think I have a preference as to whether we do it now or we do

16  it after lunch.

17          MR. WILLIAM ORTWEIN:  That's fine with the defense,

18  Your Honor.

19          MR. NEFF:  No preference, Judge.  Whenever the Court

20  wants to, that's fine.

21          THE COURT:  Okay.  Ms. Palmer, why don't you bring

22  the alternates out, then.

23          (Brief pause.)

24          THE COURT:  I would ask counsel to get together with

25  Ms. Palmer to make sure that all of the exhibits that were

1   introduced for the jury's benefit are assembled, and make sure

2   that nothing that was not for the jury's benefit goes in.  I

3   believe there was at least one, if not two, appellate exhibits

4   that were offered, I think maybe an offer of proof and perhaps

5   something else that was offered that was not for the jury's

6   benefit.

7           MR. WILLIAM ORTWEIN:  Yes, sir.  In fact, I think I

8   initially introduced a copy of the newspaper, just for the

9   purpose -- not for the purpose of going to the jury.  So if I

10  might suggest, Your Honor, it might be advisable if someone

11  from the prosecution team and the defense team look through the

12  exhibits that are up there before they're reviewed further.

13          THE COURT:  I think that's an excellent suggestion.

14  I would ask that each side do that and just make sure that only

15  those exhibits that were intended for the jury go back.

16          (Brief pause.)

17          MR. WILLIAM ORTWEIN:  While we're waiting, Your

18  Honor, could I ask another question relative to location of the

19  attorneys while the jury is deliberating?  Of course Mr. Lee

20  Ortwein's office is five minutes from here.  Whatever the Court

21  desires.  I was wondering, though, if it would be possible——we

22  could obviously leave a phone number with a clerk——for us to

23  adjourn to there during deliberations.

24          THE COURT:  Mr. Neff?

25          MR. NEFF:  That would be fine with the government,

1    Your Honor.

2              THE COURT:  Okay.  Five minutes?  So --

3              MR. WILLIAM ORTWEIN:  Well, Judge, maybe I ought to

4    say ten.

5              MR. LEE ORTWEIN:  It's five minutes by his time.

6    It's a block by my time, about two minutes.

7              MR. WILLIAM ORTWEIN:  For younger people to get here,

8    not for we older folks, necessarily.  Your Honor, it's right

9    here at Park Plaza Building on the corner of Georgia and--

10             What's that street?

11             MR. LEE ORTWEIN:  10th and Market.

12             MR. WILLIAM ORTWEIN:  10th, coming out the back door.

13             MR. NEFF:  Mr. Clements claimed he could run a 4.2

14   40, Judge, during voir dire.  So I'm sure he could get here

15   fast.

16             THE COURT:  Just make sure that Ms. Palmer, then, has

17   a way to get in touch with you.  I would suggest you leave your

18   cell phone numbers instead of your office -- or in addition to

19   your office numbers.

20             MR. WILLIAM ORTWEIN:  Thank you, Your Honor.

21             THE COURT:  I think they're taking advantage of the

22   break, so they're in the rest rooms and getting their coffee.

23   In fact, I think it probably makes sense to have them all

24   brought in, instead of just the alternates, and we can release

25   them for lunch.

1        Ms. Palmer, why don't you bring them all back out.

2        THE CLERK:  All of them?  Okay.

3        (Brief pause.)

4        (The jury entered the courtroom, and the proceedings

5        continued as follows:)

6        THE COURT:  Please be seated.

7        Ladies and gentlemen, it's about noontime now, so I

8   think it's appropriate that I release you for your lunch

9   break.  I'll ask you to come back at 1:15.  While you are away

10  at lunch, do not discuss the case with anyone and do not allow

11  anyone to discuss the case with you.  It is at the point now

12  where you can begin deliberation, but it's very important that

13  each of you hear what everyone else has to say about the

14  deliberation.  When you come back, just go directly to the

15  deliberation room.

16        Mr. Birch, Ms. Cook, Ms. Pfeiffer, Mr. Holloway,

17  Ms. Hayes, and Mr. Barry, as you know, you were the last six

18  jurors that we seated.  You also were aware that you were

19  separated somewhat from the first 12.  We're at the point now

20  where only the first 12 can be involved in the deliberations.

21  But we still need you here.  Ms. Palmer is going to find

22  somewhere in the courthouse to place you where you will not be

23  exposed to any outside influence.  Once you come back,

24  Ms. Palmer will take you to that location.  You can go ahead

25  and have lunch.  If you'd like to have lunch with some of the

1    first 12, feel free to do so.  Again, while you are at lunch,

2    do not look at anything that might touch upon this case at all

3    and do not listen to anything that might touch upon this case

4    at all.

5         Ms. Palmer.

6         (Luncheon recess.)

7         (Recess for deliberation.)

8         THE COURT:  Please be seated.

9         The Court has received a communication from the

10   jury.  The communication reads as follows:  "We need to ask

11   the Judge to clarify third part of Count 2, fourth element.

12   Is the or correct?  Either killing during kidnapping or

13   willful, deliberate, malicious, and premeditated?  Or both?"

14        This was addressed in the Court's instructions, and

15   I would propose that the Court respond directly to the

16   question with the following language:  "The or in the language

17   is correct.  It is only necessary for the government to prove

18   beyond a reasonable doubt either, quote, 'killing during

19   kidnapping' -- and that's lifted from the jury's question; I'm

20   using their language instead of the precise language in the

21   instruction, "or, quote, 'willful, deliberate, malicious, and

22   premeditated.'  However, you must be unanimous as to which of

23   the two alternatives; that is, you must all agree that the

24   government has proved the killing was committed during

25   kidnapping or you must all agree it was willful, deliberate,

1  malicious, and premeditated."

2          Mr. Neff, does the government have any objection or

3  any comments on the Court's proposed response?

4          MR. NEFF:  No, Your Honor.  It appears that answers

5  the question directly.

6          THE COURT:  Ms. Cory, does the defense have any

7  objection to the Court's proposed instruction?

8          MS. CORY:  Your Honor, we do have an objection,

9  because the charge in the indictment——this is, of course, what

10  the jury is looking at——specifies, and it's the kidnapping and

11  premeditation.  They're trying to decide how to interpret that.

12  Your Honor's instructions cover that exactly.  We do not

13  believe there is any need to give them additional instructions.

14  The jury charge takes care of it.

15          THE COURT:  I think that is correct.  But what

16  they're asking about, I think, was the charge.  So if they were

17  completely clear on that, I don't know that they would have

18  asked a question.  And I would like to respond directly to what

19  they have asked.  The instruction tells them that it is

20  either/or, there is no requirement of both, and I believe that

21  that is the current -- well, it's not current, it goes on quite

22  a while, I believe, that -- at least in the Sixth Circuit, that

23  when you instruct on alternatives, that the government must

24  charge in the conjunctive but the Court must instruct in the

25  disjunctive, which is what we've done.

1    MS. CORY:  That's correct, Your Honor.  You've done

2    that already.  And our request would be that you simply

3    instruct the jury to look over the instructions you've already

4    provided.

5        THE COURT:  Is there anything legally incorrect about

6    what the Court's proposed language states?

7        MS. CORY:  No, Your Honor.  I just don't think it's

8    necessary.

9        THE COURT:  Well, since the jury did make the

10   request, obviously they felt they needed some clarification.

11   And since neither side indicates that the proposed language is

12   legally incorrect, the Court, then, will sign the communication

13   and have Ms. Palmer return the communication to the jury.

14       Ms. Palmer.

15       MR. WILLIAM ORTWEIN:  Could I --

16       THE COURT:  Yes, Mr. Ortwein?

17       MR. WILLIAM ORTWEIN:  Go ahead.  Nothing about that.

18   I just want to make an inquiry about, for example, two things;

19   one, how long the Court intends to let the jury deliberate

20   today, and if -- when the Court -- assuming they don't reach a

21   verdict, and assuming that the Court decides to send the jurors

22   home overnight, does Your Honor bring them back into the

23   courtroom to do that, or --

24       THE COURT:  Yes.  Yes.

25       MR. WILLIAM ORTWEIN:  Okay.

1    THE COURT:  Before they are released, they have to be

2  brought back into the courtroom.  We have a running joke in the

3  courthouse.  One of the deputy clerks who was not used to being

4  in court sent the jury away without them being in court.  And

5  some of the other judicial officers started referring to her as

6  Judge So-and-So.

7    MR. WILLIAM ORTWEIN:  Well, I've seen it done both

8  ways, Judge.  I was just curious how Your Honor was going to

9  proceed.

10    THE COURT:  We will always have them brought back

11  into the courtroom before they are released.

12    MR. WILLIAM ORTWEIN:  Does Your Honor have any idea,

13  assuming they don't reach a verdict, how long you'll --

14    THE COURT:  Not much after 5:00.

15    MR. WILLIAM ORTWEIN:  5:00?

16    THE COURT:  It's very stressful to be involved in

17  deliberations, and they don't need to go much past 5:00.

18    MR. WILLIAM ORTWEIN:  I tend to agree with the Court.

19  I was just curious, I guess you could say.

20    THE COURT:  Ms. Palmer.

21    (Recess for deliberation.)

22    (The jury entered the courtroom, and the proceedings

23    continued as follows:)

24    THE COURT:  Please be seated.

25    The Court has received a communication from the

1    jury.  The communication reads as follows:  "We have a

2    verdict."

3              [Name omitted], you're the foreperson of this jury?

4              THE FOREPERSON:  Yes, sir.

5              THE COURT:  And has the jury reached a unanimous

6    decision in this case?

7              THE FOREPERSON:  Yes, sir.

8              THE COURT:  If you would, please give the verdict

9    form to Ms. Palmer.

10             (Brief pause.)

11             THE COURT:  [Name omitted], I see that in

12   Question 2.A and 4.A there is a typographical error.  There are

13   actually two word was in it, and I think the second one does

14   not belong.  So could I get you to cross the second one out and

15   put your initials beside it?

16             THE FOREPERSON:  Yes, sir.

17             (Brief pause.)

18             THE COURT:  Do you see what I was referring to?  And

19   it's on the next -- first page, also.  I think it's 4.A.  Is

20   that right?  Or 2.A?

21             (Brief pause.)

22             THE COURT:  Mr. Taylor, would you and your attorneys

23   please stand and face the jury.

24             Ms. Palmer, would you please announce the jury's

25   decision.

1    THE CLERK:  "Number 1.  We, the jury, unanimously

2 find defendant is guilty of the offense charged in Count 1 of

3 the indictment, carjacking resulting in death.

4    "Number 2.  We, the jury, unanimously find defendant

5 is guilty of the offense charged in Count 2 of the indictment,

6 first-degree murder by use of a firearm during and in relation

7 to carjacking.

8    "2.A.  We, the jury, unanimously find the murder in

9 Count 2 of the indictment was committed during the

10 perpetration of a kidnapping.

11    "Number 3.  We, the jury, unanimously find defendant

12 is guilty of the offense charged in Count 3 of the indictment,

13 kidnapping resulting in death.

14    "Number 4.  We, the jury, unanimously find defendant

15 is guilty of the offense charged in Count 4 of the indictment,

16 murder by use of a firearm during and in relation to

17 kidnapping.

18    "4.A.  We, the jury, unanimously find the murder in

19 Count 4 of the indictment was committed during the

20 perpetration of a kidnapping."

21    THE COURT:  You may be seated.

22    Mr. Neff, does the government desire to have the

23 jury polled?

24    MR. NEFF:  No, thank you, Your Honor.

25    THE COURT:  Mr. Ortwein, does the defense desire to

1    have the jury polled?

2              MR. WILLIAM ORTWEIN:  Yes, Your Honor.

3              THE COURT:  Ladies and gentlemen, you have just heard

4    that the defense has asked that you be polled.  I will ask

5    Ms. Palmer to inquire of you individually whether the verdict

6    that she just announced is your own personal verdict.  If what

7    she announced is not your personal verdict, then say no.  If

8    what she announced is your personal verdict, then please say

9    yes.

10             Ms. Palmer, please poll the jury.

11             THE CLERK:  Juror 158, [name omitted], is the verdict

12   I have read your verdict?

13             JUROR 158:  Yes.

14             THE CLERK:  Juror 116, [name omitted], is the verdict

15   I have read your verdict?

16             JUROR 116:  Yes.

17             THE CLERK:  Juror 144, [name omitted], is the verdict

18   I have read your verdict?

19             JUROR 144:  Yes, ma'am.

20             THE CLERK:  Juror 228, [name omitted], is the verdict

21   I have read your verdict?

22             JUROR 228:  Yes, ma'am.

23             THE CLERK:  Juror 115, [name omitted], is the verdict

24   I have read your verdict?

25             JUROR 115:  Yes.

```
 1              THE CLERK:  Juror 132, [name omitted], is the verdict
 2    I have read your verdict?
 3              JUROR 132:  Yes.
 4              THE CLERK:  Juror 148, [name omitted], is the verdict
 5    I have read your verdict?
 6              JUROR 148:  Yes.
 7              THE CLERK:  Juror 138, [name omitted], is the verdict
 8    I have read your verdict?
 9              JUROR 138:  Yes.
10              THE CLERK:  Juror 256, [name omitted], is the verdict
11    I have read your verdict?
12              JUROR 256:  Yes.
13              THE CLERK:  Juror 122, [name omitted], is the verdict
14    I have read your verdict?
15              JUROR 122:  Yes.
16              THE CLERK:  Juror 114, [name omitted], is the verdict
17    I have read your verdict?
18              JUROR 114:  Yes.
19              THE CLERK:  And, Juror 160, [name omitted], is the
20    verdict I have read your verdict?
21              JUROR 160:  Yes.
22              THE COURT:  The Court will direct the courtroom
23    deputy to file and record the verdict.
24              Ladies and gentlemen, this will conclude your
25    service on this phase of the case.  I'm going to ask that you
```

1    retire to the jury deliberation room at this point for further

2    instructions.  So the jury should leave the courtroom.

3              (The jury exited the courtroom, and the proceedings

4              continued as follows:)

5              THE COURT:  Be seated.

6              In light of the jury's decision, we need to decide

7    when we would like to commence the next phase of the case.

8    The parties had asked for some time off.  I think that we're

9    ahead of schedule.  And it is possible for the Court actually

10   to commence the second phase on Wednesday the 10th of this

11   month.  The 11th and 12th would not be feasible.  And then we

12   would resume on the 15th -- I'm sorry, the 16th.

13             MR. WILLIAM ORTWEIN:  Your Honor, I was just going to

14   say I thought you said the other day for some reason we weren't

15   going to hold court the 15th.

16             THE COURT:  You're correct.  The 15th is wrong.

17   Ms. Palmer just reminded me of that, that one of the jurors is

18   going to be out of town and not available on the 15th.

19             MR. WILLIAM ORTWEIN:  Start the 16th?

20             THE COURT:  The 16th.

21             MR. NEFF:  Your Honor, if it's possible, we'd like to

22   start on the 16th rather than going one day and taking five

23   days off and coming back.  If we could start on Tuesday the

24   16th and roll through it, that would be our preference.

25             (Off-the-record discussion.)

           1          THE COURT:  I don't know how much time we're looking

           2   at, but, again, on the 18th and 19th we will not have full

           3   days.  We may be able to get in a half day on that Thursday the

           4   18th, but the 19th is out and the afternoon of the 18th is out.

           5   And looks like we'll have it three days the following week,

           6   Monday, Tuesday, and Wednesday.  So I think there is going to

           7   be a break anyway, unless you're looking at completing

           8   everything in two or three days.

           9          MR. NEFF:  Well, Your Honor, we can -- we can

          10   probably conclude our case in two to two and a half days on

          11   sentencing, ourselves.  And that might be a natural breaking

          12   point.  If we start on Tuesday, we'll finish by the end of the

          13   week.

          14          THE COURT:  Well, okay.  Again, if we start on the

          15   16th, that's a Tuesday, we'll have that day, some of that

          16   Wednesday, and perhaps a half day on Thursday.  So we're

          17   looking at, at most, two days that week.

          18          MR. NEFF:  I think that's enough for us, Judge, for

          19   our case.  I would rather do it that way than do one day on

          20   Wednesday and wait a week and put on another day, if that's

          21   possible.  Obviously we'll do whatever the Court wishes.

          22          THE COURT:  And the following week we'll have three,

          23   perhaps three and a half days.

          24          MR. NEFF:  Yes, sir.

          25          MR. WILLIAM ORTWEIN:  Whatever Your Honor says is

1  fine.  Of course we just didn't know about the scheduling,

2  scheduling witnesses.  I will tell the Court I expect the

3  defense proof to last approximately a week and a half.  That's

4  just an expectation.  I obviously don't know how many questions

5  counsel for the government will ask.

6          THE COURT:  I'll have Ms. Palmer, then, instruct the

7  jury that they should return on Tuesday the 16th.

8          MR. POOLE:  Thank you.

9          MR. NEFF:  Thank you, Your Honor.

10          THE COURT:  That's a week from tomorrow.

11          MR. NEFF:  Yes, sir.

12          THE COURT:  Okay.  And in view of the hour, I'll not

13  have them brought back into court, but I will just have

14  Ms. Palmer instruct them that they should return on that date.

15          MR. NEFF:  Thank you, Your Honor.

16          MR. WILLIAM ORTWEIN:  Thank you.

17          THE COURT:  Is there anything else we need to do?

18          (Off-the-record discussion.)

19          MR. WILLIAM ORTWEIN:  Your Honor, that's fine.

20          THE COURT:  Is there anything further?

21          MR. NEFF:  No, thank you, Your Honor.

22          MR. POOLE:  No, Your Honor.

23          THE COURT:  Ms. Palmer.

24          (Evening recess.)

25