1          IN THE UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF TENNESSEE

3                   AT CHATTANOOGA
   ------------------------------------------------------------
4                              :
   UNITED STATES OF AMERICA,    :
5                              :
              Plaintiff,        :
6                              :
   v.                          :            1:04-CR-160
7                              :
   REJON TAYLOR,               :
8                              :
              Defendant.        :
9  ------------------------------------------------------------
                                   Chattanooga, Tennessee
10                                  October 7, 2008

11       BEFORE:  THE HONORABLE CURTIS L. COLLIER,
                 CHIEF UNITED STATES DISTRICT JUDGE
12
   APPEARANCES:
13
           FOR THE PLAINTIFF:
14
           STEVEN S. NEFF
15         CHRISTOPHER D. POOLE
           Assistant United States Attorney
16         1110 Market Street, Suite 301
           Chattanooga, Tennessee  37402
17
           FOR THE DEFENDANT:
18
           WILLIAM H. ORTWEIN
19         Post Office Box 38
           Hixson, Tennessee  37343
20
           HOWELL G. CLEMENTS
21         1010 Market Street, Suite 401
           Chattanooga, Tennessee  37402
22

23
                       JURY TRIAL
24              FIFTEENTH DAY OF TRIAL

25

1  APPEARANCES:  (Continuing)

2          FOR THE DEFENDANT:

3          LESLIE A. CORY
           FREDERICK L. ORTWEIN
4          1010 Market Street, Suite 306
           Chattanooga, Tennessee  37402
5

6                    INDEX OF PROCEEDINGS

7  Defendant's Unsworn Allocution. . . . . . . . . . .  2160

8  GENE COPPINGER
       Direct Examination by Mr. William Ortwein . . . .  2176
9      Cross-Examination by Mr. Poole. . . . . . . . .  2185

10 BILL W. SMITH
       Direct Examination by Ms. Cory. . . . . . . . .  2186
11     Cross-Examination by Mr. Neff . . . . . . . . .  2193
       Redirect Examination by Ms. Cory. . . . . . . .  2214
12
   JAMES EVANS AIKEN
13     Direct Examination by Mr. Lee Ortwein . . . . . .  2222
       Cross-Examination by Mr. Neff . . . . . . . . .  2252
14

15                  DEFENDANT'S EXHIBITS

16

   DS4    Anger management certificate            2175
17
   DS5    Anger management certificate            2176
18
   DS6    Transcript of GED test results          2176
19
   DS7    Inmate Classification Summary           2180
20
   DS8    Inmate Disciplinary Report              2182
21
   DS9    Jail records                            2254
22
   DS10   Proffer – McNally (For ID only)         2261
23
   DS11   McNally declaration (For ID only)       2261
24
   DS12   Bell declaration (For ID only)          2261
25

                UNITED STATES DISTRICT COURT

1          (The proceedings were held outside the presence of

2          the jury, as follows:)

3          THE COURT:  Mr. Ortwein?

4          MR. LEE ORTWEIN:  Yes, sir.  If we can have just a

5  minute.

6          (Brief pause.)

7          MR. WILLIAM ORTWEIN:  I'm sorry, Your Honor.  I was

8  outside talking to a witness.  I seem to be obsessed with

9  scheduling, because of the people from North Carolina and

10  Dallas.  So I wanted to update the Court on what the situation

11  is, because it changed last night after court.

12          Basically this morning we intend -- we only have a

13  short amount of evidence to present to the jury.  We're

14  going--  Mr. Taylor will make an allocution; I have two

15  witnesses, which will probably be short; there are some

16  stipulated documents to introduce, and that's about it.

17  However, Mr. Aiken would be available at 1:30 to make his

18  proffer, and I think Mr. Clements would like to take up a

19  matter at that time about Mr. McNally.  The other change--

20  And Mr.--  I don't think the Court would want to keep the jury

21  around.  It's up to the Court.  If the Court allows some or

22  all of Mr. Aiken's testimony, he could testify this afternoon,

23  or he would be available in the morning.

24          Dr. Cunningham, because of other obligations, is

25  flying in late this afternoon to begin his testimony tomorrow,

1    also.  Basically, if it please the Court, that's the status.

2    And Dr. Cunningham we envision as being our last witness.

3    Basically that's the status of where we are in relation to

4    scheduling witnesses and defense proof at this particular

5    time.

6            THE COURT:  Okay.  Thank you.  So you think you'll

7    have about how much material for the jury today, this morning?

8            MR. WILLIAM ORTWEIN:  Your Honor, just a moment.

9            (Off-the-record discussion.)

10           MR. WILLIAM ORTWEIN:  Your Honor, I would estimate 45

11   minutes to an hour.

12           THE COURT:  Okay.  And then after that you'd have

13   witnesses for the proffer, so we could let the jury go?

14           MR. WILLIAM ORTWEIN:  Yes, Your Honor.  However, the

15   witness won't be available for a proffer until 1:30.  He's

16   coming in from North Carolina.

17           THE COURT:  That's fine.  That's fine.  That's fine.

18           MR. WILLIAM ORTWEIN:  And then, of course, depending

19   on what Your Honor rules there, he can begin his testimony

20   tomorrow, if Your Honor allows him to testify in whole or part.

21   He would be our next -- or our first witness Wednesday.  As I

22   say, Dr. Cunningham, who will be our last witness, he had some

23   other obligations, the reason for the change.  We'll at least

24   begin his testimony Wednesday.  I don't know that we'll be able

25   to conclude it Wednesday.  But he can be back the following

1    Tuesday.  But that's where we are.  We intend that this --

2    unless something happens, Judge, to rest after Dr. Cunningham's

3    testimony.

4           THE COURT:  Okay.  Does the government anticipate

5    putting on rebuttal evidence?

6           MR. NEFF:  Yes, Judge.  I think that's a possibility,

7    certainly.

8           THE COURT:  How long do you think that would be?

9           MR. NEFF:  A couple hours, maybe, tops, Judge.

10          THE COURT:  Okay.  So if we don't finish the case on

11   Wednesday, we should finish it next week, easily?

12          MR. NEFF:  Yes, sir.

13          (Off-the-record discussion.)

14          MR. WILLIAM ORTWEIN:  Your Honor, if possible, after

15   we hear the evidence this morning and the jury is discharged, I

16   think Mr. Clements would like to take up a matter relative to

17   Mr. McNally.

18          THE COURT:  That's fine.

19          MR. CLEMENTS:  I'm just going to read part of his

20   proffer and identify it for the record.  None of it will be

21   before the jury, Your Honor.

22          THE COURT:  That's fine.

23          Let me raise with you an ongoing issue—I mentioned

24   it when we concluded yesterday—that concerns Juror Number 9.

25   As you'll recall, when the Court asked the jury whether there

1  were any other matters that had arisen since they were first

2  impaneled that might have caused them to answer questions

3  differently, she was the only juror that responded.  At the

4  conclusion of court yesterday, she contacted our jury

5  administrator and indicated to the jury administrator that her

6  serving on the jury has created a severe hardship, she is

7  surviving now by her savings, she is dipping into her savings

8  to meet her everyday expenses.

9       We were able to talk to the Federal Bar Association,

10  and Attorney Donna Mikel has volunteered to take on the issue.

11  I've had my staff communicate with her, and I've asked her to

12  speak to the employer, that this is a matter of great urgency,

13  and, if nothing could be resolved with the employer, to

14  consider filing something with the Court today, this

15  afternoon.

16       So there is some possibility that we may have a

17  hearing with the employer this afternoon.  And if counsel

18  would like to be available and participate in that, you can,

19  but-- In fact, the juror indicated to the administrator that

20  she was not going to come in today, that she was just going to

21  go to work.  If that happens on some day because of the

22  hardship that she is undergoing, I cannot see that I would

23  have her arrested and brought in.  I don't think that would be

24  an appropriate action, in view of her personal hardship.  But

25  I did want to let you know what was going on.  I have not

1   spoken to her at all. I'm repeating to you what my staff and

2   the jury administrator has communicated to me. And once I

3   know-- If it is necessary for a hearing, I'll let you know.

4   And if you'd like to participate in it, you are of course

5   welcome to. Okay?

6         And I plan on giving the jury an instruction

7   regarding Mr. Taylor's allocution, to explain to them what's

8   going on. I will take a short recess and get that instruction

9   and share it with you so you can see it.

10         MR. NEFF: Thank you, Judge.

11         THE COURT: Is that the first thing that you're going

12   to do this morning?

13         MR. WILLIAM ORTWEIN: Yes, Your Honor.

14         THE COURT: Okay. Well, let's take a recess, then.

15         (Brief recess.)

16         (The jury entered the courtroom, and the proceedings

17         continued as follows:)

18         THE COURT: Please be seated.

19         Ladies and gentlemen, you are about to hear from the

20   defendant Rejon Taylor. You will recall I earlier instructed

21   you that in this phase of the case rules of evidence are

22   somewhat relaxed. Because of that, I am permitting defendant

23   to speak to you. However, what he will say is not testimony

24   nor evidence. For that reason he will not be sworn, he will

25   not be on the witness stand, he will not be questioned by his

1    attorneys, and he will not be subject to cross-examination.

2    Because what he says will not be evidence, he will not be

3    permitted to talk about any factual matters or discuss the

4    evidence in the case.  Rather, he is simply being provided an

5    opportunity to speak to you personally regarding himself and

6    sentencing.  Although you may not treat his statement as

7    evidence, you may consider his statement in reaching your

8    decision regarding sentencing.

9           You may proceed.

10          THE DEFENDANT:  Good morning.  Good morning.  I'm

11   kind of very nervous and a little bit afraid because--  I can't

12   speak--  Okay.  I just wanted to give you some personal things

13   about my life and how I grew up and what's been going on with

14   me since I've been locked up and stuff like that.  So I guess--

15   I know you heard from my family yesterday.  So I guess I'll

16   expound a little bit more on some of the things that they have

17   said or whatever.

18          But, really, I grew up in a single-parent home.  My

19   dad was locked up.  He had escaped.  He had got my mom

20   pregnant around the time my mom conceived me because he had

21   escaped from the state penitentiary.  And so he was locked up

22   for, like, the first ten years of my life, I think.  Could

23   have been a little bit longer, but I'm not quite sure.  So I

24   was staying with my mom and grandmother at this time.

25          And around this time, my mom, she was really the

1   supportive figure in my life.  She wasn't really an authority

2   figure, so I really didn't have those type of boundaries set

3   and stuff like that.  So it was like anything goes with my

4   mom.  So she was just really a provider.  And sometimes she

5   was working, like, two and three jobs.  So I can remember

6   those years that it was really my sister that I really grew up

7   around, I can really remember.  She was kind of like a mother

8   figure to me, because my mom was always working and stuff like

9   that.

10          And my grandmother, she was there keeping me --

11  keeping my grades and stuff up in school and stuff.  So at

12  that time I considered my grandmother to be, like, the

13  disciplinarian of the household, because my sister, she didn't

14  whip me, but at times my grandmother, she could just say some

15  of the things to me and I'd get in line and stuff like that.

16          So as I was growing up, my dad got out -- he got out

17  of the penitentiary when I was around, I think, 11 years old,

18  12, somewhere in there.  So we went and stayed with him.  But

19  I wasn't just really used to having a father figure in my

20  life, and he really wasn't a presence of authority, and it was

21  kind of like hard for me to kind of cope with him because I

22  felt like he was an intruder, but I really didn't know,

23  because -- but I longed to really have a father, but it was

24  just at the time that he came in my life, I was considered a

25  mom -- a mother's boy and stuff like that, so it was kind of

1   hard for me to adjust, and sometimes I just wanted to stay at

2   my grandmother's house because I just didn't feel comfortable

3   being around my dad at the time.  We were staying with him for

4   probably about three or four years.  At this time I was really

5   learning responsibilities and stuff, and I really had, like,

6   chores and stuff that I was allowed to do and stuff like that.

7   So my dad, he had us, like, doing chores and -- but when I was

8   with my mom and grandmother, I wasn't really required to do

9   stuff like that.

10          And at this time my dad was involved in identity

11   theft, bank fraud, of that nature and stuff like that.  And by

12   me being young, and the reputation I heard that my daddy had,

13   I kind of secretly wanted to be like him, in my heart, because

14   I kind -- I don't know if you notice, but what kid wouldn't

15   want to be like their father, especially a boy?

16          And so I just -- even though I wouldn't say my dad

17   taught me identity theft, by me being in the household and

18   being around the stuff, it really made me want to get into it,

19   because I can just sit back sometime and just listen to him

20   just wiring money over the phone, like millions of dollars,

21   and I heard him try to do stuff like that and it was just --

22   at the time I wasn't aware that I was being influenced by it,

23   but since I've been in jail, I've been looking over my life

24   and just seeing how I got to -- how my life just got all

25   screwed up, because as a kid I was very timid, I'll say, and

1 shy, and I really was quiet and really stayed away from a lot

2 of kids, but at times I had friends, but, really, I was one

3 that stayed to myself.

4       I consider myself-- Being young, I had ability with

5 computers and stuff like that. I think I started computer

6 class around 12 or 13, me and my mom. I went to that for a

7 while. I was learning how to type and rebuild computers and

8 stuff like that at a young age. And, see, my mom, she

9 really -- she really had me in the business type of world.

10 We'll go, like, to different type of seminars at a young age.

11 We'll go to seminars. We was taking -- learning about, like,

12 different type of investments and things like that. So I was

13 getting more knowledge about the financial market and the

14 economy and stuff like that and investing. So that's

15 something I can remember me and my mom doing, and going to

16 computer class, so -- because she knew I had a love for

17 computers. So sometimes people would just give me computers

18 and I would just try to, like, break them down and put them

19 back together and put different software and stuff on the

20 computer and just components and stuff like that. I just had

21 a passion for computers and stuff like that.

22       And so going -- speaking back to my dad, I respected

23 my dad, but in a way I despised him because he wasn't really

24 the father that I longed for. I really wanted somebody to

25 take me fishing and just have an intimate relationship. I

1  just can't really say that me and my father had a intimate

2  relationship.  He became a provider, he cooked, he brought

3  authority to my life, and he taught me somewhat of

4  responsibility, but when it come down to intimacy, what my

5  heart really longs for, I just didn't have it with my dad, I

6  just can't say I did.  I figure he spent so much time being

7  locked up--  I think when he was around 14 years old—could

8  have been a little bit older—he caught his first murder case.

9  And he have--  His life has been going in and out of the

10 penitentiary since that time there.  And see what he's locked

11 up for now -- if I'm not mistaken, I think he violated his

12 probation, his parole, because he caught another charge.  It

13 was a bank fraud; I think it was over 2 million dollars in

14 bank fraud and stuff like that.

15        But I really haven't kept in contact with my dad

16 since he been locked up, since--  Even when I've been here, I

17 never wrote him, because deep down inside I just feel like if

18 I would have had a father figure that was really there with

19 me, I feel like my life would have went down a different road.

20 So I just feel--  I just think--  I don't think I have really

21 forgiven him for not just being there for me and stuff like

22 that.

23        So I really got deep in the identity theft, and I

24 had this silly notion that I justified myself for doing it

25 because I was like, "Well, I'm not really hurting no one, and

 1  these people are not really responsible for the fraudulent

 2  activity that's taking place on their credit card" and stuff

 3  like that.  So I just kind of justified myself and what I was

 4  doing, I wasn't really hurting no one because they wouldn't be

 5  responsible for it and stuff like that, because I had the

 6  opportunity to sell drugs, but I just couldn't see how -- that

 7  was really tearing down the people's -- people's lives and

 8  stuff that was around me.  And I had one friend——her name was

 9  Tomesha——and I really felt bad because her mother was on drugs

10  and she was even stealing from her, so she really had to start

11  her lifestyle off.  I think at the time she was lying on

12  applications to get jobs because her mother wasn't providing

13  because she was so strung out on drugs and stuff.  So I just

14  didn't want to go that route, because at the time I was doing

15  identity theft, it was bothering my conscience, so I think the

16  reason I justified myself for doing it because I was like,

17  "Well, I'm not really hurting anyone, and they're not really

18  responsible for the fraudulent activities and stuff that was

19  taking place on the credit reports and credit cards and stuff

20  like that."

21          By me being -- loving computers, only thing I did

22  was surf the Internet and just did stuff like that, trying to

23  learn different ways out of the system and stuff like that,

24  because I really had a passion for it.

25          So as I was growing up, when I got around the age

1  of, I think, my late 15, early 16 years——this was before the

2  identity theft——I started a mobile detailing.  My company was

3  called Year-Round Mobile Detailing.  My mom and grandmother

4  helped me get in business.  I had, like, a '96 Astro van with

5  my whole setup inside of it; had, like, a 200-gallon water

6  tank, a generator.  I had everything I needed to go out and

7  detail cars.  At this time I was in school.  So my business

8  started picking up.  I had, like, contracts with, like,

9  different limousine companies in Atlanta.  For instance, I had

10  one called London Livery, Ltd., that was on Peachtree Street.

11  I had another limousine -- a contract, called A Step Above,

12  that was on State Avenue, because I had, like, senators and I

13  was doing, like, contracts with them and detailing their cars.

14  And my van had everything I needed.  So I could really just

15  set up wherever their cars and stuff was located at.

16        So at this time I started going to night school

17  because day school was interfering with just working my

18  business and stuff like that.  However, I dropped out of

19  school after this because business started picking up and I

20  couldn't make it at school on time.  And so I started my

21  business more and more, but at the same time my daddy was

22  locked up and I keep hearing rumors and stuff about how "Your

23  daddy, he can go get 30- and 40-, $50,000 out of the bank,

24  easy," and it wasn't hard work.  And my dad had a real lot of

25  nice stuff and nice houses, cars, whatnot, and it began to

1    influence me, not considering the rap that I was really being

2    influenced by, because the songs, they really glorify this

3    lifestyle it was acceptable to have——the womens, the cars, and

4    the jewelry, and stuff like that.  So it really made me want

5    to pursue the life of crime.  So I really got involved in

6    identity theft at this time.  So I started that.  I really got

7    really deep into it.  More than likely--  I'm trying to say--

8    So at this time I was involved in the identity theft.  So--

9    Let me see where I want to go.

10          (Brief pause.)

11          THE DEFENDANT:  Okay.  I guess I can go to the part--

12   Since I've been locked up in jail, I've been doing a lot of

13   reflecting, stuff, over my life.  And I really began to

14   discover my true self, really who I really am, because just the

15   influence and things that I had in the world, I was so caught

16   up, because things was moving so quick, really, the influence

17   through the rap music and just that longing to want to be like

18   my father, it brought me into a life of crime.

19          I began to really do a lot of soul searching.  At

20   this time I was really going through a serious time of

21   depression because I felt so bad for what I had done around

22   this time and stuff like that and it was really kind of

23   bothering me at this time.  I was thinking about committing

24   suicide, because I began to really see how, like, my actions

25   was kind of like -- I guess you can call it, like, a ripple

1  effect, that I didn't--  I just never knew that so many people

2  could be hurt just by a costly mistake.  I just--  I never--

3  I never just weighed things.  It's just the pain and the hurt

4  that I caused Mr. Luck's family and my family, and just facing

5  this every day.  And it was -- it was really, really hard.  It

6  really hurt a lot.

7         So -- so then I began on to -- I began to go into a

8  real pursuit of God, and it was like at this time I really

9  began to, like, seek out the God at this time right here.  I

10 just had a longing, a passion, to really experience the

11 reality of God, because I figure since I -- growing up, I

12 didn't have a father figure, I figure, like, I can get God and

13 stuff in and replace what I never had.  So still I cry just

14 for that reality, that intimacy, because just by -- growing

15 up, I just never really had it like that.  Just something that

16 I really wanted was a father, but it was never there.

17        And so I began to meet a lot of people and stuff

18 since I was locked up.  And I have a couple of letters that

19 they was writing me, and I just want to share some of the

20 influence and stuff that I began to have on a lot of people.

21 And I'm going to give you, like, some--  This first person I

22 really want to go over, his name is Timothy Fizer.  He's done

23 a lot of prison time.  And he was in this gang called the

24 Aryan Brotherhood.  And to my knowledge, it was -- it was a

25 thing -- it was a thing about white people being a superior

1    race.  But God really did a work in his life, and he really

2    renounced the thing that he was in.  And I got two little

3    short letters from him.  One is a prayer list, and one is a

4    letter.  And I just want to start with the prayer list first.

5              It was like, "Hey, Brother.  If you wouldn't mind,

6    please add these prayers to your prayers.  And any that you

7    would like me to add to mine, send them over to me.  Pray for

8    Randolph.  He is having trouble with his heart.  Pray that

9    Tim, Sneed, and Mario will give their lives to God.  My family

10   and court case.  Missionaries in foreign countries.  That the

11   guards would have compassion and understanding for us.  Our

12   country and the president.  Lost souls inside and outside of

13   these walls.

14             "Thanks for being a light of Jesus.  You have really

15   helped me in my love and faith for God just by witnessing your

16   Christian love and faith.  Thank you.  Your brother in Christ,

17   Tim."

18             Then I'm going to go on to the letter he wrote.  He

19   was like, "Rejon, listen, I'm not trying to get in your

20   business or anything, but today when I was talking to the

21   chaplain, I told him that I had struck a friendship up with

22   you and how impressed I was at your desire of learning and

23   love of God, plus how have -- plus how you have blessed me

24   with kindness and Christian love and compassion.  Well, he

25   kind of told me a little about what is going on with you.

1   Well, I just want you to know I have a lot of respect for you.

2   I don't generally tell people at your age I have respect for

3   them, because a lot of the ones I know don't have respect for

4   themselves, much less respect for anyone else.  I see God and

5   what God wants us as Christians to do when it comes to other

6   people besides ourselves.  When I see and talk to you, you

7   live the first and second commandment very well.

8          "From my point of view, I want to thank you for the

9   kindness you have shown me as well as the inspiration to be

10  Christ-like.  And I am praying that God delivers a miracle in

11  your case and continues to use you.  If you ever just need a

12  friend to talk to, to just -- if it's just to help to get

13  through another day or just a nice word of hope, please feel

14  free to holler at me.  It is a privilege to know you.  I'm

15  praying for you.  Your brother in Christ, Tim."

16         At the time Tim is serving, I think, like, eight

17  years in the federal penitentiary for, I think, like, a meth

18  case or something.

19         This next person, he just got sent off to a state

20  prison.  His name is Timothy Sorrells.  He had a murder case.

21  This make his third murder case.  And he just got a life

22  sentence for his third murder case.  And I just want to read

23  his letter because he really got to know God and stuff, and I

24  had somewhat influence on his life, also.  He goes on and

25  says, "Dear Rejon.  This is my chance to really speak to

1  you--"  Oh, he wrote this letter to me from the state

2  penitentiary, too.  "This is my chance to really speak to you

3  about everything that you are going through at this particular

4  moment in time.  Brother, you have been my inspiration in the

5  midst of adversity.  You have taught me how to be strong in

6  the Lord when all else fails.  The system let both of us down,

7  but we must always remember that God is still in control of

8  our entire situation.  We must have something else to go

9  through or somebody else to teach.  (Smile).  We must always

10  know that Romans 8:28 is in effect at all times in our life.

11       "Rejon, this is a test that we must go through.

12  Learn something from this that will strengthen your walk with

13  God.  Take this time to get closer to God.  Go through your

14  grieving process, also.  Brother, always know that I'm here

15  for you, no matter what it is.  They can move you out of the

16  cell or away from this jail, but they can never remove you out

17  of my heart.  You have become my true rock.  I'll be praying

18  for you each and every day.  Stay blessed and know that I'm

19  just a letter or a trustee away.  (Smile)."

20       Oh, no, this one here--  I'm sorry.  It was--  This

21  not the letter that he wrote me from the penitentiary.  It's a

22  card he had sent me through the mail.  Then he says -- on the

23  card, it says, "I'm going to stay on the chaplain for you.

24  Just stay strong and know that I'm praying for you and what

25  God -- and that God is in total control of our situation."

         1          So he had wrote me this because I was in the cell

         2   with him and they moved me out after I got convicted and they

         3   took me off the chaplain listing.  So he tried to get me back

         4   on the list with the chaplain.

         5          This person here's name is Jamie Snow.  She is

         6   considered to be one of my best friends, and I've been knowing

         7   her since I was, like -- I was way young.  My brother has a

         8   baby by her sister.  And so we have got -- we got back in

         9   touch since I been locked up.  She sent me this card.  She was

        10   like, "Dear Rejon.  I had a dream about you last night.  You

        11   were standing at the top of a tall mountain with the most

        12   beautiful clouds I have ever seen, with tears the size of

        13   puddles streaming down your face, speaking three words,

        14   'Please forgive me.'  Rejon, a voice like none I have ever

        15   heard before replied, 'Son, I already have.'  Rejon, I am not

        16   sure why I had a dream like this about you.  All I know is

        17   that God wanted me to tell you.

        18          "Rejon, I don't know why you are -- know why you are

        19   there, and I don't intend to ask you.  I just wanted you to

        20   know that God put you in my life for a reason, whatever that

        21   reason may be.  I know -- I know that I love you very much.  I

        22   wish I could hold you in my arms and tell you that everything

        23   will be okay.  I miss your voice, Rejon.  I hope to hear from

        24   you soon.  I'm going to continue to send you daily motivators.

        25   Much love, Jamie."

1           (Off-the-record discussion.)

2           THE DEFENDANT:  So I just wanted to show you the type

3  of influence that I'm capable of having on people and I hope to

4  continue to have if you give me a chance, a second chance at

5  life.  That's just some of the people that I just ranned

6  across, but it's just letters that I had -- that I had on my

7  person and stuff.  So I just wanted to share those with

8  you-all, let you just have some type of -- give you some type

9  of perspective on who I am and things of that nature and stuff

10  like that.

11           (Brief pause.)

12           THE DEFENDANT:  Oh, I think I probably want to speak

13  on--  Oh, I can't say--  I'm sorry.

14           (Brief pause.)

15           THE DEFENDANT:  I guess I can just let you know a

16  little bit about me.  And I consider myself to be a people's

17  person.  I love to make friendships, and I try to value those

18  friendships and have, like, lifelong friendships.  And so a lot

19  of people that I meet, they're still in my life today.  And

20  just people that have been around me, they really can come to

21  me with their problems and stuff like that.  And I really just

22  been motivated, and inspired a lot of people with just

23  different relationships and different problems they been facing

24  in their life and stuff like that.

25           I just know that--  I just want some good to come

1    out of all this suffering that people have had and I have

2    caused.  And I just can really devote my life to just helping

3    so many countless suffering and broken and hopeless people

4    throughout the penitentiary system, just--  I just feel it's a

5    lot of work that I really can do to inspire people for the

6    good and stuff like that.

7         I guess that's probably about all I really can say

8    without just stepping over my boundaries.

9         THE COURT:  Okay.  Mr. Ortwein, ready for your next

10   witness?

11        MR. WILLIAM ORTWEIN:  Yes, Your Honor.  If we could

12   have one second.

13        MS. CORY:  Your Honor, we would request permission to

14   put the letters that Mr. Taylor read into evidence.

15        THE COURT:  No.

16        MS. CORY:  Your Honor, as you indicated, the rules of

17   evidence are relaxed here.  These are letters that have some

18   indicia of being what they purport to be, which is letters to

19   Mr. Taylor, independent of the fact that he read them.

20        THE COURT:  I will consider the request, but

21   Mr. Taylor was not a witness.  I will consider it, but --

22        MS. CORY:  Thank you, Your Honor.

23        THE COURT:  Mr. Ortwein?

24        MR. WILLIAM ORTWEIN:  Your Honor, by stipulation with

25   the government--  I lost my exhibit number, what my next

1    exhibit number would be.

2              MR. LEE ORTWEIN:  Three.

3              MR. WILLIAM ORTWEIN:  All right.  I would like to

4    introduce Defense S3, which is a certificate which was awarded

5    to Mr. Rejon Taylor for anger management.  This was, of

6    course -- he has taken while he was incarcerated.  This one is

7    dated April 2005.  And I'd like to offer this as Defense S4.

8              THE CLERK:  Four.

9              THE COURT:  Admitted.

10             (Defendant's Exhibits S4 was received into

11             evidence.)

12             MR. WILLIAM ORTWEIN:  Then, Your Honor, there is

13   another one.  He took the course again, was awarded a

14   certificate by Dr. Robert Sanders in July of 2005 for anger

15   management, where he apparently took the course the second

16   time.  And I would offer this as Defense S6.

17             THE CLERK:  Five.

18             MR. WILLIAM ORTWEIN:  Five.  I'll get my numbers

19   straight in just a minute.  And then, if it please the Court,

20   I would offer this, which is the certificate where Mr. Taylor

21   passed his General Education -- or GED test, which was

22   administered -- the classes were administered by Hamilton

23   County authorities in the jail.  The issue date of this is

24   March 11th, 2008.  I offer this as Defense Exhibit 6.

25             THE COURT:  Received.

1          (Defendant's Exhibits S5 and S6 were received into

2          evidence.)

3          MR. WILLIAM ORTWEIN:  And I would like to call--

4          Would you get Lieutenant Coppinger for me, please?

5          (Brief pause.)

6                          GENE COPPINGER,

7     called as a witness at the instance of the defendant, having

8     been first duly sworn, was examined, and testified as

9     follows:

10                        DIRECT EXAMINATION

11    BY MR. WILLIAM ORTWEIN:

12    Q          What is your name, please, sir?

13    A          Gene Coppinger.

14    Q          I believe you're a lieutenant with the Hamilton

15    County Sheriff's Department?

16    A          That's correct.

17    Q          And you've testified before, I believe, earlier on

18    in this case.  Is that correct?

19    A          Yes, sir.

20    Q          What are your duties, Lieutenant?

21    A          I'm responsible for security operations, housing,

22    segregation, those type of things.

23    Q          At the Hamilton County Jail?

24    A          Yes, sir.

25    Q          All right, sir.  I'll ask you, sir, if -- when you

1   receive an inmate, or a new inmate, if you have a

2   classification process that you go through to determine what

3   type security risk those individuals may be?

4   A        Yes, sir, we do.

5   Q        Could you tell us a little bit about that, please,

6   sir?

7   A        That process consists of looking at various factors,

8   which can include the current offense that they're

9   incarcerated for; their past history, whether it be criminal

10  history, institutional history; their likelihood for violence,

11  stability within the community, and various other factors such

12  as those.

13  Q        Lieutenant Coppinger, I just happened to pull one of

14  the classification records relative to Mr. Taylor.  I just

15  looked at it, and it's 6/22/07.  But I believe it's

16  representative of his classification status there at the

17  Hamilton County Jail.  And I'd like to, if I could, show it to

18  you, if you could see it on the projector, go over part of it

19  with you, please, sir.  Can you read that?

20  A        Yes, sir.

21  Q        All right, sir.  I believe, sir, your first issue --

22  or classification issue is "Severity of Current Offense or

23  Detainers."  And that was a score of 11, I believe.  Is that

24  correct?

25  A        Yes, sir.

1   Q        And that is based, I believe——and you correct me if

2   I'm wrong——upon the charges pending against an individual?

3   A        The current -- the current charges they're

4   incarcerated for, yes, sir.

5   Q        All right, sir.  He had a--  Your second matter is,

6   "Serious Offense History."  And that is, on this at least,

7   "Classification:  Zero."  Is that correct, sir?

8   A        Yes, sir.

9   Q        His escape history at this time——we'll talk about

10  that in a minute——is Number 3, which obviously you looked at

11  for security issues, it was zero at that time?

12  A        Yes, sir.

13  Q        The next one is, "History of Institutional

14  Violence."  The score there is zero.  Is that correct, sir?

15  A        Yes, sir.

16  Q        "Disciplinary Conviction History."  Now, this deals

17  with whether or not a person——correct me if I'm wrong——is

18  incarcerated but they commit some offenses while they're

19  incarcerated which result in some disciplinary action against

20  them.  Is that right?

21  A        Yes, sir.  It's a violation of institutional rules

22  and regulations.

23  Q        All right.  And his score here was zero.  Is that

24  correct?

25  A        Yes, sir.

1  Q        And then the next one is "Prior Felony Convictions,"

2  and his score there was zero?

3  A        Yes, sir.

4  Q        The next one is "Substance Abuse-Related

5  Convictions," and the score there was zero.  Is that correct?

6  A        Yes, sir.

7  Q        And the next -- last one is "Stability Factors."

8  Could you explain that to us, please, sir, what that --

9  A        "Stability Factors," part of what we look at there

10  is current years of residence at a set location, whether or

11  not they're gainfully employed, and how long they've been

12  employed, things like that.

13  Q        And I believe here he was a minus 3.

14  A        Yes, sir.

15  Q        Is that correct?

16  A        Yes, sir.

17          MR. WILLIAM ORTWEIN:  I just noticed the screen went

18  out, Judge, for the jury.

19          THE CLERK:  When it's admitted, I'll turn it back on.

20          MR. WILLIAM ORTWEIN:  Ma'am?

21          THE CLERK:  When the exhibit is admitted, I'll turn

22  it back on.

23          MR. WILLIAM ORTWEIN:  Okay.

24  BY MR. WILLIAM ORTWEIN:

25  Q        Which left us with a total score of 8.  Is that

1  right, sir?

2  A          That's correct.

3  Q          Okay.  Now --

4          MR. POOLE:  We don't object to this being admitted so

5  the jury can sit here and see it, by the way.

6          MR. WILLIAM ORTWEIN:  Your Honor, I would go ahead,

7  for the purpose of the jury being able to see it, offer it as

8  an exhibit.  The government doesn't object, my understanding.

9          THE COURT:  Received.

10          (Defendant's Exhibit DS7 was received into

11          evidence.)

12  BY MR. WILLIAM ORTWEIN:

13  Q          All right, sir.  Then we have a second page which

14  goes with this.  Under "Special Concerns" there's no comments.

15  Is that right, sir?

16  A          That's correct.

17  Q          Then we have "Custody Level Scales," and you have a

18  scale there where you grade individuals to determine what

19  their security level is.  Is that right, sir?

20  A          That's correct.

21  Q          Now, on this particular form, "Custody Level

22  Indicated by Scale," you have checked "Minimum."  Is that

23  right, sir?

24  A          That's correct.

25  Q          However, "Custody Override" -- tell us what that

1   means, please.

2   A        The custody level indicated by scale is the point

3   value and what that point value would represent and how it

4   would place them.  The custody override is if there are some

5   other factors that would cause us to feel uncomfortable with

6   that point value rating, and it would give us the ability,

7   then, to override his custody level by the point system and

8   place him in a more restrictive area.

9   Q        In this instance could you tell whether or not that

10  was -- override was based upon the charges pending against

11  him?

12  A        Yes, sir.  Looking at this document, it indicates

13  that his custody level was overridden and it was recommended

14  that his custody level be maximum and that he at this point be

15  placed in segregation.  And it -- for comments it lists

16  "Nature of Charges/High Risk."

17  Q        All right, sir.  And I believe this is signed by

18  Classification Technician whoever, correct?

19  A        Yes, that's correct.

20  Q        Okay.  Then obviously this would have changed after

21  the escape attempt.  Is that right, sir?

22  A        Yes, sir.

23  Q        He would have still been classified as he was here,

24  as high risk or maximum.  Is that right, sir?

25  A        Yes, sir.

1    Q        There would have been some changes relative to his

2    escape history and history of institutional violence.  Is that

3    right?

4    A        Yes, sir.

5    Q        All right.  This was representative, I believe, of

6    when you first took custody of Mr. Taylor?

7    A        Yes.

8             MR. WILLIAM ORTWEIN:  Okay.  Thank you.

9             Your Honor, this is DS-7, I believe.

10   BY MR. WILLIAM ORTWEIN:

11   Q        Now, Mr. Taylor has been, I believe, in your custody

12   for roughly five to five and a half years.  Is that right,

13   sir?  Somewhere in that?

14   A        That's pretty close, yes, sir.

15   Q        Okay.  During that time, I believe-- And correct me

16   if I'm wrong.  I believe you reviewed the records.  He's had

17   one -- other than the escape, one disciplinary problem.  Is

18   that right, sir?

19   A        That's correct.

20            MR. POOLE:  I don't object to whatever he's got.

21            MR. WILLIAM ORTWEIN:  Your Honor, the government

22   doesn't object.  So the jury can see this, I would submit DS8

23   as an exhibit, which is the inmate disciplinary report.

24            THE COURT:  Admitted.

25            (Defendant's Exhibit DS8 was received into

1          evidence.)

2    BY MR. WILLIAM ORTWEIN:

3    Q          All right, sir.  Can you see this, Lieutenant?

4    A          Yes, sir, I can.

5    Q          It shows that Mr. Taylor, I believe--  I can't--

6    I'm not sure of the date, but I think it's the 27th--  Can you

7    read that date?  Well, the report date is the 27th of January,

8    '06.

9    A          Yes, sir.

10   Q          So I assume that the offense occurred on the 27th of

11   January, '06.  Is that right, sir?

12   A          Yes.

13   Q          And the incident which is checked off is,

14   "Destruction, alteration, or damage to property."  Is that

15   right, sir?

16   A          Yes, sir.

17   Q          Now I'm turning the page.  Can you tell us what the

18   damage to property was?

19   A          Yes, sir.  It was the security identification arm

20   band that the inmates are issued for -- obviously for

21   identification purposes.

22   Q          All right.  Now, what was--  Can you look at this

23   and tell us what the disposition of that particular offense

24   was?

25   A          Yes, sir.  He was -- in this particular case he was

1    found guilty and charged $2.55 for the replacement of the arm

2    band.

3    Q        I believe, actually, as far as--  He pled guilty --

4    A        Yes.

5    Q        -- whatever?  He was guilty?

6    A        He was guilty and -- yes.

7             MR. WILLIAM ORTWEIN:  All right.  Your Honor, I would

8    submit DS8 to the clerk.

9             (Brief pause.)

10   BY MR. WILLIAM ORTWEIN:

11   Q        As we have said, Lieutenant, here again I'm not

12   referring to the escape attempt, just to this one disciplinary

13   problem.  How long have you been involved with the security

14   there at the Hamilton County Jail, Sir?

15   A        I've been directly involved with the security

16   department for the last 12 1/2 years.

17   Q        All right, sir.  Based upon your experience in that

18   particular area, over approximately a five-year period, with

19   this -- here again, excluding the escape attempt, this one

20   sole disciplinary problem, would you say that that is a good

21   record, comparatively, or how would you describe that, sir?

22   A        Yes, I would describe that as a good -- a good

23   record.

24            MR. WILLIAM ORTWEIN:  Okay, sir.

25            Your witness.

1                    CROSS-EXAMINATION

2    BY MR. POOLE:

3    Q        Let's count the escape attempt and talk about

4    whether or not it's a good record.  How many escape attempts

5    do you have at the Hamilton County Jail?

6    A        They're not that frequent.  I don't--  I couldn't

7    give you a number.  I don't know what period of time you're

8    looking for, but...

9    Q        In the last five years, how many did you have?

10   A        The last five years, we might have had somewhere

11   around three or four documented attempts.

12   Q        Okay.  Including the one by the defendant.  Is that

13   correct?

14   A        Yes.

15   Q        Okay.  So, counting the escape attempt, that's not a

16   good record, is it, in custody?

17   A        No, sir.

18   Q        Now, just because I don't understand it and you may

19   want to know it, the classification form that you guys looked

20   at here, Defense Exhibit 7, was filled out June of 2007.  I

21   realize the defendant had not yet been indicted for his escape

22   attempt, but I assume it is a horrible mistake that the escape

23   history there is zero, since it took place in April of 2006,

24   which was before this report was filled out.  Was that just a

25   mistake?

1    A          Obviously it was.  I'm not involved in the

2    classification process.

3    Q          Okay.

4    A          It comes to me to look at and to view, but --

5    Q          But certainly that's a factor that normally should

6    be included, in fairness?

7    A          It should have been included.

8               MR. POOLE:  No further questions.  Thank you, Judge.

9               MR. WILLIAM ORTWEIN:  That's all, please the Court.

10              THE COURT:  Thank you, Lieutenant Coppinger.  You may

11   step down.

12              THE WITNESS:  Yes, sir.

13              (Witness excused.)

14              THE COURT:  Call your next witness.

15              MR. WILLIAM ORTWEIN:  Just a moment, Judge.

16              (Brief pause.)

17                        BILL W. SMITH,

18   called as a witness at the instance of the defendant, having

19   been first duly sworn, was examined, and testified as

20   follows:

21                    DIRECT EXAMINATION

22   BY MS. CORY:

23   Q          Good morning, Chaplain Smith.

24   A          Good morning.

25   Q          Would you please state your full name?

1  A        Believe it or not, it's Bill W. Smith.

2  Q        Nice, simple name.  I won't ask you to spell

3  anything.

4  A        Right.  Yes, ma'am.

5  Q        Would you please tell us what your occupation is?

6  A        I've been a chaplain at Hamilton County Jail full

7  time for the last eight years.

8  Q        For the last eight years?

9  A        Yes, ma'am.

10  Q        And prior to that, what did you do?

11  A        I worked as a state probation officer for juveniles.

12  I was over therapy, foster care.

13  Q        So you've been involved in the criminal justice

14  system one way or the other for quite a while.  Is that true?

15  A        At least 25 years.

16  Q        Now, in your capacity as chaplain at the Hamilton

17  County Jail, have you met Rejon Taylor?

18  A        Yes, I have.

19  Q        And how did you come to know Rejon?

20  A        Well, he was in an isolation area for a long time.

21  And I have different associate chaplains that go and visit in

22  the different isolation areas.  And I heard about him for a

23  while, and heard a lot of good things about him.  And finally

24  I was able to get him into my office and talk to him, and got

25  to know him a little bit.

1  Q        And how long ago was it that you first met him?

2  A        I believe it was over four years ago.  I think -- I

3  think maybe he's got close to five years in the jail,

4  something like that.

5  Q        Okay.  Could you describe briefly what your initial

6  contacts with Rejon were like and what you thought of him

7  initially?  When you're going back to the four years ago, what

8  was Rejon like?

9  A        I was a little skeptic of some things that I heard

10  about him, that he was having influence.  And I thought,

11  "Well, he's probably a jailhouse religion," trying to go

12  through the motions of being religious in order to, you know,

13  appease the Court or whatever.  But I got to know him, and I

14  heard -- different inmates told me about him, about the

15  influence that he had on them.  So I -- the more I got to know

16  him, I started giving a few tests, plus I checked with some of

17  the people that lived in the same unit with him.  And people

18  were telling me the same things, that he walked the talk and

19  he seemed to be having great influence on other people.

20  Q        And was he participating in church-related

21  activities?

22  A        He was.

23  Q        What kind of things was he doing as far as organized

24  activities?

25  A        He was in Bible studies.  He was in anger

1    management.  They had a thing called Emmaus Walk, and I think

2    he was one of the leaders in the Emmaus Walk.  And he was in

3    most of the activities at the jail for some time.  I think he

4    was even in GED, I believe.

5    Q        Was there a time when you felt like your

6    relationship with him was becoming a little more distant?

7    A        Well, to be honest with you, I wrote a letter, I

8    think, about three years ago.  And I think it's a record -- on

9    the record that he was a part of an escape attempt.  And I

10   guess I -- to be honest with you, at that time I felt like I

11   had some mud kicked in my face, so to speak.  And so, to be

12   honest with you, I sort of -- I was a little bit distant or

13   somewhat indifferent toward him.

14   Q        Is that something you had to work through with your

15   relationship?

16   A        I did.  I came to a point that I knew that there

17   would be a day that this would happen.  I was aware--  Having

18   worked long enough in the system, I knew that sooner or later

19   I would be -- end up here.  So I said, "Well, I got to be

20   fair."

21            So then I did my own little investigation behind the

22   scenes and -- because I wasn't sure, to be honest with you --

23   I didn't -- I don't think I really wanted to testify.  I felt

24   like it was going to tear me apart to testify, because I

25   didn't really know if I could be open.  I mean, I just didn't

1    know what I could say; I just -- I wasn't sure.  And -- but I

2    as I evaluated, I remembered some discussions I had with him,

3    and I become more aware.  I had somewhat of an

4    underperspec- -- misperspective on some things regarding the

5    escape.  And I had that perspective, and I had the perspective

6    about him being in the jail almost five years.  That was

7    something that weighed in my mind.

8           So what I did, I deliberately -- in the last couple

9    of months, I said, "I got to be fair."  I said, "This day is

10   coming."  I knew it was coming.  I called out a couple of guys

11   that lived with him, and I talked with them.  One of them was

12   a guy that was a real spiritual leader in the jail.  And I was

13   hoping that they would help me finalize in my own mind what I

14   wanted to say.  And they both gave glowing reports of him

15   being at peace——that particular unit he was in had a lot of

16   fights——he was a peacemaker, he was having a spiritual

17   influence on other people.

18          And then probably one of the things that really

19   challenged me, I heard through the grapevine of another guy

20   that he had an influence on.  So I called this guy out.  This

21   guy was a gang leader, had been a gang leader.  He had also

22   been not only a gang leader but he had been a -- he was a

23   Muslim.  He was a very aggressive person.

24          And, anyway, I called him out and talked to him for

25   several hours.  And he told me that Rejon Tay- -- because this

1  particular individual was -- had -- in my eight years there at

2  the jail, was probably one of the most remarkable changes in

3  an individual I ever saw in my life.  Coming from being what

4  we would call a gang-banger, a leader of gang-bangers, a very

5  aggressive person, totally changed.  Really a remarkable --

6  one of the most remarkable conversions I've ever seen.  I've

7  got three guys in full-time Christian work that came to the

8  jail, and this guy is up there at their level.  And he told me

9  that Rejon was the person that had the most influence on him,

10 that Rejon had really -- had talked with him, every time they

11 went out to rec Rejon was the one that talked to him.

12        So I read my letter again for about the

13 twelfth time, and I said to myself, you know, "I have to go

14 with what I believe."  I believe that this young man still has

15 great merit.  I do believe he's had an influence on others.  I

16 don't condone what he did and everything, but I -- I do see --

17 I see him having great influence on the people.  I got to give

18 him credit for that.

19 Q       Now, when you say you don't condone what he did, you

20 mean the escape attempt.  Is that right?

21 A       The escape, primarily.

22 Q       That's what you've had to deal with.  Looking back

23 on your entire relationship with Rejon and the progress he's

24 made since he's been in custody, how would you describe him as

25 a young man, his personality?

1    A        Well, I can compare him with thousands of young men

2    I work with.  I think he's a young man that had no, really,

3    father figure in his life.  I think that he was a person that

4    felt a certain sense of injustice about life.  And despite

5    that, you know--  I don't know what led to what happened; I

6    don't know all the detail.  You know, I've heard different

7    versions of what happened and everything.  But whatever led to

8    him ending up in the jail at 19 years old——he was 19 years old

9    when he came into jail——I don't really believe he's the same

10   person now as he was then at 19 years old when he came to the

11   Hamilton County Jail.

12   Q        When you think of Rejon as a person living out a

13   life in prison, what kind of expectations do you have for his

14   future in a prison setting?

15   A        I was awake most of the night thinking about that.

16   I woke up around 3:00 thinking about that --

17            THE COURT:  Counsel, you asked him what did he expect

18   of the defendant in a prison setting.  Because this is a

19   federal prosecution, if the defendant goes to prison, it will

20   be a federal institution.  And unless this witness has some

21   experience in a federal institution, I don't know that he's in

22   a position to really answer that.  The federal prisons are

23   very, very different from state prisons, and the experiences

24   are very, very different.  He may have some experience in

25   federal institutions.  So he may be well-qualified to answer

1    it.

2            MS. CORY:  Would Your Honor accept the question of

3    what kind of hopes the chaplain would have for a ministry that

4    Mr. Taylor might have in the future, that would not require him

5    to know for certain what kind of future Mr. Taylor were going

6    to have, but his hopes for Mr. Taylor?

7            THE COURT:  Okay.  I don't see a problem with that.

8    BY MS. CORY:

9    Q       So if you would, just -- without in your mind

10   putting him in one kind of setting or another, given the Rejon

11   Taylor you know, the talents he has, what kind of future would

12   you hope him to have in terms of ministering to other people?

13   A       I think he'll be a peacemaker.  I think he'll be a

14   spiritual influence on others.  That's what I see.  And,

15   believe me, I've thought about it solid for the last three

16   months.

17   Q       Is there anything else that you'd like to tell the

18   jury, Chaplain Smith?

19   A       I don't think--  I think I pretty much covered all

20   the bases, I think.

21           MS. CORY:  All right.  Thank you.  The government may

22   have some questions for you.

23                          CROSS-EXAMINATION

24   BY MR. NEFF:

25   Q       How are you today, Chaplain Smith?

1    A          Pretty good.

2    Q          Good.  My name is Steve Neff.  I'm an Assistant

3    U. S. Attorney.  I just have a few questions for you if you

4    don't mind.

5    A          Sure.

6    Q          I think it's fair to say from your testimony that

7    you consider the defendant to be an individual who is able to

8    exert influence over other people.  Is that right?

9    A          I--  That's correct.

10   Q          Okay.  And I think it's also fair to say, judging

11   from what you just testified to, that you would consider the

12   defendant to have good leadership abilities or be capable of

13   leading others very well?

14   A          Yeah.  He's kind of a quiet type leader.

15   Q          Okay.  Now, you mentioned that you've known him for,

16   what, about roughly four or five years.  Is that right?

17   A          Close to five, I think.

18   Q          Okay.  And obviously you became aware that he was

19   involved in the escape attempt in 2006.  Is that right?

20   A          Right.

21   Q          Now, you mentioned something about becoming somewhat

22   distant from him.  And what I took from your testimony was

23   that the distance occurred after you learned of the escape

24   attempt.  Is that right?

25   A          Yes, because I had wrote a letter to the assistant

1    attorney in Washington, D.C.  I was asked by the -- to write a

2    letter for him, and I did.  So I sort of felt a little bit

3    betrayed, that maybe my letter wasn't -- wasn't something I

4    would be happy with.

5    Q        Okay.  And for the entire period leading up to April

6    of 2006, you had no idea that was coming——is that fair to

7    say?——that he was going to try to escape, or that you would

8    even be concerned that he would try to do something like that.

9    A        Well, he quit coming to all services for about three

10   or four months.

11   Q        Okay.

12   A        I called him out a couple of times and talked to him

13   about it, but he just quit all activities for three or four

14   months.  And I was worried about him.  And I actually talked

15   to him about it.

16   Q        So you maintained contact with him leading up to the

17   escape attempt?

18   A        A little bit.

19   Q        All right.  And then you said after the escape

20   attempt, when you felt betrayed, that's when you sort of

21   distanced yourself from him.  Is that right?

22   A        Right.

23   Q        Now, if--  You've testified that I guess you feel

24   like he's -- I don't know.  Is he back to where he was in

25   terms of your view of him prior to the escape attempt?

1    A        Like I say, in the last three months I've thought --

2    there hasn't been hardly a day I haven't thought about it.

3    And I believe he's back to where he was.  I do.  I really do.

4    Q        All right.  If you were made aware of the fact that

5    the defendant was writing letters to inmates at other jails

6    and talking about people harming a codefendant who testified

7    against him, and saying, "Trust me that he won't testify

8    against me again," would that surprise you?

9    A        Not exactly.  In my view of a guy that knew that he

10   was-- You know, it's a matter of-- I don't condone-- If

11   that's true, I don't condone any of that.  But I guess I know

12   that when you're, quote, fighting for your life at 20 years

13   old, 19, 20 years old, I think, a lot of these guys, their

14   perspective would be that it was -- "I've got to survive at

15   all costs, whatever I've got to do to survive."

16   Q        So it doesn't concern you that in a letter he was --

17   A        It does concern me, yes.

18   Q        Okay.  And would it surprise you if you knew that

19   the defendant-- Let me ask you a question before I ask that

20   one.  Who are the folks that he was living with that you

21   talked to?

22   A        A couple of guys that were in the cell he was living

23   in.

24   Q        Yes, sir.

25   A        Yeah.  One of them was the guy that was-- I don't

1    think I need to give their names, do I?

2            MS. CORY:  Your Honor, this may be a matter of

3    priest-penitent confidentiality; I don't know.  If the chaplain

4    feels like he can't disclose a confidence, I don't think he

5    should have to do that.

6            THE COURT:  Mr. Neff?

7            MR. NEFF:  Well, Judge, he testified on direct that

8    he talked to people that the defendant was living with.  I'm

9    not asking what they said to him.  I'm only asking who they

10   are.  I don't think that's a matter of --

11   A       Let me say it like this:  One of them --

12           MR. NEFF:  Hang on, Chaplain Smith.  I want to make

13   sure that the Judge says it's okay before we go further.

14           THE WITNESS:  Sure.

15           MS. CORY:  He's already said what he said.  I think

16   what he doesn't want to do is have to attribute it to someone

17   without that person's permission.

18           MR. NEFF:  Well, that's backwards.  I mean, he's not

19   supposed to say what they said.  But I think he can tell us who

20   they are.

21           THE WITNESS:  Could I offer their crimes, rather than

22   names?

23           MR. NEFF:  Hang on, Chaplain Smith.  Just a second.

24   We're going to wait on the Judge on this.  Okay?

25           (Brief pause.)

1          THE COURT:  Mr. Neff, you just want the names of the

2    people?

3          MR. NEFF:  I just want the names, Judge.  I'm not

4    asking what they said.

5          THE COURT:  Okay.  I am unable to determine whether

6    the privilege applies, just based on what I have heard.  The

7    privilege applies when a communication is made to a member of

8    the clergy in his spiritual capacity.  And it has to apply in

9    situations where there is a human need to disclose perceived

10   flaws to a spiritual counselor in order to receive priestly

11   consolation and guidance.  There is a case where someone

12   consulted the priest for tax advice, and the courts decided

13   even though there was a priest and the person seeking advice

14   was a penitent, that giving tax advice was not spiritual

15   guidance.  There is also a case that says that a confession to

16   a member of the clergy in the presence of a security officer is

17   not privileged.  So I don't know enough about the surrounding

18   circumstances at this point to make a decision.

19         MR. NEFF:  Well, I mean, here is what I would say

20   about it, Judge.  He's already testified what they said.  He

21   testified to that on direct.

22         THE COURT:  Well, I think what I'm suggesting is that

23   you can flesh out the surrounding circumstances to determine

24   whether the privilege applies or it does not apply.  Just based

25   upon the question and the answer, the Court cannot make a

1    decision.

2              MR. NEFF:  Okay.

3    BY MR. NEFF:

4    Q        Are you familiar with Sir Matthews, Chaplain Smith?

5    Sir Matthews?

6    A        Pardon me?

7    Q        Sir Matthews, are you familiar with him?

8    A        I am familiar with him.

9    Q        Is he one of the folks that was living in the

10   vicinity of Mr. Taylor?

11   A        He was, but he was not the one I -- that told me

12   that.

13   Q        He's not the one that you talked to?

14   A        No.

15   Q        All right.  Now, would--  Obviously you testified

16   you felt like Mr. Taylor is back, roughly, in your good

17   graces, so to speak, back to the place that you thought he was

18   before.  Is that right?

19   A        That's what I see.

20   Q        All right.  It didn't surprise you, however, that he

21   made comments about Joey Marshall being harmed so that he

22   wouldn't testify again?  That doesn't surprise you, and it

23   doesn't cause you to change your mind?

24   A        I -- I don't know.  It's--  I'm surprised--  If

25   that's what he said, I'd be surprised.

1  Q        This is Government's Sentencing Number 1.  Can you
2  see that up there, Chaplain Smith?
3  A        Yes, I do.
4  Q        Can you see this paragraph right here?
5  (Indicating.)
6  A        Okay.
7  Q        Okay.  Rejon Taylor wrote that.
8  A        Pardon me?
9  Q        Rejon Taylor wrote that, Chaplain Smith.
10 A        Did he?
11 Q        Yes, he did.  He wrote that in September of 2008.  I
12 would assume that it would not be consistent with your
13 viewpoint of him, that he would make light or make fun of
14 crimes that he has committed?
15 A        I would hope not.
16 Q        I'll show you the same letter here.  He's talking
17 about the identity theft that he engaged in.  Right here in
18 this paragraph, Chaplain Smith, it says, "My Number 1 card is
19 American Express.  Some had credit limits up to $100,000, and
20 I would go from there.  That was all she wrote.  Laugh out
21 loud.  Enough of that."
22          That would be inconsistent -- someone laughing about
23 the crimes that they've committed in the past would be
24 inconsistent with your current view of Mr. Taylor?
25 A        Yeah, that would be -- it would be.

1    Q        I assume that making fun of the victim and the

2    victim's loved ones would also be inconsistent with your view

3    of Mr. Taylor at this point?

4    A        It would be.

5    Q        And if you learned that there was a -- there were

6    telephone calls in which the defendant --

7              MS. CORY:  I object, Your Honor.  I think this has

8    been --

9              THE COURT:  What's the objection?

10             MS. CORY:  Your Honor, I believe the government has

11   indicated that this was not going to be admitted.

12             MR. NEFF:  No, I don't--  This was specifically

13   allowed.  We just didn't--  We haven't put it into evidence

14   yet, Judge.

15             MS. CORY:  It certainly has not been--  Excuse me.

16             MR. NEFF:  The defendant's comments about the victim

17   was something that could come in.

18             MR. WILLIAM ORTWEIN:  Could we ask the jury be

19   excused before he starts describing certain things that are not

20   in evidence, Judge?

21             THE COURT:  How much more do you have with your

22   cross-examination?

23             MR. NEFF:  Just a couple more questions, Judge.

24             THE COURT:  Huh?

25             MR. NEFF:  Just a couple more questions.  I can move

1    on to something else.

2              THE COURT:  Well, that's okay.

3              Ladies and gentlemen, let me have you step out for

4    just a minute.

5              (The jury exited the courtroom, and the proceedings

6              continued as follows:)

7              THE COURT:  I take it, Mr. Neff, what you're

8    referring to are some of the telephone recordings that were

9    supplied to the defense on the eve of the session that we did

10   not have.  Is that correct?

11             MR. NEFF:  Yes, sir.

12             THE COURT:  Okay.  Now, Ms. Cory, is your position

13   the government promised that it would not use these materials?

14             MS. CORY:  Your Honor, our position is, these phone

15   calls and that particular topic came up as a matter that the

16   government might seek to introduce.  We objected to it.  The

17   government at that point indicated they would not be

18   introducing it.  We continue to object to its introduction.  I

19   particularly object to trying to introduce it through Chaplain

20   Smith.  He is a totally unsuitable person to be introducing

21   this evidence through.  It is not in evidence yet.  It should

22   not be put in evidence through the chaplain.

23             THE COURT:  Mr. Neff, did the government make a

24   commitment to not use this evidence?

25             MR. NEFF:  No.  We said we were not going to use the

1    evidence of the call that's been widely reported in the media,

2    Judge.  This is an entirely different call.  One of the

3    categories that we indicated that we wanted to get admitted

4    into evidence was categories in which the defendant is talking

5    about the victim and making fun of the victim and his family.

6    I've got the transcript of the Court's ruling on it right here.

7    Page 4 says, "The next category is remarks relating to the

8    victim of the crime.  The Court will admit those."  Now, we

9    decided that we weren't going--  We didn't put those -- that

10   particular tape into evidence during our case in chief.  But we

11   never represented we were never going to use it.  And obviously

12   I have a good faith basis for asking the question.  I think it

13   goes to -- directly to something that Chaplain Smith is

14   testifying about, and that's his belief that the defendant is

15   going to be some sort of a positive influence.  He's obviously

16   been fooled by the defendant, as have a lot of people.  And I

17   think it's fair to bring this out at this point.

18           THE COURT:  The witness's testimony, although it is

19   in a sentencing hearing and not a guilt/innocence setting, is

20   tantamount to character evidence.  He's offering his opinion as

21   to the defendant's character.  And he's explained why he's

22   formed that opinion.  And based upon that opinion, he's also

23   offered his projection as to how the defendant will perform in

24   the future.  He's also offered character evidence in the form

25   of reputation evidence by discussing how other people think of

1  the defendant.

2          The United States Supreme Court, in the case of -- I

3  think it was *United States v. Michelson*, it may be *Michelson*

4  *v. United States*, discussed character evidence, and indicated

5  that when character evidence is being offered, the opposing

6  side has the right to explore anything that might affect

7  either the jury's agreement with the witness's testimony or

8  the witness's own testimony regarding character evidence.  It

9  is not important whether the things are true or not, because

10 as human beings we often talk about things that are not true

11 that pertain to a person's character.

12         So the fact that this is not in evidence yet is not

13 an impediment.  The government must have a good faith basis

14 for it.  And Mr. Neff has represented that what he's doing is

15 referring to a recording of the defendant that he has.  If the

16 statements from the recordings are the type of things that

17 would affect the witness's opinion as to the defendant's

18 character or would affect the witness's opinion as to what

19 other people would think about the defendant, then it is

20 relevant and it is admissible.  Even if it does not affect the

21 witness's character, if it gives the jury some basis for

22 determining whether the witness's opinion as to character is

23 trustworthy or not, it is also admissible.

24         MS. CORY:  Your Honor, what Mr. Neff -- what I

25 anticipate he's going to play is a very small --

1          THE COURT:  I don't know that he's going to play

2    anything.  I think he was just quoting things and then asking

3    the witness whether that conforms with this witness's opinion

4    of the defendant.

5          Were you planning on playing anything, Mr. Neff?

6          MR. NEFF:  No, sir.  I was just going to ask him the

7    question.

8          MS. CORY:  Your Honor, I presume he's going to be

9    asking a question based on reading part of a transcript from a

10   phone call.  I think a transcript from a phone call isn't

11   evidence and it isn't reliable.  He can't go from the

12   transcript.  That's far more prejudicial than going from the

13   tape recording itself.  And it is just, as Mr. Neff has said, a

14   snippet of a linear conversation.  To ask either the jury or

15   Chaplain Smith to draw a conclusion about Mr. Taylor based on a

16   tiny portion of a conversation is unfair.

17         THE COURT:  I don't think this is the *Michelson* case,

18   but there are cases on character where it is absolutely

19   indisputable that something did not happen but people in the

20   community talk about it and it goes to the person's reputation.

21   For example——this is an extreme example——there were people in

22   the Old West who had reputations of being tremendous

23   gunfighters, and they had never been in a gun fight at all, but

24   their reputation was that they were tremendous gunfighters.

25   And people were afraid of them.  They liked that reputation

1  because it made them safer.  As long as it goes to reputation,

2  it doesn't make any difference whether the underlying facts are

3  true or not true if it's the type of thing that people would

4  talk about or if it's the type of thing that would go to

5  someone's opinion of a person.

6        Now, here I -- even though the government is not

7  introducing the evidence through this witness, as long as they

8  have a good faith basis for believing that the evidence is

9  true, they can ask the question.  They don't have to introduce

10 it.

11       MS. CORY:  Your Honor, if you are going to permit

12 this line of questioning, we would ask that no transcript be

13 read, no recording be introduced.  If Mr. Neff is going to ask

14 a theoretical question, "Would it surprise you if," it should

15 be no more than that.

16       (Off-the-record discussion.)

17       MR. WILLIAM ORTWEIN:  Could I have exactly──I'm

18 sorry, Your Honor──what quote he's referring to, because, what

19 I think, Mr. Taylor didn't say anything.

20       MR. LEE ORTWEIN:  What we believe is, Judge, it's

21 basically a statement by the person with which Mr. Taylor is

22 having the conversation, Mr. Taylor laughs or giggles or

23 whatever, then they move on to a different subject.

24       MR. NEFF:  That was exactly the question I asked, "Is

25 laughing about the victim and the relationship with his loved

1    ones."  That's exactly the question I asked, and that is

2    definitely a fair paraphrase of what happens on --

3         MR. WILLIAM ORTWEIN:  I think that paraphrasing takes

4    it totally out of context, Judge.

5         MR. NEFF:  Well, we're going to introduce it as

6    rebuttal.  The jury can decide for themselves.  But there is no

7    question I have a good faith basis for asking this question.

8         MR. WILLIAM ORTWEIN:  Depends on how it's asked, Your

9    Honor.

10        MR. NEFF:  I just said how I was going to ask it.  I

11   actually did ask it.  The defense can play it if they want to,

12   if they think I'm mischaracterizing something.  I have no

13   objection to that.

14        (Off-the-record discussion.)

15        THE COURT:  I will refer counsel to a case out of the

16   Ninth Circuit.  It's *United States v. Scholl*, S-C-H-O-L-L, 166

17   F.3d 964, a 1999 Sixth Circuit case.  "A witness who has

18   testified in reputation or opinion form as to the character of

19   a person may be asked on cross-examination about relevant

20   specific instances of the person's conduct.  The form of the

21   question may be either 'Have you heard' or 'Do you know,'

22   regardless of whether the form of the direct testimony was

23   opinion or reputation.  There are two important limitations

24   upon admitting inquiries concerning prior misconduct; first, a

25   requirement that the prosecution have some good faith factual

1    basis for the incidence inquired about; second, a requirement

2    that the incident inquired about be relevant to the character

3    traits involved in trial."

4              MS. CORY:  So, Your Honor, the Ninth Circuit says

5    Mr. Neff can ask 'Have you heard' or Do you know'?

6              THE COURT:  Yes, those are both --

7              MS. CORY:  Excuse me?

8              THE COURT:  Both are appropriate.

9              MS. CORY:  Well, if Chaplain Smith hasn't heard it or

10   doesn't know, then that's the end of the questioning, correct?

11             THE COURT:  Well, one of the purposes of it is so the

12   jury can determine whether they can trust the witness's

13   testimony regarding the person's character.  If the person has

14   not heard about things, then that may mean that the person

15   really doesn't know what the person is talking about.  The

16   other thing is, if the person says, "Well, yes, if I had known

17   this person had committed six robberies and murdered five

18   people, I'd still think he was a good person," the jury would

19   know that this person may not be that credible in terms of

20   trusting their estimation of what character is, their

21   understanding of what character means is different from what

22   other people may mean.

23             So if the witness has not heard about it, then the

24   follow-up question would be, "Would that affect your

25   decision?"  And so what the jury is trying to do is determine

1    "whether this person's testimony about someone's character is

2    reliable for me as a juror."  And if the person's basis for

3    making that statement is quite different from most people, the

4    jury should have that information.  And if the witness does

5    not know, then it may mean that the witness's basis for

6    testifying is lacking.

7         MS. CORY:  So the question is, 'Have you heard' or

8    'Do you know;' the follow-up question would be, 'If it were

9    true, would it affect your opinion'?

10        THE COURT:  It depends upon the circumstances.  As I

11   said, when we're talking about a person's character, whether

12   something is true or not true is not all that germane.

13        MS. CORY:  Your Honor, I think the question Mr. Neff

14   is going to ask, it's going to matter whether or not it's true

15   whether there was any ridicule of the victim or not.

16        THE COURT:  I think it depends upon the circumstances

17   and the question.  I'm thinking in generalities.  If someone

18   offers their opinion that someone is as honest as the day is

19   long and people in the community talk about the person being a

20   dishonest person, if they have not heard that, then maybe their

21   opinion is not all that well-based.  If they have heard that

22   and they've discounted it, then perhaps they are not as attuned

23   to their community as we would like them to be.

24        So it depends to some extent on whether the witness

25   is giving his own opinion or whether the witness is giving his

1    opinion as to what the other person's reputation is.  It

2    varies.  And it also varies on the question.  If we're talking

3    about reputation, you know, as long as it's the type of thing

4    that people talk about, it's irrelevant whether it's true or

5    not true.

6            MS. CORY:  Your Honor, not to belabor a point, but

7    what Mr. Taylor said in a confidential call or what his sister

8    said to him in a private call between him and his sister really

9    isn't the sort of thing that reputation evidence is built on,

10   because it doesn't go to reputation.  It was a private

11   conversation.

12           THE COURT:  I think that is correct.  Unless these

13   other people that the witness testified he talked to were

14   exposed to that, I think that would be the case.  So we may be

15   limiting this particular question just to the witness's

16   opinion.  It's opinion evidence.

17           MS. CORY:  Well, needless to say, Your Honor, we

18   would like to limit it as much as possible because it remains

19   our opinion that the government is misusing this information,

20   that they are attempting to give the jury a false impression of

21   Mr. Taylor.

22           THE COURT:  Well, that's one of the dangers of

23   character evidence.  In my younger days, when I was a trial

24   lawyer myself, I always really enjoyed character evidence

25   because doors were opened up that otherwise would not be opened

1    up.  The Supreme Court actually said in the *Michelson* case it's

2    a very, very dangerous avenue, because people even talk bad

3    about the Pope.  You can always find somebody who says

4    something bad about someone.  And that's what character does;

5    it lets all that bad stuff that people say about other people

6    in.

7           MS. CORY:  But I think in a sentencing hearing in a

8    death penalty case character evidence is something the jury is

9    looking for, Your Honor; it's not something we can ignore.

10          THE COURT:  And there are two sides to character

11   evidence; there's good and there's bad.

12          Let's bring the jury back in.

13          (The jury entered the courtroom, and the proceedings

14          continued as follows:)

15          THE COURT:  Please be seated.

16          Proceed.

17          MR. NEFF:  Thank you, Your Honor.

18   BY MR. NEFF:

19   Q      Now, Chaplain Smith, you testified about your

20   opinion of Mr. Taylor and where he was, I suppose, in his

21   spiritual life at this point, or where you thought he was.  If

22   you were aware that the defendant was on -- making telephone

23   calls or receiving telephone calls, making telephone calls

24   from the jail, and had a conversation in which he laughed

25   while someone made fun of the victim and his family, would

1    that be consistent with your opinion about the defendant's

2    character?

3    A         No.

4    Q         And if I could ask you to look here at the P.S. on

5    this letter from the defendant, right here, where he says, "I

6    guess someone killed the President, and I'm being held

7    responsible——you know what I mean," referring to the victim in

8    this case, would that be consistent with your opinion of Rejon

9    Taylor's character at this point?  (Indicating.)

10   A         I--  The only thing I can say--  I got to be honest.

11   The way I read it, the question is, Who is "the President"?

12   Is "the President" the victim, or is "the President" referring

13   to if the President was killed?

14   Q         Well, obviously you're not aware that the President

15   was killed, right?  The President wasn't killed, was he?

16   A         Inmates would say something like that to say,

17   basically, "If some--  If the President was killed, I

18   would --" or let's say "If the mayor of the city or somebody

19   was killed, I would be the one that would be blamed."

20   Q         Okay.  So you interpret that a different way.  But

21   if you interpret it the way in which he was making fun of the

22   victim or lessening who the victim was by saying that

23   "Everybody's acting like I killed the President," that would

24   not be consistent with your view of Mr. Taylor?

25   A         No, it wasn't, if that's the way it was, it was

1    really interpreted that way.

2    Q         All right.  Is it fair to say, Chaplain Smith -- and

3    I think you've really pretty much alluded to this.  Is it fair

4    to say that it has been very difficult for you to get a handle

5    on exactly who Rejon Taylor is?

6    A         Yeah.  Sometimes--  I look at a lot of factors.  I

7    look at the factor of a 19-year-old spending five years in a

8    county jail.  So when I think in terms of a person, I'm

9    drawing conclusions of a guy that's spent almost five years in

10   the county jail, which is equivalent to about eight to ten

11   years in the correctional facility.  So when I think about a

12   person, I'm drawing from my own experience of dealing with

13   people.  And I guess -- I guess I would have said to myself

14   that's an excessive amount of time in a correctional facility

15   like the Hamilton County Jail.

16   Q         Okay.  You had no idea that he was about to commit

17   an escape attempt, correct?

18   A         No.

19   Q         Didn't see that coming?

20   A         I -- I knew that he quit coming to programs for

21   three or four months.

22   Q         But you didn't see an escape attempt coming?

23   A         I didn't see that coming.

24   Q         That was inconsistent with what your view of him was

25   at the time, correct?

1  A          Correct.

2  Q          Obviously you weren't aware -- and it's not any

3  fault of your own, but you weren't aware of any of these

4  things the defendant was saying or doing as recently as last

5  month, when you were making your opinion about --

6  A          I heard--  I had no knowledge.  I heard nothing like

7  that.

8          MR. NEFF:  Okay.  Thank you, Chaplain.

9          THE COURT:  Cross--  I'm sorry.

10          MS. CORY:  Redirect.

11          THE COURT:  Redirect.

12          MS. CORY:  Thank you, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MS. CORY:

15  Q          Chaplain Smith, I want to apologize, because I know

16  when you showed up this morning you did not know you were

17  going to get dragged into the middle of this kind of a

18  confrontation.  I still appreciate your coming.  I apologize

19  for the inconvenience to you.  I did have a couple of

20  questions I wanted to ask you, though, in follow-up.

21          When Mr. Neff asked you about your disappointment in

22  Rejon Taylor following the escape attempt, he also asked you a

23  couple times was there a diminution in your contact with

24  Mr. Taylor, did your contact with Mr. Taylor diminish prior to

25  the escape attempt or after the escape attempt.  Would you

1   describe what happened before the escape attempt?

2   A        He quit coming to all the services and Bible studies

3   and all the programs.  That's what happened.  And that alarmed

4   me.

5   Q        And did you say that you tried to reach out to him

6   to find out what was going on?

7   A        I tried to reach out to him, yes.

8   Q        And what happened?

9   A        He just, you know -- he just wouldn't talk to me.

10  He just kind of was--  He just wouldn't say what was going on.

11  I knew he was consumed about the fact of the death penalty

12  being sought for him.  I knew that that was a factor for him,

13  that he was facing the death penalty.

14  Q        In looking back on his having kind of withdrawn from

15  fellowship with you before that escape attempt, have you drawn

16  any conclusions as to why he did that, why he drew away from

17  you?

18  A        I would be just voicing my opinion.

19  Q        As far as I'm concerned, you can voice your opinion.

20  A        I think that some of the people that was involved in

21  it was a person that was what I would characterize as a career

22  criminal and was in the same unit with him.  And it was my

23  opinion -- I don't know if it's true or not, but it's my

24  opinion that career criminal probably had a big influence on

25  him at that time, and the fact that he was facing the death

1    penalty.  And I think the door was opened and that guy was a

2    career criminal, I think, may have had a influence on him.

3    Q        And since the escape attempt and since--  I know

4    you've had a hard time getting over the sense of betrayal.

5    A        I did.

6    Q        But since you have gotten together with him again,

7    restored somewhat that relationship you had initially, have

8    you had any sense that Mr. Taylor is a continuing problem in

9    the jail?  Is he a bad influence in the jail?

10   A        He's a peacemaker.

11   Q        So he's a good influence in the jail?

12   A        He's--  I mean, to me, it's a miracle, the guy

13   that -- the leader of the gang-bangers was influenced by him.

14   I thought that was a miracle.  I was really--  To be honest,

15   when I called that guy and talked to him, I was surprised when

16   he told me that Rejon was the person that had the most

17   influence on him.

18   Q        Now, in terms of--  Mr. Neff has asked you about a

19   letter, he showed you a little piece of a letter that he says

20   Rejon wrote to another inmate, he's talked to you about his

21   interpretation of a phone call, and he showed you another

22   little piece of a letter that you and he interpret entirely

23   differently.  Do you know from your experience whether inmates

24   write letters to their family and friends, whether they make

25   phone calls to their families?  Is this a common occurrence in

1    the jail?

2    A        I don't know exactly what you're asking me.

3    Q        Just --

4    A        Are you saying that they--  I don't know.  I --

5    Q        Okay.  What is an inmate's contact with the outside

6    world?  Someone like Rejon Taylor who is locked up for five

7    years, what -- how does he contact the outside world?

8    A        Well, the letters and telephone calls, I guess.

9    Q        Is it your experience that that kind of personal

10   contact with people is important to someone who is locked up?

11   A        Yes, very important.

12   Q        Would it surprise you that during a moment of crisis

13   an inmate might express confusion or dismay or even anger at

14   what's going on in his case?

15   A        I think personally—I'm just giving my opinion—that

16   they might express the anger.  They might express anger and

17   frustration about their case, especially if they feel like

18   it -- their life is kind of unjust or whatever you want to

19   say.

20   Q        Now, in terms of your experience as a chaplain at

21   the jail, do people like Rejon Taylor get to pick who their

22   cellmates are?

23   A        Get picked?

24   Q        Did Rejon get to pick who he was locked up with?

25   A        No.

1   Q        That was done for him, wasn't it?

2   A        Yes.

3   Q        And he has to make the best of the relationships

4   that are provided to him with his other --

5   A        Actually he was locked up with the worst of the

6   worst.

7   Q        Well, how do you describe "the worst of the worst"?

8   A        I may have put my foot in my mouth there.  Guys that

9   were-- Most of the guys that he was locked up with were

10  people that was similar charges or worse, similar charges like

11  him, and a lot -- some of them even worse.  Some of them had

12  been in the system for a while.  Most of them had been in the

13  system for a while.

14  Q        So you'd say he was sort of a babe in the woods in

15  terms of who his cellmates were?

16  A        At least regarding his age, yes, that would be true.

17  Q        Now, I know you've probably had some additional time

18  to think.  The prosecutor has brought some information which

19  he thinks is important as far as Rejon's character goes.

20  Nonetheless, you've known Rejon Taylor for five years, you

21  have gone through a very stressful experience with him in

22  terms of his escape attempt.  In looking at Rejon Taylor,

23  would you tell me-- I know nobody's perfect.  Tell me what

24  you think he is as a man, what kind of a man he is.

25  A        I just would have to -- to emphasize the two words

 1    that I've seen with him is the word <u>peacemaker</u> and the person

 2    that's usually actively involved in trying to help people have

 3    a greater spiritual knowledge.  I think he spends a lot of

 4    time working individually with guys about the Bible and about

 5    God and about that sort of thing, yeah.

 6            MS. CORY:  Chaplain Smith, I'm going to just check

 7    and see if any of my colleagues have a question for you.  I

 8    personally am done, but...

 9            THE WITNESS:  Okay.

10            (Off-the-record discussion.)

11            MS. CORY:  Thank you very much.

12            THE WITNESS:  Okay.

13            (Witness excused.)

14            THE COURT:  Call your next witness.

15            MR. WILLIAM ORTWEIN:  Your Honor, as far as today is

16    concerned, that is our last witness for the jury.

17            THE COURT:  Okay.  Ladies and gentlemen, you've heard

18    Mr. Ortwein indicate that they have run out of witnesses today.

19    So that means that I'm going to be releasing you early.  I've

20    also been informed by counsel that the case is going quicker

21    than they had anticipated and the defense expects that they may

22    wrap up their case tomorrow.

23            Is that correct, Mr. Ortwein?

24            MR. WILLIAM ORTWEIN:  Your Honor, I'm not optimistic

25    that it would be tomorrow, but I would be that it would be the

1    following-- I think we're scheduled to come back Tuesday for

2    sure.

3            THE COURT:  So you think tomorrow and part of the

4    next day, next trial day?

5            MR. WILLIAM ORTWEIN:  Next trial date, I believe,

6    which is the following Tuesday, yes, sir.

7            THE COURT:  Okay.  And the government anticipates

8    there may be some rebuttal?

9            MR. NEFF:  Yes.  Yes, sir.

10           THE COURT:  How long do you think that would take?

11           MR. NEFF:  No more than an hour or two, Judge.

12           THE COURT:  Okay.  So we probably could wrap up all

13   the evidence, then, on Tuesday of next week?

14           MR. NEFF:  Yes, sir.

15           THE COURT:  Okay.

16           MR. WILLIAM ORTWEIN:  That would be my best estimate,

17   Judge.

18           THE COURT:  I'm sorry?

19           MR. WILLIAM ORTWEIN:  I just said that would be my

20   best estimate, Your Honor.

21           THE COURT:  Okay.  Ladies and gentlemen, I asked

22   those questions to give you some idea of where we were with

23   respect to the scheduling.

24           I also know that one of the jurors is having some

25   difficulty with her employer, and I'd like to let the juror

1    know that one of the attorneys for the Federal Bar Association

2    should have been in communication with the employer today.

3    I've told -- or I've had my staff pass on to that attorney

4    that if nothing is worked out, I'd like that attorney to file

5    a motion so we can have proceedings with the employer this

6    afternoon here in my court to try to resolve it one way or the

7    other.  So I did want the juror to know that that is something

8    that we did not ignore.  We are working on it.  Okay?

9           Ladies and gentlemen, that's it for the day.  We'll

10   see you tomorrow morning at 9:00.  While you are away, do not

11   discuss the case with anyone, do not allow anyone to discuss

12   the case with you, do not read anything about the case.  There

13   are a lot of press here today.  So you can expect there to be

14   things in the media.  Don't watch anything on the television.

15   Do not listen to anything on the radio.

16           Ms. Palmer.

17           MR. WILLIAM ORTWEIN:  Your Honor?  Your Honor?

18           (Luncheon recess.)

19           (The proceedings continued outside the presence of

20           the jury, as follows:)

21           THE COURT:  Please be seated.

22           Mr. Ortwein, you may proceed.

23           MR. LEE ORTWEIN:  Thank you, Judge.

24           Call Mr. Aiken.

25           (Brief pause.)

1        JAMES EVANS AIKEN,

2   called as a witness at the instance of the defendant, having

3   been first duly sworn, was examined, and testified as

4   follows:

5                          DIRECT EXAMINATION

6   BY MR. LEE ORTWEIN:

7   Q        Sir, if you could tell the Judge your name, please.

8   A        Yes.

9            Good afternoon, Your Honor.  My name is James Evans

10  Aiken, A-I-K-E-N.

11  Q        And, Mr. Aiken, what is your current occupation?

12  A        I'm currently president of James E. Aiken &

13  Associates, Inc.

14  Q        Okay.  And what exactly does your occupation entail?

15  A        It relates directly to prison matters,

16  consultations, as well as expert testimony as it pertains to

17  the management and confinement and security issues,

18  operational issues, also, of confinement facilities, on local,

19  state, as well as federal level.

20  Q        Okay.  So you have a great deal of experience with

21  respect to the incarceration of individuals on all three of

22  those levels.  Is that correct?

23  A        That is correct, sir.

24  Q        Specifically with reference to this case, what is

25  your experience with respect to the incarceration of federal

```
 1  inmates, your interaction with the Bureau of Prisons, any

 2  commissions which you may be on with respect to those issues,

 3  et cetera?

 4  A        Yes, sir.  And I'll be as brief as possible.

 5           When I started with the Department of Corrections in

 6  South Carolina, I developed an approach of changing

 7  correctional systems as well as institutions as it relates to

 8  security, custody, control, classification, and management of

 9  inmate population.  And the most progressive and the most

10  effective system was the Federal Bureau of Prisons.

11           Specifically, in the state of South Carolina, when I

12  was the warden of the state penitentiary, I had taken over a

13  facility that was not functioning very well.  You had a lot of

14  random as well as systemic violence between inmates as well as

15  inmates to staff.

16           And I called upon the Federal Bureau of Prisons for

17  assistance, and was allowed, through the United States

18  Department of Justice, to visit their high−security prisons,

19  such as Lewisburg, et cetera.  And specifically I was allowed

20  to look at their internal classification system, like at

21  Lewisburg, in separating and managing inmate population.  And

22  I went to Lewisburg, and I went to a number of people that

23  were experts with the Federal Bureau of Prisons, and

24  implemented it at the state penitentiary in South Carolina.

25  This was a system to separate violent predator inmate
```

1    population from what we call "normal population" as well as

2    "passive population," that population that had a high degree

3    of probability to be victimized.  And from there I also called

4    upon the Federal Bureau of Prisons to assist me, through the

5    National Institute of Corrections, to implement a number of

6    other approaches to security protocols as well as the

7    implementation of unit management.

8            Unit management was also a system that was developed

9    by the Federal Bureau of Prisons where you brought the

10   decision-making processes all the way down to the inmate

11   population, as it pertains to classification, security, and

12   custody of inmates.  The prison that I was operating at that

13   particular time, as I stated before, was a very violent place.

14   And we were able to address a number of substantive issues as

15   it pertains to operations and security as well as mandates set

16   forth by the judiciary in litigation.

17           Also, I might track a little bit.  The Federal

18   Bureau of Prisons as well as the California system were the

19   parents of classification.  Classification is to place the

20   proper inmate in the proper level of program, security, as

21   well as housing, within a prison system.  And of course I

22   embraced that and used that extensively.

23           After that I was asked by the National Institute of

24   Corrections to come and assist in providing expert

25   consultation to a number of correctional systems throughout

1    the United States.  I've been in just about all of them.  And

2    of course the National Institute of Corrections is now under

3    the Bureau of Prisons, the Federal Bureau of Prisons.

4          So I taught classification on all levels,

5    multi-jurisdictional.  Just about every jurisdiction in the

6    United States has some form of classification.  Of course I

7    taught them how to manage gangs, how to control and manage the

8    hard-to-manage, violent inmate; the youthful offender in adult

9    facilities.  I taught wardens how to be wardens as new

10   wardens.  I taught existing wardens how to be better wardens.

11   I also taught—and this is all under the U. S. Department of

12   Justice—wardens how to be wardens for super-maximum-security

13   prisons.  And that program was delivered at ADX, which is the

14   most secure prison within the world, from my estimation, but

15   certainly within the Federal Bureau of Prisons.

16   Q        And that's the one located in Florence, Colorado?

17   A        That's correct, sir.  It's a very high-security

18   prison.  And wardens from all over the United States went

19   there as a part of their training, to which I was an

20   instructor, and understanding about the Federal Bureau of

21   Prisons.

22          Additionally, when I left the South Carolina system,

23   I took over the Indiana Department of Correction.  Indiana was

24   another system that was diminished in their productivity as it

25   pertains to the security and safety of staff as well as inmate

1 population, and that's why I was called in.  The first thing I

2 did was -- one of the first things that I did was to go to the

3 Federal Bureau of Prisons, and I, through the director,

4 obtained a prison warden from the Federal Bureau of Prisons,

5 on loan, to come to Indiana and stay there for several years

6 to teach the system of the Federal Bureau of Prisons, to which

7 I had embraced and had implemented and knew very well.

8 And being the chief executive officer for the

9 Indiana Department of Correction and on the governor's

10 cabinet, I went to the best people and got two

11 individuals—one was in the headquarters setting—to set up

12 the administration, programmatic delivery, specifically, as

13 well as taking a federal warden into the state system to head

14 up the maximum-security prison at Michigan City, to which that

15 was done.  And they were federal employees, BOP.  And they

16 were allowed to come in, at no charge to the state, and teach

17 Indiana how to do prison work and operational aspects as well

18 as security aspects as it was done in the Federal Bureau of

19 Prisons.

20 Additionally I was appointed as director of

21 corrections for the Bureau of Corrections, United States

22 Virgin Islands.  This was a very diminished system, with drug

23 cartels, with very illegal activities with staff as well as

24 the inmate population.  This was a system that was heavily

25 diminished by contraband issues, escape issues, public

 1    distrust, federal court intervention, and a number of other

 2    very diminished aspects about the system.  And, again, I went

 3    to the Federal Bureau of Prisons, and they allowed me to bring

 4    in their people to assist in teaching and turning that system

 5    around as it pertained to classification, security, key

 6    control, gang activity, and all other aspects of prison

 7    security delivery, as well as administrative delivery system

 8    of monitoring telephone calls all the way through to emergency

 9    response capabilities.

10              And so my relationship with the Federal Bureau of

11    Prisons has been continuous.  I have been through a number of

12    their facilities, not just during tours but obviously looking

13    at the nuances and the high-security protocols within the

14    system, because I embraced that system continuously.

15              One other example of it is that in 2004 I was

16    appointed to the Prison Rape Elimination Commission.  This is

17    a Commission that was appointed by the leadership of the House

18    and Senate in Congress as well as the President of the United

19    States to present and develop standards to eliminate prison

20    rape within federal, state, and local jurisdictions.  We have

21    subpoena power.  We will finalize our standards this spring,

22    hopefully.  And failure to comply with these standards once

23    they are finalized will cause the diminish of federal funding

24    not only on the federal level but state as well as local

25    level.  And I'm the only individual on this Commission with

1   direct prison-related expertise and experience.

2   Q        So, as I understand it, the other members on this

3   Commission that Congress and the President appointed, all of

4   them are either lawyers or judges of some sort.  But there is

5   no other member of that committee who, I guess to steal a

6   phrase from you, has put their boots on the ground and walked

7   through and worked at these institutions.  Is that correct?

8   A        That is correct, sir.

9   Q        And you're responsible directly to Congress once

10  you've made your findings and recommendations?

11  A        That is correct, sir, as I understand it.  We make

12  our report, it's approved by the Attorney General, and then

13  these standards will apply to every jurisdiction.

14  Q        Including the federal system?

15  A        Especially the federal system.

16  Q        Okay.  Sir, you obviously have an extensive

17  experience with state corrections as well as federal

18  corrections.  And I just kind of want to, I guess, by way of

19  summary--  You have both sought advice from and have had

20  advice sought from you by the Bureau of Prisons.  Is that

21  correct?

22  A        That's correct, sir.  I have provided expert

23  consultation as well as direct training to Federal Bureau of

24  Prisons employees and executives.  I have also been recipient

25  of their gracious help in me developing diminished systems

1    using the Federal Bureau of Prisons.  I had opportunity to

2    embrace the California system or the Michigan system,

3    et cetera, but for the last 25 to 30 years I have followed the

4    Federal Bureau of Prisons because in my estimation there

5    was -- they produced the best results.  So it's not a

6    situation where something I read or those kind of things.  I

7    have actually gone, seen, and embraced, and demonstrated the

8    federal model in state facilities as well as territorial.

9    Q       And so when the government chooses you to go to the

10   Virgin Islands to assist them, what you described as being run

11   down or diminished, does that say something as far as what

12   they believe your qualifications are?

13   A       Yes, sir.  I'm the fix-it person.  I'm the person

14   that takes these systems and turn them around.  Sometimes they

15   get diminished again and I have to go back.  But the same

16   thing for the state penitentiary in South Carolina, the

17   Indiana system, as well as the Virgin Islands system.  And

18   I've been in just about every state's system, to include

19   Hawaii and Alaska, as well as many federal facilities.

20   Q       And so in fact the majority of your career, I mean,

21   that's what you've done; you've fixed broken penitentiaries,

22   broken institutions, et cetera, to the standards acceptable by

23   the government or the particular state.  Is that right?

24   A       That is correct, sir.

25   Q       Okay.  During the span of your career, have you had

1    the misfortune of executing anyone?

2    A        Well, part of my duties, I've put two inmates to

3    death personally.

4    Q        Okay.  So that's not a concept that's -- that you're

5    not familiar with, right?

6    A        I've managed death row population.  I have also

7    executed inmates, as I stated.

8    Q        Okay.  And so obviously you are very familiar with

9    the way in which death row inmates are incarcerated?

10   A        Yes, sir.

11   Q        And you're obviously also very familiar with the way

12   in which individuals who are serving a life sentence are

13   incarcerated --

14   A        Yes, sir.

15   Q        -- in the federal system?

16   A        Yes, sir.

17   Q        Okay.  And at one point you were given a set of

18   records pertaining to Rejon Taylor.  Is that correct?

19   A        That's correct, sir.

20   Q        And had you had a chance to look at those?

21   A        Yes, sir.

22   Q        And so reviewed those in some -- some detail?

23   A        Yes, sir.  I approached it the same way that I

24   approached it as a warden, as a commissioner, as an expert.  I

25   looked at it, of course using the federal model to which I've

1    done all these years, in looking at this particular inmate and

2    his ability or ability of systems to adequately manage him

3    based on the factors and information contained in the

4    documents that I've received.

5    Q        Okay.  And did you have an occasion in January of

6    '07, or maybe it was '08, to tour the Hamilton County Jail

7    where Mr. Taylor has been incarcerated?

8    A        That's correct, sir.  I think it was January 10th of

9    2008, if I'm not mistaken.

10   Q        Okay.  And you toured that facility?  I believe that

11   Lieutenant Coppinger was the one that took you through and

12   answered questions?

13   A        I think so.  I don't remember his name.  But I think

14   his rank was lieutenant, yes.

15   Q        Okay.  And based on all this information and based

16   upon your experience, you think you would be able to give us

17   an opinion as to where Mr. Taylor is likely to be incarcerated

18   if he is sentenced to life?

19   A        Yes, sir.

20   Q        Where he's likely to be incarcerated if he is

21   sentenced to die?

22   A        Yes, sir.

23   Q        How he will be treated, or what a day in the life

24   would be like either way?

25   A        Yes, sir.

1    Q        And what remedies that the Bureau of Prisons has, or

2    don't have, to deal with him if he's a trouble inmate, et

3    cetera?

4    A        Yes, sir.  The only exception to that, there are

5    security protocols, known as CIMs, to which I'm aware of, that

6    I don't share in open court.

7             MR. LEE ORTWEIN:  Okay.  Judge, based on that, I

8    would offer him as an expert at this point.  I don't know if

9    the government wants to address the issue now or once I go into

10   further detail as to what he would testify with respect to

11   Mr. Taylor, but...

12            THE COURT:  Is there any objection to the witness's

13   expertise?

14            MR. NEFF:  No, Your Honor.

15   BY MR. LEE ORTWEIN:

16   Q        Mr. Aiken, you've looked at Mr. Taylor's record,

17   seen a photograph of him.  Is that correct?

18   A        I didn't understand the question, sir.  I'm sorry.

19   Q        You've seen a photograph of Mr. Taylor?

20   A        Yes, sir, a color photograph, yes.

21   Q        Okay.  And this is generally called a booking card.

22   (Indicating.)  Is that correct?

23   A        Yes, sir.

24   Q        All right.  And on that booking card it describes

25   what the individual's height and weight is, et cetera?

1    A         Yes, sir.

2    Q         Okay.  Do you recall--  Is he a big guy?  Skinny

3    guy?

4    A         Slender built, 140 or so.  About 5'8".  And, you

5    know, there are a number of inmates much larger than he would

6    be.  Also I looked at the facial features.  I've classified

7    thousands and thousands of inmates.  And I also look at those

8    physical features of the individual, because it has a direct

9    relationship to vulnerability and safety and security issues.

10   Q         Okay.  We were talking about this earlier.  Let me

11   just ask you.  Is there a difference between a convict and an

12   inmate?

13   A         Yes, sir.  And you won't find it in a policy manual.

14   But those people that have been around prisons for many, many

15   years know the big difference.

16   Q         And that is?

17   A         Well, a convict is a person that's well-regimented

18   within a prison environment.  Those individuals know what the

19   line is, and they never cross the line.  They know that

20   they're respected by other inmates.  And for wardens like me,

21   I tell them what to do and when to do it, and I don't expect

22   any backtalk or no immature behavior patterns, and you don't

23   get them.  But I do also know, with convicts, these

24   individuals have a capability to be extremely violent if

25   necessary, and so therefore they will remain in a

1    high-security environment for the remainder of their lives.

2    They are old people, so to speak.  And I'm not talking about

3    chronologically old.  They are well-seasoned.  They know the

4    ins and outs and games that go on within prisons, and they

5    know how to control themselves.  And if you let them, they

6    know how to control other people.

7    Q        So essentially they are the better politicians

8    within the prison inmate population.  Is that correct?

9    A        To use a community definition, basically that's

10   about the closest you can get, yes.

11   Q        Okay.  Now, you know Mr. Taylor has no gang

12   affiliations.  There is no information with respect to that.

13   You obviously know that he's a relatively young man, 24.  As

14   you stated, he's -- frankly, he's skinny, smaller than I am.

15   He's African-American.  When he goes into prison, will he be

16   looked at as a predator, or as prey?

17   A        He would look more as prey, to say the least.  Old

18   convicts as well as those individuals that would love to take

19   advantage of people like this would see him as new potential;

20   I don't want to use colloquial phrases all the time, but

21   "fresh meat."  He's not a gangster.  He's not a shock collar,

22   as they call it.  He's not a signal caller.  He doesn't run

23   anything in a prison setting.  And he's going to have to be

24   more protected than anything else until he becomes seasoned.

25   Q        Do you think somebody will offer him that

1    protection?

2    A          I beg your pardon?

3    Q          Do you think somebody will offer him that

4    protection?

5    A          Yes.  And that protection doesn't come free.

6    Q          Right.

7    A          Inmates play games that way:  "Listen, you know,

8    you're a young kid.  I remember when I was young.  When you go

9    to Classification, why don't you ask them to put me and you in

10   the same cell."

11          And of course with unit management and those kind of

12   systems within the Federal Bureau of Prisons, they'll begin to

13   pick that up, and they would have to exclude him from that

14   predator population.  The biggest concern that I would have

15   for him, other than to ensure that he does not have access to

16   the community, is his own safety.

17   Q          And is he going to go to one of these camp type

18   prisons?

19   A          No, sir.  With the type of sentence as well as the

20   type of crime, this will be the driving force.  I don't care

21   how well-adjusted he is or how maladjusted he is within a

22   confinement setting, the sentence and the type of crime will

23   prevent him from reintegrating into society.  So therefore

24   incapacitation is the primary driving force here.  He is not

25   going back.  Does that say he doesn't have access to programs

1    or things of this nature?  No.  You need that, not to prepare

2    him for return to society but to further stabilize him during

3    his period of incarceration.

4    Q        So the goal, then, as a result of the crime for

5    which he stands convicted, is to incapacitate him; and any

6    programs or any alleged privileges that he's given are given

7    for the sole purpose to maintain security for the other guards

8    and inmates, keep his mind occupied.  Is that correct?

9    A        That is correct.  It's not a goal.  It's a mandate,

10   I would like to say.  And Number 2 on that, that will be

11   forever, as long as he lives.

12   Q        No step-down from that?

13   A        No, sir.

14   Q        Okay.  So we have a defendant here who is a rather

15   small guy; no gang affiliations; at least, you know, in person

16   doesn't look very intimidating, et cetera, et cetera, and his

17   BOP classification on paper may be very low, but because of

18   the crime for which he stands convicted, none of that matters.

19   I mean, is that correct?

20   A        Yes.  And I'm trying to use community terms here.

21   Q        Sure.

22   A        If it wasn't for the crime and it wasn't for the

23   sentence, he would not see a high-security prison unless he

24   demonstrates adverse behaviors, to which we've not seen per

25   se.  And I'm talking in prison context now, not as a community

1    member looking at it.  But he will always be under the gun as

2    long as he's incarcerated.

3    Q        Okay.  What type prison is he -- and specifically I

4    know a high-security prison, but could you maybe tell the

5    Judge which type prison he might go to or what the location

6    would be, what it would be like?

7    A        Yes.

8             Your Honor, he would be in a United States

9    Penitentiary, USP, and he would stay in that high-security

10   setting.  And he may go down to a medium-security facility,

11   but this still is a high-security facility for the perimeter.

12   And he will always be excluded from access to the public

13   unless there is a high level of security between the two.

14   There will be a gun between him and the community as long as

15   he lives, no matter how good he is or how bad he is.

16            Now, if he goes to the Federal Bureau of Prisons and

17   demonstrates adverse behaviors, he can be locked up within the

18   USP.  And that's normally called the SHU, which is Security

19   Housing Unit.  That is, for community terms, the jail for the

20   prison, for those inmates that have demonstrated adverse,

21   predator, disruptive behavior patterns.

22   Q        Is that the most secure place in the prison?

23   A        In a USP, yes.  But there is ADX, Administrative

24   Maximum, and that is the end of the road.  It is an extremely,

25   very meticulously built and operated facility, and very

```
 1   high-security setting, ultra-high-security.

 2   Q        What type of prisoners is that place for?

 3   A        Those inmates that have demonstrated adverse

 4   behaviors, to include systemic as well as random violence

 5   against staff as well as inmates, to include murder, hostage

 6   situations, terrorists, people of that nature.

 7   Q        Okay.  So if somebody such as Mr. Taylor gets sent

 8   to Terra Haute, is that a good example?

 9   A        That's a good example, yes, sir.

10   Q        So he goes to Terra Haute and he acts up there and

11   they put him in the SHU, I guess, is the first step?

12   A        That is correct, sir.

13   Q        All right.  And then he does something in the SHU,

14   or maybe a couple of things there, and then potentially he

15   could get to ADX, right?

16   A        Yes.  And it has to go through a review and approval

17   process.  You just can't pick up the phone, as a warden, and

18   send somebody to ADX.

19   Q        Right.

20   A        Now, you can do something in the population that

21   will send you directly to ADX, such as a murder or something

22   of that nature.  But it has to be approved through the

23   regional authority.

24   Q        Okay.  Generally those type of people, though, are

25   they not shock collars, are they not higher-ranking gang
```

1    members that need to be isolated from the rest of the world?

2    A          Exactly.  Those terrorists like--  I did the

3    evaluation, security evaluation, of Mr. Moussaoui.  And he

4    went straight to ADX.

5    Q          You testified in that trial, and Mr. Moussaoui was

6    deemed --

7    A          That is correct, sir.  And I can't go into too much

8    detail of the security protocols.

9    Q          Sure.  But that place, obviously, is for the most

10   unmanageable inmates that the BOP has --

11   A          Yes, sir.

12   Q          -- deemed necessary to go straight to ADX?  Let's go

13   to Terra Haute, where Mr. Taylor would probably be, Terra

14   Haute, Atlanta, I guess those kind of penitentiaries.

15   A          Yes.  He would start off in a USP.  And if there is

16   too much pressure on him——I'm talking about

17   vulnerability-wise——he could be placed in administrative

18   segregation or placed in protective custody, also, which are

19   separate housing units that are specially designed and

20   operated to provide that level of close supervision and

21   separation from other predator inmate population.

22   Q          You refer to him having to be separated from the

23   other predator inmate population.  What might he fall victim

24   to specifically?

25   A          Sexual assault.  Extortion.  Forced to, as they call

1   it, hook up with a STG, or security threat group, or gang.  He

2   may be pressured into holding contraband, for example, or a

3   seasoned convict will come to him, says, "Listen, I got a

4   shank, and I want you to hold it for me and, you know, keep it

5   in your cell, or keep it" in a certain hiding place, "and I'll

6   take care of you."

7          And then of course there is the inevitable sexual

8   assault and intimidation, you know——"Listen, I'm going to be

9   your daddy, and you got nothing to say about it.  And the

10  reason why I'm going to be your daddy, because I like you, and

11  you're not going to turn out to be a whore in this prison.  So

12  you are mine."

13         And that's the way it goes.  And you have security

14  systems established, especially in the Federal Bureau of

15  Prisons, to pick up these kind of behavior patterns——who is

16  eating with him in the dining hall, who is on the rec field

17  with him, who is always trying to give him candy and

18  cigarettes and things of that nature, people that are watching

19  his religious affiliation and dedication to religion, they are

20  saying, you know, "You don't need that in the penitentiary,"

21  you know, "You need to hang with us, and we'll take care of

22  you," and that improves their power and control.

23  Q        And if he says no to doing some of these things?

24  A        Things happen.

25  Q        Such as?

1    A        Well, using some vivid examples, when there is a

2    fight on the yard or a fight in the cell block and he's not

3    affiliated with a certain gang or -- he's not going to be

4    protected, I mean, those people are not going to come to his

5    rescue.

6            When there are racial tensions within the

7    facilities, the ABs make a move, he makes a mistake and steps

8    on a AB --

9    Q        Aryan Brotherhoods?

10   A        -- Aryan Brotherhood, I'm sorry, or a Nazi's foot,

11   for example, steps on a foot, for example, he can say "I'm

12   sorry" all you want, but, "That's disrespectful, so we got to

13   make a move on it."  He's not hooked up with anybody and he

14   really didn't mean to do it.

15           On the rec yard, the Gangster Disciples and Latin

16   Kings on the one side, and AB on one side, and he goes

17   bouncing out there and goes on the wrong territory, he's got

18   no business over there.  And those are the things--  You and

19   other people from the society see a bunch of inmates on the

20   yard.  I don't see that.  And possibly he won't see that

21   because he's not a seasoned convict.

22   Q        And of course if he has a life sentence there is no

23   hope at the end of that tunnel, right, in the federal system?

24   A        No hope from the standpoint of ever going back to

25   the community.  We will stabilize him.  He will become

1    regimented.  He will be constantly accounted for.  Like, in

2    the Federal Bureau of Prisons, you have total accountability.

3    You don't wake up in the morning and decide to take a stroll

4    around the prison.  You go from Point A to Point B, and you

5    got a certain time to be there, and people are going to watch

6    you.  Not only that, you have what we call CIMS, C-I-M-S,

7    that's a Central Inmate Monitoring System, or management

8    system, where central office tracks your movements to make

9    sure that you are in the right housing, make sure that you are

10   not involved with illicit activities, because you are not

11   going back home.

12   Q        Well, speaking of that, tell us what a typical day

13   in the life of Mr. Taylor would be at Terra Haute or --

14   A        And I'll use it very generically.  You're constantly

15   watched.  You're constantly evaluated, from a security

16   perspective, that is.  Contraband searches.  They can strip

17   you down till you're buck naked at any time they want to.

18   They can take everything out of your cell and examine it.

19   They tell you where you're going to live, who you're going to

20   live with, what you eat, who you're going to talk to, who

21   you're going to visit with, what kind of clothes you're going

22   to wear, what type of radio you're going to get, even what

23   kind of TV you're going to watch.  Everything is controlled by

24   the staff, and it's a privilege, it's not a right.  And what I

25   mean by that is, any of these things can be taken away at any

1  time.

2          You wake up early in the morning, anywhere between

3  5:30 and 6:00.  You have to keep your area clean.  You are

4  counted -- formally and informally counted all through the

5  day.  You go eat, you come back, you go to work.  When you

6  finish work, you go to lunch, you come back to work.  When

7  that is completed—and of course the security protocols that

8  I've just shared with you are continuous—you may be allowed,

9  you will be allowed, to be involved in some type of

10  programmatic activity, to include going on the rec field and

11  things of that nature, for a certain period, depending on your

12  behavior and the type of adjustment you've made to the prison

13  setting, and you are counted continuously again, and then

14  you're locked up for the night.  And that is a continuous

15  process, day after day, week after week, year after year,

16  decade after decade.

17  Q      In former conversation you and I had, you basically

18  said they just sit there to rot.  Is that right?

19  A      In very simple terms, that is correct, they sit

20  there and rot.  And they know that if they demonstrate

21  behavior that's adverse, those behaviors will be controlled,

22  whether you have to use chemical munitions, physical force, or

23  lethal force.  I've had to order a sniper to kill a inmate

24  while he was holding a hostage.  And that was done.  And I

25  learned a lot of this and most of this through the Federal

1  Bureau of Prisons and their emergency response as well as

2  emergency prevention protocols.

3  Q        Okay.  Let's say that somebody gets in trouble; they

4  have contraband or they got a shank or whatever.  All right.

5  They get taken to the SHU.  Tell the Judge what the SHU is

6  like.

7  A        The SHU is commonly called, usually, 23 and 1.

8  You're locked down 23 hours a day, and you're allowed to go on

9  the rec, which is a confined rec area——most inmates call it

10 the dog run because it's usually a chain-link corridor——that

11 you will be able to have outside access to.  And there are

12 specially trained staff to manage your behaviors.  And what I

13 mean by that, forced cell movements will be an example.  If

14 you're disruptive in your cell, there are specially trained

15 people to go in, and they're specially equipped to come in and

16 subdue you.  And if we have to tie you down to a point -- in

17 four-point or six-point restraints in order to control your

18 behavior, we can do that, also.

19 Q        Okay.  Tell us about death row.

20 A        Death row is -- it's a high-security area, but it's

21 not the most secure area within --

22 Q        What's the most secure area?

23 A        ADX, for example, is much more secure.

24 Q        How does security at the SHU compare to security on

25 death row?

1   A        Depending on the facilities, they're about the same,

2   but they have more access to go from Point A to Point B or to

3   supervision.  The difference between that and, like, general

4   population is that they don't have access out of their

5   particular housing area.

6   Q        Okay.  I'm sorry.  I interrupted you telling us

7   about death row.

8   A        Death row is a unit within certain prisons, Terra

9   Haute being an example for the Feds, to which I've had an

10   opportunity to review.  It is a place for holding inmates

11   before putting them to death.  And they have some programs,

12   they have outside recreation, and they are stabilized until we

13   are ordered to put them to death and we put them to death.

14   Q        Okay.  So all of these are ways in which the BOP

15   deals with inmates and the potential that they can cause harm

16   to other inmates and harm to themselves.  Is that right?

17   A        Yes, sir.  The key issue and the driving force is

18   protection of the public.  And the public is inclusive of

19   inmate population as well as staff.

20   Q        Okay.  Let's just use an example.  Let's say that I

21   am -- oh, I don't know, I'm some inmate who decides to testify

22   against another inmate, and I end up going to the federal

23   penitentiary after I get my sentence cut.  Are you going to

24   throw me out there in general population?

25   A        No, sir.

1    Q        All right.  Where will I go?

2    A        Well, when you come into the system, we will

3    evaluate what transpired, what we think and what we know

4    officially and unofficially, that is, from inmate as well as

5    what's in the official documents.  And if there is a need to

6    separate--  And of course if you testify against someone, you

7    will separate, possibly going to another institution, or you

8    may be at the same institution and you'll never see each

9    other, for years and years and years, because systems are --

10   and I don't want to go into detail, but systems are designed

11   to keep these inmates from ever crossing paths.

12           And they've gotten much more sophisticated in

13   ensuring that if they have friends, those friends are

14   separated.  And that's the job of the warden.  That's the job

15   of classification.  For the last 30 years, you know, that's--

16   That's what you do as a warden.  You're always keeping people

17   separated.  You're always looking at who's got a beef with

18   whom.  And whether the beef is legitimate or not is

19   immaterial.  And if you got to ship them out to another

20   institution, another system, or just lock them all up until

21   you feel better, you do that, too.  But the key here is, if

22   you got a snitch, then you separate them and you listen to all

23   the chatter and the monitoring of the telephones and

24   everything else and make decisions on what to do to secure

25   that population.

1    Q        Okay.  And there are other types of inmates that

2    obviously have to be separated, not because they're providing

3    information to the government, but because perhaps they have

4    betrayed gang members on the outside or something of that

5    nature, maybe they're admittedly homosexual and they have to

6    be separated.  Is that correct?

7    A        That's certainly correct.  It could be, you know,

8    for someone like Rejon Taylor, an inmate can go to him and

9    say, "Here's a shank.  And you take this guy out.  If not,

10   we'll take you out."  He's in a jam.

11   Q        Right.  So are you confident that the Bureau of

12   Prisons would be able to incarcerate Mr. Taylor for the rest

13   of his life?

14   A        Yes, sir, they can, within reason, safely control,

15   manage, and contain him in confinement for the remainder of

16   his life without causing undue risk to staff or harm to staff,

17   inmates, as well as the general community.

18   Q        Okay.  You can't promise me he won't hurt anybody?

19   A        I don't have a crystal ball, sir.

20   Q        Me, neither.  Can't promise me if he sat on death

21   row he wouldn't hurt anybody, either, right?

22   A        That's correct, sir.

23            MR. LEE ORTWEIN:  I want to pass to the witness some

24   records which I had already referred to.  If he could just have

25   a look at those and make them at least an exhibit at this

1  point.

2           (Brief pause.)

3  BY MR. LEE ORTWEIN:

4  Q       Do you recognize what they are?

5  A       Yes, sir.  These are materials that you forwarded to

6  me and I used in making my evaluation.

7  Q       Okay.  Thank you.  If you'd pass those to the clerk.

8  A       Yes, sir.  (Witness complying.)

9  Q       Are you aware if back in 2006 Mr. Taylor tried to --

10  allegedly tried to escape from Hamilton County Jail?

11  A       Yes, sir.

12  Q       Okay.  Do you know the details about that?  Have you

13  and I discussed that?

14  A       Yes, sir.

15  Q       Okay.  And you're aware that essentially he and

16  other inmates were involved?

17  A       That's correct, sir.

18  Q       Some were inmates.  Some were convicts.  Two guards

19  were assaulted.

20  A       Yes, two officers received injury.  One went to the

21  hospital, and I don't think the other one did; I'm not sure.

22  Q       That's correct.  So Mr. Taylor apparently grabbed

23  one of the radios off one of the officers?

24  A       That's correct, sir.

25  Q       All of the participating inmates, with the exception

1   of one, went back to their cell or got up against the wall.

2   Whatever they were ordered to do, they complied with that.

3   You understand Mr. Taylor complied?

4   A        That's correct, sir.

5   Q        Okay.  And, again, you've toured the county jail,

6   correct?

7   A        Yes, sir.

8   Q        Okay.  What's your view on that?  Does that

9   increase -- or does that change your opinion about how he

10  would be classified by the Bureau of Prisons?

11  A        I think you asked two questions there.  The first

12  one is, yes, I've had an opportunity to look at the jail.

13  Q        Yes.

14  A        And part of my tour of the jail was to compare BOP

15  regimen to what's existing or was existent at that facility

16  when I went through it.

17  Q        Okay.

18  A        And obviously the Federal Bureau of Prisons has a

19  higher security standard than what I saw on that particular

20  day.  And that's based on 36 years of managing prisons and

21  jails and prison systems specifically, and the security

22  protocols.  The second aspect of it is Mr. Taylor himself in

23  those environments.  And what transpired on the day in

24  question, he was involved, from what I could ascertain from

25  the reports, and he was compliant when staff intervened.  I

1    hope I answered your questions.

2    Q        So basically what you're telling the Judge is, the

3    security measures taken at Terre Haute, if he's doing life

4    and, I certainly would assume, if he's on death row, would be

5    such that it would be hard for him to even have conceived of

6    such an escape plan.  Is that correct?

7    A        To say the least.  To say the least.  With the

8    security protocols, the contraband control activities, the key

9    control, the lock control, the radio control, the training of

10   staff, the weaponry, nonlethal weaponry staff has, compared to

11   what I could ascertain from the report as well as what I saw

12   when I toured the facility, the probability of an attempt of

13   this nature would be extremely unlikely, even from the

14   standpoint of at the jail.  I mean, they tried to pull it off

15   at shift change.  And anybody -- any convict will tell you

16   that at shift change you've got more staff there than you have

17   during -- after shift change.

18   Q        So essentially, using a street term, it was just

19   stupid?

20   A        I beg your pardon?

21   Q        It was just stupid?

22   A        To say the least.

23   Q        Okay.  As a result of your knowledge about this

24   attempt, does that change your opinion about whether the BOP

25   can safely incarcerate him if he receives a life sentence?

1  A        It doesn't change it at all, because of the fact

2  that I've had the experience of reviewing escape attempts,

3  escape plans, actual implementation of escapes, preventing

4  escapes, evaluating after critical events have taken place, to

5  include events that have caused death, and the probability of

6  him being successful within the Federal Bureau of Prisons is

7  nil.  But, I mean, look at the event itself that took place at

8  the jail.  As a old warden, the first question you ask is,

9  "How far did they get?"  And they didn't even get out of the

10 housing unit.

11 Q        Right.  Right.  We had talked earlier about how he

12 would be classified by the BOP, and I think initially -- and I

13 think I actually said this, and not you, but that he would

14 be -- minus the conviction that he has now, if it wasn't so

15 serious, he wouldn't be classified -- even with the escape, he

16 wouldn't be classified as being sent to Terra Haute or Atlanta

17 or one of these higher U. S. Penitentiaries.  Is that correct?

18 A        Basically, yes.  And the premise that I make, I

19 mean, I look at him, even still incarcerated at the place

20 where the event took place, and he's back in general

21 population now, which is not unusual.  And certainly the BOP

22 would take that under consideration.  But he would -- absent

23 this type of offense that he's been convicted of and the

24 possible sentences, he would not be in as high a security

25 setting that he would be because of his sentence, and of

1    course there would be the probability of him reintegrating to

2    society.

3            MR. LEE ORTWEIN:  That's all I have.  Thank you,

4    Judge.  Except I would like to admit these jail records.

5            MR. NEFF:  No objection.

6            THE COURT:  Is there any cross-examination?

7            MR. NEFF:  Judge, just a couple of quick things.

8                        CROSS-EXAMINATION

9    BY MR. NEFF:

10   Q       Mr. Aiken, when you were doing your assessment, I'm

11   not sure that I understood specifically what kinds of things

12   that you relied on.  So let me ask you first this:  Did you--

13   Have you spoken with the defendant personally?

14   A       No, sir.  What I did instead was to do, as I do most

15   of the time, thousands of inmates I've classified, is to rely

16   on the official records of his behavior while incarcerated as

17   well as the information contained in his criminal history, to

18   include this instant offense.

19   Q       Okay.  So you had access to information about the

20   offense itself?

21   A       Yes, general information concerning it.

22   Q       What was the nature of that?  Where did that come

23   from exactly?  Did that come from his lawyers?

24   A       All the documentation that I've received came from

25   counsel, yes, sir.

1   Q       Okay.  And what kinds of -- just in general, what

2   kinds of documents were those?

3   A       Institutional records, to include his assignment,

4   incident reports, investigative reports as it pertained to the

5   escape attempt, some information concerning the medical

6   aspects of it, of him, as well as his demographics, to include

7   his size and religion and education and things of that

8   nature --

9   Q       Okay.

10  A       -- which is commonly found in prison records, jail

11  records.

12  Q       Right.  That's what a warden would -- or a person

13  making the assessment, I guess, would rely on when deciding

14  how to house a particular inmate.  Is that right?

15  A       That's correct, yes, sir.

16  Q       So they're at least somewhat dependent upon, in fact

17  totally dependent upon, the accuracy of documents they're

18  looking at?

19  A       The official records, yes, sir.  And in this

20  particular case the records span over years of incarceration,

21  which gives you a good track record.

22  Q       Obviously you're relying on the accuracy of those

23  documents, though, to some extent?

24  A       Well, yes, sir.  And, you know, there's also the

25  sixth sense.  When things don't add up, I -- bells go off.

1    Q        Sure.  Sure.

2    A        I've seen some incomplete records.

3    Q        I'm sure you have.  And does your assessment or

4    evaluation involve interviewing anyone, or is it purely a

5    documentary evaluation?

6    A        In this particular circumstance, it was purely

7    documentary.  I relied on the official records.

8             MR. NEFF:  Nothing else.  Thank you, Mr. Aiken.

9             THE WITNESS:  Thank you, sir.

10            THE COURT:  Any redirect?

11            MR. LEE ORTWEIN:  No, sir, I don't think so.  I'm

12   just going to submit these.

13            THE COURT:  Okay.  The Court will accept those, then,

14   as exhibits to the witness's testimony.

15            (Defendant's Exhibit DS9 was received into

16            evidence.)

17            THE COURT:  Thank you, sir.  You may step down.

18            THE WITNESS:  Thank you, Your Honor.

19            (Witness excused.)

20            THE COURT:  Did you have another witness you wanted

21   to call?

22            MR. CLEMENTS:  Your Honor, I would like to proffer

23   briefly, summarize, just the headings of Mr. McNally's

24   declaration, who is the Death Penalty Federal Resource Center

25   head, and Dr. Bell, who he referred to, who is a professor of

1  political science, was a Fellow on the Sentencing Commission,

2  to show statistics as to racial discrimination and

3  disproportionality of the selection of blacks or

4  African-Americans or minority groups for the death penalty as

5  opposed to majority groups such as whites.

6        THE COURT:  Very well.  The Court will accept the

7  submissions.

8        MR. CLEMENTS:  All right, sir.  For clarity of the

9  record, may I just briefly summarize?

10        THE COURT:  You may.  You may.

11        MR. CLEMENTS:  Thank you.

12        THE COURT:  And if you wish, you don't have to be

13  brief.  You can be as long as you like.

14        MR. CLEMENTS:  Well, thank you.  And -- well, I'll

15  save that to later.  I am going to get a hearing aid after this

16  trial.  I thought Mr. Poole had called me something that

17  somewhat upset me.  But I won't go into that.

18        But this is, Your Honor, prepared by Mr. Kevin

19  McNally, who keeps up with all the federal death penalty

20  cases.  There has been 403 of them.

21        THE COURT:  In the history of the United States?

22        MR. CLEMENTS:  Yes, sir, the United States.  Well,

23  just federal court.

24        THE COURT:  That includes George Washington's

25  executions?

1          MR. CLEMENTS:  I'm not sure.  In fact--  I won't say

2    it.  Anyway, his memorandum and what he analyzes is the number

3    of cases where the Attorney General in Washington has withdrawn

4    the notice of intent to seek the death penalty as to nonwhite

5    killer of witnesses.  And that's--  He cites the cases.  And he

6    also lists the whites who have not killed witnesses--  Excuse

7    me.  Whites who have not killed witnesses have not faced the

8    death penalty.

9          And then the juries.  He lists the juries that have

10   sentenced numerous defendants to life who have been convicted

11   of witness killings.  And that's in his sworn-to declaration.

12   And then he has listed the white victim discrimination.  And

13   he lists each of the Attorney Generals, Attorney General

14   Ashcroft, Gonzales, and Mukasey.  And that shows the selection

15   rate.  And the selection rate, it shows that there have been

16   more minority groups or blacks selected for the death penalty

17   when there is a killing of a white or a majority person.  That

18   is what's referred to in his declaration, Exhibit Number A.

19          He also lists cases in which the facts of the

20   case -- such as RICO killings where there have been five or

21   six people killed, there's been torture, and there's been

22   significant aberrant behavior, in which the juries had

23   returned life sentences.  He has filed a summary of each case,

24   federal capital defendants accused of witness killings who

25   were not sentenced to death through September the 19th, '08,

1   with anywhere from eight- to ten-line summary of the facts of

2   the case.  And he has the race of the victim, the race of the

3   defendant, and the Attorney General that's approved the

4   seeking of the death penalty.

5           He's also attached as an exhibit every completed

6   authorized federal death penalty case which shows a guilty

7   plea, a not guilty plea, and what the jury verdict was, and

8   the race of the defendant and/or the victim.  He has done the

9   same thing for authorized federal capital defendants resulting

10  in a life sentence through September the 19th, '08, which

11  shows the race of the victim, the race of the defendant, it

12  shows the name of the Attorney General, it gives the -- like

13  the other exhibit I've referred to, it refers to the district

14  courts where the case was tried in, and gives the district

15  court number.  And that includes all those cases.  That

16  particular exhibit, I believe, will be defendant -- if I'm

17  writing it down right, would be S9.  I've written down four,

18  but that's changed with Exhibit A through D, which is

19  attached.  All of this information was previously given to the

20  U. S. Attorney's Office and resulted in an order in which the

21  Court denied all of Mr. McNally's testimony.  I would like to

22  have that filed, please, sir, as --

23          THE COURT:  The Court will accept that as a proffer.

24          MR. CLEMENTS:  Thank you, Your Honor.

25          THE COURT:  And I take it that the materials that

1 have been compiled by Mr. McNally are of cases that were

2 prosecuted by United States Attorneys; that is, they're

3 nonmilitary cases?

4          MR. CLEMENTS:  There's no--  There's no nonmilitary

5 cases.

6          THE COURT:  There are no military cases?  They're all

7 non- --

8          MR. CLEMENTS:  I mean, excuse me, no -- no military

9 cases.  There is one oddity in there I would like to point out

10 to the Court.  There is one espionage case.  The rest of them

11 were murder cases, as far as I know.

12          THE COURT:  And I take it some of them arose out of

13 Indian reservations?

14          MR. CLEMENTS:  Well, yes.  Yes, but, I mean, they

15 were all murder cases, as I remember it, except one espionage

16 case.

17          THE COURT:  On Indian reservations the federal

18 government has basically state law type jurisdiction for

19 murders, and in most of the country the United States would not

20 have that type of jurisdiction.  There has to be some type of

21 special statute which allows the case to come into federal

22 court.  It would also include, I guess, cases coming out of the

23 District of Columbia; although, I don't know if anyone out of

24 the District of Columbia has been sentenced to death.  There

25 may be, but I'm not familiar with it.

1          MR. CLEMENTS:  Judge, I don't remember it.  While I

2   read every case, I simply don't remember it.  I can't answer

3   correctly.  I just don't know.

4          THE COURT:  And there are a ton of murders in the

5   District of Columbia, but I don't know if --

6          MR. CLEMENTS:  But I don't believe there was--  If

7   the Court will give me just a moment, please, I have lost--

8   Let me--  Can I see that exhibit?

9          (Brief pause.)

10          MR. CLEMENTS:  There was the declaration that I

11   announced to the Court yesterday and I gave to Mr. Neff

12   yesterday, in which Mr. McNally updated his declaration,

13   stating all of the death penalty cases and some abbreviations,

14   I'd like to refer to the Court.  And he summarized some of the

15   more grave cases.  And he likewise provided the data sent by

16   Dr. Bell, who was the Ph.D. political scientist college

17   professor who has served as a Fellow on the Sentencing

18   Commission and done racial studies and analysis, and she -- we

19   filed a separate declaration that he refers to.  But it

20   indicates that defendants who kill a white victim or victims

21   are nearly three times as likely as other capital defendants to

22   be sentenced to death, the race of the victim is highly

23   statistically significant, and the likelihood that this occurs

24   by chance is essentially zero.

25          Now, Dr. Bell has done a -- while she is an

1  associate professor of political science, she has done a

2  quantitative analysis of data and relied upon the statistical

3  package.  And between August of 2006 and August of 2007, she

4  was one of the four United States Supreme Court Fellows.  She

5  explains in Table 1 the relationship between the presence of

6  white victims and the imposition of a death summons.  That's

7  in Table 1.  And in Table 2 she analyzes the relationship

8  between the presence of a white victim and the imposition of a

9  death sentence.

10      The bottom line of her conclusions, on Page 6, is

11  meaning that the probability of chance of these statistics is

12  less than 1/10 of 1 percent, or 1 in 1000.  So she is

13  basically saying that a defendant in a federal capital trial

14  was almost 2 1/3 -- actually the figure she used is 2.29 more

15  likely to be sentenced to death in a case involving a white

16  victim than a defendant in a case in which there was no white

17  victim.  These results are also statistically significant.

18  And she gives an equation there, indicating that the

19  probability that this relationship has been observed by chance

20  is zero.

21      So we would like to introduce the declaration as to

22  disproportionality as to Mr. McNally as S9, if it please Your

23  Honor, and we would like to introduce the declaration of

24  Dr. Bell, who I -- plus her CV of nine pages is attached, as

25  S10, who will verify the statistics that I have --

1           (Off-the-record discussion.)

2           MR. CLEMENTS:  Excuse me.  Mr. McNally's will be 10.

3           THE CLERK:  11.

4           MR. CLEMENTS:  And Dr. Bell's will be 11.

5           THE CLERK:  It should be 11 and 12.

6           MR. CLEMENTS:  Pardon me?

7           THE CLERK:  It should be 11 and 12.

8           MR. CLEMENTS:  Well, I'm sorry.  I'll correct myself

9      again.  Mr. McNally's will be 11, please, Your Honor.

10     Dr. Bell's will be 12.

11          (Defendant's Exhibits DS10, DS11, and DS12 were

12          received for identification only.)

13          MR. CLEMENTS:  I believe that we can agree with the

14     government that the United States Attorney General in

15     Washington is the one who ordered the local office to seek the

16     death penalty.  This was not an occasion where the local office

17     asked Washington for permission to seek the death penalty.  The

18     reason I bring it out is that in Mr. McNally's declaration

19     there is a heading of when the local U. S. Attorney sought the

20     death penalty and a heading as to when the United States

21     Attorney General in Washington sought the death penalty.  And

22     we're saying that both of those are disproportionate racially

23     and that it's been that way and it's borne out by Dr. Bell's

24     finding and Mr. McNally's declaration.

25          I don't think there is any dispute as to that, is

1  there?

2          (Off-the-record discussion.)

3          MR. NEFF:  Well, the Attorney General makes all of

4  those decisions.  Local U. S. Attorney's Office --

5          MR. CLEMENTS:  What I told the Judge is that he

6  ordered you-all to do it rather than you-all requesting to do

7  it.  That's what I told the Judge, and that's my understanding.

8          MR. NEFF:  I don't know that we can comment about

9  what our -- officially what our local position was, but --

10          MR. CLEMENTS:  I'm not asking you to comment about

11  your local position.

12          MR. NEFF:  Yes, I think all instances where the

13  U. S. Attorney's Office seek the death penalty, that has been

14  -- they've been instructed to do so by the Attorney General.

15          MR. CLEMENTS:  Well, I--  Well --

16          MR. NEFF:  I mean, maybe I'm not getting it, Howell.

17  I'm sorry.

18          MR. CLEMENTS:  Okay.  I'm sorry.  Well, at any rate,

19  we can agree that they were instructed by the U. S. Attorney

20  General in Washington to seek the death penalty.  I don't think

21  there is any -- any dispute as to that.  Then in that regard,

22  Your Honor, I think what I said, or I wouldn't have said it, is

23  true.

24          But I would like to ask the Court to examine, under

25  seal and in camera, certain things to back up the fact that we

1    think that there is a great racial disproportionate seeking of

2    the death penalty when a victim is white and a defendant is

3    black or African-American or a member of a racial minority

4    group.  We think that all the Attorney Generals --

5    overwhelmingly that has been the case.  We think that's been

6    the case as borne out by Mr. McNally and Dr. Bell's

7    declaration.

8              And to buttress that, we would like the Court to

9    examine in camera, and have them produced by either the United

10   States Attorney in Washington or here, the cases in which the

11   Attorney Generals of the United States have ordered a local

12   U. S. Attorney to seek the death penalty when the local U. S.

13   Attorney was not inclined to do so.  And we would like e-mails

14   and internal memorandum from the United States Attorney's

15   Office in Washington as to their instructions to the local

16   U. S. Attorney's Office as to whether or not to seek the death

17   penalty against Mr. Taylor, and the Death Penalty Prosecution

18   Memorandum as described in Section 73 of the Department of

19   Justice Criminal Resource Manual, and the Death Penalty

20   Evaluation Form for Homicides under Title 18, and all attached

21   memorandum as described at 74 of the Department of Justice

22   Criminal Resource Manual, and the Non-decisional Case

23   Identifying Information Form identifying the race of the

24   defendant and victims as described in Section 74 of the

25   Department of Justice Criminal Resource Manual, and the

1  captions and case numbers of any cases submitted to the

2  Capital Case Review Committee of the Department of Justice

3  between June 6, 2001, and the present date, with a description

4  of the offense and the ultimate disposition of the case and

5  the race or ethnic background of all defendants and victims;

6  plus, all standards, policies, and practices employed by the

7  Department of Justice to guard against the influence of

8  racial, political, or other arbitrary or invidious factors in

9  the selection of the cases and defendants for capital

10  prosecutions, and the Death Penalty Evaluation Form for

11  Homicides under Title 18, any correspondence——well, I've

12  already gone over that——a list of all death-eligible

13  indictments originating in the Eastern District of Tennessee

14  since June 6, 2001, the race of the defendant, and the race of

15  the victim.

16        I would also like to say that those documents were

17  all outlined in the memorandum in support of motion for

18  discovery and evidentiary hearing.  And that should be

19  Document Number 705.  And that's been outlined.  If I might --

20  and I know this is just a proffer which has been introduced as

21  to Mr. McNally and Ms. Bell, but my -- may I make one short

22  comment about the *Sampson* case?

23        THE COURT:  Yes.

24        MR. CLEMENTS:  The government--  The big difference

25  between the *Sampson* case that the government cited and is

1  apparently the lead case in which the court held that, yes,

2  disproportionality is relevant but it's confusing and

3  misleading to the jury, there's two or three things that we say

4  this case is different in.  The primary one is that in this

5  Taylor case, as opposed to the *Sampson* case where there were

6  three or four killings, that there is only one killing in this,

7  and that race was not made -- was not raised as an issue.  It

8  was raised in the *Sampson* case as disproportionate because --

9           THE COURT:  Was that the Massachusetts case?

10          MR. CLEMENTS:  Massachusetts, or Maryland?

11          (Off-the-record discussion.)

12          MR. NEFF:  Massachusetts.

13          THE COURT:  That was the case that Judge Wolf

14  presided over.  Judge Mark Wolf presided over it.

15          MR. CLEMENTS:  Sir?

16          MR. NEFF:  Massachusetts, Judge.

17          MR. CLEMENTS:  Massachusetts.  And, Judge, very good

18  judge.  Excellent written opinion, have no problem with it or

19  anything, but it mainly went off onto gravity of the crimes.

20  And the judge held it was relevant but it was just--  And she

21  cited, you know, the information, as opposed to Rule 403 or

22  402.

23          There is one other thing, and --

24          THE COURT:  Correct me if I'm wrong, not right, on

25  this case.  Was this the Veteran's Administration Hospital

1  killings?  Was that the case?

2          MR. CLEMENTS:  This was the killing of four different

3  people.  And the killings were--  Tied one man to a tree and

4  cut his throat, shot him.  And then there were two or three

5  others.  Isn't that the case?  Were there four killings?

6          MR. NEFF:  I think so.  I have a lot of cases running

7  through my mind.

8          MR. CLEMENTS:  Judge, I can find it, but I think

9  that's where there was four killings and a man's throat was

10  slit and they highjacked his car and tied him to a tree.

11          MR. NEFF:  Judge, do you want the cite for that case?

12          THE COURT:  No.

13          MR. CLEMENTS:  I can find it.

14          THE COURT:  I've read the case.  I've read several

15  cases, though, and they run --

16          MR. NEFF:  It's --

17          MR. CLEMENTS:  335 F.Supp.2d.  And the big thing is

18  that *Sampson* did not consider the issue of race in the proffer

19  at 18 U.S.C. 3593(f).  And of course the proffer is extremely

20  significant, because the jury, at the end of the day, has to

21  sign the affidavit that they haven't considered race or

22  religion.

23          Then also the court of appeals apparently

24  automatically has to review that there has been nothing that's

25  happened in the case, from their review, that is done in an

1    arbitrary or racially discriminatory factor.  In other words,

2    the court of appeals has to find the sentence was imposed

3    under the influence -- or can examine under the influence of

4    passion, prejudice, or any other arbitrary figure -- factor.

5          And we say the arbitrary factor in this case is the

6    fact that they're simply not seeking the death penalty and/or

7    withdrawing the death penalty notice as to when the defendant

8    is white and is killed by a black or minority defendant, and

9    that's wrong, plus it's arbitrary.

10         Now, also in the *Sampson* case——and I'll mention this

11   and sit down——the court applied the Federal Death Penalty

12   Act's balancing test, and found that the probative value of

13   the proposed testimony was outweighed by the danger of unfair

14   prejudice and confusion of the issues.  And the *Sampson* court

15   also found, however, that if the Federal Death Penalty Act

16   does not limit mitigation, the statutory list, which is not

17   exclusive but is merely illustrative--  And one thing that I

18   think *Sampson* pointed out that I thought was extremely

19   important is the fact that, under the sentencing guidelines, a

20   judge such as yourself, when you pass a sentence, you have a

21   vast pool of cases that are analogous cases to compare what

22   the sentence should be.  I mean, of course you have

23   discretion, and the guidelines aren't mandatory.  But a jury,

24   a jury, doesn't have that vast pool of comparison.  There is

25   no testimony in front of them.

UNITED STATES DISTRICT COURT

1        And some of these sentences, as to proportionality,

2   are simply irreconcilable.  You would think that somebody that

3   killed six people and tortured somebody, that if there is a

4   death penalty, would probably get the death penalty most of

5   the time.  Well, that hasn't been the case.  Some of the more

6   horrific and horrible cases with the worst aggravators and

7   very little mitigation are getting life sentences, and some

8   less, less, less culpable defendants are getting the death

9   penalty.  And that's simply disproportionality.  And we would

10  just like to point that out to the Court.

11        But I think the basic difference is, when you look

12  down at it at the end of the day, whether it was intentional

13  or not, or by accident, or whether or not there was racial

14  bias, that in practice——and the statistics back it up——in

15  practice, if I'm a white person and kill a minority, an

16  Afro-American, my chances of facing the death penalty are not

17  near as high as if it's a black or an African-American or

18  minority group killing a white person.

19        In fact, Professor Bell's statistics, as apparently

20  prepared under the direction of the Supreme Court, shows that

21  the ratio is nearly 3:1 on the statistical analysis.  And that

22  can't be right, under the Fifth, Eighth, or

23  Fourteenth Amendment.

24        And I appreciate the Court letting me make this

25  proffer and argument.  Thank you.

1          THE COURT:  Would the government like to make any

2     comments regarding the proffer?

3          MR. NEFF:  Judge, I don't know that I really have

4     much more to add other than what we put in the motion.  I think

5     the key here is that this is not a mitigating factor as to the

6     defendant.  I mean, I would agree with Mr. Clements that

7     somebody who has killed six people and tortured them ought to

8     get the death penalty, but I don't think that's an argument for

9     why Rejon Taylor shouldn't get the death penalty.  And this

10    kind of argument is very misleading for a jury because there is

11    no way to properly evaluate and compare facts from one case to

12    another.

13          It seems like the bottom line is, they want to say,

14    "Well, the Attorney General is racist, and that's why the

15    United States is seeking the death penalty against Rejon

16    Taylor," which is preposterous.  So, you know, as I put in the

17    motion in limine, I just think -- I don't even think -- I know

18    the judge in Massachusetts said it could arguably be relevant,

19    proportionality could arguably be relevant, but I would

20    suggest that it's not relevant, first of all; to the extent

21    that it is, it's heavily outweighed by prejudicial effect.

22    There is no way for a jury to be able to do any kind of

23    meaningful proportionality review.  They're assessing the

24    merits of their decision -- or they're assessing their

25    decision based upon the merits of the facts that were

1    presented to them in the case, as they should be, the facts

2    surrounding the defendant.

3              Obviously, Judge, I think there are circumstances

4    here which cut against the argument that there's some racial

5    motivation, seeing as how there are two other codefendants,

6    who are also black, who the Attorney General did not tell us

7    to seek the death penalty against.  I think there's clear

8    differences in culpability between each of the three, levels

9    of culpability between each of the three, and, you know, I

10   think that certainly suggests against any ulterior motive or

11   improper motive by the United States to seek the death penalty

12   just because Rejon Taylor is black and the victim happens to

13   be white.

14             So our view is that it's -- Number 1, it's not

15   relevant.  To the extent that it is relevant, any relevance it

16   has is significantly outweighed by its prejudicial effect.

17   That's not even the standard.  It's just whether the

18   prejudicial effect outweighs the probative value.  So it's not

19   like other instances -- it's not like other 401 and 403

20   balancing tests where it has to be substantially outweighed.

21             So unless the Court has any questions for me, that's

22   all I have.

23             MR. CLEMENTS:  Your Honor, may I double-check to make

24   sure I got both -- all three exhibits in?

25             THE COURT:  You may.

1          (Off-the-record discussion.)

2          MR. NEFF:  Judge, those exhibits that they admitted,

3  I'm assuming those are -- in the Army we used to call it

4  appellate exhibits.  But I think they've numbered them the same

5  way we've numbered the other exhibits.  I assume those are

6  exhibits associated only with the proffer.

7          THE COURT:  That's correct.

8          MR. CLEMENTS:  Yes, they were only proffered.  Judge

9  Collier has already overruled.  They're marked ID only, and

10  they were Mr. McNally's declaration, Ms. Bell's declaration and

11  brief.  And I went through the captions of the brief.  But

12  they're all marked ID.

13          MR. NEFF:  Okay.

14          THE COURT:  I appreciate the testimony of the witness

15  and the information presented by counsel.  The Court will take

16  into account both the witness's testimony and the presentation

17  in preparing the memorandum that the Court indicated was

18  forthcoming to explain the order that has already been issued.

19          MR. LEE ORTWEIN:  Should I keep Mr. Aiken here, or

20  send him back to North Carolina?

21          THE COURT:  Well, I can tell you what the bottom line

22  is.  The Court would not permit Mr. Aiken to give testimony

23  about any particular institution that the defendant might be

24  sentenced to.  The Court also would not permit Mr. Aiken to --

25  Dr. Aiken to testify about the facility in Florence, Colorado.

1   And the Court would not permit the witness to testify about the

2   general conditions in federal prisons.  I think that would take

3   care of the bulk of his testimony.

4          If you wanted to call him for the sole purpose of

5   testifying that after the conclusion of this trial at some

6   point the defendant will be transferred to the Federal Bureau

7   of Prisons and at a Federal Bureau of Prisons facility the

8   security will be different than what's at the Hamilton County

9   Jail, the Court would permit that.  I don't know that that's

10  really an issue, though.

11         MR. LEE ORTWEIN:  Yeah, I don't, either, Judge.

12         THE COURT:  Would the government be willing to

13  stipulate to that?

14         MR. NEFF:  We would.

15         MR. WILLIAM ORTWEIN:  We may still want to put him

16  on--  I'm sorry, Judge.  I need to stand up.  We may still want

17  to put him on, because I think there are other issues Your

18  Honor has to consider relative to -- the testimony is, he's not

19  a gang member, what effect that is, about how snitches are

20  handled and why.  The government has talked about snitches, or

21  we have, because of Mr. Uhuru's letter.

22         THE COURT:  Well, Mr. Aiken -- Dr. Aiken obviously

23  knows a lot more about the prison system than I do, but we'd

24  have to be very careful to confine his testimony to just the

25  federal system and not the state system.

1        MR. WILLIAM ORTWEIN:  That's what we intend to do to

2   begin with, if it please the Court, just as to the federal

3   system.  He's been to every one of these penitentiaries.

4        THE COURT:  Well, I think there are well over a

5   hundred federal institutions now.  They're building them every

6   day, just about.

7        MR. WILLIAM ORTWEIN:  I'm sorry.  What about --

8        THE COURT:  And the culture differs in each one.

9        MR. WILLIAM ORTWEIN:  I'm talking about high-security

10  penitentiaries where Mr. Taylor will automatically go.

11       THE COURT:  Well, the witness did not say that.  The

12  witness said he might go to a medium-security or

13  maximum-security facility.

14       MR. WILLIAM ORTWEIN:  I beg to disagree with the

15  Court.

16       MR. LEE ORTWEIN:  That's incorrect.

17       THE COURT:  No, I listened to him carefully.  That's

18  what he said.

19       MR. WILLIAM ORTWEIN:  High-security.  He could be

20  possibly sent later to medium, or later on to SHU, SHUTE, or

21  whatever it is.  But originally, his testimony is, he would go

22  to high-security.

23       THE COURT:  Well, you may be using the term

24  "high-security" --

25       MR. WILLIAM ORTWEIN:  Well --

            THE COURT:  -- in a sense different than what he

said.  What he said--  There is no such thing in the federal

system as a high-security system.  The classifications are

camp, minimum security, medium security, and maximum security.

            MR. WILLIAM ORTWEIN:  Yes, sir.

            THE COURT:  Those are the categories.  I think what

the witness was saying, he was lumping the top two in the same

category, which he was calling "high."

            MR. WILLIAM ORTWEIN:  Judge, I'm sorry.  I disagree

with the Court as to what I heard.  But it's obvious that all

prisoners who have a life sentence go to certain institutions.

            THE COURT:  I think that's true.

            MR. WILLIAM ORTWEIN:  And there is a commonality in

all of these institutions where there's security, the risk of

the prisoners, and how they are treated, regardless of whether

it's Terra Haute, Colorado, Atlanta, because they all come

under the same protocols.  And a day in the life of a

prisoner --

            THE COURT:  That may be also the case for a

medium-security prison.

            MR. LEE ORTWEIN:  Well, Judge, then I'd ask that you

strike the government's ability to argue that Rejon Taylor has

demonstrated he is an escape risk thereby warranting increased

security classification for incarceration.

            MR. WILLIAM ORTWEIN:  That's in the opening

1  statement?

2         MR. LEE ORTWEIN:  It's not only in the opening

3  statement, I believe.  And I may be wrong.  So I want it

4  stricken.  If we can't put any evidence on it to rebut their

5  allegation, I don't -- you know, I don't see any reason why

6  they should be allowed to argue it to the jury.  I don't see

7  why it should be in the indictment.  You know, this is one of

8  the allegations that the government has set forth as a reason

9  that he should die.  So I think we should be free to put on

10 testimony to rebut that at least.

11        THE COURT:  Well, that was part of the reason the

12 Court suggested that if the witness wanted to testify that at

13 some point he'll be transferred from Hamilton County Jail to a

14 Bureau of Prisons facility and at a Federal Bureau of Prisons

15 facility the security will be greater and different than it is

16 at Hamilton County Jail, I think that responds specifically to

17 the government's argument.

18        MR. WILLIAM ORTWEIN:  And about the difference

19 between the securities with respect to both, between the

20 Hamilton County Jail and the federal penitentiaries?

21        MR. NEFF:  We agree that the security will be greater

22 at a Bureau of Prisons facility.

23        THE COURT:  Yeah.

24        MR. WILLIAM ORTWEIN:  Well, we would still like to

25 offer him to testify to it, please the Court.

1          THE COURT:  If that's what he will testify to, as I

2    say, you can put him on if you wish him to testify to that.

3          MR. WILLIAM ORTWEIN:  Okay.

4          THE COURT:  But he cannot testify as to specific

5    institutions.

6          MR. WILLIAM ORTWEIN:  That's fine.  That's --

7          MR. CLEMENTS:  I had just --

8          (Off-the-record discussion.)

9          MR. CLEMENTS:  Can I say something?

10          THE COURT:  Let's let Mr. Ortwein finish.  I think

11    he's thinking about whether he can say something else.

12          MR. LEE ORTWEIN:  No, he's been fully heard, Judge.

13    Thank you.

14          MR. CLEMENTS:  I just wanted to state, and I probably

15    did state but have forgotten it, what I did state as to

16    Mr. McNally and Dr. Bell, that would have been their sworn

17    testimony before the Court, and they were willing to be here.

18          THE COURT:  Yeah, the Court has accepted it as a

19    proffer under Rule 103 of the Federal Rules of Evidence.  Is it

20    103(c)?

21          MR. CLEMENTS:  I believe that's it, yes, sir.

22          MR. NEFF:  It's 103(a)(2), is it not, Judge?

23          THE COURT:  Yes, 103(a)(2) and 103(b).

24          MR. CLEMENTS:  All right, sir.  Thank you.  One

25    further question, and I'll sit down.  Does Your Honor have any

1    anticipation of when we will receive the jury charge --

2    proposed jury charge?

3              THE COURT:  How about at the close of--  Well, let's

4    see.  You expect to go all day tomorrow?

5              MR. CLEMENTS:  Yes, sir.

6              THE COURT:  We'll take Thursday and Friday off.  How

7    about Friday afternoon?

8              MR. CLEMENTS:  All right, sir.

9              THE COURT:  That will give you three days to go over

10   it --

11             MR. CLEMENTS:  Okay.

12             THE COURT:  -- plus whatever evidence comes in on

13   Tuesday.

14             MR. CLEMENTS:  Sir?

15             THE COURT:  Plus whatever evidence is taken on

16   Tuesday.

17             MR. CLEMENTS:  Evidence.  Thank you, Your Honor.

18             THE COURT:  Is there anything further?

19             (Off-the-record discussion.)

20             MR. NEFF:  No, thank you, Your Honor.

21             MR. CLEMENTS:  Bill, anything further?

22             MR. WILLIAM ORTWEIN:  No, Your Honor.  Hopefully not,

23   Judge.  I'm sure I'll think of something after we leave, but

24   not right now.

25             MS. CORY:  Your Honor, I was wondering where we are

1   with the juror situation.

2           THE COURT:  If you ever run into Donna Mikel, you

3   should commend her.  She was able to discuss things with the

4   hospital.  The hospital has seen the error of their ways, and

5   they've agreed not only to resume paying the juror but also to

6   give her backpay.  As I understand it, they will have a check

7   for her this afternoon.

8           MR. WILLIAM ORTWEIN:  She needs thanking for doing

9   that.

10          MS. CORY:  We'll make a point of running into her.

11          THE COURT:  Ms. Palmer.

12          (Evening recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25