1        IN THE UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF TENNESSEE

3                  AT CHATTANOOGA
------------------------------------------------------------
4                              :
UNITED STATES OF AMERICA,      :
5                              :
            Plaintiff,         :
6                              :
v.                             :          1:04-CR-160
7                              :
REJON TAYLOR,                  :
8                              :
            Defendant.         :
9  ------------------------------------------------------------
                              Chattanooga, Tennessee
10                             October 14, 2008

11        BEFORE:  THE HONORABLE CURTIS L. COLLIER,
                  CHIEF UNITED STATES DISTRICT JUDGE
12
APPEARANCES:
13
            FOR THE PLAINTIFF:
14
            STEVEN S. NEFF
15          CHRISTOPHER D. POOLE
            Assistant United States Attorney
16          1110 Market Street, Suite 301
            Chattanooga, Tennessee  37402
17
            FOR THE DEFENDANT:
18
            WILLIAM H. ORTWEIN
19          Post Office Box 38
            Hixson, Tennessee  37343
20
            HOWELL G. CLEMENTS
21          1010 Market Street, Suite 401
            Chattanooga, Tennessee  37402
22

23
                     JURY TRIAL
24            SEVENTEENTH DAY OF TRIAL

25

1   APPEARANCES:   (Continuing)

2

3          FOR THE DEFENDANT:

4          LESLIE A. CORY
           FREDERICK L. ORTWEIN
5          1010 Market Street, Suite 306
           Chattanooga, Tennessee  37402

6

7                          – – –

8

9                    INDEX OF PROCEEDINGS

10

11  MARK DOUGLAS CUNNINGHAM
         Cross-Examination by Mr. Poole. . . . . . . . . .   2459
         Redirect Examination by Mr. Lee Ortwein . . . . .   2464
12
    JAMES J. MELIA
13       Direct Examination by Mr. Poole . . . . . . . . .   2484
         Cross-Examination by Mr. William Ortwein. . . . .   2495
14
    Charge Conference . . . . . . . . . . . . . . . . . .   2499
15
    Closing Argument by Mr. Poole . . . . . . . . . . . .   2562
16
    Closing Argument by Mr. William Ortwein . . . . . . .   2584
17
    Rebuttal Argument by Mr. Neff . . . . . . . . . . . .   2610
18
    Jury Charge . . . . . . . . . . . . . . . . . . . . .   2628
19

20

21

22

23

24

25

1                       GOVERNMENT'S EXHIBITS

2

3     S3      CD of telephone calls                          2487

4     S3A     Transcript of Exhibit S3 (For ID only)         2487

5     S4      CD of telephone calls                          2489

6     S4A     Transcript of Exhibit S4 (For ID only)         2489

7

8

9

10

11                      DEFENDANT'S EXHIBITS

12

13    DS18    Transcript of call (Government's S4A)           2497
              (For identification only)
14

15    DS19    CD of Power Point slide used during             2645
              government's closing argument
16            (For identification only)

17

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated.

2          The witness may return to the stand.

3          MS. CORY:  Your Honor, before Dr. Cunningham takes

4    the stand, we received an order and memorandum the Court had

5    issued, I guess this morning.  I have not had an opportunity to

6    fully review it, but we would request an opportunity to get

7    some clarification on the motion regarding Dr. Cunningham's

8    testimony.

9          THE COURT:  Very well.

10          MS. CORY:  It was my hope that this would be--  My

11    apologies to the jury, but it was my hope that this would be a

12    jury-out conference so Your Honor could explain some of the

13    rulings.

14          THE COURT:  What page do you have?

15          MS. CORY:  One specific page is Page 28 of the

16    ruling.  Your Honor references a specific case, which does

17    stand for one proposition but does not stand for another

18    proposition.

19          THE COURT:  The *Edelin* case?

20          MS. CORY:  Yes, Your Honor.  In that case the

21    government withdrew its future dangerousness aggravator.

22          THE COURT:  Which made it irrelevant.

23          MS. CORY:  Which made testimony regarding future

24    dangerousness --

25          THE COURT:  Irrelevant.

1          MS. CORY:  -- irrelevant.

2          THE COURT:  And the parallel is, because of the facts

3     in this case, that same testimony is irrelevant.

4          MS. CORY:  The parallel, to us, would be that this

5     jury is going to have to decide Rejon Taylor's future, and they

6     have no context for deciding what his future is going to be

7     like.  And we have experts who could tell the jury what his

8     future is going to be like.

9          THE COURT:  Well, this Court has complete confidence

10    that the jury will use its knowledge and its intellect and

11    reach the appropriate decision.  And the jury can do that

12    without irrelevant information being presented to it.

13         MS. CORY:  The jury does have one member who has

14    done, I think, some private volunteer work at state facilities.

15    And they will probably rely on him to tell them what Rejon

16    Taylor's future is like.  And I think that that would be

17    inappropriate and irrelevant, but I think it's very likely to

18    happen.

19         THE COURT:  Right.  That would also be inappropriate.

20    And the Court would be prepared to tell that particular juror

21    that she should not do that in deliberation.

22         MS. CORY:  Thank you, Your Honor.  The other matter

23    that was of particular concern to us -- and the Court may have

24    addressed it and I simply not have seen it.  But regarding

25    Dr. Cunningham's expertise, we provided the Court with numerous

1  affidavits from other very learned social scientists, we

2  provided the Court with his body of scholarly work wherein he

3  has done both large-scale and small-scale studies of various

4  prison populations, and the Court has ruled that Dr. Cunningham

5  is incompetent as an expert to testify in regard to the very

6  matters that he is acknowledged throughout this country as an

7  expert on.  And we would like the Court to at least reconsider

8  that part of its ruling of last week.

9          THE COURT:  Well, to the extent that the Court

10  indicated that Dr. Cunningham was not knowledgeable in areas in

11  which he's written and spoken, that was not the Court's intent

12  to say.  I don't believe, though, that the witness was being

13  offered as an expert in Bureau of Prisons rules, regulations,

14  policies, et cetera.  I think he was a fact witness there.

15          With respect to any testimony about Bureau of

16  Prisons rules, policies, or procedures, that's actually a role

17  of the Court and not of any witness.  So Dr. Cunningham should

18  not be giving any testimony about what the policies,

19  procedures, or rules of the Bureau of Prisons are.  That's a

20  legal instruction that could only come from the Court.  And to

21  the extent he's talking about particular prisons and things,

22  he becomes a fact witness.  And his expertise has nothing to

23  do with him being a fact witness.

24          MS. CORY:  Yes, Your Honor.  We were putting him

25  forward in terms of his -- the studies he has conducted

1    regarding different prison populations, different types of

2    offenses --

3            THE COURT:  Well, I don't question his ability to

4    have knowledge in those areas.  That was not what the Court--

5    I hope I didn't say that.  That surely was not the Court's

6    intent.  But when he starts talking about the Bureau of

7    Prisons' policies and procedures and what they're going to do,

8    he's not testifying as an expert then, he's testifying as a

9    fact witness.

10           MS. CORY:  Yes, Your Honor.  So the Court was not

11   questioning his expertise in his particular --

12           THE COURT:  Field, no.

13           MS. CORY:  -- field as a social scientist who has

14   studied prison populations, only he cannot venture over into

15   the role of the Court and the judges.  Is that correct?

16           THE COURT:  That's correct.  And to a lesser extent,

17   when he becomes a fact witness, there has to be some minimal

18   standards of reliability there.  The rules of evidence are

19   relaxed here.  So it is not strictly true that we hold a fact

20   witness in this type of hearing to the same standards as in the

21   guilt phase, but, for example, if the defendant's sister came

22   in and started telling us about what particular Bureau of

23   Prisons facilities do and what their capabilities are, I don't

24   know that we would want that.  She is a fact witness, and she

25   is talking about things.  She may have studied these things,

1  she may have looked at TV to get information, may have

2  interviewed people, she may have made visits, but I'm just not

3  comfortable that's the type of evidence we need to be having in

4  this type of proceeding.  But the ultimate issue is that the

5  testimony that Dr. Cunningham was going to give is not relevant

6  to the issues in this particular case.  It might be relevant in

7  some other case, but it's not relevant in this particular case.

8       MS. CORY:  Thank you, Your Honor.  We would still

9  tender him as an expert, and retain our position that he has

10  sufficient factual knowledge.  But I understand Your Honor's

11  ruling.

12       THE COURT:  And I think *United States v. Johnson*

13  tells me what I have to do when that is -- when that offer is

14  made?

15       MS. CORY:  Yes, sir.  Thank you.

16       THE COURT:  Cross-examination?  And, Mr. Poole, in

17  your cross-examination, in light of our discussion, then, stay

18  away from any mention of the Bureau of Prisons.

19       And, Dr. Cunningham, I'd ask you to do the same

20  thing.  In your responses, do not mention the Bureau of

21  Prisons.

22       And, Mr. Poole, why don't you try to ask just

23  leading questions.  That might minimize the risk of us getting

24  into the Bureau of Prisons.

25       MR. POOLE:  Yes, sir.  I will.

1          THE WITNESS:  Yes, sir.

2                          CROSS-EXAMINATION

3     BY MR. POOLE:

4     Q          Good morning, Dr. Cunningham.

5     A          Good morning.

6     Q          My name is Chris Poole, from the U. S. Attorney's

7     Office.  We met briefly last week, I think.

8     A          Yes, sir, that's correct.

9     Q          Thanks for coming back, I guess, this morning.

10    A          Thank you.

11    Q          You testified last week about your background with

12    respect to articles you had written and schooling and Navy and

13    all the research you had done.  And you testified that a lot

14    -- I think you were talking about your writing or your

15    researching was a hobby of yours.  Is that correct?

16    A          Yes, sir.  It's part of my identity as a scientist,

17    but I also enjoy it for its own sake.

18          THE COURT:  Dr. Cunningham, why don't you just answer

19    yes or no to the questions.  If you can't answer the question

20    yes or no, just say that you can't.  The burden will be on the

21    attorney to ask questions that you can answer yes or no.  He

22    asked you if you said something about a hobby.  And the answer

23    to that is, "Yes, I said that," or "No, I did not say that."

24    There was no need for anything further.

25          Go on, Mr. Poole.

1              (Off-the-record discussion.)

2    BY MR. POOLE:

3    Q       So your researching and writing are a hobby in that

4    your testimony was you were not compensated for them.  Is that

5    correct?

6    A       That's correct.

7    Q       You are, however, compensated for work like you've

8    done today, coming in, testifying, researching a defendant,

9    things of that nature.  Is that correct?

10   A       Yes, sir.

11   Q       How much are you paid per hour for this type of

12   work, sir?

13   A       My fee is $300 per hour.

14   Q       Okay.  How many hours have you spent on this case?

15   A       Approximately 100.

16   Q       So how much money have you made on this case?

17   A       The total billings are about $30,000.

18   Q       Okay.  And this is--  You do this type of work, you

19   come, you testify in these types of cases all over the

20   country.  Is that correct?

21   A       Yes, sir.

22   Q       About how many times do you do that a year; do you

23   know?

24   A       It varies by year.  About 15 or so times a year.

25   Q       How many times have you testified in a capital case

1  in your career?

2  A        Approximately 135 times.

3  Q        And in those 135 times, you've never testified on

4  behalf of the state or on behalf of the prosecution.  Is that

5  correct?

6  A        I can't answer that question the way it's phrased.

7  Q        You have always been called by the defense, have you

8  not, in those 135 cases?

9  A        Yes, sir, that's correct.

10  Q        Do you still see patients, sir?

11  A        No, sir.

12  Q        So 100 percent of your income is derived from this

13  type of work.  Is that correct?  Is that fair?

14  A        I can't answer that question the way it's phrased.

15  Q        All right.  What percentage of your income is --

16           THE COURT:  You can ask him is it more than

17  90 percent, more than 80 percent, instead of asking him to

18  answer the question --

19  BY MR. POOLE:

20  Q        Is your income -- is the percentage of your income

21  for work like this where you've made $30,000 on this case,

22  approximately, work like this, is that more than 90 percent of

23  your income?

24  A        All of my practice is court-related.  Not all of it

25  is in capital cases, but all of it is court-related.

1    Q        You formerly saw patients, did you not?

2    A        Yes, sir.

3    Q        And when you saw patients, I assume that you

4    actually met with the patients and talked to them about their

5    background, about whatever problems they were having.  Is that

6    correct?

7    A        Yes, sir.

8    Q        You did not, in this case, however, talk to the

9    defendant.  Is that correct?

10   A        That's correct.

11   Q        You base your testimony on interviews of his family

12   and friends and loved ones.  Is that correct?

13   A        In part, yes.

14   Q        You never met with the defendant in the several

15   years you've been hired in this case.  Is that correct?

16   A        No, sir, I did not.

17   Q        You did talk with his mother, Ms. Reba Taylor.  Is

18   that correct?

19   A        Yes, sir.

20   Q        And you testified about the fact that the defendant

21   was actually conceived while his dad was on escape status.  Is

22   that correct?

23   A        Yes, sir.

24   Q        And you got that information, I assume, from

25   Ms. Reba Taylor as well as interviews with Johnny Taylor, his

1    dad.  Is that correct?

2    A        Yes, sir.

3    Q        And you testified that Ms. Reba Taylor helped

4    Mr. Johnny Taylor escape.  Is that correct?  Or harbored him,

5    or something of that nature.  Is that correct?

6    A        She was harboring him, and she also received a

7    probated sentence for trying to prepare some sort of false ID

8    for him while he was in prison.

9    Q        Okay.  And you also testified -- you were talking

10   about the eerie similarities, I believe, between Mr. Johnny

11   Taylor and Mr. -- and the defendant here, Mr. Rejon Taylor?

12   A        Yes, sir.

13   Q        And you talked about how they each had committed a

14   murder at a young age, correct?

15   A        Yes, sir.

16   Q        And Mr. Johnny Taylor had escaped.  Mr. Rejon Taylor

17   attempted to escape relatively shortly thereafter.  Is that

18   correct?  Similar pattern.  Is that correct?

19   A        Similar patterns.

20   Q        Okay.  Did Ms. Reba Taylor also tell you that she

21   attempted to help Mr. Rejon Taylor escape?

22   A        I did not question her about that.  I saw that in

23   the records, but I did not question her about that.

24   Q        Okay.  You talked a little bit about frontal lobe

25   development and how at the age of 18 or 19 the frontal lobe is

1    not necessarily fully developed.  Is that correct?

2    A        That's correct.

3    Q        And it develops, I guess, over time.  Is that

4    correct?  I mean, as you get older it becomes more fully

5    developed.  Is that fair?

6    A        That's fair.

7    Q        Based--  And I assume your assumption is that 18- or

8    19-year-olds don't always -- based on this frontal lobe

9    development, don't always make the best decisions.  Is that

10   correct?  Is that the point of that?

11   A        They are vulnerable to bad decisions and bad

12   judgment as a result of their immature brain development.

13   Q        Based on that, would a 21- or 22-year-old be less

14   vulnerable to bad decisions than an 18-year-old, based on

15   frontal lobe development?

16   A        Generally, yes.

17            MR. POOLE:  Just one second, please, Your Honor.

18            (Off-the-record discussion.)

19            MR. POOLE:  No further questions.

20            THE COURT:  Redirect?

21                         REDIRECT EXAMINATION

22   BY MR. LEE ORTWEIN:

23   Q        Dr. Cunningham, you've never been called by the

24   prosecution to testify for them?

25   A        No, sir, that's not correct.  I've been called on

1    many occasions by the state.  I've never been called by the

2    state in a capital case.

3    Q        Okay.  So you have testified for prosecutors before,

4    against criminal defendants?

5    A        Yes, sir.  I never testify for anybody.  But I have

6    been called by the state.

7    Q        Okay.  Well, let's talk about that for a second.

8    You don't testify for anyone, do you?

9    A        That's correct.

10   Q        Okay.  No matter how much you were to get paid, your

11   testimony would be whatever the truth is.  Is that not

12   correct?

13   A        Yes, sir.  I'm paid for my time.

14   Q        Okay.

15   A        My findings and opinions are not for sale.

16   Q        Okay.  And obviously if you testified to something

17   that wasn't true, and it was proven not to be true, what would

18   that mean for your career?

19            THE COURT:  That's not an appropriate question.

20            MR. LEE ORTWEIN:  I'm sorry?

21            THE COURT:  Ask another question.

22            MR. LEE ORTWEIN:  If the Court could explain to me

23   why that's not appropriate.

24            THE COURT:  Do you have any other questions?  Are you

25   done with this witness?

1          MR. LEE ORTWEIN:  I have more questions.

2          THE COURT:  Well, go on, then.

3     BY MR. LEE ORTWEIN:

4     Q          You testified that you were -- you're paid $300 an

5     hour?

6     A          Yes, sir.

7     Q          Okay.  And what's the standard rate for a

8     professional like yourself?

9     A          That's on the low end of the scale for psychologists

10    and psychiatrists that testify on a national basis.  Most of

11    the colleagues that I'm familiar with who have that kind of

12    practice are charging from 400 to 600 an hour.

13    Q          Okay.  So your rate's lower than the typical rate,

14    correct?

15    A          Yes, sir, for psychologists that are testifying --

16    are working on a national basis.

17    Q          Okay.  And when you are retained for a case like

18    this, you are actually -- you have to get approval of the

19    court, do you not?

20    A          Yes, sir.

21    Q          Okay.

22         THE COURT:  Counsel?

23         MR. LEE ORTWEIN:  I'm sorry?

24         THE COURT:  That's-- I'm not sure what you meant by

25    that.

1          Ladies and gentlemen, I'm not sure what Mr. Ortwein

2    meant.  I'm quite sure that his question was asked in good

3    faith and the answer was answered in good faith.  But this

4    Court had absolutely no involvement at all in approving any

5    witnesses in this case.  That is not the role of the Court,

6    and the Court would never do that.  This is the first time the

7    Court has ever seen this witness, when he testified, I guess

8    it was on Wednesday of last week.  And if I even was aware of

9    his name before that, it may have been because of some

10   documents that the lawyers have filed.  But this Court has not

11   approved or authorized any witness at all.

12        Counsel.

13        MR. LEE ORTWEIN:  Yes, sir.

14   BY MR. LEE ORTWEIN:

15   Q        Explain to us how you get paid.

16   A        I submit detailed billings that describe the date

17   and specific amount of time and activities that I was involved

18   in in creating that billing.  Those are created on a daily

19   basis and summarized into invoices monthly.  That's attached

20   to what's called a CJA 31 form, which is a form that is then

21   filed with the attorneys, who sign off on it, who then file it

22   with the Court, who then signs off on a thing, they send it up

23   to the circuit court.  But that's how the billings are

24   approved and ultimately paid.

25   Q        Okay.  So when you get a check, it's from the

1  government; it's not from the defense lawyers?

2  A        That's correct.

3           MR. LEE ORTWEIN:  Okay.  That's all.

4           Thank you, Judge.

5           THE COURT:  Thank you, Dr. Cunningham.

6           THE WITNESS:  Thank you, sir.

7           THE COURT:  You may step down.

8           (Witness excused.)

9           THE COURT:  Call your next witness.

10          MR. WILLIAM ORTWEIN:  Please the Court, the defense

11  rests.

12          THE COURT:  Ladies and gentlemen, you've just heard

13  Mr. Ortwein indicate that the defense rests.  That means that

14  the defense has presented all of the information it cares to in

15  this phase of the case.

16          Mr. Poole, Mr. Neff, will there be any rebuttal

17  evidence?

18          MR. POOLE:  Yes, sir.  We have one witness, Your

19  Honor, in rebuttal——Special Agent Melia.

20          (Brief pause.)

21          MR. POOLE:  Judge, can we do something with this

22  screen?

23          THE COURT:  Yes.

24          MR. WILLIAM ORTWEIN:  Your Honor, before they offer

25  evidence, I have a motion in limine.

1          THE COURT:  Okay.  Ladies and gentlemen, let me have

2     you step outside, please.

3          (The jury exited the courtroom, and the proceedings

4          continued as follows:)

5          (Brief pause.)

6          THE COURT:  Counsel?

7          MR. WILLIAM ORTWEIN:  If it please the Court,

8     Mr. Poole has just briefly, I think, attempted to show me what

9     they were intending to introduce.  I was going to make a motion

10    in limine, since the defense has not offered any evidence of

11    the lack of remorse, that the government be prevented, in its

12    rebuttal, from introducing any evidence of lack of remorse.

13    Also, if the government intends -- and I don't know that they

14    do, Judge.  I'm not quite sure what they're going to introduce,

15    candidly, or attempt to introduce.  Any evidence--  There's a

16    letter, I think, or statement about Mr. Taylor saying he would

17    like to go to Colorado because of the facilities there.  I

18    would move that -- to exclude that from the government's

19    evidence, as Your Honor excluded specific security matters

20    relative to specific federal institutions.

21          And I think, Judge, and I'm not sure, from just a

22    brief conversation with Mr. Poole, and I don't recall the

23    contents of it at this point, that they intend to, at this

24    time, attempt to introduce a statement, I believe, from--

25          Mr. Poole, if I'm wrong --

1          MR. POOLE:  I'll be glad to talk to the --

2          MR. WILLIAM ORTWEIN:  -- Sir Jack, Sir Jack Matthews

3    made.  And to be candid with the Court, I don't remember what

4    that conversation was, we've had so much evidence.  But

5    Mr. Poole graciously said that he would bring it up before he

6    attempted to introduce it to the jury.

7          THE COURT:  Okay.  Let's take them up one at a time.

8    The first one was remorse.  As I recall, the information

9    presented by the defense consisted of a number of witnesses who

10   were friends or relatives of the defendant who talked about his

11   upbringing and his life, then we had --

12         MR. LEE ORTWEIN:  There you go.

13         THE COURT:  -- testimony from Lieutenant Coppinger

14   who talked about his adjustment at the jail while he's been in,

15   there was a prison chaplain who talked about the same thing

16   from a different aspect, then we had testimony from Mr. Aiken

17   and we had testimony from Dr. Cunningham.  I don't recall that

18   in any of that information anybody made statements regarding

19   the defendant being remorseful.  So I don't know if there is

20   anything to rebut on that.  I may be missing something.  It's

21   been a while.

22         MR. POOLE:  Judge, my understanding was--  I think

23   you're right about the evidence offered.  But my

24   understanding——might be wrong——on the Court's order with regard

25   to the defendant being allowed to allocute was that we could

1  rebut the defendant's statements.

2           THE COURT:  Yes.

3           MR. POOLE:  And --

4           THE COURT:  But I don't know that he --

5           MR. NEFF:  He didn't say he was sorry.

6           THE COURT:  I don't know that he said anything in his

7  statement, though, about being remorseful.

8           MR. POOLE:  Well, no, Judge, he didn't, really, but

9  he did say that he "never knew so many people could be hurt by

10 such a costly mistake.  It's just the pain and hurt I caused

11 Mr. Luck's family, my family.  Just facing this every day, it

12 was -- really, really hurt, it hurt a lot."  He talked about he

13 was thinking about committing suicide when he was talking about

14 this.  I think it's arguably--  I'm going to argue to the jury

15 he hasn't shown any remorse.  But maybe this is, arguably, an

16 attempt he was talking about remorse, Judge.

17          THE COURT:  I don't think what he was doing is saying

18 anything at all about remorse.  If you think you have some

19 evidence that rebuts that particular statement, I think you

20 would be entitled to offer that.  I'm not sure that what he was

21 saying indicates lack of remorse.  I think what you want to do

22 is show he said X and you've got information that contradicts

23 X.

24          MR. POOLE:  Well, that's correct, Judge.  What we're

25 talking about is something that the Court allowed in on the

1   case in chief but we didn't put it in on the case in chief.

2   And I understand that was at our own peril.  The fact he says,

3   "the pain, and facing that every day, it was really, really

4   hard," I think the phone call where he laughs about Mr. Luck's

5   fiancée in response to the person on the other end of the phone

6   talking about her testimony does rebut that.  That's why we

7   would like to call--  With regard to rebutting the fact that

8   he's saying it's really hard thinking about the pain he's

9   caused Mr. Luck's family, we've got a phone call where he's

10  laughing about that.  I think that does directly rebut whether

11  it's an attempt at remorse or just a statement.  I think that

12  would be relevant.  And we would like to --

13          THE COURT:  I think that would be admissible.  I

14  don't see anything, though, even taking into account

15  Mr. Taylor's statements, that, in my mind, goes to remorse.  So

16  I think Mr. Ortwein's objection, then, is well-taken, and the

17  Court will sustain any information that would demonstrate a

18  lack of remorse.

19          MR. POOLE:  That --

20          THE COURT:  What was the other thing Mr. Ortwein

21  said?

22          MR. WILLIAM ORTWEIN:  First, I don't know if they're

23  going to offer it.  Let me say this.  But there is somewhere

24  within either a phone call or a letter wherein Mr. Taylor says

25  he would like to go to the Colorado penitentiary because --

```
 1              THE COURT:  Mr. Poole, why would you want to put that
 2    in?
 3              MR. WILLIAM ORTWEIN:  Sir?
 4              THE COURT:  I'm asking Mr. Poole why in the world
 5    would he want to put that in.
 6              MR. WILLIAM ORTWEIN:  I don't know that he does,
 7    Judge.  I just was --
 8              THE COURT:  You don't?
 9              MR. POOLE:  We're not going to talk about Colorado or
10    any other --
11              THE COURT:  Okay.  That takes care of that, then.
12              MR. POOLE:  But, but, he does say he can't wait to
13    get to the penitentiary to get access to a computer.
14              MR. WILLIAM ORTWEIN:  Yes, sir.  And my point about
15    that--  That is the Colorado statement.
16              MR. POOLE:  But we aren't going to talk about
17    Colorado specifically.
18              MR. WILLIAM ORTWEIN:  May it please the Court, since
19    Your Honor limited us and would not allow us to introduce
20    specific evidence like life in the day in a prison and other
21    matters, we don't think there is anything there to rebut.  Now,
22    had Your Honor ruled differently in regard to Mr. Aiken's
23    testimony, possibly that could be introduced, I would agree.
24    But since Your Honor specifically ruled that type information
25    out of evidence, there is nothing there to rebut by that
```

 1  statement, either.

 2          THE COURT:  What does that rebut, Mr. Poole?

 3          MR. POOLE:  Judge, I think that they did rebut the

 4  future dangerousness allegation.  I think Mr. Aiken did talk

 5  about the increased security in the BOP.  He didn't talk about

 6  a specific one.  He even said, "I can't go into detail."  But

 7  he did talk about how what was going on at Hamilton County Jail

 8  couldn't happen in the BOP, and that the BOP is much more

 9  secure and therefore any kind of threat that the defendant

10  might cause would be less.  I think the defendant talking

11  about--  You know, our theory all along, Judge, the defendant

12  by himself is not physically imposing or a danger, but he is a

13  danger in that he can influence people, and he's a danger with

14  computers, quite frankly.

15          THE COURT:  Again, what does it rebut, though?  There

16  has to be --

17          MR. POOLE:  I think it rebuts Mr. Aiken's statement

18  that the security at the BOP is such that -- you know, I think

19  the implication was that the defendant would not be able to be

20  any kind of danger because the security --

21          THE COURT:  I don't think Mr. Aiken testified to

22  that.  I know he was not authorized to say that.  What he was

23  authorized to testify to was that the defendant would be

24  transferred to a Bureau of Prisons facility and at that

25  facility there would be better security than there was at the

1  Hamilton County Jail.

2          MR. POOLE:  That's correct.  We will not --

3          THE COURT:  He did testify to more than that, but

4  that was not authorized by the Court.  And I don't recall

5  whether he actually talked about in any detail what the

6  particular security features were going to be.  I don't see a

7  direct connection there.

8          MR. POOLE:  Judge, my first point, I guess, would be,

9  I think you're right, the Court did not authorize that type of

10  testimony.  I think he did testify--  He didn't testify

11  specifically about what -- whether they had a computer or TV or

12  anything of that nature.  He testified about the procedures the

13  BOP uses, somewhat, however.  He talked about--  Whether the

14  Court authorized it or not, the jury heard it.  He talked about

15  always a gun on the defendant.  He talked about the SHU.  He

16  talked about levels of security.  He'd say, "I don't want to go

17  into too much detail on plans," to rebut this.  But he did talk

18  about BOP.  But, Your Honor, he did not talk about what they

19  would or would not have access to, if that's Your Honor's

20  point.  So I understand that.

21          THE COURT:  I'll grant Mr. Ortwein's motion on that,

22  then.

23          MR. POOLE:  I understand that, Judge.

24          THE COURT:  Was there something --

25          MR. WILLIAM ORTWEIN:  There was some letter -- I

1  don't -- Judge, to be candid, I don't remember, Judge, if they

2  want to introduce, that we objected to once before, that

3  Mr. Poole -- and that Your Honor disallowed relative to certain

4  -- maybe it was a communication from Sir Jack Matthews.

5           MR. POOLE:  I'll be glad to tell the Court, just lay

6  out --

7           MR. WILLIAM ORTWEIN:  Would you please, because I'm

8  not sure what it is.

9           THE COURT:  Let's just focus on the Sir Jack.

10          MR. POOLE:  Yes, sir.  Yes, sir.  Judge, there is

11  a -- two phone calls that we would like to play, one of

12  which --

13          THE COURT:  I think Mr. Ortwein was just talking

14  about a letter, not phone calls.

15          MR. WILLIAM ORTWEIN:  Have --

16          MR. POOLE:  I showed him a transcript.  I think he

17  thought it was a letter.

18          MR. WILLIAM ORTWEIN:  Between phone calls and

19  letters...

20          THE COURT:  So it may be a phone call.

21          MR. WILLIAM ORTWEIN:  Whatever it is he's trying to

22  introduce, Judge, I'm again' it.  I'll figure out a reason once

23  I hear what it is, but I'm again' it.

24          MR. POOLE:  What it is is a phone call.  I believe

25  Your Honor has now said we can play a phone call where the

1   defendant is talking about -- he's laughing about the victim's

2   fiancée.  He talks about, in that phone call, how -- he's

3   talking about how Sir Jack is going to testify the next day.

4          We have a phone call from a few days before that,

5   August 26, 2008, where Sir Jack Matthews is on the phone, he's

6   calling the same number as the defendant, and he's talking

7   about how it's going to come out Wednesday, which is when he

8   testified, how he's -- Rejon's going to go to trial before

9   him, "I'm going to go there and testify on his behalf or

10  whatever.  After his trial, that's when I go.  I go after

11  him."  And he talks about, "That's how it works.  We're

12  banking on this."

13         He's basically saying he's going to get Rejon off

14  and Rejon can do the same for him, they'll be out of the Fed

15  system.  We think that's important.  The defense did put on

16  proof in their case about Sir Jack Matthews' arrest and school

17  background and things of this nature.  One of the arguments

18  they're making is, comparably to the defendant, he's not

19  facing the death penalty and he's a worse guy.

20         Now, I think our evidence is relevant for a couple

21  of purposes.  Number 1, when they're talking about how bad a

22  guy he is, I think it's relevant to show that he was working

23  with the defendant as late as during this trial, that they

24  have a plan to perpetrate a fraud on this Court.  I think that

25  it is also relevant to show -- and there is a letter that we

1   aren't going to put in but we were going to ask Special Agent

2   Melia about where Mr. Taylor also says Sir Jack Matthews has

3   plans to withdraw from his plea agreement.  So that combined

4   with the phone call, I think, undercuts their argument that,

5   "Well, we know Sir Jack Matthews is going to get life in

6   prison, and he's just as bad as Rejon Taylor."

7           His plan, the defendant's plan, along with Sir Jack

8   Matthews, is to try and get out of this plea.  We may well

9   object to that; I don't know, Judge.  But his plan is to try

10  to get out of his plea, and that's in a letter and, you know,

11  talked about in the phone call.  So I think that's relevant,

12  that we don't know necessarily what's going to happen to Sir

13  Jack Matthews after he perjured himself.  And their plan

14  together, their conspiracy, is, Sir Jack Matthews to try to

15  get out of his plea agreement and try and beat this case like

16  he tried to beat -- you know, Mr. Taylor tried to beat the

17  case.  So we would like to offer the phone call where Sir Jack

18  is kind of talking to his girlfriend, he's talking about how

19  he's going to get Rejon off and they'll do the same thing for

20  him and they'll move on to state court together, and a

21  reference to a letter from Special Agent Melia where he'll say

22  Rejon Taylor actually wrote that Sir Jack is going to try to

23  get out of his plea agreement.  That's what we would like to

24  offer in terms of Sir Jack Matthews.

25           MR. WILLIAM ORTWEIN:  Judge, I'm going to make one

1  statement, then I'm going to turn it over to my legal person,

2  Ms. Cory.  As there was no evidence introduced in our proof in

3  chief to rebut or show that there was no collusion over this

4  statement between Sir Jack Matthews and our client, there is

5  nothing to rebut by introducing those particular letters at

6  this particular time.  The government had an opportunity to try

7  to put them in their proof in chief, but they chose to wait and

8  to determine what the defense did.  The defense did not

9  introduce any evidence whatsoever to show that there was no

10  collusion; we didn't attempt to, by any witness.  This being

11  rebuttal, if it please the Court, there being nothing for them

12  to rebut, the Court should exclude it.

13           THE COURT:  Ms. Cory?

14           MS. CORY:  Your Honor, I really have very little to

15  add to that.  We did have a great deal of argument on this when

16  the letters in the case originally came up.  Your Honor ruled

17  that they could not admit any of that evidence during their

18  case in chief.  And as Mr. Ortwein indicated, we have not

19  presented any evidence during our mitigation evidence that

20  brought that up.  So they have nothing to rebut.

21           THE COURT:  There was, I believe, a stipulation, and

22  there may have been some evidence along these lines, too,

23  involving Sir Jack Matthews' pretty horrible school record, and

24  there was some testimony involving his arrest for statutory

25  rape, I believe of a 12-year-old young lady, and that the

 1   mother and the child were fearful of Mr. Matthews.  And I do

 2   recall that there were some statements made that Sir Jack

 3   Matthews was going to receive a life sentence and would not be

 4   exposed to the death penalty, but I don't know that there was

 5   any evidence of that.  Was there any evidence of that?

 6          MR. WILLIAM ORTWEIN:  That was in the plea agreement.

 7          MR. POOLE:  Judge, his original plea agreement is in

 8   evidence.  So that would be the only--  Of course it also says

 9   that he cannot withdraw.  Of course his plea agreement was in

10   evidence.  I assume that's what they were talking about, and we

11   would like to argue in closing.

12          THE COURT:  Was it put in evidence during the

13   sentencing phase by the defense?

14          MR. WILLIAM ORTWEIN:  No, Your Honor.

15          MS. CORY:  No, Your Honor.

16          THE COURT:  What we're talking about is rebuttal.

17   We're not talking about anything that's in evidence.  We're

18   talking about rebutting anything put in by the defense in this

19   phase of the case.  So am I correct, then, that there has been

20   no evidence or information presented to the jury during the

21   defense phase of the case that Sir Jack Matthews will receive a

22   life sentence and will not be exposed to the death penalty?

23          MS. CORY:  That's correct, Your Honor.

24          THE COURT:  Okay.  I don't think, then, you have a

25   right to rebut with evidence, then, the idea that Sir Jack

1   Matthews is going to only receive a life sentence.  I think

2   what happened was, that was argument.  And you can respond to

3   that in argument, that if that comes up, the argument would be

4   that there has been no evidence at all presented that's going

5   to happen to Sir Jack; nobody knows.

6           MR. POOLE:  That's true, Judge, but that's submitted

7   as a mitigating factor.  You know, the plea agreement does say

8   that.  It wasn't--  We were not allowed to put this in in the

9   case in chief, so we couldn't rebut the proof that was already

10  in from the guilt/innocence phase.  They're arguing it.

11  They're putting on more proof with regard to that argument

12  about how bad a guy Sir Jack is.  This is our only chance to

13  rebut that.  If we can't rebut it, I don't think we ought to be

14  allowed to argue it.

15          THE COURT:  They may not.  If there is no evidence to

16  support it, they should not argue things with respect to which

17  there is no evidence.  With respect to the school records and

18  the arrest, I think the government does have a right to rebut

19  that.  I think this evidence would tend to show that

20  Mr. Matthews is a pretty disgusting and disreputable person,

21  but the evidence of an association between -- a voluntary

22  association between the defendant and Mr. Matthews, I think,

23  would tend to rebut that.  So to the extent that the government

24  wishes to offer evidence of ongoing communications and ongoing

25  communications and plans and agreements, I think that would be

1    proper rebuttal.

2              MR. POOLE:  Thank you.

3              MS. CORY:  Your Honor, one of our problems with the

4    specific letters they're talking about and specific phone call

5    is, what Rejon Taylor hopes will happen and what Sir Jack

6    Matthews hopes will happen is absolutely irrelevant to what is

7    actually going to happen in a court of law.  They are

8    uneducated in this regard.  For the government to put before

9    the jury statements they make as though they can anticipate

10   what's going to happen in court, I think, gives their comments

11   far more credence than is realistically appropriate.

12             THE COURT:  Well, the government is entitled to

13   respond to information and evidence.  And as the Court has

14   stated, there was evidence concerning Sir Jack Matthews.  And

15   the Court thinks from what the Court has heard that this would

16   be a fair -- fair rebuttal.  So the Court will allow the

17   government to present this.

18             MS. CORY:  So will their rebuttal evidence be

19   testimony by Mr. Melia that Sir Jack Matthews used a phone line

20   that was paid for by the defendant's sister, or --

21             THE COURT:  That's the first--  I don't know.  That's

22   the first I've heard of that.

23             MS. CORY:  Well, I'm not sure what his testimony is

24   going to be, Your Honor, to rebut.

25             THE COURT:  Counsel is not required to and counsel

1   has not given me a preview of what evidence they intend to put

2   on.

3           MS. CORY:  I think I've heard Your Honor say that

4   before.

5           MR. POOLE:  I think -- I don't want to give a

6   preview, but I think basically we're going to play the phone

7   call, talk about their association, reference the letter, and

8   play the other phone call with the laughter Your Honor is aware

9   of.  I think that's all we're going to do, Judge.

10          THE COURT:  I think what Ms. Cory was asking

11   specifically, were you going to put in evidence that Sir Jack

12   Matthews was not paying for these telephone calls but, rather,

13   it was a relative of the defendant that was paying for them?

14          MR. POOLE:  I think we would, yes.  I mean, I wasn't

15   really going to focus on who was paying for it, but it

16   certainly is part of the association.  Special Agent Melia will

17   talk about the fact that Sir Jack is using the defendant's

18   phone number.  I don't think there is any doubt about that.

19          MS. CORY:  I think that's it for us, Your Honor.

20          THE COURT:  Okay.  Let's bring the jury back.

21          (The jury entered the courtroom, and the proceedings

22          continued as follows:)

23          THE COURT:  Please be seated.

24          MR. POOLE:  Special Agent Jim Melia.

25          (Brief pause.)

1          JAMES J. MELIA,

2   recalled as a witness at the instance of the government,

3   having been previously duly sworn, was examined, and

4   testified as follows:

5                    DIRECT EXAMINATION

6   BY MR. POOLE:

7   Q        This is the third time you've testified.  So I think

8   the jury knows who you are.  But you are still Special Agent

9   Jim Melia.  Is that correct?

10  A        That's true.

11  Q        And you've talked about, in this case, after Sir

12  Jack Matthews testified, that you took about an investigation

13  regarding his testimony and the relationship between he and

14  the defendant.  Is that right?

15  A        I did.

16  Q        And you've testified before about one of the things

17  you did was, had the Hamilton County Jail start getting phone

18  calls that the defendant made, and you listened to many of

19  those calls.  Is that right?

20  A        That's right.

21  Q        Remind the jury, how was it that the specific calls

22  that were pulled were chosen; was it based on the defendant's

23  name, or how did we get the calls that we got; what did they

24  use?

25  A        There's a couple of different ways that the jail can

1      pull phone records or phone calls for us.  Each prisoner is

2      assigned what they call a spin number, SPN number, and they're

3      required to punch that number in before they make a telephone

4      call.  So oftentimes we use that number to pull calls.  But

5      many times prisoners won't use their own spin number, and in

6      that case, if we know there is a common number that's dialed,

7      we just ask that all the phone calls placed to a particular

8      phone number be pulled for us and provided to us.

9      Q        Is that-- Was this done in this case?  A particular

10     number was identified?

11     A        Right.  I think it's (423) xxx-xxxx.  I believe

12     that's the correct phone number.

13     Q        And that is a Chattanooga number, I guess, 423.  Is

14     that right?

15     A        It is.  It's a cellular telephone.

16     Q        Do you know who holds that cellular telephone, who

17     has it?

18     A        I believe the phone number is subscribed to either

19     by -- I think it's by Eva Williams, who is Rejon Taylor's

20     grandmother.

21     Q        Okay.  And Mr. Taylor made several calls on this

22     number.  Is that correct?

23     A        I think I testified before the number is somewhere

24     around 10,000 phone calls from the Hamilton County Jail,

25     placed during the time that Mr. Taylor's been incarcerated

1    over there.

2    Q        And another thing you did based on listening to many

3    of these calls, was, you started pulling letters that the

4    defendant wrote to someone at Silverdale.  Is that right?  The

5    workhouse.  Is that correct?

6    A        Right.  We kind of did that on the other end.  We

7    asked Silverdale to screen the mail being provided to a

8    particular inmate over there.  And those letters were provided

9    to us by the investigative personnel at Silverdale.

10   Q        Based on reviewing those letters--  I assume you

11   didn't review all over 10,000 calls, but during your review of

12   the calls, can you tell the jury about any ongoing association

13   between the defendant and Sir Jack Matthews?

14   A        Yes.  I can tell you that both the defendant and Sir

15   Jack Matthews regularly place telephone calls to that number.

16   Sir Jack Matthews will talk to Taylor's family, and he'll also

17   dial that number, get connected to Taylor's family, and then

18   he'll ask to be connected to his own family members or to a

19   girlfriend.  But he uses that -- pretty much uses that

20   telephone number as his own as a means to stay connected to

21   others.  I've even got instances where Taylor and Matthews are

22   on the telephone with each other at the same time, connected

23   to that (423) xxx-xxxx number.

24   Q        All right.  And do you have calls or letters that

25   refer to any kind of plan between the defendant and Sir Jack

1  Matthews with respect to this case and specifically with

2  respect to this jury trial?

3  A       Yes, I do.

4  Q       Tell the jury about those, please.

5  A       Telephone call, or letter?

6  Q       Let's start with the telephone call.

7  A       I do have --

8          MR. WILLIAM ORTWEIN:  Objection.  Best evidence would

9  be for him to play it.

10          MR. POOLE:  I will be glad to do that, Judge.  I've

11  got the transcripts here, and I will offer Government's Exhibit

12  S3 into evidence and S3A for identification, which is the

13  transcript, into evidence, Your Honor.

14          THE COURT:  They're received.

15          (Government's Exhibit S3 was received into

16          evidence.)

17          (Government's Exhibit S3A was received for

18          identification only.)

19          MR. WILLIAM ORTWEIN:  Of course, Your Honor, I don't

20  know that it's necessary, but I will preserve our objection to

21  these, both of these items, for purposes of the record.

22          THE COURT:  The Court notes that this is coming in

23  over objection.  That objection is preserved.

24          MR. WILLIAM ORTWEIN:  In addition, I believe there is

25  another document or telephone call.  Both of them we would like

1   to preserve the objection on.

2              THE COURT:  That objection is noted, will be

3   preserved.

4              MR. POOLE:  Thank you.  Publish to the jury, please,

5   that call.

6              (The tape was played in open court, and the

7              proceedings continued as follows:)

8   BY MR. POOLE:

9   Q        Do you know when that call was made?

10  A        August 26, 2008, at 8:20 p.m.

11  Q        Okay.  And that was the day, or day after, we

12  started trial in this case.  Is that correct?

13             MR. WILLIAM ORTWEIN:  Objection.  Leading.

14  BY MR. POOLE:

15  Q        Was it--  Do you know when in reference to when this

16  trial started it was?

17  A        I think the start date of the trial was August 25th.

18  Q        You also pulled a call from the defendant during

19  this time frame, related to this, did you not?

20  A        Many of them.

21             MR. POOLE:  Okay.  I'm going to ask to just go ahead

22  and play Government's Exhibit S4.  S4A is for identification,

23  Judge, a transcript.  We'll ask to submit that.  It's a phone

24  call of the defendant.  S4 is the CD, Judge.  S4A is the

25  transcript.

1          THE COURT:  Received.

2          MR. POOLE:  Thank you.

3          Play the tape, please.

4          (Government's Exhibit S4 was received into

5          evidence.)

6          (Government's Exhibit S4A was received for

7          identification only.)

8          MR. POOLE:  Pass the transcripts up.

9          (Brief pause.)

10          (The tape was played in open court, and the

11          proceedings continued as follows:)

12          MR. WILLIAM ORTWEIN:  Your Honor, I hate to

13  interrupt, but at this point --

14          THE COURT:  Mr. Poole, could you pause it, please?

15          MR. POOLE:  Yes, sir.

16          (Brief pause.)

17          MR. POOLE:  It's paused.

18          MR. WILLIAM ORTWEIN:  I believe Your Honor just ruled

19  out part of this phone call.  And I don't want to--  Maybe

20  counsel for the government wants to redact.

21          THE COURT:  Would you point it out to him?  You can

22  just stand beside him and point it out.

23          MR. WILLIAM ORTWEIN:  If I may confer with the

24  government.

25          (Off-the-record discussion.)

1          MR. WILLIAM ORTWEIN:  Your Honor, there is a matter,

2    if I could ask the Court --

3          THE COURT:  Just point it out to him, and he may

4    agree to it.

5          MR. POOLE:  I don't agree to it.  My recollection was

6    that Your Honor said we could play that portion, Judge.  He can

7    pass it up.

8          MR. WILLIAM ORTWEIN:  I can pass it up, mark it, show

9    it to the Court, and the Court can rule from the bench if you

10   like.  Might be the easiest way to do it.

11         (Brief pause.)

12         MR. WILLIAM ORTWEIN:  Our objection dealt with

13   remorse, Judge, on rebuttal.  And I would say the jurors have

14   transcripts of it at this point in time, of evidence Your Honor

15   has ruled inadmissible.

16         (Brief pause.)

17         MR. POOLE:  Judge, my recollection was that the Court

18   ruled it was admissible specifically to rebut a portion of the

19   defendant's allocution.

20         MR. WILLIAM ORTWEIN:  Your Honor, that's a

21   lack-of-remorse rebuttal, we submit, which Your Honor said the

22   government could not introduce in rebuttal.

23         MR. POOLE:  It's to rebut his statements about the

24   victim's family, specific statements.

25         MR. WILLIAM ORTWEIN:  Your Honor said--  I'm sorry.

1    I just remember the Court's ruling a little different than the

2    government.

3            THE COURT:  What the Court indicated was that -- and

4    I'm not going to mention the word, but the word that you

5    indicated was out of bounds, but the government would have the

6    right to respond to anything that actually came in as evidence

7    or information.  And the Court is looking at Page 3, about

8    midway down, and there is a statement by Tameka and response by

9    the defendant.  I have not heard this, but if the transcript is

10   correct, the Court finds that this is a direct relationship to

11   statements made by -- by the defendant.

12           MR. WILLIAM ORTWEIN:  Even though Your Honor ruled --

13   told the jury that statements made by the defendant was not

14   evidence?

15           THE COURT:  Yes.  As I --

16           MR. WILLIAM ORTWEIN:  They can rebut matters which

17   are not evidence?

18           THE COURT:  As I understand the law in this area, and

19   there is not an awful lot of cases that authorize the Court to

20   do what the Court did, but if a defendant makes an unsworn

21   statement, that although the defendant is not subject to

22   cross-examination, the other side does have the right to rebut

23   what the person says.

24           MR. WILLIAM ORTWEIN:  I'm sorry.  I just

25   misunderstood your earlier ruling that in fact--  I have to

1    watch what I say in front of the jury.

2              THE COURT:  Yes.

3              MR. WILLIAM ORTWEIN:  -- in fact that Mr. Taylor's

4    allocution did not approach that subject, and therefore there

5    was nothing to rebut.

6              THE COURT:  That is correct as a general statement,

7    that the government would not be allowed to introduce evidence

8    on that general subject.  If there was some specific something

9    that they had contrary evidence on, they would be allowed to do

10   that.  And that is the situation here, that there was something

11   specific said that the government can rebut.  This is not the

12   general subject that we've been talking about, though.

13             MR. WILLIAM ORTWEIN:  Okay.  Like I say--  Well, in

14   the old school, I note the exception, Judge, but we don't do

15   that anymore.

16             Could I ask for my copy back, please, sir?

17             THE COURT:  Ms. Palmer.

18             (Brief pause.)

19             MR. POOLE:  May we play the tape, Judge?

20             THE COURT:  Yes.

21             (The tape was played in open court, and the

22             proceedings continued as follows:)

23   BY MR. POOLE:

24   Q         Special Agent Melia, when was this call?

25   A         September 2nd, 2008.

1  Q        And when was this in reference to Sir Jack Matthews'

2  testifying before this jury?

3  A        Matthews testified the following day.

4  Q        So when he's talking about "Everything's going to be

5  cleared up tomorrow," he's talking about "I'm waiting for

6  tomorrow," what's he talking about?

7         MR. WILLIAM ORTWEIN:  Please the Court, the telephone

8  call speaks for itself without counsel trying to summarize and

9  make it into something else.  The jury heard it.

10         THE COURT:  Let's try to ask nonleading questions,

11  Mr. Poole, and then let's see if there is an objection to the

12  nonleading question.

13 BY MR. POOLE:

14  Q        What was he talking about, Special Agent Melia?

15         MR. WILLIAM ORTWEIN:  Objection to his opinion, if it

16  please the Court.  He's an FBI agent who has testified to the

17  facts.  Under case law he can now not turn into an expert to

18  interpret the language of other individuals and what they're

19  saying.  That's about what he's attempting to do.  He can't

20  testify as a fact witness and then an expert witness to

21  interpret conversations, both.

22         THE COURT:  Mr. Poole?

23         MR. POOLE:  I'll move on, Judge.

24 BY MR. POOLE:

25  Q        On Page 3 of the transcript they're talking about

1    his dream.  Do you know who they're talking about, just to put

2    it in context for the jury?

3    A         Guy Luck's dream.

4    Q         Okay.  And on that same page, talking about "she met

5    him in 1989," do you know who "she" is?

6    A         Stephanie Belcher.

7    Q         And who is Stephanie Belcher?

8    A         Mr. Luck's girlfriend, business partner.

9              MR. POOLE:  No further questions.  Judge.

10             THE COURT:  Cross-examination?

11             MR. WILLIAM ORTWEIN:  Your Honor, first of all, I

12   would like to request--  To me, there are some errors in this

13   transcript, especially parentheses about laughing.  So I would

14   like to ask the Court to charge the jury that what they heard

15   on the tape or the disk was the actual evidence, and that the

16   transcript is not evidence.

17             MR. POOLE:  No objection.

18             THE COURT:  Okay.  Ladies and gentlemen,

19   Mr. Ortwein's request that the Court instruct you is

20   appropriate.  What has just been introduced to you as evidence

21   or information in this case is the tape recording itself.  The

22   transcript that you were provided was just an aid to help you

23   understand the voices on the recording.  If there is any

24   difference between what's in the transcript and what's in the

25   recording, ignore the transcript and go by what you heard in

1    the recording.  And if there are some parts of the recording

2    that you cannot understand but there is something in the

3    transcript, then ignore the transcript and do not assume that

4    what's in the transcript actually relates what was -- what's in

5    the recording.  Special Agent Melia was not a participant in

6    these conversations, so he's not able to fill in any blanks or

7    any gaps.

8           MR. WILLIAM ORTWEIN:  Thank you, Your Honor.

9                      CROSS-EXAMINATION

10   BY MR. WILLIAM ORTWEIN:

11   Q         Just a couple of questions.  Mr. Melia, how many

12   other people were using that phone number?

13   A         I'm not sure.  I think I've probably heard about

14   five different people use the phone number.  There's--  I

15   don't have everybody who was using the phone number completely

16   identified, but there was a guy who just got convicted of

17   murder over in Red Bank who was using the telephone, that

18   telephone number.  There were some gang guys that were using

19   that telephone number.  I'm not sure who all of them are.

20   Q         But it's fair to say that Rejon Taylor did not

21   exclusively grant Sir Jack Matthews the right to use that

22   telephone number?

23   A         No, not exclusively.  There's several people over at

24   the jail that are using that telephone number.

25           MR. WILLIAM ORTWEIN:  All right, sir.  That's all.

1          MR. POOLE:  No further questions, Judge.

2          THE COURT:  Thank you.  You may step down.

3          THE WITNESS:  Thank you.

4          (Witness excused.)

5          THE COURT:  Call your next witness.

6          MR. POOLE:  United States rests.

7          THE COURT:  Ladies and gentlemen, you've heard

8    Mr. Poole state that the United States rests.  That means that

9    the United States has completed its rebuttal evidence.

10          Mr. Ortwein, does the defense have any surrebuttal?

11          MR. WILLIAM ORTWEIN:  No, Your Honor.

12          THE COURT:  And you've heard that the defense also

13   has no surrebuttal.  That means that all the information that

14   the parties care to present to you in this phase of the case

15   has now been presented to you.

16          The next step in the case is for the Court to have

17   the attorneys present their closing arguments to you, and then

18   for the Court to give you your instructions.  The Court has

19   prepared draft instructions.  The Court has provided those to

20   the attorneys, but it's necessary for the attorneys to --

21   it's necessary for the Court to go over those with the

22   attorneys.  The Court has not had occasion to do that yet.

23   Why don't I let you go ahead and take your morning recess.

24   While you're out at recess, the Court will take this up with

25   the attorneys.

1          (The jury exited the courtroom, and the proceedings

2          continued as follows:)

3          THE COURT:  Okay.  Please be seated.

4          MR. WILLIAM ORTWEIN:  Your Honor, if I may bring up

5    one other matter.  We took up an objection in the presence of

6    the jury, was sort of cautious about the language.  What I

7    would like to do is file the defense sentencing exhibit, not

8    for the jury, a transcript of that phone call where on Page 3 I

9    have marked -- where I marked and handed up to the Court to

10   show what my objection actually was to, so it will be clear in

11   the record, if I could.

12         THE COURT:  Very well.  The Court will accept that,

13   then, as another appellate exhibit.  It will be the

14   next-numbered appellate exhibit.

15         MR. WILLIAM ORTWEIN:  Yes, sir.  I've got "AP" by it,

16   but I don't know the number.

17         THE CLERK:  It will be S18.

18         MR. WILLIAM ORTWEIN:  I'm sorry?

19         THE CLERK:  S18.

20         (Defendant's Exhibit DS18 was received for

21          identification only.)

22         MR. WILLIAM ORTWEIN:  Your Honor, I don't know what

23   time you want to take up closing arguments, but Mr. Cooper and

24   I need to, I guess, adjourn to the office, because I have over

25   there various copies of transcripts of testimony I intend to

1  use that I have not brought to the courtroom.

2          THE COURT:  Okay.  We do need to discuss the jury

3  instructions at some point.  I take it that you-all received

4  those on Friday.

5          MR. WILLIAM ORTWEIN:  Yes.  Ms. Cory, obviously, is

6  in charge of that, Your Honor.

7          THE COURT:  Do you want to do that now, or would you

8  like to do that at a later point, then?  We do need to reach

9  some agreement on the instructions.

10          MR. WILLIAM ORTWEIN:  However the Court desires to

11  proceed.  I just wanted the Court to know that before closing

12  argument I do need to go back to the office to get copies of

13  the transcripts I've had blown up, et cetera, to bring back to

14  the court.

15          THE COURT:  Okay.  Mr. Neff, looks like we need to

16  take a break for Mr. Ortwein at any rate.  Do you want to do

17  the charge conference now, or would you like to do the charge

18  conference a little bit later?

19          MR. NEFF:  Well, Judge, I guess, if I had my

20  druthers, just do it now and get it done.  If the defense wants

21  to wait, I don't have any problem with that.

22          MR. WILLIAM ORTWEIN:  Ms. Cory?

23          MS. CORY:  I don't have any problem.

24          MR. WILLIAM ORTWEIN:  I just wanted to ask the Court

25  for permission to leave while that was going on.

1          THE COURT:  Yes.  Yes.  You may do that.

2          Why don't we start with the government, then.

3          MR. NEFF:  Do you want me to wait, Judge?

4          THE COURT:  Yes.  I need to get my copy.

5          MR. NEFF:  I beg your pardon?

6          THE COURT:  I do not have a copy.

7          (Brief pause.)

8          THE COURT:  Okay.  Mr. Neff?

9          MR. NEFF:  Yes, sir.

10          THE COURT:  You've had a chance to look at the

11  proposed charge?

12          MR. NEFF:  I have, Your Honor.

13          THE COURT:  Okay.  Let's take up, then, the first

14  page as to which you have an objection or suggestion.

15          MR. NEFF:  Okay.  Your Honor, Page 5, the instruction

16  on the unsworn allocution, the Court says there that the

17  defendant has a right -- has an absolute right not to testify.

18  Obviously the unsworn allocution was not considered testimony.

19  We would ask that the Court say the defendant also has a right

20  to testify under oath, subject to cross-examination, as well as

21  the right not to testify.  It was his choice to do this, and I

22  don't know that that's clear to the jury.

23          One of the things the defendant said in his

24  statement, in his allocution, at the end, which we're

25  concerned misleads the jury, he says, "I guess that's really

1  all I can -- all I really can say without just stepping over

2  my boundaries," makes it sound as if the Court would not

3  permit him to testify or--  Obviously he could have said

4  whatever he wanted to say, had he chosen to get up, be sworn

5  in, and testify subject to cross-examination.  So we'd ask

6  that that additional language be placed in there as well.

7          THE COURT:  Ms. Cory?

8          MS. CORY:  Your Honor, we would strenuously object to

9  this being an either/or kind of instruction.  One of our

10 requests is going to be that this whole bottom part of the

11 allocution instruction be moved to a separate instruction

12 regarding the defendant's right not to testify, because leaving

13 it here gives an implication that the Court is commenting on

14 his failure to testify.  So we think the unsworn allocution

15 paragraph should stand alone, that there should be a separate

16 instruction just dealing with the defendant's right not to

17 testify.  Your Honor is explaining to the jury the difference

18 between what the defendant is doing in allocution and what

19 evidence is.  So we think the government's suggestion is

20 totally inappropriate.

21         THE COURT:  So if we move it to another section and

22 then just talk about the defendant's right to testify, do you

23 have any objection, then, to changing the sentence that

24 Mr. Neff is speaking of to "A defendant has an absolute right

25 not to testify or to testify"?

1          MS. CORY:  Your Honor, this is--  I think what Your

2     Honor has given here is the standard instruction that's given

3     when a defendant chooses not to testify.  I don't think it

4     needs to be altered.

5          THE COURT:  The situation, though, is not all that

6     typical.  This is the first instance in a civilian court that a

7     defendant has given an unsworn statement.  And I don't know how

8     realistic it is that the jury might think the defendant did not

9     have a right to testify; but to the extent that that's the

10    case, just including those additional three words would cure

11    that.

12         MS. CORY:  Your Honor --

13         THE COURT:  In most cases it's an either/or

14    situation; they either hear from the defendant or they don't

15    hear from the defendant.  Here we're kind of betwixt and

16    between.

17         MS. CORY:  Your Honor, if you're considering adding

18    that to this instruction as a separate instruction, I would

19    like to have the opportunity to talk to my client about whether

20    he would prefer just to waive the entire instruction about

21    right to testify or not testify.

22         THE COURT:  Okay.  Mr. Neff, you don't have a problem

23    with moving this last paragraph to a different location, do

24    you?

25         MR. NEFF:  No--  Well, I--  No, but I actually think

1    it's where it makes the most sense, because, as the Court

2    pointed out, this is an unusual situation.  There is obviously

3    an instruction on the fact the defendant decided to make an

4    unsworn allocution.  And given the fact that it is unusual,

5    that this wasn't an either/or situation, as the Court put it,

6    and given the fact that the defendant in his own statement said

7    that he didn't want to step over his boundaries, our concern,

8    Judge, is that the jury is going to think that the Court

9    somehow limited him in what he could do or what he could say.

10          Now, within the context of the unsworn allocution,

11   obviously the Court did, but it does not account for his right

12   and ability to make the decision to get up and testify under

13   oath, subject to cross-examination.  So I think it actually

14   makes the most sense to put it there.  The defendant did not--

15   "The defendant has an absolute right not to testify, but he

16   also has the right to testify," and I think, accurately,

17   should say, "under oath, subject to cross-examination."  We

18   don't need to highlight that he didn't make that choice, but I

19   think it's important to say what the options were.

20          THE COURT:  But you don't have a serious problem,

21   then, with moving it someplace else?  You think this is the

22   best place for it, but you don't have a serious problem with it

23   being placed somewhere else?

24          MR. NEFF:  Well, Judge, if you're going to place it

25   somewhere else, I guess I would suggest putting it right after

 1   this instruction.  If the Court wants to do it in a separate

 2   instruction, put it under the next page, maybe, Page 6, "The

 3   defendant's right to testify," or "right not to testify," or

 4   however the Court usually handles that.  But I think it should

 5   be in close proximity to this, because that's my concern, that

 6   the jury is going to be misled.

 7       THE COURT:  The Court will give Ms. Cory a chance to

 8   speak to Mr. Taylor about it, then, but the Court would be

 9   inclined to just include the three words "or to testify" at the

10   end of the sentence that we're discussing.  What's next?

11       MR. NEFF:  Judge, Page 11, please.  And--  Excuse me.

12   Losing my voice.  In the -- I guess it's the second paragraph,

13   or precursor, right before it says first, "The government

14   alleges four intent factors--" and I think the Court says this

15   somewhere else, perhaps.  Actually the Court says it on

16   Page 13, "If you find the government has proved at least one of

17   the intent factors."  I think it also makes sense to put it

18   when we're talking about the intent factors, to say, "The

19   government alleges four intent factors but need only prove one

20   of the four factors beyond a reasonable doubt before you may

21   move on and consider aggravating factors alleged."  I think

22   that makes sense to put it there.

23       THE COURT:  Well, don't we say that, though, in that

24   first sentence, in "One of the ways"?  It doesn't say "Four of

25   the ways."

1          MR. NEFF:  Yeah.  I mean, the Court does say that,

2    yeah.  I--  Okay.

3          THE COURT:  I guess if you wanted to we could make it

4    a little bit clearer by saying "resulting in the death of Guy

5    Luck with respect to one of the four intent factors alleged by

6    the government;" we could use the same language, something like

7    that.

8          MR. NEFF:  I think that would make it a little bit

9    more clear; otherwise, it's easy to kind of miss that.

10          THE COURT:  Ms. Cory?

11          MS. CORY:  Your Honor, again, we have our own

12    suggestion on how the Court should word it, but I agree with

13    the government it would be helpful to give the jury some more

14    specific instructions.

15          THE COURT:  Okay.  Why don't we say -- in taking out

16    "ways," we put <u>intent factors</u> there, then, so it's obvious that

17    what the jury is being told is that they have to find at least

18    one of the four intent factors listed afterwards.

19          MR. NEFF:  Yes, sir.

20          THE COURT:  What's next?

21          MR. NEFF:  I also think it might be a good idea --

22    and perhaps the defense has already thought of addressing this,

23    but it might be a good idea to say something along the lines

24    of, "These intent factors are not to be weighed against the

25    mitigating factors or examined on their own in order to

1    determine whether a sentence of death is justified."  I think,

2    to be fair to the defendant, Title 18 and Title 21 are

3    absolutely different.

4              I think under Title 21 the intent factors are also

5    considered to be aggravating factors, and can be weighed.  So

6    the jury is instructed to only find one of the intent factors

7    because they're also aggravating factors.

8              In a Title 18 situation, the intent factors are not

9    considered to be aggravating factors, and do not -- I don't

10   think the jury is supposed to consider them to be aggravating

11   factors such as they're weighing them against mitigating

12   factors.  So in order to make the instruction clear and to be

13   fair to the defendant, it might be a good idea to put language

14   like that in there.

15             THE COURT:  Well, we have not talked about weighing

16   at all, I don't believe, at this point in the instruction.

17             MR. NEFF:  No.

18             THE COURT:  The first time we talk about weighing is

19   on Page 18.  And on Page 18 we specifically say that "You must

20   weigh the aggravating factor or factors found existing against

21   the mitigating factor or factors found to exist."

22             MR. NEFF:  I agree that the Court says that.  I'm

23   just wanting to make sure that they're clear about the fact

24   that they're not supposed to use an intent factor as an

25   aggravating factor, I guess is my point.

1          THE COURT:  I think if we say anything on Page 11 it

2    would be unduly confusing, because we're now introducing a

3    concept that they've never heard before, and it's in isolation.

4    And we're going to talk about it later.  To the extent there is

5    some confusion about whether these intent factors have to be

6    weighed, I think it would be more appropriate to clear that up

7    on Page 18.

8          MR. NEFF:  That's fine, Judge.  I just want to make

9    sure it was clear to the jury in some way.

10          THE COURT:  Ms. Cory?

11          MS. CORY:  For the record, we support the

12    government's view that when you introduce the appropriate

13    mental state is a very important time to let the jury know this

14    is a threshold determination they have to make before they can

15    go on to weigh aggravating and mitigating factors, and that the

16    intent state, the mental state, is not to be treated as an

17    aggravating factor later on.

18          THE COURT:  Do you think, though, that that could go

19    in this part of the instruction, since they have no idea what

20    we're talking about with respect to weighing?

21          MS. CORY:  Well, I think if Your Honor instructed

22    them at this point that this was a threshold issue, that would

23    be a good introduction to what they're going to be doing,

24    because I think, the way it flows now, the jury is not going to

25    understand, until perhaps it's too late, that they are going

1  through steps, and that once they have finished the intent, the

2  mental state, that's the point at which they start weighing

3  aggravating and mitigating factors, and not before.  I think

4  it's very likely to get just all thrown in together in the

5  jury's mind.

6      THE COURT:  Well, you'll notice that at the beginning

7  of each one of these we tell the jury that "If you've done

8  this, then you must do this," which is actually taking the jury

9  through a step-by-step process.  So when you get to the

10  aggravating factors, it says, "If you find that the government

11  has proved," which means that the jury has already gone through

12  certain steps, then it says, "then you must determine."  So

13  assuming they've gone through those steps, then they get to the

14  next stage.  So we don't use terminology like threshold, but I

15  think that the instructions are designed to do the same thing,

16  take the jury step by step through the process that they must

17  use.  And what they're doing--  The word you used was

18  "threshold."  "If you find," that means they've reached that

19  threshold.  If they don't find, then they don't go on to the

20  next issue.

21      MS. CORY:  I just don't think you can start too early

22  to make those distinctions for them, Your Honor.

23      THE COURT:  What's next, Mr. Neff?

24      MR. NEFF:  Your Honor, Page 13, please.  I know--

25  This is a suggestion somewhat like the one I made before.  I

1  know it says in the first paragraph up there that, you know, as

2  the Court just alluded to, "If you find the government has

3  proved at least one of the intent factors, you must determine

4  whether the government has proved beyond a reasonable doubt the

5  existence of either of the two statutory aggravating factors."

6         In order to maybe flesh that out a little bit or

7  make it more clear, my suggestion is, down there in the last

8  full paragraph that starts that, "The government has alleged

9  two aggravating factors that are set out in the law; we call

10  these statutory aggravating factors," I would suggest putting

11  another sentence in there right after that that says, "The

12  government need prove only one of these factors beyond a

13  reasonable doubt before you consider," or "can consider," "may

14  consider nonstatutory aggravating factors in deciding whether

15  to impose the death penalty."

16         THE COURT:  Any objection, Ms. Cory?

17         MS. CORY:  Your Honor, I think actually the Court's

18  instruction here is sufficient.  But if Your Honor wants to add

19  a clarification, we don't object to it.

20         THE COURT:  Okay.  The Court will add, "The jury need

21  only find that the government has proven one of these statutory

22  aggravating factors beyond a reasonable doubt," period.  Then

23  on Page 15, at the end of the first sentence, the Court will

24  add the sentence, "However, you may not consider any

25  nonstatutory aggravating factor unless you have found at least

1  one statutory aggravating factor," period.

2          I've taken Mr. Neff's suggestion and broken it up

3  into two parts, and I put one part in the "statutory

4  aggravating factors" and the other in the "nonstatutory

5  aggravating factors," for pretty much the same reason.  In the

6  language concerning "statutory aggravating factor," they've

7  never heard of "nonstatutory aggravating factor," so we're

8  introducing a concept to them that is new, with no

9  explanation, then the explanation comes later.  I think it

10  makes more sense to -- if we're going to have any limits or

11  clarifications, to include that when the concept is being

12  introduced to them.

13          MR. NEFF:  I agree, Judge.

14          THE COURT:  What's next?

15          MR. NEFF:  Staying on Page 13, the last sentence of

16  that same paragraph there, it says, "The government must prove

17  beyond a reasonable doubt that the defendant committed the

18  kidnapping, which during the first phase of the trial you found

19  the defendant guilty of, and the death or injury occurred

20  during the commission of that kidnapping."  Just to mirror the

21  first part of that sentence, I would suggest putting a comma

22  there, saying, "the finding you also previously made during the

23  first phase of the trial."

24          THE COURT:  Any objection?

25          MS. CORY:  Yes, Your Honor.  I think this is the

1  decision the jury is making at the penalty phase.  And Your

2  Honor has stated it accurately.  The jury can put those two

3  things together during their deliberations, or not.

4        THE COURT:  The Court will reject that suggestion.

5  What's next?

6        MR. NEFF:  Page 15, Your Honor, first paragraph.

7  Suggesting a sentence at the end of that paragraph that says

8  something along the lines of, "You may, but are not required

9  to, find the existence of nonstatutory aggravating factors

10  before considering imposition of the death penalty."

11        THE COURT:  Ms. Cory?

12        MS. CORY:  I'm sorry to be so slow, Your Honor.  I'm

13  trying to put it in context of what the Court has already

14  instructed here.  I think what the government is saying is a

15  true statement.  I don't see that it's necessary in the context

16  of the instructions that Your Honor is giving here.

17        THE COURT:  Since this is a correct statement of the

18  law, then the Court will add that, then.  We'll put that at the

19  location requested by the government.

20        What's next, Mr. Neff?

21        MR. NEFF:  Your Honor, that same page, 15, third

22  paragraph, "The second nonstatutory aggravating factor alleged

23  by the government is that the defendant would be a danger in

24  the future to the lives of others," I think also under that,

25  and this is part of the notice, and part of what we'll likely

1  argue, and the proof has shown, is to put something along the

2  lines of "and that the defendant demonstrated a lack of remorse

3  for his crime and has failed to adapt to societal norms."

4           THE COURT:  And what specific evidence was there

5  introduced along those lines?

6           MR. NEFF:  About his lack of remorse and failure to

7  adapt to societal norms?

8           THE COURT:  Yes.

9           MR. NEFF:  Well, Judge, for one thing, the defendant

10  had the opportunity to express remorse.  His actions after the

11  crime --

12           THE COURT:  So it's not so much evidence as a lack of

13  what the defendant did, then.

14           MR. NEFF:  Well, that's part of it.  But there has

15  also been a significant amount of evidence about the

16  defendant's actions after the crime was committed and the fact

17  that they show that he had no remorse for the commission of the

18  crime, not the least of which is the escape, but there are

19  several other things as well.  The defense itself put on proof

20  about how he's failed to adapt to societal norms.  And

21  obviously that's part of -- that was part of the notice.  And I

22  think the proof has been pretty clear about both of those

23  issues.

24           MS. CORY:  Your Honor, I don't --

25           MR. NEFF:  He talks about acting like -- the

 1  government acting like he killed the President, talks about

 2  committing a life of crime, you know, laughing about it,

 3  laughing about his crimes; in one of the letters that's been

 4  admitted, laughing about the victim.  Judge, there's been

 5  boatloads of proof about the defendant's lack of remorse and

 6  boatloads of proof about his failure to adapt to societal

 7  norms.  The defense put on a lot of the proof about the

 8  defendant failing to adapt to societal norms.

 9          THE COURT:  Ms. Cory?

10          MS. CORY:  Your Honor, I don't think there has been

11  any evidence, in the penalty phase or previously, about a lack

12  of remorse.  I don't think that instruction is appropriate,

13  just because the government hasn't made any showing to support

14  it.

15          THE COURT:  Well, what the Court was trying to do was

16  to confine the jury as to what evidence it could look at in

17  making a determination that the defendant would or would not be

18  a danger in the future to the lives and safety of others.  I

19  don't think it would be improper for the government to argue

20  that there has been a lack of remorse in this case, but I'm not

21  satisfied that there has been specific evidence introduced that

22  would allow the Court to comment on it in limiting the jury's

23  consideration.

24          There were other things that were introduced, that

25  the Court had given some thought to, that the Court did not

1    put in.  I believe it was Agent Melia who testified that Joey

2    Marshall told him that the defendant had been robbing, I

3    think, drug dealers while he was avoiding capture.  Even if

4    the Court thought that the jury could accept that, I'm not

5    sure that says anything at all about whether the defendant is

6    a danger to others.  And what I tried to do was just specify

7    things that I thought the jury could look at fairly

8    comfortably in making such a decision.  So I don't know that I

9    feel comfortable in giving an instruction along the lines of

10   remorse.

11          MR. NEFF:  What about the failure to adapt to

12   societal norms, Judge, which is also --

13          THE COURT:  And the evidence came from the defense?

14          MR. NEFF:  The evidence--  Well, obviously the

15   evidence comes from --

16          THE COURT:  Dr. Cunningham's evidence.

17          MR. NEFF:  Not just Dr. Cunningham.  I think that was

18   part of it.  But I was just pointing out that the defense

19   themselves put on proof about the defendant's failure to adapt

20   to societal norms.  But obviously we have the proof of

21   everything the defendant did, both leading up to the murder,

22   during the course of the murder, and after the murder, all of

23   which support the concept that he has failed to adapt to

24   societal norms.  Even after he's been caught in this particular

25   enterprise, he has failed to adapt to societal norms.

1          THE COURT:  Ms. Cory?

2          MS. CORY:  Your Honor, none of the evidence of

3     Mr. Taylor's past failure to adapt to societal norms, such as,

4     quote, unquote, his "life of crime," does anything to go toward

5     his future dangerousness.

6          MR. NEFF:  Well, Judge, it clearly does.  I mean, in

7     fact, our -- that's one of the factors that we discuss in the

8     future dangerousness.  I think it's under our-- The amended

9     superseding notice of intent to seek the death penalty

10    specifically points out, on Page 4, Number 1, "Rejon Taylor has

11    failed to adapt his behavior to societal norms, thereby

12    signifying a low rehabilitative potential," which goes directly

13    to his future danger.  Obviously I think his lack of remorse

14    goes to future danger as well.  I understand the Court's ruling

15    on that.  We'll obviously argue it.  But I think, clearly, if

16    somebody has failed to adapt to societal norms, they're a

17    future danger, especially even after he's been caught.

18         MS. CORY:  Your Honor, no more than anybody else who

19    stands before the Court having been convicted of a crime.

20    There is nothing about the evidence that Mr. Neff is talking

21    about that is uniquely true of Rejon Taylor.  Your Honor has

22    denied our putting in the kind of evidence that you said was

23    too broad because it dealt with more than just what's unique to

24    Mr. Taylor.  I mean, unique to Mr. Taylor is that he does not

25    have a criminal record, he does not have prior convictions.

1 Most people, by the time they get into federal court, have, you

2 know, a boatload of prior convictions, and that's what gets

3 them here. So to say this is something that applies to Rejon

4 Taylor, that the evidence, such as it is, that he has failed to

5 adapt establishes a future danger just isn't there.

6 MR. NEFF: Judge, I mean, this goes specifically to

7 the defendant. We're talking about a guy who continues to

8 conspire with his codefendant to perpetrate a fraud on the

9 Court. We're talking about a guy who tries to escape from

10 prison. We're talking about a guy who laughs at his victim.

11 We're talking about a guy who laughs at his crime. This is all

12 very specific to Rejon Taylor. This is not evidence that is

13 general in nature and would apply to any defendant.

14 THE COURT: Well, the Court, as it has commented

15 before, is looking at evidence or information introduced in the

16 case, not allegations by the parties. And I do not think that

17 the evidence as to remorse rises to the level where the Court

18 would feel comfortable including that in this particular

19 instruction. The Court does believe that there has been some

20 evidence introduced, both by the government and also by the

21 defense, that the defendant heretofore has failed to adapt to

22 societal norms. So the Court will include that language, then,

23 at the end of this sentence. We'll put a comma after

24 "grandmother," and then we'll put "and defendant failed to

25 adapt to societal norms." But the Court will not make any

1    statements regarding remorse.

2            MR. NEFF:  I understand, Judge.  If we could also put

3    in this -- where the Court's listed some of those things, if we

4    could put in there something about this list not being

5    exhaustive, that the jury may consider other proof that the

6    government has put on in deciding whether the government's

7    proved any of these aggravating factors beyond a reasonable

8    doubt.

9            THE COURT:  No, I think that's fairly clear from the

10   language, "In support of this allegation, the government

11   introduced."  The Court does not want to leave it completely

12   open-ended, for some of the reasons the Court rejected the

13   testimony of Dr. Cunningham.  I mean, one of the arguments for

14   introducing Dr. Cunningham's evidence was that some juror might

15   believe that the defendant was going to be a bomb-maker in

16   prison or he was going to jump on all of the other inmates and

17   beat them up.  There is no evidence to support that.  And what

18   the Court was trying to do was to limit things to what the

19   evidence was in the case the jury could rely upon and not make

20   decisions based on speculation.

21           MR. NEFF:  And, Judge, I agree.  I guess my only

22   point is, there may be other proof that either the Court or the

23   government has not thought of to put specifically in here.

24           THE COURT:  Well, if you think it supports this, my

25   suggestion would be that you argue it.  If Ms. Cory disagrees,

1    she will object.

2            MR. NEFF:  Okay.  Thank you, Your Honor.  Page 17,

3    please, Judge.  Page 17, I think that paragraph that starts out

4    "Mitigating factors," I suggest -- I suggest either one of two

5    things, either the last sentence of that paragraph be stricken

6    because it doesn't make any sense, or that if the Court keeps

7    that sentence in there, that the Court add an additional

8    sentence that says, "Individual jurors, however, are not

9    required to consider mitigating factors found only by other

10   jurors."  And there is a case that supports this idea very

11   clearly, *United States v. Webster*, 162 F.3d 308 (5th Circuit,

12   1998).

13           It does not make sense to tell a juror that they

14   should consider a factor that they have not found, a factor

15   that they have rejected.  And I understand that the

16   Eighth Circuit, which provides the pattern instructions for

17   capital cases, does include this sentence in their pattern

18   instructions, but I don't think that's a correct statement of

19   the law.  I think the government's position is that individual

20   jurors should not have to consider a factor they did not find

21   to be mitigating.  I know that's a double negative.  But it

22   just doesn't make any sense, Judge, to say that, and I don't

23   think it's an accurate statement of the law.

24           THE COURT:  Ms. Cory?

25           MS. CORY:  Your Honor, I think it is an accurate

1 statement of the law.  In fact, I think every juror must

2 consider every mitigating factor that is proposed.  They are

3 free to reject it, but they are not free to refuse to consider

4 it first.

5          THE COURT:  Okay.  I'll take a look at this, then.

6 We did borrow from the Eighth Circuit.  I don't know that we

7 did any independent research on this particular statement.  And

8 perhaps it could be written more clearly; I don't know.  But

9 the government says it's not supported by the law.

10          Ms. Cory, you don't have any cases offhand, do you,

11 that --

12          MS. CORY:  I'm looking, Your Honor.

13          MR. NEFF:  Judge, I'd just point the Court to that

14 *Webster* case.

15          THE COURT:  *Webster* case?

16          MR. NEFF:  Yes, sir.

17          MS. CORY:  Your Honor, I think if you go back to

18 cases like *Eddings v. Oklahoma* or *Mills v. Maryland*, it

19 requires the sentencer to consider any mitigating information.

20 The statute itself, 3592(a), says, "The finder of fact shall

21 consider any mitigating factor."  *Williams v. Taylor*, 529 U.S.

22 362; *Tennard v. Dretke*, 542 U.S. 274 (2004); *Abdul-Kabir v.*

23 *Quarterman*, 127 S.Ct. 1654; *Ayers v. Belmontes*, 127 S.Ct. 469,

24 2006 case.  I think the force of the law is very much behind

25 the concept that every mitigating factor must be considered.

 1          MR. NEFF:  Well, Judge, perhaps Ms. Cory is

 2    misunderstanding me.  And I'm not sure if I'm making myself

 3    clear.  Maybe I'm not.  I think I am, though.  Obviously I'm

 4    not saying the jurors should not consider mitigating factors.

 5    What I'm saying is, jurors should not have to be -- be required

 6    to have to consider a mitigating factor that that individual

 7    juror has rejected.  In other words, if Mr. Poole and I are

 8    deliberating as jurors, and Mr. Poole finds a mitigating

 9    factor, and I say, "No, I don't think that the defense has

10    proven that mitigating factor," I should not have to consider

11    Mr. Poole's finding when I'm considering my vote as to whether

12    to impose the death penalty or not.  That's my point.

13          I think Ms. Cory is right that obviously jurors

14    should consider all mitigating factors; but if a juror has

15    considered it and rejected it, the juror should not then be

16    required to have to consider something that they've already

17    rejected.  That's my point, and I think that's what this case

18    says.

19          THE COURT:  Okay.  We'll take a look at that.  I

20    think what the Court had in mind happening as it thought about

21    this particular instruction was that at some point each juror

22    would outline or list what they considered to be mitigating

23    factors, and the list would differ as to each juror, and then

24    as a group they would just go through everything that was there

25    and they'd make some decisions on it.  They may convince people

1   who had listed something as a mitigating factor that's not a

2   mitigating factor, or they may convince other jurors this is a

3   mitigating factor, but I thought there would be some collective

4   discussion about all of the factors that each particular person

5   had listed.  But we'll take a look at the case and --

6           MR. NEFF:  Thank you, Your Honor.

7           THE COURT:  -- see.  Next page?

8           MR. NEFF:  Actually same page, last paragraph,

9   suggestion regarding a sentence at the end of the paragraph

10  that says, "Whether the factor is supported by a preponderance

11  of the evidence and whether it is mitigating is a matter for

12  you to decide."

13          THE COURT:  "Whether a mitigating factor has been

14  proven and whether it is a mitigating factor is for you to

15  decide"?

16          MR. NEFF:  "Whether the mitigating factor is

17  supported by a preponderance of the evidence and whether it is

18  mitigating is a factor -- a matter for you to decide."

19          THE COURT:  Ms. Cory?

20          MS. CORY:  Your Honor, I think you've already said

21  that.

22          MR. NEFF:  Well, not necessarily, because somebody

23  could find that evidence supports a factor by a preponderance

24  of the evidence, but they may -- that juror may not believe

25  that that factor is a mitigating factor, or vice versa; they

1    may say, "Well, this would be a mitigating factor, but the

2    defense didn't prove it by a preponderance of the evidence."  I

3    think that makes it clear that the juror has to find -- the

4    individual juror and then the jury as a whole has to find both.

5            MS. CORY:  The fact that this whole section is

6    talking about mitigating factors, I think, explains

7    sufficiently to the jury that they can't find it as a

8    mitigating factor unless they find it's a mitigating factor.

9            THE COURT:  The Court tends to agree with Ms. Cory,

10   but I don't know that there is any harm that comes from adding

11   it, so the Court will do it.

12           MR. NEFF:  Thank you, Your Honor.  Page 18, last --

13   it's not the full paragraph, but --

14           THE COURT:  This is the page where you wanted to add

15   the sentence that you do not weigh the intent factors?

16           MR. NEFF:  Yes, sir, I think that's what -- it makes

17   sense there.  I'm specifically concerned, on Page 18, with the

18   last full sentence on the page, "If one or more of you so find,

19   you must return a sentence of life in prison without the

20   possibility of release."  I think that -- I think that this may

21   be an incorrect statement of the law.  I think the sentence

22   undermines the requirement of unanimity under Title 18,

23   3593(e).  I think it basically gives the jury an out rather

24   than asking them to stay in and deliberate and try to reach a

25   unanimous agreement.

1           And I'm going to have a similar argument here on the

2   next -- on Page 20 when we talk about "Consequences of

3   Deliberations."  And I can go to that right now if the Court

4   wishes for me to.  I think when you put it together it will

5   make more sense.  On Page 20, in the penultimate sentence

6   there, the next-to-last sentence on that page, on that

7   instruction, I think that the Court should say, "If you

8   unanimously determine that the defendant should receive a

9   sentence of life imprisonment without possibility of release,

10  then that is the sentence."  I suggest that the Court take out

11  the last sentence entirely.  And there are--  I have a couple

12  of cases to support this; one is *Jones v. United States*, 527

13  U.S. 373, Supreme Court case from 1999.  In that case the

14  court said that the object of the jury system is to secure

15  unanimity; and it also said that the government has a strong

16  interest, in capital sentencing proceedings, for the jury to

17  express the conscience of the community on the ultimate

18  question of life or death.  Charging the jury in the way

19  that's expressed here undermines that strong governmental

20  interest.  There is also a Sixth Circuit case from 2000, *Scott

21  v. Mitchell*, 209 F.3d 854, and the quote from that case says,

22  "The Supreme Court has chastised such instructions as this as

23  encouraging deadlock and undermining the strong government

24  interest in unanimous verdicts."

25          I'm afraid both that that sentence on Page 18, that

1    last full sentence, as well as the last full sentence on

2    Page 20 undermine the interest in unanimity.  And I also think

3    that the Court should put the word underlined unanimously in the sentence

4    which I'm now saying should be the last sentence, "If you

5    unanimously determine that the defendant should receive a

6    sentence of life imprisonment."  Obviously we know what the

7    law is.  The law is, if the jury cannot reach a unanimous

8    decision, if they hang, then the result is life in prison

9    without parole.

10           I don't think that this should be told to the jury.

11   I think the jury should be encouraged--  And if the jury does

12   get hung, there is precedent for the Court sending them back

13   with an *Allen* charge in capital cases as well.  I don't have

14   that right at the tip of my fingers here.  But we feel that

15   those particular statements in the instructions undermine the

16   unanimity concept.

17           THE COURT:  Ms. Cory?

18           MS. CORY:  Your Honor, before I respond directly to

19   what Mr. Neff said, I would say that on Page 20, that last

20   sentence left out an important word, which is "will receive a

21   sentence of life imprisonment with no possibility of release."

22           THE COURT:  Yes, that should say "without," instead

23   of "with."

24           MS. CORY:  With that one change, both of these

25   sentences, the one on Page 18 to which Mr. Neff has referred

1    and the one on Page 20, are absolutely correct statements of

2    the law.  I don't see any reason to keep the jury in the dark

3    about this.  Your Honor is telling them that they need to

4    deliberate, that they need to try to reach a unanimous verdict.

5    But to let them think that the result of their failure to reach

6    a unanimous verdict is anything other than that Your Honor will

7    impose a sentence of life without possibility of release, it's

8    -- I won't say "deceitful," but it's holding back something

9    from the jury that they have every right to know.  And it's a

10   correct statement of the law.

11            THE COURT:  The Court will take a look at the cases,

12   then, cited by the government, and will make a decision on this

13   after the Court --

14            MR. NEFF:  Judge, the pin cites, by the way, on *Jones*

15   *v. United States*, the 527 U. S. 373, the pin cites are 382 to

16   383, on the things that I cited there.  And on the *Scott v.*

17   *Mitchell*, 205 F.3d 854, that pin cite is 877.

18            THE COURT:  Okay.  Anything else?

19            MR. NEFF:  One moment, please, Judge.

20            (Brief pause.)

21            MR. NEFF:  Judge, going on to the -- I guess the jury

22   form, I don't -- the jury form itself doesn't have page

23   numbers, but I think it's the third page, under "Mitigating

24   Factors," Number 5 there, I don't know that there's even an

25   allegation that there is no scientific or physical evidence.

1  In fact, there was plentiful amounts of scientific and physical

2  evidence presented during the case.  There was DNA.  There was

3  ballistics.  There was fingerprint evidence.  I'm not sure

4  where that's coming from.  I'm not sure why the Court included

5  that.  But --

6          THE COURT:  I included it because the defense gave it

7  to us.

8          MR. NEFF:  Okay.  Well --

9          THE COURT:  I didn't make any changes to it.

10          MR. NEFF:  Okay.  Got you.  I don't think it's

11  supported by the evidence, or, I guess, what the defense say,

12  lack of evidence.

13          THE COURT:  Ms. Cory?

14          MS. CORY:  Your Honor, the rest of that sentence read

15  "showing whether Rejon Taylor or Sir Jack Matthews killed Guy

16  Luck," and I think that's specifically referencing the

17  testimony of Dr. King.

18          MR. NEFF:  Well, but there was testimony about who

19  had which gun, who got shot with which gun, whose fingerprints

20  were inside the van, whose blood.  I mean, Judge, there was

21  copious amounts of physical proof, physical and scientific

22  proof.

23          MS. CORY:  And we are not saying there was no

24  scientific proof or there was no physical proof.  We are going

25  back to the question in the jury's mind, how certain are they

1    who it was who fired the fatal shot.

2         THE COURT:  Mr. Neff, what the Court has done here is

3    just taken all of the defense's submissions and just included

4    them verbatim.  To the extent they're not supported by the

5    evidence, I think you can point that out in your argument.

6         MR. NEFF:  Judge, yes, I understand that.

7         THE COURT:  I'm not approving or disapproving of any

8    of the mitigating factors.  The defense has given them to us,

9    and we're giving the jury a chance to act on them.  We're not

10   approving them.  We're not disapproving them.  We're not saying

11   they're supported by the evidence.  We're not saying they're

12   not supported by the evidence.  They're just what the defense

13   says, so here they are.

14        MR. NEFF:  I guess in that vein, then, I have a

15   question for the Court, because I would have similar kinds of

16   objections to many, many of the mitigating factors that the

17   defense has submitted to the Court which I say have not been

18   supported by evidence.  Is it the Court's intention to give

19   those instructions regardless, or should I abandon my --

20        THE COURT:  What do you mean, "regardless"?

21        MR. NEFF:  Well, I mean, I guess I was going to argue

22   about some of the things we would submit the proof has not

23   supported in terms of mitigating evidence, that the Court

24   should not instruct them about things that there's no proof

25   for.  There--  I didn't count how many, let's see -- maybe the

1   Court did -- how many mitigating factors --

2           THE COURT:  There was fifty-something.  And what I

3   had in mind, just as I had done with the government's

4   aggravating factors, list and summarize them, but I did not

5   think I could do that with 50.  And some of them the Court was

6   not -- the Court did not want to be in a position of telling

7   the jury that there had been evidence to support them.  So what

8   I decided to do was, instead of discussing them in the body of

9   the instructions, just say, "The defense has a list, and you'll

10  have a chance to see the list."  So the Court has provided

11  them.  There was -- I don't think it's included in this list,

12  but at one time there was a mitigating factor submitted

13  regarding French law, and as a matter of law the Court

14  determined that that would not apply so it was not proper for

15  the jury to be concerned about law.  But that's different from

16  facts.

17          MR. NEFF:  Okay, Judge.  Well-- All right.  I guess

18  we'll just -- I guess we'll see if the Court agrees with me,

19  then.  For example, in light of what the Court's just said, if

20  you go to Number 33, for example, one of the factors --

21  mitigating factors that the Court has listed here——I guess that

22  the defense sent them——my understanding of the way the Court

23  ruled on the law is that that's not appropriate, that's not an

24  appropriate mitigating factor, execution impact evidence is not

25  appropriate evidence for the jury to consider, just as an

1    example of--  I guess that's what I'm trying to figure out——if

2    the Court is just going to include wholesale the defendant's

3    suggestions about what the mitigating evidence is, or if the

4    Court wants to be nuanced about which ones it gives.  I guess I

5    just don't know the answer to that question.

6         THE COURT:  Ms. Cory, this one that Mr. Neff just

7    pointed out, I think this probably is more an issue of law

8    rather than fact, isn't it?

9         MS. CORY:  Your Honor, you did not permit the family

10   witnesses to testify about how Rejon's death would affect them.

11   I would still say that the jury is entitled to contemplate the

12   fact that not only has Guy Luck's family suffered a loss but

13   Rejon Taylor's family will suffer a loss.  This is not a young

14   man that no one cares about, that's just society's refuse.

15   This is a person who has a family, who has friends, and who

16   will be -- it will be a loss if he's executed.  I think the

17   jury is going to think about that anyway.  And for us to be

18   allowed to formulate it is simply going to aid them in their

19   discussion.

20        THE COURT:  This is an issue here that I think runs

21   more into the legal arena, much like the French law question.

22   The Court did not allow friends and family members of the

23   defendant to talk about what effect a possible future execution

24   of the defendant will have on their lives at some unknown point

25   in the future, and the Court did that for legal reasons.  So I

1    think the legal premise of the question is somewhat lacking.

2    And because of the Court's legal decision, there is no evidence

3    produced to support it.  So the Court will strike that one,

4    then, Number 33.  It's not so much factual as it is legal.

5              What's next, Mr. Neff?

6              MR. NEFF:  Judge, in terms -- I guess in terms of

7    legal questions, that's the only other one that I saw.

8    Obviously we take issue with whether there has been evidence to

9    support many of these factors which have been alleged here, and

10   would like for them to not be included, or, in the alternative,

11   some way to, I guess, consolidate some of these things.  For

12   example, it seems like one of the philosophies or theories that

13   the defense is trying to put forth is that there are people

14   that are more culpable than the defendant in this case.  I

15   think the Court could just consolidate some of these things,

16   talking about what Joey Marshall did and what Sir Matthews did

17   on other occasions or whatever, can consolidate those things

18   and say -- ask the jury whether they find if there is another

19   individual who is equally or more culpable than the defendant

20   in the crime, in terms of their moral culpability, rather than

21   setting forth a separate fact.

22             I guess ultimately, Judge, we've alleged only a few

23   aggravating factors, both statutory and nonstatutory

24   aggravating factors.  If the Court is going to leave this in

25   here, I would ask for an instruction similar to what the Court

1   does in terms of the instruction that it gives with regard to

2   the number of witnesses, that the number of mitigating

3   factors-- And I know the Court talks about the weighing, and

4   I think maybe that takes care of it to some degree, but it

5   just looks overwhelming to me, all of these mitigating

6   factors. And, I mean, I think obviously some of these the

7   jury is going to find, and they can weight them as much as

8   possible. I mean, "Rejon Taylor's life has value," I vote for

9   that one. But I just don't know that it has a place,

10  necessarily, in here as a mitigating factor, as well as some

11  of these others, too. So if we could consolidate and give an

12  instruction about not considering the quantity as much as the

13  quality of the proof as to each of the mitigating and

14  aggravating factors, to make it more clear.

15          THE COURT: On Page 18 of the draft, it says, "In

16  other words, you should not simply count the number of

17  aggravating and mitigating factors and reach a decision on

18  which number is greater; you should consider the weight and

19  value of each factor. The law contemplates that different

20  factors may be given different weights or values by different

21  jurors. Thus, you may find that one mitigating factor

22  outweighs all aggravating factors combined, or that any

23  aggravating factors proved do not, standing alone, justify the

24  imposition of a sentence of death. Similarly you may

25  unanimously find that a particular aggravating factor

1 sufficiently outweighs all mitigating factors combined to

2 justify a sentence of death.  You are to decide what weight or

3 value is to be given to a particular aggravating or mitigating

4 factor in your decision-making process."

5          Mr. Neff, as I indicated before, I think originally

6 there were fifty-something --

7          MS. CORY:  Fifty-five.

8          THE COURT:  Fifty-five.  And the Court asked the

9 defense to consolidate them.  And I think what you see now is

10 their effort at consolidating.

11          MR. NEFF:  Well, I would have made a better effort to

12 consolidate, Judge.

13          MS. CORY:  Your Honor, I feel sure that Mr. Neff

14 would have thought of as many mitigating factors as he could

15 have, were he in our shoes.

16          MR. NEFF:  I'm sure I would have, Your Honor.  I

17 think that's all I have, Judge.

18          THE COURT:  Ms. Cory?

19          MS. CORY:  Thank you, Your Honor.

20          Your Honor, I did type up what is, hopefully, a

21 helpful outline of what changes we were asking for.

22          THE COURT:  Excellent.  Thank you.

23          MS. CORY:  And I apologize.  There may be some

24 overlap with what we had just discussed as far as the

25 government's changes are concerned.  I tried to mark those, but

1    I may repeat some of it, because some of our issues were with

2    the same parts of the instructions.

3              THE COURT:  Okay.  So first is on Page 3, when we

4    define evidence, you'd like to add the word relevant before

5    "evidence"?

6              MS. CORY:  Yes, Your Honor.

7              THE COURT:  Any objection?

8              MR. NEFF:  No, Your Honor.

9              THE COURT:  Okay.  We'll do that, then.

10             MS. CORY:  Then the second paragraph we asked to be

11   deleted this:  "With the exception of your ability to consider

12   information that does not rise to the level of evidence."  I

13   think the only thing that that could possibly apply to is

14   Mr. Taylor's allocution, and that your instruction on his

15   allocution covers that.  To leave it --

16             THE COURT:  It also applies to Agent Melia's

17   testimony; I'm trying to think what else.  It's been a long

18   time.  It may refer to some of the defense witness testimony.

19   It refers to Dr. Cunningham's testimony.  There were a lot of

20   people that gave statements that in an ordinary proceeding

21   would not have been admitted into evidence because it was

22   hearsay or there was some other evidentiary barrier to allowing

23   it.  We let it in.  And this-- Before, I told the jury what

24   evidence is, and I recall telling the jury that hearsay

25   evidence is not admissible, and I explained to them why hearsay

1    does not come in.  And then in this stage they're hearing

2    second- and thirdhand about things.  And I wanted to make sure

3    that the jury understood that they could still consider it even

4    though I told them previously in the guilt phase that this

5    stuff is not evidence.

6            MS. CORY:  Then I would say this sentence is going to

7    confuse them, because they're not going to know whether you are

8    telling them at the penalty phase that they can or cannot

9    consider evidence that doesn't -- or information that does not

10   rise to the level of evidence.  And if the Court --

11           THE COURT:  We said that in the first sentence.  It

12   also said that in the preliminary instructions when the jury

13   was brought back in.  I told them that they could consider

14   things other than evidence.

15           MS. CORY:  Well, I'm not sure where in the

16   instructions Your Honor says that.  I'm concerned the jury is

17   going to read this to mean that anything that doesn't

18   constitute evidence that was admissible at the first stage is

19   something they really aren't supposed to consider.

20           THE COURT:  Well, it says, "Evidence or other proper

21   information that was presented at the sentencing phase of the

22   trial," in the first sentence.

23           MS. CORY:  Yes.

24           THE COURT:  So they can consider all the evidence

25   that came in during the guilt phase, and they can consider all

1   the evidence or other proper information that came in during

2   this phase of the trial.

3           MS. CORY:  I would still say, Your Honor, that that

4   particular sentence that constitutes the second paragraph is

5   going to confuse them as to what they can consider.

6           THE COURT:  Mr. Neff?

7           MR. NEFF:  Judge, I think it's fine the way it is.

8   I'm not sure I totally understand Ms. Cory's objection, but

9   I --

10          THE COURT:  The concern here was to make sure that

11  the jury understands that they're being told that the

12  instructions we gave them previously still apply.  We told them

13  that they could only consider evidence, and we defined what

14  evidence was --

15          MR. NEFF:  Right.

16          THE COURT:  -- and we told them you could only

17  consider that.  Well, the rules have changed now.  And what

18  we're trying to tell them is, "Not only can you consider

19  evidence, you can also consider other things that do not rise

20  to the level of evidence."

21          MR. NEFF:  Which you say, Judge.

22          MS. CORY:  Your Honor, perhaps we could change the

23  heading, then, to "Information."

24          THE COURT:  That will be fine.  We can do that.

25          MS. CORY:  Thanks.

1          MR. NEFF:  That's fine.  How about "Evidence and

2    Information"?

3          MS. CORY:  Well, at the penalty phase they can

4    consider any information; that includes evidence, and that

5    includes other things that aren't evidence.

6          THE COURT:  Like hearsay.

7          MS. CORY:  Yes.  Then we had asked for a sentence to

8    be added at the very end of Paragraph 3, to read, "If in the

9    course of your deliberations it appears that such matters are

10   being discussed, please cease your discussions and advise the

11   Court immediately."  And that's something that of course the

12   jury should do.  And in this case we think it's important to

13   reemphasize that to them.

14         MR. NEFF:  Judge, I think that's getting dangerously

15   close to discussing the deliberations process of the jury,

16   which I don't think the Court is allowed to do.

17         THE COURT:  The Court agrees.  The Court will not add

18   that.  What's next?

19         MS. CORY:  Going on to Page 5, Your Honor, we were

20   requesting a revision to the final two sentences in the

21   "Unsworn Allocution" section, that they read "Instead, this was

22   his," being Mr. Taylor's, "opportunity to speak to you

23   personally regarding himself and your sentencing decision.

24   Although you will not be treating his statement as evidence,

25   you must give his statement consideration when reaching your

1   decision regarding sentencing."

2          THE COURT:  Any objection, Mr. Neff?

3          MR. NEFF:  I would say, "You may give his statement

4   consideration," not "you must."

5          MS. CORY:  Here again, Your Honor, I think the jury

6   must give it consideration.  They can give it whatever weight

7   they want to.  They can reject it.  But they must consider it.

8          THE COURT:  Okay.  We will make that change, then.

9          MS. CORY:  Thank you, Your Honor.  And then I think

10  we already made the decision regarding that second paragraph --

11         THE COURT:  Yes, we've moved the second one.

12         MS. CORY:  -- the second instruction.

13         THE COURT:  Do you know where you want it to go?

14         MS. CORY:  Your Honor, I had asked it be placed

15  following "Lawyers' Objections," just to get it far enough away

16  from the allocution instruction so as not to confuse the jury.

17         THE COURT:  It's about four pages over, then.  Why

18  don't we head this, then, "Defendant's Right to Testify or Not

19  Testify"?  Why don't we call it that?

20         MS. CORY:  Okay.

21         THE COURT:  Okay.  So we'll move it there, then.

22  What's next?

23         MS. CORY:  Page 11, "Requisite Mental State."  I

24  think Mr. Neff and I were in agreement on a good bit of this,

25  and I'm a little confused at what the Court's final ruling was

1  as to how you were going to handle the end of the first

2  paragraph.  Our suggestion is--  Here you didn't like the

3  reference to it being a threshold determination.

4          THE COURT:  Knowing the jury, do you think most of

5  them, in their everyday conversation, use the word threshold?

6          MS. CORY:  I don't know.  Perhaps they use if, then

7  instead.  But they would understand the comment.  And then the

8  last part of the sentence -- the last part of that paragraph, I

9  think Your Honor decided, "Please bear in mind the intent

10 factors listed below are not, themselves, aggravating factors,

11 and may not be weighed or considered by you," you intend to

12 place that later on in the instructions, but you do intend to

13 use that statement?

14         THE COURT:  I think I have addressed that in

15 discussing the government's request.

16         MS. CORY:  Yes.

17         THE COURT:  We're going to put intent factor in that

18 first paragraph, which will specify, and we're going to later

19 on tell the jury that there is no need to weigh the intent

20 factor.

21         MS. CORY:  Yes, Your Honor.  The next thing was on

22 Page 12, still on the "Requisite Mental State."  We were asking

23 for an additional paragraph that would read, at the very end,

24 "Any finding that one of these four types of intents has been

25 established by the government must be unanimous.  It must be a

1 finding by all 12 members of the jury. If any of you are left,

2 after impartially considering it, with a reasonable doubt as to

3 whether the government has proven one of these four types of

4 intent with respect to Rejon Taylor, you should so indicate on

5 Question 2 of the verdict form. In that event, your sentencing

6 deliberations will be at an end."

7 Here again, it's our desire to make sure the jury

8 understands up front that their decision-making process falls

9 into several discrete areas.

10 THE COURT: Mr. Neff?

11 MR. NEFF: Your Honor, I don't have any objection to

12 the first sentence that Ms. Cory has suggested or proposed

13 there. I mean, I think that's-- Actually the whole thing is

14 accurate. I think in other places on the form or in the

15 instructions the Court -- maybe it was the jury verdict form,

16 the Court says something about "proceed," "continue to Question

17 Number 7," or something along those lines. Perhaps this can be

18 put on the form, if it's not already—let me look—in terms of

19 the statutory intent factors. I think the Court's already

20 covered the rest of what Ms. Cory is concerned about on the

21 verdict form, looking at it here. Question Number 2, at the

22 bottom, it says, "If you answer yes to one or more parts of

23 Question 2, answer Question 3. If you answer no to any or all

24 parts of Question 2, skip to Question 7."

25 I don't disagree with Ms. Cory that the four types

1  of intent has to be unanimous and found beyond a reasonable

2  doubt.  And that is not in that instruction, Judge, and I

3  agree it probably should be.

4         THE COURT:  The Court had considered doing this.  In

5  the Eighth Circuit pattern instruction they have language like

6  this after each particular section.  So what happens is that

7  the Court will be repeating itself over and over again and

8  saying the same thing.  So, to avoid that, on Page 7 the Court

9  indicated that wherever the government has the burden of proof,

10  the government must carry their burden of proof by proof beyond

11  a reasonable doubt.

12         So wherever later on in the instruction the Court

13  talks about the government's burden, this earlier instruction

14  will cover it, instead of having the Court repeat the same

15  thing over and over and over again.  I mean, that is true of

16  the intent factor, the statutory aggravating factor, the

17  nonstatutory aggravating factor.  So we'll be saying the same

18  thing over and over and over again, which I would like to

19  avoid, since I'm reading it.

20         MS. CORY:  Your Honor, I have never been in the

21  military, but I have been a teacher, and I know that people

22  learn by repetition.  And I know you don't want to put the jury

23  to sleep listening to 50 pages of instructions.  But, on the

24  other hand, everything you say to them carries special weight

25  because you said it to them.  And I think putting it in the

1    instructions, even if it involves repeating it at appropriate

2    moments, has a valuable effect on the jury, and is going to

3    keep them from getting confused when they start going through

4    the verdict form and it says things like, you know, "If you say

5    yes to this, skip to question such-and-such, but if you say no

6    to this, go to the next question."  Your instructions are going

7    to be what carries them through their deliberation.

8         THE COURT:  Well, there are theories as to what

9    people retain; and one is primacy, and the other is recency.

10   Primacy would involve what the Court instructs the jury here in

11   court orally.  And the Court providing the jury with the

12   instruction itself will take care of the recency.  So the jury

13   will have the written instruction, and they'll be able to go

14   through it, and they will see that the way that the instruction

15   is written tells them that whenever there is a burden on the

16   government it's proof beyond a reasonable doubt, whenever there

17   is a burden on the defendant it's only by a preponderance of

18   the evidence.

19        So I think that concern is taken care of by the

20   Court providing the jury with a written copy of the

21   instruction.  Each juror will have a written copy of the

22   instruction.  And, believe me, they pay close attention to the

23   instructions.  When you go back and look at them, they have

24   red marking and arrows and things, they've highlighted things.

25   They pay very close attention to the instructions.  What's

1    next?

2            MS. CORY:  Next would be Page 13.  We're asking for

3    three small changes; one, since two of the alleged statutory

4    aggravating factors were knocked out, we ask that it be changed

5    to "either of the two statutory aggravating factors."  That's

6    the first paragraph there.

7            Third paragraph, where Your Honor is talking --

8    after the first sentence, where you're talking about

9    mitigating and aggravating, we have a real concern that there

10   is a commonsense understanding of mitigating which means it

11   only goes to the underlying offense, and we're asking for a

12   sentence to be added saying, "In this context the word

13   mitigate refers to the sentence to be imposed, and not to the

14   underlying crime."  That would be right after the first

15   sentence in the third paragraph.

16           And finally --

17           THE COURT:  Any objection, Mr. Neff?

18           MR. NEFF:  Well, Judge, yeah, actually I do.  I think

19   that the defense lists all these factors the Court is going to

20   tell some of them are mitigating factors relating specifically

21   to the underlying crime.  So I'm not sure that adding that

22   would be appropriate.  Seems contradictory to me.

23           MS. CORY:  Any mitigating factor that we're asking

24   the jury to consider is in the context of what the penalty is

25   that they're going to propose, either life or death.

1        MR. NEFF:  But they're asking about mitigating--

2   They're asking the jury to find mitigating factors relating to

3   the underlying crime.  So I think that is more confusing than

4   anything.  I think just leaving it like it is is fine.

5        THE COURT:  I'll take a look at this.  What's next?

6        MS. CORY:  Then our final comment on Page 13 was to

7   introduce the concept of weighing.  Paragraph 3, at the very

8   end of that last sentence, to change "which might indicate that

9   the defendant should not be sentenced to death" to "which

10  weighs against a sentence of death."

11       THE COURT:  Mr. Neff?

12       MR. NEFF:  "Which might weigh against a sentence of

13  death."  I will agree.

14       THE COURT:  Ms. Cory?

15       MS. CORY:  I think the proper replacement for what

16  the Court has there, "should not be sentenced to death," is

17  "weighs against a sentence of death."  The jury -- again,

18  they're the ones that are going to decide whether to accept it

19  or reject it.

20       THE COURT:  Well, I think the language that is there

21  now takes care of that.  If the parties are agreeable to a

22  change, I don't mind changing it.  I don't think it adds or

23  takes anything away from it.  Mr. Neff would like to keep in

24  the word "might," which I do see in the present instruction.

25  If you-all can agree to something, I'll include it; if not, I

1  think what's there now conveys the same idea.

2  MS. CORY:  I think, Your Honor, we'd rather stick

3  with what the Court has.

4  THE COURT:  Okay.  What's next?

5  MS. CORY:  Page 14, "Statutory Aggravating Factors."

6  We're asking for an additional paragraph.  This was in our

7  original requests for penalty phase instructions.  And the

8  final paragraph would read, "Please keep in mind that

9  substantial planning and premeditation refer to the crime of

10  murder, not to any other offenses that accompanied or preceded

11  the murder.  Further, the government does not establish

12  substantial planning and premeditation by showing that a murder

13  was premeditated or some small amount of planning preceded it,

14  but the government must show the murder was preceded by an

15  unusual degree of planning."

16  That, I think, is just a correct statement of the

17  law.  "Substantial planning," that's what the statute says.

18  It's clearly above and beyond just premeditation and planning.

19  I think--  I don't have the cites right in front of me, but

20  the *Tipton* case in the Fourth Circuit and the *Webster* case in

21  the Fifth Circuit, the government previously cited, both stand

22  for that proposition that it's more than just premeditation

23  and planning.

24  THE COURT:  Mr. Neff?

25  MR. NEFF:  Your Honor, the Court says at the bottom

1    of Page 13, "The second statutory aggravating factor alleged by

2    the government is that defendant committed the murder after

3    substantial planning and premeditation to cause the death of

4    Guy Luck."  That should take care of it.

5              MS. CORY:  Your Honor, I think it's correct that, our

6    first sentence there, the Court has already addressed.  The

7    reason we are putting it in there again is to deal with what

8    constitutes substantial planning and premeditation, which is

9    the rest of that paragraph.  I think the jury needs more

10   guidance on what, at the penalty phase, planning and

11   premeditation means.

12             MR. NEFF:  Well, the Court says, "Substantial

13   planning and premeditation means a considerable or significant

14   amount of planning and premeditation."  I think that's

15   accurate.

16             MS. CORY:  It is accurate.  We just think the jury

17   would benefit from more.

18             THE COURT:  Well, I will add the first two sentences.

19   And I'll add the first sentence after the words "caused the

20   death of Guy Luck."  And then after the word "before" and

21   before "substantial," the word, we'll add, "Further, the

22   government does not establish substantial planning and

23   premeditation by showing that the murder was premeditated or

24   that some small amount of planning preceded it.  Substantial

25   planning and premeditation means a significant or considerable

1    amount of planning and premeditation."

2          MS. CORY:  Thank you, Your Honor.  Next was Page 15.

3    And we had a good bit of discussion about this, I think, with

4    the government, the nonstatutory aggravating factors.  We were

5    requesting that in the first paragraph, the final sentence,

6    "This is proper and must be considered" be changed to "This is

7    proper and may be considered."

8          On Paragraph 3 we were asking that that paragraph be

9    deleted in its entirety.  I realize Your Honor has set forth

10   already how you intend to change that third paragraph.  Our

11   concern is, everything Your Honor says has extra weight

12   because you're saying it.  You are pointing the jury to

13   specific things that you believe came in as evidence.  Because

14   it comes out of your mouth they are going to give that more

15   weight than if they just go back to the jury room and start

16   talking about the evidence that they heard.  And it would be

17   our request that you would simply say, "The government

18   introduced evidence through witnesses pertaining to this

19   allegation.  Please understand that the defendant's future

20   dangerousness must be evaluated in the context of

21   incarceration."

22         The thing we're most interested in is letting the

23   jury decide what the evidence was that goes to future

24   dangerousness, rather than the Court's giving them direction

25   in that regard.

1          THE COURT:  Well, the Court——and I think this is

2     probably pretty obvious——included this to protect the

3     defense --

4          MS. CORY:  Yes, Your Honor.

5          THE COURT:  -- so that the jury did not just have

6     free rein, for example, to conclude that the defendant was a

7     bomb-maker and would be making bombs while he's in prison.  If

8     the defense is not concerned about the possibility of the jury

9     looking at facts other than the facts introduced in evidence or

10    introduced during the sentencing phase, the Court will take it

11    out.

12         What the Court could then do is just give the

13    government a chance to list its statutory or nonstatutory

14    aggravating factors, just as it's doing with the mitigating

15    factors, and the Court would not make any comment at all

16    except to say, "The government has alleged certain things, and

17    argues that it has introduced evidence to support them, and

18    here is a list."  And then the defense mitigating factors and

19    the nonstatutory aggravating factors would be treated the

20    same.  And then the Court would not be commenting on whether

21    the evidence supports it or not.

22         MS. CORY:  Your Honor, that actually feeds into our

23    next request, which is that Your Honor state one by one what

24    the 35 mitigating factors are in the instructions, for the same

25    reason that when Your Honor tells the jury what the aggravating

1    factors are it has special weight because you told them.  If

2    you omit telling them what the mitigating factors are, they are

3    necessarily going to give them less weight than if Your Honor

4    were to include them in the instructions.  So our request is

5    that if you are going to give the aggravating factors in your

6    instructions, you also give the mitigating factors in your

7    instructions.

8            THE COURT:  Mr. Neff, would you have any problem with

9    just the Court submitting a list to the jury with the

10   government's alleged aggravating factors and whatever proof you

11   think has been submitted to support them?

12           MR. NEFF:  Well, let me make sure I understand the

13   Court -- what the Court's asking.  You mean that in doing so

14   you would take out this paragraph the defense has asked you to

15   take out, or at least a portion of it?

16           THE COURT:  The Court would take out the second full

17   paragraph, the third full paragraph, the fourth full paragraph,

18   and the Court would have some language similar to what the

19   Court has for the defense, that "The government has alleged

20   certain nonaggravating factors, it contends it has introduced

21   evidence to support them, and here is a list of them."

22           MR. NEFF:  You would propose doing that in the

23   special verdict form, Judge?

24           THE COURT:  Yes.

25           MR. NEFF:  As opposed to here?

1          THE COURT:  Yes.

2          MR. NEFF:  No, that's fine.

3          THE COURT:  And the government would put in the stuff

4     about remorse and all these other things, so its list may be 35

5     or 40 also.

6          MS. CORY:  Your Honor, those factors that the

7     government has alleged that do not meet a minimal evidentiary

8     standard, I think, cannot be submitted to the jury.  The burden

9     that's on the government is entirely different from the burden

10    that's on the defense.  They have proof beyond a reasonable

11    doubt.  We have asked for a directed verdict as to certain of

12    the statutory aggravators.  The Court has, for instance,

13    decided on the pecuniary gain.  So some of these factors for

14    which there is no evidence should not go to the jury when it's

15    an aggravating factor.  The defense's burden is much, much

16    lower.  And so we would not agree to just a wholesale listing

17    of those statutory aggravators or nonstatutory aggravators

18    alleged by the government for which there was no proof.

19         THE COURT:  Well, assuming that they confine

20    themselves to things they think there is proof on and they come

21    up with a list, there's probably going to be more than what the

22    Court has here.  Do you have any objection to that, then?

23         MS. CORY:  Your Honor has put me between a rock and a

24    hard place.  And if I could consult with my counsel for just a

25    moment, because there -- I mean, there are certain things about

1    the way you're addressing the nonstatutory aggravators that I

2    think are very helpful to the defense.

3         THE COURT:  As the Court said, the Court did this to

4    protect the defendant.  And if the defendant does not want that

5    protection, then that's fine.  We can do it in some other way.

6         MS. CORY:  Well, Your Honor, we certainly don't want

7    the government to be able to allege aggravators for which there

8    is no evidence.

9         THE COURT:  Remorse, for example, the Court is not

10   going to include anything at all on remorse.  I think the

11   government, though, probably would like to have the jury check

12   off on whether there has been a showing of remorse and some

13   other things.  Now, they can argue that.  And I think there has

14   been some evidence to allow them to argue that.

15        MS. CORY:  Well, under the options we have, I would

16   say I would rather stick with Paragraphs 2 and 3 the way Your

17   Honor has them.  But I still think we should be allowed to

18   present to the jury, through Your Honor's reading, our

19   mitigating factors as part of the instructions; otherwise, it

20   gives too much weight to the government's aggravating factors.

21        THE COURT:  That was the reason, as I said before,

22   what the Court had planned to do was to do the same thing with

23   the defense mitigating factors, assuming there would be four or

24   five, maybe as many as ten, and the Court was going to go

25   through them and summarize the evidence, just as the Court did

1  with the government's.  And that was what prompted the request

2  that they be consolidated.  But 35 is too many, and it's going

3  to be difficult for the Court to articulate the evidence that

4  supports some of them.  The Court has given the defense the

5  benefit of the doubt in allowing them to go to the jury, but

6  the Court would have a difficult time identifying specific

7  information or evidence that supports some of them.

8        The Court also didn't want to be in a position of

9  saying, "Well, you may consider the defendant's youth and the

10  defendant's home development, and the evidence that supports

11  this is X, Y, and Z," but then not make a comment about

12  others, because then it would look like the Court was

13  approving some and saying the others did not have any merit.

14  The Court did not want to do that, either.

15        MS. CORY:  No, Your Honor.  And what we're simply

16  asking for in the instructions is that the Court read what the

17  defense says the mitigating factors are, not marshaling the

18  evidence for us, which we will do in argument.

19        THE COURT:  How about if the Court just read the

20  headings?  I think there are about ten of those.

21        MS. CORY:  Well, Your Honor, reading the headings is

22  better than not reading anything at all.  And I don't want to

23  belabor this point, but I think Your Honor underestimates the

24  importance of what's said from the bench during the

25  instructions.  And the jury needs to hear that from you so that

1    they know they are to consider each of the mitigators.

2          THE COURT:  Well, unless there is an objection from

3    the government, then, the Court will add each one of the

4    headings with the exception of "Execution Impact."

5          MR. NEFF:  Wait a minute, Judge.  Add-- Do it

6    instead of listing the 35, or --

7          THE COURT:  Well, on Page 17, the Court says, in the

8    third paragraph, "Defendant's attorneys have included in their

9    arguments a number of what they allege to be mitigating

10   factors.  The Court will provide the complete list for you in

11   the verdict form.  The defense has alleged the following

12   categories of mitigating factors.  They've also discussed these

13   in greater detail in their arguments.  The Court will include

14   this complete list for you in the verdict form," something

15   along those lines.

16         MR. NEFF:  Are we then going to be allowed to list

17   the specific pieces of proof that we think support the specific

18   aggravating factors alleged, Judge?

19         THE COURT:  I don't think that was Ms. Cory's

20   request.  I think she has withdrawn that.

21         MS. CORY:  I think Your Honor's correct.

22         MR. NEFF:  Well, I mean, it seems to me, Judge, in

23   order to be consistent, if we're going to give the headings or

24   overall mitigating factors that the defense is alleging and

25   then we're going to set out specific pieces of evidence that

1    the defense thinks -- even when there really isn't any evidence

2    that supports any of them, the defense thinks support the

3    mitigation headings, then obviously I think the United States

4    should be allowed to submit a list which supports the

5    aggravating factors.  Now, I understand we're held to a higher

6    standard.  The Court is instructing the jury as to that.  And

7    obviously we would submit what we propose ahead of time.  But

8    it doesn't seem fair to my client that the defense gets to list

9    all the things that they think support their allegations but we

10   don't get to list ours.

11          THE COURT:  Well, the law in this area is unfair to

12   the government, it's stacked in favor of the defendant, and I

13   think this is one of those instances where that's true.

14          MR. NEFF:  I understand, Judge.

15          THE COURT:  So the Court will list the categories.

16          MS. CORY:  Your Honor, one other item on Page 17.

17   We're asking for a small addition to the final paragraph.  On

18   Line 2, where the Court says "background or character," we're

19   asking for the additional phrase "background or character or

20   any relevant circumstance" in referring to mitigating factors.

21   And, here again, I think it's on Page 10 of my comments.

22          MR. NEFF:  Page?

23          MS. CORY:  Page 10.

24          MR. NEFF:  Page 10.

25          MS. CORY:  No, no.  I'm sorry.  Scrap that.  I don't

1  know what page it's on.

2          MR. NEFF:  Where are we?  What page?

3          MS. CORY:  It's Item Number 16 --

4          MR. NEFF:  Okay.  Got it.

5          MS. CORY:  -- on my comments.  We're asking for two

6  additions, one is just the addition of the phrase "any other

7  relevant circumstance," and also the change in the last line

8  from "you are free to consider" to "you must consider," because

9  I think that the case law is clear, as we said earlier, that

10 the jury must consider the mitigating factors.  They are free

11 to reject them, they are free to give them any weight they

12 want, but they are not free to ignore them.

13         THE COURT:  Mr. Neff?

14         MR. NEFF:  Well, Judge, as to the first thing,

15 "background or character or any relevant evidence," didn't we

16 talk earlier about the fact that mitigating factors relating

17 specifically to the sentence in the case, and not to the

18 underlying crime?  I'm afraid that's not--  If the Court's

19 going to do that, I don't know that that's specific enough.  I

20 don't know why we would make any changes to it.  It seems fine

21 to me.

22         As far as the second thing that Ms. Cory suggests,

23 again, I mean, you know, obviously I asked the Court to change

24 things from "must" to "may," and the defense has asked the

25 Court to change things from "must" to "may" and "may" to

1    "must."  I think we should be consistent.  I mean, if the

2    Court is going to make the proposed changes that Ms. Cory

3    talks about in terms of they may consider things aggravating

4    factors, then the Court, I think, should be consistent and say

5    they may consider whatever mitigating factors that the defense

6    alleges.

7            THE COURT:  Why don't we just use the word <u>must</u>,

8    then, in both instances, then.

9            MR. NEFF:  That's fine.

10           THE COURT:  Ms. Cory, what's next?

11           MS. CORY:  Page 18 --

12           THE COURT:  The Court will take a look at that

13   "background, character, relevant evidence."  But the second

14   part the Court will do.  What's next?

15           MS. CORY:  Page 18, first paragraph, we're asking the

16   Court to revise the beginning of that paragraph to read, "Once

17   you've decided upon the aggravating and mitigating factors

18   present in the case, the law requires you to (1) decide whether

19   you are unanimously persuaded beyond a reasonable doubt that

20   the aggravating factors proved outweigh the mitigating factors,

21   and (2) if the aggravating factors do outweigh the mitigating

22   factors, decide whether you are unanimously persuaded beyond a

23   reasonable doubt that the aggravating factors proved so

24   outweigh any mitigating factors that justice cannot be served

25   absent a sentence of death."

1          And then in Paragraph 2 of that same page, we're

2     asking for an additional sentence in that second paragraph,

3     "Keep in mind, however, regardless of your findings with

4     respect to aggravating and mitigating factors, you are never

5     required to vote for a sentence of death."

6          And that sentence, Your Honor -- there is a

7     significant amount of case law supporting that being used as

8     an instruction.  One of the cases that we cited, *United States*

9     *v. Haynes*, is a Western District of Tennessee case in which

10    the judge did an excellent job of outlining why that is a

11    proper instruction to give.

12         THE COURT:  How does this differ from what the first

13    paragraph says already?

14         MS. CORY:  How does our -- our Comment 17, how does

15    that paragraph differ from your first paragraph?

16         THE COURT:  Yes.  We're telling the jury that after

17    they have made their findings regarding aggravating factors and

18    mitigating factors they then have to weigh them against each

19    other.

20         MS. CORY:  Your Honor, I do not think that your

21    paragraph is an inaccurate statement of the law.  My concern

22    with the jury is, it becomes very confusing, and they're

23    switching from the decision whether he is death-eligible to the

24    decision of weighing aggravating and mitigating factors, and

25    the fact that they are really making two separate

1    determinations in the weighing process.  They've got to weigh

2    the aggravating and mitigating factors, but once they decide

3    the weight, then they have to decide beyond a reasonable doubt

4    whether those aggravating factors outweigh any mitigator so

5    that they are required to impose the death penalty.  And what

6    follows on that is, the law is pretty clear that even when

7    they're through with all of this, if they still have a sense

8    that they should not impose the death penalty, they do not have

9    to do that.

10           This is not a case -- a situation in a death penalty

11   case where the jury is following the Court's instructions,

12   one, two, three, four, five, and then they add it all up and

13   it's life or death.  It's important for them to understand

14   that they are engaged in a very delicate weighing process, and

15   when it's all done, in the end, if they still aren't

16   comfortable with death, even if it looks like it adds up to

17   that, they don't have to impose it.

18           THE COURT:  Mr. Neff?

19           MR. NEFF:  Your Honor, with regards to Paragraph 1,

20   I'm more confused by Ms. Cory's suggestion than I am by the

21   Court's.  I think the Court's instruction is clear on that and

22   it's accurate.  As far as the Paragraph 2 addition, I don't see

23   the need to add that.  I think that's probably--  I think

24   Ms. Cory is right that regardless of their findings with

25   respect -- they're never required to vote for a sentence of

1   death, but that that's inherent in the instructions anyway.

2        THE COURT:  I don't see any distinction between what

3   the Court has in its first paragraph and what the defense

4   proposes.  I think what the Court has is a lot clearer and easy

5   to understand than what the proposal says.  What the proposal

6   says is that they must weigh the aggravating factors against

7   the mitigating factors and then they have to decide whether

8   aggravating factors outweigh the mitigating factors sufficient

9   to justify a sentence of death.  And I think that's the same

10   thing that the first paragraph says except in somewhat simpler

11   terms.

12        MS. CORY:  Your Honor, I would say that our Item 19

13   of the two items dealing with Page 18 is by far the more

14   important, because we, I think, have a real risk with a jury

15   thinking that this is a simple adding-and-subtracting

16   procedure.  And it is so important for them to know that if --

17   even if it adds up to death, they don't have to do that.

18        THE COURT:  The Court will add, then, the "Keep in

19   mind" language to the end of this instruction, then.

20        MS. CORY:  Thank you.  Thank you, Your Honor.  All

21   right.  Our next item, going to the special verdict form, we --

22   our Item 20, we had requested that the Court add a title to

23   each question to clarify, I think, for the jury what each

24   question pertains to, so that Question 1 would be entitled "Age

25   of the Defendant," Question 2 would be "Requisite Mental

1  State," Question 3 would be "Statutory Aggravating Factors,"

2  Question 4 "Nonstatutory --"

3          THE COURT:  Any objection, Mr. Neff?

4          MR. NEFF:  No, Your Honor.

5          THE COURT:  Okay.  We'll include those headings,

6  then.

7          MR. NEFF:  Obviously, Judge, I do object--  Going

8  back to my previous objection, I do object to Item 19 on

9  Ms. Cory's proposal, because, our position is, that sentence

10  should be taken out entirely.  So, just to be clear, I am

11  objecting to that --

12          MS. CORY:  Yes.

13          MR. NEFF:  -- but I don't object to what she has

14  there.

15          THE COURT:  I think we said we would take this under

16  consideration.  I don't recall whether it concerned a legal

17  issue or something else.  But I think the Court said it would

18  look at this and make a decision.

19          MR. NEFF:  Yes, sir.

20          MS. CORY:  But we all agreed it was supposed to say

21  "no possibility."

22          MR. NEFF:  Yes, if the Court leaves that in.

23          MS. CORY:  Our final request in regard to the verdict

24  form is that the Court give the jury a third option, like

25  "Death by unanimous decision" or, "After all reasonable

 1  efforts, we are unable to come to a unanimous decision on a

 2  sentence," and then their understanding that the result will be

 3  that Mr. Taylor be sentenced to life imprisonment.

 4          THE COURT:  I think that relates to the issue that

 5  came up earlier the Court said it was going to look at.

 6          MS. CORY:  Yes, Your Honor.  Finally I have a note

 7  here--  A lot of the jurors did take notes, and we asked the

 8  Court to give the standard instruction for the jury in regard

 9  to their notetaking.

10          THE COURT:  The Court will do that, then.

11          MS. CORY:  I think that covers ours.

12          THE COURT:  It's after 12:00 now.  So the Court

13  proposes to bring the jury in and excuse it for lunch.  Before

14  we do that, why don't we decide how much time we're going to

15  take up with closing arguments.

16          MS. CORY:  If the next thing when we reconvene is

17  going to be closing arguments, I would like at this point to

18  ask again, you know, to reiterate our request for a directed

19  verdict in the case, for all the reasons that we set before the

20  Court after the close of the government's proof.

21          THE COURT:  The Court having considered the evidence

22  that has come in during this phase of the case, along with the

23  applicable legal standard for the evidence, the Court will deny

24  the defendant's motion.

25          Mr. Neff, how much time would you and Mr. Poole like

1  for closing arguments?

2          MR. NEFF:  Your Honor, an hour total, 31 and 29

3  split.

4          THE COURT:  Okay.

5          Ms. Cory, are you speaking for the defense?

6          MS. CORY:  Your Honor, I'm sorry, I was distracted.

7  The question was the amount of time?

8          THE COURT:  Yes.

9          MS. CORY:  And what was the --

10          THE COURT:  They wanted an hour.

11          MS. CORY:  An hour?

12          THE COURT:  For both sides?

13          MS. CORY:  Your Honor, I think an hour would suffice

14  for us as well.  Mr. Bill Ortwein is doing closing argument.

15          THE COURT:  Okay.  We'll give each side an hour,

16  then.

17          And would the government like a warning before its

18  first argument --

19          MR. POOLE:  I would.  Two minutes, please, Your

20  Honor.

21          THE COURT:  So at the 29-minute point, then, the

22  government will get a warning.

23          Ms. Cory, would the defense like a warning before

24  their time expires?

25          MS. CORY:  Yes, Your Honor, ten-minute warning.

1          THE COURT:  Okay.  So at the 50-minute point, then,

2    the defense will get a warning.

3          Okay.  Are we ready for the jury?

4          MR. CLEMENTS:  Your Honor, could I?  (Indicating.)

5          THE COURT:  Yes, you may.

6          MR. CLEMENTS:  Just to protect the record, the motion

7    I filed to dismiss for racial discrimination and

8    disproportionality --

9          THE COURT:  Yes.

10         MR. CLEMENTS:  -- I got the Court's order today, and

11   memorandum.  But for the record, I'd like to renew that, for

12   appellate purposes, to make sure that I have not waived it.

13         THE COURT:  Very well.

14         MR. CLEMENTS:  Thank you.

15         THE COURT:  Let's bring the jury in.

16         (The jury entered the courtroom, and the proceedings

17         continued as follows:)

18         THE COURT:  Please be seated.

19         Ladies and gentlemen, you may want to know that

20   since you left we all have been present here in the courtroom

21   working through things, and we have walked all the way through

22   the instructions.  They will not be nearly as long as the

23   instructions during the first phase.  So we've taken care of

24   all of the things we needed to do now.

25         The next phase is for you to hear the closing

1   arguments of the attorneys.  In view of the hour, though, I'm

2   going to release you for lunch.  And I'll ask you to come back

3   at 1:30.  And then you'll hear the government start with their

4   argument, then the defense, and the government rebuttal, after

5   which the Court will give you the charge.  So the jury is

6   released for lunch, and we'll stand in recess.

7           (Luncheon recess.)

8           THE COURT:  Please be seated.

9           Mr. Poole, will you open for the government?

10          MR. POOLE:  I am, yes, sir.

11          THE COURT:  Proceed.

12          MR. POOLE:  Thank you.

13          We are finally to the portion of the trial where you

14  will soon determine the sentence for Mr. Rejon Taylor.  We

15  obviously started almost two months ago, on August 26, when

16  you guys came in for jury selection.  And we went through, as

17  you know, a long process in selecting you as the jurors in

18  this case, and then went through the guilt/innocence phase and

19  the long process of putting on evidence, arguing that evidence

20  to you.  And you made your decision on Mr. Taylor's guilt, and

21  that is a decision that you need to remember.  The facts and

22  the evidence that were involved in the first part of the

23  phase -- first part of the trial are relevant now, and you can

24  rely on them, and should rely on them, in making this

25  important decision at this juncture.

1          As the Court will tell you, and as we've told you

2     throughout, in order to put the death penalty on the table, in

3     order for you to consider the death penalty, the government

4     must prove to you beyond a reasonable doubt one statutory

5     intent factor, that Mr. Taylor intentionally killed Guy Luck,

6     or that he intentionally inflicted serious bodily injury that

7     resulted in the death of Mr. Luck, or that Mr. Taylor

8     performed an intentional act to take the life of Mr. Luck, or

9     used lethal force, that he intentionally participated in an

10    act contemplating Mr. Luck's life would be taken, and that he

11    was one of the participants in the offense, and that Mr. Luck

12    died as a result of his actions, or that the defendant acted

13    with intentional reckless disregard for his life -- for

14    Mr. Luck's life.

15         Your guilty verdict in this case has already

16    indicated that the defendant had the requisite intent.

17    Remember, when you found the defendant guilty of the four

18    charges, one of the things you considered was malice

19    aforethought and whether or not the defendant acted with

20    reckless disregard for Mr. Luck's life.  And the evidence

21    showed, and you found, that he did do that.  If one of these

22    intent factors is proven beyond a reasonable doubt to you,

23    that is enough.  And the Court will tell you that.

24         Let's talk about the defendant's intent.  Despite

25    what he said in his unsworn, noncross-examined allocution to

1  you, this was not, as he said, a costly mistake.  This was an
2  intentional act of the defendant.  He did not accidentally
3  fire three shots into Mr. Luck, including one into Mr. Luck's
4  mouth.  He intentionally took the gun that he brought that
5  morning to the crime, the loaded gun that he brought from his
6  house, and turned around and fired it into Mr. Luck three
7  times.  This was not some haphazard accident.  This was not an
8  action that was without thought.  This was not an action that
9  was just someone firing randomly as many times as possible.
10  How do we know that?  Look at the gun itself.  The defendant
11  fired three shots.  There were three unspent shells that did
12  not fire still in the gun when he left.  He stopped firing
13  after he put one in the victim's mouth.

14       Remember the proof that you heard from the defense
15  proof here in the sentencing phase, from Dr. Cunningham, based
16  on his interviews with the defendant's family, the defendant
17  learned how to use a gun from his father Johnny Taylor at a
18  very young age.  The proof from the defense was, the
19  defendant's father was always going in and out of the house
20  with a gun, that he taught the defendant and his brother to
21  shoot.  This was a man who knew how to handle firearms.
22  Plus—use your common sense—you don't accidentally shoot
23  someone three times, including once in the mouth.  He
24  intentionally did that after he intentionally drove over two
25  hours to get to the spot where he did that.  This was not an

1   accident.  It was an intentional act by the defendant.

2          Once you find the government has proven at least one

3   of these intent factors——and as I said, your guilty verdict

4   already demonstrates that that fact has been proven to you

5   beyond a reasonable doubt——we will have to prove one of two

6   statutory aggravating factors:  Death during the commission of

7   another crime; that Mr. Luck was killed by the defendant

8   during the defendant's commission of another crime or the

9   immediate flight thereof, from kidnapping.  Once again, your

10  verdict, proven beyond a reasonable doubt, was that the

11  defendant is guilty of kidnapping; I don't think there is any

12  reasonable argument -- that Mr. Luck died as a result of the

13  defendant kidnapping him.  This fact is before you, and it has

14  been proven.

15         Let's talk a little bit about that kidnapping.  It's

16  been a few weeks since you heard that proof.  Remember the

17  background of the defendant's relationship, if you want to

18  call it that, to Mr. Luck.  He had been stalking this man and

19  victimizing this man for over a year.  Remember Joey Marshall

20  told you that a couple of years before the murder, the

21  defendant and he started stealing mail from people's houses.

22  They'd go by and find a house specifically that had no one

23  there.  They wanted mail piling up.  They wanted to be able to

24  just take the mail, not go in the house, not meet with any

25  people, just be able to steal mail and try and steal

1    identities, try and steal credit cards.  This progressed.

2    About a year after that, they started going into houses to

3    steal more information about their identity victims.

4    Remember, they're still looking at this point in time for no

5    one to be home, no cars in the garage.  Go at a time when

6    someone's not there.  The alarms are always on, Mr. Marshall

7    told you.  They would cut the alarm.  They would get in the

8    house.  And they weren't even looking to steal money,

9    necessarily.  Obviously they would take it if they found it.

10   But they were looking to steal information.  They wanted a

11   bigger score.  They were thinking down the road.  They wanted

12   to get credit cards and other information that they could use

13   to make more money, other than just a simple break-in.

14   Remember, Mr. Marshall told you about the fact that they

15   targeted Mr. Luck, five or six times they had been in his

16   house.  The defendant found it.  He drove around and showed it

17   to them.  They went in time and time again, stealing from

18   Mr. Luck.  It went beyond that with Mr. Luck.  They stepped it

19   up from stealing mail to burglarizing the house.

20           The defendant stepped it up even farther.  Remember,

21   he was following Mr. Luck to his place of employment.  He

22   actually ate in the Violette restaurant, Mr. Luck's

23   restaurant.  He knew Mr. Luck's patterns.  He knew Mr. Luck

24   had another house nearby that he was fixing up.  And,

25   remember, he took the defendant Joey Marshall to that house

1    and said, "This is where Guy lives."

2            These weren't friends.  These weren't acquaintances.

3    He was on a first-name basis because he knew him so well from

4    following him around and stalking him.  That's the proof

5    before you.  He talked about--  The defendant told

6    Mr. Marshall--  Months before this happened, they talked about

7    robbing Mr. Luck.  And then as we come up on August 6, 2003,

8    remember, the day before, the defendant said, "We should rob

9    Mr. Luck."  Mr. Marshall couldn't do it that day.  They put it

10   off until the next morning.  Remember then the defendant,

11   along with Sir Jack Matthews, his buddy, show up and pick

12   Mr. Marshall up with loaded guns in the car, ready to go do at

13   least a robbery.  What did they not have in that car?  Masks.

14   Anything to hide their identity.

15           There is no proof, as far as Mr. Marshall was

16   concerned, about anything other than a robbery.  The defense

17   will point that out to you.  He thought they were just going

18   there to rob.  But the defendant is the one who led this.  The

19   defendant is the one who showed up with the loaded guns.  The

20   defendant is the one who brought the robbery kits, the gloves,

21   and the guns, but no masks.  The defendant was the driving

22   force behind this.  We'll talk in a minute about what actually

23   happened and whether or not your common sense tells you that

24   the defendant just wanted to rob this man or whether or not he

25   had more in mind.

1        They go to the house.  Remember, Joey Marshall

2   talked about at first he and Sir Jack Matthews went up to the

3   house and they were supposed to jump on the victim when he

4   came out of his house that morning.  All he was going to do is

5   go to work.  This is a Wednesday morning in August.  He's just

6   going to go to work.  And he's got Joey Marshall and Sir Jack

7   Matthews waiting for him outside his house.  But Joey

8   chickened out, for lack of a better term, as the evidence

9   showed.  And it happened again at the escape.  You heard the

10  testimony, and have from various sources, about how

11  Mr. Marshall -- I believe it's even in the letter——we'll talk

12  about Mr. Uhuru's letter that the defense put in——that Joey

13  Marshall called off the first attempt, he was scared.  It

14  would have worked then, Mr. Uhuru says in his letter.

15       Well, same thing on August 6, 2003; Mr. Marshall

16  can't go through with it.  He goes back to the car.  Sir Jack

17  comes back to the car.  Sir Jack says, "I'll do it.  I'll go

18  on my own.  I'll take it."  Goes up and hides under the

19  victim's car.  Remember that?  The defendant and Joey Marshall

20  drove around a little bit.  This is when Ms. Gallant, the

21  neighbor, saw the car driving around.  She wrote down the

22  license plate, called the police.  One of the ways this Impala

23  was identified later on was that she had seen them turn around

24  from her driveway, very steep driveway, no business being in

25  there, and that drew her attention to it.

1          So the defendant and Joey Marshall are driving

2     around while Sir Jack Matthews takes the victim at gunpoint

3     into the house.  Remember, he motions to them to come on.  And

4     they see--  Joey Marshall told you he saw Mr. Luck and Sir

5     Jack Matthews in the driveway.  The defendant gets out and

6     goes in the house with Sir Jack and Guy Luck.  Joey Marshall

7     keeps driving around.  He's driving around in that purple

8     Impala.  Joey Marshall didn't go in the house.  So at that

9     point we don't know what happened in the house.  But we then

10    know, according to Mr. Marshall, that the van left; Rejon's

11    driving it; and we find out that the victim and Sir Jack are

12    in the back.  They're driving to Chattanooga during this

13    kidnapping.  At this point obviously Mr. Luck has been put in

14    the van at gunpoint.  He's not coming here voluntarily.

15         Remember, as Mr. Neff pointed out to you on closing

16    argument, there was some indication at some point that PIN

17    numbers for credit cards were the goal of this heist or this

18    robbery.  But the facts show that that wasn't the goal.  Think

19    about, from Atlanta to Ooltewah, how many ATMs and other

20    places where you could use a credit card or a PIN number,

21    banks, they passed.  They didn't stop.  They go--  Remember,

22    they stop on the side of the road and the defendant comes back

23    and he talks to Joey Marshall and he says, "Hey, that guy who

24    took warrants out on me, this is him.  I saw some paper work

25    in his house."

1          We know that that paper work existed.  And we'll

2     look at the exhibit again here in a few minutes.  But we know

3     that that paper work from Matt Wolfe, Rockdale County

4     Sheriff's Office, was in the victim's house.  Remember Marty

5     Dunn from the Hamilton County Sheriff's Office talked about

6     going up that night and climbing through the window to get in

7     and they went in and the place had not been disturbed and

8     there was paper -- he didn't take the papers, but he did take

9     a picture of the Rockdale County report that says, "The

10    thieves have been identified."  You heard a reference this

11    morning on the phone call from the defendant——"The thieves

12    have been identified."

13          Now, remember, there was some confusion about

14    Rockdale County versus DeKalb County.  And there was an arrest

15    warrant out from DeKalb County, involving Mr. Westlake.  This

16    was another arrest warrant, for Matt Wolfe.  He talked about

17    how the fugitive squad had gone out to arrest the defendant

18    but they had not arrested him on the Rockdale County warrants.

19    And Joey Marshall told you about how they knew there were

20    warrants out for Rejon Taylor but they didn't know who had put

21    them out.

22          Stops on the side of the road and says, "This is the

23    guy who took the warrants out"——backed up by the physical

24    proof, backed up by the letter in the house——and then asked if

25    Mr. Marshall needs any gas.  Remember, Mr. Mar- -- they go --

1  Mr. Marshall goes and gets gas with Reba Taylor the

2  defendant's mother's gas card.  And the defendant, driving the

3  van, doesn't go into the gas station, doesn't pull off the

4  road.  He stays on the on-ramp.  He waits until Mr. Marshall

5  comes back with the gas.  They drive on to Chattanooga, really

6  past Chattanooga, into Ooltewah.  And you watched, remember,

7  the video from about the Tennessee state line, and just how

8  long that portion of the ride was.

9        Now, remember they've come from Buckhead, Atlanta,

10  Atlanta, Georgia.  Mr. Luck's been in the back of the van the

11  whole time with Sir Jack Matthews.  Even before they got to

12  the part where you saw the video, they drove out into the very

13  rural area in Collegedale and circled several times, two or

14  three times.  They didn't just stop and let him out.  They

15  circled two or three times.  No doubt that they crossed state

16  lines.  As your verdict has shown, he was guilty of

17  kidnapping.  And no doubt that Mr. Luck died as a result of

18  the defendant's actions.  Remember they circled, they circled,

19  and then——and you can see from the video——there is nothing but

20  trees on one side and kind of a creek on the other side.  The

21  car -- the van almost runs off into the creek.  And we know

22  from what Sir Jack Matthews yelled when he got back in the

23  car, about how the victim charged them, or tried to charge

24  them, and, quote, unquote, the defendant "busted" him.

25  Remember Sir Jack Matthews' yelling that when they got in the

1    car?  "He busted him.  He busted him.  You a soldier," talking

2    about Rejon Taylor, "You a soldier."

3         So we know that the victim charged them.  They

4    killed him.  The defendant killed him.  No doubt about it.

5    Sir Jack Matthews shot him.  And Sir Jack Matthews told you --

6    and I don't know how much was true that he said from that

7    witness stand.  That's for you to determine.  And your verdict

8    has shown.  But one thing he said I don't think will be

9    disputed by either side was that he would have kept shooting

10   if he could.  Sir Jack Matthews.  His gun jammed.  The

11   defendant's buddy, Sir Jack Matthews.  We'll talk about that.

12   But the defendant shoots twice, once hitting Sir Jack, after

13   it went through the victim, and shoots a third time in the

14   victim's mouth, killing him.  Then they leave.  Remember, the

15   defendant--  And Mr. Charlie Pac and other first responders

16   were there fairly quickly on the scene.  The victim managed to

17   even get out and say, "They robbed me, they robbed me," before

18   he lost the power of speech and eventually died at Erlanger.

19   But the defendant had the presence of mind to turn down the

20   license plate on the back of the Impala as he got in.

21   Remember we talked about how you got gas in the back of that

22   car by putting the license tag down?  And the defendant, as

23   Sir Jack is yelling, "You shot him, you're a soldier," they're

24   getting back in and telling Joey Marshall to drive, had the

25   presence of mind to put down that tag.

1      They drove back.  They hit traffic, you'll recall,

2  and had to stop.  And the defendant had the presence of mind,

3  once again, because he's got Sir Jack Matthews laying in the

4  back bleeding, to get out, get some blankets, and cover up

5  Mr. Matthews so the police or some trucker or someone else

6  doesn't see this man laying in the back of the car.

7      We talked about the commission of another crime.  As

8  you've already shown by your verdict, the evidence is

9  overwhelming.

10      They go back.  Sir Jack Matthews is taken to the

11  hospital, while Mr. Marshall, after--  First of all, the

12  defendant's dropped off at his own house.  We talked about

13  what the defendant and Mr. Marshall did that afternoon, as

14  Stephanie Belcher has to drive from Atlanta to Chattanooga --

15  actually she couldn't drive after she heard the news that Guy

16  Luck was in the hospital.  Remember, a friend had to drive

17  her.  Drove her up here to Erlanger.  And she got here just a

18  little too late.  Remember Stephanie Belcher talking about how

19  she talked to the nurse at Erlanger, and they didn't want to

20  give out any information, but Ms. Belcher had a background in

21  nursing and was able to convince the nurse that she could

22  handle it.  And so she's kind of getting a play-by-play, as

23  she drives up, on her fiancé, her business partner, her best

24  friend, dying in Erlanger hospital.  And she gets up here, not

25  in time to say good-bye to Mr. Luck, but just in time to

1  identify his body, at about the same time that the defendant

2  and Joey Marshall and their girlfriends enjoyed a meal at Red

3  Lobster with the victim's money.

4         Remember the proof of the kidnapping.  Another

5  statutory aggravating factor—and this will be the only other

6  statutory aggravating factor that you need to consider, or

7  that we will ask you to consider—is substantial planning and

8  premeditation.  Rejon Taylor committed the offense, the

9  murder, after substantial planning and premeditation to cause

10  the death of a person.

11         MR. WILLIAM ORTWEIN:  Your Honor, I'm going to object

12  at this point.  Proof that relates to the murder itself, rather

13  than the kidnapping or carjacking.

14         MR. POOLE:  I think that's what I said.

15         MR. WILLIAM ORTWEIN:  I think Your Honor will be the

16  proper person to tell the jury what the law is.

17         MR. POOLE:  I said to the murder, Judge.

18         THE COURT:  He says he's relating it to the murder.

19         MR. WILLIAM ORTWEIN:  Well, I didn't have a chance to

20  read what he's put up on the board.  As long as that's what it

21  says, that's fine.  Otherwise, I think it's a misstatement of

22  the law.

23         MR. POOLE:  I said to the murder, Judge.  And

24  certainly the jury knows to follow the Court's instructions

25  with regard to the law if I say something different.

1          Substantial planning and premeditation with regard

2   to the murder of Guy Luck by the defendant Rejon Taylor.  How

3   do we know that he substantially planned and premeditated?

4   First of all——I think it's in the charge now——you'll remember

5   from your charge before, premeditation, time for cool

6   deliberation, time to think about what you're doing and decide

7   to do it.  Premeditation doesn't take a long time.  It can be

8   made in an instant.  You can decide right away what you're

9   going to do, and then do it, and that's premeditation.  If I

10  walk over and grab one of the guns here --

11          MR. WILLIAM ORTWEIN:  Your Honor, I would object to

12  that, again.  I don't believe that is the law.  This is a

13  sentencing hearing where we're talking about substantial --

14          MR. POOLE:  I haven't gotten to that part yet.

15          MR. WILLIAM ORTWEIN:  -- planning and premeditation.

16  And under this scenario, at the sentencing hearing, I don't

17  believe premeditation can occur in the blink of an eye, under

18  this definition, in a sentencing hearing, which this is, not a

19  guilt/innocence hearing.

20          MR. POOLE:  And, Judge, I will demonstrate the

21  difference between premeditation and substantial premeditation

22  if I'm allowed to talk.  That's what I was going to do.

23          THE COURT:  Ladies and gentlemen, as I've told you

24  previously, the Court is the source of the law here.  And the

25  Court will be giving you a definition of what substantial

1    planning and premeditation means.  It is proper for the

2    attorneys to discuss the law during their arguments; but if

3    what they say about the law is different from what I say, you

4    must follow what I say.

5              Proceed, Mr. Poole.

6              MR. POOLE:  Thank you.

7              Premeditation.  If I take one of these guns that the

8    defendant supplied to Sir Jack and himself on August 6th, if I

9    take one of these guns, decide to go over and shoot Mr. Neff,

10   that's premeditation.  I've thought about it.  I've decided to

11   do it.  I've made the decision.  I go do it.

12             Rejon Taylor could have killed Guy Luck in his house

13   in Atlanta.  He and Mr. Matthews are in there.  They've got

14   the same loaded guns they used in Chattanooga.  No one else is

15   in there, as far as we know, in Atlanta.  But he didn't do

16   that.  We talk about substantial premeditation.  It's not--

17   We're not talking about he just picked up the gun and walked

18   over and decided right there to kill him.  No, he took him out

19   to the van, had Mr. Marshall follow in the Impala, and drove

20   over two hours, into Collegedale, Tennessee, before he killed

21   Mr. Luck.  Talking about substantial time to think about what

22   he was going to do.

23             Now, as we've said, Mr. Luck kind of interrupted

24   this plan and attempted to charge one or both of the

25   defendants in the back of the van.  And we could tell by how

1    the van went off the side of the road, almost up into the

2    creek, that the killing took place before the end of the trip;

3    the van had not stopped.  And you remember how Mr. Marshall

4    testified that the van was kind of weaving over to the side of

5    the road.  And you saw where it ended up there, almost in the

6    creek.  So I'll submit to you, and I don't think there is any

7    dispute, that we don't know where that van was supposed to end

8    up.  We don't know what the end of that plan, the defendant's

9    plan, was.  So you can only consider what you know about the

10   facts.  But you know that the defendant didn't just kill him

11   in Atlanta.  You know the defendant and his buddy Sir Jack put

12   the victim in a car and drove over two hours to a remote

13   location, that they circled around before the killing

14   happened.

15          And what else do we know that's interesting about

16   this ride from Atlanta to Chattanooga?  When they stop on the

17   side of the road--  And, remember, the defendant asked Joey

18   Marshall if he needs gas.  He does.  They go up and--

19   Mr. Marshall goes into the gas station to get gas.  The

20   defendant, driving the van, stays on the on-ramp.  He was

21   thinking ahead.  He's not going to drive the victim to a gas

22   station, where people are, where he might be able to yell in

23   the back of that van or might be able to get out of the back

24   of that van.  He stays out on the freeway where there is no

25   way to get out and yell for help.

1          What else does he do?  He gives his mother's gas

2     card to Joey Marshall to get gas on this trip.  Think about

3     that.  They are there, ostensibly, to rob and steal from this

4     man.  They've burglarized him five or six times.  They've

5     stolen his identity, as well as many, many others'.  They

6     don't pay for anything with their own money.  So why do you

7     use your credit card or your mom's credit card during this

8     kidnapping?  Why not use one of Mr. Luck's credit cards?

9     Because then there is a trail of Mr. Luck going from Atlanta

10    on his way to Chattanooga.  Think about that.  If the last

11    time the credit card was used, of Mr. Luck, was in

12    Cartersville on the way to Chattanooga, that's evidence that

13    he was removed from Atlanta or he was not in Atlanta, so maybe

14    if that body is never found somewhere in Collegedale,

15    Tennessee, that would have been a clue to the police as to

16    where to look.  Mr. Taylor is thinking ahead.  He's paid--

17    And you heard about it in his letters, you heard about it from

18    Dr. Cunningham, how his dad paid for everything.  Stolen

19    identities is what they do.  They don't pay for anything.  But

20    they don't want to be linked in any way -- or they don't want

21    the victim linked in any way to the area in North

22    Chattanooga -- excuse me -- in Tennessee where they were going

23    to kill and dump this body.  He used his own credit card to

24    pay for that gas.

25          We know──we've talked about this before──that he

1   brought loaded guns that morning.  Three young men going in

2   against one older man who was not expecting them to come,

3   early in the morning on a Wednesday morning, going to work.

4   They didn't need loaded firearms to pull off some sort of

5   robbery, but they were loaded.  They weren't wearing masks.

6   They were planning on going in and confronting this man face

7   to face with these guns, but no masks were provided by the

8   defendant.  Then of course they drive from Atlanta up into

9   Collegedale.  Use your common sense.  We know about passing

10  the ATMs.  We know about passing the banks.  What else were

11  they going to do to this man when they got up here other than

12  kill him?  This is not walking across the room and grabbing a

13  gun and premeditating and walking back and shooting somebody

14  in the back room.  It's not even walking into his house and

15  shooting him.  It's walking in, taking him out in his own car,

16  driving him across state lines, driving him for several hours.

17  Mr. Luck knew he wasn't coming back from that trip.  That's

18  why he fought for his life before the defendant ended it.

19          So I submit to you there is enough proof to show

20  substantial planning and premeditation.  You can also look at

21  the fact that he tried to escape, and continues to try to

22  escape today, to show that this wasn't an accident, this

23  wasn't happenstance.  And this wasn't just a premeditated

24  murder or a planned murder.  This was substantially planned

25  and premeditated.  There was thought put into this.  We know

1    from Mr. Taylor's letter——I'll show it to you in just a

2    minute——that he knew everything about his victims.  He didn't

3    do anything without substantial planning.  He researched his

4    victims for identity theft, through the computer, and knew

5    everything about them.  And he certainly knew everything about

6    Guy Luck.  He knew Guy Luck didn't go to the bank after

7    closing down at the restaurant.  He knew he brought the

8    proceeds home and went to the bank the next morning; at least

9    that's what he told Joey Marshall.  He knew where Mr. Luck's

10   other house was.  He'd been following this man for a year, at

11   least.  There was definitely substantial planning, substantial

12   premeditation.  This was not a random victim.  This was a

13   target of the defendant.

14          Nonstatutory aggravating factors or other factors

15   that you can consider in making your decision.  We've talked

16   about the escape.  I don't know that there is any dispute now

17   that the defendant tried to escape.  He, along with Mr. Uhuru,

18   known as J.R.; Steven Szabo, Joey Marshall, Thaddeus Reid, the

19   defendant's mom who tried to help out, attempted to escape

20   from the Hamilton County Jail in 2006.

21          You heard from Mr. Uhuru's own letter that the

22   defense put in that Rejon Taylor took part in this escape and

23   that he handled his business, he kept up his end of the

24   bargain.  Joey Marshall let Uhuru down, let J.R. down,

25   remember?  He called off the first escape.  And he and Reed

1    and Szabo were supposed to grab one of the guards, and nobody

2    did that but Szabo.  They were supposed to grab him and throw

3    him into the cell.  Mr. Ortwein may talk about this.  You've

4    got the letter in evidence that the defense put in.  Just

5    because the defense put it in doesn't mean it's a mitigating

6    factor.  You evaluate it for what it's worth.  Uhuru tells the

7    defendant's mom on several occasions that the defendant did

8    his job, the defendant handled his business on this escape, it

9    wasn't the defendant's fault that it failed.

10           MR. WILLIAM ORTWEIN:  Please the Court, I would like

11   to object at least to the caption of this particular slide,

12   which is entitled "Participation in Additional Uncharged

13   Murder, Attempted Murder, or Other Serious Act of Violence."

14   I'd like to ask that it be made a part of this record, because

15   obviously there is no allegation that Mr. Taylor ever

16   participated in additional uncharged murders or attempted

17   murders, and it's prejudicial for him to show that to this jury

18   when there is absolutely no evidence of it, to try to imply

19   that.  I'd also like the Court to strike that part of it.  And

20   I'd like to ask this particular slide be made a part of this

21   particular record, for the appeal, if any.

22           THE COURT:  Mr. Poole?

23           MR. POOLE:  Your Honor, we're talking about "or Other

24   Serious Act of Violence."

25           THE COURT:  You're not talking about additional

1    uncharged murders or attempted murders?

2            MR. POOLE:  We're not talking about additional

3    uncharged murders --

4            THE COURT:  Ladies and gentlemen, please disregard

5    this language on this slide that talks about additional

6    uncharged murders or attempted murders.  I think that

7    Mr. Ortwein is correct there has been no evidence at all in

8    this case about other uncharged murders or attempted murders on

9    the part of this defendant.  So put that completely out of your

10   mind.

11           THE CLERK:  You have two minutes.

12           MR. POOLE:  Thank you.

13           MR. WILLIAM ORTWEIN:  Could I ask that slide be made

14   an exhibit for the purpose of the record?

15           THE COURT:  Yes.  Yes.  The Court grants that.

16           MR. POOLE:  So we know about the escape.  We know

17   about future dangerousness, that the defendant has attempted

18   this escape once, and that he has shown he cannot "adapt his

19   behavior to societal norms, thereby demonstrating a low

20   rehabilitative potential."  What does that mean?  It means he's

21   dedicated to a life of crime.  And he says it in his own words

22   in that letter he wrote to Silverdale in the last couple of

23   weeks.  He's dedicated to a life of crime.  He's not worried

24   about what the rules are.  He's worried about what he wants to

25   do.

1          He has demonstrated a lack of remorse for his

2   criminal conduct.  Lack of remorse.  Have we seen any remorse

3   from the defendant?  We've seen the letters he wrote where he

4   writes that——can we put the Elmo on now, please?——where he

5   writes that——and this is hard to read, but——"It's like someone

6   killed the President, and I'm being held responsible."

7          Mr. Luck's life was of no value to him.  We heard

8   the tape this morning, where his sister is talking about

9   Stephanie Belcher, how can she be a fiancée and business owner

10  and all these things, and the defendant's laughing at her.

11  That's during this trial.  This isn't five years ago.  He's

12  had five years to think about it, and he laughs after

13  Stephanie Belcher testifies.  We've seen absolutely no remorse

14  from this defendant.  The defendant talked to you, without

15  being sworn in, without being subject to cross-examination;

16  and two words we never heard from that defendant——"I'm sorry."

17  Not one time has he shown any remorse for the life he took.

18          THE CLERK:  That's your time.

19          MR. POOLE:  Thank you.

20          THE COURT:  Mr. Neff, I see there is a chart being

21  set up.  If you'd like to move around the court so you can

22  visualize the chart, you may do so.

23          MR. NEFF:  Thank you, Your Honor.

24          MR. WILLIAM ORTWEIN:  Ladies and gentlemen——  I'm

25  sorry.  I'm being interrupted, as usual, by the U. S.

1    Attorneys.

2                (Brief pause.)

3                MR. WILLIAM ORTWEIN:  Ladies and gentlemen of the

4    jury, you have already found guilt.  You have already

5    unanimously said Rejon Taylor is guilty.  This hearing, this

6    segment of the trial, does not relate to guilt or innocence.

7    That is not an issue anymore.  That is not what is before you.

8    What is before you is for you to determine whether Rejon Taylor

9    shall die at the hand of an executioner or die in a prison

10   ward.  That's it.  You are to make that decision based upon

11   what is known as aggravators, which the United States must

12   prove to you beyond a reasonable doubt, or mitigators, which

13   are not excuses but tend to separate the worse from the worst.

14   Those only have to be proven to you by a preponderance of the

15   evidence, which generally means "more likely than not."

16               So all that you have heard about guilt or innocence

17   really does not apply at this hearing.  That's not what it is

18   about.  You have already reached that decision.  This decision

19   about determining when and how Rejon Taylor shall die will be

20   based upon whether or not you believe the aggravators set

21   forth by the government outweigh the mitigators to the extent

22   that Rejon Taylor is one of the worst of the worst.  There is

23   no issue about guilt anymore.

24               You know, of course, I'm lead counsel for

25   Mr. Taylor.  And I have had a big burden for the last five

1    years, as well as has Mr. Howell Clements, Lee Ortwein, Leslie

2    Cory, and our chief investigator Roy Cooper.  And that burden

3    deals with how do we convey to you, within the confines of a

4    courtroom, restricted by rules of evidence, the type of person

5    Rejon Taylor really is, an individual that one of us has

6    visited with at least once a week for five years.  And, you

7    know, it makes it doubly difficult because, being a young

8    human being, staring the death penalty right in the eyeball,

9    Rejon Taylor, like any of us would, has gone through a total

10   shift in emotions day by day, minute by minute, and almost

11   second by second.  Being a human being, obviously, like you or

12   I would be, he's terrified.  One minute --

13          MR. NEFF:  Objection, Your Honor.  I don't know that

14   there is any proof about the defendant being terrified.

15          THE COURT:  Mr. Ortwein?

16          MR. WILLIAM ORTWEIN:  Well, please the Court, I would

17   just say that would be obvious to anybody that's staring the

18   death penalty in the face, dying.

19          THE COURT:  Ladies and gentlemen, the attorneys are

20   afforded some leeway in discussing the evidence.  If you don't

21   find that the evidence supports their arguments, though, you

22   just should reject their arguments.

23          Proceed, Mr. Ortwein.

24          MR. WILLIAM ORTWEIN:  Thank you.

25          An individual goes from the depth of depression to

1  euphoria and highs constantly.  And being in that position,

2  they, as any human being would do, say reckless things, write

3  reckless things, which they shouldn't, and which makes it

4  doubly difficult for us to convey to you who the real Rejon

5  Taylor is.

6         What do we know about him, though?  Well, we know he

7  was born in Atlanta, and he was a very quiet child, he was a

8  very loving child.  You heard from one of his relatives who

9  testified——and you'll have to forgive me; it's been a while

10  back——and she had some physical difficulty, how he came to her

11  house and was crying about it.  He obviously had befriended an

12  individual who -- by the name of Mark Patterson, who was older

13  and mentally challenged, and was helpful to him.  And you

14  heard from his other relatives about his childhood.

15         He did quit school, and he started a legitimate

16  business.  He started a business where he had a van and he was

17  doing car detailing, except you didn't have to go to him, he

18  would come to you.  And he got off on the right track.  But

19  then the influences of his family, in particular his father,

20  kicked in, as toxic and God-awful as they were, and influenced

21  his life.  As Dr. Cunningham said, we all have scripts.  Our

22  lives are scripted.  For example, for my children, there was

23  no question they would go to high school and finish and that

24  they would go to college and graduate.  That was accepted that

25  that's what they would do.

1      Let's talk a minute about what we know about Rejon

2 Taylor and how he came to be the person who committed a

3 God-awful act for which, no matter what he does, no matter

4 what he says, he can never, ever bring solace to the losses of

5 Guy Luck's people or of his own family members, whom you've

6 heard testify, because they lose, also.  His father, at 14,

7 killed a first man and was arrested for it.  He got out during

8 some time, and he took custody -- or at least Rejon and his

9 brother John went to live with him.  And what type of an

10 influence was he on them?  What type of-- How did he

11 influence them in their later life?  And by the way, as you

12 will recall, Rejon Taylor was conceptualized and conceived

13 while his father was on escape from a Georgia penitentiary.

14      But let's go, again, to the influence.  When he was

15 very young-- I forget the age.  I think it was ten.  I don't

16 remember.  You-all will remember how old it was he was.  He

17 lived with his father, who was running a major,

18 2 million-dollar ID scam.  His father had stacks of money

19 laying around.  And what else?  Guns.  And the guns were

20 laying around the house in case somebody wanted to rob the

21 father of these stacks, huge amounts, of cash.  So what did

22 the father do?  He taught both John and Rejon how to use the

23 guns.  This is the father figure.  This is the individual who

24 influenced and shaped Rejon Taylor's life.

25      And of course John, the brother, went on to become a

1    drug dealer, and, by the way, also was found guilty of the

2    AK-47 and the pistol that was introduced earlier that was

3    found in the Taylor homestead.  Not Rejon Taylor, but John

4    Taylor was found guilty in a court of law for possessing those

5    guns.  Rejon had nothing to do with those.

6            And, you know, I can remember Dr. Cunningham saying

7    very well, of course, his mother worked two or three jobs, but

8    she got a great deal of money from the father.  And there were

9    seven drug addicts in the family.  And I forget how many of

10   them had criminal records; a bunch of them.  And

11   Dr. Cunningham said, you know, it's scary, because here we

12   have a father who is a murderer, a perpetual convict,

13   crime-breaker, and he's lecturing the mother on how to raise

14   the children because he doesn't think she's teaching them the

15   right boundaries.  That is scary.  That's how Rejon, at an

16   early age, was shaped.  That's a part of who he is.

17           You know, all of us' lives are shaped, be it for the

18   good or for the bad.  And we're all influenced by our family,

19   for the good or the bad.  Ladies and gentlemen, there is one

20   way and one way only that Rejon Taylor would not have become a

21   criminal, and that is if someone, at a very early age, had

22   taken him away from that family and he had been taught to

23   reject every moral value that they had.  With that background,

24   Rejon Taylor, without somebody having stepped in and

25   intervened and said, "Wait a minute.  What are you doing to

1    this child?" without that happening, he was destined to be

2    seated right there where he is today.

3           We don't all come from level playing fields, ladies

4    and gentlemen.  We don't choose our families.  We don't choose

5    those who give us values.  They're chosen for us.  And that's

6    how Rejon Taylor was shaped.  So we know a little bit about

7    how he was shaped.  We know how he came to be here.  We know

8    why he came to be here.  We know some of who he is.

9           What is he not, that we know?  What is he not?

10   Well, he's not a person who in his past has assaulted other

11   people.  He's not a person who has killed somebody else in his

12   past.  He is not a person who has raped a child.  He's not a

13   person, like Joey Matthews, who quit school to sell crack

14   cocaine, and would not use it himself because he knew what it

15   would do to you, and all -- he didn't care about other people,

16   what he cared about was just making his money.  He's not

17   somebody that has a felony record.  He has absolutely no

18   history of violence.  And we know, ladies and gentlemen, he's

19   not a gangbanger.

20          And let me say to you, it's been a long trial, so

21   what I have done is, I have had parts of the transcript and so

22   forth typed up, because my memory is not the greatest in the

23   world.  And let me say this to you, because I'm going to

24   disagree with something with Mr. Poole down the road.  If I

25   say something in talking about the facts that you think is

1    wrong, you go by what you remember and not what I say.  And I

2    assure you I'm not trying to mislead you.

3         Joey Marshall--  I'm sorry.  Yeah, Joey Marshall.

4         "QUESTION:  Okay.  Now, were you a member of any kind

5    of a street gang?

6         "ANSWER:  No, I wasn't.

7         "QUESTION:  Was Sir Jack Matthews a member of a

8    street gang?

9         "ANSWER:  Not that I know of.

10        "QUESTION:  What about Rejon Taylor?

11        "ANSWER:  No."

12        So we know he was not a gangbanger out here worrying

13   about somebody getting on his turf or somebody wearing the

14   wrong kind of colors or whatever those people do.  So we know

15   that he has not done or is not -- has not committed a lot of

16   the things which make one the worst of the worst.

17        Now, let's talk about this premeditation a minute.

18   And I'm going to go through some transcript because it was a

19   long time ago.  But let me say to you, Number 1, that what the

20   government wants you to believe is this, which is a real

21   stretch of the imagination, I would say to you:  First of all,

22   that Rejon Taylor decided to kill Guy Luck but he didn't tell

23   Sir Jack Matthews or Joey Marshall, but he had this secret

24   plan and then he wasn't able to carry it out.  Now, that --

25   that's their theory and their premise for premeditation.

1    Before we get to the transcripts and the actual testimony--

2    And I wish I had had this typed up.  The government keeps

3    talking about the fact that Guy Luck was being followed.  And,

4    yes, that's the testimony.  But why?  If you will recall, the

5    testimony was, because they were thinking about robbing him.

6    And their first plan, which they rejected, was to rob him on

7    his way home.  They rejected that plan.  What did Joey

8    Marshall testify to about premeditation?

9              "There was no plan to kill Guy Luck, correct?

10             "ANSWER:  Yeah.

11             "QUESTION:  There was no plan to kill Guy Luck,

12   correct?

13             "ANSWER:  Yeah."

14             Then what we have here is what is known as a 302,

15   which is an interview that was done of Sir Jack Matthews by

16   federal agents.  Matthews stated the plan of robbing the

17   victim of Guy Jean Luck was discussed between Joey Marshall,

18   Rejon Taylor, and Matthews prior to leaving their

19   neighborhood.  Matthews stated the original plan was to rob

20   the victim and dump him off in Tennessee so he would have to

21   get back to Atlanta on his own.  Matthews stated they did not

22   ever discuss killing the victim.  That's the evidence.  So

23   there is specific evidence, ladies and gentlemen of the jury,

24   from two witnesses who say there was no plan to kill him,

25   period, the plan was to rob him.  The government wants you to

1    ignore that when they talk about premeditation.  And then here

2    is what they base it on.  Okay?  Here is what they base it on,

3    is a statement -- two things.  It's a statement from Joey

4    Marshall.  All right?  Who said, "He --" talking about Rejon,

5    "He asked me did I need gas.  And he also stated he believed

6    Mr. Luck was the guy who took a warrant out on him.

7              "QUESTION:  All right.  Let's talk about that for a

8    minute.  Would it surprise you to know there was never, ever a

9    warrant taken out against Mr. Taylor where Guy Luck was the

10   victim?

11             "Would it surprise me?

12             "Yes.

13             "ANSWER:  It wouldn't matter."

14        Now, I want you to remember something else about

15   this theory.  You heard from Robert Westlake.  Robert Westlake

16   was victimized on an identity theft.  Rejon Taylor was

17   arrested.  There was a court hearing.  Rejon Taylor knew

18   Robert Westlake was a victim.  Same type of case as this would

19   have been if Guy Luck had testified against him.

20             "Mr. Westlake, has anybody ever contacted you,

21   intimidated you, threatened you on behalf of Rejon Taylor?

22             "ANSWER:  No, sir.  No, sir."

23        And it was the same kind of case.  What would have

24   made the difference?

25             And then we go back.  And let's talk about what they

 1   want to base this on.  This was Mr. Dunn testifying, the

 2   photographer, about this document.

 3          "QUESTION:  This is a photograph I'm asking about,

 4   though, sir.  Now, you moved these credit cards so you could

 5   get -- see the part, by looking at the document, that thieves

 6   had been identified, correct?

 7          "Correct.

 8          "QUESTION:  So but before you moved those

 9   photographs, somebody looking at it would not have seen that

10   part of the document, would they, because the credit cards

11   would have covered it?

12          "It covered up part of the name.  You could see

13   'thieves,' but you couldn't see by whom, just see the word

14   'thieves' and that's it, 'thieves' and I think 'identified'

15   was there as well.  But, there again, I'd have to refer back

16   to the other piece of evidence.

17          "You're not sure, in other words?"

18          What did he see?  Obviously it wasn't a warrant, as

19   Joey would have you believe.  And by the way, who supplied all

20   of this evidence, ladies and gentlemen, of premeditation?  Who

21   supplied it?  Joey Marshall.

22          "QUESTION:  Now, you're aware that at some point

23   during that time prior to the escape Mr. Taylor knew you were

24   going to testify against him, right?

25          "ANSWER:  Yes.

1          "QUESTION:  And that you were going to be sitting

2     like you are here today, sit in a courtroom, testify against

3     him in a case where he could be put to death?"

4          Right -- or "Yes" is his answer.

5          "And he never threatened you, did he?"

6          The answer is, "No."

7          Why couldn't he have threatened Joey if he wanted to

8     kill somebody?  He's in a cell with him.  We're not talking

9     about five years in the pen here, if they're talking about

10    getting rid of a witness.  We're talking about the death

11    penalty, dying.  And yet he didn't threaten Joey.  Once again,

12    Joey Marshall is the person supplying this evidence that

13    you've got to believe beyond a reasonable doubt.

14         Question to Joey Marshall:  "All right.  And by the

15    way, you've lied to police officers over charges before this

16    ever came about, haven't you?

17         "ANSWER:  Yes, sir.

18         "QUESTION:  As a matter of fact, you got arrested for

19    making a false statement to police officers, didn't you?

20         "ANSWER:  Yes, I did."

21         And this is all about, if you'll recall, when he was

22    first arrested, he got this young lady involved to write him

23    an alibi, and he didn't think it was good enough.

24         "So did you not have her do a different -- new alibi

25    she typed on her computer, signed, and got to you?

1          "ANSWER:  Yes, I did."

2          And finally, ladies and gentlemen, "Would you lie--"

3   This is Joey Marshall again, under oath:  "Would you lie to

4   not do life in the pen and die?

5          "Would I lie?

6          "Yes, sir.  To get out of doing life, dying in the

7   penitentiary, sir?

8          "Absolutely, I would."

9          Beyond a reasonable doubt, ladies and gentlemen.

10  Beyond a reasonable doubt of premeditation.  And he's the only

11  one that supplies it, or tries to.

12         Judge, could we have the earphones handed out?  I

13  want to play part of a videotape that was introduced into

14  evidence.

15         THE COURT:  Ms. Palmer?

16         (Brief pause.)

17         THE COURT:  Do you know what exhibit it is?

18         MR. WILLIAM ORTWEIN:  Judge, I don't remember the

19  number.  The government introduced it, Sir Jack Matthews'

20  testimony.  This is a part of it, which I discussed with the

21  government.  It would be part of Sir Jack's testimony where the

22  United States, after he made his incredible statement,

23  introduced the videotape of an interview of him prior to court,

24  Your Honor.

25         (Off-the-record discussion.)

1          MR. WILLIAM ORTWEIN:  Detective Starnes.  Candidly, I

2     didn't look up the number.  But I think the government

3     understands it is part of an exhibit introduced.

4          (Off-the-record discussion.)

5          MR. WILLIAM ORTWEIN:  It would be in the 800s,

6     according to the government, 802, 803, maybe, somewhere in that

7     neighborhood.

8          (Brief pause.)

9          THE COURT:  Proceed.

10          MR. WILLIAM ORTWEIN:  May I proceed?

11          THE COURT:  Yes, proceed.

12          (The tape was played in open court, and the

13          proceedings continued as follows:)

14          MR. WILLIAM ORTWEIN:  They were stopping the car to

15     let him out, is what Sir Jack says on that videotape.

16     Remember, this was before he came in and told whatever he told

17     the Court.  Stopping the car to let him out, which fits right

18     back into what he said earlier.  And let's-- You know, I don't

19     remember--

20          Well, this is some more from Marshall:  "Did they

21     give you copies of your previous statements to review?

22          "ANSWER:  Yes.

23          "QUESTION:  And did you review them?

24          "ANSWER:  Yes.

25          "QUESTION:  And what did you tell them about your

1    previous statements?

2              "That they were all lies.

3              "QUESTION:  They were all lies?

4              "ANSWER:  Yes."

5              How can you believe him?  You know, how can you?

6    That, ladies and gentlemen, is the sole government's case on

7    premeditation.  You have to take a leap, like I told you.

8              Now I want to move on to a mitigator.  One of the

9    mitigators is, an individual who is receiving life, who is

10   just as culpable, or more culpable, guilty, as Rejon Taylor.

11   And I want to start off and talk to you about Sir Jack

12   Matthews.  Of course, as you-all are aware, when he was

13   arrested on this case, he had a case pending of rape and child

14   molestation of a 12-year-old girl.  No history like that in

15   Rejon Taylor anywhere; none.

16             This is Marshall talking about, "When we went to the

17   side of the house.

18             "Side of the house?

19             "Yes.

20             "Is that the point in time you said, 'This isn't

21   going to work'?"

22             Marshall's talking to Sir Jack.

23             "Yes.

24             "Okay.  What did Sir Jack Matthews call you at that

25   point?

1          "I told him I was scared.

2          "He said some other things, didn't he?  Well, he

3   said you were a pussy, didn't he?

4          "Yes.

5          "That's what Sir Jack Matthews called you?

6          "Yes."

7          And by the way, I will disagree with Mr. Poole.  You

8   go by what you recall.  As I recall, it was Joey Marshall that

9   brought the guns, originally, to the house.

10          And then this is about the actual shooting.  And

11   just think about it a minute.  If his gun hadn't jammed, who

12   would have killed Guy Luck?  Sir Jack Matthews.

13          And this is testimony from Marshall again:  "But he

14   just couldn't.  If he could have, he would have shot and

15   killed him, right?

16          "I don't know if he would have shot and killed him,

17   but...

18          "He would have shot him again, wouldn't he?

19          "ANSWER:  Yes.

20          "QUESTION:  No question in your mind about that, is

21   there?

22          "Yes.

23          "There is a question?

24          "No.  He would have shot him."

25          His intent -- Sir Jack Matthews certainly had the

1    intent at that point to kill Guy Luck himself.

2            Here again, by Mr. Poole to Mr. Marshall, "Who said

3    that, Mr. Marshall?

4            "Sir.  Sir said the guy flinched, the guy moved.

5            "Okay.

6            "So he said he shot him.  He said, 'My gun

7    jammed --'

8            "You're talking about Mr. Matthews at this point,

9    Sir Matthews?

10           "Yeah.  Matthews said, 'My gun jammed up.  I

11   couldn't shoot no more.'  But he said, 'Rejon -- Rejon

12   soldier.  Rejon turned around and busted him."

13           Talking about -- and then what did Rejon say?  Was

14   he bragging?  Was he saying, "Look what I just did"?  Was he

15   saying, "I'm the man.  Look at me"?

16           Here is what he did.

17           "At this point Rejon is still just sitting in the

18   front seat.  He hasn't said -- he hasn't said nothing else."

19           Who is it that's acting the big man, the bad man,

20   the tough guy?  Sir Jack Matthews, that's getting a life

21   sentence.

22           MR. POOLE:  Objection, Your Honor.  I don't think

23   that's the proof.

24           THE COURT:  Mr. Ortwein?

25           MR. WILLIAM ORTWEIN:  Your Honor, his plea agreement

1   was introduced showing that.

2           THE COURT:  What was the statement again?

3           MR. NEFF:  That Sir Jack Matthews was getting life.

4   I think there was also proof that he expects not to.

5           MR. WILLIAM ORTWEIN:  Well, what he expects, not

6   what's going to happen.

7           MR. NEFF:  We don't know what's going to happen.

8           MR. WILLIAM ORTWEIN:  Well, it's up to you to file

9   the motion.

10          THE COURT:  Ladies and gentlemen, again, if what the

11  attorneys say is not supported by the evidence, ignore what the

12  attorneys say and rely upon your own recollection of the

13  evidence.

14          I think it is indisputable, though, that

15  Mr. Matthews has not been sentenced as of yet.  Is that right?

16          MR. WILLIAM ORTWEIN:  That is correct, Your Honor.

17          Then let's talk just a minute about Joey Marshall.

18  And don't forget Joey Marshall was involved in all of this.

19  The drug dealer.  And you heard what he said about that.  And

20  not only that, I'll summarize just briefly, Mr. -- "The U. S.

21  Attorney went over this plea agreement with you?

22          "Yes, he did.

23          "In great detail?

24          "Yes.

25          "To make sure you understood it?

1          "Yes.

2          "You broke the agreement with the government, didn't

3     you, by violating the law, attempting to escape, correct?

4          "Yes.

5          "So you've broken your written word with these folks

6     right here?

7          "Yes."

8          He ain't on trial for the death penalty, either, is

9     he?  And, look, he broke his word and written agreement to

10    these folks over here.  (Indicating.)  And he is in that

11    escape.  And he sold crack cocaine.  Didn't take it himself

12    because he knew what it would do to him.  And he didn't care

13    what it did to anybody else, as long as he got his money.

14    He's not on trial for the death penalty.

15         And you don't see Sir Jack sitting over there as a

16    defendant, either, do you, on trial for the death penalty?

17         Here it is again.

18         "Sir Jack, did your gun jam?

19         "Yeah.

20         "And did you -- had you tried to fire it again at

21    him?

22         "Yes, I tried to fire it again.

23         "So you tried to shoot him again, correct?

24         "Yes, that's correct."

25         And then, you know, Dr. Cunningham used a word that

1    I really can't remember, but to me it's sort of like impulse

2    reaction or reflex action.  Rejon Taylor's in the front seat.

3    He hears shooting in the backseat.  Doesn't know who's

4    shooting.  No evidence he has any idea.  In fact, he doesn't

5    know who is shooting who.  No, he don't know.  He don't know.

6    He probably seen--  Yeah, come to find out we got -- probably

7    knows somebody's shooting at him, yeah.  I can't--  I don't

8    remember the exact word, some kind of an impulse situation,

9    which is very common for people who are 18 years of age.

10          And I think you recall about common brain -- frontal

11   lobe brain development.  I'm not going through all that with

12   you, except it explains to you why so many 18- and

13   19-year-olds die in car accidents.  It basically has to be

14   developed to inhibit your risk-taking or, as I think

15   Dr. Cunningham said, cause you to step back and take a second

16   look at something and the consequences thereof before you

17   commit the act.  And it's common in every one of us.  It's

18   nothing unusual to Rejon Taylor.  And as I said, that's why so

19   many 18-year-olds do crazy, stupid things like jumping off

20   bridges into 2 feet of water and killing theirself.  People at

21   that age do not have the same judgment relative to taking

22   risks and recognizing the consequences of their risks as they

23   do -- as an older person would.  And that's just a fact of

24   biology.  It's not unique to Rejon Taylor.  My children had

25   the same; everybody's children.  And all of us went through

1    the same thing.

2            Then, ladies and gentlemen, I don't know what my

3    time frame is, but this -- once again, this is Joey Marshall

4    testifying about selling crack cocaine, he didn't care about

5    what anybody else did, and that he didn't use himself because

6    he knew what it did.

7            And then let's talk one more thing about Sir Jack

8    Matthews' not being on trial for death but being equally

9    culpable.  You remember the detective that came in and she

10   testified about the rape case pending, and she went to

11   interview him?  What did he say?  He denied having sex with

12   the victim but admitted that he killed someone.  He stated

13   that -- he kind of chuckled, he kind of chuckled and said,

14   "Yeah, I killed somebody, but I didn't have sex with that

15   girl."  He's not on trial for the death penalty.  Where's his

16   remorse?

17           Now let's talk a little bit about this escape.

18   First of all, this just says -- this is where Szabo -- it says

19   "J.R." -- real name is Uhuru, so we'll know who we're talking

20   about.  And Szabo was asked, "So earlier you said that J.R.

21   wasn't a ring leader, but it sure sounds like he was to me."

22           Then the answer is, "Really there wasn't really a

23   per se ring leader."

24           And then he's asked, "So when J.R. says Rejon's the

25   ring leader of this thing, he's lying, isn't he?"

1        Szabo:  "I would say so, yeah, because I don't think

2   Rejon really ever -- he never came up with the original plan.

3   So if that's part of what he said in here, yeah, I would say

4   that's a fabrication, that's a lie, yeah."

5        And then let's move to these shanks.  And you saw

6   the tools.  What were they for?  Well, the evidence is, first

7   of all, they were stored up high, and were not for the purpose

8   of attacking anybody but to cut wire in the windows to escape.

9        This is Szabo again:  "You're not using shank or

10  pipes on him --

11       "ANSWER:  No.

12       "QUESTION:  -- or anything like that?

13       "ANSWER:  We didn't even have that stuff in our

14  possession."

15       Then, "Okay.  And earlier you said most of the

16  things came from J.R.," that's Uhuru, "that he obtained the

17  weapons and the pipe.  You don't know where he got them from.

18  You can assume, but you don't know where?

19       "ANSWER:  True."

20       And this, ladies and gentlemen, is what Uhuru told

21  Szabo:  "I believe earlier you said if someone had got in his

22  way," that's Uhuru, J.R., "during the escape, if he had to

23  kill them, he would?

24       "ANSWER:  There was a time when all of us decided we

25  weren't even going to do it.  He says, 'Look, I don't even want

1   anybody with me unless they're willing to -- either to hurt

2   somebody or to be willing to kill somebody.'  I said, 'Man, I'm

3   not looking for that.'  I said, 'You know what, tell you the

4   truth --' at that point I think all of us, from Rejon to -- I

5   don't know about Joey, but Rejon and Thaddeus and myself said,

6   'I don't -- I'm not willing to do all that.'  And the whole

7   plan, like, dissolved for a few days, or however long it was."

8           What's the evidence?  If somebody was going to get

9   hurt in that escape and there was a plan to do it, Rejon

10  Taylor was not going to be a part of it; he refused to.

11          And then he goes on about the shank things, how they

12  looked.  They were kept in the ceiling as well.  They weren't

13  on them when the escape attempt occurred.

14          "And then you were going to cut your way out of the

15  window.  What did you need?"

16          There was wire mesh inside these windows, stainless

17  steel.  And you recall what he starts talking about.  Here is

18  the pipe that was long and sharpened on one end.  And he said

19  that he, Szabo, sharpened that pipe, and basically says,

20  "They," talking about other people, "came up with the things

21  that we needed.

22          "Who is 'they'?

23          "J.R. -- as far as I know, just J.R., because J.R.

24  is the only one that ever showed them to me."

25          So he's saying Rejon had nothing to do with coming

1    up with the escape materials.

2           "All right.  There was really no plans to really

3    hurt any guards, right?

4           "ANSWER:  No.

5           "And there was no plan to use any kind of weapons on

6    the guards at all, was there?

7           "ANSWER:  No."

8           Now, the government has introduced--  Moving to

9    another subject, but this all deals with future dangerousness.

10   And, remember, future dangerousness is not out in the

11   neighborhood.  Future dangerousness is in a federal

12   penitentiary, among inmates and guards, because Rejon Taylor

13   will never, ever be in the general -- out in the general

14   public again.  As you heard the evidence, there will always,

15   for the rest of his life, be at least one gun, if not more,

16   between Rejon Taylor and society.

17          THE CLERK:  You have ten minutes.

18          MR. WILLIAM ORTWEIN:  Thank you.

19          They have this letter they introduced, and basically

20   what it talks about is, it says that, "Well, you know, I'm

21   going to get a new trial.  I don't have to worry about Joey

22   coming back and testifying against me, because he won't be

23   available."

24          Well, when you hear that, that's one thing.  But

25   listen to this letter from Szabo, and you'll understand where

1     that came from.  He says in his original letter, "I hear

2     somebody wants to do something to him," not that he, Rejon,

3     does.

4             Here is what Szabo says, "Tell Rerun, that's what I

5     call him, joking, keep his head up.  Also let him know the

6     word is already out in the federal joint, what joint I'm at,

7     about what Joey and Sir Jack did.  Let him know that they're

8     snitches.  Let him know what they have done."

9             Briefly, ladies and gentlemen, moving on, because

10    I'm about out of time, here, once again, after the shooting

11    was over, there was testimony Rejon didn't say a word, sat

12    there real quiet, didn't brag about it.

13            "He just sat there quietly?

14            "That's correct.

15            And then later on, a couple of weeks after it was

16    over, what did he say, Mr. Marshall says?

17            "Yes.  Do you remember, though, there was one in

18    which he looked at you and he said, 'Joey, my heart can't take

19    it'?"

20            And the answer is, "Yes."

21            Had nothing to do with a courtroom.  Before he was

22    even arrested, ladies and gentlemen, "My heart can't take it."

23            They say that Rejon Taylor also can't adapt to

24    things in jail.  And like I told you before, no matter what he

25    does or how hard he tries, he can never make up for the loss

1    that he has caused.  A couple of things you have seen——he

2    completed anger management course in the Hamilton County Jail,

3    not once but twice, he got his GED while in the Hamilton

4    County Jail.  Unfortunately, where he will go, the only

5    programs available will be those to debilitate him.

6             MR. NEFF:  Your Honor, objection.

7             MR. WILLIAM ORTWEIN:  I believe that was the evidence

8    Your Honor allowed in.

9             THE COURT:  What is it again?

10            MR. WILLIAM ORTWEIN:  I said that, unfortunately,

11   wherever he goes in the federal pen, the only programs will be

12   there to debilitate him.  I think that came in on redirect.

13            THE COURT:  I'm not-- Are you referring to

14   Mr. Aiken?

15            MR. WILLIAM ORTWEIN:  Yes, sir.

16            THE COURT:  That wasn't the word he used.  I believe

17   "incapacitate."

18            MR. WILLIAM ORTWEIN:  "Incapacitate."

19            THE COURT:  Objection sustained.

20            MR. WILLIAM ORTWEIN:  I said the wrong word.  The

21   only programs that will be available will be to incapacitate

22   him.  That is because he will never, ever leave a federal

23   penitentiary again.  They only want to incapacitate him so that

24   he is not an escape risk, he is not a problem at all for

25   anybody.  He can't get education or anything else, since he

1   will never darken the door of one of those penitentiaries and

2   head outside.

3          You have a difficult and hard decision, which I

4   don't envy you, you know, because, as I said before, it's how

5   Rejon Taylor will die.  And, ladies and gentlemen, it is not

6   just 12 people's decision; it is each and every one of your

7   decisions, as an individual, coming to a decision that you

8   personally can live with the rest of your life as individuals,

9   and that you will be as sure 20 years, 30 years, 40 years from

10  now of the decision that you reach today, that you'll be as

11  sure of it, that you did the right thing, then.

12         You know, I will submit to you, as I said, this part

13  of the hearing is not guilt or innocence.  He's guilty.  No

14  question you've come to that verdict.  That's not what we're

15  arguing about.  It's whether or not the mitigators, which are

16  not excuses but show you who Rejon Taylor is and that he is

17  not one of the worst of the worst, he's not a Terry Nichols

18  that killed 180 people at Oklahoma City, or Eric Rudolph --

19         MR. NEFF:  Objection, Your Honor.

20         MR. WILLIAM ORTWEIN:  -- who got life, that killed

21  two people.

22         THE COURT:  What's the objection?

23         MR. NEFF:  He's talking about other cases that don't

24  have any bearing on this case.

25         THE COURT:  Mr. Ortwein?

1    MR. WILLIAM ORTWEIN:  I think I'm able to use

2 examples of what the worst of the worst is and why it's not --

3 who it's not.

4    THE COURT:  Sustained.

5    MR. WILLIAM ORTWEIN:  Okay.

6    As I say, ladies and gentlemen, we have tried,

7 within the confines of the law, to let you know who this young

8 man really is——it's not a pretty picture; it was one that was

9 somewhat scripted——and tried so you will understand how he

10 came to be and what he is not.  Even though the government has

11 attempted to portray him as other things, all of us, every one

12 of us, have written and said things during emotions that we

13 wish we never had, and regret it.  And I submit to you that

14 when we do that, that doesn't show who we really are, not at

15 all.

16    And in all of us, as human beings, there is some

17 good.  And there is some good in Rejon Taylor.  And I submit

18 to you that when -- and I pray that when you examine——I

19 haven't gone through them——the mitigators and the aggravators,

20 you will find and see that there is some good in Rejon Taylor,

21 and that he does not deserve to die at the hand of an

22 executioner but in a prison ward.  Thank you.

23    THE COURT:  Mr. Neff?

24    MR. NEFF:  Thank you, Your Honor.

25    I agree with Mr. Ortwein on one thing.  I want to

1    talk about who Rejon Taylor really is, who Rejon Taylor is

2    not.  Has to do with his youthful appearance, his charming

3    smile, his soft-spoken demeanor.  Has absolutely nothing to do

4    with who Rejon Taylor really is.  What you see, that's not who

5    showed up at Mr. Luck's house in August of 2003.  What showed

6    up at Mr. Luck's house in 2003 is something entirely

7    different.  We measure Rejon Taylor and who he is by his

8    actions, not by his appearance, not by anything else, just his

9    actions.  So how do we know who he is?

10          Ladies and gentlemen, during this trial he made

11    phone calls, over 10,000 of them, but several of them talking

12    about, laughing about, the victim and the victim's loved ones.

13    That's who Rejon Taylor really is.  He wrote letters, ladies

14    and gentlemen, during this trial, laughing about his crime,

15    threatening witnesses, guaranteeing they wouldn't testify

16    against him, making fun of the victim, saying, "They act like

17    I killed the President."  Ladies and gentlemen, that's who

18    Rejon Taylor really is.  (Indicating.)  That's who Rejon

19    Taylor --

20          MR. WILLIAM ORTWEIN:  Objection.

21          MR. NEFF:  -- really is.

22          MR. WILLIAM ORTWEIN:  That's an appeal to sympathy

23    and bias.  It's disallowed.

24          THE COURT:  Mr. Neff?

25          MR. NEFF:  Your Honor, it's proof in the trial.

1          MR. WILLIAM ORTWEIN:  The jury is looking at it,

2     Judge.

3          MR. NEFF:  It's admitted as evidence.  Goes right to

4     the issue of intent and substantial planning, premeditation.

5          THE COURT:  Ladies and gentlemen, the attorneys are

6     authorized to make closing arguments to you.  And obviously

7     each side feels very, very strongly about their case.  I'm

8     going to instruct you of -- that your decision should not be

9     based upon passion or prejudice or bias.  The picture that the

10    attorney for the government showed is something that came into

11    evidence.  He had indicated he was going to show you, I

12    believe, who the defendant was, and he put the picture up.

13    Obviously the picture was not of the defendant; the picture was

14    of Mr. Luck.

15          Proceed, Mr. Neff.

16          MR. NEFF:  Thank you, Your Honor.

17          My point is, who the defendant is you can tell by

18    the results of his actions.  That's the point.  And that is

19    the result of the defendant's actions.  That's the result of

20    the defendant's substantial planning and premeditation.

21    That's the result of the defendant's intent in this case.

22    (Indicating.)

23          Who is Rejon Taylor really?  Ladies and gentlemen,

24    he's a manipulator.  He's a controller.  He's a schemer.  He's

25    a remorseless and relentless hunter.  He's a cold-blooded

1    killer with no conscience.  And he's a murderer who refuses to

2    accept responsibility, who refuses to apologize, and who

3    refuses to repent.  That's who Rejon Taylor really is.

4         I want to address some of the mitigating factors

5    that the defense has discussed with you already.  First of

6    all, when you get your verdict form from the Judge, there are

7    going to be a large number of potential mitigating factors for

8    you to consider on behalf of the defendant, as well as the

9    aggravating factors that the government has alleged.  The list

10   means nothing.  I mean, the list is merely a submission by the

11   defense for your consideration.  The fact that there are

12   30-some-odd listed on there doesn't mean anything.  You need

13   to consider them separately and then decide, Number 1, whether

14   they've proven them and, Number 2, whether they are in fact

15   mitigators.  That's your job in this case.

16        Mr. Ortwein said during his opening statement in the

17   sentencing as well as just a few minutes ago that mitigators

18   are not excuses.  Ladies and gentlemen, I submit to you that

19   many, many of those mitigators listed there are excuses.  It's

20   the defendant's attempt to try on different masks to hide who

21   he really is.

22        Now, the defense suggests that Mr. Matthews is

23   equally culpable.  Is Mr. Matthews a reprehensible human

24   being?  Sure he is.  Of course.  You saw him.  But he's not

25   equally culpable.  Would he have killed Guy Luck?  I don't

1  know.  Maybe.  The defendant did.  The defendant killed Guy

2  Luck.  Sir Matthews is the guy that Rejon Taylor calls his

3  "buddy" in the letters.  Sir Matthews is the guy that Rejon

4  Taylor continues to conspire with to try to perpetrate a fraud

5  on the Court.

6          MR. WILLIAM ORTWEIN:  Objection.  No evidence to

7  that, Judge.

8          MR. NEFF:  There's copious amounts of evidence to

9  that, Judge.

10          MR. WILLIAM ORTWEIN:  Objection.  There is absolutely

11  no evidence in that record.  They have implied that throughout

12  this trial, but there is no evidence of it.

13          THE COURT:  Ladies and gentlemen, as I said before,

14  if you do not find any evidence to support the statements of

15  the lawyers, then you should ignore the lawyers' statements.

16          MR. NEFF:  Mr. Matthews on the phone talking about

17  how he's going to come in and testify for Rejon.  Rejon Taylor

18  on the phone talking about "the big day tomorrow" when we know

19  Marshall -- or Matthews came in and testified and changed his

20  story.

21          Is Joey Marshall equally culpable?  And, by the way,

22  Sir Matthews didn't try to escape.  Out of all his failings,

23  he didn't try to escape.  The defendant did, though.  Now,

24  Mr. Marshall, he did try to escape.  But, remember,

25  Mr. Marshall is the same guy that chickened out when he was

1    supposed to go confront Mr. Luck at his residence, he's the

2    same guy that chickened out when they were supposed to try the

3    first attempt at the escape, and he's basically the guy that

4    chickened out and did nothing when they actually made the

5    attempt.  Mr. Uhuru's letter talks about that.  He says Rejon

6    took care of business, he did what he was supposed to do in

7    trying to escape, he performed his role, he recruited

8    Marshall, he recruited his mother, he arranged for the

9    transportation, he did his part.

10            Now, the defense says the only way——I put quotation

11   remarks around this; I think Mr. Ortwein said this in opening

12   and then he said something similar a few minutes ago——the only

13   way he would not have become a criminal is if he rejected his

14   family.  Isn't it interesting, he had his family come in and

15   testify, and now he turns around and blames them?  And let's

16   think about this for a minute.  First of all, "scripts."  Like

17   it's written in stone that Rejon Taylor had to be a killer.

18   It's offensive.  He had a family member who is a clerk in a

19   court who testified.  He had a family member who is a nurse

20   who testified.  He had a family member who is an airlines

21   employee.  He had a family member who is a postal worker.  He,

22   himself, ladies and gentlemen——Mr. Ortwein talked about

23   this——he, himself, started his own legitimate business.  And

24   this was after he lived with his father.  He knows the right

25   thing from the wrong thing.  He could have done something

1   productive.  He chose not to.  He's an adult, and he's

2   responsible for his actions.  He had a teacher that came in

3   and testified, a teacher who, by all accounts, appears to be a

4   fine role model for Rejon Taylor, somebody that Rejon Taylor

5   associated with purposely, under the auspices of volunteering.

6   Of course at the time he's volunteering, he's engaging in

7   criminal acts, but the teacher didn't know that.

8          Frontal lobe development.  Are 18-year-olds more

9   impulsive than 20-year-olds, 30-year-olds, 45-year-olds?

10  Well, sure they are.  That's common sense.  Impulsive to the

11  point where you kidnap someone at gunpoint, drive them for two

12  hours, and shoot them in the mouth?

13         This wasn't a reaction by Rejon Taylor.  He had

14  hours, weeks, months, to steer away from this course of

15  action.  He chose not to.  Remember what he said in his

16  letter?  He researched his victims.  He didn't do anything

17  without substantial planning.  He always made sure he knew

18  everything there was to know about his victims before he did

19  it.

20         Frontal lobe development.  Ladies and gentlemen, I'm

21  sure that many people know of friends, family members,

22  acquaintances, people who had similar obstacles.  Did Rejon

23  Taylor have obstacles in his life?  Sure he did.  I'm sure

24  many people know of examples of people who have those same

25  types of obstacles, people who serve in Iraq honorably for

1    their country, make that decision to do the right thing.  It's

2    not written in stone that Rejon Taylor needed to kill someone.

3         "My heart can't take it."  Well, let's put that in

4    context, ladies and gentlemen.  When he said, "My heart can't

5    take it," he didn't mean "My heart can't take it, I feel so

6    bad that I've killed somebody;" he meant, "My heart can't take

7    it.  The police are on me.  I might get caught."  That's what

8    he meant, because when you put it in context, it's in the

9    context of him robbing drug dealers to get money to get out of

10   town; that's what it means, not "I feel really bad about what

11   I did."

12        Now, go ahead and review the statutory aggravating

13   factors that the government has alleged.  Commission of

14   another felony, that he committed the murder during the

15   commission of another felony.  Essentially, ladies and

16   gentlemen, you've already found this.  That was your verdict

17   during the course of the trial itself, that he perpetrated the

18   murder during and in relation to the kidnapping.  That

19   statutory aggravating factor is proven.  You've already found

20   that it's proven.  And once you find that, you can consider

21   the death penalty.

22        So let's talk about substantial planning and

23   premeditation, talk a little bit about intent.  How do we know

24   what the defendant intended?  How do we know that he engaged

25   in substantial planning and premeditation?  It's not because

1   just what Joey Marshall said.  And I would submit to you that

2   the defendant's actions on occasions prior to -- leading up to

3   the time of the murder shed a lot of light on his thought

4   process and the kinds of things that he does, the kinds of

5   things that he thinks about, the kinds of things that he plans

6   before he does them.  Let's talk about some of those things.

7           We know that he targeted this victim, he burglarized

8   him multiple times, over and over and over and over again.  We

9   know he chose his victims carefully.  He cased them out, chose

10  them, planned things thoughtfully.  He didn't always tell Joey

11  Marshall or Sir Matthews what was going on in his head.  That

12  might be counterproductive.

13          There's indications that he was stalking the victim,

14  that he was hunting him, ladies and gentlemen, following him

15  from place to place, eating in his restaurant, researching

16  him, following him home.  He showed up at the house that day

17  and provided two loaded guns.  Ladies and gentlemen, why do

18  you load a gun?  You load a gun because you intend to use it.

19  Two young men accosting an older guy at gunpoint.  They didn't

20  need guns at all, in the first place.  And even if they did

21  need guns to intimidate him, they didn't need to load them.

22  He was no threat to them physically.  Why would you load a gun

23  unless you're intending on using it?

24          No masks.  They're going to drive this guy two hours

25  from Atlanta to Tennessee, with no masks, to drop him off and

1   let him out of the van.  Well, all he would be able to do is

2   identify them.  He just rode with them for two hours.  They

3   had no intent of ever letting--  Rejon Taylor had no intent of

4   ever letting Guy Luck out of that van alive.

5           There was paper work in the house.  Ladies and

6   gentlemen, there was a warrant.  There was a warrant for the

7   defendant's arrest.  There was paper work in that house which

8   indicated that the thieves had been identified.  Mr. Ortwein

9   makes a big deal about the credit cards sitting on top of the

10  paper work, and that you can't see it.  Well, so what?  By the

11  time it gets photographed--  What, Rejon couldn't have picked

12  them up and looked at them?  You can't tell what's underneath?

13  And isn't it interesting that he left credit cards there, left

14  a checkbook there?

15          Two-hour drive.  He stops and makes the comment to

16  Marshall -- Marshall wouldn't have known about the paper work

17  inside the house, but he makes the comment to Marshall that,

18  "This is the guy that took the warrants out on me."  Paid for

19  the gas, as Mr. Poole said, with his mom's credit card.  He's

20  thinking.  He's thinking, ladies and gentlemen.  Driving to

21  Tennessee--  He drives back and forth when he gets into

22  Tennessee——you remember the video of the drive, that the

23  police officer made of the drive that he took——and back and

24  forth, and getting more and more and more rural, and finally

25  ending up on a road with a hillside of woods on one side and a

1    creek on the other.  Where was he going?  Ladies and

2    gentlemen, he was going to kill Mr. Luck.  And then we know

3    what he intended to do because Mr. Luck was already shot three

4    times by the time that Rejon Taylor pointed that gun and shot

5    him in the mouth.  That's how you know what his intentions

6    were.  The victim's reaction also tells us a little bit about

7    it.  When Rejon Taylor first showed up at his house that day,

8    the victim didn't know it, Mr. Luck didn't know it, but he was

9    already dead.  Now, somewhere during the ride he figured it

10   out.  The torment that he must have endured is indescribable,

11   driving for two hours in the back of that van.  And that

12   torment drove his panicked reaction.  He had to try to get

13   away.  Can't even imagine the horror of knowing that he was

14   going to die while lying on the side of an unfamiliar road in

15   a state that he doesn't go to, away from his loved ones.

16          How do we know what Rejon Taylor planned?  Well,

17   let's look at what he did after the murder.  First of all,

18   yeah, the plan didn't go acc- -- it didn't go according to

19   plan.  We're the first ones to say that.  Didn't go according

20   to plan, because the victim tried to preempt what he knew was

21   coming.  Yet witnesses are showing up on the scene.  The

22   defendant has to get out of the van.  His glove gets caught in

23   the seat belt, and he's got to leave.  He can't get out of the

24   van with guns in his hands, because there's witnesses arriving

25   on the scene.  But what does he do when he goes to the car?

1    He flips down the tag.  He's thinking.  He's still thinking.

2    Would somebody who had panicked, would somebody who had shot

3    somebody else in self-defense, or shot him accidentally, or

4    shot him not really meaning ever to kill him, would they be

5    thinking about that?

6            He then calmly directs Mr. Marshall through traffic.

7    Yeah, his reaction to Mr. Matthews, who is a thug, getting

8    into the car and saying, "You're a soldier, you busted him,"

9    his reaction was not what you would expect of an ordinary

10   human being.  His reaction wasn't, "I didn't do--  I didn't

11   mean to do it.  Oh, my God!  What are we going to do?  I

12   didn't mean for this to happen."  That wasn't his reaction.

13   His reaction was stone-cold calm silence.  And then what did

14   he do that night?  He took the victim's money and he went on a

15   date to Red Lobster with his girlfriend.

16           Now, let's talk about the nonstatutory aggravating

17   factors.  We put on victim impact evidence with Robin Belcher.

18   You heard from Stephanie Belcher during the course of the

19   trial itself.  You know a little bit about who Mr. Luck was,

20   what he meant to his loved ones, what he meant to the

21   community, the business he had, the effect that it's had on

22   their lives.  Just makes sense.  Yet the defendant is still

23   boldly attacking the victim here; he's boldly attacking him in

24   his letters and his phone calls, through Matthews' testimony.

25   He laughs and makes fun of the victim and his loved ones, even

1    while they get up here and cry.  "They're acting like I killed

2    the President or something."  No, he killed somebody equally

3    valuable.  Lack of remorse.  Failure to adapt to societal

4    norms.

5            You know, the defendant has an uncanny ability to be

6    who he needs to be to satisfy his own ends.  He's a chameleon.

7    In the Army, when we used to go out in the field, we'd put

8    camouflage on our face and wear camouflage so we would blend

9    in so you couldn't see us.  It's Halloween time.  It's time we

10   put on a mask and pretend to be something that we're not.  So

11   what are the masks, the facades, that Rejon Taylor uses to

12   manipulate people in his life?  Loving family member.  Helpful

13   friend.  Entrepreneur.  Volunteer.

14           He fooled his long-time teacher and friend.  He had

15   no idea what Rejon Taylor was doing, really.

16           Shy.  Gentle.  Quiet guy.  Computer whiz.  What

17   about big-time record producer who buys high-D TVs?

18           He fooled the clerk so much--  And the clerk, pretty

19   smart guy.  He fooled him so much he gave him his telephone

20   number, said, "Call me when you have a party."

21           Religious man who fooled the chaplain twice.

22           In court the defendant gave an unsworn statement

23   that was not subject to cross-examination.  Like he uses masks

24   to manipulate everyone else, he tried to do it with you, too,

25   ladies and gentlemen.  He tried to trick you into believing he

1    might be sorry.  Everyone was waiting for what never came,

2    though; everyone was waiting for what was never said——"I'm

3    sorry.  Will you forgive me?"

4         Didn't happen.  What does he do instead?  He blames

5    everybody else except for himself.  What indicia of remorse

6    has he shown and mercy did he show to the victim?  None.  He

7    went to Red Lobster on the victim's dime.  Does that show

8    remorse?  He hid in the refrigerator with a knife.  Does that

9    show remorse?  He escaped, with other parties, and in the

10   escape attempt procured shanks.  Does that indicate remorse?

11   Or tried to escape.  He continued to conspire with Matthews

12   and get away with it in here.  Does that show remorse?

13   Guaranteeing the elimination of witnesses, guaranteeing that

14   Joey Marshall will never testify against him again, does that

15   show remorse?  Ladies and gentlemen, this was just a couple of

16   weeks ago.  We're not talking about something that happened

17   five years ago.  We're talking about something that happened

18   in the last month.

19        Laughing about his crimes in his letters——"Once I

20   stole their identities, that was all she wrote (ha ha, laugh

21   out loud)"——making fun of the victim, in the CD and letter,

22   does that show remorse?

23        Let's talk about his future danger.  The chaplain

24   said that the defendant is an influential leader.  It's hard

25   to imagine something more scary than that, ladies and

1   gentlemen.  An influential leader.  Look with whom he

2   conspires.  He conspires with an older -- a guy that's been in

3   the Vietnam war, an older guy, a guy much older than he is,

4   that's been a criminal his whole life.  He conspires with

5   another guy who has killed somebody.  He conspires with

6   another guy who has molested children.  That's-- Those are

7   his friends.  Those are the people with whom he has influence.

8   You heard the chaplain even say he has influence over hardened

9   gang members, which I'm sure the defense intended to be a

10   positive thing.  But when you know what's really behind Rejon

11   Taylor and who he really is, is his influence over hardened

12   gang members really a good thing?

13         Now, why is Rejon Taylor dangerous, ladies and

14   gentlemen?  He's not dangerous because he's a big, powerful

15   physical presence.  He's not intimidating.  He looks like the

16   librarian aides that my mother used to employ at the high

17   school library.  He's not scary-looking.  It's just the

18   opposite.  He's more dangerous because he's not scary-looking,

19   ladies and gentlemen.  He's more dangerous because you don't

20   see him coming.  He's dangerous because he's smart.  He's

21   dangerous because he's controlling.  He's dangerous because he

22   never stops manipulating.  He's dangerous because he never

23   stops conspiring.  He's dangerous because he's a chameleon.

24   He's dangerous because he has no remorse.  He's dangerous

25   because he has no concern for others.  He's dangerous because

1 prison walls cannot contain or deter his influence, ladies and

2 gentlemen.  He can recruit.  He can influence.  He can trick

3 anyone.

4   My kids just started reading -- in advance of

5 Halloween, started reading the book <u>Dr. Jekyll and Mr. Hyde</u>,

6 the kids' version of it.  The defendant's story is much like

7 that Robert Louis Stevenson novel, except with a much more

8 dangerous twist.

9   The defense wants you to believe the defendant is

10 less culpable; he's young, soft-spoken; charming smile;

11 frontal lobe isn't developed yet; he had a bad family.  But

12 that, ladies and gentlemen, is an illusion, designed to trick

13 you.  What illusionists do, they get your attention right up

14 here while the reality is taking place down here.

15 (Indicating.)  And that's what this is.  That's what these

16 mitigating factors are.

17   Ladies and gentlemen, the most dangerous, the most

18 deadly, the most evil, the most horrible things in life often

19 come in the most innocent, innocuous, and even attractive and

20 alluring packages.  When we walk down the street, we see a guy

21 like Charles Manson, or even Sir Matthews, what do we do?  We

22 see bad-looking guys, scary-looking, we cross the street, we

23 stay away, we know to avoid them.  The defendant's dangerous

24 because, again, we don't see him coming.  His quiet,

25 soft-spoken, charming demeanor is really a friendly mask for

1  the reality that there is a cunning and criminal mind at work

2  behind that mask, and you've seen the evidence of it all

3  throughout this trial.  The defendant is not Dr. Jekyll and

4  Mr. Hyde.  He always looks--  Dr. Jekyll and Mr. Hyde, you

5  know how to transform, you could tell who you were dealing

6  with; you had Hyde over here, ugly monster-looking guy, and

7  you had Dr. Jekyll over here.  (Indicating.)  The defendant is

8  dangerous because he always looks like Dr. Jekyll but his

9  mind, his mind, ladies and gentlemen, is always working like

10  Mr. Hyde.

11         Now, what do we do about this?  What's the plan of

12  action?  Ladies and gentlemen, society has a right to

13  self-defense, just like the victim Mr. Luck had a right to

14  defend himself.  He fought tooth and nail to defend himself.

15  He had every right to kill the defendant to protect himself

16  and to defend himself, and so do you.  He couldn't finish what

17  he had the right to start.  You not only have the right but

18  you have the obligation to finish it.

19         A lot of times you'll hear people talking about the

20  horrible things that happen in the community——"When are they

21  going to do something about that?"  Well, ladies and

22  gentlemen, you are now they.  When it comes to Rejon Taylor,

23  you are the ones that have to do something about it.  You are

24  the ones who have the obligation to be the sheep dog that

25  protects the sheep, and even sometimes the wolves, from the

1    wolf.

2            There is a degree--  There are two degrees of

3    punishment here.  There is the minimum punishment, and there

4    is the maximum punishment.  The minimum punishment is life

5    without parole.  Did Rejon Taylor do the minimum?  Joey

6    Marshall did the minimum.  That's why he's getting life

7    without parole; hoping that he'll get a break, even.  Sir

8    Matthews did at least the minimum.  He's getting life without

9    parole.  Neither of them comes close to getting what -- or

10   comes close to being as culpable as the defendant.

11           THE CLERK:  You have two minutes.

12           MR. NEFF:  Thank you.

13           Hear sometimes people talk about an-eye-for-an-eye

14   philosophy.  Ladies and gentlemen, that's a limitation on

15   punishment.  We're not--  We're asking for your punishment to

16   be more merciful and less than the defendant's crime.  We're

17   not asking you to surprise him, drag him out of his cell,

18   drive him around for a couple of hours, shoot him in the

19   mouth, and leave him on the side of the road to die.  That

20   would be eye for eye.  What we are asking for is that you give

21   him due process——already done——give him a fair trial——already

22   done——you give him a humane execution, you give him a chance

23   to communicate with loved ones until then, you give him a

24   chance to realize and express true remorse before he's

25   executed.  We're asking you to exercise the legitimate

1   authority given to the people by Providence, the people of

2   this government.  You are the people of the government.  The

3   defendant's conspiracy did not end when he shot the victim in

4   cold blood in August 2003.  He continues to this day.  He's

5   never stopped plotting.  He's never stopped planning.  He's

6   never stopped scheming.  He's doing it now.  He will never

7   stop plotting unless you stop him.

8          We're mindful of what we're asking you to do.  It's

9   not easy.  Voting to execute someone isn't easy.  The right

10  thing, though, ladies and gentlemen, is not often the easy

11  thing.  It's sometimes hard to do the right thing.  Voting to

12  execute him isn't easy, but it is right, it is just, and it

13  must be done.  The mask is off.  You see what he really is.

14  You are the only ones, you, ladies and gentlemen, are the only

15  ones who can ensure that justice in its truest form is done.

16         THE COURT:  Ladies and gentlemen, why don't we go

17  ahead and take our afternoon break at this point.  We will

18  resume at 4:00.

19         (Brief recess.)

20         THE COURT:  Be seated.

21         Ladies and gentlemen, now that the attorneys have

22  presented their information regarding defendant's sentencing,

23  I must instruct you on the law concerning your decision.  This

24  is a weighty decision, one of the most important decisions

25  that can be made in a court of law.  The instructions I gave

1    to you during the first phase of the trial still apply, as

2    well as any instructions I have previously given you in this

3    phase.

4          You will be required to decide if defendant should

5    receive the death penalty or be sentenced to life imprisonment

6    without possibility of release.  This is a decision left

7    exclusively to the jury.  In making all of the determinations

8    you are required to make in this phase of the trial, you may

9    consider any relevant evidence that was presented during the

10   guilt phase of the trial as well as evidence or other proper

11   information that was presented at this sentencing phase of the

12   trial.  With the exception of your ability to consider

13   information that does not rise to the level of evidence in

14   this phase of the trial, the instructions I gave you

15   previously regarding evidence apply here, also.

16         Remember to not let rumors, suspicions, or anything

17   else you may have seen or heard about this case outside of

18   court influence your decision in any way.

19         Just as in the first phase of the case, the

20   attorneys presented stipulations during this phase.  When the

21   attorneys for both sides stipulate or agree to the existence

22   of a fact, you should accept the stipulation as evidence and

23   regard the fact as proved.  You are not required to do so,

24   however, since you are the sole judge of the facts.

25         During the sentencing phase, defendant spoke to you

1  while seated at the defense table.  As I instructed you at the

2  time, his statement was not testimony or evidence.  He was not

3  sworn, he was not on the witness stand, he was not questioned

4  by his attorneys, and he was not subject to cross-examination.

5  Because what he said was not evidence, he was not permitted to

6  talk about any factual matters or discuss the evidence in the

7  case.  Rather, he was simply being provided an opportunity to

8  speak to you personally regarding himself and sentencing.

9  Although you may not treat his statement as evidence, you may

10 consider his statement in reaching your decision regarding

11 sentencing.  Instead, this was his opportunity to speak to you

12 personally regarding himself and your sentencing decision.

13 Although you will not be treating his statement as evidence,

14 you must give his statement consideration when you are

15 reaching your decision regarding sentencing.

16      You have heard several witnesses offer you their

17 opinions regarding various matters.  The law permits witnesses

18 to offer an opinion if they have special knowledge or

19 experience which may be helpful to the jury.  As is true with

20 all witnesses, you are the sole judges of their credibility.

21 You are not required to accept their opinions.  In deciding

22 how much weight to give them, you should consider the

23 witnesses' qualifications and how the witnesses reached their

24 conclusions as well as any other factors you think are

25 relevant to determining whether their opinions are credible or

1  not.  Remember that you alone decide how much of a witness's

2  testimony to believe and how much weight it deserves.

3          Just as I instructed you during the first phase of

4  this case, the government has the burden of proof in most

5  aspects of this phase.  Where the government has the burden of

6  proof, it must carry that burden by proof beyond a reasonable

7  doubt.  The same instructions on this point I gave you

8  previously apply here.

9          In some aspects of this phase of the case, the

10 defendant has the burden of proof.  However, unlike the burden

11 the government bears, proof beyond a reasonable doubt, the

12 burden on the defendant is only proof by a preponderance of

13 the evidence.  Preponderance of the evidence is a lesser

14 standard of proof under the law than proof beyond a reasonable

15 doubt.  A fact is established by a preponderance of the

16 evidence if its existence is shown to be more likely so than

17 not so.  In other words, a preponderance of the evidence means

18 such evidence as, when considered and compared with that

19 opposed to it, produces in your mind the belief that what is

20 sought to be established is, more likely than not, true.

21         The lawyers for both sides objected to some of the

22 things that were said or done during the trial.  Do not hold

23 this against either side.  The lawyers have a duty to object

24 whenever they think something is not permitted by the rules of

25 evidence.  Those rules are designed to make sure both sides

1   receive a fair trial.  And do not interpret my rulings on

2   their objections as any indication of how I think the case

3   should be decided.  My rulings were based on the law, not on

4   how I feel about the case.  Remember, your decision must be

5   based only on what you saw and heard here in court.

6          The fact that defendant did not testify cannot be

7   considered by you in any way.  Do not even discuss it in your

8   deliberations.  A defendant has an absolute right not to

9   testify or to testify.  It is the government's burden both to

10  prove guilt beyond a reasonable doubt and, at this stage of

11  the proceeding, to prove beyond a reasonable doubt that

12  defendant should receive the death penalty.  The burden is not

13  on the defendant to prove he should not receive the death

14  penalty.

15         The Court has permitted you to take notes during the

16  course of this trial in light of the length of the trial, the

17  number of witnesses, and the complexity of the issues.  In

18  your deliberations you may use your notes to aid in your

19  recollection of the evidence, but, remember, your notes

20  themselves are not evidence.  Neither your notes nor the notes

21  of any other juror should take precedence over your own

22  independent recollection of the evidence received in the case.

23  Notes are only an aid to recollection, and are not entitled to

24  any greater weight than actual recollection or the impression

25  of each juror as to what the evidence actually was.

 1          That concludes the part of my instructions

 2    explaining your duties and the general rules.  I will now

 3    explain the factual determinations you must make in this

 4    sentencing proceeding.

 5          Before you may consider the imposition of the death

 6    penalty, you must first unanimously agree beyond a reasonable

 7    doubt that the defendant was 18 years of age or older at the

 8    time of the offense.  The parties in this case have stipulated

 9    that defendant was at least 18 at the time of the offense.

10          If you determine defendant was at least 18 years of

11    age at the time of the offense, you must then consider whether

12    the government has proved that the defendant intentionally

13    killed or committed acts resulting in the death of Guy Luck in

14    one of the intent factors alleged by the government.

15          The government alleges four intent factors:  First,

16    defendant intentionally killed Guy Luck.  To establish that

17    the defendant killed the victim, the government must prove

18    that the defendant killed a victim with a conscious desire to

19    cause the victim's death.

20          Second, defendant intentionally inflicted serious

21    bodily injury that resulted in the death of Guy Luck.  The

22    government must prove that the defendant deliberately caused

23    serious injury to the victim's body which in turn caused the

24    victim's death.  Serious bodily injury means a significant or

25    considerable amount of injury which involves a substantial

1 risk of death, unconsciousness, extreme physical pain,

2 protracted and obvious disfigurement, or protracted loss or

3 impairment of a body member, organ, or mental faculty.

4 Third, defendant intentionally participated in an

5 act, contemplating that the life of a person would be taken or

6 intending that lethal force would be used in connection with a

7 person other than one of the participants in the offense, and

8 the victim died as a direct result of the act, which directly

9 resulted in the death of Guy Luck. The government must prove

10 that the defendant deliberately committed the act with a

11 conscious desire that a person be killed or that lethal force

12 be employed against a person. The phrase lethal force means

13 an act of violence capable of causing death.

14 Fourth, defendant intentionally and specifically

15 engaged in an act of violence, knowing that the act created a

16 grave risk of death to a person other than one of the

17 participants in the offense, such that participation in the

18 act constituted a reckless disregard for human life, and Guy

19 Luck died as a direct result of the act.

20 Intent or knowledge may be proved like anything

21 else. You may consider any statements made and acts done by

22 defendant and all of the facts and circumstances in evidence

23 which may aid in a determination of defendant's knowledge or

24 intent. You may, but are not required to, infer that a person

25 intends the natural and probable consequences of acts

1  knowingly done or knowingly omitted.

2       If you find that the government has proved at least

3  one of the intent factors, then you must determine whether the

4  government has proved beyond a reasonable doubt the existence

5  of either of the two statutory aggravating factors.  In my

6  instructions at the start of this phase of the case, I

7  mentioned aggravating factors and mitigating factors and I

8  told you I would define those terms later.  I will do so now.

9  These factors concern the circumstances of the crime or the

10  personal traits, character, or background of the defendant,

11  and the effect of the offense on the victim.  The word

12  aggravate means "to make worse or more offensive" or "to

13  intensify."  The word mitigate means "to make less severe" or

14  "to moderate."  An aggravating factor, then, is a fact or

15  circumstance which would tend to support your decision that

16  the death penalty is the appropriate punishment in this case.

17  A mitigating factor is any aspect of defendant's character or

18  background, any circumstance of the offense, or any other

19  relevant fact or circumstance which might indicate that the

20  defendant should not be sentenced to death.

21       The government has alleged two aggravating factors

22  that are set out in the law.  We call these statutory

23  aggravating factors.  The jury need only find that the

24  government has proven one of these statutory aggravating

25  factors beyond a reasonable doubt.

1          The first statutory aggravating factor is that the

2     death, or injury resulting in death, occurred during the

3     commission of kidnapping.  The government must prove beyond a

4     reasonable doubt that the defendant committed the kidnapping,

5     which during the first phase of the trial you found defendant

6     guilty of, and the death or injury occurred during the

7     commission of that kidnapping.

8          The second statutory aggravating factor alleged by

9     the government is that defendant committed the murder after

10    substantial planning and premeditation to cause the death of

11    Guy Luck.  Please keep in mind that substantial planning and

12    premeditation refer to the crime of murder, not to any other

13    offenses that accompanied or preceded the murder.  Planning

14    means mentally formulating a method for doing something or

15    achieving some end.  Premeditation means thinking or

16    deliberating about something and deciding whether to do it

17    beforehand.  The government does not establish substantial

18    planning and premeditation by showing a murder was

19    premeditated nor that some small amount of planning preceded

20    it.  Substantial planning and premeditation means a

21    considerable or significant amount of planning and

22    premeditation.

23         If you find the existence of one or both

24    aggravating--  If you find the existence of one or both

25    statutory aggravating factors unanimously and beyond a

1  reasonable doubt, you must then consider whether the

2  government has proved the existence of nonstatutory

3  aggravating factors.  However, you may not consider any

4  nonstatutory aggravating factor unless you have found at least

5  one statutory aggravating factor.  Nonstatutory aggravating

6  factors are factors the government asserts supports a sentence

7  of death, but these are not listed in the statute.  This is

8  proper, and must be considered by you just as the statutory

9  aggravating factors.  You may but are not required to find the

10  existence of nonstatutory aggravating factors before

11  considering imposition of the death penalty.

12        The first nonaggravating--  The first nonstatutory

13  aggravating factor alleged by the government is that defendant

14  attempted to escape from a detention facility in Chattanooga,

15  Tennessee, on April 14, 2006.  The government introduced

16  evidence through witnesses pertaining to this allegation.

17        The second nonstatutory aggravating factor alleged

18  by the government is that defendant would be a danger in the

19  future to the lives and safety of others.  In support of this

20  allegation the government introduced evidence or presented

21  information pertaining to defendant's involvement in an escape

22  attempt from a detention facility in Chattanooga, Tennessee;

23  defendant expressing an expectation that people wished harm to

24  Joey Marshall and that he would not testify at a future trial,

25  defendant using others to communicate with people outside of

1 the detention facility, harm to the home of Joey Marshall's

2 grandmother, and defendant failed to adapt to societal norms.

3 The third nonaggravating-- The third nonstatutory

4 aggravating factor alleged by the government is that defendant

5 caused injury, harm, and loss to Guy Luck and his family and

6 friends, as demonstrated by Guy Luck's personal

7 characteristics as an individual human being and the impact of

8 the death upon Guy Luck's loved ones. The government

9 introduced evidence or presented information pertaining to

10 this allegation through Luck's fiancée and his fiancée's

11 daughter.

12 For both the statutory and nonstatutory aggravating

13 factors, remember that the burden is on the government to

14 prove them beyond a reasonable doubt and your decision must be

15 unanimous.

16 In addition to considering aggravating factors, you

17 must consider mitigating factors. Mitigating factors differ

18 in two important respects from aggravating factors. First,

19 defendant has the burden of proving any mitigating factor.

20 However, the burden of proof is only by a preponderance of the

21 evidence and not proof beyond a reasonable doubt.

22 Second, with mitigating factors the jury need not be

23 unanimous. That means that each individual juror may consider

24 something a mitigating factor even if other jurors do not view

25 the same matter as mitigating. Any juror may consider a

1   mitigating factor once it has been found by another juror.

2          The defense has alleged the following categories of

3   mitigating factors:  Alternative sentence, circumstances of

4   the crime, relative culpability, background of Rejon Taylor,

5   character of Rejon Taylor, future adaptation to prison, and

6   other factors.  Defendant's attorneys have included in their

7   arguments a number of what they allege to be mitigating

8   factors.  The Court will provide the complete list for you in

9   the verdict form.  You are permitted to consider anything else

10  about the commission of the crime or about defendant's

11  background or character or any other relevant circumstance

12  that would mitigate against imposition of the death penalty.

13  Whether a factor is supported by a preponderance of the

14  evidence and whether it is a mitigating factor is for you to

15  decide.  If there are any such mitigating factors, you must

16  consider them in your deliberations.

17         After making your findings with regard to any

18  aggravating factors and any mitigating factors, you must then

19  weigh the aggravating factor or factors found to exist against

20  the mitigating factor or factors found to exist.  The intent

21  factors should not enter into the weighing process.  It will

22  be your responsibility to determine whether the aggravating

23  factor or factors found to exist sufficiently outweigh the

24  mitigating factor or factors found to exist to justify a

25  sentence of death.  In engaging in the weighing process, you

1   must avoid any influence of passion, prejudice, or undue

2   sympathy.  Your deliberations should be based upon the

3   evidence and information you have seen and heard and the law

4   on which I have instructed you.  Again, whether or not the

5   circumstances in this case justify a sentence of death is a

6   decision that the law leaves to you.

7          The process of weighing aggravating and mitigating

8   factors against each other, or weighing aggravating factors

9   alone if there are no mitigating factors, in order to

10  determine the proper punishment is not a mechanical process.

11  In other words, you should not simply count the number of

12  aggravating and mitigating factors and reach a decision based

13  on which number is greater.  You should consider the weight

14  and value of each factor.

15         The law contemplates that different factors may be

16  given different weights or values by different jurors.  Thus,

17  you may find that one mitigating factor outweighs all

18  aggravating factors combined, or that any aggravating factors

19  proved do not, standing alone, justify imposition of a

20  sentence of death.  Similarly, you may unanimously find that a

21  particular aggravating factor sufficiently outweighs all

22  mitigating factors combined to justify a sentence of death.

23  You are to decide what weight or value is to be given to a

24  particular aggravating or mitigating factor in your

25  decision-making process.  Keep in mind, however, that

1   regardless of your findings with respect to aggravating and

2   mitigating factors, you are never required to vote for a

3   sentence of death.

4           Unlike in other types of cases, you, the jury,

5   decide the punishment in this case.  The Court plays no role.

6   Whether you decide the defendant should receive the death

7   penalty or not is your sole responsibility.  If you

8   unanimously determine that defendant should receive the death

9   penalty, then that is the sentence.  If you unanimously

10  determine that defendant should receive a sentence of life

11  imprisonment without possibility of release, then that is the

12  sentence.

13          In your consideration of whether the death penalty

14  is justified, you must not consider the race, color, religious

15  beliefs, natural origin, or sex of either the defendant or the

16  victim.  You are not to return a sentence of death unless you

17  would return a sentence of death for the crime in question

18  without regard to the race, color, religious beliefs, national

19  origin, or sex of either the defendant or the victim.

20          That concludes the part of my instructions

21  explaining the rules for considering the testimony and

22  evidence.  Now let me finish up by explaining some things

23  about your deliberations in the jury room and your possible

24  verdicts.

25          You have already chosen a foreperson.  This person

1   will help to guide your discussions and will speak for you

2   here in court.

3          Once you start deliberating, do not talk to

4   Ms. Palmer or to me or to anyone else except each other about

5   the case.  If you have any questions or messages, you must

6   write them down on a piece of paper, sign the paper, and then

7   give it to Ms. Palmer.  Ms. Palmer will give the questions to

8   me, and I will respond as soon as I can.  I may have to talk

9   to the lawyers about what you have asked.  So it may take me

10  some time to get back to you.  Any questions or messages

11  normally should be sent to me through your foreperson.

12         One more thing about messages.  Do not ever write

13  down or tell anyone outside the jury room how you stand on

14  your votes.  For example, do not write down or tell anyone

15  except your fellow jurors what your vote happens to be.  That

16  must stay secret until you are finished.

17         Now that all the evidence and other proper

18  information is in and the arguments are completed, you are

19  free to talk about the case in the jury room.  In fact, it is

20  your duty to talk with each other about the evidence and other

21  proper information and to make every reasonable effort you can

22  to reach unanimous agreement.  Talk with each other, listen

23  carefully and respectfully to each other's views, and keep an

24  open mind as you listen to what your fellow jurors have to

25  say.  Try your best to work out your differences.  Do not

1    hesitate to change your mind if you are convinced other jurors

2    are right and that your original position was wrong.  But do

3    not ever change your mind just because other jurors see things

4    differently or just to get the case over with.  In the end,

5    your vote must be exactly that—your own vote.  It is

6    important for you to reach unanimous agreement but only if you

7    can do so honestly and in good conscience.

8         No one will be allowed to hear your discussions in

9    the jury room, and no record will be made of what you say.  So

10   you should all feel free to speak your minds.  Listen

11   carefully to what the other jurors have to say, and then

12   decide for yourself how to decide each question on the special

13   verdict form.

14        The verdict form is self-explanatory.  I don't think

15   you'll have any difficulty with it once you start it.  There

16   are some instructions in bold print that will give you some

17   guidance.  And I think, as I said, the questions are

18   self-explanatory.  The verdict form will be furnished to you

19   along with the evidence in the case.

20        It is about 4:30 now.  I think it's probably too

21   late to have you start your deliberations.  Let me have you go

22   into the jury room, though, and Ms. Palmer will come and get

23   you in a few minutes.  We probably will release you for the

24   day.  So the jury should step outside to the jury room now.

25        (The jury exited the courtroom, and the proceedings

1              continued as follows:)

2              THE COURT:  Please be seated.

3              Mr. Neff, having heard the Court's instructions,

4    does the government have any objection to the instructions as

5    given?

6              MR. NEFF:  No, thank you, Your Honor.

7              THE COURT:  Ms. Cory, the Court believes that the

8    defense does have one objection.  Is that correct?

9              MS. CORY:  Your Honor, I would say first that we

10   stand upon the submissions and argument we made earlier today

11   as what we believe the jury instructions should have said.  But

12   our most serious concern is the sentence that Your Honor

13   omitted on Page 22.  You had, in your original instructions,

14   said, "If you cannot unanimously agree upon a sentence, then

15   the law provides the defendant will receive a sentence of life

16   imprisonment with no possibility for release."  That is a

17   correct statement of the law.  And we would request that that

18   one sentence be placed back into Page 22.

19             THE COURT:  This was a matter that the Court

20   discussed during the charge conference.  The government

21   objected to the inclusion of that sentence, and pointed the

22   Court to some cases.  I believe there was a Supreme Court

23   decision, *Jones*.  And the Court had occasion to review that

24   decision, along with decisions from lower courts, and the Court

25   determined that the government was correct that the courts

1    indicate the trial judge should not include that language in

2    its instructions.  So the Court took it out.

3         MR. WILLIAM ORTWEIN:  Your Honor, if we're through

4    with the charge, I have a housekeeping matter.

5         THE COURT:  Okay.  I would like to go ahead and let

6    the jury go unless someone wishes to keep them for some reason.

7         MR. WILLIAM ORTWEIN:  That's fine.  All I wanted to

8    state was, the slide I objected to, I believe Mr. Poole used in

9    his opening argument, Your Honor, I think, said that I could go

10   ahead and introduce it for the record.  I submitted it to the

11   clerk with the proper number designation as an exhibit and put

12   an AP after it, that's -- to be sure it's part of the record.

13        THE COURT:  The Court will order, then, that exhibit

14   be made a part of the record for review in case there is any

15   appeal in this case by a higher court.

16        MR. WILLIAM ORTWEIN:  Thank you.

17        (Defendant's Exhibit DS19 was received for

18        identification only.)

19        MR. CLEMENTS:  Judge, I introduced three exhibits

20   that were not to go to the jury, just marked for

21   identification.

22        THE COURT:  Regarding Mr. McNally?

23        MR. CLEMENTS:  Yes, involving Mr. McNally and

24   Dr. Bell.  I just wanted to make sure they didn't go back to

25   the jury.  Do you want me to take care of that, or Ms. Palmer,

1    or --

2           THE COURT:  No, what we will do--  In fact, you could

3    do it tonight if you wish, since the jury is going to be out.

4    I will have you, both sides, get together with Ms. Palmer to go

5    through the exhibits and make sure only those exhibits

6    appropriate for the jury go back and that nothing that was not

7    introduced for purposes of jury review goes back.  I guess you

8    could do that this afternoon.  And then tomorrow morning she

9    could just deliver the exhibits to the jury and tell the jury

10   they could start deliberating.

11          What I wanted to do now was, in case the Court had

12   erred in its instructions, to bring the jury back and just

13   reinstruct them on a point of error.  So that's why I wanted

14   to send them out.  But I would like to go ahead and release

15   them now.

16          MR. CLEMENTS:  That's fine.

17          THE COURT:  Okay.  Let's bring the jury back in,

18   then.

19          (The jury entered the courtroom, and the proceedings

20          continued as follows:)

21          THE COURT:  Okay.  Be seated.

22          Ladies and gentlemen, in view of the hour, I think

23   it makes more sense to release you for the day and have you

24   come back tomorrow, refreshed, and you can start deliberating

25   then.

UNITED STATES DISTRICT COURT

        It is very important that while you are out you not

discuss the case or allow anyone to discuss the case with you.

Do not watch anything on television about this case.  There

were members of the media in the courtroom today.  So I think

we can safely assume that there will be some media coverage of

this case.  There will likely be things on the television,

things on the radio, and information in the newspapers.  So

you must not allow any of that to be exposed to you.

        When you come back tomorrow, go directly to the jury

deliberation room.  Ms. Palmer will bring the evidence in, and

she will bring in copies of the Court's charge, and she will

tell you that you can start deliberating.  So you should be

able to start discussing the case shortly after 9:00 tomorrow

morning.  So I ask you to come back at 9:00.  And be safe.

The jury is excused.

        (The jury exited the courtroom, and the proceedings

        continued as follows:)

        THE COURT:  Okay.  The jury is out.  I would ask the

attorneys, then, to stick around and get with Ms. Palmer to go

over the evidence to ensure that only appropriate evidence or

information gets back to the jury, and that the appellate

exhibits and anything else that was not introduced for the

jury's use goes back.

        Is there anything else we need to discuss, Mr. Neff?

        MR. WILLIAM ORTWEIN:  Briefly--  I'm sorry.

1          MR. NEFF:  Judge, just what the Court wishes for the

2   attorneys to do tomorrow.  Would you have us show up here at

3   9:00, or --

4          THE COURT:  You do need to be here at 9:00.  We have

5   a bunch of alternates, and the Court would like to release the

6   alternates.  The Court would like to do that in open court.  I

7   think if we're doing that, the defendant has a right to be

8   present for it.  And if the defendant is going to be here, I

9   think the lawyers ought to be here.  If the defense attorneys

10  are going to be here, the government attorneys should probably

11  be here.

12         MR. NEFF:  That's fine, Judge.

13         MR. WILLIAM ORTWEIN:  Otherwise, can we do like

14  during guilt or innocence, leave a cell phone number?  We're

15  just five minutes away.

16         THE COURT:  Yes.

17         MR. CLEMENTS:  You want to see us first thing in the

18  morning?

19         THE COURT:  I'm sorry?

20         MR. CLEMENTS:  I'm going to be here at 9:00 anyway.

21         THE COURT:  Well, Mr. Taylor is represented by a

22  number of lawyers.  I don't think all of the lawyers have to be

23  here at 9:00.  I think he does have to be represented by a

24  lawyer.  What you may want to do is delegate that to the

25  youngest member of the team.

1          MR. CLEMENTS:  Thank you.

2          MR. NEFF:  Ms. Cory?

3          THE COURT:  Is there anything further, then, that we

4    need to take up?

5          MR. NEFF:  No, thank you, Your Honor.

6          MR. CLEMENTS:  No, thank you.

7          THE COURT:  Ms. Palmer.

8          (Evening recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25