# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:04-cr-160-1 |
| v. | ) | U.S. District Judge Curtis L. Collier |
| | ) | |
| | ) | |
| REJON TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR LEAVE TO CONTACT JURORS

Pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

United States Constitution; 28 U.S.C. § 2255; Local Rule 48.1 of the Local Rules of

the United States District Court for the Eastern District of Tennessee ("Local

Rules"); Rule 6(a) of the Rules Governing Section 2255 Proceedings For the United

States District Courts ("§ 2255 Rules"); and *McFarland v. Scott*, 512 U.S. 849

(1994), Rejon Taylor respectfully moves this Court for leave to contact the trial

jurors and alternate jurors who served in this capital case. In its order appointing

counsel, this Court found, "[p]ursuant to 18 U.S.C. § 3599 (a)(2), Defendant, as an

indigent federal prisoner facing the death penalty, is entitled to the assistance of

qualified counsel to investigate and prepare a motion for relief under 28 U.S.C.§§

2254 and 2255." (Doc. 969, p. 2, PageID # 10208). Undersigned counsel has a duty to

fully investigate, develop, and present all cognizable claims pursuant to 28 U.S.C. §

1

2255, including claims of juror bias and misconduct that played a role in the jury's decision to convict and sentence Mr. Taylor to death.

Based on a review of the record and preliminary investigation, Mr. Taylor has good cause to contact the jurors in this case to develop claims of juror bias, extraneous influence on the jurors, juror misconduct, and ineffective assistance of counsel with respect to jury issues. Local Rule 48.1 anticipates that such contact is appropriate in certain cases. This is one such case.

Mr. Taylor's trial and direct appeal record reveal evidence that racial bias and misconduct potentially infected the jury's verdict, rendering Mr. Taylor's conviction and sentence unconstitutional. There are indications that the jury's verdict and sentence were based on racial bias and at least one juror expressed fear of Mr. Taylor prior to sentencing and contemplated purchasing a weapon after learning about a racially inflammatory comment attributed to Mr. Taylor. Contacting the jurors will enable undersigned counsel to thoroughly investigate and develop these identified instances of potential juror bias and misconduct.

## ARGUMENT

I. **Granting Leave to Contact the Jurors and Alternates is Consistent with the Constitutional Rights That § 2255 Safeguards, Counsel's Duties under § 2255, and the Local Rule.**

This § 2255 proceeding is the last opportunity for this Court to examine the constitutionality and legality of Mr. Taylor's conviction and death sentence, and it is the forum in which Mr. Taylor must present all relevant facts in support of his claims for relief. With limited exception, Mr. Taylor must raise his cognizable §

2

2255 claims within the one-year statute of limitations period that § 2255(f) imposes. The procedural rules for § 2255 proceedings codify Mr. Taylor's need to marshal factual support for all claims of error. *See* Rule 2(b)(2) of the RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS ("§ 2255 Rules") (requiring that the § 2255 motion "state the facts supporting each ground [for relief]"). This includes his claims related to juror bias and misconduct. Moreover, Local Rule 48.1 is not meant to prevent Mr. Taylor from fully litigating his § 2255 motion.

### A. Jury contact in Mr. Taylor's capital § 2255 proceedings is essential to ensure that his conviction and death sentence were constitutionally obtained.

Rejon Taylor seeks leave from this Court to contact the jurors and alternates at this juncture because the § 2255 proceedings represent Mr. Taylor's only meaningful opportunity to investigate and develop juror bias and misconduct not apparent from the record. Unlike capital habeas petitioners seeking relief pursuant to § 2254 who have pursued state post-conviction relief, § 2255 Movants have not had an earlier opportunity for factual developmental of juror related claims in earlier state proceedings. Thus, it is appropriate for this Court to allow Mr. Taylor to develop them in capital § 2255 proceedings. *See e.g., United States v. Davis*, 2:94-CR-381 (E.D. La. May 12, 2014) (ECF No. 2352) (granting death sentenced federal prisoner leave under local rule to contact jurors in § 2255 proceedings in district court); *cf. Wellons v. Hall*, 558 U.S. 220, 221-22 (2010) (noting that Wellons

3

attempted to investigate facts involving alleged improper contacts between judge and jury in both state and federal courts).

The very nature of jury misconduct and bias claims requires discovery of facts outside the record. *See e.g., United States v. Fell*, 2014 WL 3697810, at *n.5 (D. Vt. July 24, 2014) (granting new trial in § 2255 capital case based on juror misconduct and noting that such claims are poorly suited to resolution on direct appeal, especially where evidence of misconduct does not appear in the trial record); *see also Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991) (granting new trial where appellate counsel uncovered juror's dishonesty during voir dire in post-trial investigation).

### B. Capital § 2255 counsel have an affirmative duty to investigate all potential claims for relief, including claims involving jurors.

As § 2255 counsel for Mr. Taylor, it is undersigned counsel's professional obligation to investigate and develop every potential claim he might assert in a motion for relief pursuant to 28 U.S.C. § 2255. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 2003 ("2003 ABA Guidelines"), Guideline 10.7 (Investigation) and Guideline 10.15.1 (Duties of Post-Conviction Counsel). In fact, "collateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation" because "the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case." 2003 ABA Guidelines, Guidelines 10.15.1, commentary. This includes investigating any juror bias and misconduct that may have improperly infected the capital trial proceedings in Mr.

4

Taylor's case. *Id.* (post-conviction counsel must investigate whether "juror misconduct" existed at trial because such evidence may not appear in the record).

It is incumbent on § 2255 counsel to "conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief." *McCleskey v. Zant*, 499 U.S. 467, 498 (1991). This professional obligation necessarily entails conducting an appropriate inquiry of the jurors and alternates to determine whether a constitutional violation occurred, and among the important mechanisms for inquiry is contacting jurors. *See, e.g., Williams v. Taylor*, 529 U.S. 420, 440-43 (2000) (reaching merits of juror misconduct claim in federal appeals where capital post-conviction counsel interviewed jurors to investigate possibility that during voir dire, juror concealed relationship that would have disqualified her from service).

The "touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Given the centrality of jury impartiality to a defendant's ability to receive a fair trial, it is imperative that undersigned counsel have a meaningful opportunity to determine the existence and extent of any racial bias and misconduct impacting the jury's verdict and sentence. *Peña-Rodriguez v. Colorado*, 580 U.S. __, 137 S.Ct. 855 (2017) (where racial bias exists within the jury, Sixth Amendment right to impartial jury requires exception to non-impeachment rule).

### C. Contacting jurors is consistent with Local Rule 48.1.

5

Counsel for Rejon Taylor seek leave to contact the jurors and alternates in accordance with the Local Rules. Local Rule 48.1 does not prohibit parties from contacting jurors. Rather, it provides a mechanism for the Court to oversee and control the method of contact. The rule requires a party seeking to contact jurors to first request "[p]ermission of the Court…stating the grounds and the purpose of the contact." L.R. 48.1. Should the Court grant permission, the Court will prescribe "the scope of the contact and any limitations upon the contact." *Id.* At bottom, the rule seeks to uphold the legitimacy of the judicial process, protect the finality of verdicts, and shield jurors from unnecessary intrusion. *See Haley v. Kundu*, 2013 WL 4039797, at \*12 (E.D. Tenn. Aug. 7, 2013) (L.R. 48.1 protects "jurors against harassment or embarrassment, the risk of future incidents of jury tampering, the finality of the trial, and the integrity of the judicial system."). Section 2255 counsel will respect the purpose of the local rule while collecting necessary evidence to support a movant's cognizable claims for relief. *See Davis,* No. 2:94-CR-00381 (E.D. La. May 12, 2014) (granting leave to interview jurors in accordance with local rule in capital §2255 proceeding).

In the past, this Court has relied on Federal Rule of Evidence 606(b)(1), which prohibits testimony or other evidence to impeach a verdict, to limit contact with jurors upon counsel's request under Local Rule 48.1. *See United States v. Morrison*, 2013 WL 6858473, at \*2 (E.D. Tenn. Dec. 30, 2013) ("Based upon Fed. R. Evid. 606(b) it is highly unlikely anything gained from a juror could be used as evidence in Defendant's sentencing hearing or any other hearing."). However, as

discussed more fully below, the United States Supreme Court recently held that the Sixth Amendment right to an impartial jury allows a petitioner to potentially impeach a verdict where there is evidence of racial bias within the jury, such as in Mr. Taylor's case. *See Peña-Rodriguez*, 137 S.Ct. 855. At this juncture, the Court should not rely on Rule 606(b)(1) to prohibit movant from pursuing evidence that the Sixth Amendment requires, and Local Rule 48.1 allows.

II. **The Record in Rejon Taylor's Case Establishes Good Cause to Contact Jurors Under the Discovery Rules that Apply to Section 2255 Proceedings.**

In addition to adhering to Local Rule 48.1, Mr. Taylor's request to contact the jurors fulfills the good cause requirement of Rule 6(a). A movant is entitled to discovery upon a showing of good cause. Rule 6(a) of § 2255 Rules. *See Cornell v. U.S.*, 2012 WL 987744, at *2 (6th Cir. Mar. 26, 2012) (reversing denial of discovery and remanding where movant demonstrated that with evidence sought, he "*may* be able to demonstrate entitlement to relief if the facts are fully developed"). Good cause exists "[w]here specific allegations before the court show reason to believe that the [movant] may, if the facts are fully developed, be able to demonstrate that he is…entitled to relief." *Bracy v. Gramley*, 530 U.S. 899, 908-09 (1997); *see also Sutton v. Bell*, 2007 WL 4570884, at *4 (E.D. Tenn. Dec. 26, 2007) (permitting discovery where movant showed good cause and inability to otherwise obtain evidence without leave of court). Notably, a movant under § 2255 "has a modest advantage over a [§ 2254] habeas corpus petitioner in regard to discovery because Rule 6(a) of the Rules Governing Section 2255 Proceedings," allows movants to "seek leave to employ the discovery devices in either the Federal Rules

7

of Civil Procedure *or* the Federal Rules of Criminal Procedure." Randy Hertz, James S. Liebman, Federal Habeas Corpus Practice and Procedure § 41.6(b) (7th ed. 2017) (emphasis in original). Conversely, § 2254 habeas petitioners are limited to discovery devices from only the Federal Rules of Civil Procedure. *Id.*

At this stage of the proceeding Mr. Taylor need not demonstrate that he will ultimately prevail on his juror bias, juror misconduct, and related ineffective assistance of counsel claims. Rather, he need only show that discovery will assist him in fully developing these claims. *See Wellons v. Hall*, 558 U.S. 220, 223 (2010) (vacating and remanding judgment of dismissal and noting that had discovery been permitted, movant might have been able to present more than speculation and surmise in support of his claim). *Bracy* holds that even if a movant "will [ultimately] be unable to obtain evidence sufficient to support a finding" for his claim, if Mr. Taylor can make "a sufficient showing as required by…Rule 6(a), to establish 'good cause' for discovery," this Court shall grant the request. 520 U.S. at 909.

Thus, the Supreme Court explained in *Bracy* that good cause exists where a movant has made allegations of a constitutional violation, can point to specific facts or evidence "that lend…support to his claim," and that the requested discovery will enable the movant to investigate and prove his claims. *Id.*; *see Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991) ("a court must provide discovery in a[n appellate] proceeding only 'where specific allegations before the court show reason to believe that the [movant] may, if the facts are fully developed, be able to demonstrate that

8

he is confined illegally and is therefore entitled to relief.'") (Internal citations omitted).

Rejon Taylor meets the requisite good cause showing to permit this Court to grant him leave to investigate racial bias and misconduct among the jurors. Even without the benefit of full investigation, undersigned counsel are aware of three separate instances of potential racial bias and misconduct warranting further investigation.

### A. There is reason to believe that the jurors impermissibly relied on race to convict and sentence Rejon Taylor to death.

The sole Black alternate juror, Alternate Juror E.H., spoke to a reporter from the *Chattanooga Times Free Press* shortly after the trial. *See* Doc. 794-1, p. 1-2, PageID# 2593-94. In a published article, Alternate Juror E.H. stated in unequivocal terms that the jury, which was comprised of 11 white people, sentenced Rejon Taylor to death because he was Black. *Id.* at PageID# 2594 ("I heard (jurors) talking about how we needed to make an example of him. It was like, here's this little black boy. Let's send him to the chair…"). He also disclosed to the reporter that the jury engaged in premature deliberations. *Id.* at PageID# 2593 ("We didn't know we weren't supposed to talk about (the case with each other) until deliberations…We talked about things all the time."). Another article stated that two other jurors confirmed Alternate Juror E.H.'s statements. Doc. 794-3, p. 1, PageID# 2596. Based on this information, the defense filed a motion for new trial. Doc. 793 (Motion for New Trial, Dec. 20, 2008) and Doc. 794 (Memo in Support, Dec. 20, 2008).

Law that is no longer controlling curtailed Mr. Taylor and the Court's ability to fully investigate whether racial bias impacted the jury's decision. *See Peña-Rodriguez*, 137 S.Ct. 855. In granting the new trial hearing, the Court specified: "the evidentiary hearing will be limited to respect the sanctity of the jury deliberations." *United States v. Taylor*, 2009 WL 311138, at *3 (E.D. Tenn. Feb. 6, 2009). The Court further explained: "The limited nature of this hearing results from constraints on jury testimony. For at least a century, 'the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of jury testimony to impeach a jury verdict.'" *Id.* at *3 (citing *Tanner v. U.S.*, 483 U.S. 7107, 117 (1987)). As a result, defense counsel was "prohibited from inquiring into internal influences on the jurors," such as racial bias (*Taylor*, 2009 WL 311138 at *4), and the hearing was limited to two witnesses: Alternate Juror E.H. and Monica Mercer, a reporter from the *Chattanooga Times Free Press*. Doc. 905. Given the constraints of Rule 606(b) pre-*Peña-Rodriguez*, neither witness was permitted to testify about whether any juror harbored internal racial bias in rendering the guilty verdict or sentencing Mr. Taylor to death. Without the benefit of a full investigation into racial bias among the jurors, the Court held "there is no credible allegation of racial bias infecting the proceedings." *Taylor*, 2009 WL 311138, at *8.

However, the legal landscape regulating impeaching a jury's verdict has changed. In a watershed ruling, the United States Supreme Court created a narrow exception to the federal "non-impeachment" rule of jury verdicts. *Peña-Rodriguez*, 137 S. Ct. 855. In *Peña-Rodriguez v. Colorado*, the Supreme Court ruled that a trial

court may consider evidence of a juror's internal influences when there is evidence indicating that "racial animus was a significant motivating factor in the juror's vote…" *Id.* at 869. Said another way, the Sixth Amendment allows a trial court to consider evidence of a juror's internal influences after a "threshold showing" indicating that a juror "relied on racial stereotypes or animus to convict a criminal defendant…" *Id.*

This change in the law directly impacts Mr. Taylor's case because he has made the requisite threshold showing that the jurors in his case relied on race to convict and sentence him to death. Further, *Peña-Rodriguez* applies to Mr. Taylor's case because his conviction became final on May 14, 2018,[1] after the Supreme Court decided *Peña-Rodriguez* on March 6, 2017. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) ("a new rule…is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final…").

The question before this Court, however, is not yet whether Mr. Taylor can attempt to impeach the jury's guilty verdict and death sentence. At this juncture, the question is whether Mr. Taylor can gather additional evidence of racial bias through juror interviews to support his claim for relief. Due to the change in relevant law, the Local Rule, counsel's duty to investigate, and Mr. Taylor's good cause showing, that answer is yes. Mr. Taylor's request to contact the jurors and

---

[1] *See Rejon Taylor v. United States,* 138 S. Ct. 1975, *re'g denied* 138 S.Ct. 2646 (Jun. 11, 2018).

alternates is urgent given the §2255 Motion filing deadline and the possibility that some critical witnesses may become unavailable.[2]

### B. Juror contact is required to determine the extent of impact the "racist rednecks" comment had on the jury, and to determine the extent of animus that the comment generated.

During trial, the defense became aware that several jurors had been exposed to media reports that Rejon Taylor had referred to the jurors as "racist rednecks."[3] In accordance with the law, the Court questioned each juror to determine whether they had been exposed to the comment.[4] *See United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985) (when potential juror misconduct is brought to the trial judge's attention, the Court has a "duty to investigate and to determine whether there may have been a violation of the sixth amendment."). The Court then reported to counsel that "[o]ut of the twelve jurors in the box – six had been exposed" to the "racist redneck" comment, all but one of the six alternates had been exposed, and that five of those that heard the comment, attributed it to Mr. Taylor. Tr. 1880, Sept. 23, 2008. Subsequent evidence showed that all 18 jurors, including the

---

[2] Alternate Juror E.H. is deceased. *See Obituaries: Holloway, Everage 'Scooter' Jr.*, THE CHATTANOOGAN, Oct. 27, 2014. https://www.chattanoogan.com/2014/10/27/287020/Holloway-Everage-Scooter-Jr..aspx (last visited Mar. 25, 2019).

[3] Notably, the media reports misstated Mr. Taylor's observations of the jury. The day after he was convicted of first-degree murder, Mr. Taylor stated in a recorded call: "I'm not upset," but "I think there was something racist going on." Tr. 1806, Sept. 23, 2008. "I guess I was naïve. I thought that when this jury told me that they could follow the law, that I could trust them. I thought…some of them looked like little redneck folk, but I trusted them. I guess I was naïve." *Id.*

[4] Before the sentencing proceeding, this Court held interviews with each juror. Tr. 1848-79, Sept. 23, 2008.

alternates, heard the comment prior to the sentencing hearing. Doc. 905, p.62, PageID# 7997 (Q: "…all 18 of you are told that there was a comment about 'racist redneck'?" A: "Oh, yeah, we – I guess we all had heard it, you know. And we talked about it…").

However, the Court did not determine whether each juror who had been exposed could set that exposure aside and serve impartially. To be sure, the Court asked some jurors whether they could continue to serve impartially (Tr. 1878-79, Sept. 23, 2008), but the Court did not ask that of Juror 1 and Juror 8. *Id.* at 1849-51, 1856-58. This was most troubling related to Juror 1. After she revealed that she had heard the "racist redneck" comment and attributed it to Mr. Taylor or one of his friends, the Court thanked her. *Id.* at 1850. But she had more to say.

> Juror 1: Oh, a couple of things I'd like to ask if I may.
>
> The Court: Uh-huh.
>
> Juror 1: Is it the usual procedure that the defendant knows the jurors' names? I've had some concern, you know. It is a murder trial, after all. And there might be some repercussions down the pike, of being found and something happening… Is that normal for jurors' names to be called?...
>
> [W]ith the Internet nowadays, it's not so tough [to determine jurors' identities]. So, you know, there was some concern. My husband and I, that's the only thing we've talked about. So, [we're] thinking about getting a weapon.

*Id.* at 1850-51. Juror 1's admission of safety concerns and contemplation of obtaining a weapon for protection came in response to the Court's inquiry of

whether she was aware that Mr. Taylor had allegedly referred to her as a "racist redneck." Juror 1 then voted to sentence Mr. Taylor to death.

It is crucial that Mr. Taylor investigate the extent of impact the "racist rednecks" comment had on all the jurors and alternates, particularly as it relates to an increased perception of fear of Mr. Taylor, a Black man, and whether Juror 1, a white woman, was able to set her fear of Mr. Taylor aside when she cast her vote to sentence him to death. *See Ewing v. Horton*, 914 F.3d 1027 (6th Cir. 2019) (due process requires court to provide defendant opportunity to demonstrate impact of bias on jury). For the reasons described above, Rule 606(b) pre-*Peña-Rodriguez* curtailed Mr. Taylor's ability to investigate and develop this evidence. "Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime," combined with evidence of his escape attempt, "might incline a juror to favor the death penalty." *Turner v. Murray*, 476 U.S. 28, 35 (plurality opinion) (1986). As the United States Supreme Court acknowledged in *Buck v. Davis*, "[o]ur law punishes people for what they do, not who they are. Dispensing punishment on the basis of an immutable characteristic [such as race] flatly contravenes this guiding principle." 137 S.Ct. 759 (2017) (defense counsel's presentation of evidence that capital defendant was more dangerous because he was Black during sentencing proceeding amounted to prejudicial ineffectiveness). Mr. Taylor has shown good cause to investigate whether the jurors, particularly Juror 1, harbored racial bias in violation of Mr. Taylor's constitutional rights when they sentenced him to death.

14

### III.   The Lack of Probing Voir Dire on Racial Bias, Requires § 2255 Counsel to Question the Jurors on Racial Bias

Rejon Taylor can also show good cause to contact the jurors and alternates about their potential racial bias because defense counsel failed to conduct probing voir dire on the issue. *See Turner*, 476 U.S. at 37 (plurality opinion) ("The inadequacy of voir dire [about the possibility of racial prejudice] in this case requires that petitioner's death sentence be vacated…Our judgment in this case is that there was an unacceptable risk of racial prejudice infecting the capital sentencing proceeding."). The inadequate voir dire was especially problematic given the interracial nature of the crime. *See id.* at 37-38. The lack of probing voir dire on potential racial bias, the interracial nature of the crime, and the small number of Black people in the trial court jurisdiction and jury pool combined, contribute to Mr. Taylor's good cause showing. As such, this Court should allow Mr. Taylor to contact the jurors to determine whether the jurors harbored racial bias, and whether, considering their views, they could serve as impartial jurors on Mr. Taylor's capital case. Voir dire can be a powerful tool to identify and remove bias from the jury.[5] However, cursory questioning without subsequent informed probing is insufficient to drive out biases from jury pools.[6] "If asked generally whether he is biased, a juror

---

[5] *See* John Blume, Sheri Lynn Johnson, and Scott E. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV 1035, 1059 (2008).

[6] *See* Linda Mar, *Probing Racial Prejudice on Voir Dire: The Supreme Court Provides Illusory Justice for Minority Defendants*, 72 J. CRIM. L. & CRIMINOLOGY 1444, 1456 (1981) (noting that general questions will not extract meaningful responses about racial prejudices).

will probably not acknowledge any prejudices, racial or otherwise."[7] Instead, "[m]ore probing" or specific questions "may reveal that the juror prefers not to live in the same neighborhood as blacks, or believes that Mexicans have lower moral standards than do other ethnic groups."[8]

Racial bias in juries poses a particular danger in capital cases involving Black defendants. The tendency for white jurors to treat Black defendants more harshly than white defendants is well documented.[9] This tendency to more harshly punish is exacerbated when the victim is white.[10] Often, white jurors are unable to recognize commonalities between themselves and Black defendants, which can

---

[7] *Id.*

[8] *Id.* at 1456-57.

[9] *See* Mona Lynch & Craig Haney, *Looking Across the Empathic Divide: Racialized Decision Making On The Capital Jury*, 2011 MICH. ST. L. REV. 573, 583 (2011) [hereinafter *Looking Across the Empathic Divide*] (describing study where participants were significantly more likely to sentence Black defendants to death than similarly situated white defendants; and likelihood was greater for simulations involved a Black defendant and white victim); Jelani J. Exum, *Should Death Be So Different?: Sentencing Purposes and Capital Jury Decisions in an Era of Smart on Crime Sentencing Reform*, 70 ARK. L. REV. 227, 243-44 (2017) (explaining that implicit racial biases causes predominately white juries not to give effect to mitigating evidence when the defendant is black and inappropriately add weight to aggravating factors when the victim is white).

[10] *See Looking Across the Empathic Divide*, 2011 MICH. ST. L. REV. at 583; *see also* Craig Haney, *Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide*, 53 DEPAUL L. REV. 1557, 1560 (2004) [hereinafter *Condemning the Other in Death Penalty Trials*] (noting that Black capital defendants are over-punished when charged with killing white victims); William J. Bowers, Benjamin D. Steiner, & Marla Sandys, *Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, 3 U. PA. J. CONST. L. 171, 192-95 (2001) (indicating that the dominance of white male jurors on a capital case is strongly associated with the imposition of a death sentence when the defendant is Black and the victim is white).

create an "empathetic divide" and inability to consider mitigating evidence, leading to disparities in death sentencing.[11] Furthermore, "the range of discretion entrusted to a jury in a capital sentencing hearing, [creates] a unique opportunity for racial prejudice to operate but remain undetected." *See Turner*, 476 U.S. at 35 (plurality opinion). Effective voir dire can identify biased jurors and help counsel exercise strikes to remove them from service. *See Peña-Rodriguez*, 137 S. Ct. at 866 (citing *Tanner*, 483 U.S. at 127); *United States v. Birchette*, 908 F.3d 50, 57 (4th Cir. 2018) (stating that "voir dire can help identify racially biased jurors [and remove them] before they reach the jury.").

Defense counsel must be attentive to these issues to protect defendant's constitutional right to an impartial jury. Incompetence or even discomfort with discussions about race cannot excuse defense counsel's failure to address issues of racial bias when relevant to the case. *See* ABA 2003 Guidelines at 103 (stating that the defense in a capital case should "voir dire to discover those potential jurors poisoned by racial bias" when appropriate). Moreover, there are numerous resources to help counsel become proficient in exploring racial bias in the jury selection process. *See, e.g., Peña-Rodriguez*, 137 S. Ct. at 880 n.8 (Alito, J., dissenting)

---

[11] *See Condemning the Other in Death Penalty Trials*, *supra*, at 1582-84 (suggesting that empathic divide between Black defendants and white jurors interferes with the jurors' ability to take structural mitigation into account as they assess culpability); Mark A. Jacobson, *Reducing the Impact of Juror Discrimination in Interracial Crimes: An Analysis of* Turner v. Murray, 5 LAW & INEQ. 135, 147-48 (1987) (explaining that a predominately white jury's inability to empathize with a Black defendant and ease in empathizing with a white defendant may cause them to impose a death sentence without giving full and fair consideration to the defendant).

(identifying practice guides and resources on how to engage venire on issues related to racial bias).

Rejon Taylor's defense counsel failed to conduct meaningful voir dire on racial bias and thus failed to learn the jurors' views on race despite the racial overtones of Mr. Taylor's case.[12] This was particularly problematic because Mr. Taylor's case dealt squarely with race – he and his two co-defendants are Black from a majority Black community[13] charged with killing a white man in a predominately white jurisdiction.[14] The few questions counsel posed that touched on race were superficial and did not elicit responses addressing the jurors' attitudes about race.

Defense counsel inquired about race only twice during voir dire. On the first day of trial defense counsel asked all the jurors to raise their hands if they were friends with an African-American and if they had an African-American co-worker. Tr. 40, Aug. 25, 2008. The trial transcript suggests that a few prospective jurors raised their hands. *Id.* However, counsel neglected to ask the jurors with hands raised about their experiences with Black friends or coworkers, or any other racially relevant questions. Moreover, counsel neglected to ask the jurors without their hands raised about the nature of their contact, if any, with Black people or more

---

[12] *See* Susan Mormino, *Exploring Racial Prejudice on Voir Dire: Constitutional Requirements, and Policy Considerations*, 54 BOSTON U. L. REV. 394, 418 (1974) (noting that trials with racial overtones require extensive voir dire examination as to racial prejudice).

[13] Atlanta, where Rejon Taylor resided, was 54% Black and 38% white around the time of trial. *See* U.S. Census Bureau, 2010.

[14] The Eastern District of Tennessee, Chattanooga Division, encompassing nine counties (Bledsoe, Bradley, Hamilton, McMinn, Marion, Meigs, Polk, Rhea, and Sequatchie) is 82% white and 12.6% Black. *See id.*

nuanced questions about their views of Black people. This question failed to elicit any meaningful information about how the perspective jurors thought about race. Counsel later asked Prospective Juror J.B. if she knew the defendant, who was sitting in the courtroom, was Black. *Id.* at 220. Prospective Juror J.B. responded that since she had a Black friend the defendant's race had no bearing on her judgment. *Id.* Counsel then asked Prospective Juror J.B. if she had preconceived notions about the defendant. *Id.* at 221. A simple "no, Sir" from Prospective Juror J.B. ended the inquiry. *Id.* Trial counsel failed to follow up on Prospective Juror J.B.'s conceptions of race or inquire as to how a singular relationship with a Black person may preclude biases against others. J.B. was later selected as a juror.

These two passing inquiries were defense counsels' only engagement with the jurors concerning race. In fact, after the guilt phase, counsel acknowledged that he had neglected race during voir dire (and trial). Out of the jury's presence, defense counsel stated: "And for the record let me say, of course, that Rejon Taylor is African-American. […] I don't know if that's been brought up or put in the record at any time." Tr. pg. 220, Sept. 23, 2008. Trial counsels' failure to address race given the race of the defendant, the race of the victim and nature of the crime, and the racial makeup of the trial jurisdiction created a welcome atmosphere for potential racial bias among the jurors.

IV. **Denying Rejon Taylor the Opportunity to Contact the Jurors in his Case, Which Resulted in a Federal Death Sentence, Deprives Mr. Taylor of his Eighth Amendment Protections, Due Process, and Equal Protections of the Law.**

19

Finally, this Court should grant Rejon Taylor leave to contact jurors and alternates to maintain constitutional safeguards, as articulated in the Eighth Amendment, as well as the due process and equal protection provisions of the Fourteenth Amendment. Differing rules governing the investigatory process inherent in § 2255 proceedings may undermine the heightened constitutional protections inherent in death penalty proceedings by treating similarly situated defendants differently. *See Godfrey v. Georgia,* 446 U.S. 420, 428 (1980) (recognizing that a state must "tailor and apply its law in a manner that avoids arbitrary and capricious infliction of the death penalty" consistent with Eighth Amendment protections).

Mr. Taylor is similarly situated to all individuals sentenced to death in federal court. Each has been prosecuted by the United States, under the authority of the U.S. Department of Justice. Each has been subject to independent guilt and sentencing stages of trial. Each can utilize § 2255 proceedings as a collateral attack on their convictions and death sentences. However, § 2255 movants' access to post-conviction investigation is not identical. Some districts where individuals have obtained federal death sentences lack rules limiting post-verdict juror contact. The Western District of Michigan, District of Idaho, Eastern District of New York, District of North Dakota, District of South Carolina, and the Western District of Texas have no rule limiting post-verdict juror contact.[15] Prohibiting Mr. Taylor from

---

[15] Federal capital cases resulting in death sentences in these jurisdictions are: *United States v. Gabrion,* I :99-cr-00076-RI IB-1 (W.D. Mich.); *United States v. Duncan*, 2:07-cr-00023-EJL-1 (D. Idaho); *United States v. Wilson*, 1:04-cr-0 I 016 (E.D. NY); *United*

contacting jurors in the investigatory phase of his § 2255 proceedings deprives Mr. Taylor of the opportunity to have access to the same rights and remedies available to other individuals prosecuted and sentenced to death in the federal system.

Moreover, other federal courts with local rules limiting juror contact have permitted death sentenced federal prisoners to contact jurors to investigate § 2255 claims of juror bias and misconduct. For example, the Eastern District of Louisiana granted leave to contact jurors in *United States v. Davis*. No. 2:94-CR-00381 at *2 (E.D. La. May 12, 2014) (granting motion to interview jurors in § 2255 investigation pursuant to local rule limiting contact). Treating Mr. Taylor different than similarly situated federal death penalty defendants contravenes underlying constitutional protection principles.

## CONCLUSION

Because Rejon Taylor has shown good cause to investigate juror bias, extraneous influence on the jurors, juror misconduct, and related ineffective assistance of counsel, this Court should grant leave to permit counsel for Rejon Taylor to contact the jurors and alternate jurors. Counsel for Mr. Taylor will not conduct any interviews of jurors who do not consent to be interviewed and will confine any inquiry to the contents of this motion.

---

*States v. Rodriguez*, 2:04-cr-00055-RRE-1 (D. ND); *United States v. Roof*, 2:15-cr-00472-RMG (D. SC); *United States v. Fields*, 6:01-cr-00 I 64-WSS- 1 (W.D. Tex.); *United States v. Vialva. et. al.*, 6:99-cr-00070·WSS-1 (W.D. Tex.) (capital proceedings for Christopher Vialva); *United States v. Vialva, et. al.*, 6:99-cr-00070-WSS-2 (W.D. Tex.) (capital proceedings for Brandon Bernard).

21

Dated: March 25, 2019

Respectfully Submitted,

/s/ Kelley J. Henry
Kelley J. Henry, BPR # 021113
Supervisory Assistant Federal Public
Defender, Capital Habeas Unit
kelley_henry@fd.org

/s/ Amy D. Harwell
Amy D. Harwell, BPR # 018691
Assistant Chief, Capital Habeas Unit
Office of the Federal Public Defender for
the Middle District of Tennessee
810 Broadway, Suite 200
Nashville, TN 37203
615.736.5047
amy_harwell@fd.org

/s/ Alexis J. Hoag
Alexis J. Hoag, BPR #028712
Senior Counsel
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
ahoag@naacpldf.org

*Counsel for Movant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of March 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel record.

/s/ Kelley J. Henry
Kelley J. Henry, BPR # 021113
Supervisory Assistant Federal Public
Defender, Capital Habeas Unit
Office of the Federal Public Defender
for the Middle District of Tennessee
810 Broadway, Suite 200
Nashville, TN 37203
615.736.5047
kelley_henry@fd.org

Case 1:04-cr-00160-CLC-CHS    Document 1023    Filed 03/25/19    Page 23 of 23
PageID #: 10439