# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | **1:04-CR-160** |
| vs. | ) | |
| | ) | **Judge Collier** |
| | ) | |
| REJON TAYLOR | ) | |

## <u>RESPONSE TO MOTION FOR LEAVE TO CONTACT JURORS</u>

Comes now the United States of America, by and through United States Attorney J. Douglas Overbey, and Assistant United States Attorneys Steven S. Neff and Christopher D. Poole, and hereby respectfully opposes the defendant's motion.

### Statement of Facts

The evidence presented in the trial demonstrated the defendant was responsible for various thefts and burglaries from Guy Luck's house and other nearby residences in Atlanta between 2001 and 2003 and was engaging in a complex scheme of identity theft and fraud. Prior to August 6, 2003, the defendant had been stalking Luck and had burglarized his residence at least five times. Additionally, he followed Luck to his various residences and even ate by himself at Luck's upscale French restaurant. During the burglaries, the defendant did not carry firearms with him. On August 6, 2003, the defendant, along with co-defendants Sir Jack Matthews and Joey Marshall, went to Luck's house with two loaded firearms, gloves, and no masks. After confronting Luck at gunpoint, Matthews guarded Luck while the defendant began looking through Luck's house. Inside the house, the defendant took around $600 or $800. The defendant later told Marshall there was a warrant or other document connected with the

defendant's previous burglary activities, which suggested Luck could be a witness against the defendant. This fact was later confirmed by investigating agents who took a picture of such a document on the victim's desk in his home.

At gunpoint, Luck was forced outside his house and into his van. The defendant got in the driver's seat, while Matthews guarded Luck in the back. The defendant and Matthews each had a loaded gun. The defendant drove the van onto Interstate 75 and traveled north from Atlanta. They made a brief stop at a gas station in north Georgia before eventually crossing into southeast Tennessee, where the defendant exited the expressway and drove into the Chattanooga suburb of Collegedale. During the trip, Marshall followed behind in a car registered to the defendant's mother.

As the defendant drove the van around relatively isolated roads in Collegedale, there was a confrontation in the back of the van, in which Matthews fired a shot, which hit Luck in the arm. The defendant turned around from the driver's seat and fired three shots at Luck. The third bullet hit Luck in the mouth and caused his death later that day at Erlanger Hospital. As witnesses began arriving on the scene, the defendant and Matthews left their guns in the van and walked briskly from the van to the car driven by Marshall. They then drove back to Atlanta.

The defendant was subsequently arrested and incarcerated pre-trial at the Hamilton County Jail in Chattanooga. While incarcerated there, he was part of a group of inmates that attempted to escape, and he was involved in communications that contained threats and manipulations.

The defendant was convicted by a jury at trial and sentenced to death on October 21, 2008. During the penalty phase of the trial, the Court conducted a *Remmer* hearing after

2

learning that some jurors had been exposed to media reports about comments made by the defendant about them on jail phone call recordings.  The jurors unanimously and unequivocally asserted that they were not affected by the comments and could ignore them.[1]  On November 20, 2008, the defendant filed a motion for a new trial.  (Doc. 778.)  On December 1, 2008, the United States responded to this motion.  (Doc. 783.)  On December 3, 2008, the defendant replied to the United States response.  (Doc. 785.)

On December 5, 2008, in accordance with the jury's verdict in this case, this Court sentenced the defendant to death.  (Doc. 790.)

On December 10, 2008, the defendant filed yet another motion for new trial.  (Doc. 793.)  This motion was based on what the defendant referred to as "newly discovered evidence."  This "newly discovered evidence" was an interview nearly six weeks after the trial that an alternate juror gave to the *Chattanooga Times-Free Press* in which he expressed his opinion that while the defendant was certainly guilty of the crimes with which he was charged, that he did not deserve the death penalty.  During the interview, the alternate juror indicated that the jury had discussed substantive issues about the trial before formal deliberations began in contravention of the Court's instructions, although he also stated that nobody understood that they were not supposed to talk among themselves – only that they were not to talk with anyone else or have any other external contact about the case.[2]  He indicated his personal belief that

---

[1]Some jurors stated that they had not been exposed to any extraneous information and several that had been exposed did not know the source of the comments.  All jurors denied additional exposure to any other external influences besides the second hand exposure to media reports of the statements at issue.

[2]It is unknown how if this alternate juror understood himself at the time that such preliminary discussions were permissible, he would later come to a realization that they were

3

while the guilty verdict was appropriate, he did not personally approve of the sentencing verdict ultimately reached by the jury of twelve that deliberated. He stated, "I heard talking about how we needed to make an example of him. It was like, here's this little black boy. Let's send him to the chair." (Doc. 794-1 at 1-2.) According to the reporter, the alternate juror provided her with names and phone numbers of other jurors, all of whom she apparently attempted to call. Two other jurors spoke with her, according to the news story, and while confirming that some discussions had taken place about witnesses prior to the deliberations, their understanding of the Court's instructions was that this was permissible. Contrary to the implication in the defendant's motion (Doc. 1023 at 9), there is nothing to suggest that these two jurors confirmed the alternate juror's impression that racial animus was involved in deliberations; rather, they merely confirmed that some pre-deliberation discussions had taken place. In the article the alternate juror appeared to express some concerns over whether the jurors properly followed the Court's instruction regarding talking about the case before deliberations began and said that the jurors had heard that defendant referred to them as "redneck racists."

The United States responded to this second motion for a new trial on December 19, 2008. (Doc. 797.) The defendant replied to this response on December 23, 2008. (Doc. 801.) The next day, December 24, 2008, the defendant filed a motion to authorize the defendant to interview the jurors who convicted the defendant and sentenced him to death. (Doc. 802.) The United States responded to this motion on January 5, 2009, and the defendant replied to this response on January 7, 2009. (Doc. 804, 805.)

On February 6, 2009, this Court ruled on the defendant's above-mentioned outstanding

---

not.

4

motions and denied all of them except that this Court ordered that it would conduct an evidentiary hearing on the sole issue of whether the jurors were exposed to media reports (regarding the defendant's "redneck racists" remarks) in a broader manner than they had previously told the Court in *in camera* interviews on September 23, 2008. (Doc. 809; 810 at 16.) This hearing, in which the defense called the alternate juror as a witness, occurred on February 25, 2009.

The alternate juror testified that after the individual juror interviews (by the Court) on September 23, 2008, that some of the jurors talked about the fact that the Court asked them "if they had heard it or whatever, about the 'redneck' incident." (Doc. 829 (Sealed), February 25, 2009, Hearing, Tr. 26.) Defense counsel asked the alternate juror if all eighteen jurors heard "there was a comment about 'racist rednecks," and the alternate juror replied, "I guess we all heard it, you know.... we made jokes about it and stuff like that. But, you know, I didn't take it personal, and they didn't seem to at the time." (*Id.*) Defense counsel again asked if every juror heard that there had been "an accusation that Mr. Taylor had called the jury redneck racists." (*Id*. at 27.) The alternate juror replied, "Yeah. Yeah. It was talked about. I mean....." (*Id*.) In response to the same question, he then said "as far as he knew" all the jurors knew about it. (*Id*.) He based this not on an independent recollection of conversations with each juror (many of whom he did not know by name by the time of the hearing), but on the fact that "everybody had to be in the room with me." (*Id*.) Defense counsel asked if, before the sentencing hearing, the alternate juror became aware of any additional news or information (regarding the case), and the alternate juror replied that he did not. (*Id*.) In response to a question from defense counsel, the alternate juror said that the jurors did not take any offense to

5

the "redneck racist" comment; in fact, they joked about it.  (*Id.*)  He said it "didn't seem like a big deal."  (*Id.*)

The alternate juror said that during the sentencing phase that many of the jurors were nervous about "making that choice."  (*Id.* at 29.)  Defense counsel asked if there were any discussion during the sentencing phase about "newspaper accounts or what people had heard on the radio."  (*Id.* at 29-30.)  The alternate juror responded, "No, not that I recall."  (*Id.* at 30.)  Defense counsel asked the alternate juror if any of the jurors "express(ed) fears or concerns related to the media coverage, particularly of the supposed 'racist redneck' remark?"  The alternate juror responded, "Well, not that remark.  But, you know, several people would talk about just things where a newspaper was put in front of them or something, and they had to avoid it or whatever, stuff like that.  But nobody said anything that, you know, let you know they had seen something or..."  (*Id.*)  The alternate juror went on to say that every "blue moon" someone might mention the "racist redneck" remark, but it was always a joke.  "It wasn't serious if it was brought up."  (*Id.* at 31.)  The alternate juror also said that he did not know where the jurors heard about the remark in question.  He said, "I don't know if they heard – all heard it personally out on the streets, but they at least heard it from us (in the jury room)."  (*Id.* at 32.)  He again reiterated that he was not aware that any jurors heard any media reports.  (*Id.*)  The alternate juror further stated that he did not observe any change in any juror as a result of the "racist redneck" remark.  (*Id.* at 34.)  The alternate juror also confirmed that he was not in the room during any deliberations.  (*Id.* at 39.)

The defense also called the reporter from the *Chattanooga Times-Free Press* who wrote the subject article at the February 25, 2009, hearing.  The reporter had no personal knowledge

6

of the jurors deliberations, interactions, or contact with the media during the trial of the defendant. Furthermore, she did not recall anything outside of the article she wrote regarding her interview with the alternate juror and two other jurors of which this Court was previously aware.

**Argument**

In seeking permission from the Court to contact jurors about the trial, the defendant relies on information published in the local newspaper about a disgruntled alternate juror who approached a reporter nearly six weeks after the verdict in order to make accusations of juror misconduct.

It is well-established that a jury cannot impeach its own verdict. *Tanner v. United States*, 483 U.S. 107, 120 (1987) ("Allegations of juror misconduct ... raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process."); *McDonald v. Pless*, 238 U.S. 264, 267 (1915); *Hyde v. United States*, 225 U.S. 347, 384 (1912). The public policy behind this rule is vitally important to our system of justice.

> But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*McDonald*, 238 U.S. at 267-68. The Court went on to state that the failure to abide by this rule against jurors being able to impeach their own verdicts "'would open the door to the most

7

pernicious acts and tampering with jurors. The practice would be replete with dangerous consequences. It would lead to the grossest fraud and abuse and no verdict would be safe.'" *Id.* at 268 (internal citations omitted). The Court in *Tanner* noted that "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post-verdict scrutiny of juror conduct." 483 U.S. at 120-21.

Moreover, an inquiry into juror deliberations would be wholly improper and violate Federal Rule of Evidence 606(b). The rule was established to prevent testimony about matters which occur during deliberations, the impact of anything in particular which might have affected the jurors' minds or emotions, and the mental processes affecting any given juror. *United States v. Logan*, 250 F.3d 350, 379 (6th Cir. 2001). Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict ..., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Only *extraneous* prejudicial information improperly brought to the jury's attention or evidence concerning outside influences on a juror are excepted from Rule 606(b) and the prohibition into inquiry regarding a jury's deliberations. *Logan*, 250 F.3d at 379.

The defendant relies heavily on a recent Supreme Court case that he believes should control the present situation. *Pena-Rodriguez v. Colorado*, 137 S.Ct. 855 (2017). In *Pena-Rodriguez*, the Court held that the standard "no-impeachment rule" as reflected in Fed. R. Evid.

8

606(b) may give way to other concerns related to racial motivations.   *Id.* at 869.   In *Pena-Rodriguez*, the defendant's counsel entered the jury room to interview jurors after they had returned a partial guilty verdict against his Hispanic client in a sexual assault case. *Id.* at 861. Two jurors remained after the others had left and advised defendant's counsel that another juror had made anti-Hispanic statements during deliberations that reflected a pre-existing mindset concerning the defendant's guilt and the credibility of the defendant and one of his Hispanic witnesses.   *Id.*   Those jurors subsequently provided sworn affidavits to that effect with the court's supervision.   *Id.* Citing Fed. R. Evid. 606(b), the trial court denied a motion for a new trial, and all of the state appellate courts that subsequently considered the matter affirmed. *Id.* at 862.   In reversing the decision, the Supreme Court held:

> [W]here a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.

*Id.*

It is this holding the defendant attempts to exploit to pry open the sanctity of juror deliberations, but this case is easily distinguishable from *Pena-Rodriguez*, and the Court should not permit far ranging discovery expeditions ten years after the verdict. The source, motivation, nature, and timing of the allegations themselves in this case are inherently unreliable. To begin, the information relied upon by the defendant came from an alternate juror, not a juror who was present for the actual deliberations and participated in the verdict like in *Pena-Rodriguez*. Unlike in *Pena-Rodriguez*, the alternate juror in the defendant's case did not raise concerns with counsel or the court and instead sought publicity through the media.   He received a front-page photograph and story.   He further had a prime opportunity to formally express those concerns to

9

the Court, if they were real, when the Court conducted the *Remmer* hearing with each juror individually, or at any other time during the lengthy trial, but instead said nothing. Instead, he waited a significant amount of time after the trial to approach the media. Based on his reported comments, the alternate appears to have a personal agenda relating to feelings about race and the death penalty. Had any of his concerns been authentic, he had the opportunity to raise them with the court while there was still time to address the results of the substantive case, including during the *Remmer* hearing or at the hearing on the defendant's motion for new trial, which took place after the alternate juror spoke to the newspaper reporter. The alternate juror testified at that hearing and addressed the very issues at bar. The fact that he did not seriously undermines any claim that his concerns ever even existed at all during the trial, much less whether they were legitimate. Other significant differences also exist. Further, unlike in *Pena-Rodriguez*, there are no sworn affidavits from any of the jurors that something improper occurred during deliberations. Indeed, in *Pena-Rodriguez*, the *court* supervised the process of the taking of affidavits. 137 S.Ct. at 861. Here, there were no such controls. The alternate juror took it upon himself to contact an extra-judicial entity to make his allegations long after the trial was over. Neither his statement nor the other jurors' statements regarding premature deliberations were under oath pursuant to an affidavit.

Perhaps most importantly, and the most salient distinction from *Pena-Rodriguez*, is the fact that *there is simply no statement any of the jurors is alleged to have made regarding race*. The defendant attempts to suggest, in quoting the statement made by the alternate about 'sending the little black boy to the electric chair,' that this was actually a statement made by one of the jurors in the case. This is misleading; the alternate juror did not claim that a juror actually said that. In fact, as the Court noted after the alternate testified at the motion for new trial,

10

"Furthermore, there is no indication jurors had made up their minds prior to deliberations. [The alternate] testified jurors were nervous about making the choice in this capital case; there was no evidence they had already made a decision." (Doc. 836 at 8.) The alternate juror was apparently subjectively imputing his own attitudes in his own words onto the other jurors, *not* quoting anyone. In *Pena-Rodriguez*, the Supreme Court itself made the following observation in the opinion, which bears directly on the facts we possess in this case:

> Not every off-hand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that … jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.

137 S.Ct. at 869. This passage from the opinion is vital to the instant analysis. First, there *was* no statement by any juror about any alleged racial motivation. Rather as mentioned, the statement was made by an alternate juror well after the trial in the context of a newspaper interview in which he used that language – his own – to attribute his subjective view of possible motivations to the actual jury. Moreover, again, he was not present and did not participate in the deliberations that led to the verdict. The defendant simply cannot make any showing whatsoever that race played any kind of role in the jurors' deliberative process. The alternate juror's own off-hand comment to the press,[3] made well after the trial, not under oath, after he had multiple opportunities to raise his concerns about justice during the case, are simply well

---

[3] At the very least, the alternate juror's comments suggest a significant amount of skepticism about the death penalty – especially as applied to black defendants.

11

outside the pale of what the Court contemplated in *Pena-Rodriguez*. The Court also noted that the ordinary processes that exist to prevent racial biases in trials are in the vast majority of cases the kinds of protections that "ensure that the [no-impeachment bar] exception is limited to rare cases." *Id.* at 871. It further affirmed the principle undergirding Fed. R. Evid. 606(b) when it stated that the rule has "substantial merit" and "promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict." *Id.* at 865. Moreover, the Court noted that the rule provides "stability and finality to verdicts." *Id.*

Several post *Pena-Rodriguez* cases illustrate the extreme narrowness of the circumstances necessary to lift the no-impeachment ban as contemplated in *Pena-Rodriguez*. In *United States v. Baker*, 899 F.3d 123, 133-34 (2d Cir. 2018), the court declined to apply the *Pena-Rodriguez* exception in a case where there was no "clear, strong, and incontrovertible evidence that [the] juror was animated by racial bias or hostility" when the juror stated that he assumed the defendant was guilty based on his appearance. *Id. at 134. Baker* is far more akin to the instant case in that the defendant was merely speculating about a juror's race-based motivations, and the court stated, "[c]rediting Baker's speculative conclusion to the contrary would run counter to our presumption that 'jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court.'" *Id.* (Internal cite omitted.)

The *Baker* case closely resembles this case. In fact, this Court already stated specifically that the defendant's contention recycled here was "pure speculation." (Doc. 810 at 14.) The Court also noted that the juror in question and all of the other jurors – *including the alternate juror who later made these allegations* – "spoke personally to the Court in a one-on-one setting

12

while the Court investigated jurors' exposure to publicity, and none of them raised any issues of racial bias." (*Id.*) Finally, the Court correctly analyzed the situation in this passage:

> In *Tanner*, the Supreme Court noted defendants' rights to a fair trial are protected by several aspects of the trial process: the determination of jurors' suitability at voir dire; the observations of the jury by the court, counsel, and court personnel; the observations of jurors by each other, who can report inappropriate behavior to the court "*before* they render a verdict" (emphasis in the original); and the ability to impeach a verdict with nonjuror evidence of misconduct. *Tanner*, 483 U.S. at 127. Here, neither Juror #[***], [the alternate juror], nor any other juror or nonjuror reported any incident of racial bias to the Court or court personnel. Jurors at times communicated with court personnel over scheduling issues and comfort issues, and no one reported any of the issues now raised by [the alternate juror]. At the start of trial, counsel had an opportunity to conduct suitable voir dire, which consisted of a lengthy written questionnaire and then oral questioning of jurors, first in large groups, then in small groups. In addition, the Court, counsel, and court personnel observed jurors throughout the trial without learning of any racist behavior. Finally, in its verdict form determining Defendant should receive the death penalty each juror affirmed their decision was not influenced by race. The Court concludes there is no credible allegation of racial bias infecting the proceedings.

(*Id.*)

Importantly, the Sixth Circuit has also declined to interpret the holding in *Pena-Rodriguez* broadly. *United States v. Robinson*, 872 F.3d 760 (6th Cir. 2017). In *Robinson*, the existence of a significant dispute came to light regarding an argument between the white foreperson of the jury and two black jurors in which the white juror accused the others of racial motivation in their reluctance to convict. *Id.* at 767. Ultimately, following an *Allen* charge, the defendant was convicted. *Id.* Three months later, just prior to sentencing, the defendant filed a motion for a new trial based on the report of three black jurors that a confrontation with the white foreperson took place regarding their reluctance to convict, which the white juror attributed to the fact that they "owed something to their black brothers." *Id.* This led to an altercation that the U.S. Marshals and deputy clerk had to intervene during the deliberations. *Id.* The information contained in the motion for a new trial derived from statements made to a

13

private investigator hired by the defense lawyer. *Id.* at 768. The court affirmed the denial of the defendant's motion for several reasons, one of which was that the white juror made no comments – "much less a 'clear statement' – showing that [racial] animus was a 'significant motivating factor' in her own vote to convict." *Id.* at 771, *quoting Pena-Rodriguez*, 137 S.Ct. at 869. Additionally, the court noted that the black jurors themselves did not claim that they found the defendant guilty because of the remarks; rather, when polled, they affirmed their judgment and cited other evidence indicative of the defendant's guilt. *Id.* at 771.

In this case, even the alternate juror acknowledged the evidence of the defendant's guilt in the newspaper interview. He also could point to no clear information other than his biased subjective perception that race played any role in the jury's actual deliberations about the sentence. Indeed, he was not even present for them. The risk of conducting a discovery expedition now so long after the fact is enormous and carries a significant risk of yielding false or incorrect information and results that could undermine the true verdict.

Once *Pena-Rodriguez* is distinguished, the remaining case law interpreting Rule 606(b) has uniformly held that in instances similar to the one raised in this case, the Court should *not* hold hearings or inquiries into matters involving internal influences. *Tanner*, 483 U.S. at 121 (drug and alcohol use by jurors during deliberations constituted an internal influence not subject to inquiry); *United States v. Blackwell*, 459 F.3d 739, 769 (6th Cir. 2006) (defendant's extrajudicial statement, "I hate you," mouthed to a witness seen and discussed by jurors even though it was not in evidence – no inquiry permitted); *Logan*, 250 F.3d at 379-80 (premature deliberations an internal influence not subject to inquiry); *United States v. Febus*, 218 F.3d 784, 795 (7th Cir. 2000), *cert. denied*, 531 U.S. 1021 (2000) (juror's post trial claim that she was confused by instructions and unduly pressured by fellow jurors was a matter of internal

14

deliberations); *United States v. Caldwell*, 83 F.3d 954, 956 (8th Cir. 1996) (premature deliberations not subject to inquiry); *United States v. Sabhani*, 529 F.Supp.2d 384, 394 (E.D.N.Y. 2008) (premature deliberations an internal influence not subject to inquiry); *United States v. Davis*, 402 F.Supp.2d 252, 265 (D.D.C. 2005) (pressure among jurors, misunderstanding of jury instructions, compromise verdict, and self-imposed time constraints are internal influences not subject to inquiry).

The Supreme Court noted, for example:

> Petitioners' Sixth Amendment interests in an unimpaired jury ... are protected by several aspects of the trial process. The suitability of an individual for the responsibility of jury service, of course, is examined during *voir dire*. Moreover, during the trial the jury is observable by the court, by counsel, and by court personnel. Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict.

*Tanner,* 483 U.S. at 127 (emphasis in original).

The Court previously questioned all of the jurors at first generally about whether they had been exposed to extraneous influences. A number of them had heard second or third hand accounts of a newspaper article about the so-called "racist rednecks" remark, although that was the only extraneous information to which any particular juror had been exposed when the Court asked the general question. To those whom had been exposed, many of them did not know the original source of the comments or could even place them into context, and all of the jurors stated that they could put aside the fact that they had heard it and be fair to both sides. This was buttressed during the hearing on the defendant's motion for a new trial when the alternate juror admitted that the other jurors regarding the racist redneck comment as a joke and did not take it seriously. Indeed, he stated that the comment was "not a big deal," and he did not say that the comment created any fear in the jurors. He further declined to state that there was evidence of

15

racial bias among any of the jurors. Because the Court has already conducted a hearing regarding the jurors' potential exposure to external influences via *Remmer v. United States*, 347 U.S. 227 (1954), and the defendant declined an invitation to further question the jurors when the Court asked.

Tellingly, this Court has already squarely disposed of this argument in its memorandum (Doc. 836 at 4-5):

> [The alternate juror's] testimony shows jurors were not affected by hearing about the "racist redneck" remark. There is no evidence jurors were affected by the remark or that the remark caused prejudice. The lack of impact is consistent with jurors' statements and expressions during the Court's in camera interviews; jurors who were aware of the comment at the time of the Court's interview were not angered or otherwise affected by the comment, and jurors who were asked said they could put the comment out of mind and decide the case solely on the evidence presented at trial. Moreover, there is nothing in the remark itself that logically that should lead a rational juror to put aside his or her oath and decide the case on improper grounds. The remark is not a threat, is not threatening, is not personal to any particular juror, and as far as insults go, is not a major insult. We must assume the jury followed the Court's instructions. The Court instructed the jury to not make its decision based upon prejudice, bias, or sympathy. At the end of the verdict sheet, each juror certified that race did not enter into his or her decision. In short, despite the seemingly inflammatory nature of the comment, the jurors were not affected by the comment and showed no inflammation or impact as a result of the comments. Thus, a new sentencing hearing is not necessary.

Defendant's current motions seeking to inquire into his jury's deliberations, or this court's assessment of the jury's deliberations, are unauthorized by law, and at best, are simply moot. This situation is different than the one that compelled the Supreme Court to open the limited no-impeachment rule in *Pena-Rodriguez.* The defendant's desire to interview jurors from the case is wholly improper, and his arguments constitute little more than a repeat of his prior arguments for a new trial. The defense seeks to violate the sanctity of the jury's deliberative process. An inquiry into external influences has already been conducted. The only issues about which the jury has not been questioned are the kinds of internal influences about which one cannot inquire

16

pursuant to Rule 606(b). Because the Court has already performed the function of questioning jurors regarding potential external influences, and because the defendant cannot make a *Pena-Rodriguez* showing that racial animus infected the jury's deliberations, the defense's efforts at manipulating the process and the individual jurors should be rebuffed.

**Conclusion**

For the above stated reasons, the United States respectfully requests that the Court DENY the defendant's motion.

Respectfully submitted,

J. DOUGLAS OVERBEY,
United States Attorney

By: /s/ Steven S. Neff
Steven S. Neff
Assistant United States Attorney
1110 Market St, Ste 301
Chattanooga, TN 37402
(423) 752-5140

By: /s/ Christopher D. Poole
Christopher D. Poole
Assistant United States Attorney
1110 Market St, Ste 301
Chattanooga, TN 37402
(423) 752-5140

17

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing response was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties of interest, indicated on the electronic filing receipt.

This 8th day of April, 2019.

*S/Steven S. Neff*
Steven S. Neff
Assistant United States Attorney
1110 Market St, Ste 301
Chattanooga, TN 37402
(423) 752-5140

18