IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSE
CHATTANOOGA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff/Respondent,* | ) | |
| | ) | |
| v. | ) | Case No. 1:04-cr-00160-CLC-CHS |
| | ) | |
| REJON TAYLOR, | ) | |
| | ) | |
| *Defendant/Movant.* | ) | |

## MOTION FOR COLLATERAL RELIEF TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND FOR A NEW TRIAL

Preliminary Statement................................................................................2

Introduction .................................................................................................5

Statement Regarding Structure and Notice Pleading ........................................8

Grounds for Relief........................................................................................10

1. Rejon Taylor Was Incompetent to Stand Trial in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, and Counsel Were Ineffective for Failing to Investigate, Develop, and Present Proof of His Incompetence.................................................................................10

2. In Violation of the Sixth Amendment, Rejon Taylor's Trial Counsel Were Ineffective in Investigation, Preparation, and Presentation at his Capital Trial. ......................................................................................................12

    a.    Defense Counsel's Conduct Prior to, During, and After Trial was Deficient and Unreasonable According to the Prevailing Professional Norms Under *Strickland v. Washington*, 466 US 668 (1984), and Resulted in Prejudice as There is a Reasonable Probability That But For Counsel's Errors, the Outcome of Rejon Taylor's Trial Would Have Been Different in Violation of his Fifth, Sixth, and Eighth Amendment Rights. ......................................................................................................12

        i.   Red Flags of Neurological and Developmental Impairment, and Symptoms of Psychosis .........................................................................13

        ii.   Assembling a Defense Team ....................................................14

        iii.   Developing the Attorney-Client Relationship .......................15

        iv.   Developing Evidence .............................................................17

        v.   Preparing for Trial.................................................................19

        vi.   Jury Selection .......................................................................21

        vii.   First Phase of Trial...............................................................22

        viii.   Juror Exposure to Prejudicial Media and *Remmer* Hearing ...................................................................24

        ix.   The Penalty Phase.................................................................25

        x.   What the Jury Did Not Hear..................................................27

        xi.   Motion for New Trial .............................................................28

    b.    Specific Ineffective Assistance of Counsel Claims ..........................29

    c.    Failure to Conduct Adequate Jury Selection ................................32

       i.    Defense Counsel Failed to Utilize Jury Selection to Identify Bias and to Remove Jurors Who Demonstrated Bias..........................................................33

      ii.    Due to Counsel's Ineffective Assistance, the Jury That Convicted and Sentenced Rejon Taylor to Death Contained Jurors Incapable of Considering Mitigation...............................................................35

     iii.    Due to Counsel's Ineffective Assistance, the Jury That Convicted and Sentenced Rejon Taylor to Death Contained Jurors Who Harbored Racial Bias ...........37

     iv.    The Circumstances of Rejon Taylor's Case Warranted Probing Questions from Defense Counsel to Identify and Eradiate Racial Bias from the Jury Pool ...................40

      v.    Trial Counsel's Failures During Voir Dire Subjected Rejon to a Biased Jury Incapable of Serving Impartially ...............................................................44

d.  Failure to Conduct a Thorough Mitigation Investigation That Complied with Prevailing Professional Norms, as Required by the Sixth Amendment .........................................................................44

      i.    Trial Counsel's Constitutionally Inadequate Life History Investigation, Including Inadequate Retention of Mental Health Experts..........................................................57

      ii.    The Impact of Trial Counsel's Constitutionally Inadequate Life History Investigation........................68

e.  Failure to Investigate and Present Rejon Taylor's Neurological and Mental Impairments ....................................................................85

f.  Failure to Adequately Represent Rejon Taylor's Fifth and Sixth Amendment Rights to Due Process and an Impartial Jury at the *Remmer* Hearing .........................................................................89

      i.    Allegations of Juror Bias or Exposure to Extrajudicial Information Require a *Remmer* Hearing to Determine the Extent of Juror Bias. .........................................................90

      ii.    The Jurors in Rejon Taylor's Trial Were Exposed to Media Reports that Rejon Called Them "Racist Rednecks."...........90

     iii.    Adequate Representation During the *Remmer* Hearing Required Counsel and Defendant's Presence and Participation to Protect Rejon Taylor's Right to an Impartial Jury ..........................93

     iv.    Prevailing Professional Norms Require Defense Counsel to Conduct Thorough Investigation and Identify and Challenge All

Allegations of Juror Bias.......................................................95

v.    Defense Counsel Failed in Its Duty to Inform Rejon About the *Remmer* Hearing and to Inform Him of His Right to Participate in the Hearing..........................................................................97

vi.   Defense Counsels' Decision to Not Participate in the *Remmer* Hearing and to Waive Rejon Taylor's Attendance Constituted Deficient Performance ......................................................99

vii.  Rejon Taylor Could Not Competently Waive His Rights at *Remmer* Hearing ..........................................................100

viii  Prejudice is Presumed Where Counsel's Deficient Performance Results in Structural Error ................................................101

g.  Failure to Object to Government's Repeated Reference to Rejon Taylor "Stalking" the Victim, a Distinct Uncharged Crime......................101

h.  Counsel Were Ineffective with Respect to Rejon Taylor's Allocution in Violation of his Fifth and Sixth Amendment Rights ......................106

i.  Rejon Taylor Received Ineffective Assistance of Counsel in Violation of the Sixth Amendment (Other Guilt Phase Issues) ..........................107

i.    Trial Counsel's Errors with Respect to Sir Jack Matthews .........................................................................107

ii.   Ineffective Assistance of Counsel with Respect to the Cross Examination of Joey Marshall....................................109

iii.  Trial counsel failed to object to Rejon Taylor's absence During a critical stage of the trial. (Fifth and Sixth Amendments)................................................................110

iv.   Failure to Object to Improper *Allen* Charge........................111

j. Cumulative Prejudicial Effect ...............................................112

3.  Rejon Taylor Was Denied His Statutory Right to Learned Counsel Under 18 U.S.C. § 3005.........................................................................113

4.  In Violation of the Eighth Amendment, it is Unconstitutional to Execute Someone Who was Under Age 21 at the Time of the Crime ....................116

a.  Adolescents are Less Culpable Than Adults Because They Have Underdeveloped Brain Functioning.......................................116

b.  The Supreme Court Requires Reliance on the Scientific Community to Support a Defendant's Lesser Culpability..........................................117

c. Scientific Research, Since *Roper*, Indicates that Brain Development of Emerging Adults Bears a Resemblance to Juveniles Under 18. .........118

d. There is Consensus Against Executing Individuals Under Age 21 at the Time of the Crime ................................................................................122

5. Under the Particular Circumstances of This Case, Rejon Taylor's Death Sentence is Unconstitutionally Disproportionate in Violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution Because He Was 18-Years-Old at the Time of the Crime ........................126

6. The Eighth Amendment Precludes the Execution of the Mentally Ill: Rejon Taylor Suffers From Severe Mental Illness. .............................................133

7. The Federal Government's Decision to Prosecute Rejon Taylor and to Authorize his Case as a Capital Prosecution was Based on Racial Discrimination in Violation of Rejon's Fifth, Sixth, Eighth and Fourteenth Amendment Rights ................................................................................135

8. The Federal Death Penalty Act is Administered in a Racially Discriminatory Manner in Violation of Rejon Taylor's Fifth and Eighth Amendment Rights.................................................................................................140

9. The Federal Government's Decision to Authorize Rejon Taylor's Case as a Capital Prosecution Against the Recommendation of the Local AUSAs Violated Mr. Taylor's Rights Under the Fifth, Sixth, and Eighth Amendments. ......................................................................................146

10. In Violation of Rejon Taylor's Right to a Fair and Impartial Jury, the Jury that Convicted and Sentenced Him to Death Was Biased and Engaged in Misconduct. ......................................................................................147

a. In Violation of Rejon Taylor's Right to an Impartial Jury, the Jury that Convicted and Sentenced Rejon to Death Was Racially Biased..........148

b. In Violation of Rejon Taylor's Right to an Impartial Jury, the Jury that Convicted and Sentenced Rejon to Death Was Biased in Favor of the Death Penalty ................................................................................153

c. In Violation of Rejon Taylor's Sixth Amendment Rights to a Fair Trial Before an Impartial Jury, the Jurors Who Presided Over His Case Engaged in Misconduct ................................................................156

11. In Violation of Rejon Taylor's Fifth, Sixth, and Eighth Amendment Rights,

The Government Used Improper Language to Describe Him...................162

a. The Government Repeatedly Used Racially Coded, Dehumanizing Language to Refer to Rejon Taylor as a "Stalker," "a Wolf" and "a Monster" Throughout Trial .................................................163

b. The Sixth and Fifth Amendments Prohibit Race-Based Determinations in the Criminal Justice System.............................................165

c. The Government's Language was Flagrant Enough to Warrant Reversal .......................................................167

   i.   The Prosecution's Remarks Misled the Jury and Prejudiced Rejon ....................................................167

      a. The Depiction of Black Men as Inherently Violent and Dangerous Is an Enduring Racial Stereotype That Has the Potential to Exert A Unique Power Over Jurors ............168

      b. The Stereotype of the Young Black Male as Violent and Criminal is Deeply Entrenched in American History and Culture....................................................168

      c. Stereotypes of Black Men as Violent and Dangerous Has a Patent Effect on Perceptions Judgment.........................169

   ii.  The Prosecution's remarks were recurring and extensive ........171

   iii. The Prosecution deliberately used this language to stoke racial fears and appeal to racial biases of jurors ................................172

   iv.  The government's evidence of premeditated first-degree murder and the aggravated circumstances of substantial planning and premeditation were weak .......................................173

12. Trial Counsel's Failure to Object to Improper Language Violated Rejon Taylor's Sixth Amendment Right to Constitutionally Adequate Counsel ......................................................174

   a. Defense Counsel Was Required to Object to the Government's Racially Inflammatory Language.......................................174

   b. Trial Counsel's Failure to Object to the Government's Racially Inflammatory Language Constituted Deficient Performance .............176

c. Trial Counsel's Failure to Object to the Government's Racially Inflammatory Language Prejudiced Rejon............................................177

13. The Prosecution Violated Rejon Taylor's Right to a Constitutionally Adequate Trial by Impermissibly Excusing Black Jurors for Non-Race-Neutral Reasons....................................................................................................179

14. Rejon Taylor's Rights to a Fair Trial Under the Fifth, Sixth, and Eighth Amendments Were Violated by Prosecutorial Misconduct in Closing Argument and Counsel Were Ineffective for Failing to Object.................180

15. Women and African Americans Were Unconstitutionally Underrepresented on the Grand Jury that Indicted Mr. Taylor in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. ...................184

16. Rejon Taylor's Conviction for First Degree Murder by Use of a Firearm Violates His Right to Due Process, Because the Predicate Felony as Defined by 18 U.S.C. §924 (c) and (j) Is Unconstitutionally Vague........................................................................................................ 187

17. In Violation of the Fifth, Sixth, and Eighth Amendments, Penalty Phase Instruction and Verdict Errors Denied Mr. Taylor Due Process of Law and a Fair Trial.......................................................................................................188

    a. Error in Instructions Regarding Mitigation and Constitutionally Ineffective Assistance of Counsel. ..................................................188

    b. In Violation of the Fifth, Sixth, and Eighth Amendments, the Jury's Guilt Phase Verdict with Respect to Counts 2 and 4 is Inconsistent with the Penalty Phase Verdict Finding the Existence of the Gateway and Aggravating factors.................................................................191

    c. General Verdict of Death Deprived Mr. Taylor of a Unanimous Verdict and Unconstitutionally Skewed the Balance of the Weighing of the Aggravating and Mitigating Factors (Fifth, Sixth, and Eighth Amendments)..................................................................................193

18. In Violation of the Fifth, Sixth, Eighth Amendments and 18 U.S.C. § 3591-93, Rejon Taylor's Rights Were Violated by the Government's Presentation of Proof and Argument Relating to Mr. Taylor's Putative Future Dangerousness ..................................................................................195

a.     Relevant legal principles governing the admission and consideration of future dangerousness evidence.................................................195

b.     Evidence of Future Dangerousness Presented at Trial: Conduct of Others ........................................................................................197

c.     The Use of Vicarious Dangerousness as a Non-Statutory Aggravating Circumstance Violates the Fifth and Eighth Amendments and Mr. Taylor's Capital Sentence is Constitutionally Unreliable as His Sentence is Premised on the Conduct of Unknown (and Unknowable) Others ........................................................................................199

d.     Trial Counsel Was Ineffective with Regard to the Nonstatutory Future Dangerousness Aggravator...........................................................201

e.     Appellate Counsel's Was Ineffective with Regard to The Future Dangerousness Claim..................................................................... 203

19. Use of Future Dangerousness and Lack of Remorse as an Aggravating Circumstance Violates the Eighth Amendment as Applied to Rejon Taylor. ........................................................................................203

20. Rejon Taylor's Rights Under the Fifth, Sixth, and Eighth Amendments Were Violated by Federal and Statutory Errors Respecting the Testimony of Stephanie Belcher and Robin Belcher .....................................................204

a.     The Law Relating to the Admissibility of Victim Impact Testimony ........................................................................................204

b.     Pre-Trial Determination of Admissibility of Victim Impact Testimony ........................................................................................204

c.     Stephanie Belcher Misrepresented Her Relationship with Luck for Financial Gain and Testified Falsely at Taylor's trial....................206

d.     *Napue* and *Giglio*..................................................................209

e.     Ineffective Assistance of Counsel .................................................210

f.     Summary ...................................................................................211

21. Denial of Jury Expert and Ineffective Assistance of Appellate Counsel for Failure to Appeal Denial of Jury Expert (Fifth, Sixth, Eighth Amendments, 18 U.S.C. § 3005, 3599)..................................................................212

22. In Violation of Rejon Taylor's Fifth, Sixth, and Eighth Amendment Rights, the Government Suppressed Material Exculpatory Evidence in Violation of *Brady v. Maryland.* ....................................................................................215

Conclusion ..............................................................................................218

## Preliminary Statement

The transcript of the trial proceedings will be cited to as "Tr." followed by the page number. Transcripts of pretrial and ancillary proceedings will be cited as "Tr." followed by the date of the proceeding and the page number. All citations to "Doc." refer to documents filed under Eastern District of Tennessee Case No. 1:04-cr-00160-CLC-CHS unless otherwise noted.

Citations to exhibits filed with this motion include a description of the exhibit and the exhibit number.

All other citations are either self-explanatory or will be explained.

## <u>Motion for Collateral Relief to Vacate, Set Aside, or<br>Correct Sentence and for a New Trial</u>

COMES NOW movant, Rejon Taylor, by and through his undersigned counsel, pursuant to 28 U.S.C. §2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside, or correct his sentence.

Pursuant to Local Rule 9.2, Rejon Taylor provides the following information: Mr. Taylor's identification number is #41070-074. Mr. Taylor is currently incarcerated at the Bureau of Prisons Federal Correctional Institution, Terre Haute Indiana, under a sentence of death. Respondent is the United States of America.

Mr. Taylor was charged by Indictment in the United States District Court for the Eastern District of Tennessee on October 13, 2004. (Doc. 1). A Superseding Indictment was returned on November 14, 2007 charging Mr. Taylor with carjacking resulting in death in violation of 18 U.S.C. §2119; firearms murder during and in relation to carjacking in violation of 18 U.S.C. §924; kidnapping resulting in death in violation of 18 U.S.C. §1201; firearms murder during and in relation to kidnapping in violation of 18 U.S.C. § 924. (Doc. 447). On June 1, 2006, the Government filed notice of its intent to seek the death penalty. (Doc. 123).

Following a jury trial in 2008, Mr. Taylor was found guilty of the offenses of carjacking resulting in death; firearms murder during and in relation to carjacking; kidnapping resulting in death; firearms murder during and in relation to kidnapping. (Doc. 670). After a subsequent penalty phase, the jury recommended

3

that Mr. Taylor be sentenced to death. (Doc. 760). On December 3, 2008, Judge Curtis L. Collier imposed sentence on Mr. Taylor and ordered that he be sentenced to death. (Doc. 789).

Mr. Taylor appealed to the United States Court of Appeals for the Sixth Circuit on April 24, 2009. (Doc. 842, Notice of Appeal). The United States Court of Appeals for the Sixth Circuit denied Mr. Taylor's appeal on February 11, 2016 (Doc. 954). *United States v. Rejon Taylor*, 814 F.3d 340 (6th Cir. 2016). A Writ of Certiorari was denied to Mr. Taylor on May 14, 2018. (Doc. 972). *Rejon Taylor v. United States*, 138 S.Ct. 1975 (May 14, 2018). This is Mr. Taylor's first Motion for Relief pursuant to 28 U.S.C. §2255.

Mr. Taylor was represented at trial and sentencing by William H. Ortwein, Howell G. Clements, Fredrick Lee Ortwein, and Leslie A. Cory. On appeal, Mr. Taylor was represented by Barry J. Fisher, S. Adele Shank, and Leslie A. Cory.

This Court appointed the Office of the Federal Public Defender for the Middle District of Tennessee to represent Mr. Taylor in this proceeding on July 21, 2017. (Doc. 969). On November 19, 2018, Kelley Henry, Alexis Hoag,[1] and Amy Harwell of the Office of the Federal Public Defender for the Middle District of Tennessee entered their appearance on behalf of Mr. Taylor. (Doc. 974).[2]

---

[1] Subsequent to assignment on Mr. Taylor's case, Ms. Hoag left the Office of the Federal Public Defender for the Middle District of Tennessee and joined the NAACP Legal Defense and Educational Fund. She remains co-counsel with Ms. Henry and Ms. Harwell.

[2] This motion is filed in compliance with the statute of limitations governing cases brought pursuant to 28 U.S.C. § 2255. Counsel have diligently assembled a team of lawyers, mitigation specialists, and investigators to investigate and uncover all claims of relief that are cognizable under this section. Each claim is pled in good faith and on the basis of what counsel have learned in their investigation and review of the voluminous record thus far. Counsel has made every effort to plead as specifically as possible each claim for relief. To be clear, counsel have not intentionally or strategically waived or

## Introduction

Rejon Taylor suffers from multiple comorbid physiological, cognitive, psychological, and emotional impairments. His impairments manifest themselves in impaired thinking and judgment, delusions, thought disorder, impaired attachments, and psychosis. Layered on top of these impairments, synergistically exacerbating them is his repeated, childhood exposure to guns (direct threats to him) and violence (interpersonal, familial, and community). His brain impairments and trauma history are compounded by profound emotional neglect. Societal and cultural deprivation and hostility heightened the deleterious effect of his impairments. Rejon's impairments can only be understood against the historical, sociological, cultural, and genetic imprint that he inherited. However, trial counsel failed to develop and present the complex narrative of his life to the jury. Rather, they falsely presented Rejon as a one-dimensional character, destined to follow in the footsteps of his absentee father and older brother, both of whom had criminal records.

Rejon's brain impairments contributed to the commission of the crime, compromised his competence, and should have been presented as mitigation. However, though trial counsel recognized that Rejon was delusional, trial counsel failed to investigate his delusions as a mental disorder. Because counsel failed to understand that Rejon's delusions were brain based and impaired his perception of

withheld any claim. That said, counsel recognize that there is still much work to be done. In some instances, not all facts giving rise to a particular claim are currently known. As discussed by the Court and the parties on May 6, 2019, upon the government's review of this petition, Mr. Taylor will expeditiously seek a scheduling order for the purpose of establishing a schedule for discovery, amendment, and an evidentiary hearing.

reality, counsel failed to litigate his incompetence to stand trial. Because counsel failed to investigate Rejon's social history, counsel knew nothing of the gun violence that created the traumatic reactivity with which Rejon responded to his co-defendant's firing of his gun inside the van. As a result, though counsel argued to the jury that Rejon's shots were impulsive, counsel lacked the necessary psycho-social context to support that argument. Finally, without a social history, counsel could not contextualize Rejon's actions within in his life story. Ironically, without the necessary context, the evidence the defense intended to present as mitigating, supported the government's case in aggravation.

Rejon's family history is one of struggle in post-reconstruction Georgia. Generations of the family contended with racial bias, violence, and pervasive societal injustice. That some of the family members resorted to crime reflects their struggle to survive and the desire to provide something better for their children. In contravention of prevailing professional norms, the trial team failed to investigate the family's inter-generational history, instead presenting only snapshots of his family without the historical and familial factors that would have made those snapshots mitigating.

Ironically, without the necessary context, that which was presented by the defense as mitigating, proved fodder for the government's arguments. That Rejon was conceived while his father was on escape status, that his mother neglected Rejon to work multiple jobs, that his mother participated in Rejon's misguided escape attempt – these facts ended up painting Rejon's family as criminals with no redeeming value rather than serving to rebut future dangerousness as the defense intended.

As a result of these factors and others discussed in this petition, Rejon Taylor, an eighteen year old child was condemned to death. Rejon could not assist counsel, could not make a rational decision about the guilty plea, did not act with premeditation, and was not a future danger as claimed by the government.

An unreliable capital conviction is unconstitutional. Reliability in capital sentencing is achieved through effective assistance of counsel; government conduct that complies with the ethical and legal obligations to ensure fairness; fair trial procedures; jury selection that excludes jurors who are unwilling or unable to consider mitigating evidence, but does not exclude jurors on the basis of race; jury instructions that properly instruct the jury on the law; a trial that excludes evidence that unfairly influences the jury; a jury unbiased by factors and influences extraneous to the issues being tried; a trial process that ensures that race plays no role in the outcome; and at trial that guarantees an individualized sentencing determination based on competent evidence. As demonstrated below, the trial held in this matter did not provide the heightened due process requires in a capital case. The execution of Rejon Taylor will be irreversible, final, and unjust.

The injustices in this case are numerous: From Rejon's lawyers' assumption that his religious delusion was just Black religion to their failure to appreciate his mental illness and brain impairment, counsel's ineffectiveness resulted in the conviction and condemnation of an incompetent eighteen year old child; from trial counsel's failure to investigate and present the intergenerational context for Rejon's participation in identity theft to the government's use of actions by an unknown

7

person against an unknown relative of one of the co-defendants as proof of Mr. Taylor's "vicarious" future dangerousness, the trial did not provide reliable, individualized sentencing; from the failure of trial counsel to properly voir dire about racial bias, to the jurors' admitted knowledge of the government's manufactured "racist redneck" tag-phrase, Mr. Taylor's trial was infected by racial bias. The constitutional violations reflected in this petition resulted in an unfair trial and a death sentence that is disproportionate, arbitrary, capricious, and devoid of the heightened reliability required by the United States Constitution. For the reasons that follow, and as demonstrated by the numerous exhibits supporting this motion, Mr. Taylor's unconstitutional conviction and sentence should be set aside.

### Statement Regarding Structure and Notice Pleading

This Motion is filed with the understanding that an amendment will be allowed following discovery and prior to an answer as discussed and agreed to on the record on Monday, May 6, 2019. A motion for evidentiary hearing is also contemplated. To avoid unnecessary repetition of facts and argument, in certain places, claims of ineffective assistance of trial and appellate counsel are embedded within the broader claim. These claims are pled with the knowledge that the Court is well versed in the legal standard governing claims of ineffective assistance of counsel. Further, each claim builds on the other claims in the motion and legal principles previously articulated are not repeated. This is a lengthy document. Repetition of that which the Court already knows would be a waste of scarce judicial resources.

Counsel are mindful that this is not the brief on the merits of the claims. As

such, this motion does not contain an exhaustive discussion of relevant case law. Rather case law is included for the purpose of defining the contours of the claim and to put the government on notice as to the nature of the claim.

Finally, counsel respectfully inform the Court that on the date that the prior appointment of counsel was animated by the denial of certiorari in the United States Supreme Court, they were enmeshed in complex and extremely expedited litigation regarding the State of Tennessee's method of execution. That litigation consumed the vast majority of counsel Henry and Harwell's time until November 1, 2018, when Mr. Edmund Zagorksi was executed. Counsel have continued to work on the case of Don Johnson whose execution is scheduled for May 16, 2019, two days after the filing of this motion. Counsel Henry and Harwell's time has also been constrained by the need to interview and hire a number of new attorneys in the Middle District of Tennessee Capital Habeas Unit. The unit is now fully staffed. Moreover, counsel encountered unexpected logistical issues beyond their control that impeded the investigation. We believe that we have identified and pled the outline of all available claims for Mr. Taylor. We are still investigating and will continue to diligently pursue factual development in support of these claims. If there are technical deficiencies with respect to the pleading of any claim, we respectfully request the right to cure said deficiency.

<p style="text-align:center">Grounds for Relief</p>

Through counsel, Mr. Taylor states the following grounds for the grant of his motion:

1. **Rejon Taylor Was Incompetent to Stand Trial in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, and Counsel Were Ineffective for Failing to Investigate, Develop, and Present Proof of His Incompetence.**

It is well established that the trial of an incompetent person violates due process. *Cooper v. Oklahoma,* 517 U.S. 348 (1996) (quoting *Medina v. California,* 505 U.S. 437 (1992); *see also Drope v. Missouri,* 420 U.S. 162 (1975) ("[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial" (citing *Pate v. Robinson,* 383 U.S. 375, 385 (1966))); 18 U.S.C. § 4241. However, in this case, Mr. Taylor was tried despite being unable to rationally assist counsel with a reasonable degree of rational understanding. *Dusky v. United States*, 362 U.S. 402 (1960). That Mr. Taylor was mentally incompetent during trial constitutes a deprivation of due process necessitating this Court to grant relief; no further prejudice is required. *Pate v. Robinson*, 383 U.S. 375, 386-87 (1966); *Dusky v. United States*, 362 U.S. 402 (1960).

Rejon Taylor suffers from serious brain impairments and from mental illness secondary to those impairments. As a result, Rejon has religious delusions and brain-based psychosis that rendered him unable to rationally assist counsel and make decisions. As Dr. George Woods found:

Rejon Taylor was incompetent to stand trial in his capital case. Mr.

<p style="text-align:center">10</p>

Taylor suffered from a mental disease or defect that, at the time of his trial, rendered him unable to "consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Mr. Taylor's sense of reality was impaired, such that it substantially undermines his judgment and his ability to rationally cooperate with counsel...

Mr. Taylor has debilitating neurological, psychological, and functional impairments and meets the diagnostic criteria for Bipolar disorder secondary to a general medical conviction, ie. Temporal Lobe Syndrome and Post Traumatic Stress Disorder. Mr. Taylor suffers from Temporal Lobe Syndrome, an umbrella term which indicates serious deficits in emotional and cognitive functioning stemming from impaired function in the temporal lobe. Mr. Taylor displays significant impairment of executive functioning, particularly in his ability to effectively weigh and deliberate, understand social cues, and understand social context. Mr. Taylor's ability to effectively weigh and deliberate is impaired by his psychotic religiosity, which is the direct result of his temporal lobe-based delusions. Mr. Taylor also suffers from a personality change secondary to his temporal lobe dysfunction. The personality change includes a manic-like set of symptoms, which includes mood lability, circumstantiality, loss of ego boundaries, and psychotic ambivalence.

Mr. Taylor's multiple impairments are synergistic and impede his perception of reality and render him psychotic. At the time of trial, Mr. Taylor suffered from religious delusions that prevented him from consulting with counsel with a reasonable degree of rational understanding, i.e., he believed that God would cause the evidence in his case to disappear and release him from custody. His religious delusions were then encapsulated, but have become more pervasive. They have grown more complex in the intervening decade and continue to impact his current thinking.

(Exhibit No. 1, George Woods, M.D., Report, at 2-3); *see also* (Exhibit 3, Hope Hill, Ph.D., Social History (Exhibit 2, Katherine Porterfield, Ph.D., Report, at 24) (finding Rejon psychotic).

Under *Dusky v. United States*, 362 U.S. 402, 204 (1960), Mr. Taylor's distorted perception of reality rendered him incompetent where his impairments substantially undermined his judgment and "preclude[d] him from perceiving

11

accurately, interpreting, and/or responding appropriately to the world around him."
*Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1990). Because of Mr. Taylor's impairments, the conviction and sentence of death violate Mr. Taylor's constitutional rights to due process, to a fair and reliable determination of guilt and the appropriate penalty, to be both physically and mentally present at trial, to present a defense, to effectively assistance of counsel, and to the assistance of qualified mental health experts, because the conviction and sentence occurred while he was mentally incompetent to stand trial.

As discussed more fully, below, *see* (IAC-Claims, collectively), the trial defense team failed to reasonably investigate Mr. Taylor's competency. If trial counsel had conducted a professionally adequate mitigation investigation, counsel would have realized that Mr. Taylor's delusions were the product of serious brain impairment, including but not limited to temporal lobe syndrome and post-traumatic stress disorder, and they would have learned that as a result, Mr. Taylor was not able to rationally assist counsel, nor to decide whether to proceed to trial or accept the government's offer of life in prison.

2. In Violation of the Sixth Amendment, Rejon Taylor's Trial Counsel Were Ineffective in Investigation, Preparation, and Presentation at his Capital Trial.

   a. Defense Counsel's Conduct Prior to, During, and After Trial was Deficient and Unreasonable According to the Prevailing Professional Norms Under *Strickland v. Washington*, 466 US 668 (1984), and Resulted in Prejudice as There is a Reasonable Probability That But For Counsel's Errors, the Outcome of Rejon Taylor's Trial Would Have Been Different in Violation of his Fifth, Sixth, and Eighth Amendment Rights.[3]

---

[3] The ineffective assistance of counsel claims raised in this section, and elsewhere in this motion, are

Rejon Taylor incorporates all the factual averments in this motion and the exhibits appended hereto in support of this claim.

Defense counsel rendered ineffective assistance of counsel when they failed to ensure an impartial jury; to conduct a thorough mitigation investigation; to investigate and present Rejon's neurological and mental impairments; to object to the prosecution's improper language; to protect his interests during the allocution; and to otherwise test the government's case. Trial counsel's representation of Rejon at the penalty and sentencing phases of his capital trial, in the motion for new trial, and on direct appeal, fell below constitutional requirements. Counsel's unreasonable errors, which are described further below, both individually and collectively, mean that this Court cannot have confidence in Rejon's sentence of death.

### i. Red Flags of Neurological and Developmental Impairment, and Symptoms of Psychosis

From the beginning, Rejon Taylor exhibited signs of neurological and developmental impairment, and symptoms of psychosis. Prior to the federal indictment, Rejon's mother, Reba Taylor retained Richard Heinsman, a local Hamilton County defense attorney to represent Rejon against state charges stemming from the underlying offense. *See* (Exhibit No. 42, Heinsman Retainer,

---

raised individually and cumulatively. Each claim relies on the facts as pled herein and those found in the attached exhibits, including, but not limited to, the reports of Dr. George Woods, M.D., Dr. Katherine Porterfield, Ph.D., Dr. Hope Hill, Ph.D., and Destiny Peery, J.D./Ph.D., including the attachments to Dr. Hill's report, Exhibits No. 1-4, attached to this motion, and the criminal court and appellate court record in this case. Each of these is specifically incorporated herein by reference.

Feb. 16, 2004). During his visits with Rejon, Mr. Heinsman recognized symptoms of mental illness and brain dysfunction. Specifically, he noted that Rejon "was hyper-religious, possibly delusional, grandiose, and exhibited symptoms that could have been psychosis or dissociation. I was concerned that his brain was impaired." (Exhibit No. 7, Richard Heinsman Dec., at 2). Rejon's disconcerting behavior continued after the federal government indicted Rejon for the crime in October 2004. (Doc. 1).

During the October 26, 2004, initial appearance, Magistrate Judge Carter asked Rejon if he wanted appointed counsel. *See* (Doc. 849, PageID #2939, p. 18). Rejon initially refused, demurring that the Court would have "to be born again to understand." (*Id.*). At the Court's request for clarification, Rejon revealed he declined a lawyer because "my heavenly father told me I don't need a lawyer. I don't need you guys to appoint me no one." (*Id.* at #2940, p. 19). Nevertheless, the court appointed William ("Bill") Ortwein lead counsel. *See* (Doc. 849, PageID #2955, p. 34).

### ii. Assembling a Defense Team

After appointing Bill Ortwein, the Court appointed Howell Clements as co-counsel. *See* (Doc. 22). "Bill and Howell both had significant capital trial experience at the state level, but neither had tried a federal capital case." (Exhibit 5, Leslie Cory Dec., at 11). Immediately, Bill Ortwein recruited his longtime collaborator, Roy Cooper, a retired Chattanooga police officer, to serve as lead investigator. *See* (*id.* at 1-2); *see also* (Exhibit No. 8, Roy Cooper Dec., at 1) ("I retired from the

Chattanooga Police Department after 20 years") and (Doc. 55, p.1). Counsel placed Mr. Cooper "in charge of all investigation in the case, both crime-based and mitigation." (*Id.*); *see also* (Doc. 73, at 6) (explaining that Mr. Cooper will "perform not only mitigation investigations, but also guilt/innocence investigations."). Prior to Rejon's case, Mr. Cooper had no training in capital mitigation investigation. *See* (*id.* at 1-2) (listing specialized education in homicide investigation, fraud and financial investigation, white collar crime, criminal investigation, computer investigation, asset forfeiture, secret service protection, document examination, FBI instructor training, and traffic investigation).

Within the first couple of months, lead counsel enlisted the help of two additional attorneys: his son, Lee Ortwein, (Exhibit No. 8, Roy Cooper Dec., at 1), and Leslie Cory, who had graduated from law school two years prior. *See* (Exhibit No. 5, Leslie Cory Dec. at 1). Although neither Ms. Cory nor Lee Ortwein had prior capital experience, each ended up with substantial trial responsibility, particularly Ms. Cory. *See* (*id.* at 6).

### iii.    Developing the Attorney-Client Relationship

Early on, the team struggled to develop a trusting attorney-client relationship with Rejon. Ms. Cory observed that "Bill, in particular, made Rejon horribly uncomfortable. Rejon did not know how to react or appropriately respond to Bill's forceful personality." (Exhibit 5, Leslie Cory Dec., at 2). Likewise, another team member witnessed a visit between Mr. Cooper and Rejon: "Mr. Cooper's interaction with Rejon distressed me. I found his manner of speaking to Rejon

15

shocking." (Exhibit 10, Marti Loring Dec., at 4). At the time, Mr. Cooper was attempting to convince Rejon, with little appreciation of Rejon's limitations and impairments, to accept the Government's offer of a life sentence: "Mr. Cooper said [to Rejon] you need to take this offer; there's a man dead and you need to take this. He spoke authoritatively and was demanding." (*Id.*).

Further, differences in race, culture, and background prevented counsel from forming a trusting relationship with Rejon and his family. Rejon's four lawyers were all white; beyond representing Black clients within the criminal justice system, none had meaningful exposure to African Americans in other contexts. Rejon's older sister, Tameka Shepard's first impression of the "defense attorneys was that they were older White men who could not relate to Rejon. I did not trust Bill from the get-go. He told us that Rejon was never going to see the light of day from the beginning." (Exhibit No. 33, Tameka Shepard, at 13).

Defense counsel attempted to use Black people as ad hoc intermediaries to overcome their shortcomings. Bill Ortwein reached out to Kevin Mathews, one of the Chaplains within the Hamilton County Jail, who happened to be Black, and a Black capital defense attorney in Atlanta, Gary Parker, for help convincing Rejon to accept the government's offer. *See* (Exhibit No. 5, Leslie Cory Dec., at 8). In retaining Mr. Parker and requesting Chaplain Mathews to meet with Rejon, the defense thought they could bridge the racial and cultural divide; one that they themselves recognized they had with Rejon. However, Mr. Parker and Mr. Mathews' roles were limited. In fact, the team sought only 20-hours of funding from the Court

for Mr. Parker's work. *See* (Doc. 458, p.3). After those two attempts failed, the defense team "did not find another African American to help us bridge the cultural and racial divide between Rejon and our team." (Exhibit No. 5, Leslie Cory Dec., at 8).

### iv.    Developing Evidence

Bill Ortwein "was in charge of strategy and overseeing the whole case…He [had] the final say in any decisions about which there was controversy or dissent." (Exhibit No. 5, Leslie Cory Dec., at 1). In the beginning, Bill Ortwein put himself in charge of the first phase of trial and Mr. Clements, the second phase. (*Id.*) Early on, the team voiced concern "that Rejon might not be competent to stand trial" and "discussed hiring a neuro-radiologist…" (*Id.* at 3). Lee Ortwein contacted Dr. Robert Kessler, a radiologist at Vanderbilt University to inquire about funding. (*Id.*). However, at no point before trial did the team seek funding for a radiologist, and ultimately, they "never hired a neurologist or arranged to have Rejon's brain scanned" despite red flags in Rejon's behavior indicating neurological impairment. (*Id.*); *see also* (Doc. 65, p. 4-5) (proposed budget lacks funding request for radiologist).

In early 2005, lead counsel arranged to work with Dr. David Solovey, a local psychologist. *See* (Doc. 65, p. 4) (proposed budget includes $3,300.00 request for "Psychologist – Dr. David Salovey"). However, counsel failed to provide Dr. Solovey with information necessary to conduct a competent forensic evaluation of Rejon. Dr. Solovey's sources of information were limited to the criminal indictment,

17

memoranda from the team about their impressions of Rejon, Mr. Cooper's single conversation with Rejon's mother, Reba Taylor, and a few school records from Rejon's high school. *See* (Exhibit 43, Solovey Report, at 1-3). Noticeably absent from the source list was a life history providing information about Rejon and his family's medical and mental health history, Rejon's adverse childhood experiences, particularly his exposure to trauma and profound neglect, and other critically important information about Rejon's developmental years and his caretakers.

Without an adequate life history investigation, Dr. Solovey could not meaningfully answer the sweeping referral questions defense counsel posed to him. *See* (Exhibit No. 43, Dr. Solovey Report, at 1). In fact, he provided inaccurate responses to some of them. *See* (Claim No. 1, Competency Claim). Without input or consultation from counsel, Dr. Solovey issued his report eight months later on January 22, 2006. *See* (Exhibit No.43, Dr. Solovey Report). Unsure how to interpret Dr. Solovey's findings, or even decipher if there was anything they could use, counsel tabled the report and Dr. Solovey.

In May 2005, defense counsel spoke to Marti Loring, a social worker with a Ph.D. in sociology, asking her to consult on Rejon's case for mitigation purposes. *See* (Exhibit No. 6, Howell Clements Dec., at 6). After a preliminary meeting with counsel Dr. Loring recounted, "[m]y initial impression was that mitigation as I understood the term/concept was not particularly important to the team, that not only was Mr. Cooper in charge of the entire investigation – for both phases of the trial – but that he was largely in charge of determining the scope of that which was

to be investigated." (Exhibit No. 10, Marti Loring Dec., at 1). Dr. Loring did not begin work on the case until more than a year later in December 2006. (*Id.* at 3).

By late 2005, the team was singularly "focused on [the] presentation to the local AUSAs regarding whether death should be sought/authorized in the case." (Exhibit No. 6, Howell Clements Dec., at 5). Instead of developing mitigating life history information, the team marshaled evidence they hoped would convince DOJ to not seek death: evidence of Rejon's good behavior in the Hamilton County Jail. Thus, the defense team had not completed or in some cases, even begun, basic mitigation tasks prior to the DOJ presentation. *See* (Exhibit No. 5, Leslie Cory Dec., at 12) (noting that the team never obtained Rejon's birth certificate).

The meeting with DOJ was scheduled for April 17, 2006. Unbeknownst to defense counsel, Rejon had participated in an ill-conceived escape from the Hamilton County jail two days prior. *See* (*id.* at 5). Defense expert James Aiken would later describe the effort as "stupid" for its "extremely unlikely" possibility of success. (Doc. 874, PageID #5648, p.98). "Our team did not know of the escape attempt and made the presentation to DOJ based on Rejon's exemplary jail record and the other factors we had prepared. Ultimately, after the presentation, the DOJ lawyers revealed that Rejon had tried to escape, and our team felt humiliated." (Exhibit No. 5, Leslie Cory Dec., at 5). According to Leslie Cory, "Bill never forgave Rejon for the escape attempt." (*Id.*).

### v. Preparing for Trial

In December 2007, less than a year before trial, the team met and discussed

"that in order for Dr. Solovey to provide an accurate and complete assessment of Rejon, he needed a reliable social history." (Exhibit No. 10, Marti Loring Dec., at 7). The team assigned the task to Dr. Loring, but she was unable to produce one without full access to witnesses and records, which the team did not provide. (*Id.*). Without a life history, the defense team's testifying mental health expert – Dr. Mark Cunningham – could not conduct an accurate evaluation.

Counsel also failed to conduct meaningful mitigation interviews or prepare lay witnesses for trial. Tonya Walton recalled her experience with counsel before testifying: "The defense lawyers did not prepare me to testify…. I did not have any individual meetings with the attorneys or anybody else from Rejon's defense team." (Exhibit No. 35, Tonya Walton Dec., at 11). Ms. Walton and her children were forced to figure out the process unassisted: "Because the lawyers didn't give me instructions, I figured I was supposed to be a character witness for Rejon. My daughters and I came up with this purpose on our own; the attorneys did not communicate it to us. Members of my family and I only met with the defense attorneys a handful of times" in group settings. (*Id.*) Rejon's older brother explained: "My family wanted to be helpful, but the defense did not tell us what they needed from us." (Exhibit No. 17, John Taylor II Dec., at 7-8). Rejon's sister noted that "[t]he defense attorneys neglected to ask my husband [Ramon Shepard] to testify on Rejon's behalf. I did not understand that decision and their exclusion of him as a valuable witness." (Exhibit No. 33, Tameka Shepard Dec., at 14).

Rejon's cousin Tayanau Nunez, shared a similar experience as her mother,

"[t]he defense did not explain what they wanted me to testify about. I assumed I was supposed to testify as a character witness because the defense did not give me directions." (Exhibit No. 34, Tayanau Nunez Dec., at 10). She described her limited preparation with the defense team: "The defense did not discuss what kind of information the attorneys wanted to cover in my testimony or anyone else's. I did not have any individual meetings with them prior to my day in court and I know that they did not meet individually with my mother or sister who also testified." (*Id.*).

### vi. Jury Selection

Prior to trial, defense counsel realized that they "desperately needed" a jury consultant. (Exhibit No. 5, Leslie Cory Dec., at 6). Particularly, because lead counsel's declining health forced him to take a back seat on trial preparation. *See* (*id.* at 11) ("After his surgery, Bill turned over most of the individual voir dire to Lee and other issues to me, things I believe he had anticipated handling personally prior to his surgery."). Ms. Cory filed a motion requesting funding for a jury consultant; however, the Sixth Circuit denied the request. *See* (*id.* at 6). Having never conducted capital jury selection, Ms. Cory took the lead, including drafting the questionnaire. *See* (Exhibit No. 5, Leslie Cory Dec., at 6).

On August 25, 2008, the first group of prospective jurors appeared in court for questioning. *See* (Doc. 860, PageID #3398, p. 1). At the start of the proceedings, twelve prospective jurors indicated that they were exposed to pretrial media about the case. *See* (*id.* at #3406, p. 9). Additionally, four prospective jurors expressed

their hesitancy to institute the death penalty. *See* (*id.* at #3413-15, p. 16-18 and #3765, p. 368). Defense counsel did not successfully rehabilitate these prospective jurors and the government removed each for cause. *See* (*id.* at #3537, #3759, #3810-11, #3890-10, p.140, p.362, p.413-14). Defense questioning on issues relevant to Rejon's case was superficial and cursory. Counsel failed to obtain meaningful information about prospective jurors' attitudes toward Black people; and failed to identify and remove jurors that expressed an inability to consider a life sentence and to appropriately consider mitigating evidence. *See e.g.,* (*id.* at #3486-88, PageID #3745, p.89-91, p.348).

The second, and final day of jury selection occurred on August 26, 2008, with Mr. Clements questioning prospective jurors. *See* (Doc. 861, PageID #3846, p. 31). At the start of proceedings, ten individuals indicated that they heard about the case. *See* (*id.* at #3818-21, p. 3-6). Mr. Clements failed to question jurors about factors directly relevant to Rejon's case, including jurors' perspectives or attitudes on Black people. At the end of the second day of jury selection, 67 qualified jurors remained in the pool. *See* (*id.* at #4009-10, p. 194-95). After the parities exercised their peremptory strikes (23 each), the Court selected "the first 12" as jurors and the next six as alternates. (*Id.* at #4010, p. 195).

### vii.    First Phase of Trial

Opening argument commenced August 27, 2008. *See* (Doc. 895, PageID #6364, p.19). The government relied on over 20 witnesses, including law enforcement from Georgia and Tennessee and both of Rejon's co-defendants, to

argue that Rejon planned to kidnap, cross state lines, and kill Mr. Luck because Mr. Luck had reported Rejon to law enforcement for an earlier burglary Rejon allegedly committed. *See* (Docs. 895-899). The government's theory rested heavily on Joey Marshall's testimony, Rejon's co-defendant, that Rejon told him that Rejon knew Mr. Luck had notified authorities about the earlier incident. *See* (Doc. 896, PageID #6606, p. 82). The Court later acknowledged the "inherent problems with [Mr. Marshall's] credibility." (Doc. 899, PageID #7197, p. 88). Before the parties rested, the Court issued an evidentiary ruling finding that government's evidence did not support the prosecution's theory that Rejon committed murder to eliminate Mr. Luck as a witness. *See* (Doc. 654, PageID #1312-14).

On September 5, 2008, after the government rested its case-in-chief, the government, again, offered to rescind the death notice if Rejon agreed to plead guilty; Rejon refused the offer. *See* (Doc. 719); *see also* (Exhibit No. 5, Leslie Cory Dec., at 11). Defense counsel did not present a single witness during the first phase of trial. On September 8, 2008, the parties gave closing argument, with Mr. Clements delivering it for the defense. *See* (Exhibit No. 6, Howell Clements Dec., at 6). Mr. Clements began with directions for the jury: "[i]f my recollection of the facts differs from your recollection collectively or individually, ignore what I say." (Doc. 868, PageID #5092, p. 47). The remainder of his argument lacked cohesion and structure, "forgive me for jumping around, because this has been a little bit hard for me to organize, and I'm disorganized by nature, anyway." (*Id.* at #5092-5107, p. 47-62 and #5102, p. 57). Counsel did little to rebut the government's case-in-chief.

Conversely, in its closing argument, the government stuck to their clearly identified theme – that Rejon committed premeditated murder, peppering their summation of evidence with repeated references to Rejon, a "black male[]," "circling" and "following" and "stalking" the victim. *See* (Doc. 868, PageID #5086, p. 41 and #5118, p. 73).

### viii. Juror Exposure to Prejudicial Media and *Remmer* Hearing

On September 16, 2008, the government notified the defense that it planned to play recordings of Rejon's jailhouse calls, including one in which he allegedly referred to the jurors as "racist rednecks." (Doc. 869, PageID #5176, p. 11). Although the jury was not present, local media widely reported the prosecution's mischaracterization of Rejon's description of the jury. *See e.g.,* Monica Mercer, "Chattanooga: Sentencing delayed in convicted murderer's case," *Chattanooga Times Free Press* (Sept. 16, 2008) ("According to some of the calls, Mr. Taylor called the 18-member jury panel a bunch of 'racist rednecks' after they convicted him of murder kidnapping and carjacking last week…"). Prior to the trial resuming, counsel met with the Court to discuss the jury's media exposure and knowledge of the comment. *See* (Doc. 870, PageID #5225. pg. 36). Defense counsel requested the Court to voir dire the individual jurors to determine the extent and impact of the exposure. *See* (Doc. 688). However, at the hearing, the defense waived Rejon's presence and failed to participate in questioning. *See* (Doc.871, PageID #5246-83, p. 2-39).

### ix. The Penalty Phase

Following a four-day break in proceedings, the penalty phase began on October 6, 2008. *See* (Doc. 900, PageID #7206, p.1). On October 7, 2008, defense counsel arranged for Rejon to give an unsworn allocution to the jury. *See* (Doc. 874, PageID #5558, p. 8). Ms. Cory oversaw Rejon's allocution preparation, but on the morning of the allocution, Rejon forgot his notes and decided he did not want to give one. *See* (Exhibit No. 5, Leslie Cory Dec., at 11). Nonetheless, counsel convinced Rejon to address the jury; the allocution was a disaster. (*Id.*).

Initially, lead counsel had assigned Mr. Clements to take charge of the penalty phase. *See* (Exhibit No. 5, Leslie Cory Dec., at 1). However, in the intervening years, Howell focused on other issues, such as the "bill of particulars, [and] issues regarding future dangerousness and constitutionality of the federal death penalty statute." (Exhibit No. 6, Howell Clements Dec, at 6). Thus, Mr. Clements had limited exposure to Rejon's family, who he concluded "were a normal, middle-class, Black family." (*Id.*). Prior to trial, Ms. Cory assumed responsibility of selecting which lay witnesses would testify and preparing their testimony. *See also* (Exhibit No. 5, Leslie Cory Dec., at 1 and 9). Ms. Cory selected six members of Rejon's mother's family to testify: Aunt Tonya Walton, Cousin Tuawanna Walton, Uncle Stanley Gatlin, Aunt Felicia Gatlin, Cousin Tayanau Nunez, and Grandma Eva Williams. *See* (Doc. 900, PageID #7207-08, p. 2-3). Ms. Nunez recalled: "We were portrayed inaccurately; the defense and the Government portrayed us like we were all criminals. We are a family of Christians, we are good people, we have

complicated lives, but we are a family who loves and supports one another." (Exhibit No. 34, Tayanau Nunez Dec., at 11). "We were very supportive of Rejon and wanted to help his case in any way that we could, but the defense attorneys did not give us an opportunity to do that." (Exhibit No. 33, Tameka Shepard Dec., at 14).

Defense counsel failed to present testimony from Rejon's immediate family – his parents and two siblings – from anyone on his father's side of the family, from his peers, and from several other available and willing witnesses. In fact, "Bill subpoenaed Rejon's immediate family" not because defense counsel intended them to testify, but "because he did not trust them to behave in court." (Exhibit No. 5, Leslie Cory Dec., at 10). Rejon's brother-in-law described the alienating circumstances, "I was not allowed to enter the courtroom during his trial, but I paced outside in the hallways and looked inside when I had the chance. No one explained to us why my wife [Rejon's sister] and I could not come into the courtroom to listen and support Rejon." (Exhibit No. 26, Ramon Shepard Dec., at 9-10). His wife, Rejon's sister, expressed similar sentiments: "the main figures in our family were forced to sit outside of the courtroom… I did not know why we had to stand in the hallway. No one explained that to us." (Exhibit No. 33, Tameka Shepard Dec., at 14).

Defense counsel presented two experts – James Aiken and Dr. Mark Cunningham – to show that Rejon would not pose a danger in the future. *See* (Doc. 901, PageID #7409, p. 2 and Doc. 902, PageID #7581, p. 2). However, without a thorough mitigation investigation, Dr. Cunningham's presentation to the jury

lacked detail, humanity, and accuracy. Mr. Cooper recalled that "when it came time for [Dr. Cunningham's] presentation in court…[h]e was left with little to say." (Exhibit No. 8, Roy Cooper Dec., at 6). Ms. Cory later lamented that her presentation of lay witnesses "did nothing to back up Dr. Cunningham's testimony…The contradictions between Dr. Cunningham's portrayal of Rejon's background and my portrayal of it were never resolved." (Exhibit No. 5, Leslie Cory Dec., at 10) (juxtaposing her presentation of a "normal" childhood and supportive family, with Dr. Cunningham's presentation that most family members were "criminals"). Rejon's cousin put it succinctly: "Rejon has a story to tell and it is not the story that the government or his defense team told at trial." (Exhibit No. 12, Edward Gatlin Dec., at 12).

      **x.**     **What the Jury Did Not Hear**

Had defense counsel performed effectively, they would have recognized that Rejon was exhibiting encapsulated delusions, incompetent to assist in his defense, and had debilitating neurological, psychological, and functional impairments. Moreover, counsel failed to grasp that the family Rejon was born into had endured generations of suffocating structural racism and poverty, and that untreated mental illness and trauma permeated his family tree, manifesting in substance abuse and misconduct. Counsel also failed to recognize the central role that racism played in the unavailability of opportunities – residential, academic, and social – that would have otherwise enabled Rejon to develop protective factors to buffer him from the profound neglect, violence, and other risk factors to which he was exposed

throughout his developmental years. *See* (Exhibit No. 3, Hope Hill, Ph.D., Social History); (Exhibit No. 2, Katherine Porterfield, Ph.D., Report); and (Exhibit No. 1, George Woods, M.D., Report). Instead, counsel's failures allowed the government to portray Rejon as a manipulative remorseless killer, whose conduct was inherently criminal.

### xi. Motion for New Trial

After the jury sentenced Rejon to death, the Court asked who he wanted to represent him on direct appeal, Lee Ortwein or Leslie Cory. *See* (Exhibit No.5, Leslie Cory Dec., at 12). Rejon chose Ms. Cory. (*Id.*). In addition to Rejon's case being Ms. Cory's first capital trial, his case was also Ms. Cory's first capital appeal. Although the Court later appointed Barry Fisher and Adele Shank to help represent Rejon on appeal, Ms. Cory "ended up doing most of the posttrial work, such as the motion for new trial and related matters, alone." (*Id.*); *see also* (Doc. 955, PageID #10126-27, p. 2-3). In the months following trial, Alternate Juror E.H., the sole Black alternate, spoke to Monica Mercer, a reporter from the *Chattanooga Times Free Press*, about the troubling things he witnessed during his service on the jury. *See* (Doc. 794-1, PageID# 2593-94, p. 1-2). The information Alternate Juror E.H. gave the media became the basis for the defense's motion for new trial, filed on December 20, 2008. *See* (Docs. 793 and 794).

In a published article, Alternate Juror E.H. stated that the jury, which was comprised of 11 white people, sentenced Rejon Taylor to death because he was Black. *See* (*id.* at #2594) ("I heard (jurors) talking about how we needed to make an

28

example of him. It was like, here's this little black boy. Let's send him to the chair…"). He also disclosed to the reporter that the jury engaged in premature deliberations. *See* (*id.* at #2593) ("We didn't know we weren't supposed to talk about (the case with each other) until deliberations…We talked about things all the time."). Another article stated that two other jurors confirmed Alternate Juror E.H.'s statements. *See* (Doc. 794-3, #2596, p. 1).

On February 25, 2009, the Court conducted a limited hearing with two witnesses: Alternate Juror E.H. and Monica Mercer, *Chattanooga Times Free Press* reporter. *See* (Doc. 905, PageID #7936-8030, p. 1-95). Given the constraints of Rule 606(b) at the time neither witness was permitted to testify about whether any juror harbored internal racial bias in rendering the guilty verdict or sentencing Rejon to death. Ms. Cory was not prepared to conduct the hearing. *See* (Exhibit No. 5, Leslie Cory Dec., at 12). The Court denied the motion for trial. *See* (Doc. 836).

### b. Specific Ineffective Assistance of Counsel Claims

In any criminal case, an accused is entitled to competent counsel. *See, Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052 (1984). In a capital case, the stakes are higher because death is indisputably different from all other sentences. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, J. J.) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment…Because of that qualitative difference, there is a corresponding difference in the need for reliability…"). Capital cases are more complex and, as a result, more is demanded of counsel. *See Sears v. Upton*,

130 S.Ct. 3259, 3266 (2010); *Porter v. McCollum*, 588 U.S. 30, 130 S.Ct. 447, 449 (2009); *Rompilla v. Beard*, 545 U.S. 374, 378 (2005); *Wiggins v. Smith*, 539 U.S. 510, 515-16 (2003). In Rejon Taylor's case, his attorneys failed to provide him with the representation demanded by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution. Had it not been for the errors and misjudgment of his defense team, whether the Court examines their impact in isolation or cumulatively, there is a reasonable probability that the outcome of Rejon's trial would have been different, and he would not have been sentenced to death. *See Strickland*, 466 U.S. at 694.

The "right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). The constitutional adequacy of counsel is assessed according to the familiar two-part test set forth in *Strickland,* 466 U.S. at 687-88. The first prong asks whether counsel's performance "fell below an objective standard of reasonableness," and the second asks whether counsel's inadequate representation was prejudicial. *Id.* Counsel's performance is deficient if it is unreasonable under "prevailing professional norms." *See Wiggins*, 539 U.S. at 521-22; *Strickland*, 466 U.S. at 688 ("the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in [ABA] standards and the like…are guides to determining what is reasonable").

The United States Supreme Court has been clear that "strategic choices

30

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 521. Thus, "[i]n other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* Counsel's performance is prejudicial if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 534; *Strickland*, 466 U.S. at 695.

A "reasonable probability of a different result" is less than a preponderance of the evidence and is present when an evaluation of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693. Due to the federal death penalty scheme, where one non-unanimous juror spares a defendant's life, confidence in the outcome of a trial is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 536.

Here, there is reasonably probability that had counsel represented Rejon Taylor according to prevailing professional norms, at least one juror would have voted for life. In fact, there was a holdout juror during deliberation on whether to sentence Rejon to death; Juror O.W., the sole African American on the jury. *See* (Doc. 794-4 at 1). Moreover, during deliberation at the conclusion of the sentencing phase, the jury twice asked the Court for clarification on what would happen if they returned a non-unanimous verdict, first at 11:15am and then again over three hours later, indicating that even with counsel's deficient performance, at least one juror

was hesitant to vote for death. *See* (Exhibit No. 44, Jury Communications with Court, at 10, 14). Had defense counsel provided constitutionally effective representation, there is a reasonably probability that the outcome of Rejon Taylor's would have been different.

In addition to the general claim of ineffective assistance of counsel stated above, Rejon makes the following specific allegations of constitutionally ineffective counsel:

### c. Failure to Conduct Adequate Jury Selection

"Jurors … take an oath to follow the law as charged, and they are expected to follow it." *United States v. Powell*, 469 U.S. 57, 66 (1984). For this reason, "trials generally begin with jury selection, by judge or counsel, seeking to identify those jurors who for whatever reason may be unwilling or unable to follow the law and render an impartial verdict on the facts and the evidence." *Powell*, 469 U.S. at 66-67. Questioning potential jurors elicits information that can "expose possible biases." *McDonough Power Equip., Inc.*, 464 U.S. at 554.

The parties may exclude a prospective juror where "the juror's views [regarding the death penalty] would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt,* 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Therefore, a juror that would automatically vote for the death penalty, or who is unable to consider mitigating evidence, must be dismissed, because they will fail in good faith to consider the evidence of aggravating and

mitigating circumstances. *See Morgan v. Illinois,* 504 U.S. 719, 729 (1992).

Prevailing norms require counsel to identify and eradicate juror bias from capital trials. *See* ABA Guidelines, 31 Hofstra L. Rev. at 1049, Guideline 10.10.02 (Jury Selection and Voir Dire) and commentary (advising counsel to identify and remove jurors incapable of considering mitigation and "potential jurors poisoned by racial bias…"). Here, defense counsels' failure to adequately question the jurors and to identify the jurors with pro-death penalty views and racial bias, resulted in a jury that contained bias in violation of Rejon Taylor's constitutional rights. Had counsel conducted adequate jury selection, a biased juror would not have participated in the decisions to convict and sentence Rejon to death. Because counsel's deficient performance resulted in juror bias, which is structural error, Rejon is entitled to a new trial.

### i. Defense Counsel Failed to Utilize Jury Selection to Identify Bias and to Remove Jurors Who Demonstrated Bias

"Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice." *Gomez v. United States*, 490 U.S. 858, 873 (1989). Without adequate jury selection a trial court cannot meaningfully fulfill its duty to remove biased jurors. *See Rosales-Lopez v. United States*, 451 U.S. at 188. During jury selection, counsel have a constitutional obligation to explore juror bias. *See Miller v. Francis*, 269 F.3d 609, 615 ("Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair trial…by using voir dire to identify and ferret out jurors [through questions that elicit information about suspected or expressed

suspect beliefs] who are biased.") (6th Cir. 2001).

Here, defense counsels' approach to jury selection was inadequate from the beginning. On January 14, 2008, lead counsel William Ortwein speculated that jury selection would be lengthy: "I guess a week and a half..." (Doc 857, PageID #3292, p. 4). He explained that a detailed and thorough jury selection in a capital case was "critical." (*Id.* at #3317, p. 29). However, the following month lead counsel had back surgery, and due to complications with his recovery, the defense requested to postpone the April 2008 trial date. *See* (Exhibit No. 5, Leslie Cory Dec., at 9). As a result, lead counsel "was only able to participate in…work by phone for a couple months following his surgery and his participation was limited." (*Id.*). In the meantime, lead counsel gave the responsibility for jury selection, including drafting the questionnaires, requesting a jury consultant, and conducting voir dire, to the least experienced person on the team, Leslie Cory. *See* (*id.* at 6). Ms. Cory had never participated in a capital trial before Rejon's, let alone conducted jury selection for such a trial. *See* (*id.* at 1). Ms. Cory lamented the Court's denial of funding for a jury consultant because the team, specifically, Ms. Cory, "desperately needed" one. (*Id.*).

Defense counsel had two opportunities to identify prospective jurors' views: (1) thorough written questionnaires and (2) through in-person questioning. All prospective jurors in Rejon's case completed a two-page questionnaire with basic biographical information, *see e.g.,* (Exhibit No. 45 Juror T.H. Form), and a 13-page questionnaire, *see e.g.,* (Exhibit No. 46 Juror T.H. Questionnaire), with more

detailed questions about publicity and views on the death penalty. Competent counsel in a capital case must use these opportunities to identify bias and remove jurors who express bias from the pool for cause. In addition to Ms. Cory, Lee Ortwein, the second least experienced person who also lacked capital experience (Exhibit 5, Leslie Cory Dec., at 11), assisted with questioning. Jury selection ultimately commenced on August 25, 2008. *See* (Doc. 860, PageID #3398-3400, p. 1-3). Instead of lasting a week and a half, as lead counsel anticipated, jury selection took only two days. *See* (Doc. 861, PageID #4014-17, 199-202).

> ii.     **Due to Counsel's Ineffective Assistance, the Jury That Convicted and Sentenced Rejon Taylor to Death Contained Jurors Incapable of Considering Mitigation**

Prior to in-court questioning, defense counsel was on notice as to each prospective juror's view of the death penalty. Question 57 on the 13-page questionnaire asked prospective jurors: "What are your personal feelings regarding the death penalty?" (Exhibit No. 46 Juror T.H. Questionnaire) at 11. In response to that question, Prospective Juror T.H. wrote: "if you commit premeditated murder then you to[o] should be put to death." (*Id.*). Prospective Juror T.H.'s response should have raised a red flag for defense counsel because the government charged Rejon with first-degree premeditated murder and they intended to prove as an aggravating circumstance, "substantial planning and premeditation." *See* (Doc. 873, PageID #5387, p. 39).

However, during voir dire, defense counsel did nothing to explore how Prospective Juror T.H.'s bias in favor of the death penalty for all who commit

35

premeditated murder was inconsistent with his constitutional duty to consider

mitigating evidence.

| Defense Counsel: | You could vote for the death penalty or life, right? |
|---|---|
| Juror T.H.: | Yes. |
| Defense Counsel: | Okay. And you can follow the Judge's instructions, whatever they might be? |
| Juror T.H.: | Yes. |
| Defense Counsel: | You also say, "I believe that if you commit premediated murder, you should be put to death." Again what's premeditated murder, in your mind? |
| Juror T.H.: | In my mind it's you thought about it, you planned it out, you knew exactly what you were going to do, how you were going to do it, and you carried it out that way. |
| Defense Counsel: | So it's not one of these spur-of-the-moment type deals? |
| Juror T.H.: | No, it's not going to be spur-of-the-moment. |
| Defense Counsel: | Something that there is no question in your mind that a person intended to do it and set it up? |
| Juror T.H.: | Yeah, they planned it out and knew exactly what they were going to do. |

(Doc. 860, PageID #3744-45, p. 347-48).

Thus, Prospective Juror T.H.'s responses continued to indicate that he would

automatically vote for death in cases where the defendant is found guilty of

premeditated murder. When defense counsel asked for clarification during voir dire,

Prospective Juror T.H. explained that he would impose the death penalty whenever

he believed a defendant "planned it out and knew exactly what they were going to

do." (*Id.*). Prospective Juror T.H. made clear that he would not be able to consider mitigating evidence in circumstances where the defendant is found guilty of premediated murder. That exchange ended defense counsel's inquiry of Prospective Juror T.H. No one else asked Prospective Juror T.H. any additional questions, and defense counsel did not move to strike him for cause. The Court then swore him in as a juror. After the jury convicted Rejon of premeditated murder, Juror T.H. automatically voted to sentence Rejon to death.

That counsel failed to remove Juror T.H. for cause, or at least exercise an available peremptory strike constituted deficient performance because under well-settled law defense counsel should have removed him. *See Morgan*, 504 U.S. at 739. That Juror T.H. presided over Rejon's trial, voting to convict and automatically sentence Rejon to death violated Rejon's right to an impartial jury. *See id.* at 729.

### iii. Due to Counsel's Ineffective Assistance, the Jury That Convicted and Sentenced Rejon Taylor to Death Contained Jurors Who Harbored Racial Bias

It is "especially pernicious" when racial bias infiltrates the jury. *See Rose v. Mitchell*, 443 U.S. 545, 555 (1979). Juries are designed to ensure the "protection of life and liberty against race or color prejudice." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986) (citing *Strauder v. West Virginia,* 100 U.S. 303, 309 (1880) (internal quotation marks omitted)). In *Peña-Rodriguez v. Colorado*, the United States Supreme Court explained that racial bias in the jury room is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." 137 S. Ct. 855, 868 (2017). To avoid this injury, it is

critical to remove jurors who express racial prejudice.

Defense counsel failed to conduct meaningful voir dire on racial bias and thus failed to learn the jurors' views on race despite the racial overtones of Rejon's case. This was particularly problematic because Rejon's case dealt squarely with race – he and his two co-defendants are Black from a majority Black community[4] charged with killing a white man in a predominately white jurisdiction.[5] The few questions counsel posed that touched on race were superficial and did not elicit responses addressing the jurors' attitudes about race.

Defense counsel inquired about race only twice during voir dire. On the first day of trial defense counsel asked all the jurors to raise their hands if they were friends with an African American and if they had an African American co-worker. "But just respond by raising your hand. How many of you are personally friends with an African-American?" (Doc. 860, PageID #3437, p. 40) (record does not reflect which prospective jurors raised their hands, or kept their hands down). Defense counsel did not ask any follow up questions to determine the extent of those relationships, or about the level of engagement in the relationships. "Yes. I knew there were several. But let's see a show of hands. All right. So that's quite a few of you." (*Id.*). Rather, defense counsel moved on to ask about prospective juror's professional relationships with Black people. "How many of you have African

---

[4] Atlanta, where Rejon Taylor resided, was 54% Black and 38% white around the time of trial. *See* U.S. Census Bureau, 2010.

[5] The Eastern District of Tennessee, Chattanooga Division, encompassing nine counties (Bledsoe, Bradley, Hamilton, McMinn, Marion, Meigs, Polk, Rhea, and Sequatchie) is 82% white and 12.6% Black. *See id.*

American coworkers? Quite few of you." (*Id.*). Again, defense counsel moved on –

this time to questioning unrelated to race – without inquiring about the extent of

prospective jurors' relationships with Black people. Like the Black friend question,

the Black co-worker question failed to elicit any meaningful information about how

the perspective jurors thought about race.

Defense counsel later asked Prospective Juror J.B. if she knew the defendant,

who was sitting in the courtroom, was Black. *See* (*id.* at #3617, p. 220). Prospective

Juror J.B. responded that since she had a Black friend, the defendant's race had no

bearing on her judgment. (*Id.*). Counsel then asked Prospective Juror J.B. if she had

preconceived notions about the defendant. (*Id.* at #3618, p. 221). A simple "no, Sir"

from Prospective Juror J.B. ended the inquiry. (*Id.*). Trial counsel failed to follow up

on Prospective Juror J.B.'s thoughts about race or inquire as to how a singular

relationship with a Black person might preclude biases against others. J.B. was

later selected as a juror.

These two passing inquiries were defense counsel's only engagements with

the jurors concerning race. In fact, after the guilt phase, lead counsel acknowledged

that the defense had neglected race during jury selection (and trial). Out of the

jury's presence, defense counsel stated: "And for the record let me say, of course,

that Rejon Taylor is African-American. […] I don't know if that's been brought up or

put in the record at any time." (Doc. 871, PageID #5289, p. 45). Trial counsel's

failure to address race given the race of the defendant, the race of the victim and

nature of the crime, and the racial makeup of the trial jurisdiction created a

welcome atmosphere for potential racial bias among the jurors.

Questions asking whether jurors had Black friends and co-workers, alone, do not provide tangible insight into potential racial biases or prejudices, particularly when, as here, counsel failed to ask any follow up questions once jurors responded with their hands raised (or not raised). Defense counsel's questions neither elicited details of the jurors' nature of contact with Black people nor insight into jurors' perceptions of Black people. Defense counsel's questions incorrectly assumed that mere proximity to Black people precluded bias

Due to defense counsel's deficient voir dire on racial bias, more than one juror who convicted and sentenced Rejon to death based their decision, in part, on the fact that Rejon was Black. *See* (Claim No. 2.f, IAC-*Remmer* Hearing Claim) (Juror 1, the foreperson, expressed concern over her safety and discussed purchasing a weapon due to fear of defendant and his friends); *see also* (Exhibit No. 38, Vicky Holloway Dec., at 2) ("During lunch the jurors discussed aspects of the case and their feelings toward Rejon for having killed a white man. My husband told me that many of the jurors thought they had to get rid of Rejon because he killed one of their own, a white man.").

### iv. The Circumstances of Rejon Taylor's Case Warranted Probing Questions from Defense Counsel to Identify and Eradiate Racial Bias from the Jury Pool

Defense counsel representing any Black client facing the death penalty should engage in probing questions on race given the empirical research demonstrating that capital punishment is intimately bound to race. *See Turner v.*

*Murray*, 476 U.S. 28, 35 (1986) (plurality opinion) (defendants in interracial murders are entitled to question potential jurors about possible racial bias); *see also* (Exhibit No. 4, Destiny Peery, Ph.D., Report, at p. 6) (citing study where white jurors, specifically white male jurors, "weighed aggravating circumstances more heavily and were reluctant to attach significance to mitigating circumstances for Black defendants compared to White defendants"); Stephen B. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty*, 35 Santa Clara L. Rev. 433, 439-42 (1995) (examining historic relationship between racial violence and the death penalty, and describing how racial prejudice continues to influence capital sentencing decisions); William S. Lofquist, *Putting Them There, Keeping Them There, and Killing Them: An Analysis of State-Level Variations in Death Penalty Intensity*, 87 Iowa L. Rev. 1505, 1535 (2002) (presenting social science data correlating death penalty intensity with race-specific factors); *see also* (Claim No. 8, FDPA-Racially Discriminatory Claim).

It is especially important to eradicate bias in capital cases involving a Black defendant and a majority white jury pool. *See* Justin J. Exum, *Should Death Be So Different?: Sentencing Purposes and Capital Jury Decisions in an Era of Smart on Crime Sentencing Reform*, 70 Ark. L. Rev. 227, 243-44 (2017) (explaining that racial bias can cause predominately white juries to give diminished effect to mitigating evidence when the defendant is black and inappropriately add weight to aggravating factors when the victim is white); (Exhibit No. 4, Destiny Peery, Ph.D.,

Report, at p. 6) (citing multiple studies where white jurors, particularly white male jurors, are more inclined to vote for death when the defendant is Black and to discount mitigating evidence). Disparities in sentencing for Black defendants is exacerbated when the victim is white. *See* Craig Haney, *Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide*, 53 DePaul L. Rev. 1557, 1560 (2004) (noting that Black capital defendants are over-punished when charged with killing white victims); *see also* (Claim 2.c., Juror Bias Claim).

Here, defense counsel's failure to meaningfully question jurors on potential racial bias given the unique circumstances of Rejon's case constituted deficient performance. *See United States v. Birchette*, 908 F.3d 50, 57 (4th Cir. 2018) (stating that voir dire can help identify racially biased jurors [and remove them] before they reach the jury).; *see also* Susan Mormino, *Exploring Racial Prejudice on Voir Dire: Constitutional Requirements, and Policy Considerations*, 54 B.U. L. Rev. 394, 418 (1974) (noting that trials with racial overtones require extensive voir dire examination as to racial prejudice). Moreover, Rejon's jury pool was drawn from predominately white communities with ongoing histories of racial tension and violence. Of the 12 jurors selected, seven were from Hamilton County, four were from Bradley County, and one was from Meigs County.[6] Of the six alternate jurors,

---

[6] Exhibit No. 47 (Juror S.B. Questionnaire, Hamilton, 23 yrs.); Exhibit No. 48 (Juror J.B. Questionnaire, Hamilton, 36 yrs., 6 mos.); Exhibit No. 49 (Juror R.B. Questionnaire, Hamilton, 40 yrs.); Exhibit No. 50 (Juror J.H. Questionnaire, Hamilton, 44 yrs.); Exhibit No. 45 (Juror T.H. Questionnaire, Hamilton, 40 yrs.); Exhibit No. 51 (Juror H.S. Questionnaire, Hamilton, 44 yrs., 7 mos.); Exhibit No. 52 (Juror O.W. Questionnaire, Hamilton, 54 yrs.); Exhibit No. 53 (Juror G.C.

five were from Hamilton County, and one from Bradley.[7] Most of the jurors had spent three or four decades in their home counties, some their entire lives.[8]

For over a century, Hamilton County has grappled with its legacy of racial terror after the 1906 lynching of Ed Johnson. Julissa Treviño, "Public Sculpture in Tennessee Will Memorialize Lynching Victim," *Smithsonian*, April 18, 2018. The lynching marked the boiling point for racial hostility within the community. At the time of Rejon's trial, Hamilton County had not yet confronted nor reconciled its legacy of racial terror. In 2008, when asked about the history of racial terror in a Hamilton County community, a resident born and raised in the county acknowledged that the racism was still very strong in the community. *See* Carrie A. Russell, *Reckoning with a violent and lawless past: A study of race, violence and Reconciliation in Tennessee* (Aug. 2010), (unpublished Ph.D. dissertation, Vanderbilt University) (on file with Vanderbilt University Library), at 256. The resident conceded that Black people were not welcome in certain areas. (*Id.*).

Race relations were similarly troubling in the other jurors' resident counties. Less than five percent and one percent of residents were Black in Bradley and Meigs Counties, respectively. U.S. Census Bureau, 2010 Census. At least one

---

Questionnaire, Bradley, 62 yrs.); Exhibit No. 54 (Juror A.C. Questionnaire, Bradley, 37 yrs.); Exhibit No. 55 (Juror G.E. Questionnaire, Bradley, 49 yrs., 7 mos.); Exhibit No. 56 (Juror A.G. Questionnaire, Bradley, 28 yrs., 6 mos.); Exhibit No. 57 (Juror C.G. Questionnaire, Meigs, 35 yrs.).

[7] Exhibit No. 58 (Juror D.B. Questionnaire, Hamilton, 23 yrs.); Exhibit No.59 (Juror C.B. Questionnaire, Hamilton, 33 yrs.); Exhibit No. 60 (Juror A.C. Questionnaire, Hamilton, 44 yrs.); Exhibit No.61 (Juror J.H. Questionnaire, Bradley, 36 yrs.); Exhibit No. 62 (Juror E.H. Questionnaire, Hamilton, 51 yrs.) Exhibit No. 63 (Juror L.P. Questionnaire, Hamilton, 17 yrs.).

[8] *Id.*

lynching was reported in Meigs County. *See* Lynching in America: Confronting the Legacy of Racial Terror; Supplement: Lynchings by County, 6, https://eji.org/sites/default/files/lynching-in-america-second-edition-supplement-by-county.pdf . Furthermore, the white jurors from Bradley and Meigs had little exposure to Black people, and studies show that lacking exposure to difference, people tend to rely on negative stereotypes to form judgments of others. *See Looking Across the Empathic Divide* at 588; *see also* (Claim No. 12, IAC-Failure to Object to Improper Language Claim).

### v. Trial Counsel's Failures During Voir Dire Subjected Rejon to a Biased Jury Incapable of Serving Impartially

Defense counsel's superficial questioning during voir dire exposed Rejon to constitutionally impermissible levels of bias. The prejudice to Rejon is clear: Due to trial counsel's inadequate voir dire, jurors who harbored death penalty and racial biases convicted and sentenced Rejon to death in violation of his right to an impartial jury. This prejudice created a structural error that warrants a new trial. *See Morgan*, 504 U.S. at 739.

### d. Failure to Conduct a Thorough Mitigation Investigation That Complied with Prevailing Professional Norms, as Required by the Sixth Amendment

Trial counsel were constitutionally ineffective in their failure to investigate and present powerful mitigating evidence. A reasonable mitigation investigation would have revealed that Rejon was exposed to chronic, direct and indirect life-threatening violence throughout his developmental years, including gun violence; was subjected to profound neglect and developed disturbed attachment and coercive

relationship; that his family legacy of intergenerational trauma adversely effected Rejon's mental health; and that debilitating neurological, psychological, and functional impairments resulted. A reasonable mitigation investigation and presentation would have also established that the signature qualities of youthful immaturity – including impulsivity, the inability to fully appreciate consequences, and being highly susceptible to peer pressure and other negative influences – were especially present for Rejon when he was 18, meaning that he was not among the "worst of the worst" offenders for whom the death penalty is reserved. All of this evidence was readily available and would have powerfully supported a life sentence. But, because of defense counsel's deficient performance, the jury and this Court heard almost none of it. Had counsel presented this evidence, there is a reasonable probability that the outcome would have been a life sentence.

In capital cases, defense counsel has "an obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000). To render constitutionally effective assistance, counsel's "investigation[] into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 523 (quoting 1989 ABA Guidelines) (emphasis in original). Counsel renders deficient performance when failing "to investigate, research, or collect pertinent records regarding Petitioner's background or history for mitigation" and failing to "locate significant persons from

Petitioner's past who may have provided valuable testimony regarding mitigating factors." *Powell v. Collins,* 332 F.3d 376, 399 (6th Cir. 2003).

The Sixth Circuit has long recognized that defense counsel has a constitutional duty in capital cases to adhere to "the prevailing standards at the time of [defendant's] trial," and that for those standards, courts may look to the "ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases." *Hamblin v. Mitchell*, 354 F.3d 482, 486-88 (6th Cir. 2003). Further, that the "[n]ew ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence. The 2003 ABA Guidelines do not depart in principle or concept from *Strickland, Wiggins* or our court's previous cases concerning counsel's obligation to investigate mitigation circumstances." *Id.*

According to these widely recognized standards, part of counsel's duty to conduct a thorough investigation includes the duty to follow-up on evidence suggesting a troubled home life or emotional difficulties growing up. *See Wiggins*, 539 U.S. at 525. Defense counsel also perform deficiently when they fail to uncover significant mental health or neurological impairment mitigation as a result of an inadequate mitigation investigation. *See, e.g., Sears v. Upton*, 561 U.S. 945, 949 (2010) (per curiam); *Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (per curiam). And counsel's "'investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities.'" *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting 1982 ABA Guidelines).

The Supreme Court has "long . . . referred to the[] ABA Standards as 'guides to determining what is reasonable.'" *Id.* (citations and additional quotation marks omitted); *see also Padilla*, 559 U.S. at 366 ("We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable.'") (Citations and internal alterations omitted). The foregoing cases rely on older version of the ABA guidelines because those were the Guidelines in place at the time of the trials in those cases.

The ABA 2003 Guidelines, in place at the time of Rejon's trial, elaborate further on these points. The Commentary to Guideline 10.7 notes that "[c]ounsel's duty to investigate and present mitigating evidence is now well established," and that "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history," beginning with the moment that defense counsel begins the representation. Specifically, counsel must explore:

> (1) Medical history, (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage); (2) Family and social history, (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.,* failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities); (3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities; (4) Military service (including length and type of service, conduct, special training, combat exposure, health and mental health services); (5) Employment and training history (including skills and performance, and barriers to

47

employability); [and] (6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

*Id.*

The Commentary to Guideline 10.7 further explains:

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. Records—from courts, government agencies, the military, employers, etc.—can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children. A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

*Id.*

Here, defense counsel failed to investigate and uncover "all reasonably available mitigating evidence," *Wiggins*, 539 U.S. at 523, and failed to present that evidence to the jury. As a result, counsel failed to provide the jurors with "a more nuanced understanding of [Rejon's] psychological background" and life story. *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008). Instead, the jury and this Court heard only an incomplete and inaccurate picture of Rejon's life history and mental health mitigation. *See Haliym v. Mitchell*, 492 F. 3d 680,713 (2007) (reasoning that not only did counsel fail to follow up on avenues of investigation that "would have

48

produced valuable mitigating evidence," but counsel introduced evidence that was inconsistent with defendant's experiences of familial trauma).

Defense counsel's presentation of lay witness testimony during the penalty phase reflected the quality of their mitigation investigation: disorganized and incomplete. "[A]t sentencing, I was supposed to communicate that Rejon was a sympathetic figure with redeeming qualities who had a family who loved him." (Exhibit No. 5, Leslie Cory Dec., at 10). *See Johnson v. Bagley*, 544 F. 3d 592, 604 (2008) (finding prejudice where counsel painted defendant's upbringing as positive and arguing that by doing so, defense had "misled the jury" into believing that [the defendant had been] raised…properly" and had his needs provided for). Prior to Rejon's case, Ms. Cory "had never seen a capital sentencing proceeding." (*Id.* at 7), yet lead counsel put her in charge of the presentation of lay witnesses during the penalty phase. (*Id.*). Without a thorough investigation, counsel's approach to presenting mitigation lacked cohesion. "I did nothing to back up Dr. Cunningham's testimony and in fact, may have limited it." (*Id.*). Specifically, Ms. Cory presented positive information about Rejon's "normal childhood," whereas Dr. Cunningham presented negative information about Rejon's family's pervasive criminality and Rejon's early introduction to criminal behavior. *See Johnson*, 544 F. 3d at 605 ("it is unreasonable, after an incomplete investigation, to put an expert on the stand who will 'directly contradict[] the sole defense theory' and 'render worthless' other helpful testimony."). Despite the centrality of investigating and identifying the client's life story in preparation for a capital trial, defense counsel never learned

49

Rejon's life story. (Exhibit No. 5, Leslie Cory Dec., at 7) ("No one ever produced a comprehensive social history of Rejon's life.").

After an incomplete and superficial mitigation investigation, Ms. Cory selected six members of Rejon's mother's family to testify: Tonya Walton, Tuawanna Walton, Stanley Gatlin, Felicia Gatlin, Tayanau Nunez, and Eva Williams. *See* (Doc. 900, PageID #7207-08, p. 2-3); Ms. Cory explained, "all I had to go on was my notes from my visits with Rejon's family and conversations with Dr. Loring and Roy Cooper's interview notes…" (*Id.* at 9). Later, when Ms. Cory requested Dr. Loring's "entire work product;" Ms. Cory "received only seven pages." (*Id.*). During the investigation, counsel failed to ask family members about key areas of mitigation. *See Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005) (finding deficient performance where counsel only interviewed defendant and a few family members, but failed to develop leads to additional mitigating evidence); *see also Foust v. Houk*, 655 F. 3d 524, 530 (6th Cir. 2011) (deficient performance where counsel failed to prepare defendant's parents and other family members to testify in at penalty phase). As a result, Rejon's family members were unclear of their role in the hearing and did not know what to testify about.

Tonya Walton, Rejon's maternal aunt, testified about the names of Rejon's immediate family members, including her three daughters, and mentioned that they all temporarily lived together. (Doc. 900, PageID #7338-42, p. 133-37). In response to direct questioning, Ms. Walton described Rejon as "[a] good child, quiet…He didn't talk a lot. He didn't get into trouble." (*Id.* at #7343, p. 138). She

testified that he was "easygoing" and would "do anything for you." (*Id.* at #7344, p. 139). "I never had any trouble out of him, never." (*Id.* at #7346, p. 141). When Ms. Cory asked if Rejon had "a pretty normal childhood," Ms. Walton acquiesced. (*Id.* at #7347, p. 142).

Tuawanna Walton, Rejon's maternal cousin, identified the Atlanta neighborhood where her family and Rejon's lived together (Gresham Park), described Rejon and his older brother John's personalities, and mentioned Rejon's budding entrepreneurship. *See* (*id.* at #7350-67, p. 145-62). She described her cousin as "always respectful. He never talked back to his mom, to his grandmother, to my mother…" and that "[h]e was loving." (*Id.* at #7354-55, p. 149-50). Ms. Cory then switched course, asking, "I don't mean to take you by surprise, but could you tell us what it would mean to you to lose Rejon?" (*Id.* at #7355, p. 150). The government objected; the parties' argument over the objection eclipsed the paltry testimony Ms. Cory obtained from Tuawanna, both in length and substance. *See* (*id.* at #7356-64, p. 151-59). Prevented from inquiring about the impact of Rejon's execution, Ms. Cory awkwardly asked Tuawanna, "You knew him as a teenager. If you were to tell somebody, like a job interview or something, what Rejon Taylor's talents were –." (*Id.* at #7364-65, p. 159-60). Like her mother before her, Tuawanna mentioned Rejon's computer skills in making programs for the family's church and described him as "a very smart individual, very smart." (*Id.* at #7365, p. 160). The government had no questions.

Rejon's maternal uncle, Stanley Gatlin's testimony also lasted only five

pages. He testified that Rejon "was a great kid. I never seen him angry," adding that Rejon was "always just in his room playing different games or outside. But he was a caring person to...everyone..." (*Id.* at #7370, p. 165). Describing Rejon's personality as a child, Mr. Gatlin said, "I wouldn't say he was a leader or nothing like that, because he was young, just – like most kids go out with their friends, get into playing different games and stuff like that." (*Id.* at #7371, p. 166). And when Ms. Cory asked whether Rejon or his brother John was more of a "disciplinary problem," he responded somewhat uncomfortably, "if you're going to use that word, I would say...Rejon was the quiet one. (*Id.*). In describing the impact of Rejon's father's incarceration, Stanley stated, "Well, I don't think he was-- He couldn't have been a father to either one of them, because he was away, incarcerated, most of their young life." (*Id.* at #7372, p. 167). Ms. Cory failed to ask any follow-up questions about Rejon's father's incarceration. *See* (*id.*). Stanley then described Rejon's talents in high school, stating that he had a mobile car wash business. Again, the government declined to conduct a cross examination. *See* (*id.* at #7373, p. 168).

Felicia Gatlin, Rejon's maternal aunt through marriage, testified to knowing Rejon as a child and described his childhood relationship with her son, who was close in age to Rejon. *See* (*id.* at #7375, p. 170). She testified that Rejon was "always kind, you know, polite. He was not boisterous. He was kind of just a gentle, sweet kid..." (*Id.*). Without context, Ms. Cory inquired whether Ms. Gatlin thought of Rejon as "sneaky," she replied, "Oh, no, no, never." (*Id.* at #7376, p. 171). Felicia

reported that when she had kidney failure, Rejon came to see her, and "he just broke down and cried. And it was just – he was about 12. You know, that wasn't that common for you to see a 12-year-old boy – you know. And that's just how kind and sensitive he was, you know." (*Id.*). Abruptly switching course, Ms. Cory asked about Rejon's strengths, to which Felicia replied, he would "maybe go on to become a computer professional." (*Id.*). The government's only two questions of Ms. Gatlin were to name her son and whether she knew Leonard Gatlin. *See* (*id.* at #7377-78, p. 172-73). She did not. *See* (*id.*).

Rejon's maternal cousin, Tayanau Nunez's testimony lasted only five pages. *See* (*id.* at #7391-97, p. 186-92). After Ms. Nunez identified her familial relationship to Rejon, Leslie Cory elicited from her that Rejon was "nice," "quiet," "sweet," and "very caring." (*Id.* at #7390, 7395, p. 185, p. 190). Even though Ms. Nunez, her mother, and her sister temporarily lived with Rejon and his family, Ms. Cory garnered only brief, superficial information about that period: "We got along well as a family. I mean, every family, I guess, have their outs and in. But we got along for the vast majority, great as a family. No arguing, no bickering." (*Id.* at #7394, p. 189). The government did not bother to cross examine her. *See* (*id.* at #7397, p.192).

Ms. Cory's questioning of Rejon's maternal grandmother, Eva Williams, lasted six pages. She testified that she helped raised Rejon. *See* (*id.* at #7398-7403, p. 193-198). For work, Ms. Williams stated: I "[t]ook care of people like myself, senior citizens, worked with them, 12 hours, 6 hours, 8 hours, whatever." (*Id.* at #7398, p. 193). She noted that she had 12 grandchildren, and that when Rejon was

growing up, he lived with her "[a] lot of the times." (*Id.* at #7399-7400, p. 194-95).

Ms. Williams said that Rejon liked to work with "computers and typewriters and stuff like that" and that he was a "very good, mannerable child, easy to obey…" (*Id.* at #7400-01 p. 195-96). Ms. Cory then stated, "I've heard that you were the family disciplinarian," asking, "Did you ever have to discipline Rejon?" (*Id.* at #7401 p. 196). To this, she responded "Well, yes. You could just promise to do it to him, and he would calm down from whatever it is." (*Id.*). Ms. Cory did not ask any questions about the reasons for or nature of discipline. Instead she continued, "Okay. So you didn't ever have to actually punish him; you just threatened to punish him—" to which Ms. Williams shook her head from side to side. Ms. Cory continued: "– and that would bring him into line?" (*Id.*). Grandma Eva responded affirmatively. *See* (*Id.*). After Ms. Williams described Rejon as a "good" child, Ms. Cory posed, "So he never let you down?" (*Id.* at #7403, p. 198). Ms. Williams did not respond to this question, instead she repeated how easygoing of a child he was. *See* (*id.*). The government again had no questions.

In sum, the six life history witnesses testified that Rejon was a quiet, sensitive, and generous child, his father was incarcerated most of his childhood, his mother worked multiple jobs, his grandmother helped watch him, and he enjoyed computers and had entrepreneurial aspirations. This account barely scratched the surface of the profound neglect and instability that Rejon experienced during his developmental years and it failed to touch upon Rejon's exposure to violence, including gun violence, trauma, and the destabilizing impact the confluence of these

factors had on his still developing adolescent brain. The collective testimony was also silent as to the family's legacy of trauma and how it negatively impacted Rejon's developmental pathways. Without a thorough mitigation investigation, the jury never heard how Rejon's family's transition from enslavement to sharecropping to domestic work for white families and the critical challenges they encountered adversely impacted Rejon's developmental years. *See Carter v. Bell*, 218 F.3d 581, 599-600 (6th Cir. 2000) (finding prejudice where counsel failed to present available evidence of defendant's childhood neglect, family history, limited education, and mental health issues).

Without a thorough mitigation investigation, the mental health evidence that defense counsel presented during the sentencing hearing was inaccurate, harmful, and failed to explain or contextualize Rejon's troubled background, his serious impairments, or the impact those had on his conduct. Dr. Cunningham testified that he met briefly with 11 family members, some for only 15 or 35 minutes, that he reviewed the school and correctional records counsel provided him, and Rejon's family's criminal records. *See* (Doc. 901, PageID #7460-61, p. 53-54). Because Dr. Cunningham did not have access to Rejon's complete school records or thorough mitigation interviews, he testified inaccurately that Rejon "[w]asn't bouncing a lot between schools." (*Id.* at 7479, p. 72). Dr. Cunningham also offered confusing testimony about Rejon's age. "[T]here are two different dates of birth in his record…And so he was either 18 years 10 months at the time of the offense or he was 19 years old and about a month. So, depending on which birthday you're

looking at, either 18 or 19." (*Id.* at #7491, p. 84). Rejon only had one birthdate, which Dr. Cunningham and defense counsel never confirmed. *See* (Exhibit No. 5, Leslie Cory Dec., at 12) (noting that the team never obtained Rejon's birth certificate). Although Dr. Cunningham testified that Rejon's brain had not yet fully developed at the time of the crime, (*id.* at #7492-7501, p. 85-94), such evidence was eclipsed by Dr. Cunningham's reductive, prejudicial, and inaccurate testimony that Rejon was destined to be a criminal because "everybody in the family system…had a criminal record." (*Id.* at #7505, p. 98). Dr. Cunningham also testified that Rejon's criminal conduct was inevitable because of "generational patterns" within his family that included "alcohol or drug abuse," "children out of wedlock," and "antisocial or criminal behavior." (*Id.* at #7505-06, p. 98-99).

In fact, a year after Rejon's trial, this Court recalled Dr. Cunningham's testimony as: "[Rejon's family was] one of the most dysfunctional and criminal families that [Dr. Cunningham] had ever encountered, and he talked about the history of violent crimes, prison sentences, illegitimacy, not working, and complete social dysfunction and breakdown." *United States v. Reba Taylor*, No. 1:07-138, (Tr. 8, Aug. 20, 2009). Because defense failed to conduct a thorough mitigation investigation, counsel's penalty phase presentation failed to identify Rejon and his family's human frailties and failed to provide context and nuance to their struggles. Instead, defense counsel's presentation supported the government's evidence of aggravation. After trial, one juror lamented: "We tried to have sympathy for him, but just couldn't find it." (Doc. 794-1, p.1).

Had defense counsel conducted an adequate investigation for all reasonably available mitigation, the jury would have heard information from Rejon's siblings, parents, cousins, aunts, and uncles, as well as neighbors, friends, and classmates about the powerful evidence summarized below and in the social history, *see* (Exhibit No. 3, Hope Hill, Ph.D., Social History), which was not presented to the jury or to this Court. These witnesses were available and willing to testify, but counsel either failed to ask them basic questions about Rejon's emotional neglect, exposure to violence, and instability, or failed to even contact them. Had counsel thoroughly investigated Rejon's case, their powerful accounts would have been confirmed by contemporaneous records, including records documenting that Rejon lacked stability (he attended ten schools in eleven years), that disabling stressors rendered Rejon's adult caretakers both unavailable and ill-equipped to care for him, and that violence pervaded Rejon's home and community. Witnesses' accounts would have also been corroborated by expert testimony detailing Rejon's neurological impairments and psychosis due to profound neglect and trauma. *See* (Exhibit No. 1, George Woods, M.D., Report); (Exhibit No. 2, Katherine Porterfield, Ph.D., Report).

> **i. Trial Counsel's Constitutionally Inadequate Life History Investigation, Including Inadequate Retention of Mental Health Experts**

As noted, prevailing professional norms required trial counsel to conduct a thorough investigation into Rejon's life history drawing from all reasonably available information. Counsel was familiar with the ABA 2003 Guidelines and

recognized them as setting forth the standard of adequate representation. Trial

counsel invoked the sentiments of the ABA 2003 Guidelines in its motions to this

Court. On July 26, 2006, almost two years after their appointment, the defense filed

an *ex parte* motion with the Court seeking support services. In it, they requested

$15,000 for a mitigation specialist, Dr. Martha ("Marti") Loring "to continue the

mitigation investigation" that Mr. Cooper had conducted. (Doc. 140(a), p. 7) (noting

her rate of $120 an hour for a total of 125 hours). Counsel specified that Dr. Loring

would:

> [O]btain evidence regarding all aspects of Mr. Taylor's character, record,
> and the in depth investigation of Rejon Taylor's family, cultural and
> patterns of behavior that would be transmitted inter-generationally and
> investigate and present a reliable social medical, psychiatric and
> educational history of Rejon Taylor himself. The development of a basic
> social history calls for extensive interviews of Rejon Taylor, as well as
> his family members and others who have observed him over time and
> during critical periods, including physicians, mental health specialists,
> law enforcement officials, social service providers, teachers, neighbors,
> peers and clergy.

*See* (Doc. 134, p. 11) (Ex Parte Motion for Support Services). In fact, Dr. Loring, who

began consulting on Rejon's case in December 2006, recalled that counsel "made

clear that the consultation was because they were aware that the ABA Guidelines

required the participation of a 'mitigation specialist' and they wanted me on board

to cover that role." (Exhibit No. 10, Martha Loring Dec., at 7).

Despite this recognition, counsel unreasonably researched only a "narrow set

of sources" which provided only a "rudimentary knowledge of" Rejon's life history.

*Wiggins*, 539 U.S. at 524. Trial counsel's investigation into Rejon's life history drew

principally from three sources: (a) certain of Rejon's school and medical records; (b)

brief interviews with certain maternal family members; (c) criminal and incarceration records from the Hamilton County Jail (after the crime occurred) and from his father, John Taylor. Trial counsel failed to follow up on obvious red flags in the records they obtained and failed to ask lay witnesses basic questions about Rejon's life history. As a result, they failed to uncover, or present to the jury, an accurate picture of Rejon's traumatic life history or of his neurodevelopmental and mental health impairments.

Prior to trial, the defense team collected records from the Hamilton County Jail; the DeKalb County School System; the Atlanta Public Schools; and portions of John Taylor's criminal record. These records – had counsel thoroughly reviewed them – could have been a valuable source for investigative leads and mitigating information. For example, Rejon's school records indicated that he attended five different high schools in three years, which should have flagged for counsel that something disruptive was happening in his life during these years (ages 14 to 17). John Taylor's incarceration records revealed that when Rejon's father was reincarcerated in 1997, shortly before Rejon's fourteenth birthday, Rejon began to act out disruptively in school, something he had not done prior. This should have triggered in depth inquiry from counsel about Rejon's behavioral changes and mental health, and about what transpired during the years that Mr. Taylor was out of prison and partially cohabitating with his son for the first and only time. Counsel could have inquired about these issues with lay witnesses.

Defense counsel's approach to investigating lay witnesses was to contact

Reba Taylor and asked her to gather family members in her home for informal group interviews. This tactic limited the scope of the mitigation investigation to people Mrs. Taylor contacted, and curtailed counsel's ability to obtain sensitive information from witnesses. Indeed, the Sixth Circuit held that counsel's performance was deficient in *Jells v. Mitchell*, where counsel interviewed only a few family members, neglected to speak to other family members who were available, and "[w]hen speaking with the family members they did contact, their inquiry was brief and they failed to ask sufficiently probing questions," and missed uncovering compelling mitigating information. 538 F. 3d 478, 493 (6th. Cir. 2008). *See* ABA Supplementary Guidelines, 36 Hofstra L. Rev. at 689, Guideline 10.11(C) ("[t]eam members must conduct in-person, face-to-face, one-on-one interviews with…the client's family….Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.").

John Taylor II, Rejon's older brother, described the defense team's interactions with the family: "When Rejon's attorneys or someone from the defense team wanted to talk to us, they relied on my mom to call us and get us together. We met with them at my mom's house and at one of my businesses." (Exhibit No. 17, John Taylor II Dec., at 7). As a result, Mr. Taylor "only talked to people from the defense at a couple of group meetings, never individually." (*Id.*); *see also* (Exhibit No. 33, Tameka Shepard Dec., at 14) ("When Bill or another member of Rejon's defense team came to Atlanta, they called Re[ba] and asked her to gather her family

members.") and (Exhibit No. 8, Roy Cooper Dec., at 2) (describing June 2005 trip where he interviewed Rejon's mother, brother, sister, and two other family members at once). Rejon's maternal uncle, Joseph Gatlin recalled a pretrial meeting with the lawyers at his sister's house in Atlanta: "The lead attorney took the floor and talked down to me and my family. He was not encouraging. His attitude was that he had all the answers and it was off-putting." (Exhibit No. 18, Joseph Gatlin, at 13).

Harold Hall, Reba Taylor's longtime companion stated, "I saw some of Rejon's attorneys…at Reba's home during a meeting with his defense team. However, the defense team did not contact me directly to speak with me about Rejon, Reba, or the Taylor family." (Exhibit 14, Harold Hall Dec., at 11). Ramon Shepard, Rejon's brother-in-law, described the situation similarly: "Rejon's defense team did not contact me personally or request an interview, even though I have been in Rejon's life since Rejon was about six-years-old. I was present during some of the family meetings that Rejon's defense organized through Reba Taylor, but they did not ask me questions." (Exhibit No. 26, Ramon Shepard Dec., at 9). Without an individual meeting, the defense did not ask Ramon "to share…information about Rejon and his family. The defense did not ask [him] to testify." (*Id.*). "I was willing to testify on Rejon's behalf without hesitation, but the lawyers did not ask me." (*Id.*). Similarly, Mr. Gatlin offered, "[h]ad Rejon's defense lawyers asked me to testify and explained what they wanted me to testify about, I would have testified." (Exhibit No. 18, Joseph Gatlin Dec., at 13). However, instead of inquiring about mitigation information, counsel's focus was often on obtaining assistance from the family to

convince Rejon to accept the government's plea offer. Bill Ortwein "was constantly trying to convince us to make Rejon take the plea. After I heard what he said about my brother not ever seeing the light of day again, I was done with Bill." (Exhibit No. 33, Tameka Shepard Dec., at 13-14).

Defense counsel relied primarily on Roy Cooper and Dr. Marti Loring to interview mitigation witnesses. In December 2004, Mr. Cooper interviewed Rejon's mother shortly after the Court appointed counsel. *See* (Exhibit No. 8, Roy Cooper Dec., at 2). At that time, Mr. Cooper collected an "initial life history on Rejon," which included that Rejon's father's family had a history of mental disorders. *See* (*Id.*). Beyond talking to Rejon's father twice, defense counsel never spoke to anyone else from Rejon's father's family despite their availability and willingness. *See* (*id.* at 3) (mentioning June 2005 meeting with John Taylor) and (Exhibit No. 10, Marti Loring Dec., at 8) (describing telephone interview with John Taylor in July 2008). During both these conversations, Mr. Taylor mentioned getting physical with Mrs. Taylor. (*Id.*). These limited conversations offered valuable investigative leads; that counsel failed to follow up on these leads fell below an objective standard. *See Harries*, 417 F.3d at 639 (finding deficient performance where "[c]ounsel's failure to follow…leads leaves no 'room for debate' that their truncated investigation was deficient.").

In February 2006, the defense team produced a timeline, purporting to be a comprehensive chronology of Rejon's life. *See* (Exhibit No. 64, Rejon Timeline); *see also* (Exhibit No. 10, Marti Loring Dec., at 2) (describing that when she joined the

team, her role was confined to working off Mr. Cooper's "completed" timeline);
(Exhibit No. 8, Roy Cooper Dec., at 3) (identifying the thirty-nine event timeline).
The document was eight pages long and contained limited information of Rejon's
father's incarceration history, a few of Rejon's doctor's appointments when he was
an infant, his disciplinary write-ups from two years of high school, and Stephanie
Belcher's – the victim's friend – filings with probate court. *See* (Exhibit No. 64,
Rejon Timeline). The document is shocking in its brevity and omissions. Although
Rejon was only 18-years-old at the time of the crime, the timeline had two five-year
gaps in it, meaning the timeline accounted for less than half of Rejon's brief life. *See*
(*Id.* at 2). No competent counsel would have supervised the production of or relied
upon such a flimsy document, particularly relative to the plethora of information
that was available at the time. *See Foust*, 655 F.3d at 535 (deficient performance
not to gather evidence of petitioner's childhood "is amplified by the relative recency
of [petitioner's] childhood, given that [he] was only twenty-four when he committed
the crimes.").

Dr. Loring produced seven pages of notes based on her interviews with Rejon
and his family. *See* (Exhibit No. 5, Leslie Cory Dec., at 9). When Dr. Loring
attempted to interview Rejon, Mr. Cooper restricted her access. (Exhibit No. 10,
Marti Loring Dec., at 2). Ultimately, Dr. Loring's "assessment [of Rejon] was
incomplete" because she could not conduct "multiple interviews consisting of many
hours [with the] opportunity to obtain a full history and observe the client's trauma
and psychosocial symptoms, in accord with professional standards." (*Id.*). The

63

defense team similarly limited Dr. Loring's access to social history witnesses. "I had to fight the team to gain access to Rejon's parents, because the team did not consider the parents to be part of my assignment." (Exhibit No. 10, Marti Loring Dec., at 1).

When Dr. Loring finally met with Rejon's mother and grandmother, Mr. Cooper "insisted…on controlling" the meetings and prevented Dr. Loring from building necessary rapport. (*Id.*). During the interviews Mr. Cooper "talked about himself and his accomplishments, he physically indicated impatience (foot tapping, hand gestures), and sometimes verbally expressed impatience with my process. He would overtly say, 'let's go.'" (*Id.*). Dr. Loring reflected, "I really had to struggle to work around Mr. Cooper to begin doing my job." (*Id.*). Despite the defense team's insistence that the mitigation investigation was complete, Dr. Loring recognized that "[t]his meeting with Mrs. Taylor was, based on my training, only an initial contact. We did not begin to discuss difficult topics or any family secrets; it would not have been appropriate to do so either in the initial meeting or with Mr. Cooper present." (*Id.*).

Despite Dr. Loring's limited contact with Rejon and his family, she accurately recognized that Rejon exhibited signs and symptoms of trauma during his developmental years. When Dr. Loring asked Rejon's mother about his response to surprising events as a child, Reba responded that Rejon "had a high startle response as a child." (*Id.* at 6). Moreover, Dr. Loring noted that "Rejon's sister Tameka visibly tensed when asked about the domestic violence between her mother

and Rejon's father, "she had tears in her eyes as she spoke of the violence she witnessed, including an attack on her mother where her mother was cut above her eye requiring stitches." (*Id.*). On October 24, 2007, Dr. Loring memorialized her findings for the team, relating "the information [she] obtained from Rejon, his brother, his sister, and his uncle (all witnesses identified to [Dr. Loring] by Roy Cooper) that supported [her] belief that Rejon suffered from PTSD." (Exhibit No. 10, Marti Loring Dec., at 7) (noting her inability to talk to family members who Mr. Cooper had not already identified).

On July 7, 2007, Dr. Loring telephoned Rejon's father, John Taylor, who was incarcerated at the time. *See* (Exhibit No. 10, Marti Loring Dec., at 8). Like Rejon's mother, Mr. Taylor described Rejon as "a jumpy and quiet child," that was "nervous." (*Id.*). Mr. Taylor also admitted that while Rejon was living "with both parents, he witnessed them arguing violently – at least hearing their conflict through the walls." (*Id.*). Dr. Loring noted that when Mr. Taylor "said something aggressive toward Rejon…Rejon seemed fearful of his father and started crying." (*Id.*). He also recalled an incident when Rejon's brother "John pulled a gun on Rejon and Rejon seemed scared." (*Id.*).

Based on her limited interviews with Rejon's family, Dr. Loring "recommended that the team retain an expert in trauma to assist in developing this evidence," and provided a referral to a trauma expert. (*Id.*). Dr. Loring also informed "the team that additional interviews were needed, particularly of Rejon's sister Tameka Shepard and his grandmother Eva Williams regarding the violence

65

in the family." (*Id.*). Despite Dr. Loring's recommendations, counsel failed to develop this line of investigation and "did not follow up on retaining any…trauma experts." (Exhibit No. 5, Leslie Cory Dec., at 7). "An expert examination of the impact of trauma on a child's development requires that the expert have knowledge of the extensive body of research and clinical literature that addresses the deleterious impact of childhood traumatic stress on the developing child and adolescent." (Exhibit No. 2, Katherine Porterfield, Ph.D. Report, at 4). Such "[a]n expert with this knowledge is necessary not only for the proper analysis of the evaluation material, but also in order to conduct interviews that are trauma-focused and sensitive and designed to garner valid information." (*Id.*). The Sixth Circuit has found prejudice where "interviews conducted by counsel produced viable leads regarding [defendant's] poor mental health and troubled family background" and counsel failed to follow these leads. *Harries*, 417 F.3d at 639. Counsel's failure leaves no "room for debate" that their truncated investigation was deficient. *Id.*

Counsel similarly dropped the ball regarding Rejon's religious delusions, which he discussed immediately and openly with trial counsel. *See* (Exhibit No. 5, Leslie Cory Dec., at 2-4); (Exhibit No. 6, Howell Clements Dec., at 2-4); (Exhibit No. 8, Roy Cooper Dec., at 2-5). Specifically, that God would make all the proof against him disappear and irrationally insisting that he had nothing to lose by rejecting the government's plea offer and proceeding to trial. *See* (*id.*). Counsel also observed that Rejon seemed unable to process the information counsel provided him. *See* (Exhibit No. 5, Leslie Cory Dec., at 9). Moreover, at least two

66

people notified trial counsel that these observations warranted investigation, development, and mental health expert assistance. *See* (Exhibit No. 7, Richard Heinsman Dec., at 2) (describing Rejon's psychosis and dissociation as concerning, and consistent with brain impairment, and that he shared his observations with federal trial counsel) and (Exhibit No. 10, Marti Loring Dec., at 5) ("I attempted to explain to Mr. Cooper that Rejon's religiosity likely stemmed from mental impairment or the trauma of the violence he had witnessed as a child. I told Mr. Cooper that Rejon's beliefs could also reflect delusions.").

Despite the clear red flags and encouragement to investigate, counsel failed to explore the neurological sources of Rejon's delusions, psychosis, and processing problems, and failed to retain appropriate experts. *See Morales v. Mitchell*, 507 F.3d 916, 935 (6th Cir. 2007) (deficient performance where defense counsel failed to investigate possible neurological impairment despite available information suggesting such impairment existed); *see also Harries*, 417 F.3d at 638 (deficient performance where counsel failed to conduct a thorough investigation of defendant's mental health and failed to retain appropriate experts despite evidence of mental illness).

Prior to trial, defense counsel ignored additional red flags from Dr. Solovey indicating that Rejon displayed serious impairment impacting his ability to assist in his own defense. In 2005, Dr. Solovey administered a MacArthur Competence Assessment Tool to Rejon. The results demonstrated that Rejon was "incompetent to assist in his defense[,]" and that he "was experiencing religious delusions leading

up to and during his trial," indicating that he was "incapable of making informed decisions regarding his case." (Exhibit No. 9, Mark Cunningham Dec., at 4-5); *see also* (Exhibit No. 11, Caress Ushry Dec., at 1-2) (explaining that had defense counsel given Dr. Solovey critical information about Rejon's déjà vous experience, it might have changed his analysis of Rejon's delusions). However, counsel dropped the ball. Ms. Cory conceded: "At the time of trial, I was not familiar with the MacArthur Competency Assessment tool. I did not ask Solovey anything about Rejon's responses to that tool. In fact[,] other than one phone call, I do not recall having direct contact with Dr. Solovey about Rejon." (Exhibit No. 5, Leslie Cory Dec., at 3-4). *See Wiggins*, 539 U.S. at 525-26 (describing defense counsel's duty to further investigate troubling discoveries in defendant's record).

When it became apparent that "Dr. Solovey needed a comprehensive social history to complete his assessment" of Rejon, the team again dropped the ball. (Exhibit No. 5, Leslie Cory Dec., at 7). In fact, "no one completed a social history and thus the defense team did not provide one to Dr. Solovey." *Id.* The team ultimately did not use Dr. Solovey as a testifying expert nor present any of his findings to the jury. Defense counsel

### ii. The Impact of Trial Counsel's Constitutionally Inadequate Life History Investigation

Had counsel conducted a constitutionally adequate investigation into Rejon's life history and identify the appropriate experts, they would have been able to present the following, powerful evidence of Rejon's traumatic life history from family members, friends, and neighbors, including but not limited to Rejon's

exposure to life threatening violence throughout his childhood, profound neglect, chaotic instability, and symptoms of serious mental illness, resulting in developmental years that were "filled with abuse and privation." *See Williams*, 539 U.S. at 1515. As described below, the witnesses' accounts would have been confirmed by documentary records. *See Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006) (deficient performance where counsel had conducted some interviews with family and acquaintances, but where counsel "failed to conduct a thorough investigation of the petitioner's mental health and family background, despite indications of his mental illness and troubled childhood.").

Beyond the six family member witnesses who testified during the penalty phase, there were several other family members and friends willing to provide mitigating information when counsel met with them at Mrs. Taylor's home. However, counsel failed to ask these witnesses about the information they had to share. Given the wealth of mitigating information these witnesses were willing to provide, there is no strategy that would explain counsel's decision to not obtain and present the information. The Sixth Circuit has held "that strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a body of mitigating evidence. It is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover." *See Dickerson*, 453 F.3d at 696 (6th Cir. 2006).

Had counsel conducted thorough investigative interviews with the

individuals who attended defense team meetings at Reba Taylor's home, counsel would have uncovered compelling mitigating evidence. This included information from the individuals who did testify, including Tonya Walton and Tayanau Nunez;[9] as well as information from people who met with counsel, but who did not testify despite their willingness to share information: Ramon Shepard (Rejon's brother-in-law), Tameka Shepard (Rejon's older sister), Harold Hall (Reba Taylor's longtime companion), Joseph Gatlin (Rejon's maternal uncle), and John Taylor II (Rejon's older brother).[10] There were also additional members of Rejon's maternal family, and longtime family friends, whom counsel failed to contact, despite the witnesses' willingness and availability.[11] *See Powell*, 332 F.3d at 399 (deficient performance where counsel failed to interview "numerous family members and other individuals from Petitioner's past [who] were willing to testify on his behalf").

---

[9] Note that Eva Williams and Felicia Gatlin passed away in the years since trial. *See* (Exhibit No. 65, Eva Williams Death Certificate) and (Exhibit No. 12, Edward Gatlin Dec., at 7, 10-11).

[10] *See* (Exhibit No. 18, Joseph Gatlin Dec., at 13) ("Had Rejon's defense lawyers asked me to testify and explained what they wanted me to testify about, I would have testified…"); (Exhibit No.14, Harold Hall Dec., at 11) ("I would have testified…"); (Exhibit No. 26, Ramon Shepard Dec., at 9) ("I was willing to testify on Rejon's behalf without hesitation, but the lawyers did not ask me."); (Exhibit No. 33, Tameka Shepard Dec., at 14) ("We…wanted to help his case in any way that we could, but the defense attorneys did not give us an opportunity to do that."); (Exhibit No. 17, John Taylor II Dec., at 9) ("They did not ask me to testify on Rejon's behalf. I would have testified…").

[11] *See* (Exhibit No. 13, Felisha Gatlin Dec., at 4) (Rejon's maternal second cousin) ("No one representing Rejon contacted me…I would have been willing to speak with anyone representing Rejon and I would have testified…"); (Exhibit No. 12, Edward Gatlin Dec., at 12) (Rejon's maternal first cousin) ("No one representing Rejon during his 2008 trial contacted me directly. I should have testified."); (Exhibit No. 23, Nicole Gatlin Carson Dec., at 6) (Rejon's maternal first cousin) ("I would have been willing to speak with anyone representing Rejon and I would have testified…"); (Exhibit No. 30, Sandra Hines Dec., at 12) (Rejon's mother's lifelong friend and fellow church member) ("I would have been willing to talk to anyone representing Rejon…I would have been willing to testify…"); (Exhibit No. 28, Rosa Pat Moss Dec., at 12) (Rejon's mother's cousin who lived with Mrs. Taylor as a child) ("I would have been willing to talk with anyone representing Rejon Taylor and I would have testified to the information in this declaration."); (Exhibit No. 24, Pearl Rankins Dec., at 6) (same) ("No one representing Rejon Taylor contacted me…I would have testified to all I have said in this declaration…"); (Exhibit No.32, Sylvia Stokes Dec., at 5) (Rejon's mother's lifelong friend and fellow church member) ("I would have been willing to speak with anyone representing Rejon. I would have been willing to testify…").

Counsel's investigative failures are most striking relative to Rejon's father's family. After counsel met with Johnny Taylor and received information that his family had a history of mental disorders, counsel failed to conduct *any* investigation into Mr. Taylor's family, and then failed to present testimony from *anyone* in Mr. Taylor's family, despite their willingness and availability to testify.[12] *See Foust*, 655 F.3d at 535 (finding counsel ineffective where counsel failed to interview family members who could have provided mitigating information about defendant's upbringing, including "parental…neglect."); *see also Williams v. Anderson*, 460 F.3d 789, 805 (6th Cir. 2006) ("In addition to presenting the jury with mitigating evidence, the testimony of Petitioner's family and friends would have humanized Petitioner.").

Counsel's investigative failures extended to Rejon's non-family members, friends, neighbors, and classmates, all of whom could have provided vital life history information about Rejon. Here, not only did counsel not interview Rejon's friends, classmates, and neighbors, they never identified nor contacted them, despite these witnesses' willingness and availability to testify.[13] Indeed, the Sixth

---

[12] *See* (Exhibit No. 31, Sarah Harper Dec., at 3) (Rejon's paternal great aunt) ("I would have been willing to speak with anyone representing Rejon Taylor and I would have testified…"); (Exhibit No. 25, Precious Heflin Dec., at 3) (Rejon's paternal first cousin, once removed) ("I would have been willing to speak to anyone about Rejon and the things I have stated in this declaration."); (Exhibit No. 29, Saadia Heflin Dec., at 17) (Rejon's paternal first cousin) ("No one from the defense talked to me before Rejon's trial…I would have testified…"); (Exhibit No. 37, Vanessa Heflin Dec., at 7) (same) ("I would have talked to anyone representing Rejon, and I was easy to find…I would have testified…I do not have anything to hide about my family or about Rejon."); (Exhibit No. 21, Lisa Taylor Dec., at 7) (Rejon's paternal aunt) ("No one representing Rejon Taylor contacted me…I would have been willing to speak with anyone representing my nephew and I would have testified…"); (Exhibit No. 39, Walter Lee Taylor Dec., at 25) (Rejon's paternal uncle) ("No one representing Rejon Taylor ever spoke to me…I would have been willing to talk to anyone representing Rejon…I would have testified…").

[13] (Exhibit No. 40, Warren Almand, at 7) (retired DeKalb County Public School teacher and longtime

Circuit recognized that to avoid deficient performance, "it is necessary [for counsel] to locate and interview…virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others." *Dickerson*, 453 F. 3d at 694; *see also Powell*, 332 F.3d at 400 ("if counsel has actually conducted an investigation and produced pertinent witnesses, jurors would have heard first-hand accounts from those who knew Petitioner best.").

Had counsel conducted a thorough mitigation investigation, including interviewing these 25 additional available and willing witnesses, this is what the jury and this Court would have learned:

> From a young age, Mr. Taylor lived in a chaotic living environment. Mr. Taylor moved constantly between houses – including his grandmother's house, his father's house, his sister's apartment, his aunt's house, his cousin's apartment, his uncle's house and friends' houses with whom he stayed. Additionally, the most stable of his residences, his grand/mother's house, was characterized as being chaotic in that family members and others were in and out, staying varying amounts of time (Declarations of John Taylor, Harold Hall, Rosa Pat Moss, Tonya Walton, Tayanau Nunez, Sylvia Stokes, Sandra Hines, Pearl Rankins, Rashard Blackwell, and Tameka Shepard). There were also frequent interruptions in his education. Mr. Taylor attended ten schools in less

Gresham Park resident) ("No one from Rejon Taylor's defense team contacted me…If asked, I would have testified at the trial…"); (Exhibit No. 27, Rashard Blackwell Dec., at 3) (Rejon's neighborhood, childhood friend, and classmate) ("I would have been willing to speak with anyone representing Rejon and testified to this information."); (Exhibit No. 15, Jessica Jackson Langford Dec., at 9) (Rejon's friend, classmate, and first girlfriend) ("No one representing Rejon Taylor contacted me…I kept expecting to be contacted, but never was. I would have testified…"); (Exhibit No. 19, Jovante McCoy Dec., at 5) (Rejon's friend, neighbor, and classmate) ("No one representing Rejon Taylor contacted me…I would have been willing to speak with anyone representing Rejon and I would have testified…"); (Exhibit No. 22, Nedras Moreland Dec., at 8) (Rejon's friend and classmate) ("No one representing Rejon Taylor contacted me…I would have been willing to speak with anyone representing Rejon and I would have testified…"); (Exhibit No. 36, Traketa Taylor Dec., at 6) (Rejon's friend and classmate) ("I would have been willing to speak with anyone representing Rejon and I would have testified…"); (Exhibit No. 20, Keashawn Washington Dec., at 6) (Rejon's friend and classmate) ("I would have been willing to speak with anyone representing Rejon. I would have testified…").

than eleven years of schooling (School Records, Declarations of Sandra Hines, Rashard Blackwell, Joseph Gatlin, John Taylor II, Lisa Taylor, Traketa Taylor, Edward Gatlin, and Tameka Shepard). Therefore, routine and consistency were missing from his formative years.

Mr. Taylor's father was incarcerated and largely absent from his life until Rejon was almost eight-years-old. There was a second period of paternal abandonment when Mr. Taylor was thirteen (Declarations of John Taylor, Joseph Gatlin, Tameka Shepard, Tayanau Nunez, Jessica Jackson, Lisa Taylor, Nicole Gatlin Carson, Ramon Shepard, Tonya Walton, John Taylor II, Nedras Moreland and the Georgia Board of Pardon and Paroles record for John Taylor).

Family and community members repeatedly observed that Mr. Taylor's mother was generally not present in the home and did not supervise Mr. Taylor (Declarations of Tameka Shepard, Edward Gatlin, Joseph Gatlin, Ramon Shepard, Traketa Taylor, John Tayor, and Harold Hall). Family members observed that that he and his older brother were "watched" but not parented by their maternal grandmother and great-grandmother (Declaration of Edward Gatlin; but see Declaration of Harold Hall (indicating that grandmother was absent from the home Monday through Friday)). Mr. Taylor's developmental years were characterized by a lack of adult supervision (Declarations of Jessica Jackson Langford, Nicole Gatlin Carson, Traketa Taylor, John Taylor, Edward Gatlin, Joseph Gatlin, Ramon Shepard, and Harold Hall).

Mr. Taylor was repeatedly exposed to both domestic violence (Declarations of Tayanau Nunez, John Taylor, John Taylor II, Tonya Walton, Tameka Shepard, Ramon Shepard, Harold Hall, Lisa Taylor, and Walter Taylor) and violence within his wider community (Declarations of Tameka Shepard, Ramon Shepard, Edward Gatlin, Jessica Jackson Langford, Javante McCoy, Keashawn Washington, Traketa Taylor, Nedras Moreland, and John Taylor II). Additionally, Dr. Hill noted multiple incidents where Rejon was threatened with a gun either intentionally or unintentionally (Declarations of Ramon Shepard, Tameka Shepard, Lisa Taylor). Most notably as a very small child, Mr. Taylor was nearly shot, accidently, by his sister's then boyfriend (Declarations of Tameka Shepard, Ramon Shepard).

(Exhibit No. 1, George Woods, M.D., Report, at 5-6).

Mr. Taylor's maternal relatives exhibit unusual religiosity with content consistent with Mr. Taylor's religious delusions and fixation (Declarations and interviews of Harold Hall, John Taylor, Tameka

Shepard, Ramon Shepard, and John Taylor II; declarations of Sylvia Stokes, Sandra Hines, Jessica Langford, Leslie Cory, Marti Loring, and Roy Cooper). Rejon Taylor's father, John Taylor, endorses possession of "second sight," attributing his power to the veil that was over his face when he was born (John Taylor Declaration).

(*Id.* at 6).

As a child, Mr. Taylor experienced multiple traumatic stressors, including gun play both in the neighborhood and in the house. He was nearly shot by his brother-in-law before he was five (Declarations of Tameka Shepard and Ramon Shepard); his brother shot him with a BB gun when he was ten (Interview by Katherine Porterfield; Declaration of John Taylor II).

There was family violence that Rejon knew about at an early age, including the domestic murder of an aunt (Declarations of Johnny Taylor; Lisa Taylor; Walter Taylor; Precious Heflin; Vanessa Heflin); Rejon's father's commission of murder (Declaration of Johnny Taylor); complex childhood trauma experienced by close family members (Declarations of Saadia Heflin, Vanessa Heflin, and John Taylor); and physical attacks on Rejon's sister , mother, and aunt (Declarations of Tameka Shepard, Tayanau Nunez, Tonya Walton, John Taylor). Rejon was also aware that his sister's father was murdered and her cousin was killed, again through a suspected murder (Declaration of Tameka Shepard).

Mr. Taylor was also exposed to domestic violence between his parents (Declarations of Johnny Taylor, Tameka Shepard, Felisha Gatlin). While attending McNair Middle and High Schools, Rejon was regularly exposed to violence, threats of violence, and disorder (Declarations of Rashard Blackwell, Jessica Jackson Langford, Jovante McCoy, Nedras Moreland, Traketa Taylor, Keashawn Washington, and Interview with Rejon Taylor).

(*Id.* at 18). To be clear, counsel's "failure to present mitigating evidence when it was available could not be considered a strategic decision, but rather an 'abdication of advocacy.'" *Powell*, 332 F.3d at 399-400.

Had counsel conducted a thorough mitigation, counsel would have been able to contextualize Rejon's family background to provide nuance to the family's adversities.

This is what the jury and this Court would have learned:

There were multiple family members in Rejon's paternal and maternal family who struggled with mental illness and substance abuse. Members of the paternal and maternal sides of Rejon's family have been diagnosed and/or have exhibited mental health problems. These problems have spanned generations. Only in the most recent generation has treatment been sought.

Rejon's mother, Reba Taylor, and his sister, Tameka Shepard, have been described as both suffering from depression. Rejon's father, Johnny Taylor, has said he was told that he was born with a "veil" over his face. Johnny believes this has allowed him to see visions of the future. Johnny had multiple incarcerations as a teenager and young adult. A psychiatrist told his parents that he had mental problems after evaluating him. Rejon shares these unusual beliefs about his own ability to perceive things. Even with an understanding of the culturally normative aspects of such a set of beliefs, they are unusual and, in combination with other indications of poor functioning, suggest that there are psychiatric issues that could explain these beliefs.

There are numerous other relatives of Rejon's who had mental illness. On Rejon's paternal side, his first cousin Erica Gould, who found her mother after she had been murdered by her father, was diagnosed with schizophrenia. Another paternal first cousin, Saadia Heflin, was diagnosed with Post-traumatic Stress Disorder (PTSD), depression and anxiety. This was due to the physical, mental, and emotional abuse she and her sister (Vanessa Heflin) received at the hands of their mother, Barbara Heflin (Rejon's paternal aunt). Saadia and Vanessa were removed from their mother's custody by DeKalb County Division of Family and Children Services due to the abuse they received. Although Vanessa has not received a diagnosis, she describes severe mental problems, such as panic attacks, anxiety, and uncontrolled crying that she has lived with since childhood. She describes self-medicating with alcohol and marijuana to this day.

On Rejon's maternal side, his first cousin Edward Gatlin was diagnosed as Bipolar when he was 16 years-old at the Charter House, a juvenile mental health facility. Edward's father, Joseph Gatlin (Rejon's maternal uncle) is described by members of his family as being emotionally abusive to his children and numerous wives and of self-medicating with drugs and alcohol. Edward was prescribed Depakote, a mood stabilizer often prescribed for Bipolar Illness and seizure disorders to treat mental illness.

Other members of Rejon's maternal family have been described as being mentally slow, unstable, and unable to keep a home. Joseph's brother Stanley Gatlin (Rejon's maternal uncle) was hit by a car when he was 12-years-old and is described by family members as severely impaired ever since.

Family members also noted numerous relatives of Rejon's who struggled with substance abuse. For example, his Uncle Willy was noted to have severe alcoholism which resulted in his death. Another uncle Leonard Gatlin Jr, who was present for Rejon's childhood was in prison and ultimately died of alcoholism.

Family members with serious mental illness create risk for children in a number of ways. First, there is the genetic risk that exists in families with a high incidence of mental illness and substance abuse. Each family member with these conditions increases the likelihood of heritable illnesses passing onto the next generation. However, there is also the lived risk for children with family members with mental illness, as they are exposed to unpredictable, frightening and disturbing symptoms in their loved ones. Finally, family members with mental illness and substance abusing behaviors may have symptoms and impairments in functioning that prevent them from providing basic needs for children. Thus, the risks to children with multiple family members with these conditions is genetic, psychological and environmental.

(Exhibit No. 2, Katherine Porterfield, Ph.D., Report, at 19-21) (Internal citations omitted).

Had counsel conducted a thorough mitigation investigation and obtained this information, counsel could have been able to provide it to their evaluating mental health experts. Had that occurred, the jury and this Court would have learned that:

Rejon Taylor was incompetent to stand trial in his capital case. Mr. Taylor suffered from a mental disease or defect that, at the time of his trial, rendered him unable to "consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Mr. Taylor's sense of reality was impaired, such that it substantially undermines his judgment and his ability to rationally cooperate with counsel...

Mr. Taylor has debilitating neurological, psychological, and functional impairments and meets the diagnostic criteria for Bipolar disorder secondary to a general medical conviction, ie. Temporal Lobe Syndrome and Post Traumatic Stress Disorder. Mr. Taylor suffers from Temporal Lobe Syndrome, an umbrella term which indicates serious deficits in emotional and cognitive functioning stemming from impaired function in the temporal lobe. Mr. Taylor displays significant impairment of executive functioning, particularly in his ability to effectively weigh and deliberate, understand social cues, and understand social context. Mr. Taylor's ability to effectively weigh and deliberate is impaired by his psychotic religiosity, which is the direct result of his temporal lobe-based delusions. Mr. Taylor also suffers from a personality change secondary to his temporal lobe dysfunction. The personality change includes a manic-like set of symptoms, which includes mood lability, circumstantiality, loss of ego boundaries, and psychotic ambivalence.

Mr. Taylor's multiple impairments are synergistic and impede his perception of reality and render him psychotic. At the time of trial, Mr. Taylor suffered from religious delusions that prevented him from consulting with counsel with a reasonable degree of rational understanding, i.e., he believed that God would cause the evidence in his case to disappear and release him from custody. His religious delusions were then encapsulated, but have become more pervasive. They have grown more complex in the intervening decade and continue to impact his current thinking.

(Exhibit No. 1, George Woods, M.D., Report, at 2-3). The jurors and this Court would have also learned that:

1. Rejon Taylor demonstrates pervasive effects of longstanding, chronic traumatic stress from:
   a. exposure to chronic, direct and indirect life-threatening violence throughout childhood and adolescence
   b. disturbed attachment and coercive relationships
   c. corruption by major adults and figures in his life in regard to normalizing of criminal behavior, violence and imprisonment
   d. family members with substance abuse and mental health problems
   e. community violence

2. Rejon Taylor demonstrates emotional dysregulation—that is, an inability to identify, process and manage emotions—in the form of dissociation that reaches the level of psychosis. This is consistent with a person with early childhood pervasive trauma and neglect, as well as other neurophysiological vulnerabilities.

3. Rejon Taylor demonstrates a disturbed sense of self and relationships in the form of feeling controlled and being able to perceive the future and people's "energy," which are also symptoms of psychosis.

4. Rejon Taylor's report of his actions during the offense suggests that he reacted in shock and dissociation to the events. This is consistent with his impairments in reality testing and emotional perception that are part of the biopsychosocial effects of trauma-impaired development.

(Exhibit No. 2, Katherine Porterfield, Ph.D., Report, at 1-2). *See Anderson v. Sirmons*, 476 F.3d 1131, 1147 (10th Cir. 2007) (finding prejudice where counsel failed to investigate and present accurate picture of petitioner's social and mental health history, including neurological health – evidence "highly relevant to the question of moral culpability").

Defense counsel had no strategic reason for not presenting any of the foregoing evidence. On the contrary, it would have supplied powerful support for counsel's theory of the case at the penalty and sentencing phases, *viz.*, as defense counsel said in closing argument at penalty, Rejon was "shaped, be it for the good or for the bad…by [his] family," (Doc. 902, PageID #7717, p. 138), and that Rejon "is not one of the worst of the worst," (*id.* at #7738, p. 159). Counsel simply failed to investigate and present readily available evidence that was necessary to adequately support that theory of the case. *See, e.g.*, *Wiggins*, 539 U.S. at 526 (failure to investigate and present evidence that would have supported a defense theory of the case supported a finding of deficient performance, and indicated that counsel's conduct reflected

"inattention, not reasoned strategic judgment").

Counsel's failures were particularly significant because they presented the limited information they obtained from the mitigation witnesses, that Rejon's mother was largely absent from the home working multiple jobs, that Rejon lacked positive male role models in his life, and his exposure to some violence between his parents while his father was out of prison, signaled that there was more to Rejon's story. *See Wiggins*, 539 U.S. at 525 (deficient performance where, among other things, "any reasonably competent attorney would have realized that pursuing the[] leads" from the limited information counsel had about the petitioner's life history "was necessary to making an informed choice among possible defenses"); *see also Haliym*, 492 F. 3d at 712 (petitioner's counsel "failed to follow up with obvious avenues of investigation that would have produced valuable mitigating evidence... of family background") (citing *Harries*, 417 F. 3d at 639 (finding that interviews conducted by counsel "produced viable leads...of poor mental health and troubled family background" and that counsel's "failure to follow these leads leaves no 'room for debate' that their truncated investigation was deficient.")); *Jells*, 538 F. 3d at 496 (noting that counsel's awareness of defendant's home environment and academic difficulties should have alerted them that further investigation would be fruitful).

As the foregoing summary makes clear, defense counsel failed to meet their constitutional obligation to conduct a thorough investigation into all reasonably available mitigating evidence. *See Williams*, 529 U.S. at 396; *Wiggins*, 539 U.S. at

523. As a result, the jury never learned about several categories of powerful mitigation. *See Morales*, 507 F.3d at 935 (prejudice resulted where counsel failed to uncover available and "compelling" evidence of petitioner's "dysfunctional family history, potential mental health problems, and detailed cultural background.") (Internal citation omitted).

Rejon was prejudiced by counsel's deficient performance because there is a reasonable probability that, had counsel investigated and presented this evidence, at least one juror would have chosen life instead of death, thereby precluding a death recommendation. *See Wiggins*, 539 U.S. at 534. In fact, twice during sentencing deliberation, the jury asked about what would happen if they could not reach a unanimous verdict. (Exhibit No. 44, Jury Communications with Court, at 10, 14) ("If the jury cannot reach a unanimous decision, what then?" at 11:15am; and "If we truly cannot get a unanimous decision, will this be declared a mistrial?" at 2:40pm). The jury's repeated questioning, over a three-hour period, indicated that at least one juror was hesitant about voting for the death penalty. In other words, this Court cannot have confidence Rejon would have been sentenced to death had counsel performed reasonably. *See Wiggins*, 539 U.S. at 534; *see also Powell*, 332 F.3d at 401 (finding that jurors informing court that they were at a "stalemate" during sentencing deliberation supported finding prejudice where counsel failed to present available family history evidence).

Indeed, Rejon has precisely the kind of troubled life history and neurological impairments that the Supreme Court and Sixth Circuit Court of Appeals have

repeatedly recognized warrants a finding of prejudice when it is not presented to the sentencer as a result of defense counsel's inadequate investigation. *See, e.g.*, *Rompilla*, 545 U.S. at 392; *Williams*, 539 U.S. at 535; *Williams v. Taylor*, 529 U.S. at 397-98. Like in *Harries v. Bell*, where the Sixth Circuit found counsel ineffective for failing to investigate defendant's troubled childhood and damaged frontal lobe, so here too, counsel failed to investigate Rejon's troubled life history or his temporal lobe impairments. 417 F. 3d 631, 639. In other words, the evidence that competent counsel would have investigated and presented "adds up to a mitigation case that bears no relation" to the cursory mitigation narrative presented to the jury; and "the undiscovered 'mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Rejon's] culpability.'" *Rompilla*, 545 U.S at 392 (quoting *Wiggins*, 539 U.S. at 538, and *Williams*, 529 U.S. at 397) (additional quotation marks omitted).

Prejudice is particularly clear here because "this case is not highly aggravated," and the prosecution's case for death was far from overwhelming. (citing *Strickland*, 466 U.S. at 696, and *Wiggins*, 539 U.S. at 538). The jurors found three aggravating circumstances (1) the death occurred during a kidnapping; (2) Rejon engaged in substantial planning and premeditation to cause the death; (3) and Rejon could be a danger in the future. Weighed against the three aggravating circumstances were 17 mitigating circumstance, many of which all 12 jurors found: Rejon had never been convicted of a crime (12 jurors); if not sentenced to death Rejon would spend life in prison (12 jurors); Rejon's father subjected him to

emotional abuse as a child (12 jurors); Rejon's parents were inadequate (12 jurors); Rejon lacked positive male role models in his life, his brother and father had both been incarcerated (12 jurors); Rejon was 18-years-old at the time of the crime (12 jurors); Rejon has a positive relationship with his defense team (12 jurors); Rejon's life has value (12 jurors);  Rejon obtained his GED in county jail (12 jurors); Rejon participated in religious programs in county jail (12 jurors); Rejon encouraged others to study the Bible in county jail (12 jurors); although two officers were hurt in the escape, Rejon did not hurt anyone (12 jurors); Rejon was exposed to violence as a child (9 jurors); at age 18, a person has not fully matured (1 juror); Rejon was immature and lacked emotional development and decision-making of a mature adult (2 jurors); Rejon has shown concern and kindness for others (5 jurors); and Rejon was influenced by other older, more criminally experienced inmates to escape from county jail (3 jurors). *See* (*id.* at #6068-72, p. 15-31).

Prejudice is also confirmed where the jury failed to find certain mitigating circumstances that defense counsel – had they conducted a thorough mitigation investigation – could have presented compelling evidence to support. *See Dickerson*, 453 F. 3d at 697 (2006) (reasoning that had defense counsel conducted a thorough investigation, they would have "put on proof that [defendant's]…family background and educational and social history showed extreme deprivation that affected his moral culpability" and failure to conduct a complete and thorough mitigation investigation prejudiced the outcome of the sentencing phase of the trial). For instance, no juror found that Rejon had been neglected as a child; that Rejon's

82

brain's immaturity impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law; that Rejon was remorseful after the murder; or that during the murder, Rejon was acting under mental or emotional distress. (Doc. 878, PageID #6069-71, p. 16-18). Had defense counsel's mitigation investigation adhered to prevailing standards, the jurors would have learned compelling information about the profound neglect Rejon experienced and his neurological and developmental impairments. *See Glenn v. Tate*, 71 F. 3d 1204, 1209 (6th Cir. 1995) (reasoning that if the lawyers had done "what they should have done, they would have been in a position to show the jurors" the defendant's neurological and development difficulties, his anxiety and insecurity, and his trauma at the hands of his mother).

During the government's penalty phase closing, it was able to refer to defense counsel's cursory mitigation presentation as "the defendant's attempt to try on different masks to hide who he really is," and that many of the potential mitigators were "excuses." (Doc. 902, PageID #7742, p. 163). The government then characterized the defense's presentation of family evidence as Rejon "turn[ing] around and blam[ing] them." (*Id.* at #7744, p. 165). Finally, that although Rejon Taylor faced "obstacles in his life," "many people know friends, family members, acquaintances, people who had similar obstacles" and didn't kill someone. (*Id.* at #7745-46, p. 166-67).

Finally, a finding of prejudice is confirmed because defense counsel's inadequate mitigation investigation and presentation allowed the prosecution to

83

urge false and misleading facts and arguments to the jury that caused them to sentence Rejon to death. Indeed, the Sixth Circuit has found prejudice where evidence counsel presented did not tell the true story about the defendant's childhood and had counsel presented available evidence, it would have given defendant "a substantial likelihood of receiving a different sentence." *Foust*, 655 F. 3d at 539. For example, the government argued that Rejon lacked remorse because he was laughing about the victim and the crime during recorded phone calls. (Doc. 902, PageID #7740, p. 161). Having done an inadequate mitigation investigation, defense counsel was not able to present evidence or explain that several lay witnesses reported that Rejon laughed or smiled in response to discomfort and uncertainty, a quality he shared with his mother, and that this was impairment based. *See e.g.,* (Exhibit No. 36, Traketa Taylor, at 3) ("He laughed even when the issues were serious and not funny…laugher was his way of responding to everything. He used laughter to deflect attention from himself and avoid dealing with serious things."); *see also* (Exhibit No. 1, George Woods, M.D., Report, at 10) ("Mr. Taylor has a poor sense of humor, frequently missing irony or sarcasm. His obsession with the concretizing of his thought reflects his limited ability for abstraction, which is frequently a component of humor.").

Rejon's trial counsel's failure to investigate and present mitigating evidence meant that the jury and this Court never had an accurate picture of Rejon and his moral culpability. As the Sixth Circuit has explained, the reviewing Court must "consider[] both the nature of the material presented to the jury that should not

have been and the nature of the material not presented to the jury that should have been," and determine if it has "confidence in the jury's weighing of the factors relevant to the issue of whether [Rejon] should be sentenced to death." *Glenn*, 71 F.3d 1204, 1210. Here, after making those considerations, there can be no confidence in the jury's decision to sentence Rejon to death.

e. **Failure to Investigate and Present Rejon Taylor's Neurological and Mental Impairments**

Rejon Taylor suffers from a constellation of mental, emotional, perceptual impairments stemming both from his neurological condition and from his history of exposure to profound neglect and trauma. *See* (Exhibit No. 1, George Woods, M.D., Report); (Exhibit No. 2, Katherine Porterfield, Ph.D., Report). Trial counsel, having failed to retain appropriate experts to assist in the preparation of a full biopsychosocial evaluation of Rejon, then having failed to follow up on the clear red flags of neurological impairment and likewise failed to present Rejon's impairments to the jury. The Sixth Circuit has repeatedly recognized that counsel's conduct is deficient where counsel fails to investigate and develop evidence of a client's mental health impairments, including with the assistance of experts, when there are red flags that such information exits. *See Morales v. Mitchell*, 507 F.3d at 935 (counsel failed to explore client's possible neurological impairment despite indications that it existed); *see also Harries*, 417 F.3d at 638 (despite evidence indicating client's mental illness, counsel failed to thoroughly investigate and retain appropriate expert).

As discussed above, Rejon Taylor suffers from temporal lobe dysfunction, a

neurological impairment that affects his perceptions of reality, his memory, and his sense of self. *See* (Exhibit No. 1, George Woods, M.D., Report, at 3, incorporated by reference). These impairments not only rendered Rejon incompetent to stand trial but also counsel should have been presented both to rebut the government's aggravating circumstances (i.e., future dangerousness and evidence of planning and premeditation) and as mitigation in and of itself. *See Glenn v.* Tate, 71 F.3d 1204, 1208 (6th Cir. 1995) (deficient performance where trial counsel failed to develop and present mitigating information about client's neurological impairment that cast doubt on state's aggravating circumstances).

Included within counsel's failure to investigate Rejon's neurological condition was counsel's failure to investigate Rejon's delusions that prevented his acceptance of the government's plea offer. Counsel noted, repeatedly, that Rejon's conviction that God was going to make the evidence in his case disappear impeded his relationship with counsel. *See* (Exhibit No. 5, Leslie Cory Dec., at 2, 9); (Exhibit No. 6, Howell Clements Dec., at 2, 3); (Exhibit No. 8, Roy Cooper Dec., at 2, 5); *see also* (Exhibit No. 7, Richard Heinsman Dec., at 2). Rejon was unable to contemplate acceptance of the government's plea offer, because God had not told him to take that offer. *See* (Exhibit No. 5, Leslie Cory Dec., at 4, 8, 9); (Exhibit No. 6, Howell Clements Dec., at 4); (Exhibit No. 8, Roy Cooper Dec., at 3, 5, 6). Counsel requested an evaluation from Dr. Solovey specifically regarding Mr. Taylor's delusions. (Exhibit No. 6, Howell Clements Dec., at 3); (Exhibit No. 5, Leslie Cory Dec., at 3); (Exhibit No. 8, Roy Cooper Dec., at 2). Despite obtaining a cryptic report from Dr.

Solovey, indicating that Rejon's religious beliefs had "taken on a delusional proportion," counsel did not further investigate the source of such delusions – specifically failing to follow up on a team discussion that Mr. Taylor needed to be seen by a neurologist. (Exhibit No. 5, Leslie Cory Dec., at 3); (Exhibit No. 43, Solovey Report); *see also* (Exhibit No. 11, Caress Ushry Dec., at 1) (explaining that Dr. Solovey admits he does not "engage" with religious delusion and found Rejon competent because of a paucity of information concerning Rejon's religion prior to incarceration). Counsel's failure to investigate the medical cause of Rejon's delusion was not in keeping with prevailing professional norms, constitutes deficient performance, and prejudiced Rejon. *See Hughes v. United States,* 258 F.3d 453, 457 (6th Cir. 2001) (finding that a strategic decision may be the basis for an ineffective-assistance of counsel claim if it is "so ill-chosen that it permeates the entire trial with obvious unfairness"); *Shafer v. Wilson*, 364 Fed. Appx. 940 (6th Cir. 2010 (citing *Hughes*); *Crane v. Johnson,* 178 F.3d 309, 314 (5th Cir.1999) (citing *Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir.1983) (on rehearing)).

That trial counsel retained a nominally qualified expert to evaluate Rejon does not end the inquiry. Indeed, where circumstances existed to alert counsel that the expert's opinion was inadequate, counsel's failure to continue to probe Rejon's ability to rationally assist counsel was ineffective. *See Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006) (holding a licensed practitioner is generally held to be competent, unless counsel has a good reason to believe to the contrary); *see also Skaggs v. Parker*, 235 F.3d 262, 268 (6th Cir. 2000) (finding defense counsel's

reliance on expert unreasonable in light of circumstances); *Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007) (citing *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir. 1995) (establishing that reliance on expert must be reasonable)); *see also O'Neal v. Delo,* 44 F.3d 655, 660 (8th Cir.1995) (evaluating the record for "behavior or other indicia of an abnormal mental state such that counsel could not reasonably decide to proceed without further psychiatric testing"). Trial counsel recognized that Rejon was delusional and specifically requested assessment of his competency. *See* (Exhibit No. 5, Leslie Cory Dec., at 3); (Exhibit No. 6, Howell Clements Dec., at 3); (Exhibit No. 8, Roy Cooper Dec., at 2).

Here, trial counsel had "behavior or other indicia of an abnormal mental state such that counsel could not reasonably decide to proceed without further [investigation]" despite a preliminary finding that Rejon was competent to stand trial. *See O'Neal*, 44 F.3d 660; *see also* (Exhibit No. 9, Mark Cunningham Dec., at 4-5) (noting that Dr. Solovey erroneously interpreted Rejon's MacArthur Competence Assessment, and that Rejon's results indicate "grave concern[]" about his ability to "mak[e] informed decisions regarding his case."). Counsel recognized that Rejon's delusions (which were noted by the screening psychologist as problematic for counsel) continued to impair his judgment and his ability to engage both with the proof and with the decision as to whether to accept the Government's plea offer. *See* (Exhibit No. 6, Howell Clements Dec., at 4); (Exhibit No. 8, Roy Cooper Dec. at 4-5); (Exhibit No. 5, Leslie Cory Dec., at 8-9). Despite counsel's acknowledgment that Rejon's delusions impaired his ability to rationally assist, counsel failed to, *inter*

*alia*, 1) review the screening psychologist's testing of Rejon; 2) discern that the screening psychologist did not "engage" with Rejon's delusions and therefore could not evaluate the pervasiveness nor the cause of the delusion; or 3) engage a neurologist for a neurological examination of Mr. Taylor. *See* (Exhibit No. 5, Leslie Cory Dec., at 9). Counsel's failures were deficient performance and resulted in prejudice. *Glenn v. Tate*, 71 F.3d 1204, 1211 (1995) (finding prejudice where counsel failed to present pertinent evidence of mental history and mental capacity); *see also Powell*, 332 F.3d at (defendant is entitled to relief where counsel presented damaging mental health testimony from an unqualified expert and failed to independently investigate, develop, and present mitigating evidence of defendant's brain impairment).

### f. Failure to Adequately Represent Rejon Taylor's Fifth and Sixth Amendment Rights to Due Process and an Impartial Jury at the *Remmer* Hearing

Prior to the sentencing phase in Rejon Taylor's trial, the jury was exposed to media reports that Rejon had allegedly referred to them as "racist rednecks." After learning of the juror taint, the Court conducted a hearing. However, defense counsel failed to effectively represent Rejon's interests at that hearing. Specifically, counsel failed to ensure Rejon was present; failed to participate in the bias inquiry; and failed to remove a biased juror. Had counsel adequately represented Rejon's interests at the hearing, Rejon's right to an impartial jury would have been protected. Due to counsel's failures, an impartial jury convicted and sentenced Rejon to death, warranting a new trial. *See Weaver v. Massachusetts*, 137 S.Ct.

1899 (2017) (prejudice is presumed where counsel's deficient performance resulted in structural error that undermines due process).

### i. Allegations of Juror Bias or Exposure to Extrajudicial Information Require a *Remmer* Hearing to Determine the Extent of Juror Bias.

The Sixth Amendment guarantees a defendant's right to a trial by an impartial jury. U.S. Const. amend. VI; *see also Wainwright v. Witt*, 469 U.S. 412 (1985); *Tuner,* 476 U.S. 28; (Claim No. 10, Juror Bias and Misconduct Claim).

The proper remedy when allegations of juror partiality arise is for the court to hold a hearing, allowing the defendant the opportunity to demonstrate actual bias. *See Smith v. Phillips,* 455 U.S. 209, 215 (1982) (citing *Remmer*, 347 U.S. 227, 230 (1954)); *Fitzgerald v. Greene*, 150 F.3d 357 (4th Cir. 1998). The proceeding is known as a *Remmer* hearing. *See Remmer*, 347 U.S. 227. Although jury deliberations are typically shielded from review, at a *Remmer* hearing a juror may testify to "any facts bearing upon the question of the existence of any extraneous influence." *See Rushen v. Spain*, 464 U.S. 114, 121 (1983) (allowing juror testimony "concerning any mental bias in matters unrelated to the specific issues that the juror was called upon to decide").

### ii. The Jurors in Rejon Taylor's Trial Were Exposed to Media Reports that Rejon Called Them "Racist Rednecks."

On September 16, 2008, prior to the sentencing hearing, the government informed defense counsel that it intended to introduce recordings of telephone calls Rejon made while confined in the Hamilton County Jail. *See* (Doc. 869, PageID

#5169-70, p. 4-5). The jury was not in the courtroom, but media was. (*Id.* at #5167, p. 2). Rather than providing full conversations, the prosecution sought to provide "snippets" of Rejon's conversations. (*Id.* at #5169-72, p. 4-7). The prosecution claimed Rejon's conversations were "highly probative of the defendant's lack of remorse," including one conversation where Rejon allegedly referred to the jurors as "racist rednecks." (*Id.* at #5176, p.11).

Significantly, Rejon never referred to the jurors as racists. In a telephone conversation between Rejon and his sister Tameka Shepard, Rejon accurately described the lack of racial diversity among the jury pool, and he stated that "there was something racist going on" with the way the parties selected the jurors. (Doc. 870, PageID #5204, p. 15). Rejon expressed that regardless of the lack of racial diversity within the jury, he trusted the jurors, despite his perception that some of them looked, "like little redneck folk." (*Id.* at #5204, p. 15). Rejon's statements to his sister reflected his regret that the cross-cultural differences between him and the jury limited his opportunity to a fair trial. (*Id.*). The government did not explain these nuances in Court that day.

Two days after the government discussed snippets of the tapes in open court, the prosecution announced that it would not introduce the recordings because of "potential prejudice." (Doc. 683, p. 10). However, the damage was done; local media had already widely reported on the prosecution's inflammatory mischaracterization of Rejon's recorded statements, including the *Chattanooga Times Free Press*, on WDEF television, WRCB television, WTVC television, and WGOW Radio. Exhibit

No. 66, Monica Mercer, "Chattanooga: Sentencing delayed in convicted murderer's case," *Chattanooga Times Free Press* (Sept. 16, 2008) ("According to some of the calls, Mr. Taylor called the 18-member jury panel a bunch of 'racist rednecks' after they convicted him of murder kidnapping and carjacking last week…"); Exhibit No. 67, "Government Says Taylor Calls Jurors 'Racist Rednecks.'" Chattanoogan.com (Sept. 16, 2008); Exhibit No. 68, WRCB (Sept. 16, 2008) ("U.S. Attorney Steve Neff told the court, Taylor refers to the jury as quote 'racist rednecks.'"); Exhibit No. 69, WDEF (Sept. 16, 2008) ("The prosecution wanted to play recordings they got of him on the phone talking about the jury. He called them 'racist rednecks.' They say it shows that Taylor is not sorry for his crime."); Exhibit No. 70, WDEF (Sept. 16, 2008) ("Judge Curtis Collier today ordered the delay because of phone calls Taylor made from his jail cell referring to the jurors as 'racist rednecks.' Prosecutors plan to use the calls as part of their argument for the death penalty."); Exhibit No. 71, WTVC, Channel 9 News (Sept. 16, 2008) ("A prosecutor wants a jailhouse recording of the defendant describing the jury as a quote 'racist rednecks' – played for them before they sentence him."); Exhibit No. 72, WTVC (Sept. 16, 2008) ("The sentencing for East Tennessee's first federal death penalty case will have to wait until next week after the defendant is accused of describing the jury as quote – 'racist rednecks' on a jailhouse telephone call."); Exhibit No. 73, "Convicted killer's sentencing delayed," *UPI.com* (Sept. 17, 2008) ("Assistant U.S. Attorney Steve Neff, alleging Taylor called the jurors 'racist rednecks for convicting him last week of murder, kidnapping and carjacking…").

On September 19, 2008, defense counsel filed a motion requesting the Court to conduct individual voir dire of the jurors to determine bias. (Doc. 688, p. 1-4). During the Court's questioning, 11 of the 18 jurors, including alternates, admitted that they were aware of the "racist redneck" remark, meaning they had been exposed to media either directly or indirectly. (Doc.871, PageID #5246-83, p. 2-39). This included six of the 12 seated jurors, including the foreperson, and five of the six alternates. (*Id.*). Jurors indicated that they heard the remark from a variety of sources, including friends, neighbors, coworkers, and on the radio. (*Id.*). Subsequent evidence after the *Remmer* hearing revealed that all 18 jurors, including the alternates, heard the comment prior to the sentencing hearing. (Doc. 880, PageID #6124, p. 29) (Q: "…all 18 of you are told that there was a comment about 'racist redneck'?" A: "Oh, yeah, we – I guess we all had heard it, you know. And we talked about it…").

### iii. Adequate Representation During the *Remmer* Hearing Required Counsel and Defendant's Presence and Participation to Protect Rejon Taylor's Right to an Impartial Jury.

The Supreme Court requires "all interested parties" to participate during *Remmer* hearings to comport with due process. *See Remmer*, 347 U.S. at 230. Given the rights at stake, presence of both defense counsel and the defendant are necessary to ensure protection of the defendant's rights at this critical stage of the proceedings. *See Remmer*, 350 U.S. 377, 378 (1956) ("Remmer II") (remanding case to trial court with "directions to hold a hearing, with the petitioner and counsel present."). In a concurrence, Justice O'Conner revisited the requirement in *Smith v.*

93

*Phillips*, 455 U.S. 209 (1982), emphasizing the important role that counsel plays in such hearings: "[A] hearing permits counsel to probe the jurors' memory, his reasons for acting as he did, and his understanding of the consequences of his actions." *Id.* at 222 (O'Connor, J., concurring). In a later concurrence, Justice Stevens also acknowledged the defendant's right to attend the *Remmer* hearing, "the defendant would naturally have a right to be present at the hearing and have the assistance of counsel at the hearing." *Rushen v. Spain*, 464 U.S. 114, 126-27 (1983) (Stevens, J., concurring). This is true even though "[t]he defense has no constitutional right to be present at every interaction between a judge and a juror." *Id.* at 125-26. The "consequences for the accused" at a *Remmer* hearing are "significant." *Bell v. Cone,* 535 U.S. 685, 696 (2002) (explaining that absence of counsel at a critical stage of trial is presumptively unfair).

Additionally, examination of witnesses and submissions of evidence in a *Remmer* hearing, "amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or meeting his adversary.'" *Rothgery v. Gillespie Cty., Tex.,* 554 U.S. 191, 212 n.16 (2008) (quoting *United States v. Ash*, 413 U.S. 300, 312 -13 (1973)). When ordered to conduct a *Remmer* hearing, a district court is "obligated" to allow the parties to make a "searching inquiry" to reveal any potential juror bias. *United States v. Boney*, 68 F.3d 497, 501 (D.C.Cir. 1995). Both the heightened consequences and the potentially adversarial nature of *Remmer* proceedings requires both counsel and defendant's unfettered presence.

iv.     **Prevailing professional norms require defense counsel to conduct thorough investigation and identify and challenge all allegations of juror bias**

Prevailing norms provide detailed guidance for how defense attorneys should prepare for a capital case, including how to handle allegations of juror bias. *See* ABA Guidelines, 31 Hofstra L. Rev. 913. The ABA Guidelines encourage defense counsel to thoroughly investigate racial bias within the jury. Guideline 10.7(B) also instructs defense counsel to conduct a thorough and independent investigation relating to the issues of both guilt and penalty. *Id.* at 1015, Guideline 10.7 (Investigation). Guideline 10.8 further instructs defense counsel to thoroughly investigate all legal claims and evaluate each potential legal claim in light of the unique characteristics of the death penalty. *Id.* at 1028-29, Guideline 10.8 (The Duty to Assert Legal Claims).

Racial prejudice continues to influence capital sentencing decisions. *See* Stephen B. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty*, 35 Santa Clara L. Rev. 433, 439-42 (1995) (examining the historic relationship between racial violence and the death penalty, and describing how racial prejudice continues to influence capital sentencing decisions); *see also* (Claim No. 8, FDPA-Racially Discriminatory Claim) and (Exhibit No. 4, Destiny Peery Report, at 6-7) ("White participants in the study were significantly more likely to give a death sentence to a Black defendant if the victim was White. Further, …White participants weighed aggravating circumstances more heavily and were reluctant to attach significance to mitigating

circumstances for Black defendants compared to White defendants.") (Internal citation omitted). Thus, defense counsel must be particularly vigilant to protect the defendant against a trial "poisoned by racial bias." ABA Guidelines, 31 Hofstra L. Rev. at 1049, Guideline 10.10.2 (Voir Dire and Jury Selection), commentary; *see generally Turner*, 476 U.S. at 36-37 (Brennan, J., concurring in part and dissenting in part).

Incompetence or even discomfort of discussions about race cannot excuse defense counsel's failure to address jurors' racial bias when required. *See id.* (stating that the defense in a capital case should "voir dire to discover those potential jurors poisoned by racial bias" when appropriate); *see also* (Claim No. 2.c, IAC-Voir Dire Claim). When investigating potential juror bias, defense counsel must explore all avenues leading to facts relevant to the merits of the allegations. *See* ABA Guidelines, 31 Hofstra L. Rev. at 1028, Guideline 10.8(A)(2) (Duty to Assert Legal Claims) ("thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted…").

In the midst of defense counsel's scrupulous investigation of potential juror bias, they must also keep their client well informed. *See* ABA Guidelines, 31 Hofstra L. Rev. at 1008, Guideline 10.5 (Relationship with the Client), commentary (describing counsel's ongoing obligation "at every stage of the case to keep the client informed of developments and progress in the case, and to consult with the client on strategic and tactical matters.").

v.     Defense counsel failed in its duty to inform Rejon about the *Remmer* hearing and to inform him of his right to participate in the hearing.

Counsel had a twofold duty: to keep Rejon informed about the hearing, a critical stage of his trial, *see Missouri v. Frye*, 566 U.S. 134, 149-50 (2012) (recognizing duty to inform during critical stages of trial), and to inform him that he had a right to be present at the hearing. *See Illinois v. Allen*, 397 U.S. 337, 338 (1970) (citing *Lewis v. United States*, 146 U.S. 370 (1892) ("One of the most basic of rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."). Counsel failed on both these fronts.

On September 22, 2008, the parties met to discuss jurors' exposure to the comment and the logistics of the hearing. At that time, defense counsel attempted to submit a written waiver of Rejon's presence at the hearing. *See* (Doc. 870, PageID #5230, p. 41) ("It's signed by Mr. Taylor, dated today's date, and witnessed by Ms. Cory."). However, the Court requested to conduct its own inquiry into Rejon's wavier. (*Id.*).

| The Court: | First of all, do you understand that you have both a constitutional right and a statutory right to be present at any and all communications and proceedings with the jury? Do you understand that? |
| --- | --- |
| The Defendant: | Yes, sir. |
| The Court: | And do you understand that your attorney has asked that I personally speak to each juror individually to see if they have been exposed to any prejudicial publicity during the break in the trial? Did you hear your attorney asking that? |
| The Defendant: | Yes, sir. |

| | |
|---|---|
| The Court: | And do you understand that the Constitution and the federal statutes give you the right to be present for any such inquiry if you would like to? Do you understand that? |
| The Defendant: | Yes, sir. |
| The Court: | And do you understand that if you waive your right to be present, the Court could go ahead and discuss with all the jurors whether they have been exposed to pretrial publicity without your being there? Do you understand that? |
| The Defendant: | Yes, sir. |
| The Court: | And do you understand that if the Court does this and later on for some reason you would like to object to what the Court did or file an appeal based upon what the Court did, you'd have no right to do that– |
| The Defendant: | Yes. |
| The Court: | —because you would have given up that right by telling me to go ahead and do it? Do you understand that? |
| The Defendant: | Yes. |

(*Id.* at #5231-33, at 42-44). The Court then asked about Rejon's prior knowledge of defense counsel's request to have the Court privately and independently interview the jurors. "Did you know in advance [William Ortwein] was going to ask that?" (*Id.* at #5232, p. 43), to which Rejon replied, "No." (*Id.*). Despite Rejon's affirmative answers to understanding he was waiving his rights, his admission that defense counsel had not informed him about the hearing and what it was about, (*id.* at #5232, p. 43), demonstrated that the Court's colloquy was insufficient to properly

obtain a waiver of Rejon's right to appear at and participate in the hearing, and to waive his right to future appeals.

Defense counsel failed to adequately inform Rejon about what the *Remmer* hearing would entail and which of Rejon's rights were at stake before obtaining his waiver of these rights. *See United States v. Perez,* 116 F.3d 840, 845 (9th Cir.1997) (stating that a waiver is the "intentional relinquishment or abandonment of a known right" ); *United States v. Hamilton*, 391 F.3d 1066, 1071 (9th Cir. 2004) (*citing Carnley v. Cochran*, 369 U.S. 506 (1962) ("courts indulge every reasonable presumption against waiver of fundamental constitutional rights" and "do not presume acquiescence in the loss of fundamental rights"); *see e.g., Olden v. United States,* 224 F.3d 561, 568-70 (6th Cir. 2000) (recognizing that lack of representation can only be excused when a defendant knowingly and intelligently waives Sixth Amendment right to counsel).

<div style="text-align:center">

vi.     Defense counsels' decision to not participate in the *Remmer* hearing and to waive Rejon Taylor's attendance constituted deficient performance

</div>

A *Remmer* hearing is a critical stage of trial that may carry significant consequence. If a defendant can prove that a juror's bias prevents impartiality, then a new trial is warranted. Additionally, examination of witnesses and submissions of evidence in a *Remmer* hearing, "amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or meeting his adversary.'" *Rothgery v. Gillespie Cty., Tex.,* 554 U.S. 191, 212 n.16 (2008) (quoting *United States v. Ash*, 413 U.S. 300, 312-13 (1973)). Both the heightened consequence and the potentially adversarial nature of *Remmer* proceedings require

counsel's participation and defendant's presence.

By excluding themselves from the *Remmer* hearing, defense counsel failed to protect Rejon's interests. Defense counsel did not participate in the "trial-like confrontation" or "searching inquiry" to reveal the impact that the prejudicial information had on the jury and how that exposure may influence the jury's deliberative process. Defense counsel's silence during the hearing limited their ability to explore all avenues leading to facts relevant to the merits of allegations of juror bias. Without factual support, trial counsel was not able to properly identify and challenge juror bias, particularly racial bias.

Assuming defense counsel had insisted on participating in the *Remmer* hearing, evidence reveals defense counsel would not have been sufficiently prepared. In fact, none of the attorneys representing Rejon – including lead counsel – knew what a *Remmer* hearing was. *See* (Exhibit No. 5, Leslie Cory Dec., at 10-11). Ultimately, Ms. Cory, the least experienced attorney took responsibility for developing this aspect of the litigation. (*Id.*). Given defense counsel's ignorance of a *Remmer* hearing, they were unprepared to participate in it, let alone waive Rejon's presence at the hearing or to adequately represent Rejon's interests.

> ### vii. Rejon Taylor Could Not Competently Waive his Rights at the *Remmer* Hearing

In defiance of prevailing professional norms, defense counsel failed to keep Rejon informed of his rights and then accepted his waiver without appreciating his neurological and developmental impairments. Rejon's conduct and mental state prior to and during trial, demonstrated that he was incompetent to assist in his own

defense, including incompetent to waive his fundamental rights during a critical stage of the proceedings. "[Rejon's] sense of reality was (and is) impaired such that it substantially undermines his judgment and his ability to rationally cooperate with counsel." (Exhibit No. 1, George Woods, M.D., Report, at 2); *see also* (Claim No. 1, Competency Claim). Given Rejon's incompetency, he was not in a position to knowingly and intelligently waive his rights without proper accommodations made in consideration of his mental and developmental impairments.

### viii. Prejudice is Presumed Where Counsel's Deficient Performance Results in Structural Error

Defense counsel's failures at the *Remmer* hearing were multiple – they failed to participate in the hearing, they failed to protect Rejon's rights at the hearing, and they waived his right to appear without adequately appreciating his impairments. The result was that at least one biased juror, Juror 1, sat on the jury that convicted and sentenced Rejon to death in violation of his right to an impartial jury. As a result, the only appropriate remedy is for this Court to grant Rejon a new trial. *See Weaver*, 137 S.Ct. 1899 (prejudice is presumed where counsel's deficient performance resulted in structural error that undermines due process).

### g. Failure to Object to Government's Repeated Reference to Rejon Taylor "Stalking" the Victim, a Distinct Uncharged Crime

In the theory of its case, the government cannot refer to criminal conduct without evidence that statutory elements of the conduct are satisfied. *United States v. Forlorma*, 94 F.3d 91 (2d Cir. 1996) (reversal for prosecutor's repeated, incorrect claims about the evidence). Defense counsel failed to object to the government's

frequent use of prejudicial, false, and inflammatory language that Rejon "stalked" the victim. Stalking constitutes a federal crime, pursuant to 18 U.S.C. §2261A, for which the government did not charge Rejon nor otherwise demonstrate that Rejon's conduct met the statutory requirements. The government referred to Rejon stalking the victim seven times throughout the trial. In the face of such statements, defense counsel remained silent, allowing jurors to consider additional uncharged criminal acts, further aggravating the crimes for which the government did charge Rejon. Counsel's repeated failure to object to such language resulted in constitutionally ineffective assistance of counsel.

In opening statement, the government told jurors that Rejon "began, for lack of a better word, *stalking* Mr. Luck. He frequented his house on East Beechwood, passing by often. He followed Mr. Luck from his restaurant. He surveilled the area of the new house that Mr. Luck was building, the other location." (Doc. 862, PageID #4044-45, p. 27-28) (Sealed) (emphasis added). During closing argument and the sentencing phase, the prosecution made six references to Rejon stalking the victim, including that Rejon "[u]ltimately…moved from simply burglarizing this particular victim to stalking him," "[t]he stalking then changed to something more sinister," and then "Joey Marshall told you they'd been stalking this man." (Doc. 868, PageID #5086, 5112, p. 41, 67) (Sealed). In the sentencing phase, the prosecution stated that Rejon had been "*stalking* this man and victimizing this man for over a year" and stated to the jury," "[t]hese weren't friends. These weren't acquaintances. He was on a first-name basis because he knew him so well from following him around

102

and stalking him. That's the proof before you." (Doc. 876, PageID #5963, 5965, p. 115, 117) (Sealed). The government reiterated, "[t]here's indications that he was stalking the victim… he was hunting him, ladies and gentlemen, following him from place to place, eating in his restaurant, researching him, following him home." (Doc. 876, PageID #6016, p. 168) (Sealed). Beyond repeated references to stalking, none of which defense counsel objected to, the prosecution made multiple statements that conjured the image of Rejon stalking the victim including that he was "circling around" him.[14] *See also* (Exhibit No. 4, Destiny Peery, Ph.D., Report, at 11-12).

Interstate stalking has three elements: "(a) that interstate travel occurred; (b) that defendant's intent was to injure or harass another person; and (c) that the person he intended to harass or injure was placed in reasonable fear of death or serious bodily injury to [him]self or to a member of [his] family as a result of that travel." *United States v. Al-Zubaidy*, 283 F.3d 804, 808 (6th Cir. 2002). The government's assertion that Rejon ate at the victim's Atlanta restaurant at some unspecified time, followed the victim to his Atlanta home, and searched for the victim in Atlanta does not meet the statutory requirements of stalking. As a threshold matter, there was no interstate travel involved in the government's descriptions of Rejon's conduct. It all occurred in Georgia. The only interstate travel

---

[14] The prosecution used language that conjures an image of stalking included "two black males were circling around, driving around," (Doc. 868, PageID #5118, p. 73) (Sealed); "as they were circling around," (Doc. 862, PageID #4048, p. 31) (Sealed); "they drove out into the very rural area in Collegedale and circled several times, two or three times. They didn't just stop and let him out. They circled two or three times… Mr. Luck died as a result of the defendant's actions. Remember they circled, they circled," (Doc. 876, PageID # 5969, p. 121) (Sealed); "You know the defendant and his buddy Sir Jack put the victim in a car and drove over two hours to a remote location, that they circled around before the killing happened." (*Id.* at #5975, p. 127) (Sealed).

occurred on August 6, 2003, when Rejon and the co-defendants *traveled with* the victim across state lines. Traveling with a victim does not constitute stalking, rather interstate stalking requires defendant to *travel to* the victim across state lines with the specific intent to harass or injure. *See United States v. Vollmer*, 2001 WL 21234, at *1 (8th Cir. Jan. 10, 2001) ("defendant's [interstate] travel must actually place the intended victim or an immediate family member in fear of harm."). Thus, the government's descriptions of Rejon's actions – both in Georgia prior to the underlying offense, and from Georgia to Tennessee on the day of the underlying offense – do not constitute interstate stalking pursuant to 18 U.S.C. §2261A.

The ABA Guidelines instruct defense counsel to "object to anything that appears unfair or unjust even if it involved challenging well-accepted practices." 31 Hofstra L. Rev. at 1032, Guideline 10.8, commentary. Here, the government's repeated assertions that Rejon stalked the victim were both unfair and unjust. *See Freeman v. Class*, 95 F. 3d 639, 644 (8th Cir. 1996) (finding ineffective assistance of counsel where counsel failed to object or move for mistrial based on prosecution's improper comments). In *Crotts v. Smith*, 73 F.3d 861 (9th Cir. 1996), (*superseded by statute on other grounds as recognized in Zapata v. Vasquez*, 788 F. 3d 1106 (9th Cir. 2015)), the court held that failing to object to a false and prejudicial remark constituted ineffective assistance of counsel. *Crotts*, 73 F.3d at 866. The falseness of the statement "diminishes any probative value of introducing the statement into evidence." *Id.* The court dismissed the argument that defense counsel had tactical

reasons for failing to object, noting "it is implausible that a reasonably competent attorney would have dismissed the inflammatory…testimony as harmless 'hyperbole.'" *Id.* So too here, there is no strategy that a reasonably competent attorney could rely upon to fail to object to the government's repeated prejudicial reference that Rejon stalked the victim.

In *Prichard v. Lockhart*, trial counsel's failure to object to the use of a prior conviction at trial was plainly ineffective and prejudicial. 990 F.2d 352 (8th Cir. 1993). Failure to object to language that references an uncharged crime, as here, has a similarly prejudicial effect. The prosecution's repeated references to stalking had the same effect as bringing up an uncharged allegation.

The government's statements that Rejon stalked the victim further bolstered the government's theory that the murder was premeditated. Competent trial counsel would have objected to such language given the gravity of the sentence combined with the government's insufficient evidence of premeditation and future dangerousness. *See* (Claim No. 18, Putative Future Dangerousness Claim).

The failure to object to the prosecution's repeated language about stalking prejudiced Rejon because had counsel objected to this language, there is a reasonable probability that at least one juror would not have voted to sentence Rejon to death. *See Strickland*, 466 U.S. at 694. In the federal death penalty scheme, where one juror's decision to spare a defendant's life can impact the outcome of the trial, confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different

105

balance." *Wiggins*, 539 U.S. at 536. Twice, during deliberations, the jury questioned the Court about a potential inability to reach a unanimous verdict. *See* (Exhibit No. 44, Jury Communications with Court, at 10, 14). The jury's repeated questioning about unanimity indicated that at least one juror was hesitant about voting for the death penalty. In fact, post-trial media coverage revealed the lone Black member of the jury advocated for a life sentence. *See* (Doc. 794-4, PageID #2597, p. 1). In these circumstances, the false and prejudicial characterization that Rejon repeatedly stalked the victim prior to the murder could have made the difference in at least one juror's decision to sentence Rejon to death.

### h. Counsel Were Ineffective with Respect to Rejon Taylor's Allocution in Violation of his Fifth and Sixth Amendment Rights

Trial counsel were constitutionally ineffective for overruling Mr. Taylor's decision to regarding allocution. The decision to allocute is personal to the defendant. On the morning of trial when Mr. Taylor was scheduled to address the jury, he informed his trial counsel that he had changed his mind. (Exhibit No. 5, Leslie Cory Dec., at 11). Trial counsel then proceeded to overbear his will and convince him to do so. (*Id.*). By all accounts, his allocution was a disaster. "[H]e was overcome with stage fright. He rambled in a disjointed way; any composure he had fell apart." (*Id.*).

Mr. Taylor was not competent to exercise his rights with respect to allocution in the first instance. *See also* (Claim No. 1, Competency Claim). Trial counsel's conduct here, overcoming his will, prejudiced Mr. Taylor. Not only was his presentation poor, the prosecution pounced on the allocution to argue it showed lack

106

of remorse. They made a point of stating that it was unsworn and that the defendant had not been willing to subject himself to cross-examination. Instead of humanizing Mr. Taylor, the allocution was used to demonize him. Further it lay the groundwork for the government to comment on Mr. Taylor's Fifth Amendment right not to testify.

### i. Rejon Taylor Received Ineffective Assistance of Counsel in Violation of the Sixth Amendment (Other Guilt Phase Issues)

In addition to the claims cited above, trial counsel's performance objectively fell below professional norms in the following prejudicial ways. Each error, individually and cumulatively with each other and the other claims in this motion, warrant relief.

### i. Trial Counsel's Errors with Respect to Sir Jack Matthews

Trial counsel, particularly in a capital case, has a duty to learn about his client's housing arrangement. *See generally,* ABA Guidelines for the Appointment and Performance of County in Death Penalty Cases. When trial counsel is on notice that the government will seek to enter into agreements with informants and/or co-defendants counsel has an even greater duty to ensure that their client is not housed in a facility where the informant/co-defendant has access to the client. If the government houses an informant/co-defendant in a jail cell with their client with the intention of calling that co-defendant as a witness at trial, trial counsel has a duty to move to suppress any statement made to that co-defendant because the co-defendant is an agent of the government. *Northrop v. Trippett,* 265 F.3d 372, 383 (6th Cir. 2001); *United States v. Henry*, 447 U.S. 264, 273, (1980) (The Fifth and

Sixth Amendment rights to counsel not only apply to direct confrontations by known government officers but also to "indirect and surreptitious interrogations" by covert government agents and informants.).

Here, trial counsel failed to learn that Joey Marshall and Sir Jack Matthews continued to be housed at the Hamilton County Jail throughout Mr. Taylor's pretrial incarceration. Worse, they failed to learn that Mr. Mathews was Mr. Taylor's cell mate for over a year. Competent counsel would have requested that Mr. Taylor be transferred to a different facility where Mr. Marshall and Mr. Matthews would not have access to Mr. Taylor. By leaving these teenagers in the same facility the government continued to amass evidence against them through telephone calls and communications.

Worse, after Mr. Matthews decided to withdraw his plea, he began to concoct a story to present at Mr. Taylor's trial. Mr. Matthews, who is intellectually impaired, plainly perjured himself. And he did so because he was angry at the government for not allowing him to withdraw his plea and for attempting to manipulate his testimony, *viz,* that Rejon panicked when he shot the victim. Mr. Matthews' false testimony was devastating to the defense in both phases of the trial.

Upon learning that the government[15] had caused Mr. Mathews and Taylor to be housed together, trial counsel should have moved to strike his testimony from the record under *Massiah v. United States*, 377 U.S. 201 (1964).

---

[15] The US Marshall is responsible for the pre-trial housing of inmates.

Had Mr. Taylor, who has multiple mental impairments, been housed in a different facility, the government would not have been able to implicate him in Mr. Matthews false testimony.

Compounding the error, trial counsel failed to introduce the contents of Sir Jack Matthews' 302 that Mr. Taylor had planned to let the victim out of the van alive. Worse still, trial counsel urged the jury to accept Sir Jack Matthews' testimony as true.

> ii. **Ineffective Assistance of Counsel with Respect to the Cross Examination of Joey Marshall**

Joey Marshall was the key witness for the government. The government needed the jury to believe Joey in order to convict Mr. Taylor on any of the charges. Given the central importance of Marshall, his cross-examination was the most critical of any examination in the guilt/innocence phase of the trial. Trial counsel failed to adequately confront and cross-examine Mr. Marshall about his plea agreement, his pending charges in Georgia which were later dismissed, and his prior inconsistent statements. *See* (Doc. 863, PageID #4316-4432, p. 120-236). Moreover, lead counsel, Bill Ortwein, who conducted the cross examination was having trouble hearing the witness throughout his testimony. *See e.g.,* (*id.* at #4325, p. 129) ("I'm sorry. I didn't hear you."); *see also* (Claim No. 3, Learned Counsel Claim). Trial counsel's professional errors were prejudicial where the credibility of Joey Marshall was the key to the government's conviction.

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308,

316 (1974). "The partiality of a witness is subject to exploration at trial" as are "possible biases, prejudices, or ulterior motives." *Id.* Competent cross-examination is "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970). The Sixth Circuit has consistently found that inadequate cross-examination—such as occurred here—amounts to deficient performance, and causes prejudice. *Higgins v. Renico*, 470 F.3d 624, 633 (6th Cir. 2006) (counsel was ineffective for failing to cross-examine key witness against defendant, when that witness "was also a suspect whose interest in avoiding criminal culpability was tied to convincing the jury that [defendant] shot [victim]."); *Blackburn v. Foltz,* 828 F.2d 1177, 1183 (6th Cir.1987) (ineffective assistance found where counsel failed to impeach an eyewitness with previous inconsistent identification testimony when "weakening [the witness's] testimony was the only plausible hope [the defendant] had for acquittal").

        iii.    **Trial counsel failed to object to Rejon Taylor's absence during a critical stage of the trial. (Fifth and Sixth Amendments)**

A criminal defendant has the right to be present at all critical stages of the trial against him. Any time there is communication between the parties with the jury is a critical stage. Here the trial judge discussed notes received from the jury and answers to their notes outside the presence of Mr. Taylor. Mr. Taylor did not knowingly, intelligently, or voluntarily waive his right to be present. Denial of the right to be present is structural error. Mr. Taylor was prejudiced by counsel's unprofessional errors.

iv.    Failure to Object to Improper *Allen* Charge.

The jury sent two notes indicating a deadlock. The first at 11:15am on October 21, 2008 and the second at 2:40pm on the same day. *See* (Exhibit No. 44, Jury Communications with Court, at 10, 14). The Court instructed the jury to try to reach a verdict but did not warn them to not give up their conscientious beliefs as required by law. *See* (*Id.* at 13, 19).

A criminal defendant subject to trial by jury is entitled to an uncoerced and unanimous verdict. *See Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988) ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body."); *see also United States v. Clinton*, 338 F.3d 483, 487 (6th Cir. 2003) ("Well settled precedent establishes that a criminal defendant being tried by a jury is entitled to an uncoerced and unanimous verdict of that body.").

Here, the jury sent out two notes indicating that it was deadlocked as to the appropriate sentence. *See* (Exhibit No. 44, Jury Communications with Court, at 10, 14). In the sentencing context, a single juror's vote for life results in a life sentence. Competent trial counsel would have ensured that the Court's instructions were not coercive. The instructions given here were coercive. They failed to provide guidance to the hold out juror that she need not give up her conscientious beliefs. *See* (Exhibit No. 38, Vicky Holloway Dec., at 1-2) ("My husband told me that the one Black juror was scared of standing up to the rest of the jury. The one Black juror was older. In her generation, Black people didn't make a fuss with white people in

Chattanooga.").

When examining an *Allen* charge at trial, "the relevant inquiry is whether, in its context and under all the circumstances, the charge was coercive." *Id.* (citing *United States v. Frost*, 125 F.3d 346, 373 (6th Cir. 1997). Trial counsel had two opportunities to make objections to the Court's use of an *Allen* charge and to ensure that if a charge were going to be made that those instructions were not coercive. Failure to do so was prejudicial. *See Clinton*, 338 F.3d at 487.

### j. Cumulative Prejudicial Effect

Individually and cumulatively, the numerous errors outlined above and elsewhere in this petition denied Rejon Taylor his right to a fair trial. Trial counsel's failures: to investigate, prepare, and present evidence to support the defense's case; to ensure an impartial jury; and to object to the government's improper and inflammatory evidence and arguments, prejudiced Rejon. But for trial counsel's ineffective representation, there is a reasonable probability that Rejon would not have been found guilty of capital murder. *See Kyles v. Whitley*, 514 U.S. 419, 434-46 (1995) (recognizing that errors must be considered cumulatively under the *Brady* materiality standard, which is identical to the *Strickland* prejudice standard); *see also Mackey v. Russell*, 148 Fed.Appx. 355, 365, 2005 WL 2175926, at *8 (6th Cir. Aug. 9, 2005) ("The *Strickland* test requires that prejudice be evaluated in light of the cumulative effect of all constitutionally infirm actions by counsel."); *Daniel v. Commissioner, Alabama Dep't of Corr.*, 822 F.3d 1248, 1278 (11th Cir. 2006) (under clearly established Supreme Court precedent, courts must consider

prejudice cumulatively). These errors constitute a violation of Rejon's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Rompilla*, 545 U.S. 374; *Wiggins*, 539 U.S. 510; *Williams*, 529 U.S. 362; *Strickland*, 466 U.S. 668. In addition, as discussed below, the foregoing errors (individually and cumulatively with the other deficient errors at the other stages of trial) also prejudiced Rejon at the penalty and sentencing phases of his capital trial.

### 3. Rejon Taylor Was Denied His Statutory Right to Learned Counsel Under 18 U.S.C. § 3005

By statute Congress guarantees the right to federal defendants charged with a capital crime the right to an attorney "learned in the law of capital cases." 18 U.S.C. § 3005. "Ordinarily, "learned counsel" . . . should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high-quality representation." *Guide to Judiciary Policy, Vol. 7 Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, Guideline 620.30. In this case, the Court appointed William Ortwein as learned counsel. Howell Clements was local counsel. Neither had ever been appointed to a federal capital case. The court later added Lee Ortwein (Mr. Ortwein's son) and Leslie Cory. Neither, Lee Ortwein nor Ms. Cory qualified as learned counsel at the time of trial. *See* (Exhibit No. 5, Leslie Cory Dec. at 1).

Prior to trial, the elder Mr. Ortwein became ill and required back surgery,

which resulted in a complicated recovery. (*Id.* at 11). The complications from the necessitated a continuance, but by the time of trial, the elder Mr. Ortwein was physically unable to function as learned counsel in a complex contentious federal capital case. (*Id.*). Mr. Clement was also ill and hearing impaired at the time of trial. (*Id.*)

As Leslie Cory explained, "Both Bill and Howell had some hearing problems, and Howell made several references in open court to not have 'caught' a comment or discussion, indicating he was having trouble hearing." (*Id.*). For instance, Mr. Ortwein informed the Court, "Let me say to the Court, if you're wondering why I've got on these headphones, I have a severe -- borderline severe hearing loss in my left ear, and it will be a little while before I get a hearing aid. This is an amplifier." (Doc 857, PageID # 3300, p. 12). There were other instances throughout trial where Mr. Ortwein admitted, "I'm sorry. I was busy, Your Honor. I didn't hear what Mr. Neff said. I apologize." (Doc 857, PageID # 3328, p. 40). During cross-examination of Joey Marshall, the government's key witnesses, Mr. Ortwein stated, "I'm sorry. I didn't hear you." (Doc. 863, PageID #4325, p. 129); *see also* (Doc 863, PageID # 4283, p. 87) ("Excuse me. I'm sorry. Who said that? I didn't hear him.") and (Doc 863, PageID # 4396, p. 200) ("I'm sorry. My hearing aids, I guess. Tell me that again."). Likewise, Mr. Clements struggled to hear the proceedings throughout the trial. At one point the Court instructed Mr. Clements "to focus on the fact," after he delivered a long critique about a witness's testimony being "flabby, flabby, flabby," to which Mr. Clements responded: "Are you talking to me, Your Honor?" *See* (Doc 865, PageID #

114

4601, p. 29). Later, Mr. Clements notified the Court, "I didn't hear what Mr. Neff said, Your Honor." (Doc 899, PageID # 7202, p. 93).

As a result, by the time of trial, Lee Ortwein and Leslie Cory were tasked with responsibilities beyond their experience and expertise. (*Id.* at 10) ("There were things…I should have done better. I learned as I went along."). For example, Lee Ortwein conducted the voir dire with respect to capital qualification. See Claim No. 2.c, IAC Voir Dire. Lee Ortwein was responsible for Dr. Cunningham's and Dr. Aiken's testimony, both of whom had large portions of their testimony excluded. See Claim No. 2.d, IAC Mitigation. Leslie Cory presented the majority of the lay mitigation witnesses. See Claim No. 2.d, IAC Mitigation. As Ms. Cory explains:

> At trial, I was concerned that Bill's health was impairing his performance. After his surgery, Bill turned over most of the individual voir dire to Lee and other issues to me, things I believe he had anticipated handling personally prior to his surgery. I thought he was trying to preserve his energy to make it through the whole trial. Lee and I contributed as much as we could to the court proceeding so that Bill could conserve his strength, but neither of us had capital experience.

(Exhibit No. 5, Leslie Cory Dec., at 11). Mr. Cooper corroborated Ms. Cory's observations, "Both Bill and Howell were nearing retirement at the time of Rejon's case, and they relied on me." (Exhibit No. 8, Roy Cooper Dec., at 1). He continued, "Bill got ill before the trial and had to ask for a continuance when he had complications after surgery. Howell had always had good days and bad days, but by the time of this case, he was struggling to keep up." (*Id.*).

Where Mr. Taylor had a statutory right to learned counsel, his right was effectively denied due to 1) no attorney appointed to represent him had prior federal

capital experience, and 2) the attorney who was appointed learned counsel was physically infirm and the next attorney in line was similarly ill and hearing impaired. Mr. Taylor was prejudiced as a result as described throughout this motion. His conviction and sentence should be vacated and set aside. Discovery and an evidentiary hearing should be granted on this claim.

4. **In Violation of the Eighth Amendment, it is Unconstitutional to Execute Someone Who was Under Age 21 at the Time of the Crime**

Current scientific and medical consensuses indicate that adolescents in their late teens to early twenties have underdeveloped brains, similar to that those under age 18. Considering these evolving standards, seeking a capital sentence against a defendant for conduct committed under age 21 constitutes an excessive sentence and cruel and unusual punishment, violating the Eighth Amendment of the U.S. Constitution. Given Rejon Taylor was 18-years-old at the time of the crime, his death sentence does not comport with constitutional standards.

a. **Adolescents are Less Culpable Than Adults Because They Have Underdeveloped Brain Functioning**

In 2005 the Supreme Court examined standards of decency concerning adolescents sentenced to the death penalty. *See Roper v. Simmons*, 543 U.S. 551 (2005). The examination resulted in a prohibition on the execution of individuals under age 18, finding such a practice violated the prohibition against cruel and unusual punishment as guaranteed by the Eighth Amendment. *Id* at 578-79. In creating this line, the Court acknowledged that, "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful

116

person to receive the death penalty despite insufficient culpability." *Id.* at 572.

In *Roper*, the Court drew a line at 18 for dueling justifications: (1) society drew the same line for many purposes between childhood and adulthood; and (2) because neuroscience available at the time indicated that 18-year-old brain functioning was underdeveloped in comparison to older brain functioning. *Id.* at 573-74; *see also* John H. Blume, Hannah Freedman, Lindsey S. Vann, and Amelia C. Hritz, *Death by Numbers: Why Evolving Standards Compel Extending Roper's Categorical Ban Against Executing Juveniles From 18 to 21*, Tex. L. Rev. (manuscript at 3) (forthcoming 2019).

### b. The Supreme Court Requires Reliance on the Scientific Community to Support a Defendant's Lesser Culpability.

The Court's decision in *Roper* derived from scientific studies about human brain development available at the time. More recently, the Court again grappled with the "unacceptable risk" that a defendant lacking the requisite culpability might receive a death sentence. *Hall v. Florida*, 572 U.S. 701, 704 (2014). To avoid such a risk, the Court determined that it is impermissible to disregard the scientific community's teachings. *Id.* at 712, 724. Rather, the Court held that where scientific consensus supports a defendant's lesser culpability, "[p]ersons facing that most severe sanction [the death penalty] must have a fair opportunity to show that the Constitution prohibits their execution." *Id.* at 724.

The Supreme Court continues to caution federal courts from diminishing or disregarding contemporary medical standards or consensus within the medical community. *See Moore v. Texas*, 137 S.Ct. 1039, 1049 (2017) (stating that a court's

disability determination must be informed by the medical community's diagnostic framework); *see also Hall*, 572 U.S. 701 (holding that states must consider prevailing norms within the mental and medical health profession bearing on the question of intellectual disability).

    c.  **Scientific Research, Since *Roper*, Indicates that Brain Development of Emerging Adults Bears a Resemblance to Juveniles Under 18.**

In determining *Roper*, the Court insisted that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *See Roper*, 543 U.S. at 574. Nevertheless, given available knowledge about human brain maturation at the time, the Court's cutoff at age 18 was justified. Leading research available at the time demonstrated that behavioral and decision-making capabilities of juveniles diverged from adult capabilities in three key ways: (1) immaturity and impulsiveness; (2) augmented susceptibility to negative influences and peer pressure; and (3) transitory personality traits. *Id.* at 569-70. *See also Miller v. Alabama,* 567 U.S. 460, 472 (2012) (observing the lack of development in juveniles causes "transient rashness, proclivity for risk, and inability to assess consequences"). Based on these considerations, imposing death sentences on juveniles failed to accomplish the constitutionally permissible penological aims of capital punishment. *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, J.) (a death sentence must serve the "two principal societal purposes" of retribution and deterrence).

At the time of the Court's decision in *Roper*, researchers understood "[y]oung adults between the ages of eighteen and twenty-one [to] constitute a less well-

defined category." *See* Elizabeth S. Scott, Richard J. Bonnie, and Laurence Steinberg, *Young Adulthood as a Transitional Legal Authority: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 643 (2016). Research had not yet produced a robust understanding of maturation in young adults age 18 to 21. *Id.* at 653.

In the 14 years since *Roper* was decided, scientific consensus indicates that new understandings of the human brain necessitate a redrawing of the age limit then adopted by the Court. Such research includes the widespread and universal use of functional magnetic resonance imaging (fMRI) studies and enhanced tools in conducting fMRI research. *See* Kerri Smith, *fMRI 2.0: Functional Magnetic Resonance Imaging Is Growing from Showy Adolescence into a Workhorse of Brain Imaging*, 484 Nature 24, 25 (2012); *see also* Megan K. Horton et al., *Neuroimaging Is a Novel Tool to Understand the Impact of Environmental Chemicals on Neurodevelopment*, 26 Curr. Ops in Ped. 200, 231-32 (2014) ("Recent advances in neuroimaging techniques" have "opened unprecedented access to study the developing human brain"); Elizabeth C. Victor & Ahmad R. Hariri*, A Neuroscience Perspective on Sexual Risk Behavior in Adolescence and Emerging Adulthood*, 28 Dev. & Psych. 471, 472 (2016) ("In the last decade[,] remarkable research has been conducted in the field of developmental neuroscience to provide a richer understanding of brain function and development during adolescence and emerging adulthood.").

Significantly, medical and mental health professionals now recognize key

traits possessed by juveniles under 18 – the same traits that made them ineligible for the death penalty – are also present in older adolescents in their late teens and early twenties. Research on brain maturation and developmental psychology indicate that, "youthfulness and attendant characteristics of defendants 18 through 20 years of age are indistinguishable in neurological development and functioning from the 16 and 17-year-old defendants the *Roper* Court categorically exempted from the death penalty due to their insufficient culpability." *See* Karen Steele, *Lockett As It Was, Is Now, And Ever ~~Shall~~ should Be*, 10 ConLawNOW 77, 83-84 (2018); *see also* John H. Blume, et al., *Death by Numbers*, Tex. L. Rev. (manuscript at 4).

First, recent scientific research indicates that late adolescent, or between the ages of 18 and 21, brains are also immature and impulsive. *See* Alexandra Cohen, Richard Bonnie, Kim Taylor-Thompson and B.J. Casey*, When Does a Juvenile Become an Adult? Implications for Law and Policy,* 88 Temple L. Rev. 769, 787 (2016); *see also* Elizabeth P. Shulman, et al., *The dual systems model: Review, reappraisal, and reaffirmation*, 17 Dev. Cogn. Neurosci. 103, 109 (2016). Young adults experience rapid changes in areas of their brains closely connected to impulsivity and decision-making. *See* John H. Blume, et al., *Death by Numbers*, Tex. L. Rev. (manuscript at 12); *see also* Lars T. Westlye et al., *Life-Span Changes of the Human Brain White Matter: Diffusion Tensor Imaging (DTI) and Volumetry,* 20 Cerebral Cortex 2055, 2062 (2010). Although many believe teenagers are the most impulsive group, in reality older adolescents are especially prone to risky

behaviors. *See* Alexandra O. Cohen, et al., *When is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27 Psych. Sci. 549 (2016). Rather than decreasing at age 18, the desire to engage in risky activities actually increases between the ages of 18 and 21 before starting to taper off later. *See id.*

Second, young adults are more vulnerable to negative influences and outside pressures, including peer pressure. *See Roper*, 543 U.S. at 569. Research demonstrates that from late adolescence to the mid-20s, individuals are susceptible to impulsive or poor decision-making processes when peers are present. *See* Aude Henin & Noah Berman, *The Promise and Peril of Emerging Adulthood: Introduction to the Special Issue*, 23:3 Cogn. & Behav. Practice 263, 263 (2016) (describing emerging adulthood as a developmental stage defined by high-risk behavior, vulnerability to peer pressure, impulsivity, deficits in self-regulation, and ongoing neurological growth).

Third, personality traits of older adolescents are more transitory and less fixed. *Roper*, 543 U.S. at 569. Character traits of young adults are not yet formed due to the lack of maturity in the developing brain. Kaitlyn Breiner, et al., *Combined effects of peer presence, social cues, and rewards on cognitive control in adolescents*, 60 Dev. Psychol. 292 (2018). Although young adult brain's reward centers are fully developed, regions of the brain that regulate higher reasoning and emotional control remain immature. *See* John Blume, et al., *Death by Numbers*, Tex. L. Rev. (manuscript at 11-12). Young adults also lack sufficient brain

structures that allow different regions of the brain to communicate. These developmental deficits cause young adults to have trouble managing and processing emotions, creating particular difficulty with generating appropriate responses to fear and understanding consequences. *Id.* at 12-13.

Updated medical science confirms that late teenaged and early 20-year-old brains show the same characteristics that the Court acknowledged as diminishing culpability and undermining retributive punishment. *Roper*'s age 18 cutoff is insufficient to ensure that those who lack the requisite culpability, specifically, adolescents in their late teens and early 20s whose still-developing brains cause behavior and decisions analogous to juveniles under 18—are not sentenced to capital punishment.

### d. There is Consensus Against Executing Individuals Under Age 21 at the Time of the Crime

The Eighth Amendment's prohibitions against cruel and unusual punishment derives meaning from "the evolving standards of decency that mark the progress of a maturing society." *Woodson*, 428 U.S. at 301. Courts may rely on objective indicators to determine whether a practice is consistent with contemporary standards of decency. *See Kennedy v. Louisiana*, 554 U.S. 407, 422 (2008) (noting the consistent approach of measuring the objective indicia of consensus); *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion) ("evolving standards of decency" are to be measured by "objective factors to the maximum possible extent"). Medical consensus, jurisdictional trends removing the death penalty, and legal trends all indicate that society's standards of decency have evolved such that

sentencing late adolescents to death is no longer permissible. Emerging medical and scientific consensus around the country demonstrate that defendants 21 and younger are just as deserving of constitutional protections from a capital sentence as defendants under the age of 18. *See* John Blume, et al., *Death by Numbers*, Tex. L. Rev. (manuscript at 1).

Few jurisdictions continue sentencing defendants under 21 years of age to death. First, twenty-one jurisdictions have removed the death penalty as a possible punishment entirely. These jurisdictions include twenty states[16] plus the District of Columbia. Six of these states have renounced the imposition of the death penalty since Rejon's sentencing, including New Mexico in 2009; Illinois in 2011; Connecticut in 2012; Maryland in 2013; Delaware in 2016; and Washington in 2018. Four additional jurisdictions have moratoria in place suspending use of the death penalty. Each of these four jurisdictions – California, Colorado, Oregon, and Pennsylvania – instituted moratoria after Rejon was sentenced. Several other jurisdictions still legally have a death penalty statute enumerated have exhibited long-term disuse. *See* (Kansas, Kentucky, Montana, Nevada, New Hampshire, North Carolina, and Wyoming). Still most relevant, the United States federal government has not executed a defendant in almost two decades.

Moreover, since *Roper*, the number of youthful offenders sentenced to death, in jurisdictions that retain capital punishment, each year has been declining. *See*

---

[16] These states are Alaska, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, North Dakota, Rhode Island, Vermont, West Virginia, Washington, and Wisconsin.

John Blume, et al., *Death by Numbers*, Tex. L. Rev. (manuscript at 20). Prior to Rejon's trial in 2008, only two other individuals who were 18 at the time of the crime had been sentenced to the federal death penalty. *See United States v. Bernard*, 299 F.3d 467, 472-73, 481-82 (5th Cir. 2002) and *United States v. Paul*, 217 F.3d 989, 994, 1002 (8th Cir. 2000). Since Rejon's sentence, no other 18-year-old has been sentenced to the federal death penalty.

Furthermore, legal institutions have recognized that brains 21-years-old and younger –like those that are 18—are sufficiently immature to be subject to a death sentence. In a May 2017 report by the United States Sentencing Commission, the Commission defined a "youthful offender" as a person "age 25 or younger at the time they are sentenced in the federal system." *See Youthful Offenders in the Federal System* at 1. The Commission further explained that, "[t]he inclusion of young adults in the definition of youthful offenders is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average." *Id.* at 5. The Commission pointed to scientific consensus on brain development that the prefrontal cortex is not complete by the age of 18, that development continues into a person's 20s, and reference age 25 as the average age at which full development has taken place. *Id* at 7. A 2013 study sponsored by the United States Department of Justice ("DOJ") concluded that "young adult offenders aged 18-24 are more similar to juveniles than to adults with respect to their offending, maturation, and life circumstances." *See* Rolf Loeber et al., *From Juvenile Delinquency to Young Adult*

*Offending (Study Group on the Transitions between Juvenile Delinquency and Adult Crime)* (July 2013). Another 2014 report from the DOJ similarly recommended raising the age for criminal court to 21 because, "young adult offenders ages 18-24 are, in some ways, more similar to juveniles than to adults." U.S. Dep't of Justice, Office of Justice Programs, National Institute of Justice, *Young Offenders: What Happens and What Should Happen*, Doc. No. NCJ 242653, at 2 (Feb. 2014). A separate report prepared for the DOJ in 2016 to address the developmental needs of young adults involved in the criminal justice system similarly recognized the impulsivity and peer-influence that contributes to the incarceration, and the need to protect, late adolescents. Connie Hayek, *Environmental Scan of Developmentally Appropriate Criminal Case Justice Responses to Justice-Involved Young Adults*, U.S. Dep't of Justice, Office of Justice Programs, National Institute of Justice (June 2016) at 20.

Other legal authorities have arrived at the same conclusions. In February 2018, the American Bar Association (ABA) House of Delegates called on all death penalty jurisdictions to ban capital punishment for any offender who committed their crime at the age of 21 or younger. *See* ABA, Resolution 111, February 2018. The ABA supported the determination based on increases in scientific understanding of adolescent brain development and legislative developments in the legal treatment of individuals in late adolescence. *See Id.* at 6-10. For example, it recognized "a consistent trend toward extending the services of traditional child-serving agencies, including the child welfare, education, and juvenile justice

systems, to individuals over the age of 18." *Id.* at 10.

In addition, many federal and local restrictions on individuals 21-years-old and under demonstrate the protected nature of this class. For example: Individuals under 21 are prohibited from purchasing alcohol, *see* 23 U.S.C. § 158; individuals under 21 cannot legally purchase or own handguns, *see* 18 U.S.C. § 922(b)(1), §923 (d)(1)(A); most car rental companies will not rent to individuals under the age of 21; over 425 cities and counties across the United States disallow the sale of tobacco to individuals under 21. *See* John Blume, et al., *Death by Numbers*, Tex. L. Rev. (manuscript at 16) (citing Tobacco21, https://tobacco21.org/state-by-state/ (last visited Jan. 18, 2019)); and, "[f]ederal immigration law permits a parent of a U.S. citizen to petition for an immigrant visa for any "unmarried children under the age of 21." *See id.* (citing 8 U.S.C. § 1151(b)(2)(A)(i)).

Scientific understanding of the adolescent brain indicates that older adolescents are immature and impulsive, vulnerable to outside influence, and emotionally transitory, similar to brains of adolescents younger than 18. Accordingly, courts should also exclude them from capital punishment. Since Rejon was 18-years-old at the time he committed the charges against him, this Court should reverse Rejon's death sentence.

5. **Under the Particular Circumstances of This Case, Rejon Taylor's Death Sentence is Unconstitutionally Disproportionate in Violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution Because He Was 18-Years-Old at the Time of the Crime**

Even assuming *arguendo* that the federal death penalty statute is constitutional, and that it can be constitutionally applied to *some* 18-year-olds, it

would be unconstitutionally disproportionate to apply the federal death penalty statute in the circumstances of *this case*. As with all statutes, a death penalty statute may be constitutional on its face, yet unconstitutional as applied in a particular case. *See, e.g., Penry v. Lynaugh*, 492 U.S. 302, 315 (1989) (Texas's special issues scheme facially valid but unconstitutional as-applied). Rejon was not only 18-years-old at the time of the crime: as a result of his exposure to trauma, disadvantage, and neurological impairment, he was functioning at a much younger chronological age. *See* (Exhibit No. 1, George Woods, M.D., Report, at 19). These facts, and the omitted mitigation more generally, make clear that Rejon is not among the narrow class of the worst offenders for whom the death penalty is reserved.

Moreover, this case is not highly aggravated: two of the aggravating circumstances (kidnapping and substantial planning and premeditation) relied on the Government's evidentiary presentation of the crime, and the third (future dangerousness) was largely the result of Rejon's poorly planned, immature attempt to escape from the Hamilton County Jail. *See* (Doc. 874, PageID# 5648) ("Q: It was jury stupid? A: To say the least."). The circumstances of the crime reflected youthful immaturity, impulsivity, and the inability to understand consequences, rather than, for example, substantial planning or premeditation. *See* (Doc. 868, PageID #5087, p.42) (Government: "somebody might argue that the manner in which the murder took place was more indicative of somebody who's reacting to events rather than a plan"); *see also* (Exhibit No. 2, Katherine Porterfield, Ph.D., Report, at 28) ("As the

events of the crime unfolded, Rejon, barely 18 years old and functioning with a highly impaired physiological stress response system became completely undone, overwhelmed and outside of himself."). Under the circumstances of this case, Rejon's death sentence is unconstitutionally disproportionate.

The Supreme Court has held that "the Eighth Amendment guarantees *individuals* the right not to be subjected to excessive sanctions. The right flows from the basic precept of justice that punishment for crime should be graduated and proportioned to the offense." *Roper*, 543 U.S. at 560 (citations and internal quotation marks omitted) (emphasis added). Thus, even outside the categorical rulings prohibiting death sentences for certain categories of offenders (or offenses), a court must "consider[] all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Graham*, 560 U.S. at 59. Applying that principle in the context of life without parole sentences for offenders under age 18, the Supreme Court recently held that "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'" *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016) (quoting *Miller v. Alabama*, 132 S. Ct. 2455, 2469 (2012), and *Roper*, 543 U.S. at 573)). That same principle applies when, as here, the defendant is 18-years-old and facing a potential death sentence. Even if the defendant's age was presented as a mitigator at trial, a death sentence violates the Eighth Amendment's proportionality principle if, under all the circumstances of the case, the defendant lacks the "extreme culpability

mak[ing] them 'the most deserving of execution.'" *Roper*, 543 U.S. at 568 (citation omitted).

Here, Rejon's death sentence is unconstitutionally disproportionate because — considering all the omitted mitigation, *see* (Claim No. 2.d, IAC-Mitigation Claim) — it is clear that he lacks the extreme culpability making him the most deserving of execution. On the contrary, the evidence reflects that, at the time of the offense, Rejon was influenced by the signature qualities of youth that make the death penalty disproportionate. First, even more than other 18-year-olds, Rejon's troubled life history, filled with neglect, exposure to trauma, and neurological impairment, meant he was immature (and indeed functioning at the level of a younger teenager) and had an underdeveloped sense of responsibility, leading to recklessness and impulsivity. *See Roper*, 543 U.S. at 569. Second, his youthful immaturity meant he was more vulnerable to negative influences, including peer pressure, and had a hard-time extricating himself from crime-producing settings. *See id.* This is reflected in the circumstances of the offense itself, which (under the State's theory of the case), involved a kidnapping gone terribly awry — based on a poorly conceived plan to extort money from the victim — and similarly immature co-defendants. Third, Rejon's character was not as well formed as that of an adult. *See id.* Again, this is reflected in the fact Rejon's life history, and the circumstances of the crime, showed extreme immaturity (and thus the possibility for change) and not heightened planning.

Rejon's possibility for change has since been confirmed based on his conduct

in prison since the Court imposed the death sentence. Indeed, "Rejon's response to prison has been positive in that the structure of prison has allowed him to function appropriately and without major stress reactions. He has been able to work as a porter in the prison for several years, a job that reflects positive adjustment to the structured environment and an ability to follow rules and interact appropriately with prison staff." (Exhibit No. 2, Katherine Porterfield, Ph.D., Report, at 29). Rejon's family members have also witnessed his maturation over the years. Ramon Shepard, Rejon's brother-in-law acknowledged Rejon's journey, including before trial at Hamilton County Jail: "Rejon has made some major changes in his life. He has grown up in prison. In the Hamilton County Jail, Rejon had a lot going on…." (Exhibit No. 26, Ramon Shepard Dec., at 10). Mr. Shepard continued, noting Rejon's growth relative to before the crime, "[h]e has matured in prison and I am proud of him for that. He has learned to express himself. When he was out here with us, he was quiet and unable to communicate like he does now." (*Id.*). Rejon's older sister made similar observations, "Rejon experienced a big change when he was sent to Indiana after the trial. He has a greater sense of faith and the spiritual world. He spends a lot of time thinking things through in ways that he never had the time for while he was out." (Exhibit No. 33, Tameka Shepard Dec., at 15). Rejon has matured and become more self-reflective while in prison. Joseph Gatlin, Rejon's maternal uncle revealed that Rejon "wrote me an apology in 2017. He was sorry that he had let me down and embarrassed the family." (Exhibit No. 18, Joseph Gatlin Dec., at 13). Rejon's cousin EJ Gatlin professed, "I'm so proud of the artwork

130

he has done since he has been at Terre Haute. Rejon has a story to tell and it is not the story that the government or his defense team told at trial." (Exhibit No. 12, Edward Gatlin Dec., at 12).

Rejon's immaturity, neurological impairment, and youthfulness were especially apparent in the lack of competency he exhibited when considering the government's offer of a life sentence. *See Miller v. Alabama*, 132 S. Ct. 2455, 2468 (2012) (one of the "incompetencies associated with youth" is an "inability to deal with . . . prosecutors (including on a plea agreement)"); *see also* (Claim No. 1, IAC-Competency Claim). In 2005, around Rejon's twenty-first birthday, in response to the government's offer, Rejon "told the [defense] team that he could not accept the life offer unless God told him to do so…" (Exhibit No. 5, Leslie Cory Dec., at 4). Mr. Clements recalled that Rejon "persisted in his refusal to consider the life offer, including telling us in November 2005 that God had not told him to enter a plea so he could not." (Exhibit No. 6, Howell Clements Dec., at 4). Mr. Cooper reported that in response to the offer, Rejon indicated that he was standing on the rock until/unless told by God to do something else." (Exhibit No. 8, Roy Cooper Dec., at 3).

At a minimum, these facts raise a strong inference of unconstitutional disproportionality between the circumstances of this case and Rejon's death sentence. That inference is confirmed by how increasingly rare it has become for young offenders (even without any consideration of the specific circumstances of the case) such as Rejon to be sentenced to death or executed. *See Commonwealth v.*

*Bredhold*, No. 14-CR-161 at 4-5 (Fayette Circuit Ct. 7th Div. Aug. 1, 2017) ("declar[ing] the Kentucky death penalty statute unconstitutional insofar as it permits capital punishment for those under twenty-one (21) years of age at the time of their offense."). When this Court considers the circumstances of Rejon's case — the substantial mitigation now presented and the comparatively limited aggravation, and his heightened immaturity — there are objective indicia of national consensus against his execution. *See Roper*, 543 U.S. at 565.

There are only two other individuals who were 18-years-old at the time of the crime and who have been sentenced to death in federal court, Brandon Bernard and Jeffrey Paul. Among other things, their cases are significantly different and more aggravating than Rejon's. *See United States v. Bernard*, 299 F.3d 467, 472-73, 481-82 (5th Cir. 2002) (two murder victims, locked in a car trunk for hours before being shot and burned, one victim was still alive when burned); *United States v. Paul*, 217 F.3d 989, 994, 1002 (8th Cir. 2000) (victim was 82-year-old man who defendant beat, nearly decapitated, shot, and then tried to hide the body). The specific facts of Rejon's case, particularly when compared to the more aggravating crimes committed by similarly situated defendants, do not warrant a death sentence. Moreover, Mr. Paul was sentenced to death in 1997, for a crime committed in 1995 and Mr. Bernard was sentenced to death in 2000, for a crime committed in 1999. Therefore, no one, except Rejon Taylor, has been sentenced to death since the Supreme Court's decision in *Roper* in 2005, clarifying that evolving standards of decency prohibited death sentences for those who commit otherwise death eligible

offenses when they are under age 18.

Under the circumstances of this case, the Constitution's ban on disproportionate punishment means that Rejon's death sentence cannot stand.

### 6. The Eighth Amendment Precludes the Execution of the Mentally Ill: Rejon Taylor Suffers From Severe Mental Illness.

Execution of the intellectually disabled is prohibited by the Eighth Amendment and the Federal Death Penalty Act. *Atkins v. Virginia*, 563 U.S. 304, 321 (2002). Execution of mentally ill people also violates the Eighth Amendment. Mr. Taylor is mentally ill and suffers from significant brain impairments that both affected his behavior at the time of the crime and affected his ability to accept the plea deal in this case. Under the rationale of *Atkins*, the Eighth Amendment prevents the government from executing Mr. Taylor as a result of his mental illness and brain impairments. *See, e.g., id.; People v. Danks*, 82 P.3d 1249, 1285 (Cal. 2004) ("If defendant's doctors are right, defendant's mental deficiencies are comparable in severity to mental retardation."); *State v. Nelson*, 803 A.2d 1, 41 (N.J. 2002) (the "lesser culpability" rationale for prohibiting imposition of the death penalty on the intellectually disabled is equally applicable to a seriously mentally ill defendant) (Zazzali, J., concurring); *Corocan v. State*, 774 N.E.2d 495, 502 (Ind. 2002) (Rucker, J., dissenting) ("I respectfully dissent because I do not believe a sentence of death is appropriate for a person suffering a severe mental illness . . . [T]he underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill, namely evolving standards of decency.").

133

Mr. Taylor suffers from bipolar disorder secondary to a medical condition (i.e.

temporal lobe syndrome). As explained by Dr. George Woods:

> Mr. Taylor has debilitating neurological, psychological, and functional impairments and meets the diagnostic criteria for Bipolar disorder secondary to a general medical conviction, ie. Temporal Lobe Syndrome and Post Traumatic Stress Disorder. Mr. Taylor suffers from Temporal Lobe Syndrome, an umbrella term which indicates serious deficits in emotional and cognitive functioning stemming from impaired function in the temporal lobe. Mr. Taylor displays significant impairment of executive functioning, particularly in his ability to effectively weigh and deliberate, understand social cues, and understand social context. Mr. Taylor's ability to effectively weigh and deliberate is impaired by his psychotic religiosity, which is the direct result of his temporal lobe-based delusions. Mr. Taylor also suffers from a personality change secondary to his temporal lobe dysfunction. The personality change includes a manic-like set of symptoms, which includes mood lability, circumstantiality, loss of ego boundaries, and psychotic ambivalence.

(Exhibit No. 1, George Woods, M.D., Report at 3). He also suffers from Post-

Traumatic Stress Disorder:

> Mr. Taylor has the signs of a vigilant, hyperaroused nervous system, which is symptomatic of a stress disorder. As a child, Mr. Taylor experienced multiple traumatic stressors, including gun play both in the neighborhood and in the house. He was nearly shot by his brother in law before he was five (Declarations of Tameka Shepard and Ramon Shepard); his brother shot him with a BB gun when he was ten (Interview by Katherine Porterfield; Declaration of John Taylor II). There was family violence that Rejon knew about at an early age, including the domestic murder of an aunt (Declarations of Johnny Taylor; Lisa Taylor; Walter Taylor; Precious Heflin; Vanessa Heflin); Rejon's father's commission of murder (Declaration of Johnny Taylor) and a physical attack on Rejon's sister (Tameka Shepard Declaration). Rejon was also aware that his sister's father was murdered and her cousin was killed, again through a suspected murder (Declaration of Tameka Shepard). Rejon was also exposed to domestic violence between his parents (Declarations of Johnny Taylor, Tameka Shepard, Felisha Gatlin).

> Mr. Taylor was especially vulnerable to traumatic stressors, due to his cognitive limitations. Poor ego boundaries undermined his ability to

> develop coping mechanisms that would protect him. Loss of ego boundaries, comorbid with dissociative experiences are synergistic. Similarly, mood lability combined with affective dysregulation made Mr. Taylor hyper-responsive, consistent with his behavior at the time of the offense.

(Exhibit No. 1, George Woods, M.D., Report, at 18).

Although *Atkins* did not explicitly address a categorical exception for the severely mentally ill, the reasoning of that decision makes clear that the Eighth Amendment protection extended to the mentally ill. Mr. Taylor has many characteristics in common with those that make execution of the intellectually disabled inconsistent with retributive and deterrence functions of the death penalty, including diminished capacity for impulse control, gullibility, and a reduced ability to engage in meaningful cost-benefit analysis. *ABA, Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 668, 670 (2006). Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. *See Woodson*, 428 U.S. at 301 ("the evolving standards of decency that mark the progress of a maturing society."); *Coker*, 433 U.S. at 592 (plurality opinion) ("evolving standards of decency" are to be measured by "objective factors to the maximum possible extent").

7. **The Federal Government's Decision to Prosecute Rejon Taylor and to Authorize his Case as a Capital Prosecution was Based on Racial Discrimination in Violation of Rejon's Fifth, Sixth, Eighth and Fourteenth Amendment Rights**

The government's decision to authorize Rejon Taylor's case as a federal

capital offense was based on racial discrimination in violation of Rejon's constitutional rights. That Rejon lacked a violent criminal history, was 18-years-old at the time of the crime, and the offense was not as aggravating as other federal capital cases made Rejon an unlikely candidate for federal death authorization. *See e.g. United States v. Lujan*, 603 F.3d 850, 852 (10th Cir. 2010) (defendant convicted of what the Tenth Circuit described as a "a gruesome[crime] in which Lujan (and his cohorts) severely beat [the victim] over a significant period of time, sexually assaulted [him], and engaged in other acts to terrify and isolate [the victim].");*United States v. McVeigh,* 940 F. Supp. 1571 (D. Colo. 1996), aff'd sub nom. *United States v. Nichols,* 169 F.3d 1255 (10th Cir. 1999)(defendant convicted of Oklahoma City bombing, which left 168 people dead and hundreds injured); *United States v. Bin Laden*, 126 F. Supp. 2d 290, 293 (S.D.N.Y. 2001), aff'd sub nom. *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) (defendants associated with Usama bin Laden convicted in simultaneous terrorist truck bombs, killing 224 and injuring thousands); *United States v. Minerd*, 112 F. App'x 841, 842 (3d Cir. 2004) (defendant convicted of arson and detonating bomb that killed pregnant girlfriend, her fetus, and three-year old daughter). However, the evidence supports an inference that, the Government pursued and secured a death sentence against Rejon at least in part because Rejon is Black, and the victim was white. Moreover, the government intentionally selected the least racially diverse jurisdiction to increase the possibility of obtaining a death sentence in this interracial crime. Once a virtually all-white jury was empaneled, the

Government then relied on racially coded and dehumanizing language to appeal to jurors' racial bias to secure a conviction and death sentence. *See* (Claim No. 11.a, IAC-Racially Coded Language Claim).

Though the Supreme Court upheld the death penalty in *Gregg v. Georgia*, 428 U.S. 153 (1976), in practice, the death penalty has failed to adhere to the Constitutional safeguards established, particularly regarding race. *See McCleskey v. Kemp,* 481 U.S. 279, 322 (J. Brennan, dissenting) (acknowledging that race plays a "prominent role" determining capital sentencing). Rejon's case is no exception. In 2015, Supreme Court Justice Breyer analyzed the operation of the death penalty nationwide, finding that constitutionally impermissible factors such as race and geography dictated who received the death penalty, instead of permissible factors, such as the "comparative egregiousness of the crime." *Glossip v. Gross*, 135 S.Ct. 2726, 2755-77 (2015) (J. Breyer, dissenting). *See also* Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era,* 50 Hous. L. Rev. 131, 132 (2012) (stating that death is more likely to be imposed if the victim is white); Matt Ford, *Racism and the Execution Chamber*, The Atlantic, June 23, 2014, http://www.theatlantic.com/politics/archive/2014/06/race-and-the-death-penalty/373081/ (demonstrating that although half of all U.S. homicide victims were black, more than three-fourths of victims of death row defendants executed since 1976 were white).

In violation of Rejon's Eighth Amendment protections against cruel and unusual punishment, race and geography appeared to serve as the driving forces in

the government's decision to seek the death penalty against Rejon. In relying on Rejon's race, the government chose to prosecute his case in the least racially diverse jurisdiction to ensure the least racially diverse jury pool. The Hamilton County district attorney's office was initially handling the prosecution against Rejon in state court. *See* (Exhibit No. 74, Hamilton County Criminal Court Rule Docket, at 1-3). At the time of trial, the Black population in Hamilton County was 20 percent. *See* U.S. Census 2000 and 2010. In addition, Hamilton County juries had only sentenced three individuals, all of whom were white, to death since Tennessee reenacted the death penalty in 1978. *See* TN Department of Correction, Death Row Offenders (Harold Nichols, sentenced in 1990; Leroy Hall, sentenced in 1992; Marlon Kiser, sentenced in 2003) (available at https://www.tn.gov/correction/statistics-and-information/death-row-facts/death-row-offenders.html). Given these facts, Rejon's likelihood of receiving a death sentence in Hamilton County was low.

Comparatively, at the time of trial, the combined Black population of the U.S. Eastern District of Tennessee, Chattanooga Division, encompassing nine counties (Bledsoe, Bradley, Hamilton, McMinn, Marion, Meigs, Polk, Rhea, and Sequatchie) was only 12.6%. *See* U.S. Census 2000 and 2010. Moreover, prior to Rejon's trial, the United States sentenced 44 individuals to death since 1993, 27 of whom were people of color. *See* (Exhibit No. 75, Federal Death Penalty Chart). Based on information and belief, undersigned counsel asserts that the federal government

assumed control over Rejon's prosecution given the lower probability of the state securing a death sentence.

The government's decision to seek death against Rejon Taylor existed against the backdrop of racial disparities in the federal government's administration of the capital punishment. Black people make up just 13% of the American population, yet comprise 43% of the federal death row population. *See* Death Penalty Information Center, *National Statistics on the Death Penalty and Race* (Nov. 18, 2018), [https://deathpenaltyinfo.org/race-death-row-inmates-executed-1976?scid=5&amp;did=184](https://deathpenaltyinfo.org/race-death-row-inmates-executed-1976?scid=5&amp;did=184). Moreover, Black defendants are significantly more likely to receive a death sentence for murders involving white victims, such as in Rejon's case. *See* (Claim No. 8, FDPA-Racially Discriminatory Claim). As in Rejon's case, the impact of a cross-racial crime on whether the defendant receives the death penalty is particularly pronounced when the jury is predominately white and the defendant Black. *See* Jelani J. Exum, *Should Death Be So Different?: Sentencing Purposes and Capital Jury Decisions in an Era of Smart on Crime Sentencing Reform*, Ark. L. Rev. 227, 243-44 (2017) (explaining that implicit racial biases causes predominately white juries not to give effect to mitigating evidence when the defendant is Black and inappropriately add weight to aggravating factors when the victim is white); *see also* (Claim No. 2.c, IAC-Voir Dire Claim).

Given the above, and based on information and belief, the government – both the local United States Attorney's Office and the DOJ – impermissibly relied on race, at least in part, when deciding to seek the death penalty against Rejon Taylor.

### 8. The Federal Death Penalty Act is Administered in a Racially Discriminatory Manner in Violation of Rejon Taylor's Fifth and Eighth Amendment Rights

The arbitrary and capricious nature in which the federal government invokes the death penalty is akin to being struck by lightning. *See*, G. Ben Cohen and Robert J. Smith, "The Racial Geography of the Federal Death Penalty," 85 Wash. L. Rev. 425, 431 (2010) ("The infrequency of the federal death penalty – with 67 federal death sentences in the face of over 150,000 murders – makes death by lightning-strike look positively routine."). There are few factors – including the severity of the underlying crime – that create a meaningful basis for distinguishing when federal prosecutors will seek death and when they will not.[17] Trends that have emerged, however, indicate capital authorizations rely, in part, on insidious factors, including race and the jurisdiction where the crime occurred. *See* Cohen, "The Racial Geography of the Federal Death Penalty," 85 Wash. L. Rev. 425 (describing capital punishment's connection to race); *see also* (Exhibit No. 75, Federal Death Penalty Chart).

The federal government's administration of the death penalty – in which it

---

[17] In the District of Colorado, Timothy McVeigh was sentenced to death and executed for detonating a truck bomb at a Federal Building in Oklahoma City, killing 168 people and injuring hundreds. In the Southern District of New York, two men associated with Usama bin Laden and al-Qaeda were spared the death penalty after being convicted of simultaneous terrorist attacks, utilizing truck bombs that destroyed two American embassies in East Africa, killing 224 – including 12 Americans – and injuring thousands. Zacharias Moussaoui was spared the death penalty in the Eastern District of Virginia despite a jury finding that he was responsible for thousands of deaths that occurred as a result of the September 11, 2001 terrorist attacks. Eric Rudolph – the Olympics and abortion-clinic bomber – entered a guilty plea to a life sentence, as did Theodore Kaczynski, the Unabomber. In Boston, in 2015, Dzhokhar Tsarnaev was sentenced to death for the bombing of the Boston Marathon where fewer people were killed than in other terrorism cases.

authorizes who to seek death against and to whom it offers pleas of a sentence less than death – is impermissibly influenced by the victim's race and the location of the crime in violation of the Fifth and Eighth Amendments. *See Glossip*, 135 S.Ct. 2726, 2755-77 (2015) (Breyer, J. dissenting) (recognizing that constitutionally impermissible factors, such as race and geography, dictate who receives the death penalty, instead of permissible factors like the aggravation of the crime).

The judiciary is tasked with "the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). The Supreme Court has repeatedly emphasized that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969). This case, a federal prosecution, similarly, is subject to the Due Process Clause of the Fifth Amendment which has long been held to embody this requirement, by implication. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see Weinberger v. Wisenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment.").

The Eighth Amendment's prohibition of the arbitrary use of the death penalty imposes constitutional limitations on capital punishment that do not apply to lesser punishments. *See, e.g., Woodson*, 428 U.S. 280 and *Roberts v. Louisiana*, 428 U.S. 325 (1976) (mandatory death sentences—but not other mandatory sentences—are unconstitutional); *Lockett v. Ohio*, 438 U.S. 586 (1978) (sentencer must be free to give "independent mitigating weight" to any fact about the

141

defendant or the offense, in a capital case); *Bullington v. Missouri*, 451 U.S. 430 (1981) (imposition of a death sentence after reversal of a sentence of life imprisonment is unconstitutional, although there is no similar per se ban on harsher sentencing on retrials of other criminal cases); *Turner*, 476 U.S. 28 (capital defendants in interracial murders but not non-capital murder defendants—are entitled to question potential jurors about possible racial bias). Illuminated by Fifth Amendment equal protection guarantees, the Eighth Amendment prohibits racial discrimination in the administration of the death penalty.

As early as 1994, merely six years after the federal death penalty was reintroduced, Congress began to investigate the uneven and discriminatory application of the federal death penalty. The House Subcommittee on Civil and Constitutional Rights investigated and concluded that race continued to plague the application of the death penalty, noting that the government authorized 33 of 37 cases, or 87%, against Black or Hispanic defendants. *See* "Racial Disparities in Federal Death Penalty Prosecutions 1988-1994," Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, Mar. 1994. Later, Congress enacted the Federal Death Penalty Act (FDPA) to set forth procedures for the imposition of the death penalty purporting to safeguard the due process and confrontation rights of the accused. 18 U.S.C. §§ 3591-3598. These procedures were a response to the Supreme Court's concerns about arbitrariness in the application of the death penalty. *See Furman v. Georgia*, 408 U.S. 238, 253 (1972). From 1995-2000 over 70 percent of the individuals that

the Department of Justice sought the death penalty against were minorities, hardly

an improvement. U.S. DOJ, *The Report on the Federal Death Penalty System: A*

*Statistical Survey 1988-2000*, (2000) at 8.

Today, racial disparities continue to plague the federal government's

administration and application of the death penalty in the United States.

Currently, of the 66 individuals on death row, 59 percent are minorities; 44 percent

of them Black. *See* (Exhibit No. 75, Federal Death Penalty Chart). Seventy-five

percent of defendants that the government has approved for capital prosecution

were minorities, consistent with decades old disparities. *See* (Exhibit No. 75,

Federal Death Penalty Chart). This disparity is striking even when considering

multiple baselines for comparison, like the proportion of Black people in the

population of the United States 13.4%, *see* U.S. Census QuickFacts 2018, or the

number of Black people that are incarcerated in federal prisons, 37.1%, *see*

Sourcebook of Criminal Justice Statistics Online, Table 6.0022.2013,

https://www.albany.edu/sourcebook/pdf/t600222013.pdf. Despite the enumerated

purpose of the FDPA, racial disparities continue to pervade the federal

government's operation of the death penalty, violating both the Eight Amendment's

prohibition against arbitrariness as well as the Fifth Amendment's right to due

process of law and equal protection.

Racial disparities exist both when considering the race of the defendant and

the race of the victim. *See* Richard C Dieter, Death Penalty Information Center, *The*

*death penalty in black and white: Who lives, who dies, who decides: new studies on*

*racism in capital punishment* (1998). Research has consistently shown that prosecutors are more likely to seek death in cases involving white victims.[18] *See* Katherine Beckett and Heather Evans, *Race, Death, and Justice: Capital Sentencing in Washington State, 1981-2014,* 6 Colum. J. Race & L. 77 (2016); *see also* Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 Hous. L. Rev. 131, 132 (2012) (stating that death is more likely to be imposed when victim is white); Matt Ford, *Racism and the Execution Chamber*, The Atlantic, (June 23, 2014) (demonstrating that although half of all U.S. homicide victims were Black, more than three-fourths of victims of death row defendants executed since 1976 were white), https://www.theatlantic.com/politics/archive/2014/06/race-and-the-death-penalty/373081/.

Moreover, Black defendants are more likely to be executed for cross-racial murders than white defendants. *See* Death Penalty Information Center, *National Statistics on the Death Penalty and Race*, (Nov. 18, 2018) (graph demonstrating that Black Defendants with a white victim are more often executed than white Defendants with a Black victim), https://deathpenaltyinfo.org/race-death-row-inmates-executed-1976?scid=5&amp;did=184. The duel disparities that exist in race

---

[18] The United States Department of Justice Report found racial disparities, including the fact that 80% of the cases submitted by federal prosecutors for death penalty review from 1995 to 2000 involved racial minorities as defendants. U.S. Attorneys were almost twice as likely to recommend the death penalty for a Black defendant when the victim was non-Black as when the victim was Black. U.S. DOJ, *The Report on the Federal Death Penalty System: A Statistical Survey 1988-2000* (2000), at 6-7.

of the defendant and race of the victim indicate that "[d]eath row's racial disparity… is not the result of race-neutral application of the death penalty or a perverse form of affirmative action to favor black defendants. Rather, a racial hierarchy clearly exists among cases based upon who the victim is." J. Blume, T. Eisenberg, and M. T. Wells, *Explaining Death Row's Population and Racial Composition*, 1 J. of Empirical Legal Stud. 165, 167 (2004).

Imposition of the death penalty also carries geographic disparities. The authorization and imposition of death has consistently been a southern phenomenon. Since 1927, there have been 37 federal executions, almost half have stemmed from federal prosecutions in the South. *See* Death Penalty Information Center, *Federal Executions 1927-present*, https://deathpenaltyinfo.org/federal-executions-1927-2003. In a study of this issue published in 2010, the authors note:

> Geographic disparities …persist. To promote uniformity, United States Attorneys submit all death-eligible federal cases to the United States Attorney General for death-authorization. Yet the geography of the federal death penalty is anything but uniform. Six of the ninety-four federal judicial districts account for one-third of death-authorizations. More than half of all death-authorizations come from fourteen federal districts. Seven federal districts are responsible for approximately 40% of the individuals on federal death row. Two-thirds of districts have not sentenced anyone to death. Nearly one-third of federal districts have not sought a death sentence. Fewer than 20% of federal districts have sentenced more than one person to death.

G. Ben Cohen, et al., *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. at 429-30. The defendant's race and where the crime was committed, constitutionally impermissible factors, are strong indicators of who the government decides to seek the death penalty against. *See Glossip*, 135 S.Ct. at 2755-77 (J.

Breyer, dissenting).

A death penalty that operates on an arbitrary basis is unconstitutional under both the Eighth Amendment and the due process and equal protection clauses of the Constitution.

Rejon Taylor was denied due process of the law, equal protection of the law, and the right to be free from cruel and unusual punishment because the federal death penalty is administered disproportionately and unconstitutionally applied based on the race of the defendant, the victim, and geography.

9. **The Federal Government's Decision to Authorize Rejon Taylor's Case as a Capital Prosecution Against the Recommendation of the Local AUSAs Violated Mr. Taylor's Rights Under the Fifth, Sixth, and Eighth Amendments.**

The local prosecution announced in February 2006 that "this office will request authorization from the United States Attorney General not to seek the penalty of death against these defendants as to each applicable count of the indictment." (Doc. 118 at 1). Thereafter, the Attorney General's Capital Case Unit review committee met on April 17, 2006. *See* (Doc. 121). The government subsequently filed a Notice of Intent to Seek the Death Penalty as to Defendant Rejon Taylor on June 1, 2006. *See* (Doc. 123). The government's rejection of the recommendation by local prosecutors reflects an arbitrary and capricious disregard for the principles of justice violating Mr. Taylor's right to due process under the Fifth, Sixth and Eighth Amendments to the United States Constitution. *But see*, *United States v. Furrow,* 100 F.Supp.2d 1170, 1178 (C.D. Cal. 2000) ("Case law is clear on this point: the guidelines, like any other provision in the [U.S. Attorneys'

Manual] do not create any substantive rights."); *United States v. Feliciano,* 998 F. Supp. 166, 169 (D. Conn.1998) (United States Attorneys' Manual does not create rights); *United States v. Roman,* 931 F.Supp. 960, 963-64 (D. R.I. 1996) ("The protocol articulates internal administrative procedures to be followed by DOJ personnel; the protocol does not create substantive or procedural rights."); U.S.A.M. § 1-1.100 (noting that the United States Attorneys' Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal"); *see also United States v. Craveiro,* 907 F.2d 260, 264 (1st Cir. 1990) ("[T]he internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party."); *United States v. Montoya,* 45 F.3d 1286, 1295 (9th Cir. 1995) ("[F]ailure to strictly comply with the United States Attorneys' Manual creates no enforceable rights."); *United States v. Busher,* 817 F.2d 1409, 1411 (9th Cir. 1987); *U.S. v. Le,* 306 F.Supp.2d 589, 592 (E.D. Va. 2004).

Because the Department of Justice overrode the considered judgment of the local AUSAs and applied factors considered irrelevant or unjust in the original review, Rejon Taylor was denied due process of the law, equal protection of the law, and the right to be free from cruel and unusual punishment.

10. **In Violation of Rejon Taylor's Right to a Fair and Impartial Jury, the Jury that Convicted and Sentenced Him to Death Was Biased and Engaged in Misconduct.**

The jury is an "essential instrumentality – an appendage of the court, the body ordained to pass upon guilt or innocence." *Sinclair v United States*, 279 U.S.

147

749, 765 (1929). It serves as the "prized shield against oppression." *Glasser v. United States*, 315 U.S. 60, 84 (1942). As such, it is imperative that the jury be impartial. *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). The Constitution expressly guarantees as much, assuring criminal defendants "the right to a . . . trial, by an impartial jury. . ." U.S. Const. amend. VI; *see also Wainwright v. Witt*, 469 U.S. 412 (1985); *Turner v. Murray,* 476 U.S. 28 (1986). However, in the instant case, the jury that convicted and sentenced Rejon Taylor to death was biased and engaged in misconduct, violating Rejon's Sixth Amendment right to an impartial jury.

An impartial jury is one in which each juror is "capable and willing to decide the case solely on the evidence before [him or her]." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982) (internal quotation marks omitted)). "The presence of even a single biased juror deprives a defendant of his right to an impartial jury." *Williams v. Bagley*, 380 F.3d 932, 944 (2004); *Franklin v. Anderson,* 434 F.3d 412, 428 (6th Cir. 2006). *See also United States v. Martinez–Salazar*, 528 U.S. 304, 316–17 (2000). Here, the jurors' biased views on race and on the death penalty violated Rejon's Sixth Amendment right to a fair and impartial jury.

a. **In Violation of Rejon Taylor's Right to an Impartial Jury, the Jury that Convicted and Sentenced Rejon to Death Was Racially Biased**

"The jury is a central foundation of our justice system and our democracy." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 860 (2017). It is "especially pernicious" when racial bias infiltrates that sacred space. *See Rose v. Mitchell*, 443 U.S. 545, 555 (1979). And even more so, when a jury is charged with the awesome

responsibility of deciding life or death; a qualitatively different form of punishment that requires "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305 (joint opinion of Stewart, Powell, and Stevens, J. J.). When the circumstances of the case necessitate it, counsel should use voir dire to ask prospective jurors about racial bias and then remove jurors unable to serve impartially. *See Ham v. South Carolina*, 409 U.S. 524, 524 (1973). Yet in this case, defense counsel failed to engage in meaningful voir dire on race, creating the opportunity for racial bias to remain within the jury. *See* (Claim No. 2.c, IAC-Voir Dire Claim). The evidence reveals that the jury that convicted and sentenced Rejon to death was improperly influenced by extraneous evidence and racial bias, in violation of his constitutional right to an impartial jury.

Here, after jurors admitted knowledge of prejudicial media exposure stating that Rejon had referred to them as "racist rednecks." *See* (Doc. 871, PageID #5246-77, p.2-33) (Sealed). The proper remedy when allegations of potential juror partiality arise is for the court to hold a hearing, allowing the defendant the opportunity to demonstrate actual bias. *See Smith v. Phillips*, 455 U.S. 209, 215 (1982) (citing *Remmer v. United States*, 347 U.S. 227, 230 (1954)). The Court held such a hearing on September 23, 2008. *See* (Doc. 871) (Sealed). During the proceeding, the Court asked Juror 1, as he asked all jurors, whether she knew about the "racist redneck" comment and to whom she attributed it. (Doc. 871, PageID #5248-49, p.4-5) (Sealed). Juror 1 confirmed she was aware of the comment and that

149

she attributed it to Rejon or to one of his friends. (*Id.*). She then expressed her fears about Rejon knowing her identity and revealed that she discussed obtaining a weapon as protection with her husband. (*Id.*). The Court failed to question whether Juror 1, considering these disclosures, could continue to serve impartially; the Court did not allow Rejon to inquire about it either. *See* (Claim No. 2. f, IAC-*Remmer* Hearing Claim).

The Court had a fundamental responsibility to ensure that not a single juror was biased against Rejon. *See Williams*, 380 F. 3d at 944. A juror who reveals that she discussed obtaining a weapon with her spouse as a result of her fear of the defendant, demonstrated bias. The facts of the crime and the circumstances of the trial further suggest the racial bias influencing Juror 1's fear – that this was an interracial crime; that Rejon is Black; that the government used racially coded and dehumanizing language to refer to Rejon, *see* (Claim No. 11, PM-Improper Language Claim); and that the defense failed to adequately question jurors about racial bias, *see* (Claim No. 2.c, IAC-Voir Dire Claim). Further, the government presented inaccurate and insufficient evidence of Rejon's alleged future dangerousness, *see* (Claim No. 18, Putative Future Dangerousness Claim). In *Turner*, 476 U.S. at 35, the Supreme Court recognized that "[f]ear of blacks" at a "subtle, less conscious[]" level, "could easily be stirred up" in a cross-racial capital case, and "might incline a juror to favor the death penalty."

The Court's failure to inquire about the impact of Juror 1's bias was especially consequential in light of studies indicating that juror fearfulness of a

150

defendant is strongly associated with rendering death verdicts. *See e.g.* Craig

Haney, *Violence and Capital Jury Mechanisms of Moral Disengagement and the*

*Impulse to Condemn Death*, 49 Stan. L.R. 1447, 1468 (July 1997); *see also* (Exhibit

No. 4, Destiny Peery, Ph.D., Report, at 15). And yet despite her statements, and the

opportunity at the *Remmer* hearing to identify and weed out bias, the Court did not

question her further nor replace her with an available alternate juror. *See* (Fed. R.

Crim. P. 24(C)(2)(B)). Instead, Juror 1, who expressed unequivocal bias, sat,

deliberated, and sentenced Rejon to death. Moreover, the jury selected Juror 1 as

the foreperson, enabling her to exercise authority over the rest of the jury. *See* (Doc.

876, PageID #6039-40, p. 191-92) (Court's instructions regarding foreperson's

responsibilities over the jury); *see also* (Exhibit No. 4, Destiny Peery, Ph.D., Report,

at 15) ("Research on the influence of jury forepersons provides evidence that a

foreperson often has enhanced influence on jury decisions relative to other jurors by

virtue of their role as the foreperson").

In addition to Juror 1's expressed bias, the sole Black alternate juror,

Alternate Juror E.H., disclosed that racial bias existed among the other jurors who

convicted and sentenced Rejon to death. In a published *Chattanooga Times Free*

*Press* article after trial, Alternate Juror E.H. stated that the jury, which was

comprised of 11 white people, was influenced by Rejon Taylor's race in sentencing

him. *See* (Doc. 794-1 at 2) ("I heard (jurors) talking about how we needed to make

an example of him. It was like, here's this little black boy. Let's send him to the

chair..."). Additionally, other evidence indicated that jurors contravened Court

151

orders, and participated in pre-deliberations discussions.  E.H.'s statements. *See* (*Id.* at 1) ("Two regular jurors confirmed that they talked about the case throughout the trial," indicating Juror C.G. and Juror R.B.). On December 20, 2008, based on this information, the defense filed a motion for new trial. (Docs. 793, 794). Pursuant to Federal Rule of Evidence 606(b), the Court prohibited questioning jurors on the content of their deliberations, and thus here, the Court did not fully investigate the jurors' racial bias or misconduct.

However, Alternate Juror E.H.'s widow recently confirmed that jurors who convicted and sentenced Rejon to death, participated in improper discussions and were influenced, in part, by Rejon's race. In recounting her husband's comments to her after the trial, jurors frequently discussed aspects of the case and their feeling towards Rejon outside of formal deliberation process. *See* (Exhibit No. 38, Vicky Holloway Dec., at 2). From these improper discussions, Juror E.H. learned that some jurors had already made up their mind to sentence Rejon to death before the sentencing phase even began, because he was Black and because he was charged with killing a white man. (*Id.*). One white male juror went as far as to say: "Yea, we need to kill him off." (*Id.*). It is axiomatic that capital proceedings require a heightened standard of reliability. *See Gregg v. Georgia*, 428 U.S. 153, 188 (1976) ("[T]he penalty of death is different in kind from any other punishment imposed under our system of criminal justice."). However, given the jury's racial bias, the outcome of Rejon's capital trial is far from reliable; it is instead contaminated with racial prejudice. Racial bias "casts doubt on the integrity of the judicial process" and "impairs the

152

confidence of the public in the administration of justice." *Rose*, 443 U.S. at 556. The racially biased views of members of Rejon's jury have no place in any judicial process, let alone a capital trial. Public confidence in the justice system cannot survive if the federal government executes a Black man sentenced to death by a jury infected with the racial bias demonstrated in this case. To remedy the unconstitutional injustice, this Court must overturn Rejon's conviction and death sentence, and grant a new trial.

b. **In Violation of Rejon Taylor's Right to an Impartial Jury, the Jury that Convicted and Sentenced Rejon to Death Was Biased in Favor of the Death Penalty**

Due process requires that a jury undertaking a capital sentence be impartial. *Morgan v. Illinois*, 504 U.S. 719, 722 (1992). In a capital case, jurors cannot impose a sentence of death unless they can first consider mitigating evidence. *See Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (citing *Woodson*, 438 U.S. at 304). The proper standard for determining whether to exclude a prospective juror for cause in a capital case "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). Thus, a juror who cannot consider aggravating and mitigating circumstances as the instructions require, cannot serve impartially. *Morgan*, 504 U.S. at 729. Here, jurors who expressed an inability to consider mitigating evidence as the Court's instructions required, sat on the jury that convicted and sentenced Rejon to death in violation to his right to an impartial jury.

In this case, all prospective jurors completed a two-page questionnaire with basic biographical information, *see e.g.,* (Exhibit No. 45 Juror T.H. Form), and a 13-page questionnaire, *see e.g.,* (Exhibit No. 46 Juror T.H. Questionnaire). Juror T.H., a 40-year-old white man, wrote in his longer questionnaire that, "if you commit premeditated murder then you should be put to death." (*Id.* at 11).

Here, defense counsel failed to ensure that Juror T.H. could consider mitigating evidence when a defendant is convicted of first-degree premeditated murder. *See* (Claim No. 2.c, IAC-Voir Dire Claim). In fact, the questions and responses only confirmed that Juror T.H. believed a person who committed premediated murder should automatically receive the death penalty.

Lee Ortwein: You could vote for the death penalty or life, right?

Prospective Juror T.H: Yes.

Lee Ortwein: Okay. And you can follow the Judge's instructions, whatever they might be?

Prospective Juror T.H: Yes.

Mr. Lee Ortwein: You also say, "I believe that if you commit premediated murder, you should be put to death." Again what's premeditated murder, in your mind?

Prospective Juror T.H: In my mind it's you thought about it, you planned it out, you knew exactly what you were going to do, how you were going to do it, and you carried it out that way.

Mr. Lee Ortwein: So it's not one of these spur-of-the-moment type deals?

Prospective Juror T.H: No, it's not going to be spur-of-the-moment.

Mr. Lee Ortwein: Something that there is no question in your and that a person intended to do it and set it up?

154

> Prospective Juror T.H: Yeah, they planned it out and knew exactly what they were going to do.

(Doc. 860, PageID #3744-45, p. 347-348). Juror T.H. thus reaffirmed and did not temper his categorical statement that a person who commits premeditated murder should automatically be put to death.

Similarly, on May 6, 2019, Juror H.S. stated that when he served as a juror in Rejon's case, he believed a defendant who is convicted of premeditated murder should automatically receive the death penalty. *See* (Doc. 1029) (Order permitting the parties to contact the jurors regarding juror bias, inviting jurors to appear in Court for questioning) (transcript forthcoming). Indeed, Juror H.S.'s response to Question 57 on the pretrial questionnaire previewed this belief: "If the crime carries the Death Penalty I'm okay with it." (Exhibit No. 76 Juror H.S. Questionnaire at 11). To be clear, during the government's voir dire, Juror H.S. agreed with the government's request to consider mitigation, but his belief that a certain crime carried a certain sentence was firm.

Juror T.H. and Juror H.S.'s statements, required removal for cause because their statements indicated that they could not evaluate the evidence and arguments with impartiality and adequately consider mitigating evidence. In a capital case, it is critical to assess whether a juror can make impartial decisions: A juror who "believes in the death penalty and considers mitigating evidence to be irrelevant, or who will not take it seriously into account…is plainly saying that such evidence is not worth consideration," which weighs in favor of finding for the death penalty.

155

*Morgan*, 504 U.S. at 720.

In Rejon's case, jurors' racial and pro-death penalty biases created a potent combination that prevented him from obtaining a fair trial. Given recent studies indicating that white jurors are predisposed to be less likely to weigh mitigating evidence favorably for Black defendants, these additional instances of racial and pro-death penalty biases were particularly detrimental in Rejon's case. *See* Mona Lynch and Craig Haney, *Looking Across the Empathic Divide: Racialized Decision Making on the Capital Jury*, 2011 Mich. St. L. Rev. 573, 585 (2011); *see also* (Exhibit No. 4, Destiny Peery, Ph.D., Report, at 6-7, 13-14). As such, this Court should reverse Rejon's conviction and death sentence, and grant him a new trial before an impartial jury.

### c. In Violation of Rejon Taylor's Sixth Amendment Rights to a Fair Trial Before an Impartial Jury, the Jurors Who Presided Over His Case Engaged in Misconduct

Rejon Taylor's Sixth Amendment right to an impartial jury was violated when the jurors who presided over his case engaged in misconduct. A defendant has a right to an impartial jury that is "capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Jury misconduct undermines this fundamental right. Here, over the Court's repeated admonishments, the jurors heard, read, and/or listened to prejudicial media reports about Rejon and the crime during trial and engaged in premature deliberations. Combined with the government's evidence that Rejon posed a danger in the future, some of which misrepresented fact, the jury's misconduct prejudiced Rejon and

156

violated his constitutional right to a fair and impartial jury.

A jury's failure to avoid media, especially media which could have a prejudicial effect on their verdict, constitutes jury misconduct and warrants a new trial. *See United States v. Gaffney*, 676 F. Supp.1544, 1552-53 (M.D. Fla. 1987) (granting new trial where jurors were exposed to detailed news accounts of the case and discussed newspaper articles about the trial, among other misconduct); *United States v. Kum Seng Seo*, 300 F.2d 623 (3rd Cir. 1962) (granting new trial where juror introduced news accounts of evidence not introduced at trial, specifically defendant's bail amount and drugs found in defendant's room). The court in *Gaffney* granted defendant a new trial based on "[t]he cumulative effect" of a number of prejudicial factors – the jury's premature deliberation of facts not in evidence; their exposure to print, television, and radio broadcast media; and jurors' discussions of the case with their spouses. *Gaffney*, 676 F. Supp. at 1552-53This combination of factors "raised the reasonable possibility of prejudice" and necessitated a new trial. *Id.* at 1553.

So here too, the record reveals multiple instances of juror misconduct, that when examined together, warrant a new trial. Here, jurors admitted to media exposure of facts not otherwise in evidence that resulted in prejudice, namely that Rejon had referred to them as "racist rednecks" (which was in fact a misstatement); to engaging in premature deliberation; and to discussing with a spouse whether to secure a weapon as protection against the defendant. *See* (Doc. 871, PageID #5246-77, p. 2-33) (Sealed). This misconduct, combined with the government's evidence

inaccurately implying that Rejon had intimidated a witness and posed a danger in the future, was highly prejudicial

When defense counsel learned that jurors had been exposed to inaccurate media reports that Rejon referred to the jurors as "racist rednecks," they requested the Court to question each juror to determine whether they had been exposed to the comment and whether the exposure resulted in prejudice. *See* (Doc. 870, PageID #5203-05 and 5228-29, p. 14-16 and 39-40); *see also* (Claim No. 2.f, IAC-*Remmer* Hearing Claim). On September 23, 2008, the Court conducted individual questioning with each juror. (Doc. 871, PageID # 5246-77, p.2-33) (Sealed). The Court then reported to counsel that "[o]ut of the twelve jurors in the box – six had been exposed" to the "racist redneck" comment. In addition, five of those that heard the comment, attributed it to Rejon. (*Id.* at PageID #5278, p.34). Subsequent post-trial evidence showed that all 18 jurors, including the six alternates, heard the comment prior to the sentencing hearing and discussed it amongst themselves. *See* (Doc. 905, PageID #7997, p. 62) (Q: "...all 18 of you are told that there was a comment about 'racist redneck'?" A: "Oh, yeah, we – I guess we all had heard it, you know. And we talked about it...").

However, at the September 23, 2008 proceeding, the Court did not determine whether each juror who had been exposed to the prejudicial media could set that exposure aside and serve impartially. Despite asking some jurors whether they could continue to serve impartially, *see* (Doc. 871, PageID #5276-77, p.32-33) (Sealed), the Court did not ask that of Juror 1 (*id.* at 5247-49). After Juror 1

revealed that she had heard the "racist redneck" comment and attributed it to Rejon or one of his friends, the Court thanked her. (*Id.* at 5250). But she had more to say.

> Juror 1: Oh, a couple of things I'd like to ask if I may.
>
> The Court: Uh-huh.
>
> Juror 1: Is it the usual procedure that the defendant knows the jurors' names? I've had some concern, you know. It is a murder trial, after all. And there might be some repercussions down the pike, of being found and something happening... Is that normal for jurors' names to be called?...
>
> [W]ith the Internet nowadays, it's not so tough [to determine jurors' identities]. So, you know, there was some concern. My husband and I, that's the only thing we've talked about. So [we're] thinking of getting a weapon.

(*Id.* at #5248-49, p.4-5). Juror 1's admission that she had safety concerns and discussed obtaining a weapon for protection came as a direct response to the Court's inquiry regarding whether she was aware that Rejon had allegedly referred to her as a "racist redneck." Juror 1 also admitted to talking about the case and her fears of the defendant with her husband. She then voted to sentence Rejon to death.

Juror 1's conduct, in which she relied on allegations from the media not in evidence and then discussed the case and needing protection from Rejon with her husband, constituted misconduct, requiring a new trial. *See e.g., Gaffney*, 676 F. Supp. at 1552-53. During closing argument at sentencing, the government played into this juror fear, arguing that Rejon sought to "[g]uarantee[] the elimination of witnesses, guarantee[] that Joey Marshall will never testify against him again...," (Doc. 876, PageID #6021, p. 173) (Sealed); that Rejon participated in an escape

159

attempt armed with "shanks," (*id.* at 6012, 6021, p. 164, 173); and that Rejon was "dangerous because he always looks like Dr. Jekyll but his mind, his mind, ladies and gentlemen, is always working like Mr. Hyde," (*id.* at 6024, p. 176). Moreover, that Juror 1 served as the foreperson, wielding additional authority over the other jurors, provided the opportunity for her misconduct and resulting bias to impact the other jurors' views. *See* (Exhibit No. 4, Destiny Peery, Ph.D., Report, at 15)

At trial and in the motion for new trial, Rejon was unable to meaningfully demonstrate the prejudice flowing from this juror misconduct. *See* (Claim No. 2.f, IAC-*Remmer* Hearing Claim); *see also Ewing v. Horton*, 914 F.3d 1027 (6th Cir. 2019) (due process requires court to provide defendant opportunity to demonstrate impact of bias on jury). Yet, the Court failed to undertake an adequate inquiry into how that Juror 1's bias impacted Rejon's trial, asking only limited questions of the jurors at the September 23, 2008 hearing. (Doc. 871, PageID # 5246-77, p.2-33) (Sealed).

Here, when Juror 1 stated her belief that she might need a weapon to protect herself, the Court had a responsibility to question her further to ensure that she could remain impartial. (Doc. 871, PageID #5248-49, p.4-5). *See United States v. Corrado*, 227 F.3d 528, 537 (6th Cir. 2000) (finding investigation by district court was required when credible allegations of extraneous influences on the jury were raised, including reports that jurors were exposed to a newspaper article that covered jury-tampering); *United States v. Davis*, 177 F. 3d 552, 557 (6th Cir. 1999) (holding that because "the [trial] judge did not inquire of the remaining jurors

160

whether they were influenced in any manner… further inquiry seems not only appropriate, but necessary to ensure the impartiality of the jury."). Indeed, in a capital case this is especially vital, as external causes tend to disrupt "the exercise of deliberate and unbiased judgment." *Mattox v. United States,* 146 U.S. 140, 149 (1892), superseded on other grounds by *Peña-Rodriguez v. Colorado*, 137 S.Ct. 855 (2017).

Lastly, multiple jurors admitted to engaging in pretrial deliberations. Alternate Juror E.H. disclosed to Monica Mercer, a reporter from the *Chattanooga Times Free Press*, shortly after the trial, that jurors discussed Rejon's race, witness credibility, and other aspects of the case amongst themselves. *See* (Doc. 794-1, PageID #2593-94, p. 1-2). Alternate Juror E.H. later confirmed those facts during a post-trial hearing, "We didn't—We wasn't aware that we wasn't supposed to talk to each other. But that's what had happened. I'd had discussions with them, arguments, about who was lying and who wasn't and things like that…" (Doc. 905, PageID #7941, p.6). Two other jurors confirmed Alternate Juror E.H.'s statements about the existence of pretrial deliberations. (Doc. 794-1 at 1) ("Two regular jurors confirmed that they talked about the case throughout the trial," indicating Juror C.G. and Juror R.B.). Here, evidence revealed that all jurors – including those who convicted and sentenced Rejon to death – engaged in pervasive and casual premature deliberations. *See* (Exhibit No.38, Vicky Holloway Dec., at 2) ("My husband told me that he and other jurors spoke frequently throughout the trial about what was going on in the trial. Everage told me that it was clear from the

jurors' conversations that they had already made up their minds to sentence Mr. Taylor to death before the sentencing phase even began."). Premature deliberation by a jury can amount to prejudice, warranting a new trial. *See United States v. Sabhnani,* 529 F. Supp. 2d 384, 390 (E.D.N.Y. 2008) (reasoning that in criminal cases, premature jury deliberations may warrant a new trial if they result in actual prejudice to the one of the parties); *see also United States v. Cox,* 324 F.3d 77, 86 (2d Cir. 2003) (stating that "[w]here the district court instructs a jury to refrain from premature deliberation ... and the jury nonetheless discusses the case before the close of trial, that premature deliberation may constitute juror misconduct.") (Citation omitted)).

The multiple instances of juror misconduct among deliberating jurors, combined with the circumstances of the case, violated Rejon Taylor's right to a fair and impartial jury and warrant a new trial.

### 11. In Violation of Rejon Taylor's Fifth, Sixth, and Eighth Amendment Rights, The Government Used Improper Language to Describe Him

Prosecutors "may strike hard blows, [but are] not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). "Prosecutorial misconduct may warrant…relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process violation." *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999). In determining whether a trial was fundamentally unfair, the reviewing court must evaluate the totality of the circumstances. *See Angel v. Overberg*, 682 F.2d 605 (6th Cir. 1982). Here, this Court must consider not just the government's misconduct as

162

asserted below, but consider it in conjunction with the government's *Brady*/false testimony violations, *see* (Claim Nos. 20.d and 22, *Brady*, *Napue*, and *Giglio* Claims), and Rejon's ineffective assistance of counsel claims, *see* (Claim No. 2, IAC Claims, collectively). *See U.S. v Hernandez*, 227 F. 3d 686, 697 (6th Cir. 2000) (quoting *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.1983) (acknowledging that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

Throughout trial, the government used improper language that was dehumanizing and racially coded, to appeal to jurors' emotion and bias to convict and sentence Rejon to death. Considering the facts and circumstances of this case, the government's injection of inflammatory, racially prejudicial language into the trial was improper, and constitutes reversible error. *See, e.g., United States v. Grey*, 422 F.2d 1043, 1046 (6th Cir.) *cert. denied*, 400 U.S. 967 (1970) ("Appeals to racial prejudice are foul blows and the courts of this country reject them.").

### a. The Government Repeatedly Used Racially Coded, Dehumanizing Language to Refer to Rejon Taylor as a "Stalker," "a Wolf" and "a Monster" Throughout Trial

Throughout both the guilt and sentencing phases of Rejon's trial the government repeatedly used racially coded and dehumanizing language to describe Rejon as a monster and a wolf, and his conduct as animalistic to appeal to the jurors' fears of and bias against Black people. "Research on dehumanization commonly defines dehumanization as a process by which individuals or groups of

people (such as racial groups) are denied 'full humanness', including denials of human feelings (e.g., love, regret, or otherwise more complex human emotions) and full human cognitive capacity." (Exhibit No. 4, Destiny Peery Report, at 7). Further, "dehumanization help[s] explain how people...systematically treat some social groups in ways that subject them to more violence and punishment than other social groups, even when both are engaged in the same behaviors." (*Id.* at 8). Dehumanization is particularly problematic when tied to race. (*Id.* at 9) ("research has shown that the dehumanization of Black people via comparisons to animals leads people to see and remember Black people differently and to endorse more violence against Black criminal suspects.").

The government referred to Rejon as a "wolf," a "chameleon," a "hunter," "Dr. Jekyll," and "Mr. Hyde," and an, "ugly monster-looking guy" throughout the trial. The government also repeatedly referenced Rejon as a "what" rather than a who. *See* (Doc. 902, PageID #7740, 7755, 5112, 7755-56, p. 161, 176, 176-77). On top of express animalistic references, the government reminded the jurors that it was "two *black* males were circling around" the victim. (Doc. 868, PageID #5118, p.73) (emphasis added), and that Rejon "was stalking the victim, that he was hunting him...following him..." (Doc. 902, PageID at #7747, p. 168). The government used this language to remove Rejon's humanity. "He's a remorseless and relentless *hunter.*" (*Id.* at #7741, 162) (emphasis added). "He's *dangerous* because he's a *chameleon.*" (*Id.* at #7753, p. 174) (emphasis added).

> My kids just started reading — in advance of Halloween, started
> reading the book *Dr. Jekyll and Mr. Hyde* . . . . you had Hyde over

164

here, *ugly monster-looking guy*, and you had Dr. Jekyll over here. (Indicating.). The defendant is dangerous because he always looks like Dr. Jekyll but his mind, his mind, ladies and gentlemen, is always working like Mr. Hyde.

(*Id.* at #7754-55, p.175-76) (emphasis added). At other points, the government created additional dehumanizing imagery by asking who/what Rejon "really is," and arguing that the person before the jury: "that's not who showed up at Mr. Luck's house in August of 2003. *What* showed up at Mr. Luck's house in 2003 is *something* entirely different." (*Id.* at #7740, p. 161) (emphasis added).

The government then instructed the jurors: "You are the ones who have the obligation to be the sheep dog that protects the sheep [the white victim], and even sometimes the wolves [referring to Rejon's Black co-defendants], from *the wolf* [Rejon]." (*Id.* at #7755-56, p. 176-77).

### b. The Sixth and Fifth Amendments Prohibit Race-Based Determinations in the Criminal Justice System

The Sixth Amendment provides that "[i]n all criminal Prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. Moreover, the Fifth Amendment's Due Process Clause requires the United States government to practice equal protection. U.S. Const. amend. V. These Amendments prohibit the prosecution from invoking race-based stereotypes to secure a conviction and sentence. *See United States v. Haynes,* 466 F.2d 1260, 1266–67 (5th Cir. 1972) (reversing conviction based on a prosecutor's use of a racially-charged phrase during cross-examination); *see also Buck v. Davis*, 137 S. Ct. 759, 778 (2017) ("Our law punishes people for what they do, not who they are.

Dispensing punishment on the basis of an immutable characteristic flatly contravenes this guiding principle.").

For well over a century, the Supreme Court has condemned race-based bias and discrimination in the criminal justice process. *See, e.g., Ex Parte Virginia*, 100 U.S. 339, 345 (1880) (prohibiting the race-based exclusion of grand and petit jurors and emphasizing that the Thirteenth and Fourteenth Amendments "were intended to take away all possibility of oppression by law because of race or color."); *Haynes,* 466 F.2d at 1266–67 (reversing conviction based on a prosecutor's racially-charged phrase even when court provided curing jury instruction); *Johnson v. Rose*, 546 F.2d 678, 679 (6th Cir. 1976) (granting writ of habeas corpus because prosecutor's racially-charged questions "so tainted the entire trial that it denied . . . defendants that fundamental fairness which is the essence of due process"); *Peña-Rodriguez v. Colorado*, 137 S.Ct. 855 (2017) (where racial bias exists within the jury, Sixth Amendment right to impartial trial requires exception to non-impeachment rule).

The Supreme Court has further recognized that, "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected.*" Turner*, 476 U.S. at 35 (plurality opinion). This risk is elevated where a Black defendant's crime appears to confirm the pervasive stereotype about his race's violent nature, enabling a juror to rely on stereotypes and implicit biases, instead of presented evidence, to convict and/or apply a harsher punishment. *See id; Buck v. Davis*, 137 S. Ct. at 778*; see also* Haney, *Violence and the Capital Jury: Mechanisms of Moral*

*Disengagement and the Impulse to Condemn to Death*, 49 Stan. L. Rev. 801, 814 (July 1997); (Exhibit No. 4, Destiny Peery, Ph.D., Report, at 6) ("activation of Black stereotypes [including or especially stereotypes about criminality] often leads to harsher punishment decisions.").

### c. The Government's Language was Flagrant Enough to Warrant Reversal

As a threshold matter, the reviewing Court must determine whether the challenged statements were improper. *See United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). If the Court finds impropriety, it then looks to determine if the conduct was flagrant enough to warrant reversal. *United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir. 1994). Flagrancy is determined by a four-factor balancing test: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of evidence against the accused." *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (citing *Francis*, 170 F.3d at 549-50).

### i. The Prosecution's Remarks Misled the Jury and Prejudiced Rejon

First, the government's language misled jurors when they repeatedly referred to Rejon "stalking," "circling," and "hunting" the victim, and in calling him a "wolf," a "something," and a "what." As argued elsewhere, stalking constitutes a federal offense for which the government did not charge Rejon. *See* (Claim 2.g, IAC-Failure to Object to Stalking Claim). Such dehumanizing and distorting language also prejudiced Rejon because it appealed to juror's racial biases and stereotypes.

### a. The Depiction of Black Men as Inherently Violent and Dangerous Is an Enduring Racial Stereotype That Has the Potential to Exert A Unique Power Over Jurors

The stereotype of a young Black male as inherently violent and dangerous has the potential to have a pernicious effect on young Black male defendants in the criminal justice system, as it obscures their humanity and youth. *See Turner,* 476 U.S. at 35 (recognizing that a juror reliance on stereotypes that Blacks are violence prone might impermissibly incline the juror to favor the death penalty); *see also Buck* 137 S. Ct. at 776 (2017) (stating that stereotyping Black men as somehow more violence-prone than others is a "particularly noxious strain of racial prejudice").

### b. The Stereotype of the Young Black Male as Violent and Criminal is Deeply Entrenched in American History and Culture

The stereotype of young Black men as violent and criminal has long permeated American society. These narratives were introduced to American psyche as early as slavery, "when Black people were believed to be not just inferior, but also savage brutes prone to violence and criminality unless domesticated and made docile." *See* George M. Frederickson, *The Black Image in the White Mind: The Debate on Afro-American Character and Destiny, 1817-1914* 45 (1987)). These racist tropes persisted after emancipation. *See id.; see also* Booker T. Washington et al., *The Negro Problem* (J. Pott & Company 697 1903); Kali N. Gross, *Colored Amazons: Crime, Violence, and Black Women in the City of Brotherly Love, 1880-1910,* (1st ed. 2006) at 133. Continuing through the twentieth century, menacing

images of violent Black men spread through the media, as criminals from drug controlled rough neighborhoods. Douglas S. Massey, *Getting Away with Murder: Segregation and Violent Crime in Urban America*, 143 U. Pa. L. Rev. 1203, 1204-05 (1995). Combined with local news linking crime with Black communities, viewers linked violence with Black people. Robert M. Entman, *The Black Image in the White Mind: Media and Race in America* 78 (2000).

By the 1990s, there was "a widespread belief that Black people, and particularly young Black inner-city males, [were] far more prone to violence than white people." Evan Stark, *The Myth of Black Violence*, 38 Soc. Work 485,485 (1993). Black Americans, as one commentator noted, had become "the repository for the American fear of crime. "Katheryn Russell-Brown, *The Color of Crime: Racial Hoaxes, White Fear, Black Protectionism, Police Harassment, and Other Macroaggressions* xiii (1998). Young Black males were believed to be "wildin'," super predators, synonymous with criminal. *See* (Exhibit No. 4, Destiny Peery, Ph.D., Report, at 4) ("In 1996, Hillary Clinton, now infamously, described these young Black and brown "super predators" as violent, threatening, and lacking conscience and empathy.").

### c. Stereotypes of Black Men as Violent and Dangerous Has a Patent Effect on Perceptions Judgment

Stereotypes are "cognitive structures that contain the perceiver's knowledge, beliefs, and expectations about human groups." Mark Peffley et al., *Racial Stereotypes and Whites' Political Views of Blacks in the Context of Welfare and Crime*, 41 Am. J. Pol. Sci. 30, 31 (1997). These cognitive generalizations shape

processing and perception. *See id.* "Researchers have documented people's explicit knowledge of the societal stereotypes about Blacks in particular," who are "construed as violent, threatening, criminal, unintelligent, uneducated, lazy, poor, athletic, and musical." Phillip Atiba Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences,* 94 J. Personality & Soc. Psychol. 292, 294 (2008). Racial stereotypes influence perception and judgments even in the absence of animus or bigotry and may create bias or preference for one group over another. *See* (Exhibit No. 4, Destiny Peery, Ph.D., Report, at 2-3). "The stereotype of Black Americans as violent and criminal has been documented by social psychologists for almost 60 years." Jennifer L. Eberhardt et al., *Seeing Black: Race, Crime, and Visual Processing,* 87 J. Personality & Soc. Psychol. 876, 876 (2004).

Further, white people often associate Black males with non-human behavior or as animals. *See* Philip Atiba Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences*, 94 J. Personality & Soc. Psychol. 292, 292-306 (2008) (study demonstrating that individuals often associate Black people with apes, even though participants indicated that they had never heard the Blacks as apes stereotype). Dr. Peery reports that "young Black men are often stereotyped as possessing a particular competence for crime even if they're deemed incompetent elsewhere, as possessing innate, animalistic tendencies with respect to committing crime, and even as having rather singular focuses on engaging in criminal or deviant activities." (Exhibit No. 4, Destiny Peery, Ph.D.,

Report, at 4). These narratives manifest into real fears that have the potential to threaten the constitutional guarantees of Black defendants within the criminal context. *See* Sophie Trawalter et al., *Attending to Threat: Race-Based Patterns of Selective Attention*, 44 J. Exp'l Psychol. 1322, 1322-27 (2008) (scientific study demonstrating that people feel more threatened by Black people than white people). Young Black men are especially likely to be portrayed by the media and stereotyped by the general population as "deviant, dangerous, and dysfunctional." (Exhibit No. 4, Destiny Peery, Ph.D., Report, at 4).

In respect to the influence these biases have on capital juries, studies have found that Black defendants' higher likelihood to be sentenced to death can be explained by juror's assessment of Black defendants as violent by nature, more likely to reoffend, and "more cold hearted," simply because they are Black rather than the evidence presented against them. Mona Lynch & Craig Haney, *Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the "Empathic Divide,"* 45 Law & Soc'y Rev. 69, 76-77, 88, 91-92 (2011). Stereotypes that Black men are intrinsically violent can affect perceptions about their likelihood of future crime and lead to harsher sentencing. *See* (Exhibit No. 4, Destiny Peery Report, at 5) ("Research has examined the interaction between age, race, and gender in sentencing and found that young Black males are sentenced the most harshly compared to all other combinations of defendant characteristics.").

### ii.    The Prosecution's remarks were recurring and extensive

Second, the Prosecution's remarks were not isolated. Throughout opening

and closing of both phases of trial, the government referred to Rejon as "stalking" (or some variant, including "hunting"), the victim at least 10 times. These references were dehumanizing and intended, specifically, to invoke an image of a "predatory" animal. In fact, the government referred to Rejon as two different non-human entities: a "chameleon" and a "wolf," and then argued that Rejon's conduct "was not what you would expect of an ordinary human being," even referring to Mr. Taylor using the inanimate term "what" rather than "who." These comments culminated in the government's closing remarks at the conclusion of the sentencing hearing: "You are the ones with obligation to be the sheep dog that protects the sheep, and sometimes even the wolves, from the wolf." (Doc. 902, PageID #7755-56, p.176-77); *see also* (Exhibit No. 4, Destiny Peery, Ph.D., Report, at 11-12).

### iii. The Prosecution deliberately used this language to stoke racial fears and appeal to racial biases of jurors

Third, the government's language was strategic and deliberate, playing directly into the jurors' racial stereotypes and biases, particularly Juror 1, who between the two phases of trial, expressed fear of Rejon and the desire to obtain a weapon as protection against Rejon and/or his friends. *See* (Claim No. 10, Juror Bias Claim). The government's repeated use of the improper language throughout the trial demonstrates that they did not use these words accidentally. Seven separate mentions of "stalking" is no accident. It was no accident that the prosecution referred to Rejon as multiple non-human entities: a "chameleon," a "wolf," and a "monster." It was no accident that the government referenced Rejon as an "it" and a "something" and a "what."

iv. **The government's evidence of premeditated first-degree murder and the aggravated circumstances of substantial planning and premeditation were weak**

The evidence supporting first-degree premeditated murder and substantial planning and premeditation was weak. *See* (Claim Nos. 18-19, Putative Future Dangerousness Claim). In fact, the facts of the crime reflected impulsive behavior from a young man with neurological and developmental impairment. *See* (Claim No. 4, *Roper* Extension Claim) (research shows that teenagers, due to their still developing brains, engage in immature and impulsive behavior, are more susceptible to negative influences and peer pressure, and have transitory personality traits); *see also* (Exhibit No. 1, George Woods, M.D., Report, at 19) ("it is my opinion that his actions were impulsive, trauma-driven, and the result of the combined effect of that trauma on his impaired neurological functioning.").

\*\*\*\*\*

The government's repeated references to Rejon as a stalker, animal, and monster – which the defense failed to examine, explain, or challenge – was materially misleading, stripping Rejon of his right to a fair trial. Further, the government's reliance on words and phrases that degraded Rejon's humanity, allowed jurors to more easily "otherize" Rejon and to rely on facts not in evidence to convict and sentence him to death without assessing "the characteristics of the person who committed the crime." *Gregg v. Georgia*, 428 U.S. 153, 197 (1976) (plurality opinion). Capital defendants must be treated not as "members of a faceless, undifferentiated mass" but rather "as uniquely individual human beings."

173

*Woodson*, 428 U.S. at 303-04 (plurality opinion). The government's misconduct violated Rejon's rights to due process and a fair trial, warranting this Court to reverse Rejon's conviction and sentence.

### 12. Trial Counsel's Failure to Object to Improper Language Violated Rejon Taylor's Sixth Amendment Right to Constitutionally Adequate Counsel

Defense counsel failed to object to the government's repeated use of improper language to Rejon and his conduct. *See* (Claim No. 11, PM-Improper Language Claim). As a result, the jury relied, in part, on racial bias and stereotypes to convict and sentence Rejon to death in violation of his right to a fair trial. Prevailing norms instruct defense counsel to "object to anything that appears unfair or unjust even if it involved challenging well-accepted practices." 31 Hofstra L. Rev. at 1032, Guideline 10.8, commentary. Here, the government's repeated reference to Rejon in dehumanizing, racially coded terms was both unfair and unjust. *See Hodge v. Hurley,* 426 F.3d 368, 376 (6th Cir. 2005) (finding ineffective assistance of counsel for "trial counsel's failure to object to any of the numerous improper statements in the prosecution's closing argument)*; see also Freeman v. Class*, 95 F. 3d 639, 644 (8th Cir. 1996) (finding ineffective assistance of counsel where counsel failed to object or move for mistrial based on prosecution's improper comments). Counsel's repeated failure to object to such language resulted in constitutionally ineffective assistance of counsel.

### a. Defense Counsel Was Required to Object to the Government's Racially Inflammatory Language

Given the difficulty of measuring a jury's impartiality following exposure to

appeals to racial prejudice, defense counsel must object and consider moving for a mistrial any time racially inflammatory rhetoric threatens the fairness of the trial. *See Hodge,* 426 F.3d at 386 (6th Cir. 2005) (stating that "failure to object to […] derogatory statements by the prosecutor is much less susceptible to the argument that it should be considered reasonable trial strategy").

In evaluating the performance of trial counsel, courts may look to the "[p]revailing norms of practice as reflected in [ABA] standards and the like..." *See Strickland*, 466 U.S. at 688. The ABA Guidelines explain that: "One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." *See* 31 Hofstra L. Rev. at 1030 (quoting Stephen B. Bright, "Preserving Error at Capital Trials," *The Champion*, Apr. 1997, at 42-3). And that "[f]ailure to preserve an issue may result in the client being executed even though reversible error occurred at trial." *Id.* This obligation is not limited to motion filing. Heightened vigilance in capital cases requires counsel to object to anything that appears unfair or unjust to their client. *Id.* at 1032; *see Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) (observing in the grand jury context that "[w]hen constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm").

Moreover, defense counsel must be vigilant to identify and challenge inflammatory language, particularly language that appeals to racial bias and

stereotype, because criminal sentences must not be based on racial prejudice. *See Buck,* 137 S. Ct. 759 (2017); *see also Peña-Rodriguez,* 137 S.Ct. 855 (2017).

### b. Trial Counsel's Failure to Object to the Government's Racially Inflammatory Language Constituted Deficient Performance

During the government's opening arguments in the guilt/innocence phase the government repeatedly referred to Rejon as "stalking," (Doc. 895, PageID #6372-73, p. 27-28), and "circling" the victim, (*id.* at #6375-76, p. 30, 31). *See also* (Claim No. 11, PM-Improper Language Claim) and (Claim No. 2.g, IAC-Failure to Object to Stalking Claim). Because these remarks were improper, defense counsel had a duty to object to them. *See Reed v. United States,* 133 F. App'x 204, 208 (6th Cir. 2005) (noting defense's counsel's duty to object to remarks that were deemed prosecutorial misconduct).

Despite being on notice of the government's improper language, the defense was similarly silent when the government returned to these themes in closing: arguing that Rejon was "stalking" the victim, that "stalking then changed to something more sinister," "[t]he stalking became what we saw the end result of here." (Doc. 868, PageID #5086, p. 41). Reminding the jurors that "two *black* males were circling around" the victim. (*Id.* at PageID #5118, p.73) (emphasis added).

In opening statements during the sentencing phase, the government intensified the imagery, inserting dehumanizing terms to refer to Rejon and his conduct. Specifically, referring to Rejon as a "what" rather than a who, a "monster," and a "wolf." *See* (Doc. 902, PageID #7740, 7755, 5112, 7755-56, p. 161, 176, 176-77). And then repeating that Rejon was "stalking," the victim, (*id.* at #7694, #7696,

#7747, p. 115, 117, 168); like an animal that "hunt[s]" and "follow[s]" prey, (*id.* at #7747, p. 168). The government continued to refer to Rejon as a "wolf," a "chameleon," a "hunter", "Dr. Jekyll," and "Mr. Hyde;" a "monster," all of which removed Rejon's humanity. (*Id.* at #7741, #7753, 162, 174); *see also* (Claim No. 11, PM-Improper Language Claim).

Not once did defense counsel object to the government's repeated invocation of racial stereotypes and dehumanizing language. To be sure, the defense made objections during the government's other arguments. For At opening during sentencing, the defense objected to the government's implication of "pecuniary gain": "I'm sorry to make an objection during opening, but…" (Doc. 900, PageID #7242-43, p. 37-38). At closing argument during sentencing the defense objected to the government's slide defining premeditation and inferences to Rejon's state of mind during recorded phone calls. (Doc. 902, PageID #7703-04, 7710, p. 124, p. 131,). Thus, defense counsel was not failing to object during the government's closing based on some strategy to not interrupt the government's argument. Rather, defense counsels' failure to challenge the government's racially inflammatory remarks constituted deficient performance. *See Hodge, supra; see also See Buck*, 137 S. Ct. at 779 (allowing race to be part of jury's sentencing consideration is constitutionally inappropriate whether the prosecution or ineffective defense counsel injects it).

### c. Trial Counsel's Failure to Object to the Government's Racially Inflammatory Language Prejudiced Rejon

Injecting racial bias and stereotypes into sentencing considerations is

177

improper and unconstitutional. *See Turner,* 476 U.S. at 35 (recognizing that juror reliance on stereotypes that Blacks are violence prone might impermissibly incline juror to favor death penalty); *see also Buck,* 137 S. Ct. at 779. When a prosecutor's conduct is improper, "there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. A failure to make such an objection can have devastating consequences for an individual defendant." *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005).

Here, counsel's failure to object to the government's improper language resulted in the jury relying, in part, on racial stereotype and bias to convict and sentence Rejon to death. Research demonstrates that, as the number of references to animals by prosecutors during closing argument increases, "so too did the likelihood of that defendant being sentenced to death." Cheryl Staats, et al., *Ohio State Kirwan Institute For The Study Of Race And Ethnicity, State Of The Science: Implicit Bias Review 2013*, 44-45 (2013) (citing Phillip A. Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences*, 94 J. Pers. & Soc. Psychol. 292 (2008)); *see also* Haney, *Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death*, 49 Stan. L. Rev. 801, 814 (1997) ("Human beings react punitively toward persons whom they regard as defective, foreign, deviant, or fundamentally different from themselves.").

Where defense counsel's deficient performance resulted in the jury relying on prejudice and race, in part, to convict and sentence Rejon to death, the proper

remedy is a new trial. *See Weaver*, 137 S.Ct. 1899 (prejudice is presumed where counsel's deficient performance resulted in structural error that undermines due process).

13. **The Prosecution Violated Rejon Taylor's Right to a Constitutionally Adequate Trial by Impermissibly Excusing Black Jurors for Non-Race-Neutral Reasons.**

In violation of the right to a fair and impartial jury as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the prosecution used preemptory strikes in a non-race-neutral manner, excusing African American prospective jurors while accepting identically or similarly situated and responding white jurors. *Batson v. Kentucky*, 476 U.S. 79 (1986). By information and belief, the prosecution excused two African American jurors, Prospective Juror S.C., *see* (Doc. 860, p. 58, 64, 65, 73), and Prospective Juror R.W., *see* (*id.* at p. 24, 40, 41, 64, 65, 108), whose responses to the Court's questionnaire and to *voir dire* by both parties did not reflect any nonracially motivated reason for the use of a preemptory strike. *See also* (Exhibit No. 77, Juror S.C. Jury Questionnaire) and (Exhibit No. 78, Juror R.W. Jury Questionnaire). This was a clear violation of the rule of *Batson*; the error is structural. *See United States v. McFerron,* 163 F.3d 952, 955 (6th Cir.1998); *U.S. v. Kimbrel*, 532 F.3d 461 (2008).

Trial counsel provided ineffective assistance of counsel with regard to the *Batson* violation. *See Strickland*, 466 U.S. at 696. Counsel failed to object to the government's racially motivated use of preemptory strikes, failed to require the government to provide a nonracially motivated justification for the strikes, and failed to request a ruling from the Court as to whether the government's strike

179

violated *Batson,* 476 U.S. 79. Further, counsel failed to show that these African American jurors' answers on their questionnaires and in voir dire were similar or identical to the answers of several white jurors who the prosecution accepted. *See Snyder v. Louisiana*, 552 U.S. 472 (2008) (finding *Batson* violation despite facially race-neutral justification where white jurors with same quality were not excused). Counsel's failure to object to the dismissal of Jurors S.C. and R.W. violated the prevailing professional norms for the defense in a capital case and Mr. Taylor was prejudiced by counsel's failure. *See Hestle v. U.S.*, 2013 WL 1147712 (E.D. Mich. Mar. 19, 2013) (noting that application of the *Strickland* "prevailing professional norms" analysis to the *Batson* context requires proof that if the objection had been made, there was a reasonable probability that it would have been sustained). Further, appellate counsel was ineffective in failing to raise the *Batson* issue on direct appeal and Mr. Taylor was prejudiced. *Strickland, supra*; *Evitts v. Lucey*, 469 U.S. 387 (1985).

14. **Rejon Taylor's Rights to a Fair Trial Under the Fifth, Sixth, and Eighth Amendments Were Violated by Prosecutorial Misconduct in Closing Argument and Counsel Were Ineffective for Failing to Object**

In violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, the prosecution engaged in misconduct during its arguments to the jury that deprived Mr. Taylor of due process, a fair and reliable trial, an impartial jury, individualized sentencing, and the right to be free of an arbitrary and capricious sentence of death. Although courts afford prosecutors "wide latitude" (*United States v. Lawrence*, 735 F.3d 385, 431 (6th Cir.2013)) during closing

argument, a prosecutor may not "urge jurors to identify individually with the victim[]" (*United States v. Boyd*, 640 F.3d 657, 670 (6th Cir. 2011)) or urge jurors to convict "in order to protect community values, preserve civil order, or deter future law breaking," *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir.1991). "[A] prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury's emotions and fears—rather than the evidence—to decide the case." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir.2008). In this case, the prosecution did just that. Having called Mr. Taylor a "wolf," "camelion," and a "monster," *see* (Claim No. 11, PM-Improper Language Claim), the prosecution impermissibly argued:

> Now, what do we do about this? What's the plan of action? Ladies and gentlemen, society has a right to self-defense, just like the victim Mr. Luck had a right to defend himself. He fought tooth and nail to defend himself. He had every right to kill the defendant to protect himself and to defend himself, and so do you. He couldn't finish what he had the right to start. You not only have the right but you have the obligation to finish it.
>
> A lot of times you'll hear people talking about the horrible things that happen in the community—"When are they going to do something about that?" Well, ladies and gentlemen, you are now they. When it comes to Rejon Taylor, you are the ones that have to do something about it. You are the ones who have the obligation to be the sheep dog that protects the sheep, and even sometimes the wolves, from the wolf.

(Doc. 902, PageID #7755-56, p. 176-77); *U.S. v. Taylor*, 814 F.3d 340, 389 (6th Cir. 2016).

In addition, the prosecution engaged in improper (guilt-phase) closing argument when, inter alia, it impermissibly alleged that Mr. Taylor "continues to conspire to attack the victim" with regard to the prosecution's claim that Mr. Taylor influenced Mr. Matthews to testify as Mr. Matthews did. (Doc. 868, PageID #5077,

181

p.32). Because the government's argument that Mr. Taylor was continuing to conspire with Mr. Matthews was entirely conjecture, the argument was improper. Further, after an early objection to the government's use of the word "we" as improper vouching (*id.* at 6), the government vouched for this argument saying, "We know they were plotting and planning this and that Mr. Taylor was affecting this." (*Id.* at #5109, p. 64). Finally, the government argued other facts not in evidence through its argument that Mr. Taylor would "get up – after he's acquitted on this story, get up and do the same thing for Sir Jack Matthews, and say, 'oh no, it was self-defense'?" (*Id.* at #5111, p. 66).

The prosecution also engaged in improper closing argument during the sentencing phase of the trial in violation of the Constitution for the following non-exclusive reasons:

1) Repeated reference to Mr. Taylor's invocation of his Fifth Amendment Right not to testify. (Doc. 773, p. 23) ("The defendant talked to you, without being sworn in, without being subject to cross-examination"); (*Id.* at 36) ("in court the defendant gave an unsworn statement that was not subject to cross-examination"). *See Griffin v. California*, 380 U.S. 609, 615 (1965); *Doyle v. Ohio*, 426 U.S. 610 (1976); *U.S. v. Nguyen*, 928 F.Supp. 1525, 1541-42 (D. Kansas 1996) (mere silence is not sufficient to show lack of remorse); *U.S. v. Montgomery*, 10 F. Supp. 3d 801, 846 (same);

2) Appealing to the emotions of the jury through display of gruesome photograph of Mr. Luck while intoning, "that's who Rejon Taylor really is." (Doc. 773, p. 24);

3) Arguing without evidence that Mr. Taylor "continues to try to escape today" as proof that the killing was premeditated. (*Id.* at 19);

4) Arguing that "the list [of mitigating factors] means nothing." (*Id.* at 26);

5) Arguing without evidence that Mr. Taylor "continues" to conspire with Sir Jack Matthews to "perpetrate a fraud on the Court." (*Id.* at 27);

6) Arguing that Mr. Taylor was "boldly attacking the victim here; he's boldly attacking him in his letter and his phone calls." (*Id.* at 35);

7) Arguing that Mr. Taylor "guatanee[d] the elimination of witnesses." (*Id.* at 36);

8) Arguing that Mr. Taylor is dangerous "because prison walls cannot contain or deter his influence, ladies and gentlemen. He can recruit. He can influence. He can trick anyone." (*Id.* at 38);

9) Arguing the jury had an "obligation" to kill Mr. Taylor to "finish" the victim's attempt to kill Mr. Taylor in self-defense. (*Id.* at 39). *See Hawthorne v. United States*, 476 A.2d 164, 172 (D.C. 1984) ("A prosecutor may no more represent the victim . . . than he may urge the jurors to place themselves in the victim's shoes.");

10) Arguing the jury's civic responsibility to "do something" about "the horrible things that happen in the community." (*Id.* at 39-40). "You are

the one that have to do something about it. You are the ones who the obligation to be the sheep dog that protects the sheep, and even sometimes the wolves from the wolf." (*Id.*). *Zant v. Stephens*, 462 U.S. 862, 879 (1983); *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

11) Arguing misleadingly that Mr. Marshall was to receive life without parole and therefore Mr. Taylor should receive more punishment because neither codefendant "comes close to being as culpable as the defendant." (*Id.* at 40);

12) Arguing facts not in evidence, including but not limited to: "he continues to this day. He's never stopped plotting. He's never stopped planning. He's never stopped scheming. He's doing it now. He will never stop plotting unless you stop him." (*Id.* at 41). *See Viereck v. U.S.*, 63 S.Ct. 561 (1943) (reversing where prosecution "indulged in an appeal wholly irrelevant to any facts or issues in the case").

As noted by the Sixth Circuit, neither trial nor appellate counsel objected to these arguments. *See Taylor*, 814 F.3d 389. Counsel's failure to object and to raise this issue on appeal was ineffective assistance of counsel and Mr. Taylor's rights under the Sixth Amendment were violated by trial and appellate counsel's failures.

15. **Women and African Americans Were Unconstitutionally Underrepresented on the Grand Jury that Indicted Mr. Taylor in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.**

The Supreme Court has made clear, discrimination in the selection of the grand jury "is a grave constitutional trespass," which "undermines the structural

integrity of the criminal tribunal itself, and is not amendable to harmless-error review." *Vasquez v. Hillery*, 474 U.S. 254, 252, 263-264 (1986). Such grand jury discrimination profoundly affects the fairness of any subsequent conviction, especially in a potentially capital case, like this one:

> [W]e [are not] persuaded that discrimination in the grand jury has no effect on the fairness of the criminal trials that result from the grand jury's actions. The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense – all on the basis of the same facts. Moreover, '[t]he grand jury is not bound to indict in every case where a conviction can be obtained.' *United States v. Ciambrone*, 601 F.2d 616, 629 (CA2 1979)(Friendly, J., dissenting). Thus, even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or very existence of the proceedings to come.

*Vasquez v. Hillery*, 474 U.S. at 263. *See also Duren v. Missouri*, 439 U.S. 347, 366 (1979) (systemic underrepresentation found where women underrepresented for period of only nine (9) months); *Sims v. Georgia*, 389 U.S. 404 (1967) (defendant entitled to relief where blacks underrepresented by 19.7% in grand jury pool and 14.6% in petit jury pool).

Upon information and belief, Mr. Taylor alleges that the grand jury empaneled here unconstitutionally underrepresented women and African Americans.[19]

---

[19] Mr. Taylor will expeditiously seek discovery in order to supplement this claim with additional facts and evidence.

It is well-settled that underrepresentation of any group by greater than 2-3 standard deviations indicates that the group has been underrepresented and excluded through invidious, discriminatory means. *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17 (1977); *Jefferson v. Morgan*, 962 F.2d 1185, 1190 (6th Cir. 1992); *Hazelwood School District v. United States*, 433 U.S. 299, 308-309 n. 14 (1977); *Vogel v. City of Cincinnati*, 959 F.2d 594, 600 (6th Cir. 1992).

When a grand jury is "plainly illegal in [its] composition" it denies the defendant due process of law to subject him to indictment by that grand jury. *Peters v. Kiff*, 407 U.S. 493, 501 (1972). There is a "presumption of prejudice which supports the existence of the right" to a grand jury empaneled free from invidious discrimination and underrepresentation of cognizable groups. *Davis v. United States*, 411 U.S. 233, 245 (1973) (discussing *Peters* right, but rejecting petitioner's due process claim on basis of waiver); *see United States v. Ovalle*, 136 F.3d at 1107 (presumption of prejudice arises from underrepresentation and discrimination in grand jury selection). When there is unconstitutional or invidious discrimination against cognizable groups, the indictment simply cannot stand. *See also Berryhill v. Zant*, 858 F.2d 633 (11th Cir. 1988) (capital conviction overturned because of systemic underrepresentation of women in jury pool); *Gibson v. Zant*, 705 F.2d 1543 (11th Cir. 1983) (Black defendant granted relief because of substantial underrepresentation of women and blacks in grand and petit jury pools).

16. Rejon Taylor's Conviction for First Degree Murder by Use of a Firearm Violates His Right to Due Process, Because the Predicate Felony as Defined by 18 U.S.C. §924 (c) and (j) Is Unconstitutionally Vague.

Mr. Taylor was convicted on four capital counts, including two for the use of a firearm under 18 U.S.C. §924 (c) and (j). The element "crime of violence" required application of the residual clause. This Court treated that element as established (Doc. 287, at 2). The verdict form reflected one aggregate death sentence for all four convictions. *See* (Doc. 760, p. 3) (Special Verdict Form). After Mr. Taylor's conviction and sentence, the Supreme Court found the residual clause unconstitutionally vague. *See Johnson v. United States*, 135 S.Ct. 2552, 2557-58 (2015). Following *Johnson*, the Supreme Court found the residual clause of 18 U.S.C. §16(b) to be unconstitutional. *See Sessions v. Dimaya*, 138 S.Ct. 1204 (2018). The Supreme Court is currently considering the constitutionality of 18 U.S.C. §924(c). *United States v. Maurice Davis and Andre Glover*, Case No. 16-10330. Mr. Taylor's conviction under this provision that is void for vagueness violates his right to due process.

In the alternative, Mr. Taylor's due process rights were violated when the question of whether kidnapping as charged as the specified "crime of violence" that by its nature involved a substantial risk of physical force under 18 U.S.C. §924 was not determined by the jury. Where the jury did not make a finding as to this element of the offense, this Court unlawfully directed the verdict thereby violating Mr. Taylor's right to a jury trial.

Finally, as pled more fully below, *see* (Claim No. 17, Verdict Form Claim), the jury expressly did not find that the murders in Counts 2 and 4 of the indictment were "willful, deliberate, malicious, and premeditated" (Doc. 670, p. 1-2) thereby failing to find the offense as charged in the indictment which required both a finding that "the defendants, with malice aforethought and in the perpetration of kidnaping (sic), did unlawfully kill Guy Luck by shooting him multiple times with the firearm willfully, deliberately, maliciously, and with premeditation in violation of Title 18, United States Code Section 924(j)(1) and Title 18, United States Code, Sections 2(a) and (b)."

17. In Violation of the Fifth, Sixth, and Eighth Amendments, Penalty Phase Instruction and Verdict Errors Denied Mr. Taylor Due Process of Law and a Fair Trial

   a. Error in Instructions Regarding Mitigation and Constitutionally Ineffective Assistance of Counsel.

The government and this Court misinformed the jurors regarding the boundaries of their authority, and trial counsel unreasonably failed to object. Although the Court had already made conclusions of law regarding which of the defense's proffered mitigating circumstances were, as a matter of law, evidence that the jury must consider as mitigation, subsequently, the government and the Court offered conflicting instructions and guidance. Specifically, the government instructed the jurors that it was up to them to determine whether they believed mitigating circumstances the defense presented were actually mitigating. The Court then compounded this error by instructing the jurors similarly. And, trial counsel failed to even seek a remedy.

Specifically, the trial court erroneously instructed the jury to first consider whether a mitigating factor had been proven by a preponderance of the evidence and second decide whether that factor is mitigating. *See* (Tr. 2638-39). "Whether a factor is supported by a preponderance of the evidence and whether it is a mitigating factor is for you to decide." (Tr. 2639).  The government argued this legal error in closing, telling the jury:

> First of all, when you get your verdict form from the Judge, there are going to be a large number of potential mitigating factors for you to consider on behalf of the defendant, as well as the aggravating factors that the government has alleged. **The list means nothing.** I mean, the list is merely a submission by the defense for your consideration. The fact that there are 30-some-odd listed on there **doesn't mean anything**. You need to consider them separately and then decide, **Number 1, whether they've proven them and, Number 2, whether they are in fact mitigators.** That's your job in this case.

(Tr. 2613); *see also* (PM-Closing Argument Claim). The Court's instruction is wrong as a matter of law, as is the government's closing argument. Counsel were constitutionally ineffective for failing to object to the instructions and argument at trial and on appeal. Mr. Taylor was prejudiced where the jury was not permitted to make a fair, reliable, individualized assessment of the mitigation evidence.

Specifically, counsel should have objected to the second step of the process – i.e., requiring the jury to decide if the proffered evidence was actually mitigating. Such a requirement was improper because the issue of whether proffered evidence constitutes relevant mitigation is a question of law, not a question of fact. *United States v. Sampson*, 335 F. Supp. 2d 166, 228-32 (D. Mass. 2004). A death sentence may not be assessed by jurors who are "mitigation-impaired"– that is, jurors who do

not recognize certain evidence as mitigating. See *Morgan v. Illinois*, 504 U.S. 719, 739 (1992); *United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) ("Other jurors may have biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing. *See Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).").

The instruction and argument violates these fundamental principles of capital sentencing by impermissibly allowed juror nullification with respect to mitigation – that is, rejecting a proffered mitigating factor established by the preponderance of the evidence solely because the juror disagreed that the particular category of evidence constituted legally cognizable mitigation.

By looking at the verdict form we know that the jurors refused to consider as mitigating certain factors which are objectively mitigation. *See* (*Id.* at # 6068-72, p. 15-31). For example, zero jurors found that Mr. Taylor did not have a history of violent criminal conduct. (*Id.*). This is objectively true. Zero jurors found that Joey Marshall would not receive a sentence of death. (*Id.*). Zero jurors found that Sir Jack would not receive a sentence of death. (*Id.*). These factors were plainly supported and proven by the record. The jury's verdict indicates that the jurors did not weigh and consider those factors at all. (*Id.*). Further, it suggests that, with respect to the other 27 mitigating factors, members of the jury felt that they did not

have to consider the factor as mitigation, even though the factor had been proven. (*Id.*).

Counsel's failure to properly object was objectively unreasonable. There was no strategic or tactical reason for counsel to refrain from raising this challenge and counsel's deficient performance in this regard resulted in prejudice to Mr. Taylor. Specifically, there is a reasonable probability that the adoption of the erroneous jury instructions, as well as the government's closing argument, resulted in one or more jurors engaging in nullification and impermissibly refusing to consider constitutionally relevant mitigating evidence. But for counsel's error, there is a reasonable probability that the outcome of the selection phase proceeding would have been different.

### b. In Violation of the Fifth, Sixth, and Eighth Amendments, the Jury's Guilt Phase Verdict with Respect to Counts 2 and 4 is Inconsistent with the Penalty Phase Verdict Finding the Existence of the Gateway and Aggravating factors

Mr. Taylor's was charged with two counts under 18 U.S.C. §924 (c), *viz.* Count 2, Use of a Firearm in connection with a carjacking; Count 4, Use of a Firearm in Connection with a Kidnapping. With respect to count 2, the verdict form instructed the jury to make additional findings with respect to each count beyond a reasonable doubt. The jury was instructed to place a "check **or checks** on the appropriate **lines**." (Doc. #670, at 1.) The verdict form has two lines: "was committed was (sic) during the perpetration of a kidnapping", "was willful (sic), deliberate, malicious, and premeditated." The jurors corrected the typo on the first line and placed a checkmark in the space provided. The jurors did not place a check mark

next to the second line. Thus, with respect to count 2, the jurors did not unanimously find that Mr. Taylor's conduct was willful, deliberate, malicious, or premeditated. The juror's verdict with respect to count 4 is identical. Counts 1 and 3 of the indictment are for felony murder.

The evidence in the penalty phase added nothing to the proof of Mr. Taylor's mental state at the time of the crime. The jury was not given an option to sentence Mr. Taylor as to each count, but was asked to render one sentence for all four counts. See Claim 17.c, Denial of Unanimous Verdict. With respect to the gateway and the statutory aggravating factors the jury found that Mr. Taylor acted intentionally and with pre-meditation. (Doc. #760, at 3.) But this finding cannot be squared with the first phase verdict.

These inconsistent verdicts indicate that the gateway factor of intent was not proven to a unanimous jury beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584 (2002); see also *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Jones v. United States*, 526 U.S. 227 (1999). As a matter of law, Mr. Taylor is ineligible for the death penalty and his sentence should be vacated and set aside and a life sentence imposed.

Indeed, submitting these factors to the jury violated Mr. Taylor's rights under the double jeopardy clause. *See Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003). Having been acquitted of pre-meditated murder in the first phase, these gateway and aggravating findings should be stricken and Mr. Taylor's capital sentence vacated and set aside and a sentence of life imprisonment entered.

192

Moreover, it appears that these inconsistent verdicts are the result of irrationality, passion or prejudice.

> Of course, if the inconsistencies were such as to indicate that the verdict was a product of irrationality, it would have to be set aside. The death penalty statute is explicit about this. "Whenever the court of appeals finds that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor ... the court shall remand the case for reconsideration under § 3593 or imposition of a sentence other than death." 18 U.S.C. § 3595(c)(2)(A) (emphasis added); *United States v. Paul, supra,* 217 F.3d at 1004–05; *United States v. Webster, supra,* 162 F.3d at 354.

*United States v. Johnson,* 223 F.3d 665, 676 (7th Cir. 2000).

Trial counsel was constitutionally ineffective for failing to object to these instructions and the verdict form at the time. Appellate counsel was similarly constitutionally ineffective for failing to raise this issue on appeal.

### c. General Verdict of Death Deprived Mr. Taylor of a Unanimous Verdict and Unconstitutionally Skewed the Balance of the Weighing of the Aggravating and Mitigating Factors (Fifth, Sixth, and Eighth Amendments).

Although Mr. Taylor was found guilty of four offenses each of which were capital eligible, the jury sentenced him to a general verdict of death, not separate sentences for each count. This unified weighing process skewed the balance of aggravating and mitigating factors in favor of death. Trial counsel failed to object to this unconstitutional weighing and general verdict. Accordingly, trial counsel was constitutionally ineffective. Appellate counsel was constitutionally ineffective for failing to raise this issue on appeal.

Mr. Taylor was convicted of four separate murder counts. The Court never instructed the jury that it had to determine the penalty for each murder count

193

individually and that it could not consider only those aggravating factors applicable to a particular count in determining sentence for that count. Instead the instructions and verdict required the jury to vote on a single verdict for life or death. The jury rendered not verdict distinguishing between each count, nor did the jury specifically apply aggravating factors to particular counts. Nor did the jury weigh, balance, and consider mitigating factors as to the aggravating circumstances that applied to each count.

The jury's general verdict of death denied Mr. Taylor his right under the Sixth and Eighth Amendments to have the jury make a determination of his moral culpability for each murder count. See also, Claim #, Inconsistent Verdicts. In imposing the sentence the jury had no mechanism for imposing separate sentences. The Special Findings Form did not allow the jury to make a finding of death on one count and life without the possibility of release on another count. Such a verdict was not merely a theoretical possibility.

Moreover, the unitary weighing process skewed the weighing of aggravating and mitigating factors, depriving Mr. Taylor his right to a reliable sentencing guaranteed by the Eighth Amendment.

From the record we know that the jury struggled with the appropriate sentence. The summary generalized weighing process unfairly skewed the verdict toward death. Had the deliberations followed applicable law and the jury engaged in a painstaking analysis of each count and the aggravating and mitigating factors that applied to that specific count, it is reasonable to conclude that at least one juror

194

would have voted to impose a life sentence.

Moreover, the general verdict deprived Mr. Taylor his right to a unanimous verdict as to the sentence on each count as required by *Ring v. Arizona*, 536 U.S. 584 (2002); see also *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Jones v. United States*, 526 U.S. 227 (1999). The Jury did not make specific, unanimous, findings beyond a reasonable doubt as to the gateway factors, aggravating factors, and mitigating factors as to each conviction. Thus, there is no unanimous finding as to the sentence for each crime. Mr. Taylor's capital sentence should be vacated and set aside and a sentence of life imprisonment imposed.

Trial counsel was ineffective for failing to ensure that the jury was instructed appropriately and as to each count and to the verdict form. Mr. Taylor was prejudiced as a result. Appellate counsel was constitutionally ineffective for failing to raise the issue on appeal and Mr. Taylor was prejudiced.

18. **In Violation of the Fifth, Sixth, Eighth Amendments and 18 U.S.C. § 3591-93, Rejon Taylor's Rights Were Violated by the Government's Presentation of Proof and Argument Relating to Mr. Taylor's Putative Future Dangerousness**

a. **Relevant legal principles governing the admission and consideration of future dangerousness evidence**.

Future dangerousness is not an enumerated statutory aggravating circumstance under the FDPA. In the penalty phase of a capital trial, the government may only introduce information regarding non-statutory aggravating circumstances for which notice has been given. 18 U.S.C. § 3593(c). The defendant is entitled to a "fair opportunity to present argument that the adequacy of the

195

information received at the hearing to establish the existence of any aggravating …

factor." *Id.* The burden of proof is on the government to establish the aggravating

factor beyond a reasonable doubt to a unanimous jury. *Id.*

Evidence presented in aggravation at the penalty phase in a capital trial is

relevant only insofar as it relates to the character and background **of the defendant**

or circumstances of the offense. Evidence of future dangerousness must be specific

**to the defendant** and, in a capital context under the FDPA, should relate to the

defendant's potential to be dangerous in the prison setting since by law the

defendant will be imprisoned for the rest of his life. *See Simmons v. South Carolina*,

512 U.S. 154 (1994); *U.S. v. Fields*, 516 F.3d 923 (10th Cir. 2008); *U.S. v. O'Reilly*,

545 F. Supp. 2d 630 (E.D. Mich. 2008); *U.S. v. Llera-Plaza*, 179 F. Supp. 2d 464

(E.D. Pa. 2001).

Evidence in support of the future dangerousness aggravator must be reliable.

Where uncharged misconduct is alleged to support a finding of future

dangerousness, the conduct must be sufficiently serious to meet relevancy

standards. *U.S. v. Pepin*, 514 F.3d 193 (2nd Cir. 2008) (excluding evidence that

defendant physically and sexually abused a child); *U.S. v. Pleau*, 2013 WL

1673109,*5 (D.R.I. 2013) (evidence of burglary only admissible if the use or threat of

violence involved); *U.S. v. Basciano*, 763 F. Supp. 2d 303 (E.D.N.Y. 2011)

(uncharged misconduct must rise to the level of a sufficiently serious crime).

In sum:

"Evidence of the adjudicated conduct, however, must be reliable and
more probative than unfairly prejudicial. *Corley*, 519 F.3d at 724–25. It

196

must also be proved beyond a reasonable doubt. 18 U.S.C. § 3593(c); see also *Henderson*, 485 F.Supp.2d at 869 ("[U]nless the Government establishes [adjudicated] behavior beyond a reasonable doubt, the jury will not be permitted to consider it when sentencing.").

*United States v. Montgomery*, 10 F. Supp. 3d 801, 819 (W.D. Tenn. 2014).

### b. Evidence of Future Dangerousness Presented at Trial: Conduct of Others

The government first gave notice of its intent to rely on future dangerousness as a non-statutory aggravating circumstance on June 1, 2006. The government amended its notice of aggravating circumstance on February 11, 2008, March 4, 2008, and finally, August 20, 2008. Each notice reads substantially the same as to the allegation of future dangerousness. The notice: 1) limits itself to Rejon Taylor; 2) references inmates and correctional officers specifically citing *Simmons*; 3) and relies on three specified factors, to wit, a) low rehabilitative potential; b) lack of remorse; and c) escape risk.

The government never gave notice that it would rely on a theory of vicarious dangerousness. Nor did the government give notice that in support of the future dangerousness aggravator, it would allege that Mr. Taylor was responsible for an alarm at Joey Marshall's godmother/grandmother's house being tripped for an unknown reasons on an unknown date and time or that it would allege that Mr. Taylor was responsible for broken windows at the unknown address of an unnamed person somehow related to Joey Marshall. Yet, as the Sixth Circuit acknowledged, the only evidence of future dangerousness in the record was 1) the escape attempt; 2) a letter that Mr. Taylor wrote to Heather Hamilton where he stated that other people wanted to hurt Joey and he described the identity theft scheme; and 3) that

Ms. Marshall's alarm had gone off once and that a family member's house allegedly had its windows broken at an unknown time for an unknown reason. *United States v. Taylor*, 814 F.3d 340, 387–88 (6th Cir. 2016). Through the testimony of Agent Melia and sleight-of-hand, the government appeared to link the letter to Ms. Hamilton with the alleged incident with Ms. Marshall. Agent Melia testified:

> I have spoken to Joey Marshall's either grandmother or godmother, Inez Marshall. She called me a couple of times since the conviction of Taylor. And the first time it appeared that somebody had tried to break into her residence. The alarm had been going off. That had never happened before. And then after the letter that I read where Marshall was mentioned and that he wouldn't be testifying anymore in the future, Ms. Marshall called me and told me that she has a relative who owns a house in Mr. Taylor's neighborhood, in xxxxxxxxxxx, that area, and that every single window in the house had been broken out of the house.

(Tr. 2044).

Trial counsel objected to this testimony as unreliable hearsay. However, he failed to object that the evidence was not contained in the notice, was evidence of the conduct of another and therefore inadmissible, and that the evidence regarding the defendant's identity theft was not sufficiently reliable to support a finding of future dangerousness. Further, trial counsel failed to investigate these alleged prior incidents at Ms. Marshall's and the phantom relative's house for the purpose of showing that there were numerous other reasons for the incidents to have occurred. Such testimony would have rebutted Agent Melia's surprise, unverified, and unreliable double and triple hearsay.

Appellate counsel failed to raise these objections on appeal and failed to comprehend that the court would rely on the dangerousness of others to support a

finding of future dangerousness with respect to Mr. Taylor. Thus, trial and appellate counsel were constitutionally ineffective as described here and in further detail below.

### c. The Use of Vicarious Dangerousness as a Non-Statutory Aggravating Circumstance Violates the Fifth and Eighth Amendments and Mr. Taylor's Capital Sentence is Constitutionally Unreliable as His Sentence is Premised on the Conduct of Unknown (and Unknowable) Others

A capital sentence predicated on unreliable evidence is unconstitutional. *Johnson v. Mississippi*, 486 U.S. 578 (1981). It is hornbook criminal law that an individual is not responsible for the conduct of another without some proof that the other person was acting in concert or at the direction of that other person.

Here the jury unanimously found that the escape attempt was NOT an aggravating circumstance. Thus, the proof in the record to support the future dangerousness factor is: The letter to Heather, the vague allegations regarding Ms. Marshall's faulty burglar alarm and neighborhood vandalism, and Mr. Taylor's alleged lack of remorse. *But see*, Claim No. 20, Victim Impact Evidence claim (Stephanie Belcher's false testimony and financial motive regarding alleged lack of remorse).

The overriding theme of the Government's closing argument was that Mr. Taylor was dangerous and remorseless (both of which have been proven untrue in this motion). As to future dangerousness, at the end of the day, what the government was left to argue was that other people who knew Mr. Taylor might be dangerous. That argument violated Mr. Taylor's right to individualized sentencing. There was absolutely no proof in the record that the alarm going off at Ms.

Marshall's house was anything more than a faulty alarm system. Further there was

no proof that the window incident was in any way related to Mr. Taylor or his case,

let alone that Mr. Taylor had any knowledge of it much less criminal responsibility

for it.

This aggravating circumstance should be stricken as unconstitutional as

applied to Mr. Taylor. Given the reliance by the prosecution on these incidents, the

jury's verdict was likely affected. Without this proof and the argument related to it,

at least one juror likely would have voted for life. Though this claim is different

than the claim presented on direct appeal, Judge White's dissent is informative:

> The majority contends the statements are relevant to put Taylor's letter to his girlfriend in context, to Taylor's level of remorse, and to the future-dangerousness aggravator. Assuming the allegations are true, to reach the conclusion that the statements are relevant, however, one must also assume that (1) Taylor ordered the actions through an outside associate, and (2) the actions were in retaliation against Marshall (via his relatives) for his testimony. The first inference seems unlikely, given that the Government provided no evidence suggesting Taylor ordered an associate to attack Marshall's family, despite the fact that it monitored his communications. The second inference seems similarly implausible considering Marshall's testimony that, even after he decided to testify against Taylor, he never felt threatened by Taylor. (PID 6718.) Because these inferences are unsupported, the statements lack an apparent or demonstrated connection to Taylor. The statements, therefore, are irrelevant. Further, any probative value is outweighed by the danger of unfair prejudice. The Government does not argue harmlessness in its brief, perhaps because it cannot prove the admission of the evidence was harmless beyond a reasonable doubt. The district court instructed the jury to consider "the harm to the home of Joey Marshall's grandmother" as evidence supporting the future-dangerousness aggravator. By allowing the jury to consider the statements, the court in effect inferred for the jury that Taylor could somehow direct crime from prison, although there was no evidence to support such a conclusion. The jury unanimously found the future-dangerousness aggravator and determined that the factor tended to support the death penalty. Thus, the statements likely affected Taylor's sentence.

*United States v. Taylor*, 814 F.3d 340, 388 (6th Cir. 2016) (footnotes omitted). Mr. Taylor's capital sentence should be vacated and set aside.

### d. Trial Counsel Was Ineffective with Regard to the Nonstatutory Future Dangerousness Aggravator

Trial counsel had a professional obligation to raise the objections outlined above; their failure to do so was professionally unreasonable, and Mr. Taylor was prejudiced as a result. Moreover, trial counsel had a professional obligation to investigate and rebut the allegations related to the faulty alarm and broken windows. Had trial counsel conducted that investigation they would have learned, and presented, that: 1) Ms. Marshall's son and other relatives have lengthy criminal records and were engaged in illegal (including drug dealing) activities during the relevant time-frame giving multiple other persons motive; 2) Joey Marshall was involved in substantial criminal activity (including drug dealing) and others wholly unrelated to Mr. Taylor, had a motive to seek retribution against Marshall; 3) that the house where the windows were broken out was a drug house; 4) that Gresham Park is a high crime neighborhood where burglaries and vandalism are frequent; and 5) Ms. Marshall's alarm system malfunctioned. Such proof would have given Mr. Taylor ground to exclude Agent Melia's unreliable testimony, seek to have it stricken, or at the very least rebut it.

Trial counsel knew that Agent Melia's testimony was unreliable. Even though the nature of evidence admissible in a federal capital sentencing phase is

201

relaxed, the rules are actually quite strict with respect to a determination of

relevancy.

> The FDPA is more stringent than the Federal Rules of Evidence ("FRE") in one sense:
>
>> the balancing test set forth in the FDPA is, in fact, more stringent than its counterpart in the FRE, which allows the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403 (emphasis added). Thus, the presumption of admissibility of relevant evidence is actually narrower under the FDPA than under the FRE.
>
> *United States v. Fell* ("Fell I"), 360 F.3d 135, 145 (2d Cir.2004). The FDPA, however, is more stringent in this sense only; evidence not allowed at trial under other provisions of the FRE may be allowed under the FDPA. See *United States v. Lee*, 374 F.3d 637, 648 (8th Cir.2004) (rejecting an argument that the FDPA allows less reliable evidence because admitting more evidence increases reliability).

*United States v. Montgomery*, 10 F. Supp. 3d 801, 813 (W.D. Tenn. 2014)

Counsel's professional errors prejudiced Mr. Taylor where the Government

relied on these alleged incidents, tenuously tied them to Mr. Taylor through the

Heather letter, and then improperly placed Mr. Taylor's positive prison adjustment

evidence in a false light. That Mr. Taylor had been a positive influence over

dangerous gang members in the jail was turned into Mr. Taylor being some sort of

criminal mastermind with power to manipulate others. Rebutting Agent Malia's

testimony about putative actions against Marshall would have blunted that

argument.[20]

---

[20] Trial counsel was also ineffective for failing to object to this improper argument. Further, counsel was ineffective for failing to rebut this proof with the mental health and mitigation proof discussed in Claim No. 2.e.

The error in admitting evidence of vicarious dangerousness amplifies the argument that the trial court erred in excluding portions of the testimonies of Drs. Cunningham and Aiken. The testimony of Drs. Aiken and Cunningham were cut short, because their testimony was allegedly not specific to Mr. Taylor, yet the government was permitted to present speculative proof that someone that Mr. Taylor could have known might have had something to do with an alarm going off and neighborhood vandalism. These compounding errors render Mr. Taylor's sentence unconstitutional.

### e. Appellate Counsel Was Ineffective with Regard to The Future Dangerousness Claim

Appellate counsel failed to properly brief this claim on appeal and failed to raise the arguments contained herein Claim 18.d above. Appellate counsel's professional errors constitute constitutionally ineffective assistance of counsel under *Edwards v. Carpenter,* 529 U.S. 446 (2000).

For all of the reasons stated above individually and cumulatively, Mr. Taylor's unconstitutional sentence should be vacated and set aside and a new trial granted.

### 19. Use of Future Dangerousness and Lack of Remorse as an Aggravating Circumstance Violates the Eighth Amendment as Applied to Rejon Taylor.

Use of these non-statutory aggravating factors violates the cruel and unusual punishment clause of the Eighth Amendment as applied given Mr. Taylor's young age combined with his multiple, co-morbid neurophysiological, cognitive, mental, and emotional impairments. The government capitalized on these impairments to

paint Mr. Taylor as remorseless and a future danger. The behaviors that the government claimed warranted death were in reality the behaviors of a mentally ill, frightened, child. See also Claim No. 4 (Roper), Claim No. 6 (Atkins), Claim No. 1 (Competency), Claim 2 (IAC). Mr. Taylor's sentence violates evolving standards of decency because he was at special risk for improper conviction and sentence given factors beyond his control. His capital sentence should be vacated and set aside.

20. Rejon Taylor's Rights Under the Fifth, Sixth, and Eighth Amendments Were Violated by Federal and Statutory Errors Respecting the Testimony of Stephanie Belcher and Robin Belcher

### a. The law relating to the admissibility of victim impact testimony

In *Payne v. Tennessee*, 501 U.S. 808, 817 (1991), the United States Supreme Court held that evidence respecting "the personal characteristics of the victim and the emotional impact of the crimes on the murder victim's family" does not per se violate the Eighth Amendment. The holding in *Payne* is "expressly 'limited to' this particular type of victim impact testimony." *Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) (per curiam). 18 U.S.C. § 3593(a) strictly limits the admission of victim impact testimony to, "the effect of the offense on the victim and the victim's family."

### b. Pre-trial determination of admissibility of victim impact testimony

Trial counsel filed a motion to limit victim impact testimony. (Docket Entry No. 533.) The court ordered the Government to provide a brief as to the admissibility of the single victim impact witness it intended to call. (Docket Entry No. 580). The Government responded that it would rely on only one witness, Robin Belcher, who was "like a daughter" to Luck because her mother, Stephanie, "dated

Mr. Luck for some time" though they "never actually married." (Docket Entry No. 582, p. 3.)

The Court permitted the testimony of Robin Belcher based on the following ruling:

> The testimony of a close friend and co-worker would likely concern the effect of the offense on the victim and the victim's family, as contemplated by § 3592(a). Section 3593(c) provides additional support to this interpretation, as it permits the government to "present any information relevant to an aggravating factor for which notice has been provided." Therefore, it would be proper to admit victim impact testimony from the victim's friend and co-worker in order to identify the victim and outline the extent and scope of the injury and loss suffered by the victim and his family.

(Docket Entry No. 608, p. 4.) The Court was concerned that exclusion of this testimony would risk the victim being faceless before the jury. However, Mr. Luck (actual name Gaston Heros) had a sister who was known to the Government and the defense. Her name was Marie-France Fabre, and she presumably opposed the Government's effort to obtain a death sentence and did not wish to testify. Mr. Heros fled France in 1985, owing the French government unpaid taxes in excess of one million francs. He immigrated under an assumed name. No one in the United States knew of his past, nor did they meet his sister. She never visited him. The Government knew, or should have known, all of this. Yet the government presented none of this testimony to the Court for its consideration in determining the motion, nor did it present it to the jury.

So the court's understanding was that Robin Belcher would provide testimony NOT of the injury to Robin Belcher and her mother, but to the injury to

Mr. Luck and his family. Neither Belcher ever met Ms. Fabre and they had no idea the impact of his death on her. And the impact of the death on Ms. Fabre was not the nature of the testimony presented and argued at trial.

### c. Stephanie Belcher misrepresented her relationship with Luck for financial gain and testified falsely at Taylor's trial.

At trial, the Government engaged in a "bait and switch." Although they had not disclosed Stephanie Belcher as a victim impact witness, they presented testimony during the guilt/innocence phase that she was Mr. Luck's "fiancée." Ms. Belcher went on to testify about her rush to be by her fiancé's side, only to learn when she arrived at Erlanger hospital that he had passed away. She told the jury that she was so overcome with emotion at the news about her fiancé that she could not drive herself. The Government returned to the testimony in sentencing and relied on it heavily in its closing argument. See Tr. 2573-2574, 2583, 2621, 2624. The Government specifically referenced Stephanie Belcher's testimony, and Mr. Taylor's skepticism about the nature of their relationship, in arguing Mr. Taylor's comment's impact on Stephanie Belcher. *Id.* The Government capitalized on Mr. Taylor's phone call referring to Ms. Belcher as a "so-called fiancée" to argue that Mr. Taylor lacked remorse and posed a future danger. *Id.* Though Robin Belcher was the only "victim impact" witness called in the second phase of the trial, her testimony was barely mentioned in closing. *Id.* She was the foil that allowed the Government to bring in Stephanie's testimony about her alleged loss.

But Stephanie Belcher was not Mr. Luck's fiancée or even his girlfriend. In fact, Mr. Luck did not have an on-going romantic relationship with her at all. As his

close friend Yves Burgand-Bourgeois explains, "Guy confided in me that his business partner, Stephanie Belcher, was constantly after him to be in a relationship with him. Guy found this annoying." (Exhibit No. 41, Declaration of Yves Burgand-Bourgeois, at 1.) Mr. Burgand-Bourgeois explains that although Mr. Luck "took [Ms. Belcher] as a mistress a few times. He was a Frenchman after all … he was not interested in taking her a wife, nor was he in a committed relationship with her." (*Id.*, p. 2.) But he "allowed" her daughter to work at the restaurant. (*Id.*, p. 2.)

Mr. Burgand-Bourgeois explains that after Luck's death, Stephanie Belcher misrepresented her relationship with Luck for personal financial gain.

> After Guy was murdered, Stephanie tried to play like she was Guy's common law wife so that she could get the other half of the restaurant for free. She even went to France to try to manipulate Guy's sister, Marie-France Fabre, into signing over all of Guy's estate to Stephanie.
> 8.　I searched for Guy's sister on my own and found her through the help of a French journalist. I simply could not stand by and let my friend's estate be taken by this woman. I made a promise to my friend that if he were ever to die, I would not let her get his money. I convinced Marie-France to try to fight for her right to the estate.
> 9.　Stephanie ultimately got the restaurant, but she had to pay for it. She did not get it for free.

(*Id.*, p. 2.) Court documents in existence prior to the trial corroborate this account. (Exhibit No. 79, Collective Pleadings from Estate Dispute.) In Dekalb County Probate Court, Stephanie Belcher initially claimed to be the "wife" and "sole heir" of Guy Luck. Exhibit No. 79, Collective Pleadings from Estate Dispute at DCPC-033. She requested a year's support from the Estate. Exhibit No. 79, Collective Pleadings from Estate Dispute at DCPC-003. She requested that the entirety of the State be

given to her. Exhibit No. 79, Collective Pleadings from Estate Dispute at DCPC-036. When Mr. Luck's sister was identified, she continued to mispresent her relationship with Luck and requested that the sister agree to split the estate with her 50/50. Exhibit No. 79, Collective Pleadings from Estate Dispute at DCPC-001. Ultimately, Stephanie Belcher was forced to withdraw her claim to the estate and summary judgment was granted in favor of Ms. Fabre. Exhibit No. 79, Collective Pleadings from Estate Dispute at DCPC-033.

Ms. Belcher and her daughter did not qualify as "victims" in Mr. Taylor's criminal trial, and their testimony was inadmissible under 18 U.S.C. § 3593(a) and the United States Constitution. Moreover, the Government's presentation and reliance on their testimony was at odds with the Court's understanding of the testimony's purpose.

This set of facts and circumstances gives rise to numerous claims of constitutional error: 1) the court should not have permitted the evidence under *Payne, Bosse*, and 18 U.S.C. §3593; 2) the government should not have knowingly used such false testimony under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972); 3) counsel was constitutionally ineffective where counsel failed to a) bring Stephanie Belcher's previous action to the court's attention pre-trial in an effort to preclude this evidence, b) object to Ms. Belcher's testimony that she was the fiancée and/or cross examine her about her previous misrepresentation for financial gain; c) use this evidence as a basis to preclude the introduction of the tape-recording of Mr. Taylor expressing skepticism about Ms.

Belcher's characterization of her relationship with Mr. Luck; d) introduce the evidence to explain the context of Mr. Taylor's comments to rebut the inference that such comments constituted evidence of lack of remorse and/or future dangerousness; and e) failed to object when the Government's argument regarding the victim impact evidence went beyond that which was in the notice and that which this Court found to be admissible. Mr. Taylor was prejudiced by these multiple constitutional and statutory errors individually and cumulatively with each other, as well as cumulatively when considered in light of the numerous other constitutional errors described in this motion and on direct appeal.

### d. *Napue* and *Giglio*

In *Napue*, the Court was clear that the knowing use of false testimony by the Government violates due process. This is true even if the Government does not solicit the false testimony, but allows it to go uncorrected. *See Alcorta v. Texas*, 355 U.S. 28 (1957); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935). The Court held that reversal is required if the false evidence "may have had an effect on the verdict." *Napue*, 360 U.S. at 272. The Court reiterated these principles in *Giglio* and clarified that knowledge of the falsity of the testimony is attributable to the prosecutor even if he did not have personal knowledge, so long as someone in his office knew. It does not matter if the failure was "by negligence or design," and reversal is required irrespective of good faith or bad faith if the evidence may have affected the verdict. *Giglio*, 405 U.S. at 154.

Here, the Government knew or should have known that Stephanie Belcher had misrepresented her relationship status with Mr. Luck for the purpose of monetary gain in probate court proceedings and that she was not Luck's fiancée. Indeed the Government's pre-trial motions did not refer to Stephanie Belcher as a fiancée. She offered that descriptor on direct examination, and the Government did not correct her. Instead they ran with it and emphasized it in closing. They used her false testimony to support the victim impact aggravator, future dangerousness aggravator, and lack of remorse. Because this evidence may have affected the jury's sentencing verdict, particularly where there was a holdout for life, Mr. Taylor was prejudiced.

### e. Ineffective Assistance of Counsel

As previously explained, counsel renders constitutionally ineffective assistance of counsel when his conduct objectively falls below prevailing professional norms and there is a reasonable probability that but for counsel's professional errors the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984). A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceedings. *Id.* at 703. Here, there is a reasonable probability that at least one juror would have voted for a life sentence but for counsel's professional errors. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

Trial counsel was on notice that the Government intended to present victim impact evidence and that the basis for the presentation of Robin Belcher was her

mother's alleged romantic ties to Stephanie Belcher. Trial counsel therefore had an obligation to investigate that proof. *Rompilla v. Beard*, 545 U.S. 374 (2005). Trial counsel knew or should have known that Stephanie Belcher had misrepresented her relationship status with Mr. Luck for the purpose of monetary gain in other court proceedings and she was not Luck's fiancée.

Had trial counsel conducted a professionally reasonable investigation, he would have 1) filed a specific pre-trial motion to exclude the testimony of Stephanie and Robin Belcher; 2) impeached Stephanie Belcher on cross-examination when she testified that she was Mr. Luck's fiancée; 3) limited her testimony in the guilt phase; 4) presented proof that Stephanie Belcher had a financial motive and had misrepresented her relationship with Mr. Luck in other proceedings if the Court had nonetheless permitted Stephanie and Robin Belcher's testimony; 5) moved to exclude the audio tape of Mr. Taylor's phone call wherein he characterized Ms. Belcher as the "so-called fiancée;" 6) objected to the Government's argument respecting victim impact evidence at sentencing; 7) objected to the Government's use of the phone call in argument as evidence of lack of remorse; 8) objected to the use of the phone call in argument as future dangerousness; and 9) rebutted the Government's arguments respecting victim impact, future dangerousness, and lack of remorse.

### f. Summary

For the above-stated legal and factual reasons, Mr. Taylor's capital sentence rests on unreliable, false evidence that presented the victim in a false light and

presented Mr. Taylor in a false light. A capital sentence procured through

unreliable evidence not only violates principles of due process, fair trial, and

effective assistance of counsel, but also violates the Eighth Amendment. Here,

where the victim impact testimony presented came from witnesses who do not

qualify as such under the statute, the Government violated Mr. Taylor's statutory

rights as well. Because he was prejudiced, this Court should vacate and set aside

Mr. Taylor's capital sentence and order a new trial. A separate motion for discovery

and evidentiary hearing will follow.

21. **Denial of Jury Expert and Ineffective Assistance of Appellate Counsel for Failure to Appeal Denial of Jury Expert (Fifth, Sixth, Eighth Amendments, 18 U.S.C. § 3005, 3599)**

Defendants in a capital case have the right to independent experts necessary

to assist counsel in the trial of their case. This right is guaranteed not only by the

due process clause, but by statute as well. *See Ake v. Oklahoma*, 470 U.S. 68, 83

(1985); *Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993); *Mason v. Mitchell*, 320 F.3d

604, 616 (6th Cir. 2003); *Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003);

*Mackey v. Dutton*, 217 F.3d 399, 410 (6th Cir. 2000); 18 U.S.C. § 3599 (f).

In this case, trial counsel requested the appointment of a jury selection

expert. *See* (Doc. 134). The Magistrate, who found the expense reasonably

necessary, approved the request. *See* (Doc. 150). However, Judge Batchelder

declined the funding request stating, "I have not approved budget amounts for

either corrections experts or jury experts in the past, and, do not intend to do so

unless and until this circuit has specifically determined that the services of these

experts are appropriate." (Exhibit No. 80, Batchelder letter, Feb. 22, 2007).

However, the Sixth Circuit had already determined that jury experts were appropriate in capital cases. At the same time as the letter was sent, a jury selection expert was at work in the Middle District of Tennessee in the federal capital prosecution of *United States v. Jamal Shakir, 3:98-cr-00038*. In *Shakir*, the Sixth Circuit approved funding for jury expert Lisa Dahl to assist counsel in the selection of the capital jury. Ms. Dahl resides in Lawrence, Kansas. The Sixth Circuit compensated her for her work in that case which began well in advance of trial and included assistance with crafting a jury questionnaire, reviewing the questionnaires, and assisting the attorneys in court during the selection process. The jury selection process in *Shakir* lasted more than six months. Ms. Dahl's travel expenses as well as her professional services were covered.

Trial counsel were aware of the *Shakir* case and could have used that case to seek reconsideration from Judge Batchelder. Appellate counsel were also aware of *Shakir* and could have used it as a basis to appeal the denial of funding.

The jury selection in a capital case is the most critical portion of the trial. The selection of jurors who are mitigation impaired deprives the defendant of his right to a fair trial and reliable sentencing. *See* (Claim No. 2.c, IAC-Voir Dire Claim). Here, it is plain from the questionnaires and a review of the record that the jury included persons who would not fairly consider mitigation in a case of first-degree murder. A jury expert would have provided critical assistance in uncovering those biases.

Moreover, in the case of an African American charged with the murder of a European, the issue of race cannot be ignored. *See* (Claim No. 12, IAC-Improper Language Claim). A jury selection expert is skilled in the identification of conscious and unconscious racial bias.

Mr. Taylor was prejudiced as a result of the denial of a jury expert, particularly where senior counsel became ill and the responsibility for jury selection fell to inexperienced counsel. *See* (Claim No. 3, Learned Counsel Claim). One need only compare the outcome of Mr. Taylor's case with the *Shakir* case to observe prejudice. Mr. Shakir, who was a gang member and drug kingpin and who the Government alleged murdered one person and ordered the murders of nine others in states spanning California, Arizona, Oklahoma, and Tennessee, was sentenced to life in prison. Mr. Taylor, an 18-year-old with no violent history, and who discharged his gun in a panic, received death.

Further, we know that there was one juror who held out for life. *See* (Doc. 794-4 at 1); *see also* (Exhibit No. 38, Vicky Holloway Dec., at 1-2) ("My husband told me that the one Black juror was scared of standing up to the rest of the jury. The one Black juror was older. In her generation, Black people didn't make a fuss with white people in Chattanooga."). A jury selection expert would have assisted counsel here in selecting jurors who would have respected that juror's views and, in all likelihood, agreed with that juror.

Given the importance of a jury selection expert in a federal capital case, trial counsel was professionally obligated to seek reconsideration of Judge Batchelder's

214

denial. Mr. Taylor was prejudiced due to counsel's professional errors. Appellate counsel was similarly ineffective for failure to raise this issue on appeal and Mr. Taylor was prejudiced.

As a result of these errors, Mr. Taylor's capital sentence is constitutionally unreliable in violation of the Eighth Amendment.

Because Mr. Taylor's rights to a due process, a fair trial, impartial jury, effective assistance of counsel, and to be free from cruel and unusual punishment, his conviction and capital sentence should be vacated and set aside, and a new trial ordered.

22. **In Violation of Rejon Taylor's Fifth, Sixth, and Eighth Amendment Rights, the Government Suppressed Material Exculpatory Evidence in Violation of** *Brady v. Maryland.*

The Government has an affirmative obligation to disclose material exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Strickler v. Greene,* 527 U.S. 263 (1999); *Banks v. Dretke,* 540 U.S. 668 (2004); *Cone v. Bell*, 556 U.S. 449 (2009); *Wearry v. Cain*, 136 S.Ct. 1002 (2016). A successful *Brady* claim requires Rejon Taylor to show that (1) the government withheld evidence (whether intentionally or not); (2) that the withheld evidence was favorable to him; and (3) that the withheld exculpatory evidence was material. *See Jamison v. Collins*, 291 F.3d 380, 384-85 (6th Cir. 2002). This rule applies not only to evidence tending to exculpate Mr. Taylor, but to evidence tending to impeach the government's witnesses as well, *United States v. Bagley*, 473 U.S. 667, 676 (1985); and to evidence known to government investigatory

agencies, not only the prosecution, *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). Thus, the Court may impute investigatory agency knowledge to the government.

Here, the government suppressed material exculpatory evidence which tended to show, inter alia, the following: that Rejon Taylor did not possess the requisite mental state to be guilty under any of the charges in the indictment, *see* (Docs. 447) (superseding indictment); and/or that Rejon Taylor did not possess the requisite mental state to sustain a finding under either of the gateway factors (intent and substantial planning and premeditation), *see* (Doc. 760, p. 3) (Special Verdict Form); and/or that Rejon Taylor acted impulsively when he discharged the gun; and/or that Joey Marshall was granted consideration for the disposition of criminal charges in other jurisdictions, including Dekalb County, in exchange for his testimony in Mr. Taylor's prosecution, *see* (Doc. 896, PageID #6573-6760, p. 49-236); and/or that the government promised Joey Marshall a sentence at the low-end of the Guidelines in exchange for his testimony in Mr. Taylor's prosecution, *see* (*id.*); and/or that the government knew that Sir Jack Matthews intended to testify falsely when they presented his testimony, *see* (Doc. 866, PageID #4789-4830, p. 8-49); and/or that Mr. Taylor's role in the Hamilton County Jail escape attempt was as a follower, not a leader.

Withheld exculpatory evidence is material if there is any reasonable likelihood that, considered cumulatively, it could have affected the jury's verdict. *See Kyles*, 514 U.S. at 436 (courts must consider suppressed evidence "collectively, not item by item" when determining materiality). However, the "materiality" test

does not require a petitioner to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35. Rather, evidence is "material" if it "could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." *Id.* at 435.

For example, based on information and belief, the government possessed information that Rejon acted impulsively and in a panic when he fired shots at the victim. Not only did the government withhold that information from the defense, the government knowingly presented a false theory of the case when they argued otherwise, that Rejon acted with substantial planning and premeditation. Specifically, the government relied heavily on Mr. Marshall's testimony – over 150 pages worth, including cross examination – to argue that Mr. Taylor acted with premeditation and substantial planning when committing murder. Through Mr. Marshall, the government established that Mr. Taylor intended to kill the victim because the victim had taken a "warrant out" on Mr. Taylor and that Mr. Taylor saw a copy of the warrant when he was in the victim's house. (Doc. 896 PageID #6606-07, p. 82-83). Mr. Marshall also testified that he and Mr. Taylor "followed" the victim from his restaurant to his house, (*id.* at #6634, p. 110), and then repeated on redirect that Mr. Taylor was "following" the victim, explaining that when he said he "lied" in an earlier statement to law enforcement, it was because he "left out several details" about Mr. Taylor "following" the victim. (*Id.* at #6745, p. 221) (claiming that that was "what [he was] talking about…when [he] told the jury that

217

[he] lied" earlier).

Then, during closing argument, the government recharacterized Mr. Marshall's testimony as: "Joey Marshall told you they'd been *stalking* this man." (Doc. 868, PageID #5086, 5112, p. 41, 67) (emphasis added). In fact, the government's theme in both phases of trial – that Mr. Taylor was "stalking," "hunting," "circling," and "following" the victim before killing him – was based squarely off Mr. Marshall's testimony. *See e.g.,* (Doc. 902, PageID at #7747, p. 168) and (Doc. 868, PageID #5118, p.73).

As a result of the government's suppression of material exculpatory evidence, the prejudice to Mr. Taylor is clear. The government's case was premised on the argument that Rejon Taylor intended to kill Guy Luck from the moment of the kidnapping. In sentencing they argued that Mr. Taylor was a "wolf," a "chameleon," and a "monster," that "hunted," "stalked," "circled," and "followed," the victim. That he was remorseless and dangerous. The evidence suppressed by the government would have rebutted those allegations.

It is reasonably probable that had the government disclosed this evidence the result of the proceedings at both stages of trial would have been different.

## CONCLUSION

WHEREFORE, movant Rejon Taylor asks that the Court provide him with the following relief:

218

I. That the Court conduct a status conference and schedule for further proceedings related to this Motion, including Movant's Amended Petition to be submitted in accordance with Rule 15(a) of the Federal Rules of Civil Procedure and, thereafter, submission of the government's Answer pursuant to Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases.

II. That the Court permit Mr. Taylor to amend this Motion to include further evidence in support of the claims currently pled.

III. That the Court permit Mr. Taylor to utilize the process of discovery as contemplated by Rule 6 of the Rules Governing 28 U.S.C. §2255 Cases.

IV. That the Court permit Mr. Taylor to amend this Motion to include any additional allegations of claims not presently known to him or his counsel which may be identified or uncovered in the court of discovery, additional investigation, and litigation of this Motion, and to allow the amendments to related back to the date of the filing of this Motion.

V. That Mr. Taylor be permitted to file a Traverse to Respondent's Answer, responding to any affirmative defenses raised by Respondent.

VI. That Mr. Taylor be permitted to file a Memorandum of Law in Support of this Motion in accordance with a schedule established by the Court.

VII. That the Court conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion or by Mr. Taylor's Traverse to be filed in response to any affirmative defenses raised by Respondent.

VIII. That the Court permit oral argument on this Motion.

IX. That the Court vacate Mr. Taylor's conviction and sentence and order a re-trial and/or resentencing hearing.

X. That the Court grant such further and additional relief as the law dictates.

Dated: May 14, 2019

Respectfully Submitted,

/s/ Kelley J. Henry
Kelley J. Henry, BPR # 021113
Supervisory Assistant Federal Public
Defender, Capital Habeas Unit

/s/ Amy D. Harwell
Amy D. Harwell, BPR # 018691
Assistant Chief, Capital Habeas Unit
Office of the Federal Public Defender for
the Middle District of Tennessee
810 Broadway, Suite 200
Nashville, TN 37203
615.736.5047
amy_harwell@fd.org
kelley_henry@fd.org

/s/ Alexis J. Hoag
Alexis J. Hoag, BPR # 028712
Senior Counsel
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
ahoag@naacpldf.org

/s/ Patricia Okonta
Patricia Okonta*
Skadden Fellow

NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
pokonta@naacpldf.org

*_Pro Hac Vice Application Pending_

_Counsel for Movant Rejon Taylor_

221

## VERIFICATION UNDER PENALTY OF PERJURY

My name is Kelley Henry. I am an attorney licensed to practice in the State of Tennessee. The District Court for the Eastern District of Tennessee appointed my office to represent Rejon Taylor in this post-conviction proceeding.

Mr. Taylor has authorized me to file the foregoing pleading, a Motion to Vacate, Set Aside, or Correct Sentence, and for a new trial pursuant to 28 U.S.C. §2255 and Rule 33 of the Federal Rules of Criminal Procedure. I am filing this pleading on his behalf.

I declare that the content of the foregoing pleading is true and correct, except for those matters based upon information and belief, and I believe the latter matters to be true. The sources of my information include, but are not limited to, official court records, documents obtained or prepared during the investigation of this pleading, and items in the possession of other lawyers, investigators, or other experts connected with the preparation of this pleading.

I make this verification pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings, because these matters are more within my knowledge than Mr. Taylor's knowledge.

I declare, under penalty of perjury, that the foregoing verification is true and correct.

/s/ Kelley J. Henry

Dated: May 14, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of May 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel record.

<div style="margin-left: 40%;">

/s/ Kelley J. Henry
Kelley J. Henry, BPR # 021113
Supervisory Assistant Federal Public
Defender, Capital Habeas Unit
Office of the Federal Public Defender for the
Middle District of Tennessee
810 Broadway, Suite 200
Nashville, TN 37203
615.736.5047
kelley_henry@fd.org

</div>