Exhibit 1



**G**

**WW** GEORGE W. WOODS, JR., M.D., FAPA

A PROFESSIONAL CORPORATION
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

415 503 3959

gwoods@georgewoodsmd.com

San Francisco Atlanta

May 12, 2019

Ms. Kelley J. Henry, Esq.
Ms. Amy D. Harwell, Esq.
Office of the Federal Public Defender
Middle District of Tennessee
810 Broadway, Suite 200
Nashville, TN 37203

Ms. Alexis J. Hoag, Esq.
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Re:     **Rejon Taylor (DOB 9/15/1984)**

Counsel:

Pursuant to your request, I have performed a preliminary neuropsychiatric examination of Rejon Taylor, who is currently incarcerated at USP Terre Haute on Federal Death Row.

During my examination, I interviewed Mr. Taylor on March 26 – 27, 2019. I reviewed Mr. Taylor's medical, social, educational, juvenile, and psychological records. I also consulted with a multi-disciplinary team, including Hope Hill, Ph.D., Kate Porterfield, Ph.D., and Jan Vogelsang, MSW, each of whom also interviewed Mr. Taylor. Finally, I interviewed several members of Mr. Taylor's family in April of 2019, including his father, his brother, his sister, and his deceased mother's romantic partner of many years. A complete list of the materials reviewed is attached. (Ex A)

I must stress that my observations and conclusions are inherently limited by the time constraints under which this evaluation was made. I will continue to assess Mr. Taylor. I reserve the right to amend or supplement my findings based on information that arises in my continued work in this case. However, based on the information provided to me, my own observations, and my clinical assessment, I hold the following opinions to a reasonable degree of medical certainty at this time.

Exhibit 1

## Referral Questions

Your specific referral questions were:

1. Did Mr. Taylor suffer from a mental disease or defect at the time of the trial?

2. At the time of the trial, did Mr. Taylor have a sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and have a rational as well as factual understanding of the proceedings against him? Specifically, did Mr. Taylor have the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and assist in preparing his defense?

3. Was Mr. Taylor competent to rationally consider the Government's offer of life in prison?

4. What role did Mr. Taylor's trauma experiences, mental illness, and cognitive functioning play in the offense?

5. Was Mr. Taylor's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law significantly impaired, regardless of whether the capacity was so impaired that it constitutes a defense to the charges?

6. Did Mr. Taylor commit the offense under severe mental or emotional disturbance?

7. Does Mr. Taylor suffer from neurological, physiological, emotional, or mental impairments regardless of whether they meet the statutory mitigating circumstances discussed above?

## Summary

It is my professional opinion which I hold to a reasonable degree of neuropsychiatric certainty that Rejon Taylor was incompetent to stand trial in his capital case. Mr. Taylor suffered from a mental disease or defect that, at the time of his trial, rendered him unable to "consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Mr. Taylor's sense of reality was impaired, such that it substantially undermined his judgment and his ability to rationally cooperate with counsel. *Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1990) ("Even if a criminal defendant has an intellectual understanding of the charges against him, he may be incompetent if his impaired sense of reality substantially undermines his judgment and prevents him from cooperating rationally with his lawyer .. It is beyond dispute that the Supreme Court's legal definition of competency . . . mandates the conclusion that a defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him.")

Exhibit 1

Mr. Taylor has debilitating neurological, psychological, and functional impairments. He meets the diagnostic criteria for Bipolar Disorder Secondary to a General Medical Condition, i.e., Temporal Lobe Syndrome and Post Traumatic Stress Disorder. Temporal Lobe Syndrome is an umbrella term which indicates serious deficits in emotional and cognitive functioning stemming from impaired function in the temporal lobe. Mr. Taylor displays significant impairment of executive functioning, particularly in his ability to effectively weigh and deliberate, as well as understand social cues and social context. Mr. Taylor's ability to effectively weigh and deliberate is impaired by his psychotic religiosity, which is the direct result of his temporal lobe-based delusions. Mr. Taylor also suffers from Personality Change Secondary to Temporal Lobe Dysfunction. The personality change includes a manic-like set of symptoms, e.g., mood lability, circumstantiality, loss of ego boundaries, and psychotic ambivalence, which is the consequence of the emotional lability and affective dysregulation seen in Mr. Taylor's temporal lobe dysfunction and trauma.

Mr. Taylor's multiple impairments are synergistic and impede his perception of reality and resulting in psychosis. At the time of trial, Mr. Taylor suffered from religious delusions that prevented him from consulting with counsel with a reasonable degree of rational understanding, i.e., he believed that God would cause the evidence in his case to disappear and release him from custody. His religious delusions were then encapsulated, but have become more pervasive. They have grown more complex in the intervening decade and continue to impact his current thinking.

## Qualifications

I am a licensed physician specializing in neuropsychiatry. I also perform forensic consultations in criminal and civil legal cases.

My private medical practice focuses on neurodevelopmental disabilities, acquired neurocognitive disorders, ethnopsychopharmacology, cognitive impairments secondary to neuropsychiatric disorders, and workplace safety. My clinical subspecialties are neuropsychiatry and consultation liaison psychiatry, which is the treatment of psychiatric manifestations of medical diseases and the assessment of neurodevelopmental disorders. For the last thirty-six years, my practice has consisted of clients with traumatic brain injuries, developmental disabilities, and cognitive impairments.

I received my medical degree from the University of Utah in 1977. I completed my psychiatric residency at Pacific Medical Center in San Francisco, California, where I served as Chief Resident. The medical training I have undertaken since my residency has been focused on psychiatry and primary care medicine. My medical training has been supplemented with training in neuroanatomy, neuropsychological investigation, psychopharmacology, neuroimaging, and other relevant subjects, such as sleep disorders, developmental disability, and dysmorphology, which is the study of structural abnormalities often related to developmental disorders. My neuropsychiatric practice is based on an understanding of the relationships among psychiatric disorders, brain dysfunction, metabolic disruption, and endocrinological abnormalities.

Exhibit 1

I am a Life Fellow of the American Psychiatric Association (APA). I participated in an APA- National Institute of Mental Health fellowship for Geriatric Psychopharmacology. I am a member of the Northern California Psychiatric Association, the California Psychiatric Association, the American Neuropsychiatric Association, the International Neuropsychological Society, and the American Psychological Association. I was on the Executive Committee of the Challenging Behaviors Special Interest Research Group of the International Association for the Specialized Study of Developmental Disorders (IASSIDD) from 2015 through 2018. I served as the Newsletter Editor for the IASSIDD Challenging Behaviors SIRG from 2013-2017 and served as Associate Editor of the IASSIDD Journal of Policy and Practice in Developmental Disabilities from 2016-2018. I am the immediate past President of the International Academy of Law and Mental Health (IALMH) and continue to serve on the Scientific and Executive Committees. In July of 2017, I was asked to continue as Secretary General of the IALMH during its amalgamation with the Institute of Ethics, Medicine, and Public Health at the Sorbonne in Paris, France. I am the recipient of the 2019 Distinguished Alumnus Award from the University of Utah Medical Center.

I am a lecturer at the University of California, Berkeley Law. I teach a course on Law and Mental Health with Jennifer Johnson, Esq. We also teach a continuing education webinar, "Where Mental Health Meets the Law," which has a comprehensive curriculum which tackles the evolving field of forensic mental health through Thomson Reuters West Legal Education. I am currently on sabbatical from my position as Adjunct Professor at Morehouse School of Medicine in Atlanta, Georgia, where I taught "Clinical Aspects of Forensic Psychiatry" and "Introduction to Geriatric Psychiatry" for thirteen years.

I remain current on the latest advancements in general and behavioral medicine by participating in medical conferences and reading various journals, including *The Journal of Neuropsychiatry and Clinical Neurosciences, CNS Spectrums, American Journal of Psychiatry, Psychiatric Annals, Journal of Clinical Psychiatry, Critical Care, Neurologic Clinics of North America* and the *New England Journal of Medicine,* among others.

I have consulted with neuropsychologists and have extensive experience interpreting neuropsychological tests, including the Wisconsin Card Sorting Test, Halstead Reitan Battery, the Cognistat, the Montreal Cognitive Assessment Instrument (MOCA), and Delis Kaplan Executive Function System (DKEFS). I have also interpreted other psychometric instruments, including, but not limited to, the Minnesota Multiphasic Personality Inventory (MMPI-1, 2, and RF), the Millon Clinical Multiaxial Inventory, the Personality Assessment Inventory, the Rorschach, and instruments measuring effort.

I have published articles on the topics of forensic assessment of neurodevelopmental disorders, fetal alcohol spectrum disorder, cognitive impairment in the elderly, financial deception in elderly populations, comorbidity, the death penalty, and trauma.

My experience and published work are fully set forth in my curriculum vitae. (Ex B)

4

Exhibit 1

## Relevant Social History

Rejon Taylor's social history as investigated and developed by his legal defense team and presented by Hope Hill, Ph.D., is remarkable in the chaos and violence he suffered growing up. This investigation explains how his impairments evaded detection until his incarceration, as it is typified by neglect and absence of parental or community oversight.

From a young age, Mr. Taylor lived in chaos. He was transient, constantly moving between relatives and friends, staying in their homes, including his grandmother, his sister, his aunt, his cousin, his uncle, his father, and various friends. Additionally, the most stable of the places he lived, his grandmother's house, was itself characterized as being chaotic in that family members and others were in and out, staying varying amounts of time. (Declarations of John Taylor, Harold Hall, Rosa Pat Moss, Tonya Walton, Tayanau Nunez, Sylvia Stokes, Sandra Hines, Pearl Rankins, Rashard Blackwell, and Tameka Shepard) There were also frequent interruptions in his education. Mr. Taylor attended ten schools in less than eleven years of schooling. (School Records, Declarations of Sandra Hines, Rashard Blackwell, Joseph Gatlin, John Taylor II, Lisa Taylor, Traketa Taylor, Edward Gatlin, and Tameka Shepard) Therefore, routine and consistency were missing from his formative years.

Mr. Taylor's father was incarcerated and largely absent from his life until Rejon was almost eight-years-old. There was a second period of paternal abandonment when Mr. Taylor was thirteen. (Declarations of John Taylor, Joseph Gatlin, Tameka Shepard, Tayanau Nunez, Jessica Jackson, Lisa Taylor, Nicole Gatlin Carson, Ramon Shepard, Tonya Walton, John Taylor II, Nedras Moreland and the Georgia Board of Pardon and Paroles record for John Taylor)

Family and community members repeatedly observed that Mr. Taylor's mother was generally not present in the home and did not supervise Mr. Taylor. (Declarations of Tameka Shepard, Edward Gatlin, Joseph Gatlin, Ramon Shepard, Traketa Taylor, John Taylor, and Harold Hall) Family members observed that that he and his older brother were "watched", but not parented by their maternal grandmother and great-grandmother. (Declaration of Edward Gatlin; but see Declaration of Harold Hall (indicating that grandmother was absent from the home Monday through Friday) Mr. Taylor's developmental years were characterized by a lack of adult supervision and guidance. (Declarations of Jessica Jackson Langford, Nicole Gatlin Carson, Traketa Taylor, John Taylor, Edward Gatlin, Joseph Gatlin, Ramon Shepard, and Harold Hall)

Mr. Taylor was repeatedly exposed to both domestic violence (Declarations of Tayanau Nunez, John Taylor, John Taylor II, Tonya Walton, Tameka Shepard, Ramon Shepard, Harold Hall, Lisa Taylor, and Walter Taylor) and violence within his wider community. (Declarations of Tameka Shepard, Ramon Shepard, Edward Gatlin, Jessica Jackson Langford, Javante McCoy, Keashawn Washington, Traketa Taylor, Nedras Moreland, and John Taylor II) Additionally, Dr. Hill noted multiple incidents where Rejon was threatened with a gun either – intentionally or unintentionally (Declarations of Ramon Shepard, Tameka Shepard, Lisa Taylor). Most notably, Mr. Taylor was

Exhibit 1

nearly shot, accidently, by his sister's then boyfriend when he was a very young child. (Declarations of Tameka Shepard, Ramon Shepard) However in interviews with the multidisciplinary team, Mr. Taylor mis-reported that his older brother was the perpetrator. This symptom, impaired autobiographic memory, is discussed below.

Mr. Taylor's maternal relatives exhibit unusual religiosity with content consistent with Mr. Taylor's religious delusions and fixations. (Declarations and interviews of Harold Hall, John Taylor, Tameka Shepard, Ramon Shepard, and John Taylor II; declarations of Sylvia Stokes, Sandra Hines, Jessica Langford, Leslie Cory, Marti Loring, and Roy Cooper) Rejon Taylor's father, John Taylor, endorses possession of "second sight," attributing his power to the veil that was over his face when he was born. (John Taylor Declaration)

### Relevant History from Past Legal Representation

Rejon Taylor's trial counsel observed symptoms of Mr. Taylor's psychosis and delusions pretrial. In early 2004, Mr. Taylor's state court attorney, Richard Heinsman, noted Mr. Taylor's hyper-religiosity, delusions, grandiosity, and symptoms of psychosis or delusion (Richard Heinsman Declaration), specifying that "he explained that he believed his incarceration was somehow similar to the experiences and suffering of the Apostle John – that his arrest and confinement were analogous to John's exile to Patmos. (*Id.*) Mr. Taylor also expressed that he was unconcerned about his case or possible conviction: "he believed and trusted that God would deliver him." (Id.) Mr. Heinsman also noted that Mr. Taylor believed that he had "experienced a 'revelation' in custody, that his current circumstances were 'only a trial' and that he was to be patient because God had told him all would be ok." (*Id.*) Mr. Heinsman noted that Mr. Taylor's affect was inappropriate: Mr. Taylor smiled and giggled was "unreasonably happy and peaceful relative to his surroundings." (*Id.*)

Members of Mr. Taylor's federal trial team also observed Mr. Taylor's delusional belief system and symptoms of his psychosis. For instance, Mr. Taylor told attorney Howell Clements that he had ten tablets of revelation from God that he had received in the jail (Howell Clements Declaration); Mr. Clements was present when Mr. Taylor told the court that his "heavenly father told [him that he did not] need a lawyer" (Transcript October 26, 2004 Initial Appearance); and Mr. Clements also observed Mr. Taylor's irrational belief that God would cause the evidence against him to disappear (Howell Clements Declaration). Mr. Taylor described his blissful state of revelation to Mr. Clements, including that Mr. Taylor felt "like a bird on the side of a waterfall on a bush." (Howell Clements Declaration) Leslie Cory noted that Mr. Taylor fasted and prayed for many hours a day and that he had conveyed that since his incarceration he was "happier than he had ever been." (Leslie Cory Declaration) Mr. Taylor compared himself to multiple Biblical figures, including Joseph, son of Jacob, who Mr. Taylor identified with because Mr. Taylor, like Joseph, had found "favor" with his captors. (*Id.*) Mr. Taylor explained to Ms. Cory that God was going to release him in July of 2005. (*Id.*) In 2008, much closer to trial, Mr. Taylor was very confused about any possibility that his testimony might not lead to his acquittal; he said that he wanted to go to trial

Exhibit 1

so that God could decide everything. (*Id.,* Roy Cooper Declaration) Mr. Taylor repeatedly told his team he could not accept the Government's offer of life imprisonment because God had not told him to do so. (Leslie Cory Declaration, Howell Clements Declaration, Roy Cooper Declaration)

A pretrial psychological screening provided further evidence of Mr. Taylor's impairment. On the MMPI, Mr. Taylor endorsed smelling peculiar odors, racing thoughts, sensations of paralysis, and extraordinary experiences. His profile was "nay-saying," that is, it was consistent with a severely mentally ill person attempting to conceal psychosis. The PAR clinical report of his scores raised the possibility of a psychotic spectrum disorder, reflecting that his code type is frequently found "in patients with characterological or psychotic disorders to which they have become adjusted." Overall, his MMPI responses were consistent with delusional thinking, thought disturbance and a defensive psychological system that necessitates a departure from reality – that is, by definition, psychotic.

### Neuropsychiatric Mental Status Examination

I interviewed Mr. Taylor on March 26 and March 27, 2019. During those visits, I conducted a neuropsychiatric mental status examination and clinical interview of Mr. Taylor.

### A. General Description

1. *General appearance, dress, sensory aids* (glasses, hearing aid)

   Mr. Taylor is a lithe, black male of medium build. He wore regulation prison attire and glasses. His hair was fashioned in what he called "organic" dreadlocks, reflecting that the hair locked without deliberate styling. His hair was clean and extremely healthy.

2. *Level of consciousness and arousal*

   Mr. Taylor was hyper-arousable. He shows no signs of sleepiness nor delirium. He does not display waxing and waning of consciousness.

3. *Attention to environment*

   Mr. Taylor was easily distractible. He responded to relevant, as well as irrelevant, stimuli in the environment. He obsessively scanned the environment attempting to pick up on minute, often irrelevant details. One of his focuses was hand movements, which he watched closely in a relatively odd way. Mr. Taylor recognized his behavior, but was unable to explain why he did it.

Exhibit 1

4. *Posture* (standing and seated)

   Posture was good, both standing and seated. He has an athletic stance.

5. *Gait*

   Gait was fluid. There was no sign of shuffling or drop foot.

6. *Movements of limbs, trunk, and face* (spontaneous, resting, and after instruction)

   Mr. Taylor's movements were fluid and appropriate. There was no sign of twisting of his body (torticollis) or facial paralysis (7th nerve palsy).

7. *General demeanor* (including evidence of responses to internal stimuli)

   There was no overt evidence of responses to internal stimuli. He manifested unusual emotional lability.

8. *Response to examiner* (eye contact, cooperation, ability to focus on interview process)

   Mr. Taylor was cooperative with the examination. He maintained good eye contact and was able to focus.

9. *Native or primary language:* English

## B. Language and Speech

1. *Comprehension* (words, sentences, simple and complex commands, and concepts)

   Mr. Taylor's grasp of the language is intact. There was no indication of expressive/ receptive aphasia during the interview. He was able to respond to simple commands. His concept formation was impaired by his delusional precepts.

2. *Output* (spontaneity, rate, fluency, melody or prosody, volume, coherence, vocabulary, paraphasic errors, complexity of usage)

   His speech is frequently pressured. He has circumstantiality, therefore, frequently added irrelevant details. His vocabulary is good and there is a complexity of usage. Volume was within normal range. There were no paraphasic errors, meaning he did not add inaccurate, intrusive language to his sentences.

3. *Repetition*

Exhibit 1

Mr. Taylor demonstrated significant perseveration, which is mental inflexibility. Although his language can be complex, within the context of his delusions, due to the fixed nature of his delusions, his speech becomes repetitive. His interviews centered on redundant themes.

## C. Thought

### 1. *Form* (coherence and connectedness)

Mr. Taylor's thinking, while coherent, was frequently delusional, meaning out of touch with reality. It was psychotic. He manifested flight of ideas, circumstantiality (irrelevant details), and hyperfocus on his language. Much of this focus was an awareness of his flight of ideas, and, at least initially, he worked hard to limit his delusional content.

### 2. *Content*

Mr. Taylor's thought content is delusional. His perceptions of reality are impaired. His delusions stem from his religious ideation and experience of the "Messiah." They have the necessary qualities of delusions, including conviction, pervasiveness, fluidity, negative and positive affective quality. The quality of his delusions was consistent with the psychosis that is often seen in temporal lobe dysfunction. Mr. Taylor exhibited extreme loss of ego boundaries, causing psychotic merging of his identity both with people in his past (i.e., his mother and his brother) and examiners in the present.

### 3. *Ideational* (preoccupations, overvalued ideas, delusions)

Mr. Taylor suffers significantly from delusional that have strong religious content. Mr. Taylor believes that he talks directly to God, and God speaks directly to him. He believes he has a special relationship with God and that he has been specifically chosen to channel God's will. He also believes his writing, music, and art are direct channeling from the Holy Spirit. He acknowledges spending time in the physical "presence" of the Messiah each morning. His experience of God and relationship with God extends far beyond praying.

### 4. *Perceptual* (hallucinations)

Mr. Taylor has olfactory hallucinations, specifically, a cinnamon-like scent, and auditory hallucinations, particularly the voice of God talking to him. He also has suffered from visual hallucinations in which he saw God descending from Heaven. He has hallucinated fire coming from his head. He acknowledged these olfactory hallucinations in Dr. Solovay's evaluation as well.

## D. Mood and Affect

Exhibit 1

1. *Internal mood state* (spontaneous and elicited; sense of humor)

Mr. Taylor's mood over time, as reported by the multi-disciplinary team, was labile. During my examinations, he was primarily euphoric and elevated, almost manic; however, he reported periods of irritability and depression. Mr. Taylor's mood lability is consistent with mood instability found in temporal lobe dysfunction. Additionally, Mr. Taylor has a poor sense of humor, frequently missing irony or sarcasm. His obsession with the concretizing of his thought reflects his limited ability for abstraction, which is frequently a component of humor.

2. *Demonstrated emotional status* (congruence with mood)

Mr. Taylor's mood and affective presentation were both extremely manic. For instance, he described his incarceration as "the best thing that has ever happened to him." He had a smiled throughout both interviews. His mood was not congruent with the topics discussed or various circumstances during the interviews.

E. **Insight and Judgment**

1. *Insight*

    a. *Self-appraisal and self-esteem*

    Mr. Taylor is psychotically impaired in his self-analysis. He believes he has developed special artistic and communication gifts, given to him from the Messiah, since his incarceration. He believes he is unusually perceptive about the thoughts and motivations of the people around him and is insistent on his analysis of them. He endorses poor ego boundaries and speaks of his "flowing" into others when they interact with him, as well as his "absorption" of the energy of the other.

    b. *Understanding of current circumstances*

    Mr. Taylor understands he is on death row; however, he believes the situation will be resolved through divine intervention, not the legal process.

    c. *Ability to describe personal psychological and physical status*

    Mr. Taylor did not endorse any physical complaints. He had significant insight into his psychological status, including the effort he makes to obscure his delusional belief system so that he is not perceived as crazy.

2. *Judgment*

10

Exhibit 1

a. *Appraisal of major social relationships*

Mr. Taylor has had significant difficulty with major social relationships historically due to his loss of ego boundaries. Evidence of his psychotic ambivalence impairs his relationships in that he is unable to maintain the façade of normalcy. When Mr. Taylor's ego boundaries are overwhelmed, we see his mood lability undermine his ability to accurately appraise relationships.

F. Cognition

1. *Memory*

   a. *Spontaneity*

   Mr. Taylor's working memory is impaired.

   b. *Tested*

   Autobiographical memory is impaired, but superficial explicit memory is intact.

2. *Executive Functions*

   Mr. Taylor's ability to weigh and deliberate is impaired by his hyper-religious delusions. Although he is, apparently, able to function in daily tasks within a highly structured settings, his problem solving, understanding of context, and ability to respond to social cues are significantly impaired.

## Clinical Formulation

It is my professional opinion, which I hold to a reasonable degree of medical certainty, that Mr. Taylor suffers from at least two cognitive disorders, Bipolar Disorder – secondary to a general medical condition (i.e., Temporal Lobe Syndrome) and Post-Traumatic Stress Disorder.

### Bipolar Disorder – Secondary to a General Medical Condition (Temporal Lobe Syndrome)

*The Diagnostic and Statistical Manual, 5th Edition (DSM-5)* utilizes the following criteria to make the diagnosis of Bipolar Disorder Secondary to a General Medical Condition:

A. A prominent and persistent period of abnormally elevated, expansive, or irritable mood and abnormally increased activity or energy that predominates in the clinical picture.

11

Exhibit 1

B. There is evidence from the history, physical examination, or laboratory findings that the disturbance is the direct pathophysiological consequence of another medical condition.

C. The disturbance is not better explained by another mental disorder.

D. The disturbance does not occur exclusively during the course of a delirium.

E. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning, or necessitates hospitalization to prevent harm to self or others, or there are psychotic features.

### Temporal Lobe Syndrome

Temporal Lobe Dysfunction, alternately called Temporal Lobe Epilepsy, was first described by Norman Geschwind, M.D. (1926-1984). He recognized specific symptoms could occur when the temporal lobes were not functioning properly.[1] The symptom list has been expanded and is an inventory of symptoms:

### Characteristics Historically Attributed to Temporal Lobe Epilepsy

| Inventory Trait | Reported Clinical Observation |
| --- | --- |
| Emotionality | Deepening of all emotions, sustained intense affect. |
| Elation, euphoria | Grandiosity, exhilarated mood; diagnosis of manic-depressive disease. |
| Sadness | Discouragement, tearfulness, self-deprecation, diagnosis of depression, suicide attempts. |
| Anger | Increased temper, irritability. |
| Aggression | Overt hostility, rage attacks, violent crimes, murder. |
| Altered sexual interest | Loss of libido, hypersexualism; fetishism, transvestism, exhibitionism, hypersexual episodes. |
| Guilt | Tendency to self-scrutiny and self-recrimination. |
| Hypermoralism | Attention to rules with inability to distinguish significant from minor infractions; desire to punish offenders. |
| Obsessionalism | Ritualism; orderliness; compulsive attention to detail. |
| Circumstantiality | Loquacious, pedantic; overly detailed, peripheral. |
| Viscosity | Stickiness; tendency to repetition. |

[1] Geschwind, N. (2009) "Personality changes in temporal lobe epilepsy." *Epilepsy and Behavior* 15(4):425-433.

Exhibit 1

| | |
|---|---|
| Sense of personal destiny | Events given highly charged, personalized significance; divine guidance ascribed to many features of patient's life. |
| Hypergraphia | Keeping extensive diaries, detailed notes; writing autobiography or novel. |
| Religiosity | Holding deep religious beliefs, often idiosyncratic; multiple conversions, mystical states. |
| Philosophical interest | Nascent metaphysical or moral speculations, cosmological theories. |
| Dependence | Cosmic helplessness, "at hands of fate"; protestations of helplessness. |
| Humorlessness | Overgeneralized ponderous concern; humor lacking or idiosyncratic. |
| Paranoia | Suspicious, over interpretative of motives and events; diagnosis of paranoid schizophrenia. |

Dr. Geschwind identified cardinal symptoms caused by electrical problems in the temporal lobes, those parts of the brain are central to multiple aspects of brain functioning. The brain structures in and adjacent to the temporal lobes impact fear, memory, academic function, the depth of emotion, and psychosis among many other cognitive tasks. Dr. Geschwind identified that abnormal brain electrical activity could also manifest in behavior, rather than motor activity. He opined that many patients, despite never having a clinical seizure, would nonetheless manifest behavioral changes.

Not each of these symptoms occurs in every manifestation of temporal lobe dysfunction. However, each of these symptoms is neurological in origin, rather than psychiatric, although their manifestations may appear and be treated as mania, psychosis, or delusions:

> In recent times, especially with the unraveling of cerebral circuitry for the expression of emotions, notably with a fuller understanding of the limbic lobe and the role of such structures as the hippocampus and the amygdala in emotional behaviors, a biological interpretation of many behaviors previously thought of as socially driven becomes possible. Epilepsy very often relates to chronic neurophysiological changes in such limbic structures, and its relation to religiosity provides an opportunity to explore in more detail the neurobiology of such behavioral predispositions.[2]

Temporal lobe symptoms, such as altered spirituality, dissociation, deepened emotionality, viscosity (a sense of clinging in relationships), circumstantiality and grandiosity are ongoing rather than being

---

[2] Dewhurst, K. & Beard, A. W. (1970) "Sudden Religious Conversions in Temporal Lobe Epilepsy". *The British Journal of Psychaitry.* 177 (540): 497-507.

13

Exhibit 1

temporally related to overt seizure activity. They are not 'ictal' phenomena, limiting to the times of overt seizure activity. Yet, these behaviors are the manifestations of aberrant electrical activity, rather than physical manifestations like limbs going a kilter or incontinence. These manifestations of bad wiring in the temporal lobes are "inter-ictal, "meaning in between overt electrical activity, rather than "pre-ictal or post-ictal" meaning these behaviors occur all the time, not just around the time of greatest electrical abnormality.[3]

> Dr. Geschwind emphasized interictal, rather than perictal behavioral changes. Chronic change in personality in TLE is very common – not an acute change in personality, but one that develops, continues, and typically gets more striking with the passage of time; a personality that the patient manifests all the time, not an acute and self-limited change related to a seizure; behavioral changes that typically follow the onset of the seizures and continue for many years, often gradually getting more intense. Dramatic ictal or pre-ictal changes in personality could occur, but were rare. But even here, a chronic inter-ictal state eventually prevailed....[4]

Temporal lobe dysfunction is often the differential diagnosis of bipolar and schizophrenic disorders, secondary to the presentation of mood lability, grandiosity, paranoid ideation, psychosis, and delusions. Bipolar-like behaviors, often with ritualistic, hyper-moral, and hyper-religious overtones, run in the maternal side of Mr. Taylor's family. The literature supports a familial inheritance of these symptoms. It also indicates that MRI findings for the disorder are often normal:

> We describe a new syndrome of familial temporal lobe epilepsy in 38 individuals from 13 unrelated white families. The disorder was first identified in 5 concordant monozygotic twin pairs as part of a large-scale twin study of epilepsy. When idiopathic partial epilepsy syndromes were excluded, the 5 pairs accounted for 23% of monozygotic pairs with partial epilepsies, and 38% of monozygotic pairs with partial epilepsy and no known etiology. Seizure onset for twin and nontwin subjects usually occurred during adolescence or early adult life. Seizure types were simple partial seizures with psychic or autonomic symptoms, infrequent complex partial seizures, and rare secondarily generalized seizures. Electroencephalograms revealed sparse focal temporal interictal epileptiform discharges in 22% of subjects. Magnetic resonance images appeared normal. Nine affected family members (24%) had not been diagnosed prior to the study. Pedigree analysis suggested autosomal dominant inheritance with age-dependent penetrance. The estimated segregation ratio was 0.3, indicating an overall penetrance of 60% assuming autosomal dominant inheritance. The mild and often subtle nature of the symptoms in some family members may account for lack of prior recognition of this

---

[3] Geschwind, N. (2009). "Personality changes in temporal lobe epilepsy." Epilepsy and Behavior 15(4):425-433.

[4] Devinsky, J. and S. Schachter (2009). "Norman Geschwind's contribution to the understanding of behavioral changes in temporal lobe epilepsy: The February 1974 lecture." 15(4): 417-424.

Exhibit 1

common familial partial epilepsy. This disorder has similarities to the EI mouse, a genetic model of temporal lobe epilepsy with a major gene on mouse chromosome 9, which is homologous with a region on human chromosome.[5]

Mr. Taylor demonstrates mood lability. He experiences abnormally elevated moods as well as irritability. There is supportive history from the extensive family and social history of a familial and early onset of temporal lobe symptomatology, including obsessiveness, grandiosity, circumstantiality, and hyper-religiosity. These symptoms result in impaired judgment, loss of ego boundaries and ambivalence of a psychotic nature.

When Mr. Taylor was eighteen years old, he was unwilling to take counsel from his attorneys. Mr. Taylor described multiple unusual experiences, culminating in direct revelations from "the Messiah." The delusions he was suffering from – hearing the "Messiah," feeling flames coming from his head, feeling an overwhelming joy at understanding his destiny – these experiences transcend the cultural norm within his community. Despite their conservative Christian beliefs, his attorneys were so concerned about his religiosity that they asked for a competency consultation.

Mr. Taylor is obsessed with etymology. He focuses on the concrete meaning of words to such an extent that it impairs his ability to communicate. He studies picto-Hebrew. He also obsessively follows hand movements of anyone he encounters. He states he has done this since childhood. It also impairs his focus and concentration.

Significant circumstantiality showed up during my interviews with Mr. Taylor. This is also associated with temporal lobe syndrome. Circumstantiality is the presentation of information in an irrelevant, overly detailed manner.[6] Mr. Taylor provided a history of his interest in linguistics that, both due to his circumstantiality and his flight of ideas, took him far afield. In fact, he discussed his interest in multiple other forms of written and spoken language before he was able to narrow his focus on picto-Hebrew. His written and verbal communication are filled with unnecessary detail. He has an obsession with precision that detracts from his actual communication. During our interviews, he digressed from the topic at hand both easily and at length, which is consistent with flight of ideas. He became so involved in discussions of the etymology of the words he used that he lost his train of thought. Many of the details were superfluous to our discussion.

---

[5] Berkovic, S. F., A. McIntosh, et al. (1996). Familial temporal lobe epilepsy 40(2): 227-235.

[6] Bear, D.M., & Fedio P. (1977) Quantitative analysis of inter-ictal behavior in temporal lobe epilepsy. *Arch Neurol* 1977; 34: 454-467.

Exhibit 1

Mr. Taylor also exhibits viscosity, or "stickiness." Viscosity is defined as a clinging quality in relationships. Such viscosity is heightened in patients with left or bilateral electrical dysfunction.[7] Mr. Taylor had difficulty when I ended the interview. This viscosity was noted consistently by other members of the multidisciplinary team. To allow for a smooth transition, we prepared him well in advance, including telling him at the start of the meeting when we would be leaving, then reminded him as the time approached. In spite of this, Mr. Taylor attempted to continue the discussion. He missed the social cues put in place to prepare him for the end of the meeting.

Missing social cues, despite super-sensitivity and emotional reactivity, demonstrates a number of symptoms. First, failing to pick up on social cues shows executive dysfunction. This is primarily a right frontal lobe phenomenon. Second, there is a loss of ego boundaries reflected in Mr. Taylor's misreading of the interview. Loss of ego boundaries is related to impaired autobiographical memory, another temporal lobe skill. When autobiographical memory is not adequately developed neurologically, children do not learn where the limits of boundaries are. It becomes difficult to determine where they end, and the boundaries of others begin. This deficit is found in persons with a vulnerability to psychosis. Loss of boundaries of oneself is, understandably, frightening, leading to a sense of not being complete. This led to Mr. Taylor to becoming irritable and emotionally labile. It ended with Mr. Taylor having a poor understanding of what had appeared to be a positive, informative discussion.

### Post-Traumatic Stress Disorder

Post-Traumatic Stress Disorder is defined by the DSM-V as follows:

> Criterion A: exposure to one or more event(s) that involved death or threatened death, actual or threatened serious injury, or threatened sexual violation. In addition, these events were experienced in one or more of the following ways:
>
> - Experience of the event
> - Witnessing the event as it occurred to someone else
> - Learning about an event where a close relative or friend experienced an actual or threatened violent or accidental death
> - Experiencing repeated exposure to distressing details of an event
>
> Criterion B: experience of at least one of the following intrusive symptoms associated with the traumatic event:
>
> - Unexpected or expected reoccurring, involuntary, and intrusive upsetting memories of the traumatic event

---

[7] Rao, V. & Lyketsos, C. (2002) "Psychiatric Aspects of Traumatic Brain Injury" *Psychiatric Clinics of North America* 25 (1): 43-69.

Exhibit 1

- Repeated upsetting dreams where the content of the dreams is related to the traumatic event
- The experience of some type of dissociation (for example, flashbacks) where the sensations is as though the traumatic event is happening again
- Strong and persistent distress upon exposure to cues that are either inside or outside of the body that are connected to the traumatic event
- Strong bodily reactions (for example, increased heart rate) upon exposure to a reminder of the traumatic event

Criterion C: Frequent avoidance of reminders associated with the traumatic event, as demonstrated by one of the following:

- Avoidance of thoughts, feelings, or physical sensations that bring up memories of the traumatic event
- Avoidance of people, places, conversations, activities, objects, or situations that bring up memories of the traumatic event

Criterion D: At least two of the following negative changes in thoughts and mood that occurred or worsened following the experience of the traumatic event:

- The inability to remember an important aspect of the traumatic event
- Persistent and elevated negative evaluations about self, others, or the world
- Elevated self-blame or blame of others about the cause or consequence of a traumatic event
- A negative emotional state (for example, shame, anger, or fear) that is pervasive
- Loss of interest in activities
- Feeling detached from others
- The inability to experience positive emotions (for example, happiness, love, joy)

Criterion E: At least two of the following changes in arousal that started or worsened following the experience of a traumatic event:

- Irritability or aggressive behavior
- Impulsive or self-destructive behavior
- hypervigilance
- Heightened startle response
- Difficulty concentrating
- Problems sleeping

Criterion F: The above symptoms last for more than one month.

Criterion G: The symptoms bring about considerable distress and/or interfere greatly regular activity.

Criterion H: The symptoms are not due to a medical condition or some form of substance use.

17

Exhibit 1

Mr. Taylor has the signs of a vigilant, hyper-aroused nervous system, which is symptomatic of a stress disorder.

As a child, Mr. Taylor experienced multiple traumatic stressors, including witnessing gun play both in his neighborhood and in the house he was living in. He was nearly shot by his brother-in-law between the ages of five and seven years of age. (Declarations of Tameka Shepard and Ramon Shepard) His brother shot him with a BB gun when he was ten years old. (Interview by Katherine Porterfield; Declaration of John Taylor II)

There was a history of family violence that Rejon was aware of from an early age, including the domestic murder of an aunt. (Declarations of Johnny Taylor; Lisa Taylor; Walter Taylor; Precious Heflin; Vanessa Heflin) Rejon's father committed a murder. (Declaration of Johnny Taylor) There is also a history of complex childhood trauma experienced by close family members. (Declarations of Saadia Heflin, Vanessa Heflin, and John Taylor). Mr. Taylor's sister, mother, and aunt were all physically attacked. (Declarations of Tameka Shepard, Tayanau Nunez, Tonya Walton, John Taylor). He was also aware that his sister's father was murdered. Her cousin was also killed, again through a suspected murder. (Declaration of Tameka Shepard)

Mr. Taylor was also exposed to domestic violence between his parents. (Declarations of Johnny Taylor, Tameka Shepard, Felisha Gatlin). While attending McNair Middle and High Schools, Rejon was regularly exposed to violence, threats of violence, and disorder (Declarations of Rashard Blackwell, Jessica Jackson Langford, Jovante McCoy, Nedras Moreland, Traketa Taylor, Keashawn Washington, and Interview with Rejon Taylor).

Mr. Taylor was especially vulnerable to traumatic stressors due to his cognitive limitations. Poor ego boundaries also undermined his ability to develop coping mechanisms that would protect him. The comorbidity of loss of ego boundaries and dissociative experiences has had a synergistic effect on his symptomatology. Similarly, mood lability combined with affective dysregulation resulted in hyper-responsiveness, which is consistent with Mr. Taylor's behavior at the time of the offense.

Dissociated experiences are not integrated into the usual sense of self, resulting in discontinuities in conscious awareness.[8] In severe forms of dissociation, disconnection occurs in the usually integrated functions of consciousness, memory, identity, or perception. Clinically, this is termed emotional numbing, and is one of the hallmarks of posttraumatic stress disorder. Dissociation is a survival response. It is not a choice, but rather, a response to developmental trauma, as well as other major mental disorders, executive function difficulties, and frank neurological deficits.

---

[8] *See* Anderson & Alexander, 1996; Frey, 2001; International Society for the Study of Dissociation, 2002; Maldonado, Butler, & Spiegel, 2002; Pascuzzi & Weber, 1997; Rauschenberger & Lynn, 1995; Simeon et al., 2001; Spiegel & Cardeña, 1991; Steinberg et al., 1990, 1993.

Exhibit 1

Finally, it is important to note that the long-term impact on seriously impaired individuals, such as Mr. Taylor is complicated and shaped by comorbid medical, psychiatric, and cognitive symptoms. Any one diagnosis alone fails to capture the synergistic complexity of Mr. Taylor's multiple neuropsychiatric conditions. These conditions worsened one another's effects throughout Mr. Taylor's life and created atypical, more severe behaviors than might occur in singular diagnoses.

## Conclusion

Mr. Taylor has multiple neurological and neuropsychiatric symptoms, including psychosis, delusion, mania, hyper-religiosity, immaturity, dependency, inadequate ego boundaries, and impaired memory. These disorders and impairments include Bipolar Disorder Secondary to a General Medical Condition, i.e., Temporal Lobe Syndrome. The psychiatric manifestations of temporal lobe syndrome are grandiosity, unusual spiritual beliefs, suicidal tendencies, unstable emotions, altered or hyper sexual drive, hypergraphia, viscosity, obsessionalism, circumstantiality and paranoid tendencies. These symptoms are associated with neurological disorders. Mr. Taylor also suffers from Post Traumatic Stress Disorder given the cumulative effect of Mr. Taylor's impairments combined with the history of childhood neglect and trauma reported in the social history. The synergistic effect of these two syndromes resulted in an overall impairment significantly more disability than the solitary effect of each impairment. The multiplicity of symptoms explains Mr. Taylor's atypical presentation and behavioral dysfunction. The etiology of these disorders is complex and interconnected, creating a depth of impaired functioning and disruptive behavior greater than would be predicted from any one disorder independently.

Mr. Taylor's history of exposure to traumatic events documented in the biopsychosocial evaluation by Hope Hill, Ph.D., and explicated by Katherine Porterfield, Ph.D., along with his physiological impairments primed him for a post-traumatic triggering in response to the gunshot fired by his co-defendant at the victim in this case. Mr. Taylor's reaction at the scene of the crime as described in the government's investigatory reports is consistent with a reflexive, traumatological response to the sudden firing of his co-defendant's weapon inside the van. The reports all indicate that Mr. Taylor fired suddenly while driving — resulting in the vehicle crashing off the road, an indication that his response was reflexive. Given Mr. Taylor's neurological impairments, his history of traumatic exposure to guns and gun violence, and the descriptions of his actions and response, it is my opinion that his actions were impulsive, trauma-driven, and the result of the combined effect of that trauma on his impaired neurological functioning.

Further, Mr. Taylor's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law were significantly impaired at the time of his crime. As discussed, above, the synergistic effect of his impairments rendered him highly reactive – particularly to gun violence. His impulsive reaction was both the result of his post-traumatic triggering and the result of his impaired perceptions of reality. He committed the offense while under the severe mental disturbance of both of these syndromes.

Exhibit 1

Mr. Taylor's limitations rendered him incompetent to stand trial – his "impaired sense of reality substantially undermine[d] his judgment and prevent[d] him from cooperating rationally with his lawyer." *Lafferty v. Cook*, 949 F. 2d 1546, 1551 (10th Cir. 1991); *Dusky v. United States*, 80 S.Ct. 788 (1960).

Thank you for the opportunity to evaluate Mr. Taylor. I will continue to work with his legal team and review materials as they become available. I reserve the right to modify my opinions based on new information.

George W. Woods, M.D.

Exhibit 1

## REFERENCES

Bear, D.M., Fedio P. Quantitative analysis of inter-ictal behavior in temporal lobe epilepsy. *Arch Neurol* 1977; 34: 454-467

Berkovic, S. F., McIntosh, A., et al. (1996). Familial temporal lobe epilepsy: A common disorder identified in twins. *Annals of Neurology,* 40 (2): 227-235.

Engdahl, B., Leuthold, A. C., et al. (2010). Post-traumatic stress disorder: A right temporal lobe syndrome? *Journal of Neural Engineering,* 7(6): 066005.

Garcia-Rill, E. (1997). Disorders of the reticular activating system. *Medical Hypotheses,* 49 (5):379-387.

Joseph, R. (1999). Frontal lobe psychopathology: Mania, depression, confabulation, catatonia, perseveration, obsessive compulsions, and schizophrenia. *Psychiatry,* 62(2): 138-172.

Kopelman, M. D. (2002). Disorders of memory. *Brain : A Journal of Neurology,* 125(Pt 10): 2152-2190.

Monaco, F., A. Cavanna, et al. (2005). Obsessionality, obsessive–compulsive disorder, and temporal lobe epilepsy. *Epilepsy & Behavior,* 7(3): 491-496.

Sachdev, P. (1998). Schizophrenia-like psychosis and epilepsy: the status of the association. *The American Journal of Psychiatry,* 155(3): 325-336.

Spitzer, C., Barnow, S., et al. (2009). Trauma, posttraumatic stress disorder, and physical illness: Findings from the general population. *Psychosomatic Medicine,* 71(9): 1012-1017.

Wakusawa, K., Sugiura, M., et al. (2007). Comprehension of implicit meanings in social situations involving irony: a functional MRI study. *NeuroImage,* 37(4): 1417-1426.

Woods, G. W. Freeman, D., Greenspan, S. (2012). Neurobehavioral assessment in forensic practice. *International Journal of Law and Psychiatry.*