Exhibit 5

## DECLARATION OF LESLIE CORY

I, **Leslie Cory**, a resident of Hamilton County, Tennessee, being of lawful age declare as follows:

1. I am an attorney licensed to practice in the state of Tennessee since 2002.

2. Prior to law school, I spent 13 years working as a federal probation officer and two and a half years as a state parole officer.

3. In late 2004, I began to assist trial counsel on Rejon Taylor's case. At that time, I was renting an office from Bill Ortwein, who was lead counsel. Bill began asking me to do various assignments, primarily legal research. As the case progressed, Magistrate Carter suggested that I be formally appointed as associate counsel.

4. At the time I joined the team, the court had appointed Bill Ortwein as lead counsel for Mr. Taylor; Howell Clement was co-counsel. Mr. Ortwein's son, Lee Ortwein, was also appointed. When I was ultimately appointed, I was the fourth attorney, the least experienced person on the team. I had no capital case experience, had never seen a capital sentencing proceeding, and — other than a law school class on capital punishment — had not received any training in capital litigation.

5. Bill, as lead counsel, was in charge of strategy and overseeing the whole case. He dealt with our budget. He was the final say in any decisions about which there was controversy or dissent.

6. Initially Bill and Howell had divided the case conceptually such that Bill was to handle the guilt/innocence phase and Howell was to handle the penalty phase. This division changed over time, but was the initial conception.

7. The team met fairly regularly. Initially, we tried to all physically meet together about once a month. Sometimes it was impractical for everyone to be physically present, so we would conference call with whoever was not present.

8. We also tried to visit with Rejon regularly. Generally, two team members visited with Rejon at a time, but sometimes someone would go alone. We kept each other advised of each client visit.

9. Prior to my joining the case, the team had hired Roy Cooper as the investigator. Bill and Roy went way back; they had worked numerous

1

Exhibit 5

cases together. Roy was Bill's 'go-to' investigator. Roy worked well with Bill. Roy wanted to have control of the investigation. Roy did hire private investigators in Atlanta to assist with some tangential tasks and oversaw the work of those investigators. Late in the case, we hired Trey Aycock to assist Roy with subpoenas for trial and other, similar, tasks.

10. Initially, I attempted to limit my role in Rejon's case. In fact, I tried to stay out of it as much as possible. My role was to research any topic on which Bill wanted information. For example, at one point he asked me to look into sentencing guidelines for non-capital cases with charges like Rejon's. One of my first research assignments was to research Alberto Gonzalez' views and position on the death penalty.

11. I began visiting with Rejon in December 2004. I immediately noted his focus on his faith, including fasting, consecrating himself, and his belief that televangelist Bynum was a prophet.

12. My early impression of Rejon was that he was very frighted and living in an environment over which he had no control. He buddied-up with certain individuals in the jail for protection. He was extremely loyal to his codefendants from the beginning to the end and often expressed his love for them.

13. Rejon had several odd mannerisms, one of which was smiling when he was uncomfortable. Rejon's mother, Reba Taylor, had this in common with Rejon. She smiled all the time. When you said something that you assumed would cause her some distress, she just smiled. She also had this little laugh that she let out if she was feeling really uncomfortable. Rejon was the exact same: It was just how he and his mother responded to uncomfortable situations and conversations and we always made Rejon uncomfortable. Bill, in particular, made Rejon uncomfortable. Rejon did not know how to react or appropriately respond to Bill's forceful personality.

14. Rejon maintained a level of optimism that was irrational. He attributed his positive and light-hearted sentiment to his faith. Rejon believed that God would defend him.

15. In January 2005, I visited Rejon three times – once with Lee Ortwein to check on Rejon's mental state, again by myself to show him photos Roy Cooper had taken of places in Atlanta, and a third time with Howell. Rejon did not recognize the photos of the scene where the crime occurred. Rejon told Howell and me that Rejon had been fasting and had had a most wonderful religious experience. He explained that he was happier than he

2

Exhibit 5

had ever been. I considered these revelations unusual and possibly symptomatic of severe mental illness.

16. At a team meeting in January, we discussed our concern that Rejon might not be competent to stand trial. The team discussed hiring a neuro-radiologist; Lee had contacted Dr. Kessler at Vanderbilt to obtain his information for a request for funding. At some point, Bill decided that we would hire Dr. David Solovey as a mental health expert in the case. Bill assigned each of us to write Dr. Solovey our initial impressions and concerns regarding Rejon. After that January discussion, I do not recall any more team discussion about a neurologist or brain scans. We never hired a neurologist or arranged to have Rejon's brain scanned. Dr. Cunningham later mentioned that had we had brain scans he could have reviewed and incorporated them into his assessment.

17. In my memo for Dr. Solovey, I described Rejon as talkative and focused on obtaining a transcendent state where he was united with Christ and completely free from earthly temptations and concerns. I explained that Rejon focused completely on worship – to the exclusion of petition, confession, intercession, and that he claimed to have been successful at having achieved the transcendent state – each time I saw him he professed a new spiritual discovery that he reported made him more blissful than the last time I had seen him. I explained to Dr. Solovey that Rejon had compared himself to Biblical figures, including Joseph, son of Jacob. Rejon explained that he, like Joseph, had obtained favor with his captors. He viewed himself as persecuted for righteousness by the other inmates. I found it significant that Rejon did not seem to regard his incarceration as persecution, only the mistreatment or ridicule by other inmates. I told Solovey that Rejon believed his incarceration was the best thing that had ever happened to him. I noted that Rejon's knowledge of scripture precluded this religious experience from being solely the product of his incarceration; Rejon could not have learned scripture as well as he clearly knew it in the amount of time he had been in jail.

18. Rejon initially refused to come down to meet with Dr. Solovey, but ultimately acquiesced and met with him. Rejon's current 2255 lawyers recently informed me that Dr. Solovey admitted that he did not engage with Rejon's religious delusions as part of his evaluation. I did not previously know that. The defense team specifically requested Solovey to help us determine the significance of Rejon's delusions and to help us figure out what to do about them. It would have been important to know he did not ask Rejon about them. At the time of trial, I was not familiar with the MacArthur Competency Assessment tool. I did not ask Solovey anything about Rejon's responses to that tool. In fact other than one

3

Exhibit 5

phone call, I do not recall having direct contact with Dr. Solovey about Rejon. Had I known that Rejon responded to the MacArthur with further indication of extreme impairment, I would have pushed the team for additional psychological evaluation. As it was, we discussed requesting funding for a neurological evaluation and for brain scans, but I do not recall us ever seeking that funding.

19. One of my early assignments was putting together all the state laws that deal with when states recognized adulthood for different purposes, including a study of federal law.

20. When we decided that a team member should see Rejon weekly. I agreed to be the person to primarily handle this, though the others continued to visit, sometimes with me and sometimes alone. That continued until mid-2006.

21. In June 2005, Howell and I had a memorable visit with Rejon wherein Rejon explained that God was going to release him in July. Rejon discussed the entire event of the crime/incarceration as the best thing that ever happened to him. I pointed out that his attitude could seem as if he did not care much about the fact Mr. Luck had died. Rejon got up and rushed from the visitation gallery. Howell told me that after I left, Rejon came back, crying, and spoke with Howell some more.

22. In 2005 the team focused on trying to get Rejon to accept a life without possibility of parole offer from the Government. Before the offer, we discussed that we should get his mother and brother on board; we perceived that Rejon was largely guided by his mother and brother. We met with United States Attorney Mattice on July 28, 2005 and he indicated that if Rejon would accept a life sentence that he believed that we could conclude the case. Bill told Mattice that Rejon had psychological difficulties and that getting him to take the offer might require some time. I did not go with Bill and Roy to convey the life offer to Rejon; I did later go in September to Atlanta to visit Rejon's family.

23. In September 2005, after Rejon had told the team that he could not accept the life offer unless God told him to do so, we traveled to Atlanta for a team meeting with Rejon's extended family, hoping to enlist them in helping us reach Rejon. I found the whole thing very disappointing. Bill presented the evidence to the family, explaining why he believed Rejon should accept the plea. Though Bill tried to be clear, he could not get through to them. They never understood why Rejon should plead. They did not realize or understand what the proof was and became angry at all of us. Although a large group of his extended family was present, it

4

Exhibit 5

became clear that only John and Reba had much input into Rejon's thinking. John told us that he believed Rejon was right to want to go to trial because it is better to be dead than to spend life in prison. Reba seemed to believe that Rejon was thinking very clearly and that his desire for a trial was rational. We made no progress in changing these attitudes.

24. In November 2005, our team made a presentation to the local AUSAs attempting to sway them to not seek authorization for death. Howell was in charge of that presentation. Ultimately, we met with Sandy Mattice, Russ Dedrick, and Steven Neff, even though Mattice had been confirmed by the Senate to be a federal court judge.

25. After our presentation, the government announced in February 2006 that they would advise the Committee at the DOJ that the local office did not think death should be authorized. This announcement was made in court and was covered in the news. The team informed Rejon of this fact.

26. In April 2006, our relationship with Rejon suffered a setback following his misguided escape attempt. While Bill, Howell, Lee, and Roy traveled to DC for the presentation to the DOJ, Rejon and three others attempted to escape the jail. Our team did not know of the escape attempt and made the presentation to DOJ based on Rejon's exemplary jail record and the other factors we had prepared. Ultimately, the DOJ lawyers revealed that Rejon had tried to escape, and our team felt humiliated. Once back in Chattanooga, the lawyers tried to regroup, but we were dispirited.

27. Bill believed that the DOJ panel would not have endorsed death except for Rejon's escape attempt. Bill made it clear that his relationship with Rejon had to change. Bill decided that it was time for a new approach with Rejon and he took over handling most of the client visits. For the rest of 2006 and most of 2007, Bill visited Rejon, sometimes accompanied by Roy. Howell and I only visited a couple of times. Bill's idea was to focus Rejon on the facts of the crime and to not allow Rejon to sidetrack discussions by talking about his religious beliefs or his idea that the case would go away.

28. After the escape attempt, Rejon still seemed optimistic, youthful and nonchalant about his defense, but his attitude was not as extreme as it had been. When the idea of the escape had come along, he thought that must be God showing up, it must have been, in his mind, God's mechanism of freeing him. Rejon had placed all his hope in the completely impossible escape plan. As I understood the proof at the time, the escape attempt was very poorly conceived and never would have worked. Rejon's participation in such a plan further underlined his impaired thinking.

5

Exhibit 5

29. The government filed its death notice on June 1, 2006.

30. My assignments progressed to working on motions, including the motion for a bill of particulars and the motion to strike the aggravating circumstances, among others. Then, I began working on some issues with Howell Clements, like the grand jury investigation. Ultimately, I worked on many facets of the case including the jury questionnaire, voir dire, our motion practice, interviewing of mitigation witnesses, and the preparation of the mitigation case.

31. At a status conference in June 2006, the government told us that it might rely on a future dangerousness expert and that it would ask for a mental examination if we intended to rely on a mental condition at sentencing. After that, we began working with Dr. Cunningham and Mr. Aiken.

32. Bill handled the budget almost exclusively but asked me to write the motion for the jury consultant. We desperately needed one but the Sixth Circuit denied us the funding.

33. Howell and I both worked trying to contact Guy Luck's sister in France. We hired translators and sent letters; we hired interpreters and called her attorney. We never managed to contact her directly.

34. The team encountered both discovery and budget problems. As of August 2006 — with a trial date of February 2007, the district court had approved our request for a budget for experts, but the Sixth Circuit had not, which prevented us from hiring experts. The Sixth ultimately cut our budget. The US Attorney's office did not timely comply with discovery, either. We were forced to file motion after motion to require the government to comply with the court's discovery order.

35. When the Sixth Circuit denied our funding for three of our experts, we decided to litigate our entitlement to a future dangerousness expert, particularly where the government had indicated it intended to use one. We discussed all moving to withdraw if the court would not allow us to do our jobs consistent with prevailing professional norms.

36. My mother became ill in 2006 and passed away in November 2006. For almost six months or so, I took hours out of my workday to be with her while she was sick.

37. The team hired Marti Loring as an expert social worker. Dr. Loring repeatedly said that Rejon likely suffered from post-traumatic stress disorder. Her perspective did not gain any traction with the defense team.

6

Exhibit 5

38. Dr. Loring and Dr. Solovey met briefly in January 2007 and indicated they believed that Howell Clement was the best person on the team to get through to Rejon about the plea. Despite this advice, Howell only visited Rejon a handful of times in 2007; most of Rejon's contact with the team in 2007 was with Bill and Roy Cooper.

39. Bill became disenchanted with Dr. Loring. In February 2007, after Dr. Loring had visited with Rejon four times, Bill sent her a letter indicating he wanted her to focus her efforts on Stephanie Belcher, the victim's surviving girlfriend, rather than on Rejon and his family.

40. In December 2007 before the April 2008 trial date, the team discussed that Dr. Solovey needed a comprehensive social history to complete his assessment. Dr.Loring was assigned that task. She indicated that she needed access to Rejon's father in order to complete that job. She and Roy were to visit Johnny Taylor, Sr. and she was to provide the team the social history so that Dr. Solovey's diagnosis could be accurate and complete. Dr. Loring warned the team that Dr. Solovey might not be the appropriate expert for Rejon's case as he did not have sufficient expertise in trauma; she made recommendations of experts we should consider hiring. After this meeting, no one completed a social history and thus the defense team did not provide one to Dr. Solovey. As far as I know, we did not follow up on retaining any additional trauma experts.

41. Bill began focusing on Dr. Mark Cunningham and indicated that Dr. Cunningham would produce the social history rather than Dr. Loring. No one ever produced a comprehensive social history of Rejon's life. When I began working on my part of the penalty phase presentation which was the examination of selected family, friends, and advisors, all I had to go on was my notes from my visits with Rejon's family and conversations with Dr. Loring and Roy Cooper's interview notes of several potential witnesses. (I later asked Dr. Marti Loring to send me her entire work product, but I received only seven pages.).

42. Rejon and his family maintained a 'name it, claim it' faith. This proved to be very unhelpful when we discussed the government's plea offer with Rejon. By the time I made my first trip to visit Rejon's family, they were already angry at Bill. They did not believe that Bill had Rejon's best interest at heart. To the family, they saw that we were appointed by the government and yet it was the government that was trying to take Rejon away. They became more and more frustrated with Bill. The family could not get over his powerful personality; they did not trust Bill or any of the rest of us on the team.

7

Exhibit 5

43. I believe that John told Rejon that he was not a man if he chose to take the plea. John was a negative influence on Rejon.

44. In an attempt to get Rejon to accept the plea, the team had Gary Parker, an African American capital defense attorney from Atlanta come talk to Rejon. We hoped that Parker's advice would help Rejon overcome his need to hear from God what to do. Parker not only met with Rejon, he spoke to Rejon's mother and brother as well. Bill told us that Parker said that he found Rejon's mother to be "crazy." Rejon wanted to continue to talk to Parker, but after we lost Parker we did not find another African American to help us bridge the cultural and racial divide between Rejon and our team.

45. In November 2007, the government agreed that they would not use evidence out of Guy Luck's house at trial. At a pretrial hearing in front of Magistrate Carter, AUSA Poole said the government would not be using the police report found in Guy Luck's house. However at trial, the government produced a photograph of the document and the court admitted it. We were caught off guard.

46. Largely at my request, AUSA Neff met with Rejon and Bill in January 2008 to try to convey to Rejon the strength of the government's case so that Rejon would take the plea offer more seriously. Rejon later told me that he could not take Steve Neff seriously, because he said Rejon needed to confess but Neff had been unwilling to admit anything he, Neff, had done wrong. Rejon indicated that after Neff talked with Rejon about the need to accept responsibility, Rejon wanted to testify.

47. In 2008, I contacted one of Rejon's spiritual role models, Pastor Rick Joyner. He was somewhat of a celebrity minister. I worked with Steve Neff to make it possible for Pastor Joyner to call Rejon on my cell phone in the Hamilton County Jail. I read up on Pastor Joyner, and, while I did not necessarily approve of his theology, I thought he could talk to Rejon and convince him to take the plea. Rejon said that if Joyner told him to do so, he would accept the plea. I got Joyner on board and Neff set it up for us at the jail. When Rejon got on the phone, he spent the entire time praising the pastor and voicing his disbelief that he was talking to a semi-celebrity. Rejon was beside himself that this famous person would take time out of his day to talk to him. They never got around to having a conversation about the plea – Rejon was so distracted by talking to Joyner. Rejon told me after the call that he still wanted to go to trial, unless Pastor Joyner's congregation's prayers changed his mind. In conversations with the team after this, Rejon maintained that he

8

Exhibit 5

understood he would be found guilty (and therefore receive no less than a life sentence) but continued to insist that he wanted to go to trial (thereby risking a death verdict). Rejon continued to insist that God was going to deliver him. As late as March 2008, Rejon expressed confusion about the jury's inability to sentence him to less than life if he were convicted, despite the team's repeated explanations. In April 2008, Rejon naively expressed confusion over the fact that the jury might sentence him to death even if he told them everything that happened. He said he wanted to go to trial so that God could decide everything. He continued to say that he had nothing to lose by going to trial because no jury would sentence him to death.

48. In February 2008, Rejon told the team that he wanted to testify at trial as to what had happened. The team discussed with Rejon that his version of the facts was a confession to the crime. Rejon was confused by this discussion. He said he had not thought of this. The team was at a loss on how to deal with Rejon's continued confusion about these simple concepts that we had explained to him numerous times.

49. In March 2008, the Court postponed the April 2008 trial date due to complications from Bill's back surgery in February 2008. Bill was only able to participate in our work by phone for a couple months following his surgery and his participation was limited. Additionally, Roy Cooper's wife was ill during this time and died from cancer. We brought Trey Aycock on as an investigator to cover tasks that Roy could not.

50. Also, in May 2008 the team noted that Rejon was asking the same questions over and over of each team member. We decided that he was testing to make sure we were all on the same page. We did not address this as a possible symptom of mental illness, cognitive dysfunction, an inability to understand, or a combination of any of these things.

51. As we neared the beginning of trial, Bill assigned additional last minute jobs. We were running out of time for preparation. Dr. Cunningham came to Atlanta to interview Rejon's family, but did so in less than two days. Dr. Cunningham did not permit me to listen to his interviews, but I spoke with each family member after they were finished speaking to him. My purpose in conducting these interviews was to assess each family members' value as a potential witness.

52. I did not know that Stephanie Belcher made a statement to Marti Loring and Roy Cooper regarding a Black male in his 40s who had been stalking Guy Luck. Had I known about this fact, I would have tried to develop this information.

9

Exhibit 5

53. Kevin McNally, of the Death Penalty Resource Counsel, worked with our team on several issues. He invested a lot of time in a couple of things that Judge Collier disregarded. He wrote a very long affidavit about one issue, but Judge Collier asked how he was supposed to know who Kevin McNally was.

54. Dr. Mark Cunningham presented academic and theoretical research to the jury in the form of graphs and similar visual aids. Bill liked that type of demonstrative evidence and wanted it to come in. However, Judge Collier severely limited Dr. Cunningham's testimony. Judge Collier announced in front of the jury that Dr. Cunningham was not an expert. The defense team had not anticipated the extent to which the Court would limit Dr. Cunningham's testimony and as a result we were unable to overcome the damage.

55. Bill subpoenaed Rejon's immediate family because he did not trust them to behave in court. Bill had visions of the family whispering to one another inappropriately. At one point Judge Collier called on one of us to tell certain individuals in the audience to quiet down. He was talking about Rejon's niece and nephew. While Bill subpoenaed John, Reba, Tameka, he did not tell them that he had no plan to call them as witnesses. The result was that Rejon did not have his closest family in the courtroom with him during trial. Some extended family members and friends sat outside of the courtroom, and that became an issue. The jurors voiced concern about the people sitting outside that they had to pass by each day. Rejon's friends and family were just sitting, in a nonthreatening way, in the hallway. It was obvious who they were because Rejon's family is black and almost everyone else involved in the case was white.

56. There were some contradictions between portrayals of Rejon in the various parts of the trial. At guilt/innocence, Bill wanted the jury to see Rejon as a hapless victim of circumstance. It was my understanding that at sentencing, I was supposed to communicate that Rejon was a sympathetic figure with redeeming qualities who had a family who loved him. I did nothing to back up Dr. Cunningham's testimony and in fact, may have limited it. Dr. Cunningham could not criticize the testifying family members. The contradictions between Dr. Cunningham's portrayal of Rejon's background and my portrayal of it were never resolved.

57. There were things that I did really well at trial, and then others that I should have done better. I learned as I went along. For example when we got into the controversy over the jurors' exposure to news reports between the guilt/innocence and penalty phases, no one else on the team knew

10

Exhibit 5

what a *Remmer* hearing was. I took responsibility for developing that aspect of the litigation. Bill and Howell both had significant capital trial experience at the state level, but neither had tried a federal capital case.

58. I was in charge of preparing Rejon to make his allocution. I met with him repeatedly. It was difficult for Rejon to focus on this task. His statement became quite elaborate. On the day that he was going to read his allocution, he did not bring his notes to court. He announced that he was not going to speak. It took some convincing, but I talked him into speaking. I wondered why I could not find my co-counsel to help me deal with this issue, given how important it was and how high the stakes were. When Rejon agreed to address the jury, I told him that I would send for his notes, but he was adamant, he did not want to see his notes. When it was time for Rejon to make his statement, he was overcome with stage fright. He rambled on in a disjointed way; any composure he had fell apart.

59. Rejon's tendency to smile or laugh in an uncomfortable situation hurt him during the trial. He was having regular telephone conversations with family. During one call, his sister Tameka made a comment about the victim, Guy Luck, having lived the American dream. Rejon made light of the comment, tittering at/with his sister. I recognized his nervous laugh and knew that he was not laughing in a malicious or remorseless way, which is how the government later portrayed it. To me, since I knew him, it sounded like Rejon did not want to make Tameka feel awkward, so he laughed and went along. We never discussed presenting evidence to the jury to explain Rejon's reaction to nervousness or uncomfortable situations.

60. At trial, I was concerned that Bill's health was impairing his performance. After his surgery, Bill turned over most of the individual voir dire to Lee and other issues to me, things I believe he had anticipated handling personally prior to his surgery. I thought he was trying to preserve his energy to make it through the whole trial. Lee and I contributed as much as we could to the court proceeding so that Bill could conserve his strength, but neither of us had capital experience. Both Bill and Howell had some hearing problems, and Howell made several references in open court to not have "caught" a comment or discussion, indicating he was having trouble hearing.

61. The U.S. Attorneys kept the plea on the table right up to near the end of the trial.

11

Exhibit 5

62. Bill had a plan for Paul Cross to take over as lead counsel in Rejon's direct appeal. This did not happen. At the end of sentencing, Judge Collier asked Rejon if he wanted me or Lee to remain as appellate co-counsel. Rejon chose me. Judge Collier then conferred with Beth Ford regarding appropriate new counsel for the appeal and she put forth Barry Fisher's name. I ended up doing most of the post trial work, such as the motion for new trial and related matters, alone.

63. Bill retired after Rejon's trial, and Lee and I went into business together. We ran an LLC for several years but have had little contact since we dissolved the LLC in October 2013.

64. Kevin McNally attended some of the trial and showed up after we lost at the 2009 hearing where I questioned the alternate juror. The alternate juror had made a statement to the media after the trial that I asked to explore in connection with the motion for new trial. I was not properly prepared and got almost nothing helpful out of the juror.

65. One of the first things that Barry did when he was appointed was to obtain Rejon's birth certificate. This is something the trial team recognized as needed but failed to do.

66. One of the saddest memories that I have of Rejon is hearing about when he was taken on a bus from the Hamilton County Jail to Atlanta. As he related, during that ride, he passed one of the houses where he had lived as a child. Seeing that house made him so happy. Something like that would have made anyone else depressed, but for Rejon, seeing a place he once called home on his way to death row was a happy thing.

67. The first time that Rejon ever flew on an airplane was on his way to death row. He was so glad to have been able to fly.

68. After Rejon got to death row, he described the windows in the cells in Terre Haute. The windows are frosted, but half an inch or so around the edges is unfrosted and he can see outside clearly if he turns his head just right. This excited Rejon. That is typical of Rejon, seeing the good thing he wants to see in a situation rather than the bad.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States of America on April 23, 2019.

_Leslie Cory_
Leslie Cory

12